No. 13-30315
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

IN RE: DEEPWATER HORIZON

LAKE EUGENIE LAND & DEVELOPMENT, INC., ET AL., INDIVIDUALLY
AND ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY
SITUATED,
*Plaintiffs–Appellees*,
*v.*
BP EXPLORATION & PRODUCTION INC., BP AMERICA PRODUCTION
COMPANY, and BP P.L.C.,
*Defendants–Appellants*.
_____

On Appeal from the United States District Court
for the Eastern District of Louisiana
MDL No. 2179, Civ. A. No. 12-970

**OPPOSITION OF THE PLAINTIFF CLASS TO BP'S EMERGENCY
MOTION FOR AN INJUNCTION AND STAY PENDING APPEAL**

Stephen J. Herman
Herman, Herman & Katz LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: sherman@hhklawfirm.com
*Lead Class Counsel*

James Parkerson Roy
Domengeaux, Wright, Roy, &
  Edwards LLC
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com
*Lead Class Counsel*

(*caption continued*)

Samuel Issacharoff
40 Washington Square South, 411J
New York, NY 10012
Telephone: (212) 998-6580
E-Mail: si13@nyu.edu
*Counsel on the Brief*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

JURISDICTION.................................................................................3

STANDARD OF REVIEW ..................................................................4

    I.    The District Court Did Not Abuse Its Discretion in Denying the
Injunction........................................................................................6

        A.    BP Fails to Establish that the Settlement Agreement
Supports its Interpretation of the Compensation
Framework. ..............................................................................6

        B.    The Plain Language of the Settlement Agreement is
Consistent with the Understanding of All Parties Before,
During, and After Final Approval of the Class
Settlement...............................................................................13

    II.    BP Has Failed to Show Irreparable Harm by Failing to Identify
Any Alternative Contract Interpretation. ..........................................19

CONCLUSION ..................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Apache Corp. v. W & T Offshore, Inc.*,
  626 F.3d 789 (5th Cir. 2010) ..................................................11

*Astarte Shipping Co. v. Allied Steel & Export Serv.*,
  767 F.2d 86 (5th Cir. 1985) ....................................................4

*Beacon Theatres v. Westover*,
  359 U.S. 500 (1959)...................................................................20

*Chembulk Trading LLC v. Chemex Ltd.*,
  393 F.3d 550 (5th Cir.2004) ......................................................12

*Corbitt v. Diamond M. Drilling Co.*,
  654 F.2d 329 (5th Cir. 1981) .....................................................11

*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir. 1977) .................................................2, 5

*Ehrheart v. Verizon Wireless*,
  609 F.3d 590 (3d Cir. 2010) ......................................................13

*Evans v. Jeff D.*,
  475 U.S. 717 (1986)...................................................................2

*Guidry v. Halliburton Geophysical Servs*,
  976 F.2d 938 (5th Cir. 1992) .....................................................19

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
  396 F.3d 922 (8th Cir. 2005) ...................................................1

*Kincade v. Gen. Tire & Rubber Co.*,
  716 F.2d 319 (5th Cir. 1983) .....................................................12

*Lakedreams v. Taylor*,
  932 F.2d 1103 (5th Cir.1991) ....................................................3

*Langbecker v. Elec. Data Sys. Corp.*,
  476 F.3d 299 (5th Cir.2007) ......................................................5

*McMahon Found v. Amerada Hess Corp.*,
  98 Fed. Appx. 267 (5th Cir. 2004)..............................................4

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*MS Tabea Schiffahrtsgesellschaft MBH & Co. KG v. Bd. of
Commr's of Port of N.O.,*
636 F.3d 161 (5th Cir. 2011) ...................................................................4

*Newby v. Enron Corp.,*
394 F.3d 296 (5th Cir. 2004) ..................................................................5

*Reed v. City of Arlington,*
650 F.3d 571 (5th Cir. 2011) ................................................................17

*Reed v. Gen. Motors Corp.,*
703 F.2d 170 (5th Cir. 1983) ..................................................................2

*Siebert v. Great N. Dev. Co.,*
494 F.2d 510 (5th Cir.1974) ..................................................................3

*Sonnier v. Crain,*
613 F.3d 436 (5th Cir. 2010) ..................................................................5

*Sullivan v. DB, Investments, Inc.,*
667 F.3d 273 (3d Cir. 2011) ...................................................................2

*Tex. Med. Providers Performing Abortion Servs. v. Lakey,*
667 F.3d 570 (5th Cir. 2012) ...............................................................2, 3

*Thibodeaux v. Vamos Oil & Gas Co.,*
487 F.3d 288 (5th Cir. 2007) ..................................................................4

*White v. Carlucci,*
862 F.2d 1209 (5th Cir. 1989) ............................................................ 5, 20

**STATUTES**

28 U.S.C. §§ 1292 (a)(1) & (3) .............................................................3, 4

**RULES**

Fed. R. Civ. P. 23(e)..............................................................................2

**TREATISES**

RESTATEMENT (Second) OF CONTRACTS §203(a) & Comment b ...........................12

## INTRODUCTION

Pending before this Court are various appeals from the district court's final approval of the class settlements of economic and medical claims arising from the Deepwater Horizon oil spill.  This is not one of them.

Instead, this is an appeal taken from the refusal of the district court to enjoin the operation of its own settlement program on the motion of appellant BP.  BP's motion for emergency relief in this Court concerns the application of only one provision of the telephone-book sized Economic and Property Damages Settlement Agreement between BP and the plaintiff class to which the district court granted full approval on December 21, 2012 ("Agreement").  At issue is the formula for objective calculation of compensable losses for a subset of what are termed "Business Economic Loss" ("BEL") claims.

There is no question of class certification presented, nor any issue of law concerning the scope of the class settlement.  As a satisfied party, BP moved for the preliminary and final approval of the Settlement Agreement and took no appeal from any aspect of the underlying class settlement approval and implementation of the settlement program.

Two principles govern this appeal.  First, the dispute is narrowly contractual: "a class action settlement is a private contract negotiated between the parties." *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 934 (8th Cir. 2005).

1

The settlement "is not an adjudication of the merits of the members' claims." *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 338 (3d Cir. 2011). Class settlements compromise, rather than subject to trial, the disputes between class members and defendants: "the very purpose of the compromise is to avoid the expense and delay of such a trial." *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) (quoting *Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971)). The power to approve a class action settlement does not give courts the power to alter the agreement: "Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed." *Evans v. Jeff D.,* 475 U.S. 717, 726 (1986).[1]

Second, "a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion on all four requirements.'"[2] *Tex. Med. Providers Performing Abortion Servs. v. Lakey,* 667 F.3d 570, 574 (5th Cir. 2012). As Class Counsel demonstrated below, BP satisfies none of them. Most centrally, an "absence of

---

[1] That is why, while the district court "may make suggestions to the parties for modification of a proposal," it is not "free to delete, modify or substitute certain provisions of the settlement." *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977).

[2] "To be entitled to a preliminary injunction, the applicant(s) must show (1) a substantial likelihood that [they] will prevail on the merits, (2) a substantial threat that [they] will suffer irreparable injury if the injunction is not granted, (3) [their] substantial injury outweighs the threatened harm to the party whom [they] seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Tex. Med. Providers,* 667 F.3d at 574 (citing *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 252-53 (5th Cir. 2009)).

likelihood of success on the merits is sufficient to make the district court's grant of a preliminary injunction improvident as a matter of law." *Id.* at 574. Undergirding these requirements is the logical principle that the party seeking such extraordinary relief articulate, clearly and precisely, the legitimate objective it claims the relief will preserve as a meaningful remedy. Neither here nor in the district court has BP managed to articulate the precise terms or operation of a compensation formula that it now seeks to substitute for the provisions in the Agreement.

## JURISDICTION

BP's application for a stay fails to address the jurisdictional basis for this Court's review. Its various notices of appeal invoke 28 U.S.C. §§ 1292 (a)(1) & (3). It is not clear that either is a suitable basis for jurisdiction, as the requested injunction is not based on the underlying merits of the class claims against BP for the *Deepwater Horizon* spill. The district court's April 5th decision is not a final decision and the order is not appealable under Section 1292(a)(1) "as the requested injunctive relief is unrelated to the substantive issues of the litigation." *Siebert v. Great N. Dev. Co.,* 494 F.2d 510, 511 (5th Cir. 1974). *See also Lakedreams v. Taylor,* 932 F.2d 1103, 1107 (5th Cir. 1991).

Similarly, Section 1292(a)(3) operates in tandem with Section 1292(a)(1) in that there needs to be a judgment on the merits determination. *Thibodeaux v. Vamos Oil & Gas Co.,* 487 F.3d 288, 292 (5th Cir. 2007) ("Orders which do not

determine the parties' substantive rights or liabilities are not appealable under 28 U.S.C.S. §1292(a)(3), even if those orders have important procedural consequences."); *MS Tabea Schiffahrtsgesellschaft MBH & Co. KG v. Bd. of Commr's of Port of N.O.,* 636 F.3d 161, 165 (5th Cir. 2011); *Astarte Shipping Co. v. Allied Steel & Export Serv.,* 767 F.2d 86, 88 (5th Cir. 1985) (interlocutory appeals in maritime cases are only appealable if the order determined the rights and obligations of the parties on the merits of the litigation).[3]

## STANDARD OF REVIEW

The standard to be applied by the district court is "stringent," and this Court reviews whether the familiar four requirements are all met "for an abuse of discretion." *Sonnier v. Crain*, 613 F.3d 436, 440 (5th Cir. 2010) (citing, *inter alia*, *Brown v. Chote*, 411 U.S. 452, 457 (1973)).[4]

As the district court noted in the April 5, 2013 hearing, BP appeared to be asking the district court to "enjoin itself." *Transcript of April 5, 2013 Hearing*, at 14, attached as Appendix "A". A district court decision to approve a class action settlement agreement is likewise reviewed for abuse of discretion. *See, e.g.,*

---

[3] *See also McMahon Found. v. Amerada Hess Corp.*, 98 Fed. Appx. 267, 269 (5th Cir. 2004) (unpublished) in which the appeal of an order denying a motion to enforce the terms of a class action settlement was dismissed because the order denying it was not a final appealable order: it did not resolve the rights and liabilities of all parties to the settlement.

[4] This Court "will reverse the denial of a preliminary injunction only under extraordinary circumstances." The decision lies within the trial court's sound discretion, and may be reversed "only by a showing of abuse of discretion." This Court may not simply substitute its "judgment for the trial court's, else that court's announced discretion would be meaningless." *White v. Carlucci,* 862 F. 2d 1209, 1211 (5th Cir. 1989) (affirming denial of preliminary injunction).

*Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 306 (5th Cir. 2007); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). The same standard applies "without regard to whether [the appellate court is] reviewing the facial reasonableness of the settlement terms or the factual sufficiency of the record underlying them." *Newby v. Enron Corp.*, 394 F.3d 296, 308 (5th Cir. 2004).

In this case, the parties have contracted for an internal dispute resolution system to handle challenges to specific awards made by the settlement Claims Administrator. *See Deepwater Horizon* Economic and Property Damages Settlement Agreement As Amended on May 2, 2012, (Exhibit D to BP's Motion), at ¶¶ 6.1.2.2., *et seq* (setting forth claims process and internal appeal board procedures). The parties vested specific discretionary authority in the district court for disputes arising from decisions of the internal appeals panel: "The Court maintains the discretionary right to review any Appeal determination to consider whether the determination was in compliance with the Agreement." *Id.* at ¶ 6.6.

Further, the Agreement grants the district court "continuing and exclusive jurisdiction over the Parties and their Counsel for the purpose of enforcing, implementing, and interpreting this Agreement." *Id.* at ¶ 18.1. *See also,* ¶¶ 4.3.1, 4.3.4 and 38.40 Even assuming this Court has jurisdiction over appeals from such determinations, the standard of review by agreement of the parties must be at the

very least the abuse of discretion standard that governs normal preliminary injunction, class certification, and settlement approval decisions, if not higher.

## I.    The District Court Did Not Abuse Its Discretion in Denying the Injunction.

### A.    BP Fails to Establish that the Settlement Agreement Supports its Interpretation of the Compensation Framework.

Underlying this appeal is a straightforward matter of contract interpretation. BP now challenges the methodology which has always been used by the independent claims administrator, Patrick Juneau, to calculate BEL losses for some businesses that keep their business records on a cash flow basis and that have seasonal or other variations in revenues or expenses.  As the district court properly found, BP's repeated recent, post-settlement approval efforts to challenge the BEL calculations are accompanied by an ever-expanding array of experts, accountants, lawyers, and economists, each advancing new theories of what the settlement terms should have been. *See* Tr. at 7 ("Seems like every time this matter rears its head again, there are more documents, more exhibits, more declarations that are filed, so it's a growing, living thing it seems.").[5]

The nub of the dispute turns on how to establish the benchmark losses that determine the actual compensation awards for BEL claims.   The Claims

---

[5] *See also* Tr. at 7 ("The Court is very familiar with this issue.  That is probably the biggest understatement I've made in a while.  I have dealt with this issue.  This is at least the third time, fourth time – I'm losing track of how many times I've dealt with this same identical issue, so I do not want to rehash everything that's been said before.").

Administrator correctly interpreted the agreement to provide for an objective comparison of the revenue and expenses recorded during a Claimant-selected "Benchmark" period prior to the spill to the revenue and expenses recorded during those same months after the spill. The trial court considered the issue and agreed with this interpretation, rejecting *three* BP challenges, the latest iteration being BP's request to enjoin the Claims Administrator. *See* Tr. at 9-14 (outlining the procedural history of this issue by the district court).

BP, by contrast, argues that the Agreement should be interpreted to require a subjective "matching" of expenses from outside the Compensation Period to the revenue that is recorded during the relevant time period – with a focus on construction, farming, and professional services. At bottom, the question is whether claims are based on the claimant's customary financial records as kept in the ordinary course of business, or whether there should be some re-working of their financial records under unspecified principles of accountancy. That is the entirety of the dispute.

In order to determine whether BP is likely to prevail on the merits, it would appear elementary to begin with the underlying Agreement. For all the exhibits and arguments marshaled, BP is noticeably quiet on what the Agreement actually says. Under Section 5.3.2.1 of the Agreement, BEL claims are to be handled in the manner provided in Exhibits 4A-7 to the settlement, of which Exhibits 4A, 4B, and

4C set forth the basic requirements for a BEL claim. *Settlement Agreement*, Exhibits 4A, 4B, and 4C, attached *in globo* as Appendix "B".

Exhibit 4A sets out the documentation required for BEL claimants. The basic request is for "[d]ocumentation maintained in the ordinary course of business," ¶ 6(a)(iii). At no point in Exhibit 4A is there any requirement for documents maintained in any fashion other than the normal course of business of that particular claimant. Indeed, claimants are required to provide alongside their submissions to the Claims Administrator their monthly profit and loss statements, ¶ 4 n.5, as well as their 2011 federal tax returns, ¶ 4 n.3. *See also Settlement Agreement*, (Exhibit D to BP's Motion), ¶ 38.38 ("'Contemporaneous' or 'Contemporaneously prepared' records or documentation shall mean documents or other evidence generated or received in the ordinary course of business at or around the time period to which they relate; in the case of financial statements, this shall include all periodic financial statements regularly prepared in the ordinary course of business.").

Exhibit 4B defines the causation requirements for a BEL claim. The causation requirement is specifically linked to the compensation framework that is set out in Exhibit 4C. *See* Ex. 4B at ¶ II(A)(1) n.2. Causation is nothing more than an agreed upon formula between the parties. Once the numbers are run based upon records kept in the ordinary course of business, if the numbers pass the test, then

all losses that are calculated under Exhibit 4C are *presumed* to be caused by the spill. BP's expert CPA clearly articulated this negotiated agreement:

> Once a business meets the causation requirements, for purposes of quantifying causation, all revenue and variable profit declines during the claimant-selected compensation period are presumed to be caused by the spill, with no analysis required to determine whether the declines might have been due, at least in part, to other causes.

*Declaration of Holly Sharp*, at 10, ¶17 [Doc 7114-18] (quoted in BP's Memorandum in Support of Final Approval [Doc 7114-1], at 33).[6]

Accordingly, there can be no "fictitious" losses or "fraudulent" claims by businesses that meet the objective formulas set forth in the Causation and Compensation Frameworks, as BP agreed to define any and all such losses as caused by the spill.

The causation requirements are generally tied to a "V" shaped distribution of total revenues. For example, in the first category involving geographic zones B and C, the "V" is established by first "a decline of 8.5% or more in total revenues over a period of three consecutive months between May-December 2010 [immediately after the BP oil spill] compared *to the same months* in the Benchmark Period *selected by the claimant*," and then "an increase in the

---

[6] Another bedrock principle, to which BP expressly agreed, is contained within Section 4.3.8 of the Settlement Agreement, which directs the Claims Administrator and the Program Vendors to evaluate and process claims to produce the "*greatest*" Economic Damage Compensation Amount. (*See also,* ¶ 4.3.7.)

aggregate of 5% or more in total revenues **over the same period** of three consecutive months in 2011 compared to 2010." Ex. 4B at ¶ II (A)(1) & (2). All of the categories for V-shaped and Modified V-Shaped revenue patterns track this same language, with only the depth of the "V" altered. The V-shaped revenue patterns defined under Exhibit 4B entitle the claimant to receive compensation.

Exhibit 4C, which defines the Compensation for BEL claims, follows directly from Exhibit 4B. In the definitions section of 4C, both the compensation and benchmark periods are specified to be chosen by the claimant, ¶ 1, although no further definition is given. In one of the only provisions that BP does quote, the Step 1 function on p. 1 of 4C, the Agreement speaks of the reduction in profit between the compensation period and the "comparable months" of the benchmark period. For BP, this invites a long disquisition on why "comparable" months does not mean the "same" months, even though the Agreement speaks in terms of the "same months" in defining causation in 4B.

BP imports references to academic treatises and dictionaries, which is contrary to maritime law rules of contract interpretation: "a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous." *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332-33 (5th Cir. 1981).

Indeed, BP's entire argument hinges on making the word "comparable" somehow ambiguous by displaying it in splendid isolation from the Agreement. As with the definitional contortion of the word "comparable," BP is forced to make the difficult argument that "corresponding" expenses refers, not to the expenses recorded during those same months, but to the revenue. Ex. 4C at 2; *Motion* at 10-11. This would require, under a methodology that BP has never specified to the district court or this Court, the subjective application of purported accounting principles that are contrary to the express terms of the Agreement.

In place of a contractual argument, BP provides an astonishing array of parole evidence dressed up as expert opinions on what might have been intended. But the post-hoc opinions of these experts are irrelevant to the contractual language as a whole, as this Court has well recognized: "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole . . . ." *Apache Corp. v. W & T Offshore, Inc.,* 626 F.3d 789, 794 (5th Cir. 2010) (quoting and applying Louisiana law to a maritime dispute). This is as true of a class action settlement agreement as any other contract: the agreement must be read as a whole to reveal the parties' intent. *Kincade v. Gen. Tire & Rubber Co.*, 716 F.2d 319, 321 (5th Cir. 1983). Further, the Court should "interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous." *Chembulk*

11

*Trading LLC v. Chemex Ltd.,* 393 F.3d 550, 555 (5th Cir. 2004);[7] RESTATEMENT (Second) OF CONTRACTS §203(a) & Comment b.

The use of objective formulas to establish both eligibility for BEL compensation and the formula for such compensation is no accident. One of the major complaints about the predecessor Gulf Coast Claims Facility, and one of the reasons it failed to achieve the global resolution necessary to BP, was precisely its use of subjective methodologies that were nontransparent and incomprehensible to the claimants. The parties' settlement approval submissions, and the district court's preliminary and final settlement approval decisions address the intent of the settlement to solve this problem:

> The Settlement Program calculates awards using public, transparent frameworks that apply standardized formulas derived from generally accepted and common methodologies. This level of transparency permits class members to understand how their claims will be evaluated under the Settlement. It also ensures that similarly situated class members are treated similarly. The Settlement Program employs specialists in a variety of fields to ensure that awards are calculated accurately, and internal audits further ensure accuracy.

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, MDL 2179, 2012 WL 6652608, at *4 (12/21/12) (order granting final approval).

---

[7] Moreover, the fact that a party disputes the meaning of a contract term does not by itself make the contract ambiguous. *Chembulk*, 393 F.3d at 554.

BP acknowledged as much in a submission to the Claims Administrator in which BP argued that claimants were required to use their actual monthly profit and loss statements, and could not simply average from annuals or quarterlies:

> One of the cornerstones of the Settlement Agreement is the use of transparent, objective, data-driven methodologies designed to apply clearly-defined standards to a claimant's contemporaneously-maintained financial data submitted in compliance with documentation requirements. These methodologies and requirements were carefully negotiated by the parties and are set forth in the Settlement Agreement as mandatory requirements. Among other reasons, these methodologies and requirements were negotiated in response to concerns voiced by some that the prior GCCF process was too dependent on accounting judgments that were not transparent.

> [T]he Settlement Agreement does not allow for the use of professional judgment or discretion as a substitute for expressly articulated standards or requirements . . . .

> [B]ecause the claimant's actual monthly results are the foundation for the causation and compensation evaluations under the BEL framework, use of allocated proxy rather than actual data could severely distort the resulting outcomes.[8]

### B.    The Plain Language of the Settlement Agreement is Consistent with the Understanding of All Parties Before, During, and After Final Approval of the Class Settlement.

Contrary to BP's contention, the issue before this Court is not an abstract evaluation of purported accounting principles, but the agreement reached by the parties.   Buyer's remorse does not alter the deal that was struck. *Ehrheart v. Verizon Wireless,* 609 F.3d 590, 594-96 (3d Cir. 2010) (finding post-agreement

---

[8] *Letter from BP Counsel, Mark Holstein, to the Claims Administrator, Patrick Juneau* (Sept. 28, 2012) (re "Sept. 25th Policy Announcements") [Rec. Doc. 8963-68], at 2.

changes do not alter enforceability of class action agreement).  The record shows that until the recent, post-final approval efforts of BP to upend the BEL awards, there was no uncertainty about the calculation of BEL compensation.  At all times, the parties understood that the use of the three-month comparisons would be beneficial to claimants and that the clear settlement formula obviated any other proof of causation in the class action settlement.  A few examples from the record make this clear.

First, on February 17, 2012, before preliminary settlement approval, the lead negotiator for BP sent an email to the lead negotiators for the plaintiff class summarizing the terms of the agreement. *See Memo via E-Mail from Richard Godfrey to Joseph Rice and Calvin Fayard* (Feb. 17, 2012) [Rec. Doc. 8963-58]. The memo is specific with regard to how "to compare the actual financial results during the defined loss period measured against the profit that the claimant might have or should have been expected to earn in *the comparable post-spill period of 2010*." *Id.* at No. 3.  As set out in the memo, "The word '*comparable*' and the phrase '*comparable months*' is used throughout the document in the context of comparing the months selected by the Claimant in 2010 to compare *against the same months* in the Benchmark Period." *Id.*

The district court found this memo and others like it to be credible evidence of the intent of the parties. *See* March 5, 2013 Order [Rec. Doc. 8812], at 2-5.  The

14

district court thus found that the Settlement Agreement did not support a reading of "matching" or "smoothing" variable profit; that such a reading would not create absurd results; and that BP's own counsel understood that variable profit would generally not be "matched" or "smoothed". *Id.*

Further, the Claims Administrator prepared a training powerpoint that instructed that "for both Benchmark and Compensation Periods" the variable profits would be calculated by the "[s]um of monthly revenue minus variable expenses from revenue *over the same time period*." *See* Rec. Doc. 8963-63. Mr. Juneau testified at the fairness hearing that this presentation was provided to BP, which not only registered no objection, but also tested the models to determine that they properly captured the intent of the parties. *See* Tr. at 83.

The Compensation Framework, as applied by the Claims Administrator, was touted by BP's own experts as a basis for the district court's approval of the settlement. James Henley, a forensic accountant, emphasized that the "transparency and objectivity" of customary business records "assures that claimants can understand how their claims can be treated under the framework." *Declaration of James Henley*, [Rec. Doc. 7114-11], at 18.

Professor James Richardson, an economist from Louisiana State University, recognized that: "The Business Economic Loss Frameworks compare the actual profit of the business during a defined post-spill period of their choice in 2010 to

the profit the claimant might have expected to earn in ***the same post-spill period.***" *Declaration of James Richardson*, [Rec. Doc. 7114-17], at 20; *see also Declaration of Holly Sharp, CPA*, [Rec. Doc. 7114-18], at 10 ("[t]he Compensation Period is three or more months from May through December 2010, selected by the business claimant, ***and these same months*** are used for the Benchmark Period.").

As Professor John Coffee of Columbia Law School (the settling parties' joint expert) attested, having been asked to analyze the settlement on behalf of both BP and the class, "this is not ordinary litigation, but rather a negotiated resolution of a broad program of social remediation and rehabilitation." *Declaration of John C. Coffee, Jr.*, [Rec. Doc. 7110-3], at 33, 35. The object "is not simply the compensation of plaintiffs, but the economic and social rehabilitation of the Gulf Coast areas affected by the Deepwater Horizon disaster." *Id.*

Having secured class member acceptance of the settlement so presented, for the purpose of judicial approval, BP cannot now escape its contractual obligations. Moreover, having sought and obtained such court approval of the class settlement, BP is judicially estopped from altering the terms under which it secured favorable court relief. *See Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (en banc) (affirming role of judicial estoppel as equitable doctrine used to prevent

16

assertions of inconsistent litigation positions that would give a party an unfair advantage).

Perhaps most telling is the fact that the position that now causes BP feigned surprise was apparent even to outside parties. For example, Halliburton objected to the settlement and sought to distance itself from any joint liability for the settlement terms. It proffered a declaration filed in opposition to the settlement by Dr. Marc Vellrath, a forensic economist, who attacked the settlement for allegedly overcompensating plaintiffs.[9] *See Declaration of Dr. Marc Vellrath*, *In re Oil Spill, Objections to Settlement*, Docket No. 10-cv-7777, Rec. Doc. 91-2. According to the report, "The ability for similar claimants to provide different proofs also suggests that the Frameworks may compensate claimants that would not otherwise be able to establish through a formal analysis of economic harm that they suffered damages caused by the DWH Incident." *Id*. at 65. In particular, Dr. Vellrath gave examples of what BP today calls "egregiously distorted awards" and identified the exact same methodology that is today the source of BP's claimed need for emergency injunctive relief. *Id.* at 61.

Further, during both the test period of the settlement protocols and subsequently, BP knew that the settlement formula yielded precisely the types of

---

[9] It is important to recognize, in this regard, that BEL claimants do not compete with each other for limited proceeds. BEL compensation is uncapped. All BEL claimants receive the full amount of their claims as calculated under the provisions of the Agreement.

"spikes" in revenue that BP is now observing in, for example, construction, agriculture and professional claims.    For example, Test Case No. 72 was a construction claim.  Not only did BP not suggest, during the testing period, that the Compensation Framework had been misapplied, but BP did not appeal the actual award and payment made by the Settlement Program on this claim.  *See Declaration of John Tomlinson* (Feb. 18, 2013) (with summaries of Test Cases Nos. 13, 20, 71 and 72) [Rec. Doc. 8963-86]; *Declaration of Robert Wallace*, [Rec. Doc. 8963-84], ¶ 5.[10]

The district court's March 5th Order framed the exact issue that is raised in BP's new motion:   "[T]he Court has re-visited the issue of whether the Claims Administrator has correctly interpreted the Economic and Property Damage Settlement Agreement as it applies to the calculation of 'Variable Profit' for Business Economic Loss Claims."   March 5, 2013 Order, [Rec. Doc. 8812], at 1, attached as Appendix "C".   The district court re-re-visited BP's arguments on April 5, 2013, considering the additional materials and declarations BP prepared, but again found no basis in the argument to stay the claims program in favor of

---

[10] It is somewhat bewildering how one of the largest corporations in the world, with its nationally renowned law firms and teams of industry leading experts, now claims that it could have not foreseen that businesses in northern Alabama were going to file a claim, when BP intentionally desired and agreed to include the entire state of Alabama is the settlement.  BP could have, but did not, limit the class geography.  BP could have, but did not, insist upon the exclusion of construction, agricultural or professional service businesses.  BP could have, but did not, attempt to place a limit or cap on the total Business Economic Loss payouts.

substituting a claims methodology that BP could not yet articulate. Tr. at 23. The district court thus three times fully considered, and three times denied, the same arguments BP presents here. The district court reviewed and considered the Settlement Agreement thoroughly at the preliminary and final approval stages, has held three hearings at which the provisions of the agreement were discussed, and has given its detailed attention to BP's recent request for a new and as-yet-unarticulated BEL claims calculation methodology. As this Court has written, "[w]here the interpretation of a settlement agreement turns on an evaluation of extrinsic evidence, a district court's findings deserve great deference. This is especially true in cases where the court has been intimately involved in the process." *Guidry v. Halliburton Geophysical Servs,* 976 F.2d 938, 941 (5th Cir. 1992).

## II.    BP Has Failed to Show Irreparable Harm by Failing to Identify Any Alternative Contract Interpretation.

BP is wrong on the merits. For that reason alone, no injunctive relief should issue. But in addition, BP cannot satisfy the preliminary injunctive requirement that it show irreparable injury. In order to determine the risk of injury, this Court must be able to determine the magnitude of the harm relative to BP's proposed correction. As the district court found, however, BP has offered only a moving target of undefined and ever-changing criteria that are impractical, subjective,

inconsistent, and non-transparent.  Tr. 23-24.[11]  Even on appeal to this Court, BP has yet to identify how a proper resolution of a claim *should* be handled.  Thus, while BP offers the same three examples of "egregious awards" that it has presented time and again to the district court, *Motion* at 16, 17, at no point does BP tell this Court (nor did it tell the court below) what the proper award should be for these businesses.  Absent an alternative methodology that can be explained and rooted in the controlling Settlement Agreement, BP is simply complaining of the consequences of its own doing.

Accordingly, the district court did not err in refusing to enjoin the operation of the settlement claims administration program.  To the contrary, a preliminary injunction issued without specific findings as to the irreparable injury would have been an abuse of the equitable powers of the court.  *See Beacon Theatres v. Westover*, 359 U.S. 500, 506-507 (1959) (requiring specificity of proof of injury for equitable injunction); *White v. Carlucci*, 862 F.2d at 1212 (5th Cir. 1989) (citing *Sampson v. Murray*, 415 U.S. 61 (1974)).

---

[11] At oral argument, the Court recognized, and BP conceded, that BP's proposed methodology is not traditional accrual accounting or cash accounting – the two primary accounting methods – but, rather, "some amorphous standard."  Tr. at 24.

**Conclusion**

For the above and foregoing reasons, BP's request for emergency relief and a preliminary injunction should be denied.

This <u>17th</u> day of <u>April</u>, <u>2013</u>.

Respectfully submitted,

<table>
<tr>
<td>

   /s/  Stephen J. Herman       

**Stephen J. Herman**, La. Bar No. 23129
**HERMAN HERMAN & KATZ LLC**
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: sherman@hhklawfirm.com
*Lead Class Counsel*

</td>
<td>

   /s/ James Parkerson Roy       

**James Parkerson Roy**, La. Bar No.11511
**DOMENGEAUX WRIGHT ROY &**
**EDWARDS LLC**
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com
*Lead Class Counsel*

Samuel Issacharoff
40 Washington Square South, 411J
New York, NY 10012
Telephone: (212) 998-6580
E-Mail: si13@nyu.edu
*Counsel on the Brief*

</td>
</tr>
</table>

## ECONOMIC & PROPERTY DAMAGES CLASS COUNSEL

Brian H. Barr
LEVIN, PAPANTONIO
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER &
IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU &
SOUTH, LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

23

## **CERTIFICATE OF ELECTRONIC COMPLIANCE**

I hereby certify that that, on April 17, 2013, this Opposition to Emergency Motion for a Stay and Injunction Pending Appeal was transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit through the Court's CM/ECF document filing system, https://ecf.ca5.uscourts.gov.   I further certify that required privacy redactions have been made pursuant to this Court's Rule 25.2.13.

/s/ Stephen J. Herman and James Parkerson Roy

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 17, 2013, an electronic copy of the foregoing Opposition to Emergency Motion for a Stay and Injunction Pending Appeal was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system.

I further certify that service will be accomplished by the appellate CM/ECF system and by commercial carrier for next-day delivery on the following counsel:

Theodore B. Olson
Miguel A. Estrada
Thomas G. Hungar
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

George H. Brown
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304
(650) 849-5339

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
R. Chris Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

S. Gene Fendler
Don K. Haycraft
R. Keith Jarrett
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139
(504) 581-7979

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 662-5985

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
(202) 942-5000

Jeffrey Lennard
Keith Moskowitz
DENTONS
233 South Wacker Drive
Suite 7800
Chicago, IL 60606
(312) 876-8000

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX 77079
(281) 366-2000

*Attorneys for BP Exploration & Production Inc., BP America Production Company, and BP p.l.c.*

Richard C. Stanley
Jennifer L. Thornton
Gina M. Palermo
Patrick H. Fourroux
STANLEY, REUTER, ROSS,
THORNTON & ALFORD, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, LA 70112
(504) 523-1580

Patrick A. Juneau
Claims Administrator of the Deep-water
Horizon Court Supervised Settlement
Program

*Additional Interested Parties*

/s/ Stephen J. Herman and James Parkerson Roy

26

# APPENDIX
# "A"

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

     ****************************************************************
 3

     IN RE:  OIL SPILL BY THE            Docket No. MDL-2179
 4   OIL RIG DEEPWATER HORIZON           New Orleans, Louisiana
     IN THE GULF OF MEXICO ON            Friday, April 5, 2013
 5   APRIL 20, 2010

 6   ****************************************************************
     BON SECOUR FISHERIES, INC.
 7
                                         Docket No. 12-CV-970
 8   VS.                                 Section "J"
                                         New Orleans, Louisiana
 9                                       Friday, April 5, 2013
     BP EXPLORATION & PRODUCTION,
10   INC, ET AL
     ****************************************************************
11   BP EXPLORATION & PRODUCTION,
     INC, ET AL
12                                       Docket No. 13-CV-492
     VS.                                 Section "J"
13                                       New Orleans, Louisiana
                                         Friday, April 5, 2013
14   DEEPWATER HORIZON COURT
     SUPERVISED SETTLEMENT PROGRAM, ET AL
15   ****************************************************************

16
                     TRANSCRIPT OF MOTION PROCEEDINGS
17          HEARD BEFORE THE HONORABLE CARL J. BARBIER
                     UNITED STATES DISTRICT JUDGE
18

19   APPEARANCES:

20   FOR THE PLAINTIFFS:            HERMAN, HERMAN, KATZ & COTLAR, LLP
                                    BY:  STEPHEN J. HERMAN, ESQ.
21                                       SOREN GISELSON, ESQ.
                                    820 O'Keefe Avenue
22                                  New Orleans, LA 70113

23                                  DOMENGEAUX, WRIGHT, ROY & EDWARDS
                                    BY:  JAMES P. ROY, ESQ.
24                                  P. O. BOX 3668
                                    556 JEFFERSON ST.
25                                  LAFAYETTE, LA 70502-3668
```

```
 1                              LEWIS KULLMAN STERBCOW & ABRAMSON
                                BY:  PAUL M. STERBCOW, ESQ.
 2                              601 POYDRAS STREET, SUITE 2615
                                NEW ORLEANS, LA 70130
 3
                                IRPINO LAW FIRM
 4                              BY:  ANTHONY IRPINO, ESQ.
                                2216 Magazine St.
 5                              New Orleans, LA 70130

 6                              WILLIAMS LAW GROUP
                                BY:  CONRAD "DUKE" WILLIAMS, ESQ.
 7                              435 Corporate Drive, Suite 101
                                Maison Grand Caillou
 8                              Houma, LA 70360

 9                              BREIT DRESCHER IMPREVENTO & WALKER
                                BY:  JEFFREY A. BREIT, ESQ.
10                              1000 Dominion Tower
                                999 Waterside Drive
11                              Norfolk, VA 23510

12                              CUNNINGHAM BOUNDS, LLC
                                BY:  ROBERT T. CUNNINGHAM, ESQ.
13                              1601 Dauphin St.
                                Mobile, AB 33604
14
                                WILLIAMSON & RUSNAK
15                              BY:  JIMMY WILLIAMSON, ESQ.
                                4310 Yoakum Blvd.
16                              Houston, TX 77006

17                              MOTLEY RICE
                                BY JOSEPH D. RICE, ESQ.
18                              28 Bridgeside Blvd.
                                Mount Pleasant, SC 29464
19
                                BRADLEY, MURCHISON, KELLY & SHEA
20                              BY:  JOEL A. RICE, ESQ.
                                401 Edwards St., 10th Floor
21                              Shreveport, LA 71101

22                              FAYARD & HONEYCUTT
                                BY:  CALVIN C. FAYARD, JR., ESQ.
23                              519 Florida Ave., SW
                                Denham Springs, LA 70726
24

25
```

```
 1                                OLDFATHER LAW FIRM
                                 BY:  ANN B. OLDFATHER, ESQ.
 2                               1330 South Third St.
                                 Louisville, KY 40208
 3

 4   FOR THE STATE OF ALABAMA:    ATTORNEY GENERAL OF ALABAMA
                                 BY:  COREY L. MAZE, ESQ.
 5                               500 Dexter Ave.
                                 Montgomery, AB 36130
 6

 7   FOR BP EXPLORATION &
     PRODUCTION INC., ET AT:      KIRKLAND & ELLIS
 8                               BY:  RICHARD C. GODFREY, ESQ.
                                      ANDREW B. BLOOMER, ESQ.
 9                               300 N. LaSalle
                                 Chicago, IL 60654
10
                                 LISKOW & LEWIS
11                               BY:  S. GENE FENDLER, ESQ.
                                      R. KEITH JARRETT, ESQ.
12                               One Shell Square, Suite 5000
                                 701 Poydras St.
13                               New Orleans, LA 70139

14                               KIRKLAND & ELLIS
                                 BY:  JEFFREY B. CLARK, ESQ.
15                               655 Fifteenth St., N.W.
                                 Washington, D.C. 20005
16
                                 DENTONS US
17                               BY:  JEFFREY LENNARD, ESQ.
                                 7800 Sears Tower
18                               233 South Wacker Dr.
                                 Chicago, IL 60606
19

20
     FOR PATRICK JUNEAU AND DEEPWATER
21   HORIZON COURT SUPERVISED
     SETTLEMENT PROGRAM:          STANLEY, REUTER, ROSS,
22                               THORNTON & ALFORD
                                 BY:  RICHARD C. STANLEY, ESQ.
23                                    JENNIFER L. THORNTON, ESQ.
                                 909 Poydras St., Suite 2500
24                               LL&E Tower
                                 New Orleans, LA 70112
25
```

4

OFFICIAL COURT REPORTER:        Karen A. Ibos, CRR, RMR, CCR
                                500 Poydras St., Room HB-406
                                New Orleans, LA 70130
                                (504) 589-7776
                                Karen_ibos@laed.uscourts.gov


Proceedings recorded by mechanical stenography.  Transcript
produced by computer.

09:34:24  1

2                        P R O C E E D I N G S

3                      (FRIDAY, APRIL 5, 2013)

4                        (MOTION PROCEEDINGS)

5

6

7          (OPEN COURT.)

09:34:24  8              THE DEPUTY CLERK:  All rise.

09:34:26  9              THE COURT:  All right.  Please be seated, everyone.

09:34:29 10    Okay.  Call this matter, Stephanie.

09:34:32 11              THE DEPUTY CLERK:  MDL 10-2179, *In re:  Oil spill by the*

09:34:37 12    *oil rig Deepwater Horizon in the Gulf of Mexico on April 20th,*

09:34:41 13    *2010;* Civil Action 12-970, *Bon Secour Fisheries, Incorporated,*

09:34:48 14    *et al., versus BP Exploration and Production, Incorporated, et al.;*

09:34:52 15    Civil Action 13-492, *BP Exploration and Production, Incorporated*

09:34:58 16    *et al., versus Deepwater Horizon Court Supervised Settlement*

09:35:02 17    *Program, et al.*

09:35:04 18              THE COURT:  All right.  Counsel, make your appearances,

09:35:07 19    please.

09:35:09 20              MR. GODFREY:  Richard Godfrey on behalf of BP.  With me

09:35:13 21    is Andrew Bloomer, Jeff Clark, Keith Jarrett, Jeff Lennard, and the

09:35:20 22    Gene Fendler.

09:35:20 23              THE COURT:  Are you going to be doing the argument,

09:35:22 24    Mr. Godfrey?

09:35:22 25              MR GODFREY:  Yes, sir.

09:35:24 1          MR. HERMAN:  Steve Herman for the class, and with me is

09:35:27 2  most of the PSC class counsel I believe.

09:35:30 3          THE COURT:  And you will be doing the argument,

09:35:31 4  Mr. Herman?

09:35:33 5          MR. HERMAN:  Yes, Your Honor.

09:35:33 6          THE COURT:  Okay.  Thanks.

09:35:34 7          MR STANLEY:  Good morning, Your Honor.  Rick Stanley and

09:35:36 8  Jennifer Thornton here for Pat Juneau and the settlement program.

09:35:40 9          THE COURT:  Okay.  Thank you.

09:35:47 10          All right.  Looks like we have several matters before the

09:35:52 11  Court this morning, but they're all really related.  First, as I

09:35:59 12  see it, there is a motion -- BP filed a motion in the Bon Secour

09:36:10 13  class action case, which is Civil Action 12-970.  BP has filed a

09:36:18 14  motion for preliminary injunction against Mr. Juneau in his

09:36:24 15  official capacity as the claims administrator and against the

09:36:28 16  settlement program itself, seeking to enjoin Mr. Juneau from

09:36:38 17  interpreting the business economic loss claim provisions in the

09:36:55 18  settlement in the manner in which he has interpreted them.

09:37:03 19          Second motion, the second matter is a completely new

09:37:08 20  lawsuit filed by BP, 13-492, which is *BP, et cetera, versus*

09:37:17 21  *Deepwater Horizon Court Supervised Settlement Program, et al.,*

09:37:23 22  which essentially is, as I see, is duplicative of the Motion For

09:37:31 23  Preliminary Injunction.  In fact, it asks for the identical

09:37:34 24  injunctive relief as I see it.  So they're really one and the same,

09:37:38 25  although they're filed in two different matters.

09:37:41  1          And then, thirdly, we have a Motion to Dismiss filed by

09:37:50  2     the defendants in 13-492, motion filed by Mr. Juneau as claims

09:37:57  3     administrator and by the settlement program, a Rule 12(b)(6) Motion

09:38:03  4     to Dismiss for Failure to State a Claim.

09:38:06  5          Finally, the economic and property damage class,

09:38:11  6     represented by class counsel here today, have formally intervened

09:38:19  7     in the new lawsuit as defendants in 13-492 and everyone, obviously,

09:38:28  8     all of those parties, each of those parties have filed pleadings,

09:38:34  9     memoranda, and so forth either in support or opposition to these

09:38:38  10    matters.

09:38:40  11         The Court is very familiar with this issue.  That is

09:38:46  12    probably the biggest understatement I've made in a while.  I have

09:38:49  13    dealt with this issue.  This is at least the third time, fourth

09:38:52  14    time -- I'm losing track of how many times I've dealt with this

09:38:55  15    same identical issue, so I do not want to rehash everything that's

09:38:59  16    been said before.

09:39:02  17         I have gone through what you all have filed, which is

09:39:05  18    voluminous, and that's a grand understatement in itself.  Seems

09:39:11  19    like every time this matter rears its head again, there are more

09:39:16  20    documents, more exhibits, more declarations that are filed, so it's

09:39:20  21    a growing, living thing, it seems.  And I don't know when or what

09:39:29  22    it's going to take to finally resolve it, but I want to finally

09:39:32  23    resolve it here today.

09:39:34  24         So with that said, Mr. Godfrey, I will hear from you.  I

09:39:38  25    would like to talk about the Motion to Dismiss because I think that

09:39:42  1    precedes your Motion For Preliminary Injunction.  I am going to

09:39:45  2    give each side 20 minutes, by the way, so it's now 20 minutes to

09:39:51  3    ten, Mr. Godfrey

09:39:52  4            MR GODFREY:  Thank you, Your Honor, and I deeply

09:39:54  5    appreciate the Court's taking the time to visit this issue.  I know

09:39:56  6    the Court has spent a great deal of time on it.  I would like to

09:40:00  7    try to reserve three minutes, but we'll see how it goes.

09:40:01  8            THE COURT:  You can do that if you would like.

09:40:04  9            MR GODFREY:  Thank you.

09:40:04  10           THE COURT:  Just have someone on your side keep count for

09:40:09  11   you.

09:40:09  12           MR GODFREY:  Mr. Lennard will keep the count.

09:40:12  13           THE COURT:  I don't have a clock up here.  It's not like

09:40:14  14   a Court of Appeal.  We are in sequestration.  I doubt they will

09:40:19  15   give me a clock.  The one I have up here, my batteries are dead, I

09:40:24  16   think.

09:40:24  17           MR GODFREY:  I can't solve that problem, Your Honor.

09:40:25  18           The Court knows we have two motions for preliminary

09:40:28  19   injunction.  The Court is intimately familiar with the issue.  I

09:40:30  20   would like to step back and see if we can find common ground, a

09:40:34  21   spot where perhaps we can all agree and then see whether, if we

09:40:36  22   agree on that spot, that has implications for whether or not BP

09:40:41  23   should be granted the relief that we seek.

09:40:44  24           Assume that a business prepares, a business claimant

09:40:48  25   prepares monthly financials in the ordinary course --

09:40:53  1    THE COURT:  Well, Mr. Godfrey, I'm sorry.  I really want

09:40:55  2  you to talk about the Motion to Dismiss first because I think that

09:40:59  3  has to precede everything else.

09:41:00  4    MR GODFREY:  Well, that -- the most --

09:41:02  5    THE COURT:  I want to know why I should not -- I want to

09:41:05  6  hear from you why I should not grant the Motion to Dismiss filed by

09:41:10  7  Mr. Juneau and the program.

09:41:14  8    MR GODFREY:  Well, number one, I don't think that he is

09:41:16  9  entitled to judicial immunity.  We laid that out in our brief.  He

09:41:20 10  is not a judicial officer.  He is not a special master.  So the

09:41:23 11  first argument that they raise is there's judicial immunity.  We've

09:41:25 12  laid out in our brief that he is not entitled to judicial immunity,

09:41:29 13  he is not exercising a judicial function.  He is not appointed

09:41:32 14  pursuant to Rule --

09:41:33 15    THE COURT:  Let me ask you about that.  I want to think

09:41:36 16  about the practical implications of what you're saying.  Despite

09:41:41 17  the fact that I know this settlement was negotiated over a long

09:41:46 18  period of time, I think about a year as I recall, and resulted in

09:41:52 19  a, roughly 1,000-page document that spelled out in great detail the

09:42:00 20  settlement agreement program, as with anything that you put in

09:42:04 21  writing, whether it be a statute, a regulation or a contract, there

09:42:16 22  will from time to time be disagreements about how that should be

09:42:19 23  interpreted or applied.  Do you agree with that?

09:42:21 24    MR. GODFREY:  That is correct, Your Honor.

09:42:23 25    THE COURT:  If that's the case, who is it in your view

09:42:30  1    that is empowered in this situation, has authority in the

09:42:33  2    circumstance we're in to interpret and decide how that is

09:42:39  3    interpreted and applied?

09:42:40  4         MR. GODFREY:  Your Honor.  And Your Honor alone is

09:42:45  5    empowered to interpret it because it's a question of law in terms

09:42:45  6    of contract interpretation.  Mr. Juneau is to implement, not

09:42:49  7    interpret.

09:42:50  8         THE COURT:  Okay.  But somebody has to do it in the first

09:42:52  9    instance before it gets -- not every question comes to me

09:42:54  10   immediately.  You agree with that?

09:42:55  11        MR. GODFREY:  I would agree with that, Your Honor.

09:42:57  12        THE COURT:  So it seems to me what happened in this case

09:42:59  13   is pretty clear and pretty simple, not that the issue may not be

09:43:06  14   simple, but the -- procedurally is pretty simple in that there was

09:43:11  15   a disagreement at some point, at some point BP came to the

09:43:18  16   conclusion that they believed Mr. Juneau was and his staff were

09:43:30  17   wrongly interpreting the business economic claim matrix, I'll call

09:43:34  18   it.  Is that accurate?

09:43:35  19        MR. GODFREY:  That is correct.  We reached the conclusion

09:43:37  20   after we started to see awards that we could not reconcile with the

09:43:40  21   data underlying the awards.

09:43:42  22        THE COURT:  Okay.  And you brought that to his attention

09:43:44  23   in some fashion, correct?

09:43:45  24        MR. GODFREY:  We did bring that to his attention.

09:43:47  25        THE COURT:  As a result, he -- actually, and then he

09:43:51  1   heard from both sides in some fashion, invited memoranda, letters,

09:43:56  2   whatever way that was done, correct?

09:43:58  3       MR. GODFREY:  Yes.  By that point in time, hundreds of

09:44:01  4   awards had been made --

09:44:02  5       THE COURT:  That's neither here nor there.  I'm trying to

09:44:05  6   get to procedurally what happened here.

09:44:07  7       MR. GODFREY:  Yes, there was a procedure.  On

09:44:08  8   December 16th, class counsel -- we were engaged in discussions.

09:44:11  9   Class counsel on December the 16th asked for a policy decision, we

09:44:14  10  briefed --

09:44:15  11      THE COURT:  Wait a minute.  You're getting way ahead of

09:44:16  12  me here.

09:44:17  13      MR. GODFREY:  My 20 minutes are short, Your Honor.

09:44:19  14      THE COURT:  So after he heard from both sides where each

09:44:25  15  side could not agree, did not agree on how this should be

09:44:29  16  interpreted or applied, he issued what he calls a policy statement,

09:44:34  17  which apparently there's been a number -- this is not the first

09:44:38  18  "policy statement" issued since the settlement.

09:44:40  19      MR. GODFREY:  That is correct, Your Honor.

09:44:41  20      THE COURT:  BP requested -- or somebody requested -- I

09:44:47  21  don't know if he did it on his own, not that it matters, but

09:44:51  22  somebody requested or invoked the three panel -- three-person panel

09:44:57  23  shortly thereafter, almost immediately thereafter, as I recall.

09:45:00  24      MR. GODFREY:  That is correct, Your Honor.

09:45:01  25      THE COURT:  And the three-person panel is envisioned --

09:45:07  1  designed in the settlement program to be the claims administrator,

09:45:12  2  a representative of class counsel, and a representative of BP,

09:45:16  3  correct?

09:45:16  4        MR. GODFREY:  That is correct, Your Honor.

09:45:17  5        THE COURT:  And the way it's designed to work is they

09:45:19  6  meet, try to see if they can reach consensus, which I know they

09:45:24  7  have in other instances, there have been instances where that has

09:45:27  8  worked in that fashion, correct?

09:45:28  9        MR. GODFREY:  It in general has worked, Your Honor.  It

09:45:31 10  did not in this instance.

09:45:32 11        THE COURT:  Okay.  So after that was done and it didn't

09:45:37 12  result in a consensus, the settlement agreement provides that it

09:45:45 13  then comes up to the Court, whoever is not happy with it can bring

09:45:48 14  it to the attention of the Court, correct?

09:45:50 15        MR. GODFREY:  That is correct, Your Honor.

09:45:51 16        THE COURT:  And you did that?

09:45:52 17        MR. GODFREY:  That is entirely correct, Your Honor.

09:45:54 18        THE COURT:  We had -- this is only the second one we've

09:45:59 19  ever handled like this, that has gotten up to my level at least.

09:46:03 20        MR. GODFREY:  Fortunately, yes, Your Honor.

09:46:05 21        THE COURT:  Although, as I've said, I've now dealt with

09:46:08 22  this multiple times.  But when it comes to me, the procedure that

09:46:12 23  we had used and everyone agreed on is we handled it informally,

09:46:17 24  initially at least.  I met with you all at least twice, right?

09:46:20 25        MR. GODFREY:  The parties --

09:46:21  1          THE COURT:  Once in here and once in my conference room

09:46:23  2     as I recall.

09:46:23  3          MR. GODFREY:  Yes, the parties met with Your Honor twice.

09:46:25  4          THE COURT:  And after the first meeting, I issued an -- I

09:46:29  5     guess I'd call it an informal ruling.  I said I agree with

09:46:33  6     Mr. Juneau's interpretation.  At some point thereafter, you came

09:46:37  7     back and said, "Would you reconsider and vacate your order?"  And I

09:46:44  8     am pretty sure BP -- you or someone, BP, suggested that "We think

09:46:48  9     maybe there is a way to resolve this amicably if you give us time

09:46:53 10     and send us back to talk to a mediator," correct?

09:46:57 11          MR. GODFREY:  Yes.  We went to a mediator and it failed.

09:47:01 12          THE COURT:  So I did that.  I set aside my January 30th,

09:47:05 13     I think it was, informal ruling.  I designated Mr. Dan Balhoff,

09:47:17 14     which both sides as I recall agreed to, who already was a

09:47:21 15     Court-appointed neutral for other purposes, and you all met with

09:47:27 16     him.

09:47:28 17          And at some point within the couple of weeks or so, I got

09:47:31 18     a report from him that he didn't see any way that the parties were

09:47:34 19     going to reach a resolution.  There was no way to amicably resolve

09:47:39 20     it.  Is that fair?

09:47:39 21          MR. GODFREY:  That is a fair statement, Your Honor.

09:47:41 22          THE COURT:  So then it was back in my lap, and I spent, I

09:47:50 23     think, a couple of weeks.  Of course, by this time -- I think I am

09:47:54 24     right -- we had just about started this trial that we've been in

09:47:58 25     now for six weeks, right around that time.

09:48:00  1          MR. GODFREY:  I think the trial started the 25th of

09:48:03  2    February.  I think, yes, that's correct.

09:48:05  3          THE COURT:  Right around that time.  So in the midst of

09:48:08  4    trying to get this trial up and running and doing this, I spent

09:48:13  5    time as I could over the next couple of weeks re-reviewing

09:48:18  6    everything that everybody had submitted, and it, again, was

09:48:21  7    voluminous even back at that time because by this time you all had

09:48:26  8    submitted more documents.

09:48:28  9          Each time this matter has come back up, first in front of

09:48:32  10   Mr. Juneau, then in front of me informally, and then in front of me

09:48:36  11   a second time, the record grows.  So I've reviewed all of that

09:48:41  12   again.  And then I issued my March 5th, 2013, ruling, which is

09:48:50  13   Record Document 8812, where I set out my reasons and my

09:48:58  14   interpretation, my own interpretation of the settlement agreement

09:49:06  15   provisions in question and said that my interpretation agreed with

09:49:12  16   Mr. Juneau's interpretation.

09:49:16  17         So that led us up to -- that's the rough background,

09:49:22  18   quick summary of what has led us to where we are today.  So my

09:49:27  19   question is, I am having a real hard time -- I am just being honest

09:49:34  20   with you, Mr. Godfrey.  I am having a real hard time understanding

09:49:37  21   how BP is now asking me to enjoin Mr. Juneau from following my

09:49:47  22   order.  Basically you're asking me to enjoin myself, it seems to

09:49:53  23   me.

09:49:53  24         MR. GODFREY:  Well, not quite, Your Honor.

09:49:54  25         THE COURT:  Not quite.  I think that would be the effect

09:49:57  1    of it.  How else can I view it?

09:49:59  2         MR. GODFREY:  I think the Court knows we filed a notice

09:50:01  3    of appeal, as I'd indicated in chambers, two weeks ago.

09:50:04  4         THE COURT:  I know that.  Yesterday.

09:50:07  5         MR. GODFREY:  Yes.  And as we've outlined in our papers,

09:50:11  6    the status quo is that awards for large amounts of money to people

09:50:17  7    who had suffered no loss whatsoever --

09:50:20  8         THE COURT:  Well, according to you.

09:50:21  9         MR. GODFREY:  According to --

09:50:23 10         THE COURT:  Not according to the parties who made the

09:50:26 11    claim.

09:50:26 12         MR. GODFREY:  Well, according to the expert declarations

09:50:28 13    on file, they suffered no loss.  What they're getting --

09:50:31 14         THE COURT:  The problem with that argument, as I see it,

09:50:33 15    is whether someone has sustained a loss is defined by the

09:50:38 16    agreement.  And if the plain terms of the agreement says someone

09:50:45 17    has -- passes the causation test and has sustained a loss, then

09:50:49 18    they've sustained a loss, whether you think they sustained a loss

09:50:52 19    in some real sense or other sense, or whether I think.

09:50:55 20         The whole point here, this is not like we're litigating

09:50:59 21    individual claims, and that's what the settlement is intended to

09:51:02 22    avoid.  And it seems to me the fundamental issue -- and I don't

09:51:06 23    want to get too far into the underlying merits today because I

09:51:10 24    don't think we need to go there.  I want to understand:  How is it

09:51:13 25    that you think -- or BP believes that I can enjoin a claims

09:51:20  1    administrator from obeying and following an explicit order of the

09:51:28  2    Court dated March 5th, 2013?

09:51:30  3        MR. GODFREY:  There are two separate bases, Your Honor,

09:51:33  4    and I'll just cover them in the order in which we filed them.

09:51:36  5        As to the preliminary injunction motions themselves --

09:51:39  6    and you're correct that they are seeking identical relief, and I

09:51:42  7    explained in chambers when we went in chambers that it was a

09:51:45  8    belt-and-suspenders based on some guidance that Fifth Circuit

09:51:48  9    precedent had provided.

09:51:49  10       THE COURT:  Seems like this whole exercise is a

09:51:53  11   belt-and-suspenders operation.

09:51:54  12       MR. GODFREY:  Not quite.

09:51:55  13       THE COURT:  Well, what you're really trying to do, it's

09:51:58  14   quite obvious -- there's no subtlety here -- you're trying to get

09:52:03  15   this issue to the Fifth Circuit, and whether you have a right to do

09:52:06  16   that or not and whether they'll review it or not, I have no idea.

09:52:09  17   That's not for me to decide.

09:52:10  18       But I am trying to understand, you know, yesterday you

09:52:14  19   finally, BP filed an appeal from my March 5th order, after 30 days,

09:52:20  20   and now you've asked me to stay my ruling based on your appeal.

09:52:27  21       MR. GODFREY:  That is the second issue, Your Honor.

09:52:28  22       THE COURT:  That's the second issue.  But it's all

09:52:30  23   related because it's essentially the same test that you would have

09:52:34  24   to -- you know, it's essentially an injunction so --

09:52:39  25       MR. GODFREY:  Yes.

09:52:40 1     THE COURT:  -- it's all the same thing.  So we're back --

09:52:42 2 you know, this is all circular here.  We're back to my fundamental

09:52:49 3 problem with what you're doing here, and that is you're either

09:52:52 4 asking me one of two things:  This is either a third motion for me

09:52:55 5 to consider this, second motion for reconsideration, which it

09:53:01 6 essentially is.  That's what you're really asking me to do.  Or if

09:53:05 7 you're not asking me to reconsider and change my mind, then you're

09:53:09 8 asking me to enjoin myself --

09:53:11 9     MR. GODFREY:  No.

09:53:12 10     THE COURT:  -- by enjoining Mr. Juneau.

09:53:14 11     MR. GODFREY:  This is a typical proceeding --

09:53:16 12     THE COURT:  If I enjoin Mr. Juneau, then he is in

09:53:19 13 contempt of my Court order which says he's got to --

09:53:23 14     MR. GODFREY:  No, Your Honor.

09:53:23 15     THE COURT:  And then if I sanction him for that, I think

09:53:26 16 BP would have to pay.  I think you would to have indemnify him,

09:53:30 17 right?

09:53:30 18     MR. GODFREY:  But Your Honor fully understands that we

09:53:33 19 are not asking for that.  What we're doing is we're asking for when

09:53:36 20 a Court rules and a party disagrees with a ruling, it is entitled

09:53:38 21 to seek a preliminary injunction if there is a substantial

09:53:42 22 likelihood of success on the merits that raises a serious question

09:53:44 23 of law according to the *Janus* case in the Fifth Circuit.  That is

09:53:47 24 what we have done.

09:53:48 25     As to the stay motion, that is an independent basis, and

09:53:51  1    it is typical, it is routine in this country in every circuit of

09:53:55  2    this country --

09:53:55  3         THE COURT:  Oh, certainly, you have a right -- well, I'm

09:53:56  4    not going to say you have a right to appeal because I don't know.

09:53:58  5    But if you believe you have a right to appeal, you know, you can

09:54:01  6    take that up with the Circuit.  And then you can ask me to stay my

09:54:05  7    order, and I'll decide whether to stay it or not.  And then if I

09:54:10  8    decide not to stay it, you can take that to the Circuit.  That's

09:54:12  9    how it works.

09:54:13 10         I don't know why we're going through all these other

09:54:16 11    machinations.  It's a pretty simple straightforward way to approach

09:54:16 12    this.

09:54:22 13         MR. GODFREY:  Well, we have asked for a stay and an

09:54:23 14    injunction pending appeal.

09:54:24 15         THE COURT:  I know that.  But that's what not we're here

09:54:27 16    on this morning.  You filed that yesterday.

09:54:29 17         MR. GODFREY:  That's correct, we filed the Notice of

09:54:30 18    Appeal the night before, and here what we were seeking to do is

09:54:32 19    preserve the status quo.  Now, if Your Honor were willing to

09:54:35 20    reconsider it under Rule 62.1, we would embrace that.

09:54:38 21         THE COURT:  Reconsider what?

09:54:39 22         MR. GODFREY:  If you were willing to reconsider.  But we

09:54:42 23    did not see Your Honor as likely to --

09:54:44 24         THE COURT:  Wait.  Reconsider what?

09:54:47 25         MR. GODFREY:  The underlying merits of the dispute.  But

09:54:49  1   we did not see Your Honor as likely --

09:54:49  2          THE COURT:  That would be a second Motion For

09:54:50  3   Reconsideration.

09:54:50  4          MR. GODFREY:  Yes, it would, Your Honor, and we do not

09:54:50  5   see that as likely for Your Honor --

09:54:51  6          THE COURT:  And then you have a tough hurdle there

09:54:53  7   because you have to show the law has changed, the evidence has

09:54:56  8   changed, you have to have not been able to make arguments that

09:54:59  9   you're making now.  And I don't think you can get there under that

09:55:02 10   hurdle.

09:55:02 11          MR. GODFREY:  Well, I understand that, Your Honor, which

09:55:04 12   is why we did not ask that.  I was responding to Your Honor's

09:55:07 13   suggestion about reconsideration.

09:55:07 14          THE COURT:  Okay.

09:55:08 15          MR. GODFREY:  So we narrowly filed this and drafted this

09:55:11 16   based upon our reading that we would be seeking a preliminary

09:55:14 17   injunction, and in addition we -- you know, I indicated in chambers

09:55:18 18   we would probably be filing a notice of appeal.

09:55:20 19          When we sat down for this on emergency hearing, it was

09:55:23 20   with the hope, but we understood that Your Honor obviously had

09:55:26 21   other commitments including the trial in this case, that we would

09:55:29 22   be able to have this heard before that.

09:55:31 23          But we are now here before --

09:55:32 24          THE COURT:  I gave you a pretty expedited hearing

09:55:35 25   considering.

09:55:35  1        MR. GODFREY:  You did.  And I'm not complaining about

09:55:36  2   that, Your Honor.

09:55:37  3        THE COURT:  I mean, I'm going into a seventh week of a

09:55:40  4   trial that you're involved in -- or your client's involved in.

09:55:43  5        MR. GODFREY:  Yes, I am aware of that, Your Honor.  I am

09:55:45  6   across the street every day so I am fully cognizant of that.

09:55:50  7        THE COURT:  All right.

09:55:50  8        MR. GODFREY:  But we are not asking you to enjoin

09:55:52  9   yourself.  What we are asking to is to enjoin the continued

09:55:55 10   implementation of the BEL policy decisions.  We've laid out the

09:55:59 11   irreparable injury, and we do not agree that there are losses as

09:56:03 12   calculated by the agreement.  These are not losses whatsoever.  So

09:56:06 13   Your Honor's indicated you don't want to discuss the merits on that

09:56:09 14   this morning, so...

09:56:09 15        THE COURT:  Well, that may be a dis -- that is a

09:56:12 16   disagreement, obviously.

09:56:13 17        But getting back -- asking a different -- maybe the same

09:56:17 18   question in a different way:  As a matter of law, how can a claims

09:56:24 19   administrator be in breach of his contract if all he is doing is

09:56:32 20   applying it as he believes it should be applied and now as ordered

09:56:37 21   by the Court?  How can that possibly be a breach of contract?

09:56:42 22        MR. GODFREY:  Ultimately, if the Court of Appeals affirms

09:56:44 23   the March 5th order that claims interpretation adopted by the

09:56:52 24   claims administrator and affirmed by this Court that BP is wrong on

09:56:58 25   that, the claims administrator is correct, then it is not a breach

09:57:00  1    of contract and we recognize that.

09:57:02  2          But we are following Fifth Circuit guidance that suggests

09:57:05  3    that when you are seeking to enforce your rights under a settlement

09:57:11  4    agreement, this is a procedure that you should follow.  That's why

09:57:14  5    I said it was a belt-and-suspenders.

09:57:16  6          But you are entirely correct that if the March 5th order

09:57:19  7    is the final word, either by the Court of Appeals or by this Court,

09:57:25  8    that in terms of the BEL policy decisions, then that is the

09:57:29  9    decision which will govern the claims administrator and BP as well.

09:57:33 10          We disagree with the decision respectfully.  We think it

09:57:36 11    rewrites the contract.  We think it awards people who have no

09:57:39 12    losses.  But you're entirely correct, Your Honor, I can't quarrel

09:57:43 13    with the question you've asked.  And we've indicated that in our

09:57:47 14    papers in response.

09:57:48 15          THE COURT:  All right.  Go ahead.  I know I've

09:57:50 16    interrupted you a great deal.  But that's what oral argument is

09:57:55 17    for, for judges to be able to interrupt lawyers.

09:57:57 18          MR. GODFREY:  Your Honor, I actually embrace that because

09:58:00 19    it helps to frame the issue.

09:58:02 20          I would like to ask the question about common ground.  I

09:58:06 21    know Your Honor has considered the merits, but I think, in fairness

09:58:09 22    to the Court, we need to understand what is actually happening in

09:58:14 23    the bowels of the administration.

09:58:15 24          Assume that a business claimant prepares monthly

09:58:20 25    financials that at year-end makes cumulative changes to those

09:58:24 1  financials, finds errors, finds that it had recorded things wrong,

09:58:27 2  makes cumulative errors dated December 31st relating to the earlier

09:58:32 3  periods.  Happens every day.  Nothing wrong about that.

09:58:35 4       Time passes and now that business claimant seeks to make

09:58:38 5  a claim, claim in this settlement.  What financial information

09:58:42 6  should be used to calculate compensation under this agreement?  The

09:58:47 7  correct monthly financials, that is the monthly financials as

09:58:50 8  corrected at year-end, which everyone now knows what those should

09:58:55 9  be, or the monthly financials as prepared originally and as written

09:58:58 10 down, which we now know contained inaccurate, erroneous and even

09:59:01 11 false information?

09:59:02 12      Under the BEL policy decisions at issue, they are using

09:59:07 13 the incorrect data from the monthly financials as recorded, because

09:59:11 14 that's what they're required to do.  So in our declarations we have

09:59:18 15 examples of overbilling that were corrected at year-end.  We have

09:59:24 16 examples of negative revenue that were corrected at year-end.  We

09:59:31 17 have examples of erroneously recorded data that were corrected at

09:59:35 18 quarter or year-end, significant examples of Hall declaration, the

09:59:43 19 Crider declaration, the Finch declaration.

09:59:46 20      On page 26 and 27 of our brief, we outline two specific

09:59:49 21 examples of simple recordation errors where even under the

09:59:54 22 interpretation adopted by the claims administrator, if you use the

09:59:58 23 wrong data, you get the wrong result.  But the administration's

10:00:03 24 interpretation is whatever is recorded at the time is used now,

10:00:08 25 even when claimants point out that it's inaccurate.

10:00:11  1        That's what the declarations before the Courts reflect.

10:00:16  2   It's not a random event.

10:00:18  3        THE COURT:  That's not what we're talking about.  You may

10:00:20  4   have found some cases like that.  I am not saying, you know, when

10:00:23  5   you're talking about tens of thousands of cases.  But I am not

10:00:26  6   talking about the outliers.

10:00:28  7        What you're talking about is not where somebody made

10:00:31  8   mistakes and went back and corrected.  It's a larger issue than

10:00:35  9   that.  You're talking about a -- what this is at bottom is a

10:00:43 10   disagreement over whether revenues -- I am going to call it this,

10:00:46 11   you may have a different term, I know you use a fancy accounting

10:00:49 12   term, but I am calling it you want a smooth revenues and match

10:00:54 13   expenses to revenues, correct?

10:00:55 14        MR. GODFREY:  No.

10:00:56 15        THE COURT:  Well, that's -- I've been dealing with this

10:01:01 16   for months, Mr. Godfrey, and that's the only way I can understand

10:01:03 17   it.

10:01:03 18        MR. GODFREY:  We've never said the word "smooth."

10:01:06 19        THE COURT:  I know you didn't use the word "smoothing,"

10:01:09 20   but that's the effect of it.  You want to smooth out revenues and

10:01:12 21   match revenues -- somehow you want to match expenses.  I mean,

10:01:16 22   somehow you have a theory or a formula -- and I'm not sure what it

10:01:21 23   is because I think it's changed several times, but -- and, in fact,

10:01:24 24   as I recall when we met with you all, you couldn't explain how this

10:01:29 25   would work under BP's proposal.  It was kind of a moving target.

10:01:33 1    But you want to take, somehow take expenses that were

10:01:38 2  incurred in different periods and bring them up and apply it to

10:01:42 3  when the revenue is received under -- would be somewhat similar to

10:01:47 4  accrual accounting, but you're not really using accrual accounting,

10:01:51 5  are you?

10:01:51 6    MR. GODFREY:  Accrual accounting is not required by the

10:01:53 7  agreement, Your Honor.

10:01:54 8    THE COURT:  Right, exactly.  So it's not accrual

10:01:56 9  accounting.  You don't want to use strict cash accounting, which of

10:02:00 10  course a lot of businesses, particularly small businesses, use,

10:02:04 11  including me when I was in business.  You use cash accounting,

10:02:08 12  perfectly legal.  IRS accepts it.

10:02:13 13    So you don't want to use cash accounting -- I mean, you

10:02:16 14  don't want to rely strictly on cash accounting and you don't want

10:02:21 15  to adopt pure accrual or have everybody would have to convert to

10:02:26 16  accrual accounting, and that, as you say, is not required by the

10:02:30 17  agreement.  So there's some animal, I am going to call it, that's

10:02:35 18  somewhere in between there.

10:02:36 19    I don't know what you call it.  I call it smoothing and

10:02:39 20  matching or whatever.  But that's some amorphous standard is what I

10:02:44 21  envision you're proposing.  I know you don't agree with that, but

10:02:47 22  that's the way I am viewing it.

10:02:49 23    So why don't you tell me -- I'm not talking about people

10:02:51 24  that made mistakes and have to correct.  I'm not talking about when

10:02:55 25  people made mistakes.  I'm talking about here's the way they keep

10:02:58  1    the books, here's the way revenues were received, here's the way

10:03:02  2    expenses were incurred or paid, how would you propose to do it?

10:03:07  3        MR. GODFREY:  Your Honor, the language of the contract

10:03:09  4    says, "Sum the monthly revenues over the period and subtract the

10:03:11  5    corresponding variable expenses."  Those terms are well understood

10:03:15  6    by accountants, economists and financial professionals.  Monthly

10:03:18  7    revenue does not equal cash received and recorded in a month.

10:03:21  8        THE COURT:  That's assuming that the agreement called for

10:03:25  9    some standardized, generally accepted accounting methodology such

10:03:29 10    as accrual accounting, but you admit it does not.

10:03:33 11        MR. GODFREY:  No, Your Honor, it does not depend upon

10:03:37 12    accrual accounting.  The treatises all say, "Do not confuse cash

10:03:42 13    receipts with revenue."  If the suggestion is that revenue does not

10:03:46 14    mean what the treatises, the 19 of them that we've put before the

10:03:50 15    Court, the expert declarations mean, it means something else, then

10:03:53 16    it's not defined in the agreement that way.

10:03:55 17        That's a specialized definition that is unknowing to the

10:03:58 18    profession and it leads to absurd results.  You cannot calculate

10:04:02 19    lost profits --

10:04:03 20        THE COURT:  The results are only absurd if -- in your

10:04:08 21    view because you don't agree with how the outcome is coming out and

10:04:15 22    the way it's being interpreted.  But if the program, if the

10:04:20 23    agreement says, "This is how you calculate it," then that's how you

10:04:25 24    calculate it and that's a loss.  It doesn't matter if you would

10:04:28 25    consider it a loss in some other world, in some other sense, to me.

10:04:33  1    That's the way I'm looking at it.

10:04:33  2            MR. GODFREY:  Let me simplify it.

10:04:35  3            THE COURT:  Okay.

10:04:36  4            MR. GODFREY:  This Court found a finding of this Court

10:04:41  5    that the program and the settlement adopts standardized,

10:04:45  6    well-recognized lost profit methodologies.  The terms used in the

10:04:51  7    contract, the five key terms -- revenue, expenses, corresponding,

10:04:59  8    comparable, profits -- have well-recognized and understood

10:05:04  9    definitions.

10:05:04 10            The only way you can determine -- and the stated purpose

10:05:08 11    of the agreement is to determine lost profits.  The only way you

10:05:11 12    can determine lost profits is by recording those terms.  They're

10:05:15 13    recognized and well understood definitions.

10:05:17 14            What the claims administrator has done is adopt unique

10:05:21 15    definitions that are not only rejected by the professions, but

10:05:25 16    cannot possibly meet the stated terms of the contract or satisfy

10:05:29 17    what the Court found in its findings as the parties presented to

10:05:33 18    it, which was standard, well recognized lost profit methodologies.

10:05:37 19            THE COURT:  Well, the claims administrator, Mr. Juneau,

10:05:39 20    is not, you know, is not there by himself in his office.  He has a

10:05:47 21    staff of accountants who works with him and apparently he relies on

10:06:00 22    and has relied on in how he applies this -- these accounting

10:06:11 23    issues, or deals with these accounting issues.

10:06:16 24            And so there are accountants who apparently, just like

10:06:26 25    lawyers, accountants sometimes disagree, amazingly enough, you

10:06:32  1   know.  And, for example, there's a declaration of Mr. Carroll, who

10:06:36  2   I am not sure if he is in Mr. Juneau's office or not, but just for

10:06:41  3   example, but that, you know, disagrees with what you just said.

10:06:53  4   It's not as obvious as what you just said.

10:06:56  5        And secondly, as I recall, there's also something in this

10:07:01  6   record where that this was or should have -- the fact that you

10:07:07  7   would have businesses, certain businesses or professions that would

10:07:12  8   have swings of revenues and expenses up and down from month to

10:07:15  9   month or year to year is not something that would just suddenly be

10:07:20 10   recognized by BP.  That's obvious that that occurs.

10:07:26 11        And this was well-known, this was -- in fact, there's a

10:07:32 12   declaration in here somewhere where that was pointed out while the

10:07:37 13   settlement was being finalized, that this is something that you all

10:07:41 14   might want to look at, and nothing was changed in the settlement

10:07:47 15   agreement apparently.

10:07:47 16        So I have to assume that that is something that was known

10:07:50 17   or should have been known, should have been anticipated.  So that's

10:07:54 18   another question.  But, how is it that BP just came to the

10:07:58 19   realization late last year that this was a problem?

10:08:01 20        MR. GODFREY:  We didn't, Your Honor.  The agreement has a

10:08:03 21   standardized methodology where, depending upon the industry,

10:08:06 22   shouldn't make a difference.  If revenue is properly defined or

10:08:09 23   expenses are properly defined, it shouldn't make a difference.  I

10:08:13 24   am a little bit --

10:08:14 25        THE COURT:  These claims were being -- there was sampling

10:08:19 1   done, there were claims being paid since last summer.  This wasn't

10:08:24 2   raised or pointed out to the Court as a problem when we had our

10:08:27 3   final fairness hearing in November, and it just became a problem in

10:08:32 4   December apparently.

10:08:33 5        MR. GODFREY:  We did not recognize what was taking place

10:08:35 6   in the facility, Your Honor.  The tests that took place in July did

10:08:39 7   not test anything other than assume the data is correct, run it

10:08:43 8   through the systems, and get the same result, as Mr. Crider's

10:08:47 9   declaration, paragraphs 89 through 93.

10:08:50 10        THE COURT:  Well, there are other declarations that

10:08:51 11   disagree with that.

10:08:52 12        MR. GODFREY:  But, Your Honor, let me try to respond to a

10:08:56 13   number of your points.  I've taken up, I think, more than my

10:09:00 14   20 minutes, but I --

10:09:01 15        THE COURT:  I've given you a little extra time.

10:09:03 16        MR. GODFREY:  Thank you.  Point one, the example of the

10:09:07 17   corrections are not outliers.  That is a common, common occurrence

10:09:13 18   in the construction industry in particular.  Those aren't outliers.

10:09:17 19   The failure to adjust or correct for that is a direct result of the

10:09:21 20   wooden adherence to the notion whatever is recorded at the time is

10:09:25 21   used at the time even though we know that the data is incorrect.

10:09:28 22   So that's not an outlier, Your Honor, that's a common occurrence.

10:09:33 23        Number two:  The leading accounting professor in this

10:09:35 24   country, Roman Weil, and we submitted his declaration, he points

10:09:39 25   out that the interpretation that leads to this doesn't produce a

10:09:43  1  variable profit analysis.  And you would say, well,

10:09:46  2  "Mr. Godfrey" --

10:09:46  3         THE COURT:  Is that one of the new declarations that you

10:09:48  4  submitted?

10:09:48  5         MR. GODFREY:  No, that was a prior declaration, but we've

10:09:51  6  had similar declarations before.

10:09:52  7         Mr. Carroll doesn't give grand -- or he has some very

10:09:55  8  general statements, but he doesn't get grand to understand exactly

10:09:59  9  what's going on, and we can file something about that if the Court

10:10:01 10  wanted, but I doubt you want it.

10:10:05 11         THE COURT:  I don't want any more declarations, I can

10:10:05 12  tell you that.

10:10:05 13         MR. GODFREY:  I was going to say, I'm hesitant to even

10:10:05 14  raise the issue.

10:10:07 15         THE COURT:  Or not even another page of brief.

10:10:09 16         MR. GODFREY:  Fair enough.  But you go back to what was

10:10:12 17  the purpose of the agreement, to determine lost profits.  This

10:10:16 18  isn't some unique or bizarre or unknown definition.  The terms here

10:10:21 19  understandably lead to either an absurd result where people are

10:10:26 20  getting money that has nothing to do with the profits they made

10:10:28 21  based on net cash flow differences, or where they're an accrual

10:10:34 22  basis or cash basis taxpayer, but the expenses and the revenue

10:10:38 23  match because of the nature of their business, it's a proper lost

10:10:41 24  profits calculation.

10:10:43 25         One of the examples in the plaintiff's brief used this

10:10:47 1  week, given a lot of press, was the alligator farm.  Read all about

10:10:51 2  it.  Problem is in 2010, it was the most profitable year by almost

10:10:56 3  five times in its history.  2011 was the second most profitable

10:11:00 4  year.  And yet it gets an award for alleged lost profit, not based

10:11:04 5  upon the difference between revenue and corresponding variable

10:11:08 6  expenses in the two periods, but based upon the difference of

10:11:12 7  differential cash flows, which is not what the agreement provided.

10:11:17 8       THE COURT:  What about Chef Folse?

10:11:20 9       MR. GODFREY:  That's a different issue.

10:11:22 10      THE COURT:  Is BP seriously saying he's not a seafood

10:11:25 11 processor and not eligible for an award, or is it a BEL issue?

10:11:30 12      MR. GODFREY:  It's a different issue, Your Honor.  It's a

10:11:32 13 causation passing issue, number one, and it's a location of

10:11:34 14 headquarters issue, number two, as I understand it.

10:11:37 15      THE COURT:  Well, all I know is what I read in the media,

10:11:40 16 and that may not be fair to ask you about --

10:11:40 17      MR. GODFREY:  There were some --

10:11:43 18      THE COURT:  -- but it said he was denied, and he's shown

10:11:45 19 with his little BP sticker on his chef's vest --

10:11:45 20      MR. GODFREY:  I understand what --

10:11:48 21      THE COURT:  -- and now he's saying he's not -- he is

10:11:51 22 being disqualified because he doesn't process seafood, which

10:11:55 23 doesn't make a lot of sense to most people down here.

10:11:57 24      MR. GODFREY:  Well, remember the test is a revenue

10:11:59 25 causation test.

10:12:00  1          THE COURT:  No, I'm just talking about why he is not a

10:12:03  2    seafood processor.  That sounds strange to me.

10:12:05  3          MR. GODFREY:  Well, I have to think about it.  Let me be

10:12:09  4    blunt about something.  I'm caught between the sword and the shield

10:12:12  5    of confidentiality here, the Rule 408 stuff.  There's a lot of

10:12:15  6    stuff I could tell the Court about negotiations otherwise that are

10:12:18  7    quite different than the presentation being made.  But I am bound

10:12:20  8    by the Rules, I think, of the Court in terms of 408 and other

10:12:25  9    things.  The same with the facility.

10:12:26  10         I think I can say this about the chef.  I think I can say

10:12:28  11   that he has designated himself on tax returns something different

10:12:31  12   than what he claims to be now.  I think people can --

10:12:32  13         THE COURT:  I read the declaration of his attorney.

10:12:35  14         MR. GODFREY:  I think I can say that there's a question

10:12:37  15   about where his headquarters is located, which determines about

10:12:40  16   whether or not he can pass the causation test.  I am not an expert

10:12:43  17   on that claim.  I'm a data-driven person, as the Court knows, and I

10:12:47  18   spent time on the alligator farm claim this week.

10:12:49  19         So I don't know all of the answers.  But in terms of what

10:12:51  20   the issue is, it seems to be a little bit unfair to have a

10:12:54  21   confidential process where the claims information is submitted

10:12:57  22   confidentially and then stuff is spread of record selectively, and

10:13:00  23   I am bound by the confidentiality provisions but my colleagues to

10:13:04  24   the left are not.  It's a fundamentally unfair proposition.

10:13:06  25         THE COURT:  I don't know that they spread that to the --

10:13:09  1   Chef Folse, I imagine, spread that.

10:13:12  2          MR. GODFREY:  They put the affidavit in before the Court.

10:13:14  3          THE COURT:  I need to give the other side a chance to

10:13:17  4   respond because I have a time limit to get out of here today.

10:13:20  5          MR. GODFREY:  I appreciate the Court's time.  I would ask

10:13:22  6   that the Court enter the injunction, fictitious awards are being

10:13:24  7   awarded.  And I appreciate the Court's time.  Thank you very much.

10:13:26  8          THE COURT:  All right.  Mr. Stanley.

10:13:37  9          MR. STANLEY:  Good morning, Your Honor.  Rick Stanley

10:13:39 10   here for Pat Juneau and for the settlement program, for what I hope

10:13:43 11   is a cameo appearance in this matter.

10:13:47 12          Let me first talk about the Motion to Dismiss, and I'm

10:13:51 13   not going to spend a whole lot of time on that.  Our position is

10:13:55 14   pretty simple.  First, we don't believe that BP has alleged facts

10:14:00 15   to support a claim for relief in this Court, and I believe that the

10:14:04 16   argument I just heard confirms that.

10:14:06 17          And second, that if there is a possible claim for relief,

10:14:10 18   that judicial immunity would apply.

10:14:14 19          First, if I heard Mr. Godfrey correctly, he stated that

10:14:18 20   it wouldn't be until the Fifth Circuit affirmed -- or, rather,

10:14:21 21   reversed this Court's March 5th ruling that there would be a

10:14:25 22   misinterpretation to the settlement agreement.  The problem is that

10:14:28 23   Mr. Juneau was sued before any appeal was lodged.  Mr. Juneau was

10:14:33 24   not a party to anything on March 5th, 2013.

10:14:39 25          THE COURT:  But you're not arguing the Court doesn't

10:14:41  1    have -- I wouldn't have jurisdiction or authority to enjoin him or

10:14:47  2    if I found he was wrongly interpreting or applying the contract?

10:14:53  3         MR. STANLEY:  No, sir.  I am suggesting that the

10:14:54  4    complaint is unnecessary.  In fact, I am here to say that whatever

10:14:58  5    this Court decides, Mr. Juneau will do.  He doesn't take a position

10:15:03  6    with respect to who is right, who is wrong.  Whatever this Court

10:15:07  7    directs, Mr. Juneau will faithfully follow this Court's directive.

10:15:12  8    But we don't think that a complaint and injunction was the

10:15:15  9    appropriate way to proceed, and we don't believe the facts that

10:15:18  10   have been alleged allege a claim for relief because, essentially,

10:15:22  11   it's as Your Honor pointed out, he is simply accused of following

10:15:27  12   the ultimate process that was provided for in the settlement

10:15:30  13   agreement and the ultimate order of this Court.  We don't think

10:15:33  14   those facts support a claim for a breach of any contract.

10:15:36  15        But second, we're also asking for it to be dismissed on the

10:15:40  16   grounds of immunity.  And here is why we think that matters:

10:15:46  17   Mr. Juneau is engaged in quasi judicial functions trying to

10:15:51  18   administer this settlement agreement.  There is no doubt that as he

10:15:55  19   grants some claims and denies others, someone is going to be

10:15:58  20   displeased.  If there is a precedent that the thing to do is to

10:16:03  21   file a complaint against Mr. Juneau and just sue him every time

10:16:07  22   someone disagrees with a determination that he makes of eligibility

10:16:11  23   or something else, then we have just created an entire new set of

10:16:16  24   litigation against the claims administrator that I don't think has

10:16:21  25   any place anywhere.  And I think the immunity doctrines that we

10:16:26 1  have pointed out in our briefs fully support the fact that

10:16:29 2  Mr. Juneau is immune from those claims because the authority he is

10:16:33 3  acting under is derived from the order of this Court.

10:16:37 4        THE COURT:  Hypothetically, if he was -- let's see how I

10:16:43 5  can put this.  I guess the other side argues that he is not immune

10:16:52 6  because he is just performing a ministerial administrative

10:16:56 7  function, he is not really exercising a judicial function -- quasi

10:17:01 8  judicial function.  And beyond that, there's no judicial immunity

10:17:09 9  for prospective injunctive relief.

10:17:14 10       MR. STANLEY:  We think both of those points are

10:17:17 11 incorrect.  We think, as we pointed out in our reply brief, the

10:17:20 12 authority they have for saying that prospective injunctive relief

10:17:24 13 is not available was a Supreme Court case that was legislatively

10:17:28 14 overruled in the context of 1983 actions.  As the law stands today

10:17:33 15 in Bivens actions and in 1983 actions, injunctive relief is barred

10:17:38 16 by judicial immunity.

10:17:39 17       THE COURT:  We don't have a Bivens action here or a 1983

10:17:42 18 action.

10:17:43 19       MR. STANLEY:  We don't.  And what we have argued by

10:17:45 20 analogy is that the doctrine of judicial immunity which protects

10:17:50 21 decision makers like Mr. Juneau, whether it be a trustee or

10:17:55 22 receiver or anybody of the sort, should apply in this case.  We

10:17:59 23 can't find a case directly on point, Your Honor.  We looked.  But

10:18:04 24 we think that the functions that he is being asked to perform,

10:18:08 25 interpret the agreement when disputes arise, state eligibility for

10:18:14 1    claims, decide whether someone is eligible or not eligible for a

10:18:18 2    claim, handle disputes in the first instance about the agreement to

10:18:23 3    see if some kind of accommodation can be reached, those are all

10:18:29 4    quasi judicial.

10:18:29 5         Whether you call him a special master or don't call him a

10:18:32 6    special master, we don't think is here or there.  We think the

10:18:35 7    function he is performing would entitle him to immunity from the

10:18:41 8    suit.

10:18:41 9         I am going to start and finish by saying that he is

10:18:44 10   absolutely subject to your authority at all times.  If he deviates

10:18:48 11   from what this Court orders him to do, he could be held in

10:18:52 12   contempt, he could be dismissed; but I don't think the remedy is

10:18:55 13   for someone to sue him, whether it be the one party to the

10:18:59 14   agreement or another party to the agreement or a disappointed

10:19:03 15   claimant.

10:19:04 16        And so that's our position on the motion to dismiss.  We

10:19:07 17   do think it matters as a matter of policy.  There are MDLs all over

10:19:11 18   the country that have to use people like Mr. Juneau to adjudicate

10:19:17 19   complicated claims.  We have 150,000 plus claims here.  The Courts

10:19:22 20   would grind to a halt if all of those claims had to be processed

10:19:26 21   through a Court.  So to have a precedent that, gee, the thing to do

10:19:31 22   when your claims process isn't working the way you wanted it to is

10:19:35 23   to sue the claims administrator to get the Court to intervene, we

10:19:42 24   think is the wrong way to go.

10:19:43 25        Let me move quickly to the response to the preliminary

10:19:47 1  injunction, and I will begin and end this argument also by saying

10:19:50 2  all Mr. Juneau wants to do is what this Court directs him to do.

10:19:54 3  He wants to interpret this and move this process forward according

10:19:57 4  to the settlement agreement.  He did not draft it.  He did not

10:20:01 5  participate in the negotiation of it.  He really has no position

10:20:05 6  about the wisdom of the settlement agreement or how it came to be.

10:20:09 7  He just wants to do his job as claims administrator.

10:20:12 8        The only points that I really want to address for the

10:20:16 9  Court are procedural in nature.  There are two procedural points,

10:20:22 10 and I want to be sure the record is clear.  There is a contention

10:20:24 11 that BP claims it had no input on Mr. Juneau's decision.  That is

10:20:29 12 repeated a couple of times in the brief.

10:20:32 13       First of all, Your Honor, we think that the record belies

10:20:35 14 that claim.  There was a blind test of 62 blinded claims in the

10:20:40 15 summer to see how they came out.  On September 25th we put in the

10:20:45 16 record Mr. Juneau -- Mike Juneau sent a hypothetical to both

10:20:49 17 parties saying, "Do you understand that there are instances under

10:20:53 18 the way this settlement program is going to be applied where you

10:20:57 19 could have causation met, even though we all know, looking at it,

10:21:03 20 that it's not caused by the spill?"  And both parties said, "We

10:21:07 21 understand that.  We understand that's going to happen in this

10:21:09 22 settlement agreement."  And so that was asked to BP in a specific

10:21:14 23 hypothetical and a specific response was given.

10:21:17 24       On September 28th, BP sent four questions over saying,

10:21:22 25 "We want to understand how you accountants are looking at these

10:21:25 1  claims.  How are you booking these revenues?  What are you doing

10:21:28 2  with cash basis folks?"  On October 2nd there was a conference call

10:21:33 3  to address those claims.  BP participated, BP's questions were

10:21:38 4  answered.

10:21:40 5          In terms of the right of review, Mr. Juneau's office

10:21:46 6  issues a certificate of eligibility.  At that point, both sides are

10:21:50 7  entitled to look at that and appeal his determination.  And if they

10:21:55 8  feel that there is an erroneous determination, they can argue that

10:22:00 9  to this Court and bring that claim up.  In fact, of the 201 claims

10:22:06 10 listed in Exhibit B to their brief by our count, 70 of those have

10:22:11 11 been appealed.

10:22:12 12         THE COURT:  Actually, I think they'd appeal first to an

10:22:15 13 appeal panel --

10:22:16 14         MR. STANLEY:  Correct.

10:22:17 15         THE COURT:  -- appointed by the Court, and then there's a

10:22:20 16 discretionary appeal to the Court.

10:22:23 17         MR. STANLEY:  There is a review.

10:22:24 18         THE COURT:  Right.

10:22:26 19         MR. STANLEY:  And they have all of the information that

10:22:28 20 they could want to decide whether to appeal those eligibility

10:22:31 21 determinations, so they do have input.

10:22:35 22         And we also want to point out to the Court that, with

10:22:39 23 respect to the process that's being suggested, the first time that

10:22:42 24 process was suggested by BP, that four-step process, was

10:22:47 25 January 8th, 2013.  It was the first time we understood or were

10:22:52   1    told exactly how they were reading the agreement and what they

10:22:56   2    thought that agreement called for in terms of process.  And within

10:22:59   3    one week, Mr. Juneau made his policy announcement and then, as Your

10:23:04   4    Honor is familiar, everything proceeded from there.

10:23:07   5         THE COURT:  Am I correct that Mr. Juneau didn't make this

10:23:15   6    policy, didn't issue this policy announcement solely on his own;

10:23:19   7    that is, without consulting with people that work for him, I'm

10:23:23   8    assuming?

10:23:23   9         MR. STANLEY:  You're absolutely correct.  No, he had the

10:23:26  10    position paper of the PSC from December 16th, BP's response on

10:23:31  11    January 8th, he met with his team, considered all of it, and issued

10:23:35  12    his policy announcement.  And in fact, made a statement in there

10:23:39  13    that there are three instances where they would look at information

10:23:43  14    and ask the claimant to correct it if they thought there was an

10:23:46  15    error.

10:23:47  16         THE COURT:  So there are instances where, under some

10:23:49  17    circumstances, the claims program or claims administrator will ask

10:23:56  18    people to correct misinformation in the financials?  Am I correct

10:24:04  19    about that?

10:24:04  20         MR. STANLEY:  That is correct.  In fact, the policy

10:24:06  21    announcement uses the word "error," and if there is an error and

10:24:09  22    it's identified, they will ask the claimant to correct it.  That's

10:24:13  23    the policy that they use.

10:24:14  24         THE COURT:  Okay.

10:24:15  25         MR. STANLEY:  Also, Your Honor, there is some implication

10:24:19  1    that the claims administrator used some unusual process in this

10:24:24  2    instance and did not follow the pattern that existed for other

10:24:28  3    policy interpretations.  We don't believe that's the case.  The

10:24:32  4    claims administrator simply did not have a question about the way

10:24:37  5    these claims were being viewed because, frankly, the settlement

10:24:42  6    program accountants and Mr. Juneau thought it was fairly clear what

10:24:45  7    the agreement said and how to do it.

10:24:48  8         It was only after BP raised the question about do you

10:24:54  9    think you're doing it the right way, that the question was put

10:24:57 10    forward.  So Mr. Juneau didn't have the question, the question came

10:25:01 11    from one of the parties to the settlement agreement, which is why

10:25:03 12    this didn't -- wasn't initiated in the first instance from

10:25:08 13    Mr. Juneau.

10:25:09 14         And then finally, Your Honor alluded to the fact that, as

10:25:12 15    we discovered as preparing for this hearing, that there is an

10:25:15 16    April 4, 2012, memorandum where the program accountants were asked

10:25:19 17    to review the settlement agreement in advance and alerted both

10:25:24 18    sides to the fact that using a short time period to assess

10:25:29 19    compensation might lead to a matching problem between revenues and

10:25:34 20    expense s; and that was pointed out to both sides.  That was not a

10:25:38 21    memorandum Mr. Juneau even had until responding to the preliminary

10:25:43 22    injunction motion in this matter.

10:25:45 23         Unless Your Honor has any questions, I'll sit down.

10:25:49 24         THE COURT:  Thank you very much.  All right.  Mr. Herman.

10:25:53 25         MR. HERMAN:  Thank you, Your Honor.  Steve Herman for the

10:25:58 1 class. I have a short presentation, which I think I am going to

10:26:01 2 make a lot shorter in light of the Court's comments. Provided a

10:26:05 3 couple of copies to Ben and copies to all counsel.

10:26:09 4         Very quickly. It occurs to me that BP sued the claims

10:26:16 5 administrator claiming *ultra vires*. Don't even know what that

10:26:19 6 means. Had to look it up in *Black's Law Dictionary.* They're

10:26:23 7 saying he's trying to do something the Settlement Agreement doesn't

10:26:26 8 allow. As I think Your Honor noted, there is a process for issues

10:26:29 9 of disagreements that can't be unanimously resolved by the claims

10:26:33 10 administration will be referred to the Court for resolution. Which

10:26:36 11 Court? This Court. "The Court shall mean the United States

10:26:40 12 District Court for the Eastern District of Louisiana, Judge Carl

10:26:43 13 Barbier presiding."

10:26:45 14         And I thought Mr. Godfrey said Your Honor and Your Honor

10:26:49 15 alone; but as Your Honor pointed out, the whole reason we're here

10:26:53 16 today is to go to the Fifth Circuit. And I would submit that if

10:26:58 17 anybody is *ultra vires* of the Settlement Agreement it's BP, not the

10:27:02 18 claims administrator.

10:27:03 19         Your Honor has seen a lot of this before, so I won't

10:27:06 20 belabor the points, but there is one thing I do want to address

10:27:10 21 very quickly, about the third bullet point from the bottom because

10:27:14 22 this is something Mr. Godfrey touched upon. A lot of these claims

10:27:18 23 that they are now attacking are based on annual revenue. And

10:27:21 24 Mr. Godfrey says -- I think he was talking about the gator farm.

10:27:24 25 Well, their annual profit in 2010 is greater than it was in the

10:27:28  1  past.  Well, BP --

10:27:30  2      First of all, it was known to all of the parties that

10:27:33  3  that might happen, that's why you focused on a three-month period.

10:27:38  4  And this really had a very easy fix.  I don't know necessarily

10:27:42  5  would have agreed to it, but BP never even suggested, "Why don't we

10:27:47  6  say you have the causation test, but as a secondary test, if your

10:27:51  7  annual revenue is bigger in 2010 by some margin than it was in the

10:27:54  8  past, we're just going to say that doesn't pass causation."  That's

10:27:59  9  nowhere in the document, was never discussed, never suggested by

10:28:02 10  BP.  But now, in these claims that they're attacking, that's one of

10:28:06 11  the main arguments that they use.

10:28:09 12      Just very briefly, this is a blown up Louisiana,

10:28:12 13  Mississippi, and Alabama.  Goes all the way to Arkansas --

10:28:17 14      THE COURT:  Let me ask you this.

10:28:20 15      MR. HERMAN:  Yes, sir.

10:28:22 16      THE COURT:  Are the vast majority of the claims that are

10:28:24 17  at issue -- I know, according to what I've understood and the

10:28:29 18  number of times we've dealt with this issue, largely fall within

10:28:35 19  three industries or the three categories.  And those are:

10:28:38 20  Professional services, which would be attorneys, engineers, so

10:28:41 21  forth; professional services, agriculture, and construction.

10:28:48 22  Correct?

10:28:48 23      MR. HERMAN:  Correct, Your Honor.

10:28:49 24      THE COURT:  And some of the examples that I know -- I am

10:28:52 25  not suggesting all of them by any means, but a number of the

10:28:55  1  examples they cite are, like, way up by the Arkansas border.

10:28:59  2          MR. HERMAN:  Right.

10:29:00  3          THE COURT:  But is their argument limited to people that

10:29:04  4  are remote we'd say from the Gulf Coast or would this -- does this

10:29:08  5  issue apply even to people along the Gulf Coast?

10:29:11  6          MR. HERMAN:  Well, as Your Honor mentioned, it's kind of

10:29:14  7  a moving target.  I initially thought it was just limited to those

10:29:17  8  three industries.  They seem to be suggesting at certain points in

10:29:21  9  time that it should apply to everyone across the board.  But the

10:29:24 10  reason I backed up to the previous thing is they never suggested

10:29:28 11  that these three types of services -- these types of industries be

10:29:33 12  excluded from the agreement or that they operate under a different

10:29:35 13  framework.

10:29:36 14          And there was a lot of discussion about construction

10:29:37 15  companies in particular because real estate developers were

10:29:40 16  excluded, and there was a lot of thought to we need to make sure

10:29:43 17  that construction companies, general contractors, subcontractors

10:29:46 18  are included, an intentional decision by BP to put them in the

10:29:50 19  class and include them in the settlement as opposed to real estate

10:29:54 20  developers.

10:29:54 21          THE COURT:  And obviously, both parties intended and did

10:29:58 22  put the entire states of Louisiana, Mississippi, and Alabama in the

10:30:02 23  settlement, in the class.

10:30:04 24          MR. HERMAN:  Correct, Your Honor.  And now they have your

10:30:06 25  final judgment which gives them a class-wide release for this

10:30:10  1  entire area.  I didn't have time to specifically correctly

10:30:13  2  delineate the zones that have presumptions in them, but they're

10:30:16  3  really along I-10.  So everything above I-10, 90 percent probably

10:30:21  4  of this class, is a Zone D claim, what we call a Zone D claim, and

10:30:26  5  that has the exact same causation structure -- the percentages are

10:30:31  6  different, but the causation structure that BP agreed to, the

10:30:35  7  objective criteria how you would decide if there was a loss caused

10:30:39  8  by the spill, is the same structure in Zone D for 90 percent of the

10:30:44  9  cases as it is for the people along the Coast, and that's what they

10:30:47  10  agreed to.

10:30:47  11      THE COURT:  Generally a so-called V test, your revenue

10:31:09  12  goes down and goes back up; or a modified V, and two or three

10:31:14  13  different ways you can prove that.

10:31:15  14      MR. HERMAN:  Correct, Your Honor.

10:31:16  15      THE COURT:  But the difference, as I appreciate it, it's

10:31:19  16  a higher standard the farther you get away from the coast because

10:31:25  17  there has to be a greater deviation in your revenue in other words?

10:31:29  18      MR. HERMAN:  Right.  You have to have a sharper V.  If

10:31:32  19  you're in Monroe, you need to have a V; if you're down south, you

10:31:35  20  maybe only need to have a U.

10:31:37  21      THE COURT:  Okay.

10:31:39  22      MR. HERMAN:  So all of this is set forward in our briefs

10:31:44  23  and I won't belabor it.

10:31:46  24      But there are three kinds of chronologies that sometimes

10:31:49  25  get overlapped, but they're a little bit separate but they kind of

10:31:52   1   mix together.  One chronology is this matching/smoothing issue

10:31:55   2   which I think really is the issue before Your Honor today, or BP

10:32:01   3   wants it to be.  There is also another chronology that went along,

10:32:04   4   and you'll see a lot of this in the briefing, well you already

10:32:07   5   have, on monthly P&Ls.  And the issue there is that with that issue

10:32:12   6   BP took the exact contrary position because they said you shouldn't

10:32:16   7   match or smooth, you should use the actual monthly P&Ls that were

10:32:21   8   created.

10:32:21   9        Then you have this the third issue, this is what we call

10:32:23   10  the alternative causation issue.  And this is something that

10:32:27   11  Mr. Stanley brought up.  There's lots of things in this chronology,

10:32:31   12  and we briefed it extensively, but this is just trying to touch the

10:32:36   13  salient points.  But this is the e-mail from Mr. Juneau to the

10:32:39   14  parties in September.  "As to BEL claims, once a claimant's

10:32:44   15  financial records satisfy the causation standard set out in

10:32:47   16  Exhibit 4B, does the Settlement Agreement mandate and/or allow the

10:32:51   17  claims administrator to separate out losses attributable to the oil

10:32:55   18  spill vs those that are not?"

10:32:57   19       "Stated another way, once a claimant passes the causation

10:33:01   20  threshold, is the claimant entitled to recovery of all losses as

10:33:05   21  per the formula set out in Exhibit 4C, or is some consideration to

10:33:10   22  be given so as to exclude those losses clearly unrelated to the

10:33:14   23  spill?"

10:33:14   24       Now, he puts in a hypothetical.  "A small accounting

10:33:18   25  corporation firm is located in Zone B."  Accounting corporation is

10:33:22  1  a professional services corporation, so he is giving them a hypo

10:33:26  2  for one of the exact industries that BP is now attacking.  "They

10:33:30  3  meet the V-shaped curve causation test.  The explanation for the

10:33:33  4  drop is that one of the three partners went out on medical leave,

10:33:38  5  income went back up six months later when the partner comes back.

10:33:42  6  Applying the compensation formula under Exhibit 4C, the accounting

10:33:45  7  firm can calculate fairly substantial loss.  Is that full loss

10:33:48  8  recoverable?"

10:33:49  9       Here is the answer, response from BP counsel, on their

10:33:53  10  letterhead with the little sundial.  "If proper application of the

10:33:57  11  methodology with accurate financial data yields a determination

10:33:59  12  that causation is satisfied, BP agrees with class counsel that all

10:34:04  13  losses calculated in accordance with Section 3.3 and Exhibits 4C

10:34:09  14  and 19 of the Settlement Agreement are presumed to be attributable

10:34:12  15  to the oil spill."  They kind of restate that.  Then they say,

10:34:16  16  "Nothing, not causation framework or compensation framework,

10:34:19  17  provides for an offset where the claimant firm's revenue declined

10:34:23  18  (and recovery, if applicable) satisfies the causation test, but

10:34:28  19  extraneous non-financial data is indicative that the decline was

10:34:32  20  attributable to a factor wholly unrelated to the oil spill.  Such

10:34:37  21  false positives are inevitable, concomitant of an objective

10:34:41  22  quantitative database test."

10:34:44  23       So then skipping ahead a couple of months, now the claims

10:34:47  24  administrator has issued a formal policy.  BP is coming to the

10:34:51  25  court, along with class counsel, trying to get the release for that

10:34:54 1   whole area that we saw.  And they submit joint proposed statements

10:34:58 2   on November 19th.  "Once the causation tests are satisfied, all

10:35:02 3   revenue and variable profit declines during the compensation period

10:35:06 4   are presumed to be caused entirely by the spill, with no analysis

10:35:12 5   of whether such declines were also traceable to other factors

10:35:15 6   unrelated to the spill."  And they cite two BP experts, Fishkind

10:35:21 7   and Sharp who submitted declarations in support of the settlement.

10:35:25 8   So they're kind of going along, pulling everybody along, trying to

10:35:30 9   get the class approved, some people have called it a "bait and

10:35:34 10  switch" or "laying in wait" or whatever you want to say, but the

10:35:38 11  reality is this is all the way November 19th.

10:35:40 12         Your Honor will recall we appeared here in this very

10:35:43 13  courtroom on December 12th to talk about the nonprofits and this

10:35:46 14  issue came up, this issue of alternative causation.  And Your Honor

10:35:49 15  from that very bench asked BP counsel:  Do you agree with the

10:35:54 16  claims administrator's policy that once you satisfy causation under

10:35:58 17  the objective formula in the Settlement Agreement, all of the

10:36:01 18  losses under the compensation framework are deemed to be caused by

10:36:06 19  the spill and are recoverable?"  And BP's counsel, I think they

10:36:09 20  were over there at the time, said, yes, Your Honor, we agree with

10:36:12 21  that.  And Your Honor confirmed that, confirmed that agreement.

10:36:16 22         Well, now, here we are four months later, or five months

10:36:19 23  later --

10:36:20 24         THE COURT:  Let me ask you this, you may be getting to

10:36:21 25  this.  But when is the first time that you knew, class counsel were

10:36:27  1   alerted that BP believed there was a problem, you know, voiced the

10:36:34  2   complaint that they're voicing now in fact?  Was it after or before

10:36:43  3   the, let's talk about the November 8th fairness hearing, final

10:36:46  4   fairness hearing, for example?

10:36:48  5        MR. HERMAN:  Well, I have to answer this in a couple of

10:36:51  6   ways.  I had some indication of their -- of what happened in

10:36:57  7   October because I think I was on that conference call that

10:37:00  8   Mr. Stanley referred to where they were asking the accountants

10:37:03  9   questions.  As far as I knew for awhile they were okay with that.

10:37:08  10  They weren't raising it.

10:37:09  11       However, around the time of Thanksgiving, about, I don't

10:37:14  12  know, a week or two after this, not on the matching/smoothing issue

10:37:20  13  but on alternative causation, as Your Honor will recall --

10:37:23  14       THE COURT:  Did that deal with the nonprofits?

10:37:26  15       MR. HERMAN:  Well, it came up around that same.  Really

10:37:28  16  didn't have anything to do with it, but just happened to come up at

10:37:31  17  the same time.

10:37:31  18       And the way it came up to me was right around

10:37:34  19  Thanksgiving, I think we had a conference call with BP counsel from

10:37:37  20  Thanksgiving, from home, because they were objecting to the

10:37:43  21  supplemental information program and they were saying that if a

10:37:47  22  claimant subjectively didn't know or believe that they had a loss

10:37:53  23  caused by the spill that it was "fraudulent" to file a claim.  We

10:37:57  24  got in a huge disagreement about that because of things, of

10:38:00  25  statements like they have made here of their answer.

10:38:03 1       So when it came up to Your Honor, I think everybody,

10:38:06 2  well, at least class counsel was appreciative that the claims

10:38:11 3  administrator brought it up because they said, wait, BP keeps

10:38:16 4  saying that you don't look at alternative causation, but now

10:38:20 5  they've objected to this advertisement saying that it's going to

10:38:23 6  encourage "fraudulent" claims.  Now, these are claims that they now

10:38:28 7  say are "fictitious," some other time they said they were "absurd".

10:38:33 8  These are the same claims that they agreed would be compensated

10:38:36 9  under objective formula.

10:38:38 10      So when we were before Your Honor on the nonprofits, we

10:38:39 11 said let's get the alternative causation issue done once and for

10:38:43 12 all, and they agreed and Your Honor confirmed that.  Nevertheless,

10:38:46 13 here we are again a few months later with a slightly different

10:38:51 14 motion for reconsideration, purportedly on matching/smoothing, but

10:38:56 15 what they're really talking about in a lot of these cases is

10:38:59 16 alternative causation.

10:39:00 17      And not only that, the big problem that the class has

10:39:03 18 right now is that BP is now appealing virtually everything.  But

10:39:07 19 what they're saying in their appeal, and these are the appeals that

10:39:10 20 Your Honor mentioned to the appeal panelists within the settlement

10:39:14 21 program, not to the Fifth Circuit.  They're going to these appeal

10:39:17 22 panelists and they're saying, the award is being driven not by a

10:39:21 23 decrease in economic activity after the spill, but rather -- and

10:39:25 24 we've protected the confidentiality, we didn't want to put too much

10:39:29 25 detail -- but the bottom line is by some alternative cause during

10:39:32  1    the post compensation period.  Claimant's own economic data shows

10:39:36  2    that claimant is not a class member and thus may not file a claim

10:39:39  3    or receive compensation under the Settlement Agreement.  This is

10:39:42  4    the position that BP is taking right now.

10:39:44  5            And here is another example.  This is a better example

10:39:48  6    frankly.  I understand, I can't confirm, but I understand that

10:39:51  7    there's hundreds, maybe even thousands of these things being

10:39:55  8    appealed and being held up right now.  But this is what they say.

10:39:58  9    Again, it's unclear what basis this type of company -- I can

10:40:02 10    probably tell you, but I was being overly cautious -- that some

10:40:05 11    type of company can assert a spill related loss, a necessary

10:40:09 12    prerequisite to class membership and recovery.  There's no

10:40:12 13    indication in the record as to what possible basis a, this type of

10:40:15 14    company that's not excluded, that's included, that they now have a

10:40:20 15    class release against, could have any losses associated with the

10:40:23 16    spill class membership and the right to recover are limited to

10:40:26 17    those who had a loss due to the spill.  So that's the position

10:40:29 18    they're talking in all of these appeals right now.

10:40:32 19            The class definition issue I thought was put to rest

10:40:35 20    before.  They continuously cite 1.3.1.2 where it talks about --

10:40:42 21            THE COURT:  As I recall, I haven't looked at that

10:40:45 22    recently, but beyond the geographic category, boundaries, the

10:40:53 23    Settlement Agreement is defined by basically who is excluded.  In

10:41:00 24    other words, there are express exclusions of certain industries,

10:41:06 25    businesses, things like that, I remember casinos, I think financial

10:41:11  1   institutions.  You can probably remind me who else, but BP

10:41:16  2   dealers --

10:41:17  3              MR. HERMAN:  Yes.

10:41:18  4              THE COURT:  -- people like that are expressly excluded.

10:41:21  5   Are you saying that the appeals -- I noticed one of them said this

10:41:32  6   company, whatever it is, is not a member of the class.  Is it that

10:41:34  7   kind of argument they're making that it falls within an excluded

10:41:38  8   category or what is --

10:41:40  9              MR. HERMAN:  I don't believe so, Your Honor.  There are

10:41:42  10  basically three requirements for class membership.  One is that you

10:41:45  11  meet the geographical descriptions.

10:41:47  12             THE COURT:  Right.

10:41:48  13             MR. HERMAN:  The second is that you are not expressly

10:41:51  14  excluded.  And what I think is relevant here is they never said we

10:41:54  15  should exclude agricultural firms, construction firms or special

10:41:58  16  services companies.

10:41:58  17             THE COURT:  And then thirdly that you pass the causation

10:42:00  18  test.

10:42:01  19             MR. HERMAN:  Well, basically.  But the way the class

10:42:03  20  definition works, and I think Your Honor will recall, for Rule 23

10:42:05  21  purposes and they submitted expert reports on this, you have to

10:42:09  22  have objectively ascertainable criteria.  You can't be on some

10:42:12  23  subjective standard where people don't know whether they're in or

10:42:15  24  not based on whether they passed causation.  So what the class

10:42:19  25  definition does is it says:  "The following are summaries," and BP

10:42:22 1   keeps citing the summary without citing what it's summarizing, "of

10:42:27 2   the damage categories which are fully described in the attached

10:42:30 3   exhibits."

10:42:30 4        THE COURT:  And there are about six different categories

10:42:32 5   of business economic claims, property damage, things like that.

10:42:38 6        MR. HERMAN:  Correct.  And the economic damage category

10:42:40 7   is the one we're talking about.  And, yes, the summary says it has

10:42:44 8   to be caused as a result of the incident; but the way that you find

10:42:48 9   out whether it's caused by the incident is you go to the exhibit,

10:42:53 10  which is Exhibit 4B which as Your Honor correctly identified

10:42:58 11  before, is the objective test by which we determine under this

10:43:02 12  settlement whether things are caused by the spill.  And BP is

10:43:05 13  continuing to, as Your Honor noted, just come back and say, well,

10:43:09 14  we don't think that it's caused by the spill, so we don't think

10:43:13 15  they're a class member and they don't have a right to recover.

10:43:16 16  Even though they meet the causation under 4B.

10:43:20 17       THE COURT:  Try to wrap it up because I need to give

10:43:24 18  Mr. Godfrey a few minutes of time.

10:43:26 19       MR. HERMAN:  Yes, Your Honor, just two things very

10:43:27 20  briefly.  They put in this footnote in these appeals, "We're aware

10:43:28 21  of the court's order but respectfully disagree."  Blah, blah, blah.

10:43:32 22  The problem that's created for the class members here is that the

10:43:37 23  March 5th order that Your Honor is I guess here today on for the

10:43:41 24  fifth time, is talking about matching and smoothing.  They're

10:43:45 25  really challenging alternative causation, and alternative causation

10:43:49 1   is not something that is supposed to be still a live issue.  That's

10:43:52 2   something that they agreed to in this very courtroom several months

10:43:55 3   ago.

10:43:56 4        And what is very, I'll just say, offensive is, you know,

10:44:02 5   they put in here:  "Claimant executed a registration form and a

10:44:05 6   claim form, both under penalties of perjury, seeking recovery from

10:44:10 7   business economic losses arising from or due to the spill."  So

10:44:13 8   they're here filing a piece of paper that they agreed wasn't valid

10:44:18 9   several months ago in this courtroom before Your Honor, and they

10:44:21 10  have the nerve to imply or bully or intimidate or threaten class

10:44:29 11  members with "perjury" for filing the claims that they agreed by

10:44:33 12  objective standards would be compensated under the formula.

10:44:37 13       And I know the last thing Your Honor wants is another

10:44:40 14  motion or anything about what to do about this problem, but it's a

10:44:43 15  big problem for the class, and I think it just goes to the

10:44:48 16  disingenuity with which BP is here today.

10:44:51 17       I'll be happy to answer questions.

10:44:53 18       Also, Your Honor, on the motion to stay that they filed

10:44:55 19  yesterday, I know Your Honor said that you didn't want any more

10:44:59 20  briefing, I've never read it, but I feel pretty comfortable saying

10:45:03 21  that it should be denied for all of the reasons that we've already

10:45:07 22  submitted.

10:45:07 23       THE COURT:  It's really intertwined with what we're

10:45:11 24  talking about here today.

10:45:11 25       MR. HERMAN:  Thank you, Your Honor.

10:45:13  1         THE COURT:  Thank you.  Mr. Godfrey.

10:45:14  2         MR. GODFREY:  Thank you, Your Honor.

10:45:15  3         THE COURT:  I'll give you about three minutes, because I

10:45:17  4    have to be off the bench in about five minutes.

10:45:19  5         MR. GODFREY:  I only need two minutes I think, Your

10:45:22  6    Honor.

10:45:22  7         THE COURT:  Okay.

10:45:23  8         MR. GODFREY:  First, I am not aware of any settlement

10:45:25  9    program accountant who has filed a declaration or affidavit saying

10:45:28 10    that they agree with the interpretation of the claims

10:45:31 11    administrator.  They did file declarations but they studiously

10:45:35 12    avoided that issue.  So unless I missed it, in which case I

10:45:39 13    apologize, but I don't think I did, I am not aware of anyone from

10:45:42 14    Price Waterhouse who said that this is the way you interpret the

10:45:44 15    word revenue or expense or corresponding variable expenses.

10:45:47 16         Second, the April 4 memo, to the extent the Court

10:45:52 17    wants --

10:45:52 18         THE COURT:  Let me ask you this.  Is it correct, I want

10:45:54 19    to make sure I have the sequence, that this came to your attention

10:46:01 20    because long before Mr. Juneau issued his January 15th policy

10:46:05 21    statement on this issue, the program was analyzing and paying these

10:46:13 22    claims in the same manner, and that's what brought it to your

10:46:16 23    attention, correct?

10:46:17 24         MR. GODFREY:  It came to our attention when the portal

10:46:19 25    opened up in September where we had access to the underlying claim

10:46:23  1  data, we started to see some aberrations that led to the

10:46:25  2  October 2nd call.  I would encourage Your Honor to carefully read

10:46:28  3  Mr. Hacker's declaration as compared to the arguments in the

10:46:30  4  briefs.

10:46:31  5       THE COURT:  That's not my question.  My question is, is

10:46:35  6  it correct that it came to your attention, I think it's obvious,

10:46:39  7  that it came to your attention because the claims facility, program

10:46:48  8  was routinely, I guess I would say, that's how they were

10:46:51  9  interpreting and applying the program before -- this wasn't a

10:46:55  10  change in what he did as of January 15th?

10:46:59  11       MR. GODFREY:  That's not quite correct.  We started

10:47:02  12  seeing awards we couldn't understand.  We had a call in October, we

10:47:05  13  thought we understood them, and then we saw more awards in

10:47:08  14  November.  And this issue arose after the fairness hearing --

10:47:12  15       THE COURT:  I still think you're not answering any

10:47:14  16  question, Mr. Godfrey.  It came to your attention because that's

10:47:18  17  how they were applying it and it came to your attention that they

10:47:21  18  were applying it in a manner that you think was wrong, and,

10:47:23  19  therefore, that ultimately led to the January 15, after some back

10:47:27  20  and forth, to the January 15, "official" policy statement.

10:47:30  21       MR. GODFREY:  The chronology is that it came to our

10:47:33  22  attention before January 15th, but we did not understand what he

10:47:37  23  was doing in October if that's the question.

10:47:38  24       THE COURT:  No, that's not my question.

10:47:40  25       MR. GODFREY:  We are ships passing in the night then, I

10:47:43  1   apologize.

10:47:44  2          THE COURT:  I think this could be answered yes or no.  I

10:47:47  3   feel like I am cross-examining a witness with all due respect.  But

10:47:50  4   isn't it true, is it true that it came to your attention because

10:47:53  5   that's how they were applying, they being the program, that's how

10:47:57  6   they were applying the BEL provisions before, long before the

10:48:03  7   January 15 policy statement, and that's what brought it to your

10:48:06  8   attention in the first place?

10:48:07  9          MR. GODFREY:  We discovered that they were --

10:48:08  10         THE COURT:  Can you answer that question?

10:48:09  11         MR. GODFREY:  Yes, Your Honor, before January 15th, we

10:48:11  12  figured this out sometime late November, early December.

10:48:15  13         THE COURT:  Okay.  So I just wanted to understand that it

10:48:17  14  wasn't that Mr. Juneau issues a January 15 policy statement that

10:48:23  15  all of a sudden changed what he and his team accountants and all

10:48:29  16  were doing long before that.

10:48:30  17         MR. GODFREY:  No.  We figured out what they were doing in

10:48:32  18  November, December time frame that led to the December 16th

10:48:36  19  exchange and then the January 15th issue.

10:48:39  20         Second point, the April 4 memo, setting aside the Rule

10:48:44  21  408 problem, I encourage Your Honor to read that.  The accounts

10:48:46  22  there are trying to match, they use the word matching.  They're not

10:48:49  23  saying, oh, you're not matching under the agreement, they're trying

10:48:51  24  to figure out how to do it.  It proves just the opposite of the

10:48:54  25  argument being made.

10:48:55  1          Third:  This court and this district court is the

10:48:58  2     supervisory agent or supervisory power, judicial power over

10:49:03  3     Mr. Juneau.  Obviously this court has an appellate court to which

10:49:06  4     supervises what this court does.  This court, respectfully, we

10:49:10  5     never anticipated this problem coming up, but we have to take an

10:49:15  6     appeal; ultimately the Court of appeals will decide.  But it is not

10:49:18  7     true to say that this court has the final word, it has the final

10:49:22  8     word in the district court sense like every other district court

10:49:25  9     and we respect that, although we disagree with the court in this

10:49:27  10    instance.

10:49:28  11         THE COURT:  You're certainly not suggesting that people

10:49:30  12    are subject to my orders and judgments don't have to follow them

10:49:35  13    unless and until they're affirmed by the Fifth Circuit?

10:49:37  14         MR. GODFREY:  Not at all, Your Honor, not at all.  That

10:49:38  15    decision was decided years ago by the Supreme Court.  I think there

10:49:41  16    was a man from the UAW who took the opposite position and learned

10:49:45  17    the hard way that that is not a proper approach.  So not at all.

10:49:50  18         I am simply saying that in answer to Mr. Herman's point

10:49:52  19    that suggested you have the final word -- you have the final

10:49:53  20    word --

10:49:53  21         THE COURT:  Well, that's an issue I will let you all

10:49:56  22    decide somewhere else.

10:49:57  23         MR. GODFREY:  Correct.  There's no question that once

10:49:58  24    Your Honor has ruled, I am bound by it unless the Fifth Circuit

10:50:01  25    tells me something differently.

10:50:02  1      THE COURT:  Let me ask you this real quick.  I am

10:50:05  2  troubled by something that -- I am troubled by the implications or

10:50:13  3  the potential fallout of something that Mr. Stanley alluded to.  I

10:50:21  4  mean, if you have the right to sue the claims administrator for

10:50:25  5  essentially doing his job, which as I see it he is applying and

10:50:29  6  interpreting a contract, the agreement as he sees and as I've

10:50:34  7  agreed with him at this point.  If you can sue him for that, why

10:50:39  8  can't anybody else sue him that's not happy with what he did?  Any

10:50:43  9  claimant that's turned down can file a suit here and say he is

10:50:46 10  breaching the contract by not honoring my claim?

10:50:48 11      MR. GODFREY:  No --

10:50:49 12      THE COURT:  And say we disagree with his interpretation

10:50:53 13  of how he's applied the contract, the agreement, I mean to my

10:50:56 14  claim?

10:50:56 15      MR. GODFREY:  There are a couple of answers to that, Your

10:50:58 16  Honor.  If the Court were to be concerned about that issue, then

10:51:02 17  the solution is that some courts have done to appoint him as a real

10:51:06 18  special master under Rule 53.  There are consequences though to

10:51:10 19  Mr. Juneau with that appointment, there are benefits and there are

10:51:13 20  certain limitations about who want he can and cannot do.

10:51:16 21      THE COURT:  So unless I appoint him under Rule 53 he is

10:51:19 22  subject to being sued by anybody who wants to sue him?

10:51:23 23      MR. GODFREY:  No, no.  With us he has a direct contract

10:51:25 24  that has to mean something, otherwise the contract means nothing.

10:51:30 25      THE COURT:  What about somebody who is a beneficiary, if

10:51:31  1    the contract says and the program says he is to interpret it, I

10:51:35  2    think for the benefit -- the beneficiaries of the trust are the

10:51:40  3    class members, right?

10:51:41  4            MR. GODFREY:  The beneficiaries of the -- well, the class

10:51:44  5    members have rights under the Settlement Agreement.

10:51:47  6            THE COURT:  Yeah.

10:51:49  7            MR. GODFREY:  I don't think --

10:51:51  8            THE COURT:  They certainly have rights, so I don't know

10:51:53  9    whether we talk about them as third-party beneficiaries or

10:51:57 10    whatever.

10:52:00 11            MR. GODFREY:  I think as a technical matter their rights

10:52:02 12    are to appear before the court seeking relief before this court.

10:52:06 13            THE COURT:  Maybe that's your rights, too, as the other

10:52:08 14    side would say you've done.  But I am having trouble limiting your

10:52:13 15    argument to just you.  It would only apply to BP.

10:52:18 16            What if I had ruled in your favor and they were here

10:52:22 17    telling me I should enjoin the administrator from applying it the

10:52:25 18    way BP wants it applied?  I suspect you might be here saying they

10:52:31 19    don't have a right to do that.

10:52:32 20            MR. GODFREY:  I think class counsel has separate rights

10:52:34 21    that are different from the class in this instance, Your Honor, I

10:52:37 22    don't agree with that proposition.  But I would say that the

10:52:39 23    solution to this issue --

10:52:40 24            THE COURT:  So any time they don't agree they can do the

10:52:43 25    same thing you've done, they can sue Mr. Juneau?

10:52:46  1          MR. GODFREY:  We looked at the case law on this before we

10:52:48  2      actually --

10:52:48  3          THE COURT:  Could they sue Mr. Juneau?

10:52:50  4          MR. GODFREY:  I think if they wanted to seek an

10:52:52  5      enforcement they would have a right to do that, yes.

10:52:53  6          THE COURT:  And who else could sue him?

10:52:54  7          MR. GODFREY:  I think that's it, I think it's limited.

10:52:56  8          THE COURT:  Just BP and the class?

10:52:58  9          MR. GODFREY:  I believe so.

10:52:59 10          THE COURT:  Members of the class, not just class counsel?

10:53:01 11          MR. GODFREY:  No, class members I think are entitled to

10:53:02 12      seek relief from the court.

10:53:04 13          THE COURT:  Why couldn't they see sue him?

10:53:06 14          MR. GODFREY:  I haven't actually looked at that, Your

10:53:08 15      Honor, but I think the answer is --

10:53:08 16          THE COURT:  It's a big problem if he's subject to

10:53:11 17      lawsuits by anybody that's not happy with something he does.

10:53:13 18          MR. GODFREY:  There is no question, Your Honor, that you

10:53:16 19      raise a policy question.  The law does not address this, the law

10:53:19 20      says the solution is if you want to avoid this, appoint him as a

10:53:24 21      special master pursuant to Rule 53, that's why they can't find

10:53:26 22      cases for the motion to dismiss.

10:53:28 23          THE COURT:  Maybe nobody's ever sued them like you have

10:53:32 24      in this case.

10:53:33 25          MR. GODFREY:  I'm not sure about that, Your Honor, but I

10:53:35  1  can tell you that I know what the solution to the issue is if the

10:53:36  2  court would want me to do that, but there are limitations upon

10:53:38  3  Mr. Juneau.

10:53:38  4       THE COURT:  Are you suggesting I should appoint him under

10:53:42  5  Rule 53?

10:53:42  6       MR. GODFREY:  No, I did that to the court.  The

10:53:45  7  supervisor of this settlement in the first instance is the court,

10:53:47  8  this court is the parties and the Court knows.

10:53:50  9       On the Exhibit 4B versus Exhibit 4C.  Class counsel

10:53:55 10  continue to want to talk about causation, and we will set aside

10:53:58 11  some of the argument, maybe that's for a later day; but everything

10:54:01 12  we said, including when we quoted from Mr. Holstein's letter said:

10:54:05 13  Accurate data, monthly revenue, variable expenses.  And that goes

10:54:09 14  back to whether or not the Exhibit 4C, variable profits calculation

10:54:13 15  is being done properly.  We think that the problem here, setting

10:54:16 16  aside causation, is that it as it is not being done properly.  I

10:54:22 17  think the Court knows our position on that.  I would ask the Court

10:54:24 18  to consider that.  There's no reason for me to repeat that.

10:54:28 19       But in answer to your question about where are most of

10:54:31 20  these claims coming from, well, 50 percent of the new claims are

10:54:34 21  now coming from Zone D.  This is a feedback effect, economists call

10:54:38 22  it, where people are making claims from Zone D based upon

10:54:43 23  differential cash flows, not based upon the variable profits

10:54:47 24  analysis that we thought we had agreed to and that we think that

10:54:50 25  the agreement plainly says we did agree to.  And at least the

10:54:54  1    fictitious awards.

10:54:55  2          One final point.  It is true, it is true that in the

10:54:59  3    January 15th BEL policy decisions, Mr. Juneau said we will make

10:55:04  4    some adjustments.  It is not true that the adjustments are being

10:55:08  5    made daily.  Every day they're awarding claimants which have

10:55:13  6    year-end adjustments, whether they have negative revenue or

10:55:15  7    overbilling or errors of any type.  And many times the claimants

10:55:20  8    point them out themselves that they use the monthly financials as

10:55:23  9    submitted.  It is a direct result of the application of the BEL

10:55:26 10    policy decisions, and if the Court thinks that that is incorrect at

10:55:30 11    a minimum, that is a reason for the injunction to stop these

10:55:32 12    fictitious awards from being issued.

10:55:35 13          THE COURT:  Let me ask you one more thing before you sit

10:55:37 14    down.  And I do have to leave.  Mr. Herman mentioned something that

10:55:43 15    I had not heard before that BP is appealing some of these awards

10:55:49 16    not solely on the BEL, not the issue that we're here on today and

10:55:54 17    that's the subject of the March 5th order, but on I'll call it the

10:56:00 18    underlying causation; in other words, arguing that basically the

10:56:06 19    business, the losses must have been caused by something else, not

10:56:11 20    by the oil spill.  Is that accurate?  Is BP now taking that

10:56:16 21    position?

10:56:16 22          MR. GODFREY:  I am not on the appellate side of the

10:56:18 23    house, that's another firm that runs that.  But I can tell you what

10:56:21 24    I know.  There's a definition that the Court affirmed in the class

10:56:26 25    agreement that says people who have suffered damages caused by the

10:56:30  1   spill where the objective data shows that the damage was not caused

10:56:35  2   by the spill.  And some cases the claimants submit it wasn't caused

10:56:39  3   by the spill.  I believe appeals are being taken on that ground.

10:56:42  4        THE COURT:  That's not what I understood Mr. Herman to

10:56:46  5   say, but that's neither here nor there because that's not the issue

10:56:48  6   before the Court, but I just wanted to give you a chance.

10:56:50  7        MR. GODFREY:  I should point out though one point about

10:56:53  8   appeals.  We've appealed as of Monday 2.8 percent of the awards, BP

10:56:57  9   thus far of all appeals that either side has taken has won

10:57:02 10   79 percent of the appeal and a bunch of other appeals and certain

10:57:05 11   percent have been resolved amicably by the parties, more in favor

10:57:08 12   of BP than the other side.  So the notion that somehow the

10:57:11 13   appellate process is being abused, I think the data is really to

10:57:14 14   the contrary.  If the Court wanted the data in the form of a

10:57:18 15   declaration, we'd do it, but I think that's available from the

10:57:19 16   settlement claims administrator as well.

10:57:21 17        With that, Your Honor, I greatly appreciate your time

10:57:24 18   this morning, I know you've visited this issue before.  I think our

10:57:26 19   position is clear on the record, but I also think that we should

10:57:28 20   have an injunction to protect us against us in the interim these

10:57:32 21   continued awards that in our view, based upon hard, cold economic

10:57:37 22   data are fictitious for people who have no actual losses

10:57:41 23   whatsoever.  It's not just they have some loss and it's an

10:57:43 24   exaggerated award, they have no losses whatsoever, however

10:57:46 25   measured.

10:57:46  1          Thank you very much, Your Honor.

10:57:47  2          THE COURT:  Thank you.  The Court has spent, as I said,

10:57:52  3   an enormous amount of time dealing with this issue, not just today

10:57:55  4   and in preparation for this hearing this morning, but in going back

10:57:59  5   to -- I'm not sure when I first got involved, I guess it was in

10:58:03  6   February -- no, must have been January I guess.  And as I said,

10:58:08  7   this is at least the third time that the curt has had to review and

10:58:13  8   look at this issue.

10:58:16  9          And despite the fact that the record has continued to

10:58:20  10  grow, I don't think it changes the fundamental issue before the

10:58:28  11  Court.  And, first of all, I'll say that to the extent this is a

10:58:34  12  motion for reconsideration, which I guess I could construe it as

10:58:38  13  before the Court, of my March 5th, 2013, order where I set forth in

10:58:47  14  some detail the reasons why I interpreted the Settlement Agreement

10:58:52  15  in the same way that the claims administrator had interpreted it in

10:58:56  16  his January 15th policy decision, for those same reasons, I see no

10:59:01  17  basis on which I would consider changing my view of that, of that

10:59:09  18  order.

10:59:10  19         As a consequence of that, what's before the Court this

10:59:15  20  morning as a procedural matter are the following:  As I said, there

10:59:24  21  is a motion to dismiss filed by the defendants in Civil Action

10:59:29  22  13-492, it's filed against the claims administrator Mr. Juneau and

10:59:33  23  the settlement program itself.  I agree essentially with the

10:59:40  24  reasons advanced by counsel for the claims administrator and the

10:59:44  25  settlement program, that the claims alleged by BP in 13-492 do not,

10:59:56  1    that is that they failed to state a claim against either defendant

11:00:04  2    because in essence what is alleged against Mr. Juneau is that he is

11:00:10  3    complying with an order of the court.  As a matter of law, that

11:00:16  4    cannot be a situation where he is breaching the agreement.

11:00:23  5         So I am granting the motion to dismiss 13-492, that

11:00:31  6    lawsuit under Rule 12(b)(6).

11:00:37  7         Second matter before the Court in that same lawsuit there

11:00:40  8    is a motion for preliminary injunction, that is, as I see it, moot

11:00:45  9    because the court's now dismissed that lawsuit.

11:00:52 10         Third matter before the Court is a related practically

11:00:56 11    identical motion for preliminary motion for the *Bon Secour* class

11:01:01 12    action, Civil Action 12-970.  In that case the claims administrator

11:01:10 13    and settlement program are not parties to the lawsuit, but

11:01:14 14    nonetheless they have opposed the preliminary injunction; and so as

11:01:21 15    class counsel and for the reasons I've stated here today, there's

11:01:26 16    no basis on which if I consider the four factors that are required

11:01:33 17    for granting a preliminary injunction:  First of all, likelihood of

11:01:40 18    success on the merits by the moving party, second factor being

11:01:49 19    irreparable harm, and the third and fourth factors deal with

11:01:55 20    weighing the harm or injury to be caused by, in consequence of the

11:02:04 21    court's either granting or denying the request for injunctive

11:02:09 22    relief.  When I consider those factors, I find that BP's motion for

11:02:13 23    preliminary injunction should be denied.

11:02:17 24         In essence, as Mr. Godfrey candidly admitted, this is

11:02:24 25    nothing more than, as he put it, a belt-and-suspenders procedural

11:02:30  1  maneuver by BP to attempt to gain some appellate right that

11:02:38  2  apparently -- appellate rights that apparently is not entirely

11:02:45  3  convinced that it has otherwise because otherwise there would have

11:02:48  4  been no need to file a motion for preliminary injunction.

11:02:56  5       Since they have now appealed my order, filed a notice of

11:03:00  6  appeal and filed a request for a stay, so I am denying the motion

11:03:04  7  for preliminary injunction in *Bon Secour*.

11:03:09  8       And finally, insofar as the request for a stay of my

11:03:12  9  March 5th order, which was filed sometime yesterday I believe, I

11:03:15  10  saw it this morning for the first time, the analysis would be

11:03:21  11  essentially the same for the same reason that I am not revisiting

11:03:27  12  my March 5th order and not granting preliminary injunction, I am

11:03:31  13  also not going to stay my order.

11:03:36  14       So I think that covers everything.  Have a good day.

11:03:40  15       THE DEPUTY CLERK:  All rise.

11:03:41  16    (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

17                    * * * * * *

18                  REPORTER'S CERTIFICATE

19

20       I, Karen A. Ibos, CCR, Official Court Reporter, United
    States District Court, Eastern District of Louisiana, do hereby
21  certify that the foregoing is a true and correct transcript, to the
    best of my ability and understanding, from the record of the
    proceedings in the above-entitled and numbered matter.

22

23

24       _____

25       Karen A. Ibos, CCR, RPR, CRR, RMR
         Official Court Reporter

# APPENDIX "B"

Case 2:10-md-02179-CJB-SS   Document 6276-8   Filed 04/18/12   Page 1 of 5

# EXHIBIT 4A

## Documentation Requirements for Business Economic Loss Claims[1]

The framework detailed below describes the documentation requirements for business economic loss claims.

In order to be eligible for compensation, a business claimant must provide the following:

1.  A Claim Form which the claimant (or claimant's representative) shall verify under penalties of perjury. The Claim Form shall direct the claimant to provide information, including the claimant's chosen Compensation Period and corresponding Benchmark Period[2] in the year(s) selected by the claimant. The claimant shall attach required documents supporting the claim. All statements made in and documents submitted with the Claim Form may be verified as judged necessary by the Claims Administrator.

2.  Documents reflecting the business structure and ownership of the claimant, including but not limited to articles of incorporation, shareholder list(s), and partnership or limited partnership agreements.

3.  Federal tax returns (including all schedules and attachments) for the years included in the claimant-selected Benchmark Period, 2010, and, if applicable, 2011.[3]

    a) Provide the complete federal tax return and the applicable supporting documentation.
    b) For self employed individuals, provide Form 1040, pages 1 and 2, along with Schedules C, D, E, and F and Form 1099 if applicable.

4.  Monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenues and expenses for the claimed Benchmark Period,[4] 2010 and, if applicable,

---

[1] These Documentation Requirements also apply generally to (i) start-up businesses and (ii) businesses claiming to have ceased operations due to and resulting from the DWH Spill, subject to such exclusions as may be noted in the frameworks governing compensation for such businesses. Other provisions of the settlement agreement might require additional documentation for specific business types.

[2] As used herein, Benchmark Period will have the meaning set forth in the Compensation Framework for Business Economic Loss Claims), and may include (i) 2009, (ii) 2008 and 2009, or (iii) 2007-2009. If the claimant selects a Benchmark Period including dates in years prior to 2009, the claimant shall provide the relevant documents for each of those years.

[3] Claimants who must satisfy the requirements of Sections II and III of the Causation Requirements for Business Economic Loss Claims are required to submit 2011 federal tax returns.

[4] If the claimant's Benchmark Period includes dates in years prior to 2009, the claimant shall provide the relevant documents for the applicable years.

2011.[5] Profit and loss statements shall identify the dates on which they were created. The Claims Administrator may, in his discretion, request source documents for profit and loss statements. If there is a discrepancy between amounts reflected in a tax return and comparable items reflected in a profit and loss statement for the same period, the Claims Administrator may request the claimant to provide additional information or documentation.

5.   If the claimant falls within any of the specific business types listed below, the following additional documents are required for the years included in the Benchmark Period, 2010, and, if applicable, 2011:

   a)  Retail
      i.   Monthly sales and use tax returns.

   b)  Lodging (including hotels, motels, and vacation rental properties):
      i.   Lodging tax returns;
      ii.  Occupancy reports or historical rental records, on a per unit basis if available;
      iii. Documentation to identify how the rental property is managed, such as (i) a management contract from a third-party management company or (ii) a **Sworn Written Statement** from an owner that manages its own property.

6.   Additional documents may be required depending on the causation provisions the claimant is seeking to satisfy, as reflected in "Causation Requirements for Business Economic Loss Claims". These documents include, where applicable:

   a)  Documents used to satisfy the Customer Mix Tests accompanying the Modified V-Test and/or Down Only Revenue Pattern Test:
      i.   Credit card receipts, or other contemporaneously-maintained records of payment from customers;
      ii.  Customer registration logs, such as hotel registries;
      iii. Documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers;
      iv.  Business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.

   b)  Documents providing contemporaneous written evidence of the cancellation of a contract as the direct result of the DWH Spill, which the claimant was not able to replace, under the same terms, or a Sworn Written Statement from an individual third party affirming that the cancellation was Spill-related. A copy of all corresponding contracts shall also be provided.

---

[5] Claimants included in Sections II or III of the Causation Requirements for Business Economic Loss Claims are required to submit 2011 monthly profit and loss statements or alternate source documents.

026540

    c) Specific documentation identifying factors outside the control of the claimant that prevented the recovery of revenues in 2011, such as:

        i. The entry of a competitor in 2011;

        ii. Bankruptcy of a significant customer;

        iii. Nearby road closures affecting the business;

        iv. Unanticipated interruption resulting in the closure of the business;

        v. Product/service replacement by customer; or

        vi. Loss of financing and/or reasonable terms of renewal.

    d) Documents created during the period April 21, 2010 - December 31, 2010, that evidence spill-related reservation cancellations during that period that the claimant was not able to rebook under the same terms, such as letters, emails, hotel logs for the relevant time, or a Sworn Written Statement from an independent third party citing the DWH Spill as the reason for the cancellation. Written evidence of the original reservation shall also be provided.

    e) Documents demonstrating expenses associated with purchases of seafood harvested in the Gulf of Mexico during 2009, such as historical purchase orders or invoices.

    f) Other business documents the claimant believes establish causation pursuant to the terms of the Economic and Property Damages Settlement Agreement. Purchase orders or invoices documenting seafood purchase costs for the compensation period, and for the year 2010 or 2011 if applicable.

7. Claimant must provide a copy of any applicable federal, state, or local governmental license required to operate its business. For example, claimants shall produce the following for the Benchmark Period, 2010 and, if applicable, 2011:

    a) Real estate sales licenses

    b) Occupancy licenses (lodging businesses, including hotels, motels, and vacation rental properties)

    c) Business or occupational licenses

        i. Restaurant licenses

        ii. Bars (liquor) licenses

        iii. Taxi/livery licenses

        iv. Service licenses or permits

8. Claimants who have received any of the payments listed below must provide documentation of the amount of payments received:

    a) VoO payments

    b) Payments from GCCF

    c) Payments from BP as part of its OPA claims process.

026541

9.     Additional documentation for claimants with annual revenue of $75,000 or less which seek to establish causation on the basis of a Causation Proxy Claimant:

   a)   Sworn Written Statement from Claimant documenting the following:
      i.    Contact information and verification of status in MDL 2179 Settlement of the Causation Proxy Claimant to be used by the claimant to satisfy causation;
      ii.   Business linkage between the claimant and the Causation Proxy Claimant; and
      iii.  Proximity of the claimant to the Causation Proxy Claimant (must be within 100 yards for urban claimants and within one-quarter mile for rural claimants).
   b)   Sworn Written Statement from Causation Proxy Claimant authorizing claimant's use of the Causation Proxy Claimant's documentation to satisfy causation.

10.    Form affirming that the individual filing the claim on behalf of the business is an authorized representative of the claimant.

026542

# EXHIBIT 4B

## CAUSATION REQUIREMENTS FOR BUSINESSES ECONOMIC LOSS CLAIMS[1]

**I.    Business Claimants for Which There is No Causation Requirement**

1) If you are a business in Zone A, you are not required to provide any evidence of causation unless you fall into one of the exceptions agreed to by the parties, and listed in footnote (1).

2) If you are a "Landing Site," or "Commercial Wholesale or Retail Dealer A," or "Primary Seafood Processor," as set forth in "Seafood Distribution Chain Definitions," you are not required to provide any evidence of causation.

3) If you are in Zone A, B or C and you are a "Commercial or Wholesale or Retail Dealer B," or a "Secondary Seafood Processor," or a "Seafood Wholesaler or Distributor," or a "Seafood Retailer," as set forth in "Seafood Distribution Chain Definition," you are not required to provide any evidence of causation.

4) If you are in Zone A or Zone B, and you meet the "Tourism Definition," you are not required to provide any evidence of causation.

5) If you are in Zone A, B or C, and you meet the "Charter Fishing Definition" you are not required to provide any evidence of causation.

**II.    Causation Requirements for Zone B and Zone C**

If you are not entitled to a presumption as set forth in (I) above and you are located in Zone B or Zone C then you must satisfy the requirements of one of the following sections A-E below:

A.  V-Shaped Revenue Pattern:

Total business revenue shows the following pattern:

1.  DOWNTURN:  a decline of an aggregate of 8.5% or more in total revenues over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant;[2] AND

2.  LATER UPTURN:  an increase of an aggregate of 5% or more in total revenues over the same period of three consecutive months in 2011 compared to 2010.[3]

OR

---

[1] This Causation Requirements for Business Economic Loss Claims does not apply to (i) Start-up Businesses; (ii) Failed Businesses; (iii) Entities, Individuals or Claims not included within the Economic Class definition; and (iv) Claims covered under the Seafood Program.

[2] See Compensation Framework for Business Economic Loss Claims.

[3] See Exhibit A attached hereto for an example of how this calculation is performed.

028725

B.  Modified V-Shaped Revenue Pattern:

Total business revenue shows the following pattern:

1.  DOWNTURN: a decline of an aggregate of 5% or more in total revenues over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant;[4] AND

2.  LATER UPTURN:  an increase of an aggregate of 5% or more in total revenues over the same period of three consecutive months in 2011 compared to 2010;

AND ONE OR MORE OF THE FOLLOWING:

a.  The claimant demonstrates a decline of 10% in the share of total revenue generated by non-local customers over the same period of three consecutive months from May-December 2010 as selected by claimant for the Modified V-Shaped Revenue Pattern as identified in (II.B.1) compared to the same three consecutive month period in 2009, as reflected in:[5]

- customer credit card receipts or other contemporaneously maintained records of payment; or
- customer registration logs (e.g., hotel registries); or
- documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
- business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.[6]

OR

b.  For business claimants that  have  customers in Zones A-C, the claimant demonstrates a decline of 10% in the share of total revenue generated by customers located in Zones A-C over the same period of the three consecutive months from May-December 2010 as selected by claimant for the Modified V-Shaped Revenue Pattern as identified in (II.B.1) compared to the same three consecutive month period in 2009, as reflected in:

---

[4] See Compensation Framework for Business Economic Loss Claims.
[5] A Customer shall be considered a "non-local customer" if they reside more than 60 miles from a claimant business location.
[6] See Exhibit B attached hereto for an example of how this calculation is performed.

028726

- customer credit card receipts or other contemporaneously maintained records of payment; or
- customer registration logs (e.g., hotel registries); or
- documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
- business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.[7]

OR

c. The claimant provides contemporaneous written evidence of the cancellation of a contract as the direct result of the spill that claimant was not able to replace.  Proof of a spill-related contract cancellation only establishes causation for the specific contract substantiated by the claimant and may result in recovery only of damages solely associated with such contract.

OR

C. Decline-Only Revenue Pattern:

1. DOWNTURN:  a decline of an aggregate of 8.5% or more in revenues over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant;[8]

AND

2. Specific documentation identifying factors outside the control of the claimant that prevented the recovery of revenues in 2011, such as:
   - The entry of a competitor in 2011
   - Bankruptcy of a significant customer in 2011
   - Nearby road closures affecting the business
   - Unanticipated interruption resulting in closure of the business
   - Product/Service replacement by Customer
   - Loss of financing and/or reasonable terms of renewal;

AND

3.  ONE OF THE FOLLOWING:

---

[7] See Exhibit C attached hereto for an example of how this calculation is performed.
[8] See Compensation Framework for Business Economic Loss Claims.

028727

- The claimant demonstrates proof of a decline of 10% in the share of total revenue generated by non-local customers over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Decline-Only Revenue Pattern as identified in (II.C.1) compared to the same three consecutive month period in 2009, as reflected in:[9]
  - customer credit card receipts or other contemporaneously maintained records of payment; or
  - customer registration logs (e.g., hotel registries); or
  - documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
  - business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.[10]

- For business claimants that have customers in Zones A-C, the claimant demonstrates proof of a decline of 10% in the share of total revenue generated by customers located in Zones A-C over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Decline-Only Revenue Pattern as identified in (II.C.1) compared to the same three consecutive month period in 2009, as reflected in:
  - customer credit card receipts or other contemporaneously maintained records of payment; or
  - customer registration logs (e.g., hotel registries); or
  - documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
  - business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.[11]

OR

D.  Proof of Spill-Related Cancellations

- Claimant may establish causation by providing contemporaneous written evidence of spill-related reservation cancellations (*i.e.*, letters, emails, hotel logs for the relevant time, or an affidavit from an independent third party citing the

---

[9] A Customer shall be considered a "non-local customer" if they reside more than 60 miles from a claimant business location.

[10] See Exhibit B attached hereto for an example of how this calculation is performed.

[11] See Exhibit C attached hereto for an example of how this calculation is performed.

028728

spill as the reason for cancellation) that the claimant was unable to rebook. Proof of spill-related reservation cancellations only establishes causation for the specific cancellations substantiated by the claimant and may result in recovery only of damages solely associated with such cancellations established as causally resulting from the spill. However, if the lodging facility has food and/or beverage services on site, the evidence of cancellation shall satisfy causation for the specific losses corresponding to such cancellation in those service areas as well.

- The claimant provides contemporaneous written evidence of the cancellation of a contract as the direct result of the spill that claimant was not able to replace. In the absence of contemporaneous written evidence, the claimant must present an affidavit from an independent third party affirming that the cancellation was spill-related. Proof of a spill-related contract cancellation only establishes causation for the specific contract substantiated by the claimant and may result in recovery only of damages solely associated with such contract.

OR

E.  A non-rural business claimant on a property that is in close proximity (within 100 yards) to the property of a separate MDL 2179 business claimant that has established causation ("Causation Proxy Claimant") may rely on the documentation submitted by such Causation Proxy Claimant to satisfy these Causation Requirements for Business Economic Loss Claims. A "Rural Business" claimant located within one quarter-mile of the property of the Causation Proxy Claimant may rely on the documentation submitted by the Causation Proxy Claimant to satisfy these causation requirement only if the claimant provides information sufficient for the Claims Administrator to determine that a causal relationship exists between the claimant's financial performance and the financial performance of the Causation Proxy Claimant. A Rural Business shall be defined as one is located in area outside an Urban Area or Urban Cluster, as defined by the US Census Bureau's classification. Only business claimants with annual revenue of $75,000 or below are eligible to establish causation under this Subpart IIE.

**III.    Causation Requirements for Zone D**

If you are not entitled to a presumption as set forth in (I) above and you are located  outside of Zones A, B or C, then you must satisfy the requirements of one of the following sections A-F below:

A.    V-Shaped Revenue Pattern:

Business revenue shows the following pattern:

028729

1. <u>DOWNTURN:</u> a decline of an aggregate of 15% or more in total revenues over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant;[12]

   AND

2. <u>LATER UPTURN:</u> an increase of an aggregate of 10% or more in total revenues over the same period of three consecutive months in 2011 compared to 2010.[13]

OR

B.    Modified V-Shaped Revenue Pattern:

Total business revenue shows the following pattern:

1. <u>DOWNTURN:</u> a decline of an aggregate of 10% or more in total revenues over the same period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant;[14]

   AND

2. <u>LATER UPTURN:</u> an increase of an aggregate of 7% or more in total revenues over the same period of three consecutive months in 2011 compared to 2010;

   AND

3. <u>ONE OF THE FOLLOWING:</u>

   • The claimant demonstrates proof of a decline of 10% in the share of total revenue generated by non-local customers over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Modified V-Shaped Revenue Pattern identified in (III.B.1) compared to the same three consecutive month period in 2009, as reflected in:[15]

---

[12] See Compensation Framework for Business Economic Loss Claims.

[13] See Exhibit A attached hereto for an example of how this calculation is performed.

[14] See Compensation Framework for Business Economic Loss Claims.

[15] A Customer shall be considered a "non-local customer" if they reside more than 60 miles from a claimant business location.

028730

- o customer credit card receipts or other contemporaneously maintained records of payment; or
- o customer registration logs (e.g., hotel registries); or
- o documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
- o business documents reflecting contemporaneous recording of receipts or invoices listing customers by location. [16]

- For business claimants that have customers in Zones A-C, the claimant demonstrates proof of a decline of 10% in the share of total revenue generated by customers located in Zones A-C over the same period of the three consecutive months from May-December 2010 as selected by the claimant for the Modified V-Shaped Revenue Pattern identified in (III.B.1) compared to the same three consecutive month period in 2009, as reflected in:
    - o customer credit card receipts or other contemporaneously maintained records of payment; or
    - o customer registration logs (e.g., hotel registries); or
    - o documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
    - o business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.[17]

- The claimant provides contemporaneous written evidence of the cancellation of a contract as the direct result of the spill that claimant was not able to replace.  Proof of a spill-related contract cancellation only establishes causation for the specific contract substantiated by the claimant and may result in recovery only of damages solely associated with such contract.

OR

C.      Decline-Only Revenue Pattern:

1. <u>DOWNTURN:</u>  a decline of an aggregate of 15% or more in total revenues over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant without a recovery in the corresponding months of 2011; [18]

---

[16] See Exhibit B attached hereto for an example of how this calculation is performed.
[17] See Exhibit C attached hereto for an example of how this calculation is performed.
[18] See Compensation Framework for Business Economic Loss Claims.

028731

AND

2. Specific documentation identifying factors outside the control of the
   claimant that prevented the recovery of revenues in 2011:
   - The entry of a competitor in 2011
   - Bankruptcy of a significant customer in 2011
   - Nearby road closures affecting the business
   - Unanticipated interruption resulting in closure of the business
   - Produce/Source replacement by Customer,
   - Loss of financing and/or reasonable terms of renewal;

AND

3. ONE OR MORE OF THE FOLLOWING:

- The claimant demonstrates proof of a decline of 10% in the share of total
  revenue generated by non-local customers over the same period of three
  consecutive months from May-December 2010 as selected by the
  claimant for the Decline-Only Revenue Patter as identified in (III.C.1)
  compared to the same three consecutive month period in 2009, as
  reflected in:[19]
  - o customer credit card receipts or other contemporaneously
    maintained records of payment; or
  - o customer registration logs (e.g., hotel registries); or
  - o documentation maintained in the ordinary course of business that
    lists customers by location and monthly sales associated with
    those customers; or
  - o business documents reflecting contemporaneous recording of
    receipts or invoices listing customers by location. [20]

- For business claimants that have customers in Zones A-C, the claimant
  demonstrates proof of a  decline of a 10% in the share of total revenue
  generated by customers located in Zone A, Zone B, or Zone C  over the
  same period of three consecutive months from May-December 2010 as
  selected by the claimant for the Decline-Only Revenue Pattern as
  identified in (III.C.1) compared to the same three consecutive month
  period in 2009, as reflected in:
  - o customer credit card receipts or other contemporaneously
    maintained records of payment; or
  - o customer registration logs (e.g., hotel registries); or

---

[19] A Customer shall be considered a "non-local customer" if they reside more than 60 miles from a claimant
business location.
[20] See Exhibit B attached hereto for an example of how this calculation is performed.

028732

      ○ documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or

      ○ business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.[21]

OR

D. Proof of Spill-Related Reservation Cancellations

- Claimant may establish causation by providing contemporaneous written evidence of spill-related reservation cancellations (*i.e.*, letters, emails, hotel logs for the relevant time) that the claimant was unable to rebook. Proof of spill-related reservation cancellations only establishes causation for the specific cancellations substantiated by the claimant and may result in recovery only of damages solely associated with such cancellations established as causally resulting from the spill. However, if the lodging facility has food and/or beverage services on site, the evidence of cancellation shall satisfy causation for the losses in those service areas as well.

- The claimant provides contemporaneous written evidence of the cancellation of a contract as the direct result of the spill that claimant was not able to replace. In the absence of contemporaneous written evidence, the claimant must present an affidavit from an independent third party affirming that the cancellation was spill-related. Proof of a spill-related contract cancellation only establishes causation for the specific contract substantiated by the claimant and may result in recovery of damages solely associated with such contract.

OR

E. For claimants defined as "Seafood Retailers" (including restaurants):

      ○ Claimant demonstrates purchases of Gulf of Mexico harvested seafood from Zone A, Zone B or Zone C vendors represented at least 10% of food costs during 2009, as reflected in historical purchase orders and/or invoices.

      AND

---

[21] See Exhibit C attached hereto for an example of how this calculation is performed.

028733

     ○  Claimant demonstrates a decline of 7.5% in gross profit (gross sales less cost of goods sold) over a period of three consecutive months between May-December 2010 compared to the same months in 2009.

OR

F.  A non-rural business claimant on a property that is in close proximity (within 100 yards) to the property of a separate MDL 2179 business claimant that has established causation ("Causation Proxy Claimant") may rely on the documentation submitted by such Causation Proxy Claimant to satisfy these Causation Requirements for Business Economic Loss Claims.  A "Rural Business" claimant located within one quarter-mile of the property of the Causation Proxy Claimant may rely on the documentation submitted by the Causation Proxy Claimant to satisfy these causation requirement only if the claimant provides information sufficient for the Claims Administrator to determine that a causal relationship exists between the claimant's financial performance and the financial performance of the Causation Proxy Claimant. A Rural Business shall be defined as one is located in area outside an urban area or urban cluster, as defined by the US Census Bureau's classification. Only business claimants with annual revenue of $75,000 or below are eligible to establish causation under this Subpart IIIF.

**Exhibit A**

### Summary of Revenue Pattern Requirements for Causation Tests

| Test | Zone A | | Zone B (Non-Tourism and Non-Seafood) | | Zone C (Non-Seafood) | | Zone D | |
|------|--------|----|--------|----|--------|----|--------|----|
| | Down | Up | Down | Up | Down | Up | Down | Up |
| V-Test | | N/A | -8.5% | 5% | -8.5% | 5% | -15% | 10% |
| Modified V-Test * | | N/A | -5% | 5% | -5% | 5% | -10% | 7% |
| Down Only Test * | | N/A | -8.50% | N/A | -8.50% | N/A | -15% | N/A |

\* = For the Modified V-Test and the Down Only Test, additional requirements apply, as described in Sections IIB, IIC, IIIB, and IIIC above.

10

028734

## Examples of Revenue Pattern Requirements for Causation Tests

In these examples, the claimant is located in Zone B or C, uses 2008-2009 average as Benchmark Period, and has selected June, July and August as its three consecutive months.

**Example 1:**

| Month | 2008 | 2009 | Average of 2008-2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| | | | Revenue by Year | | |
| June | 325,000 | 300,000 | 312,500 | 285,000 | 305,000 |
| July | 360,000 | 350,000 | 355,000 | 330,000 | 345,000 |
| August | 340,000 | 325,000 | 332,500 | 295,000 | 330,000 |
| 3-Month Aggregate: [Sum of June, July, August] | 1,025,000 | 975,000 | 1,000,000 | 910,000 | 980,000 |

| | | |
|---|---|---|
| Down Percentage: | **-9.0%** | =(910,000 - 1,000,000)/1,000,000 |
| Up Percentage: | **7.7%** | =(980,000 - 910,000)/910,000 |

*Claimant passes V-Test.  Note: A claimant that satisfies the revenue pattern requirements for the V-Test will always also satisfy the requirements for the Modified V-Test and Down Only Test.*

**Example 2:**

| Month | 2008 | 2009 | Average of 2008-2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| | | | Revenue by Year | | |
| June | 325,000 | 300,000 | 312,500 | 295,000 | 320,000 |
| July | 360,000 | 350,000 | 355,000 | 335,000 | 355,000 |
| August | 340,000 | 325,000 | 332,500 | 315,000 | 340,000 |
| 3-Month Aggregate: [Sum of June, July, August] | 1,025,000 | 975,000 | 1,000,000 | 945,000 | 1,015,000 |

| | | |
|---|---|---|
| Down Percentage: | **-5.5%** | =(945,000 - 1,000,000)/1,000,000 |
| Up Percentage: | **7.4%** | =(1,015,000 - 945,000)/945,000 |

*Claimant fails V Test and the Down Only Test.*
*Claimant has satisfied the revenue pattern requirement for the  Modified V-Test and can establish causation if able to satisfy the additional requirements described in Section IIB above.*

**Example 3:**

| Month | 2008 | 2009 | Average of 2008-2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| | | | Revenue by Year | | |
| June | 325,000 | 300,000 | 312,500 | 285,000 | 300,000 |
| July | 360,000 | 350,000 | 355,000 | 330,000 | 325,000 |
| August | 340,000 | 325,000 | 332,500 | 295,000 | 310,000 |
| 3-Month Aggregate: [Sum of June, July, August] | 1,025,000 | 975,000 | 1,000,000 | 910,000 | 935,000 |

| | | |
|---|---|---|
| Down Percentage: | **-9.0%** | =(910,000 - 1,000,000)/1,000,000 |
| Up Percentage: | **2.7%** | =(935,000 - 910,000)/910,000 |

*Claimant fails V Test and the Modified V-Test.*
*Claimant has satisfied the revenue pattern requirement for the  Down Only Test and can establish causation if able to satisfy the additional requirements described in Section IIC above.*

Notes:

The causation tests would work in the same way for claimants in Zone D with higher thresholds for the tests.  In Zone D, the V-Test thresholds are -15% decline, 10% upturn; the Modified V-Test thresholds are -10% decline, 7% upturn; the Down-Only Test threshold is -15%.

11

028735

## Examples of Revenue Pattern Requirements for Causation Tests

In these examples, the claimant is located in Zone B or C, uses 2008-2009 average as Benchmark Period, and has selected June, July and August as its three consecutive months.

Example 4 demonstrates that under an aggregate test, three months of revenues are summed. The individual months may be up or down, as long as the three month aggregate period passes the test.

### Example 4A:

Revenue by Year

| Month | 2008 | 2009 | Average of 2008-2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| June | 325,000 | 300,000 | 312,500 | 285,000 | 305,000 |
| July | 360,000 | 350,000 | 355,000 | 330,000 | 345,000 |
| August | 340,000 | 325,000 | 332,500 | 295,000 | 330,000 |
| 3-Month Aggregate: [Sum of June, July, August] | 1,025,000 | 975,000 | 1,000,000 | 910,000 | 980,000 |

Down Percentage:  **-9.0%** =(910,000 - 1,000,000)/1,000,000
Up Percentage:  **7.7%** =(980,000 - 910,000)/910,000

*Claimant passes V-Test.  Note: A claimant that satisfies the revenue pattern requirements for the V-Test will always also satisfy the requirements for the Modified V-Test and Down Only Test.*

### Example 4B:

Revenue by Year

| Month | 2008 | 2009 | Average of 2008-2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| June | 325,000 | 300,000 | 312,500 | 385,000 | 305,000 |
| July | 360,000 | 350,000 | 355,000 | 230,000 | 345,000 |
| August | 340,000 | 325,000 | 332,500 | 295,000 | 330,000 |
| 3-Month Aggregate: [Sum of June, July, August] | 1,025,000 | 975,000 | 1,000,000 | 910,000 | 980,000 |

Down Percentage:  **-9.0%** =(910,000 - 1,000,000)/1,000,000
Up Percentage:  **7.7%** =(980,000 - 910,000)/910,000

*Claimant passes V-Test.*

### Example 4C:

Revenue by Year

| Month | 2008 | 2009 | Average of 2008-2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| June | 325,000 | 300,000 | 312,500 | 385,000 | 305,000 |
| July | 360,000 | 350,000 | 355,000 | 430,000 | 345,000 |
| August | 340,000 | 325,000 | 332,500 | 95,000 | 330,000 |
| 3-Month Aggregate: [Sum of June, July, August] | 1,025,000 | 975,000 | 1,000,000 | 910,000 | 980,000 |

Down Percentage:  **-9.0%** =(910,000 - 1,000,000)/1,000,000
Up Percentage:  **7.7%** =(980,000 - 910,000)/910,000

*Claimant passes V-Test.*

Notes:

The causation tests would work in the same way for claimants in Zone D with higher thresholds for the tests.  In Zone D, the V-Test thresholds are -15% decline, 10% upturn; the Modified V-Test thresholds are -10% decline, 7% upturn; the Down-Only Test threshold is -15%.

12

028736

**Exhibit B**

## Example of Customer Mix Test (Non-Local Customers)

The claimant in this Exhibit B uses the same three-month time period as the claimant in Exhibit A (June-July-August).

To pass the test, claimants must demonstrate proof of a decline of 10% or more in the share of total revenue generated by non-local customers over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Modified V-Test or Down Only Tests compared to the same three consecutive months in 2009.

**Example 1:**          LT= Less than                    GE=Greater than or equal to

| Customer Residence | June-August '09 | June-August '10 |
|---|---|---|
| LT 60 miles from claimant | $80,000 | $66,000 |
| GE 60 miles from claimant | $20,000 | $14,000 |
| Total | $100,000 | $80,000 |
| % GE 60 miles | 20% | 17.5% |
| | *Claimant passes Customer Mix Test:  Claimant has a 12.5 percent decline in share of total revenue from non-local customers  [12.5%= .125 = (20-17.5)/20].* | |

**Example 2:**

| Customer Residence | June-August '09 | June-August '10 |
|---|---|---|
| LT 60 miles from claimant | $50,000 | $40,000 |
| GE 60 miles from claimant | $50,000 | $40,000 |
| Total | $100,000 | $80,000 |
| % GE 60 miles | 50% | 50% |
| | *Claimant fails Customer Mix Test:  No change in share of total revenue from non-local customers. [0% = 0 = (50-50)/50].* | |

**Example 3:**

| Customer Residence | June-August '09 | June-August '10 |
|---|---|---|
| LT 60 miles from claimant | $50,000 | $48,000 |
| GE 60 miles from claimant | $50,000 | $40,000 |
| Total | $100,000 | $88,000 |
| % GE 60 miles | 50% | 45.5% |
| | *Claimant fails Customer Mix Test:  Claimant has a 9% decline in share of total revenue from non-local customers [9% = .09 = (50-45.5)/50].* | |

028737

**Exhibit C**

## Example of Customer Mix Test (Customers in Zones A-C)

The claimant in this Exhibit B uses the same three-month time period as the claimant in Exhibit A (June-July-August).

To pass the test, claimants must demonstrate proof of a decline of 10% or more in the share of total revenue generated by customers in Zones A-C over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Modified V-Test or Down Only Tests compared to the same three consecutive months in 2009.

### Example 1:

| Customer Residence | June-August '09 | June-August '10 |
|---|---|---|
| Zone D | $80,000 | $66,000 |
| Zones A-C | $20,000 | $14,000 |
| Total | $100,000 | $80,000 |
| % Zones A-C | 20% | 17.5% |
| | *Claimant passes Customer Mix Test: Claimant has a 12.5 percent decline in share of total revenue from customers in Zones A-C [12.5%= .125 = (20-17.5)/20]* | |

### Example 2:

| Customer Residence | June-August '09 | June-August '10 |
|---|---|---|
| Zone D | $50,000 | $40,000 |
| Zones A-C | $50,000 | $40,000 |
| Total | $100,000 | $80,000 |
| % Zones A-C | 50% | 50% |
| | *Claimant fails Customer Mix Test: No change in share of total revenue from customers in Zones A-C. [0% = 0 = (50-50)/50]* | |

### Example 3:

| Customer Residence | June-August '09 | June-August '10 |
|---|---|---|
| Zone D | $50,000 | $48,000 |
| Zones A-C | $50,000 | $40,000 |
| Total | $100,000 | $88,000 |
| % Zones A-C | 50% | 45.5% |
| | *Claimant fails Customer Mix Test: Claimant has a 9% decline in share of total revenue from customers in Zones A-C [9% = .09 = (50-45.5)/50]* | |

028738

**Addendum To**
**Causation Requirements For Business Economic Loss Claims and**
**Compensation Framework for Business Economic Loss Claims**

The term "Benchmark Period" is defined at pp. 1-2 in the **Compensation Framework for Business Economic Loss Claims** (Ex. 4C).  That definition provides:

> The Benchmark Period is the pre-DWH Spill time period which claimant chooses as the baseline for measuring its historical financial performance.  The claimant can select among the following Benchmark Periods: 2009; the average of 2008-2009; or the average of 2007-2009, provided that the range of years selected by the claimant will be utilized for all Benchmark Period purposes.

Footnote 2 of the **Causation Requirements For Business Economic Loss Claims** (Ex. 4B) specifically incorporates that definition of Benchmark Period by reference.

Accordingly, once the claimant selects the Benchmark Period year(s) (2009, the average of 2008-2009, or the average of 2007-2009), the **same** Benchmark Period year(s) are used "for all Benchmark Period purposes" -- specifically, the same Benchmark Period year(s) are used for purposes of determining **both** causation and compensation.

In contrast, a claimant is not required to use the same **months** in the Benchmark Period for purposes of establishing causation pursuant to Ex. 4B and determining compensation pursuant to Ex. 4C.

For example, when evaluating whether a claimant can satisfy causation using the "V Test," the claimant may select any consecutive 3-month period between May and December 2010 for comparison to a comparable period in the Benchmark Period (i.e., 2009, the average of 2008-2009, or the average of 2007-2009).  After establishing causation, however, the claimant may select a different 3 or more consecutive months between May and December 2010 in determining compensation in accordance with the **Compensation Framework for Business Economic Loss Claims**, so long as the claimant uses the same Benchmark Period years as the basis for comparison.  Thus, if the claimant selected for *causation* the three months of May - July in the Benchmark Period years of the average of 2008-2009, the claimant can select for *compensation* different months -- e.g., August - October -- but must use the same average of 2008-2009 Benchmark Period.  The same Benchmark Period year(s) thus must be used both for causation (Ex. 4B) and compensation (Ex. 4C).

The additional examples on the next page illustrate these rules:

Scenario 1:

1) Claimant selected the months of May-July 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009 and 2007-2009;

2) In determining Compensation, Claimant would be allowed to select the months of August through November 2010 as compared to the months of August through November in either 2009, 2008-2009 or 2007-2009 as the Benchmark years – whichever provides the highest compensation.

Scenario 2:

1) Claimant selected the months of October – December 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009;

2) In determining compensation, Claimant could select the months of May-September 2010 as compared to the months of May-September in either 2009 or 2008-2009 – whichever provides the highest compensation.

Scenario 3:

1) Claimant selected the months of June – August 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period year of 2009.  In addition, Claimant selected the months of August – October 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2007-2009;

2) In determining compensation, Claimant could select the months of May-December 2010 as compared to the months of May-December in either 2009 or 2007-2009 – whichever provides the highest compensation.

028780

# EXHIBIT 4C

## Compensation Framework for Business Economic Loss Claims

The compensation framework for business claimants compares the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010.[1]  The calculation is divided into two steps:

> **Step 1** – Compensates claimants for any reduction in profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period.  Step 1 compensation reflects the reduction in Variable Profit (which reflects the claimant's revenue less its variable costs) over this period.

> **Step 2** – Compensates claimants for incremental profits or losses the claimant might have been expected to generate in the absence of the spill relative to sales from the Benchmark Period. This calculation reflects a Claimant-Specific Factor that captures growth or decline in the pre-spill months of 2010 compared to the comparable months of the Benchmark Period and a General Adjustment Factor.

For purposes of the two step calculation, the parties have agreed to a defined list of fixed and variable expenses as reflected in Attachment A.

In order to allocate payroll expenses (including Salaries and Wages, Employee Benefits, and, where applicable, 401K Payments, but excluding Owner/Officer Compensation) into fixed and variable components, a minimum level of fixed payroll costs will be measured based on the average of the two months between May 2010 and December 2010 in which the claimant had its lowest payroll costs. Certain exceptions are identified below for identifying months with the claimant's lowest payroll costs.

For claimants that include Cost of Goods Sold (COGS) in their financial statements, COGS will be treated as a variable expense after excluding, to the extent possible, the following cost items which may be embedded in COGS and are likely to be fixed in nature: Fixed COGS Payroll, Amortization, Depreciation, Insurance Expense, Interest Expense, and Contract Services.

Based on these considerations, the resulting calculations are performed to determine compensation for claimants.

## I.    Definitions

For the purposes of this calculation, the following are defined terms:

**Compensation Period:**  The Compensation Period is selected by the Claimant to include three or more consecutive months between May and December 2010.

**Benchmark Period:** The Benchmark Period is the pre-DWH Spill time period which claimant chooses as the baseline for measuring its historical financial performance.  The claimant can select among the

---

[1] This Compensation Framework for Business Claims does not apply to (i) start-up businesses and (ii) failed businesses.  Compensation frameworks for these types of businesses will be presented separately.

026294

following Benchmark Periods: 2009; the average of 2008-2009; or the average of 2007-2009, provided that the range of years selected by the claimant will be utilized for all Benchmark Period purposes.

**Claimant-Specific Factor**:  In order to capture the impact of pre-DWH Spill trends in the claimant's revenue performance that might have been expected in the post-DWH Spill Benchmark Period, revenue will be adjusted by a Claimant-Specific Factor.  The following steps will be used to compute the Claimant-Specific Factor:

A. Calculate the difference between claimant's total revenue for January through April 2010 and total revenue in January through April of the corresponding claimant – selected Benchmark Period.

B. Divide the revenue change calculated in Step A by total revenue in January through April of the Benchmark Period to derive the Claimant-Specific Factor. If the calculated Claimant-Specific Factor falls below -2% or exceeds +10%, then it will be set at -2% or +10%, respectively.

**General Adjustment Factor:**  In addition to the Claimant-Specific factor, all Claimants shall be entitled to a 2.0% General Adjustment Factor.

**Variable Profit**:  This is calculated for both the Benchmark Period and the Compensation Period as follows:

1. Sum the monthly revenue over the period.
2. Subtract the corresponding variable expenses from revenue over the same time period. Variable expenses include:
   a. Variable Costs as identified in Attachment A.
   b. Variable portion of salaries, calculated as described below in the definition of Fixed and Variable Payroll Expenses.
   c. Variable portion of COGS, calculated by excluding salary costs (which are discussed below in the definition of Fixed and Variable Payroll Expenses) and fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, and Interest Expense and Contract Services.

**Variable Margin**:  This is calculated only for the Benchmark Period and is calculated as follows:

1. Sum Variable Profit from May through December of the years selected by the claimant to be used for the Benchmark Period.
2. Sum total revenue from May through December of the years selected by the claimant to be used for the Benchmark Period.
3. Calculate Variable Margin percent as Variable Profit calculated in (1) divided by total revenue calculated in (2).

026295

**Fixed and Variable Payroll Expenses:**  Fixed and Variable Payroll Expenses are calculated based on the understanding that every business must operate with a minimum core staff and are defined using monthly profit and loss statements and/or those documents listed in the Documentation Requirements for Business Claims, for May through December 2010.  Fixed and Variable Payroll expenses are calculated as follows:

1. Obtain monthly amounts for the following payroll expenses (excluding Owner/Officer Compensation):  (a) Salaries & wages; (b) Payroll taxes (including FICA, workers compensation insurance, unemployment tax); (c) Employer costs for employee benefits.  Calculations include components of salaries and related expenses included in both Selling, General & Administrative Expenses ("SG&A") and COGS.
2. Sum these payroll expenses on a monthly basis to determine the Total Payroll Expense for each month.
3. Identify the two months between May and December 2010 with the lowest Total Payroll Expense.
   - Months in which the claimant has zero revenue, zero non-officer payroll expenses, or the business is closed, will be excluded from this calculation.
4. Define "Fixed Payroll Expenses" as the average payroll expense over the two months with the lowest Total Payroll Expense.
5. For any month with Total Payroll Expenses less than Fixed Payroll Expenses, all payroll costs will be considered fixed expenses.
6. For any month with Total Payroll Expenses greater than Fixed Payroll Expenses, the excess amount of Total Payroll Expenses will be considered variable expenses.

**Incremental Revenue**: Incremental revenue shall be calculated as (i) the claimant's revenue in a claimant-selected period of six, seven or eight consecutive months (as set forth in Step 2 below) between May and December of the years selected by the claimant to be included in the Benchmark Period, multiplied by (ii) the Claimant-Specific Factor and the General Adjustment Factor.


**II.    Description of Compensation Calculation**

**Step 1 Compensation**

Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the comparable months of the Benchmark Period.

As noted above, the Compensation Period is selected by the Claimant to include three or more consecutive months between May and December 2010.

026296

For claimants that participated in the VoO program, Variable Profit in the Compensation Period will exclude revenue generated by or costs incurred in connection with VoO.[2]

**Step 2 Compensation**

Step 2 of the Compensation Calculation for Business Economic Loss Claims is intended to compensate claimants for incremental profits the claimant might have been expected to generate in 2010 in the absence of the spill, based on the claimant's growth in revenue in January-April of 2010 relative to the claimant-selected Benchmark Period (2009 or (average of 2008 and 2009) or (average of 2007, 2008 and 2009)).

**Calculation:**

Using monthly profit and loss statements and/or those documents listed in the Documentation Requirements for Business Claims:

1. Claimant may select from the following six-consecutive month periods for calculating Step 2 Compensation:
   a. May-October
   b. June-November
   c. July-December
   Unless claimant chose a seven-consecutive-month or eight-consecutive-month period in Step 1, in which case that same period of identical consecutive months in 2010 shall be used for Step 2.
2. Calculate the Claimant-Specific Factor:
   a. Calculate the difference between claimant's total revenue for January through April 2010 and total revenue in January through April of the Benchmark Period.
   b. Divide the revenue change calculated in [2.a] by total revenue in January through April of the Benchmark Period to derive the Claimant-Specific Factor.  If the calculated Claimant-Specific Factor falls below -2% or exceeds +10%, then it will be set at -2% or +10%, respectively.
3. Calculate Incremental Revenue:
   a. Calculate total revenue in the consecutive months of the Benchmark Period selected in [1] above.
   b. Multiply total revenue by the sum of the Claimant-Specific Factor and the General Adjustment Factor of 2% to calculate Incremental Revenue.
4. Multiply Incremental Revenue by the Variable Margin in the Benchmark Period to calculate Step 2 Compensation.

---

[2] Claimants are required to report payments received under the VoO program.  If claimants that received VoO payments fail separately to report costs incurred in VoO and non-VoO activities, then Step 1 Compensation for non-VoO activity alone can be determined through a pro-rata revenue based allocation of variable costs between VoO and non-VoO related activities.

026297

**Example 1:**

In this example, the claimant selects June-November as the six-consecutive month period in the Benchmark Period to calculate Step 2 Compensation:

| | | |
|---|---|---:|
| June-November Revenue in the Benchmark Period | [a] | $200,000 |
| Claimant-Specific Factor | [b] | 8% |
| General Adjustment Factor | [c] | 2% |
| Incremental Revenue | [d] = [a]*([b]+[c]) | $20,000 |
| Variable Margin Percentage | [e] | 50% |
| Step 2 Compensation | [f] = [d]*[e] | $10,000 |

**Example 2:**

In this example, the claimant selected June-December as the seven-consecutive month Compensation Period in Step 1 and therefore must use the same period of identical consecutive months in the Benchmark Period to calculate Step 2 Compensation:

| | | |
|---|---|---:|
| June-December Revenue in the Benchmark Period | [a] | $220,000 |
| Claimant-Specific Factor | [b] | 8% |
| General Adjustment Factor | [c] | 2% |
| Incremental Revenue | [d] = [a]*([b]+[c]) | $22,000 |
| Variable Margin Percentage | [e] | 50% |
| Step 2 Compensation | [f] = [d]*[e] | $11,000 |

**<u>Total Compensation</u>**

Total Compensation is calculated as follows:

(1)      Add Step 1 Compensation to Step 2 Compensation.

(2)      Apply the agreed-upon Risk Transfer Premium (RTP).

(3)      Where applicable, subtract from the sum of Step 1 Compensation and Step 2 Compensation any payments received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, as well as any VoO Settlement Payment Offset and VoO Earned Income Offset.

5

**Addendum To**
**Causation Requirements For Business Economic Loss Claims and**
**Compensation Framework for Business Economic Loss Claims**

The term "Benchmark Period" is defined at pp. 1-2 in the **Compensation Framework for Business Economic Loss Claims** (Ex. 4C). That definition provides:

> The Benchmark Period is the pre-DWH Spill time period which claimant chooses as the baseline for measuring its historical financial performance. The claimant can select among the following Benchmark Periods: 2009; the average of 2008-2009; or the average of 2007-2009, provided that the range of years selected by the claimant will be utilized for all Benchmark Period purposes.

Footnote 2 of the **Causation Requirements For Business Economic Loss Claims** (Ex. 4B) specifically incorporates that definition of Benchmark Period by reference.

Accordingly, once the claimant selects the Benchmark Period year(s) (2009, the average of 2008-2009, or the average of 2007-2009), the **same** Benchmark Period year(s) are used "for all Benchmark Period purposes" -- specifically, the same Benchmark Period year(s) are used for purposes of determining **both** causation and compensation.

In contrast, a claimant is not required to use the same **months** in the Benchmark Period for purposes of establishing causation pursuant to Ex. 4B and determining compensation pursuant to Ex. 4C.

For example, when evaluating whether a claimant can satisfy causation using the "V Test," the claimant may select any consecutive 3-month period between May and December 2010 for comparison to a comparable period in the Benchmark Period (i.e., 2009, the average of 2008-2009, or the average of 2007-2009). After establishing causation, however, the claimant may select a different 3 or more consecutive months between May and December 2010 in determining compensation in accordance with the **Compensation Framework for Business Economic Loss Claims**, so long as the claimant uses the same Benchmark Period years as the basis for comparison. Thus, if the claimant selected for *causation* the three months of May - July in the Benchmark Period years of the average of 2008-2009, the claimant can select for *compensation* different months -- e.g., August - October -- but must use the same average of 2008-2009 Benchmark Period. The same Benchmark Period year(s) thus must be used both for causation (Ex. 4B) and compensation (Ex. 4C).

The additional examples on the next page illustrate these rules:

Scenario 1:

1) Claimant selected the months of May-July 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009 and 2007-2009;

2) In determining Compensation, Claimant would be allowed to select the months of August through November 2010 as compared to the months of August through November in either 2009, 2008-2009 or 2007-2009 as the Benchmark years – whichever provides the highest compensation.

Scenario 2:

1) Claimant selected the months of October – December 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009;

2) In determining compensation, Claimant could select the months of May-September 2010 as compared to the months of May-September in either 2009 or 2008-2009 – whichever provides the highest compensation.

Scenario 3:

1) Claimant selected the months of June – August 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period year of 2009.  In addition, Claimant selected the months of August – October 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2007-2009;

2) In determining compensation, Claimant could select the months of May-December 2010 as compared to the months of May-December in either 2009 or 2007-2009 – whichever provides the highest compensation.

# APPENDIX
# "C"

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION "J" |
| | * | |
| This Document Relates To: | * | JUDGE BARBIER |
| No. 12-970 | * | |
| | * | MAGISTRATE SHUSHAN |

### Review of Issue from Panel (Matching of Revenue and Expenses)

Before the Court is a motion by BP, asking the Court to review and reverse the Claims Administrator's January 15, 2013 policy decision interpreting certain portions of the Economic Settlement Agreement.[1]

Accordingly, the Court has re-visited the issue of whether the Claims Administrator has correctly interpreted the terms of the Economic and Property Damage Settlement Agreement as it applies to the calculation of "Variable Profit" for Business Economic Loss Claims.

After fully reviewing the additional materials submitted by the parties and the relevant portions of the Settlement Agreement, the Court affirms the Claims Administrator's interpretation as set forth in the January 15, 2013 Announcement of Policy Decisions Regarding Claims Administration.

Nowhere does the Agreement state or indicate that revenue and expenses must be "matched" or revenues "smoothed," nor does it state that one should inquire into when revenue was "earned."

---

[1]Following the vacation of the Court's prior ruling in an email dated January 30, 2013, the parties have made further submissions to the Court and have met with Dan Balhoff, court appointed neutral, both privately and jointly. Mr. Balhoff also had the opportunity to meet with the Claims Administrator, Pat Juneau, and representatives of his professional accounting staff. The Court met with Mr. Balhoff on February 19, 2013 and received a report from him regarding his efforts. Mr. Balhoff reported that there is no likelihood of a negotiated resolution of the dispute. The fees of Mr. Balhoff for his participation in attempting to resolve this dispute shall be paid by BP as part of the cost of claims administration.

Rather, the provisions of Exhibit 4C and 4A, when read together, support the Claims Administrator's interpretation.

For example, Step 1 of the of Exhibit 4C's Compensation Framework states:

Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the ***comparable*** months of the Benchmark period.

Exhibit 4C p. 3 (emphasis added); *see also id.* at 1 ("**Step 1** – Compensates claimants for any reduction in profit between the 2010 Compensation Period selected by the claimant and the ***comparable*** months of the Benchmark Period.  Step 1 compensation reflects the reduction in Variable Profit (which reflects claimant's revenue less its variable costs) over this period." (emphasis added)).  The meaning of "comparable" is illustrated by the examples provided in Exhibit 4C:

Scenario 1:
1) Claimant selected the months of May-July 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009 and 2007-2009;
2) In determining Compensation, Claimant would be allowed to select the months of August through November 2010 ***as compared to the months*** of August through November in either 2009, 2008-2009 or 2007-2009 as the Benchmark years – whichever provides the highest compensation.

Scenario 2:
1) Claimant selected the months of October – December 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009;
2) In determining compensation, Claimant could select the months of May-September 2010 ***as compared to the months*** of May-September in either 2009 or 2008-2009 – whichever provides the highest compensation.

Scenario 3:
1) Claimant selected the months of June – August 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period year of 2009.  In addition, Claimant selected the months of August – October 2010 for the purpose of determining causation, and the

2

claimant, using these months, meets the causation test for the Benchmark period
years of 2007-2009;
2) In determining compensation, Claimant could select the months of May-December
2010 *as compared to the months* of May-December in either 2009 or 2007-2009 –
whichever provides the highest compensation.

Exhibit 4C, Addendum.  These examples make clear that the same months of the Compensation

Period are to be compared with the months in the Benchmark period; not, as BP urges, that the

Claims Administrator's accountants should seek out months where the claimant engaged in

comparable activity.   Notably, this is the exact interpretation BP advocated while the parties

negotiated the Settlement Agreement:

> The word "comparable" and phrase "comparable months of" is used throughout the
> document in the context of comparing the months selected by the Claimant in 2010
> to compare against the *same months* in the Benchmark Period.

E-mail from Richard Godfrey to Joe Rice and Calvin Fayard (Feb. 17, 2012), Ex. 3 to PSC

Submission (emphasis added).

The heart of this dispute, however, appears to center on the word "corresponding" as it is

used in the calculation of "Variable Profit" (which, in turn, is used in Step 1 of the Compensation

Framework):

> <u>Variable Profit</u>: This is calculated for both the Benchmark Period and the
> Compensation Period as follows:
> 1. Sum the monthly revenue over the period.
> 2. Subtract the *corresponding* variable expenses from revenue *over the same
> time period*. . . .

Exhibit 4C at 2 (emphasis added).  The question is whether variable expenses must correspond to

the revenue those expenses produced, as BP contends, or whether variable expenses must correspond

to "the same time period," as Class Counsel contends.  BP claims that Class Counsel's interpretation

ignores "corresponding;" Class Counsel claims that BP's interpretation ignores "the same time

period."

The Court adopts Class Counsel's interpretation as it is most in line with the rest of the

Settlement Agreement.  For example, the documentation provisions contained within Exhibit 4A

make it clear that the Program's analysis is to be based on revenue and expenses during the relevant

periods chosen by the claimant, as reflected in historical business records.  Specifically, the

Framework requires:

> Monthly and annual profit and loss statements (which identify individual expense
> line items and revenue categories), or alternate source documents ***establishing
> monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if
> applicable, 2011.***

Exhibit 4A ¶ 4 (emphasis added, footnotes omitted).  If expenses had to be "matched" to revenues,

then the Settlement Program would potentially need to consider financials that pre-date the

Benchmark Period.  Likewise, Exhibit 4A does not require that accounting occur on an "accrual"

basis, as opposed to a "cash" basis.[2]  Similarly, Exhibit 4C's examples quoted above reflect that the

Framework is based on the expenses and revenues that were recorded in the Claimant-selected

months, not expenses and revenues that occurred outside these months.  Furthermore, although a

claimant may select the Benchmark and Compensation Periods, his choice is subject to certain

restrictions.  Notably, the Benchmark and Compensation Periods must be a minimum of three

consecutive months.  This demonstrates that the parties anticipated that too short a snapshot could

create "anomalies," and the three-month minimum was the agreed-upon method for controlling for

---

[2] On a related note, Exhibit 4A ¶¶ 5, 6 does require certain additional documents for certain types of businesses and for certain types of causation tests.  However, Exhibit 4A does not require extra documents or a specific type of accounting for the businesses that are the subject of the instant dispute.  Similarly, while the Settlement Agreement permits the Claims Administrator to exercise his discretion to request ***source*** documents for profit and loss statements; it appears that this is to ensure that the statements are accurate and consistent, not that they use one accounting method over another.  *See* Exhibit 4A ¶ 4 ("If there is a discrepancy between amounts reflected in a tax return and comparable items reflected in a profit and loss statement for the same period, the Claims Administrator may request the claimant to provide additional information or documentation.").

such anomalies. *See* Fishkind Decl. ¶ 87;[3] Henley Decl. ¶ 30 (submitted with BP's motion for final approval).

With respect to BP's argument that this interpretation of the Settlement Agreement can create absurd results, BP's declarant acknowledges that class settlement payments do not always perfectly match economic losses in every instance. Polinsky Declaration, p.5 n.8, Ex. 9 to BP's submission. BP's counsel similarly explained that "false positives" are an "inevitable concomitant of an objective quantitative, data-based test." Letter from Mark Holstein to Patrick Juneau (Sept. 28, 2012), p. 3, Ex. 12 to PSC's Submission.

And, as mentioned above, the parties agreed to give Claimants flexibility in choosing the most favorable Compensation and Benchmark Periods. Indeed, the Settlement Agreement provides that if a Claimant fails to select the period that generates the greatest recovery, the Program will choose that period for him. Objective formulas, the possibility of "false positives," and giving claimants flexibility to choose the most favorable time periods are all consequences BP accepted when it decided to buy peace through a global, class-wide resolution. In light of this, to the extent that the Claims Administrator's interpretation produces "false positives" or, as BP claims, "absurd" results, it appears that the Settlement Agreement anticipates that such results would sometimes occur.

The overarching theme of the Settlement is a transparent, uniform application of an objective quantitative data-based test which can be fairly and efficiently administered by the Claims Administrator. Notably, the Settlement Agreement itself defines those businesses that lost profits,

---

[3] "[T]he requirement that the Benchmark and Compensation periods used to measure decline and recovery be measured over at least 3 months is a reasonable means of ensuring that the data reflect a genuine trend in economic performance and not just routine month-to-month variation that any business can expect even absent any unusual event."

income, and/or earnings "as a result of" the Spill as those businesses that meet the objective

causation requirements set forth in Exhibit 4B. Once the Settlement's causation formula is met, then

all losses calculated under Exhibit 4C are presumed to be attributable to the oil spill. BP's

interpretation injects a subjective notion of alternative causation and a degree of complexity that are

contrary to the Settlement's terms.

    New Orleans, Louisiana, this 5th day of March, 2013.

                                    United States District Judge