No. 13-30315

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

IN RE:  DEEPWATER HORIZON

_____

LAKE EUGENIE LAND & DEVELOPMENT, INC., ET AL.,
INDIVIDUALLY AND ON BEHALF OF THEMSELVES AND
ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs–Appellees*,

*v.*

BP EXPLORATION & PRODUCTION INC., ET AL.,

*Defendants–Appellants*.

_____

On Appeal from the United States District Court
for the Eastern District of Louisiana,
MDL No. 2179, Civ. A. No. 12-970

_____

**REPLY OF BP EXPLORATION & PRODUCTION INC.,
BP AMERICA PRODUCTION COMPANY, AND BP P.L.C.
IN SUPPORT OF EMERGENCY MOTION FOR
INJUNCTION AND STAY PENDING APPEAL**

_____

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
R. Chris Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

Theodore B. Olson
  *Counsel of Record*
Miguel A. Estrada
Thomas G. Hungar
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

*[cover continued on next page]*

[*cover continued*]

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

George H. Brown
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304
(650) 849-5339

S. Gene Fendler
Don K. Haycraft
R. Keith Jarrett
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139
(504) 581-7979

*Attorneys for BP Exploration & Production Inc.,*
*BP America Production Company, and BP p.l.c.*

## REPLY IN SUPPORT OF EMERGENCY MOTION FOR
## INJUNCTION AND STAY PENDING APPEAL

Plaintiffs' response nowhere disputes the critical reason why an injunction and stay pending appeal are necessary: BP is suffering irreparable injury from the district court's erroneous interpretation of the settlement agreement that, unless an injunction and stay are granted, will continue throughout the pendency of this appeal. Plaintiffs devote only two paragraphs of their opposition to discussing irreparable injury, and do not even attempt to rebut BP's showing (Mot. Ex. C ¶¶ 20-21) that the already huge total of awards for fictitious losses could climb into the billions of dollars. Moreover, in the short time between the filing of BP's motion and this reply, the Settlement Program has substantially increased both the number of large awards and the aggregate amount of improper awards. *See* Ex. A.

Plaintiffs are similarly silent on the final two factors for an injunction and stay pending appeal: the balance of harms and the public interest. They do not dispute that the massive harm to BP that will be caused by the district court's decision during this appeal outweighs any temporary delay in payment to BEL claimants. Nor do they contest that the public interest favors an injunction and stay while this Court decides the proper meaning of the settlement agreement.

Instead, plaintiffs rest their opposition almost solely on the argument that BP is unlikely to prevail on the merits. They insist that BEL claimants should be permitted to claim lost profits under the settlement based purely on "cash flow" or other business records that indisputably do not accurately record monthly revenues and expenses. Yet plaintiffs never reconcile this approach with the express con-

tractual language requiring use of monthly "revenue" and "corresponding variable expenses" to calculate Variable Profit—language that plaintiffs briefly mention (at 10) but never construe. Nor do they explain how a net-cash-flow analysis is consistent with the parties' stated purpose of measuring *lost profits*; indeed, it is undisputed that, as a matter of economics and accounting, net cash flows *cannot* accurately measure most businesses' profitability. And while plaintiffs repeatedly mislabel BP's argument as a dispute about accounting *methods*, they never challenge the widely accepted meaning of the terms "revenue" and "expenses" as established by the accounting and economics literature, which explicitly rejects and refutes the district court's baseless interpretation.

BP has demonstrated a "substantial case on the merits" as to a "serious legal question." *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981). Because BP has no effective post-appeal remedy, the Court should grant an injunction and stay.

## JURISDICTION

Plaintiffs curiously suggest it is "not clear" that this Court has jurisdiction over the March 5 order interpreting the settlement agreement. Opp'n 3. But this Court clearly has jurisdiction under 28 U.S.C. § 1292(a)(3), because the March 5 order "determin[es] the rights and liabilities of the parties to [an] admiralty cas[e] in which appeals from final decrees are allowed." *See, e.g., Campbell v. Sonat Offshore Drilling, Inc.*, 27 F.3d 185 (5th Cir. 1994) (exercising jurisdiction under Section 1292(a)(3) in dispute over maritime contract). This is an admiralty case, D.E. 6412, at 22 ¶ 28, and interpretation of the agreement is governed by general maritime law, Mot. Ex. D ("Agreement") ¶ 36.1. Although plaintiffs assert that

there must be a "judgment on the merits" to invoke Section 1292(a)(3), Opp'n 3, the statute applies whenever the relevant order "would for all intents and purposes be dispositive" of the rights and liabilities of "at least one party" to the dispute. *Associated Metals & Minerals Corp. v. Alexander's Unity MV*, 41 F.3d 1007, 1011 (5th Cir. 1995); *Stoot v. Fluor Drilling Servs., Inc.*, 851 F.2d 1514, 1516 (5th Cir. 1988). In this case, the March 5 order is dispositive of the rights of many BEL claimants (those with fictitious losses) as against BP, and the Settlement Program's appeals panels have confirmed this fact by citing the March 5 order in summarily rejecting BP's appeals from such awards. *See, e.g.*, Mot. Ex. P.

This Court also has jurisdiction under 28 U.S.C. § 1291 because orders interpreting settlement agreements are "final decision[s]," even when the district court has continuing jurisdiction over the settlement. *Walker v. Dep't of Housing & Urban Dev.*, 912 F.2d 819, 825 (5th Cir. 1990).[1] And the March 5 order also satisfies the collateral order doctrine: it "(1) conclusively determine[d] the disputed question; (2) resolve[d] an issue that is completely separate from the merits of the action; and (3) would be effectively unreviewable on appeal from a final judgment." *Walker v. Dep't of Housing & Urban Dev.*, 99 F.3d 761, 766 (5th Cir. 1996).[2]

---

[1] Plaintiffs cite *McMahon Foundation v. Amerada Hess Corp.*, 98 F. App'x 267 (5th Cir. 2004), but that non-precedential decision pertained to only one of many parties rather than, as here, all claimants. Denying review here will spur hundreds of appeals from individual fictitious awards, disserving the goal of avoiding piecemeal appeals. And the order here (unlike in *McMahon*) would be effectively unreviewable after final implementation of the settlement.

[2] BP has also appealed from the district court's April 5 orders denying preliminary injunctions, which are reviewable under 28 U.S.C. § 1292(a)(1), and from the court's order dismissing

[Footnote continued on next page]

## ARGUMENT

## I.    BP Has Presented A Substantial Case On The Merits.

Plaintiffs seek to cabin this Court's review using the abuse-of-discretion standard, yet they devote the bulk of their opposition to the proper interpretation of the agreement—a legal question reviewed *de novo*. *Waterfowl Ltd. Liab. Co. v. United States*, 473 F.3d 135, 141 (5th Cir. 2006). The district court "necessarily" abused its discretion by denying relief based on a misinterpretation of the agreement. *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 405 (1990).

### A.    The District Court Misinterpreted Key Provisions Of The Settlement Agreement.

1. <u>"Revenue" and "Expenses."</u>  The settlement agreement's BEL framework compensates claimants for "reduction in profit," which is calculated by reference to a claimant's "revenue" and "expenses" in particular periods. *See* Agreement Ex. 4C, at 1. Plaintiffs have no response to BP's argument that the term "reduction in profit"—and its constituent terms, such as "revenue" and "expenses"—are well-understood terms with settled meanings in measuring business performance, as shown by the accounting and economics literature. *See* Mot. 8-10. Indeed, they tacitly concede that "revenue" and "expenses" are not the same as cash inflows and outflows and that revenue must be attributed to the period in which it is earned,

---

[Footnote continued from previous page]

BP's lawsuit against the Claims Administrator and Settlement Program, which is a final judgment reviewable under 28 U.S.C. § 1291. Those appeals have been docketed as No. 13-30329, in which a motion for an injunction pending appeal has also been filed. Thus, even if plaintiffs could seriously question appellate jurisdiction here, which they cannot, the Court would indisputably have jurisdiction to grant the requested relief in No. 13-30329.

leaving them with no way to defend the district court's contrary rulings.

Indeed, plaintiffs' only textual argument is their insinuation that BEL claimants must be permitted to use only documentation "'maintained in the ordinary course of business'" to prove their claims.  Opp'n 8 (quoting Agreement Ex. 4A ¶ 6(a)(iii)).  But plaintiffs ignore the general documentation requirement, which requires annual financial reports and tax returns, and also authorizes the Claims Administrator to request more data whenever desirable.  Agreement Ex. 4A ¶ 4.  And in most cases, the Claims Administrator's accountants can perform the necessary calculations without any need for more data.  Thus, the data provisions do not undermine, but instead support, the text's insistence on determining "revenue" and "expenses" (rather than merely cash receipts and expenditures) and on subtracting only "corresponding" variable expenses from revenue earned during the period.

2. <u>"Corresponding."</u>  The court also erred by ignoring the express contractual requirement to "[s]ubtract the *corresponding* variable expenses from revenue over the same time period."  Agreement Ex. 4C, at 2 (emphasis added).  Plaintiffs offer no response to BP's showing that the court's interpretation renders "corresponding" superfluous, in that the relevant phrase would have *precisely* the same meaning with "corresponding" omitted:  "[s]ubtract the . . . variable expenses from revenue over the same time period."  Only BP's interpretation gives meaning to every word:  "corresponding" means that expenses must correspond to—*i.e.*, match with—whatever revenue has been earned during the relevant time period.

Thus, while it is not improper to "keep . . . business records on a cash flow basis," Opp'n 6, "such cash-based accounting will reflect only cash flow during the

relevant months," "a comparison of the two periods will . . . not [compare] prof-it[s]," and that comparison will not measure "lost profits." Mot. Ex. N, at 9 ¶ 21. The agreement, however, does not compensate based on cash flow or on how a claimant happens to record or keep its financial data. Instead, the contract express-ly instructs the Settlement Program to "1. [s]um the monthly revenue over the pe-riod," and "2. [s]ubtract the corresponding variable expenses from revenue over the same time period." Agreement Ex. 4C. The "root" of the problem with "basing compensation on net cash received" is that it does not satisfy the correspondence requirement because it "might not include all of the revenues and costs attributable to the activity over [a given] period; and net cash received might include some of the revenues or costs attributable to business activity in other periods." Mot. Ex. O, at 7 ¶ 30 (emphasis omitted). As a result, the net-cash approach does not measure lost profits. *See* FASB, *Statement of Financial Accounting Concepts No. 6: Elements of Financial Statements* ¶ 144 (1985) ("A [financial] report showing cash receipts and outlays of an enterprise for a short [time] period cannot . . . indi-cate whether or to what extent an enterprise is successful or unsuccessful.").[3]

    3. "Comparable." Plaintiffs do not dispute that the district court read the

---

[3] Plaintiffs accuse BP of invoking "parole [*sic*] evidence" (Opp'n 11) in relying on "academic treatises and dictionaries," as well as economics and accounting experts, to interpret terms in the settlement agreement, such as revenue and expenses. *Id.* at 10. But the expert statements quoted in text are uncontradicted, and this Court routinely consults treatises, dictionaries, and industry documents to ascertain as a matter of law the meaning of terms used in contracts, in-cluding in the maritime context. *See, e.g., Musser Davis Land Co. v. Union Pac. Res.*, 201 F.3d 561, 565-66 (5th Cir. 2000) (consulting multiple oil-and-gas-law treatises and commen-tators in interpreting contract); *In re Commonwealth Oil Ref. Co.*, 734 F.2d 1079, 1081-82 (5th Cir. 1984) (citing multiple dictionaries to define maritime contract's terms).

word "comparable" to mean "same" in assessing Variable Profit under Exhibit 4C of the agreement. They claim, however, that this interpretation is consistent with the *causation* test in Exhibit 4B, which requires "compar[ing]" three post-spill months to "the *same months* in the Benchmark Period selected by the claimant." Exhibit 4B, at 1 (emphasis added). But this simply proves that the parties understood the difference between "comparable" and "same," and used the latter only when intended. *See, e.g., Cleere Drilling Co. v. Dominion Explor. & Prod., Inc.*, 351 F.3d 642, 651 (5th Cir. 2003) (refusing to construe different contractual terms as equivalent). The district court erred by disregarding the parties' choice of different words for these separate parts of the agreement.[4]

Like the district court, which considered parol evidence without bothering to explain how doing so was permissible, *see* Mot. Ex. A, at 3, plaintiffs attempt to bolster their atextual view with an e-mail from a BP attorney sent *during settlement negotiations*. This is improper: Plaintiffs' reliance on this "Rule 408 Settlement Communication: Confidential" document (D.E. 8963-58, at 1) violates a confidentiality agreement governing the parties' settlement discussions, *see* D.E. 9103-8, at 1, along with the settlement agreement itself, *see* Agreement ¶ 22.1. It is also legally irrelevant, because the settlement agreement's merger and integration clause (Agreement ¶ 26.1) "negates the legal introduction of parol evidence," *Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 564 (5th Cir. 2005), and because "evidence

---

[4] Rather than confront these terms, plaintiffs dwell on the issue of causation. *See* Opp'n 8-10. But causation is addressed separately from the BEL compensation framework (Agreement ¶¶ 5.3.2.3-.4), which applies only once causation is established. BP's objections to the district court's erroneous BEL ruling are separate from the proper test for causation.

. . . of antecedent understandings and negotiations" cannot be "admitted for the purpose of varying or contradicting the writing," *Har-Win, Inc. v. Consol. Grain & Barge Co.*, 794 F.2d 985, 987 (5th Cir. 1986).[5]

### B.     The District Court's Interpretation Leads To Absurd Results.

Plaintiffs do not dispute that, on their view, BEL claimants can receive payments simply because "the[ir] numbers pass" the district court's flawed "test." Opp'n 8.  Indeed, they embrace that view:  "[T]here can be no 'fictitious' losses or 'fraudulent' claims" because BP purportedly "agreed to define any and all such losses as caused by the spill." *Id.* at 9.  But this is question-begging.  BP agreed to compensate for actual *losses* once causation is established, but it never agreed to confer windfalls on claimants who suffered *no losses*—and thus are not even members of the class—nor did it agree to compensate claimants whose losses are grossly inflated by improper calculation methods that ignore economic reality.

Plaintiffs also invoke their unique view of administrative convenience, claiming (like the district court) that BP accepted overpayments as a "conse-

---

[5]  In any event, plaintiffs' use of 3 lines from a 249-line e-mail is highly misleading.  The e-mail does not relate to the Variable Profit definition, but rather to a second-step growth factor applied *after* making the Variable Profit calculations.  *See* Agreement Ex. 4C, at 1; *see also* D.E. 8963-58 ¶¶ 6-7, 9.  Moreover, the point of the e-mail was that arbitrarily applying the growth factor to a period of eight months was not "comparable" to a three-month Compensation Period.  D.E. 8963-58 ¶ 10.E.  Significantly, the parties resolved this issue during further negotiations after the e-mail was sent by modifying the then-draft agreement to provide that, if the "claimant chose a seven-consecutive-month or eight-consecutive-month period" for calculating Variable Profit, then "that *same* period of identical consecutive months in 2010 shall be used" for calculating the growth factor.  Agreement Ex. 4C, at 4 (emphasis added). Thus, even if confidential Rule 408 materials could be considered here, in direct breach of the parties' agreements, they would prove only that plaintiffs' argument is flatly wrong— specifically, the parties' final agreement embodies and reflects their understanding that "comparable" has a *different* meaning from "same" or "identical."

quenc[e]" when it "decided to buy peace through a global, class-wide resolution." Mot. Ex. A, at 5. But they never explain why either side would have negotiated payments for fictitious claims for non-existent losses by non-class members. Nor can they reconcile their position with the agreement's aim to provide compensation only for "[l]oss of income, earnings or profits." Agreement ¶ 1.3.1.2.

Moreover, the magnitude of the harm that BP will suffer under the district court's interpretation cannot be reconciled with the view that BP would have accepted that harm—in an uncapped part of the settlement agreement, no less—in exchange for administrative convenience. This misinterpretation results not in an occasional miscalculation, but instead the systematic award of potentially *billions* of dollars for fictitious losses. *See* Mot. Ex. C, at 7-8 ¶¶ 20-21. It is impossible to determine precisely the total of illegitimate awards, but 68% of large BEL awards raise warning flags for "flawed or incomplete financial data." *Id.* at 3-4 ¶¶ 8-10. The absurdity doctrine applies where, as here, an interpretation conflicts with the terms that any rational actor would accept. *See* Mot. Ex. O, at 3-5 ¶¶ 12-16.

Plaintiffs' view also risks invalidating the settlement. Widely disparate treatment of class members will bar Rule 23 approval, *see In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 808 (3d Cir. 1995), especially when, as here, a segment of the class will receive much more relief than others, *see Staton v. Boeing Co.*, 327 F.3d 938, 978 (9th Cir. 2003). By systematically providing windfalls to claimants who have suffered no actual loss, the settlement as now construed is irreconcilable with Rule 23. It is an exercise in self-contradiction to construe an agreement in a manner that renders it invalid and void.

## II.    BP Will Suffer Irreparable Harm Absent An Injunction And Stay.

Plaintiffs argue that "this Court must be able to determine the magnitude of the harm relative to BP's proposed correction" to rule that BP will be irreparably harmed.  Opp'n 19.  They cite no authority for this novel proposition, nor for their claim (at 20) that BP must pinpoint "what the proper award should be" for each claimant—an impossible task because BP (unlike the Claims Administrator) lacks full access to each claimant's books and records.

The test is instead whether the district court's flawed interpretation will "ir-reparabl[y] harm" BP.  *Ignacio v. INS*, 955 F.2d 295, 299 (5th Cir. 1992).  BP has met this test by showing that the Administrator is issuing improper and inflated awards to BEL claimants that BP cannot, as a practical matter, recover even if it succeeds in this appeal.  Plaintiffs do not dispute that the amounts already awarded reach into the hundreds of millions of dollars, that more such erroneous payments to BEL claimants are imminent, or that those payments are effectively unrecoverable once made.  That BP cannot establish the *precise* amount that it will be irreparably harmed absent an injunction hardly means that it will not be harmed at all.[6]

### CONCLUSION

This Court should issue an injunction and stay pending appeal.

Respectfully submitted.

---

[6] Plaintiffs are wrong to suggest that BP has not shown "how a proper resolution of a claim *should* be handled."  Opp'n 20.  BP has explained at length its reading of the relevant provisions of the BEL compensation framework (Exhibit 4C), including in this motion.  In any event, the relevant question now is whether the district court's interpretation is incorrect and is harming BP.  After this appeal is concluded, it will ultimately be the Claims Administrator's responsibility to administer the claims process properly (subject to judicial oversight).

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
R. Chris Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

  /s/ Theodore B. Olson
Theodore B. Olson
   *Counsel of Record*
Miguel A. Estrada
Thomas G. Hungar
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

George H. Brown
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304
(650) 849-5339

S. Gene Fendler
Don K. Haycraft
R. Keith Jarrett
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139
(504) 581-7979

*Attorneys for BP Exploration & Production Inc.,*
*BP America Production Company, and BP p.l.c.*

April 22, 2013

## CERTIFICATE OF ELECTRONIC COMPLIANCE

I hereby certify that that, on April 22, 2013, this Reply in Support of Emergency Motion for a Stay and Injunction Pending Appeal was transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit through the Court's CM/ECF document filing system, https://ecf.ca5.uscourts.gov.  I further certify that: (1) required privacy redactions have been made pursuant to this Court's Rule 25.2.13, (2) the electronic submission is an exact copy of the paper document pursuant to this Court's Rule 25.2.1, and (3) the document has been scanned with the most recent version of Microsoft Forefront Endpoint Protection and is free of viruses.


  /s/ Theodore B. Olson
Theodore B. Olson
*Attorney of Record for Defendants–*
*Appellants BP Exploration & Production*
*Inc., BP America Production Company,*
*and BP p.l.c.*

# CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2013, an electronic copy of the foregoing Reply in Support of Emergency Motion for a Stay and Injunction Pending Appeal was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system.

I further certify that service will be accomplished by the appellate CM/ECF system and by commercial carrier for next-day delivery on the following counsel:

Stephen Jay Herman
HERMAN HERMAN & KATZ LLP
820 O'Keefe Avenue
New Orleans, LA 70113

James Parkerson Roy
DOMENGEAUX, WRIGHT, ROY & EDWARDS
Suite 500
556 Jefferson Street
Lafayette, LA 70501

*Counsel for Plaintiffs–Appellees*

    /s/ Theodore B. Olson
Theodore B. Olson
*Attorney of Record for Defendants–*
*Appellants BP Exploration & Production*
*Inc., BP America Production Company,*
*and BP p.l.c.*

# EXHIBIT A

No. 13-30315

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

IN RE:  DEEPWATER HORIZON

_____

LAKE EUGENIE LAND & DEVELOPMENT, INC., ET AL.,
INDIVIDUALLY AND ON BEHALF OF THEMSELVES AND
ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs–Appellees*,

*v.*

BP EXPLORATION & PRODUCTION INC.,
BP AMERICA PRODUCTION COMPANY, and BP P.L.C.,

*Defendants–Appellants*.

_____

On Appeal from the United States District Court
for the Eastern District of Louisiana
MDL No. 2179, Civ. A. No. 12-970

_____

## DECLARATION OF HAL SIDER IN SUPPORT OF
## EMERGENCY MOTION OF DEFENDANTS–APPELLANTS
## FOR AN INJUNCTION AND STAY PENDING APPEAL

_____

1.     I am a Senior Vice-President of Compass Lexecon and previously submitted declarations in this matter on February 18, 2013 and March 14, 2013. My February 18 declaration includes a description of my qualifications, my curriculum vita, and describes my role in assisting BP in its negotiation of the Economic and Property Damages Settlement Agreement and in monitoring the implementation of the Settlement Agreement.

2.     I have been asked by BP to summarize Court Supervised Settlement Program (CSSP) offers to BEL claimants in recent weeks.  My analysis focuses on BEL offers made between April 8, 2013 and April 19, 2013, the period since Judge Barbier's April 5, 2013 ruling denying BP's request to enjoin processing of BEL claims under the January 15 Policy Decisions.  My analysis is based on (i) electronic data files summarizing BEL claims activity through April 14, 2013; (ii) lists of appealable BEL offers issued over the period April 15-19, 2013; (iii) publicly available CSSP summaries of payable BEL notices; and (iv) data from workbooks prepared by CSSP accountants in evaluating BEL claims.  Each of these data sources is made available to BP under the terms of the Settlement Agreement.

3.     Table 1, which is attached at the end of this declaration, shows the value of BEL offers made by CSSP for the weeks starting April 8 and April 15, 2013.  The table shows that 559 BEL offers totaling $151 million have been made over the last two weeks.  As the table indicates, the value of BEL offers made for

the weeks starting April 8 and April 15 is the highest two-week total in the past eight weeks.

4.    Table 2 lists all BEL claims with offers made during the weeks starting April 8 and April 15, 2013 with base compensation of $250,000 or more.  Base compensation is defined by CSSP as a claimant's 2010 losses (before applying the Risk Transfer Premium or accounting for prior compensation received by the claimant).  CSSP has made 76 such offers over this period.  Thirty-nine of these offers were made to claimants in "Group 1" industries -- construction, agriculture or professional services industries -- which have previously been shown to be most frequently characterized by flawed and incomplete data that does not accurately reflect monthly revenues and corresponding variable expenses.[1]  Another 21 offers were made to claimants in "Group 2" industries -- real estate, wholesale trade, manufacturing and retail trade industries -- which also exhibit a high share of BEL offers based on flawed and incomplete data.[2]

5.    Table 3 reports the number and value of BEL claims made during the weeks starting April 8 and April 15, 2013 with base compensation above $250,000 in total, and separately for Group 1 and Group 2 industries.  The value of the 76 BEL offers with base compensation above $250,000 made during these two weeks

---

[1] Supplemental Declaration of Hal Sider, March 14, 2013, p. 6.
[2] Supplemental Declaration of Hal Sider, March 14, 2013, p. 6.

is $89 million.  Roughly $38 million (42%) of this total is to claimants in Group 1 industries and another $35 million (39%) is to claimants in Group 2 industries.

6.      Taken together, Tables 2 and 3 indicate that a large share of recent BEL offers in the past two weeks, and 80% of the dollar value of offers with base compensation above $250,000, have been made to claimants in industries previously characterized by the presence of flawed and incomplete data.

7.      Based on the claims files I have reviewed, in which I found that a high number of the BEL offers for claimants in Group 1 industries are based on flawed and incomplete data, additional offers to claimants in those industries have a high likelihood of similar flaws.  These results are consistent with results presented in my earlier declarations which showed that a high share of BEL claims at the time of those declarations was affected by flawed and incomplete data which resulted in compensation for artificial losses, and that claims in Group 1 and Group 2 industries are most frequently affected by these problems.[3]

---

[3] Declaration of Hal Sider, February 18, 2013, pp. 15-18 explains how errors in reported financial data combine with optionality available to claimants to exaggerate estimates of lost variable profit.  The frequency with which claims are based on financial data that meets an indicator of flawed and incomplete data is discussed in Declaration of Hal Sider, p. 22, and Supplemental Declaration of Hal Sider, pp. 2-6.

_____

Hal Sider

Dated:  April 21, 2013

**Table 1**
**BEL Offers by Week**

| Week Beginning | Number of Offers | Amount Offered ($ Million) |
|---|---|---|
| 02/25/2013 | 250 | $44.8 |
| 03/04/2013 | 310 | $77.3 |
| 03/11/2013 | 319 | $65.0 |
| 03/18/2013 | 253 | $53.1 |
| 03/25/2013 | 227 | $53.7 |
| 04/01/2013 | 178 | $34.3 |
| 04/08/2013 | 293 | $75.0 |
| 04/15/2013 | 266 | $76.3 |
| | | |
| Last 8 weeks | 2096 | $479.5 |
| Last 2 weeks | 559 | $151.3 |

Sources: CSSP weekly data as of April 15, 2013;
CSSP Notice Reports from April 13-20, 2013.

**Table 2**

**CSSP Business Economic Loss Offers with Base Compensation Above $250,000**

**Weeks beginning April 8 and April 15, 2013**

| Business Name | Zone | Industry | Offer Date | Base Compensation | Amount Offered | Business Name | Zone | Industry | Offer Date | Base Compensation | Amount Offered |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | C | Retail Trade | 04/15/13 | $1,615,740 | $4,847,219 | | A | Construction | 04/09/13 | $275,736 | $689,340 |
| | D | Construction | 04/11/13 | $3,804,985 | $4,760,019 | | C | Construction | 04/09/13 | $526,514 | $659,772 |
| | C | Retail Trade | 04/15/13 | $1,523,756 | $4,571,267 | | A | Professional Services | 04/15/13 | $262,349 | $655,871 |
| | D | Manufacturing | 04/15/13 | $3,278,788 | $4,098,485 | | A | Professional Services | 04/15/13 | $254,652 | $641,723 |
| | D | Manufacturing | 04/11/13 | $2,952,106 | $3,742,263 | | D | Real Estate | 04/15/13 | $510,617 | $638,271 |
| | D | Manufacturing | 04/10/13 | $2,851,485 | $3,564,356 | | D | Health Care | 04/15/13 | $502,497 | $628,121 |
| | B | All Other Industries | 04/15/13 | $1,354,488 | $3,047,599 | | D | Construction | 04/15/13 | $497,669 | $622,086 |
| | B | Construction | 04/11/13 | $1,344,165 | $3,033,006 | | B | Professional Services | 04/12/13 | $274,464 | $621,252 |
| | B | Professional Services | 04/15/13 | $1,148,882 | $2,584,985 | | D | All Other Industries | 04/15/13 | $481,270 | $601,588 |
| | C | Wholesale Trade | 04/15/13 | $1,913,426 | $2,391,782 | | D | Professional Services | 04/10/13 | $480,800 | $601,000 |
| | B | All Other Industries | 04/10/13 | $730,000 | $2,192,218 | | C | Construction | 04/15/13 | $573,754 | $584,893 |
| | D | Construction | 04/12/13 | $1,706,794 | $2,135,855 | | C | Construction | 04/10/13 | $456,669 | $572,666 |
| | A | Bars and Restaurants | 04/11/13 | $551,948 | $1,849,871 | | D | Construction | 04/15/13 | $446,301 | $557,876 |
| | A | Real Estate | 04/15/13 | $656,224 | $1,722,131 | | D | Professional Services | 04/12/13 | $430,269 | $539,144 |
| | D | Agriculture | 04/15/13 | $1,336,788 | $1,670,685 | | D | Retail Trade | 04/12/13 | $422,846 | $532,646 |
| | C | Professional Services | 04/12/13 | $1,256,607 | $1,577,095 | | D | Retail Trade | 04/15/13 | $425,811 | $532,263 |
| | B | Professional Services | 04/15/13 | $680,278 | $1,530,625 | | D | Construction | 04/15/13 | $419,401 | $524,251 |
| | D | Construction | 04/09/13 | $1,142,446 | $1,433,610 | | D | Construction | 04/09/13 | $411,590 | $516,963 |
| | A | Retail Trade | 04/15/13 | $384,190 | $1,346,952 | | D | Agriculture | 04/12/13 | $406,625 | $510,802 |
| | B | Professional Services | 04/15/13 | $585,585 | $1,317,565 | | D | Manufacturing | 04/15/13 | $349,930 | $437,413 |
| | D | Construction | 04/15/13 | $1,014,235 | $1,267,794 | | D | All Other Industries | 04/15/13 | $349,916 | $437,395 |
| | D | All Other Industries | 04/11/13 | $974,622 | $1,220,367 | | D | All Other Industries | 04/08/13 | $343,599 | $430,291 |
| | A | Professional Services | 04/15/13 | $462,567 | $1,156,419 | | D | Retail Trade | 04/15/13 | $342,881 | $428,601 |
| | A | Hotels and Motels | 04/12/13 | $316,050 | $1,106,175 | | D | Construction | 04/11/13 | $337,426 | $424,807 |
| | C | All Other Industries | 04/15/13 | $863,568 | $1,079,460 | | D | Construction | 04/15/13 | $333,194 | $423,157 |
| | A | All Other Industries | 04/11/13 | $514,711 | $1,051,334 | | D | All Other Industries | 04/10/13 | $333,734 | $421,660 |
| | D | Professional Services | 04/15/13 | $768,942 | $961,177 | | C | Construction | 04/11/13 | $331,781 | $418,561 |
| | D | Retail Trade | 04/15/13 | $740,164 | $925,205 | | C | Construction | 04/11/13 | $326,624 | $409,905 |
| | A | Real Estate | 04/12/13 | $372,078 | $918,574 | | C | Retail Trade | 04/10/13 | $317,079 | $396,349 |
| | D | Construction | 04/09/13 | $706,910 | $885,925 | | D | Professional Services | 04/15/13 | $314,871 | $393,588 |
| | C | Retail Trade | 04/10/13 | $707,869 | $884,836 | | D | Wholesale Trade | 04/11/13 | $304,943 | $385,720 |
| | C | All Other Industries | 04/12/13 | $347,280 | $882,206 | | C | Construction | 04/15/13 | $291,200 | $364,000 |
| | D | Wholesale Trade | 04/15/13 | $698,411 | $873,013 | | D | Agriculture | 04/11/13 | $279,286 | $353,443 |
| | D | Construction | 04/09/13 | $681,924 | $855,305 | | D | Construction | 04/15/13 | $276,993 | $346,241 |
| | D | Seafood Processors and | 04/11/13 | $262,902 | $854,432 | | D | Agriculture | 04/15/13 | $276,388 | $346,085 |
| | C | All Other Industries | 04/15/13 | $668,762 | $835,952 | | A | Seafood Processors and | 04/08/13 | $314,111 | $343,882 |
| | C | Retail Trade | 04/12/13 | $639,803 | $802,381 | | C | Construction | 04/15/13 | $260,448 | $325,561 |
| | B | Retail Trade | 04/15/13 | $323,603 | $728,108 | | D | Professional Services | 04/10/13 | $254,052 | $322,646 |

Note: Yellow highlighted claims are in Agriculture, Construction, Professional Services; Blue highlighted claims are in Retail Trade, Real Estate, Manufacturing, Wholesale Trade industries.

**Table 3**
**Appealable BEL Offers with Base Compensation Above $250,000**

| Week Beginning | All BEL Offers with Base Compensation Above $250,000 | | Group 1: Agriculture/ Construction/ Professional Services | | Group 2: Manufacturing/ Real Estate/ Wholesale Trade/ Retail Trade | |
|---|---|---|---|---|---|---|
| | Number of Offers | Amount Offered ($ Million) | Number of Offers | Amount Offered ($ Million) | Number of Offers | Amount Offered ($ Million) |
| 02/25/2013 | 15 | $22.1 | 1 | $0.5 | 7 | $15.9 |
| 03/04/2013 | 39 | $45.9 | 9 | $10.2 | 17 | $14.4 |
| 03/11/2013 | 28 | $29.3 | 12 | $10.1 | 5 | $3.8 |
| 03/18/2013 | 26 | $32.1 | 14 | $17.3 | 4 | $8.6 |
| 03/25/2013 | 21 | $31.7 | 11 | $19.3 | 7 | $9.0 |
| 04/01/2013 | 23 | $17.5 | 11 | $7.5 | 5 | $4.5 |
| 04/08/2013 | 42 | $45.7 | 23 | $22.7 | 9 | $12.6 |
| 04/15/2013 * | 34 | $43.7 | 16 | $14.9 | 12 | $22.2 |
| Last 8 weeks | 228 | $268.1 | 97 | $102.4 | 66 | $90.9 |
| Last 2 weeks | 76 | $89.3 | 39 | $37.6 | 21 | $34.8 |

Sources: CSSP weekly data as of April 15, 2013;
* Based on CSSP Appealable Claims Report as of April 20, 2013.
Note: Excludes Start-Up and Failed BEL offers.