No. 13-30315
(consolidated with No. 13-30329)

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

IN RE:  DEEPWATER HORIZON

_____

On Appeal from the United States District Court
for the Eastern District of Louisiana
MDL No. 2179, Civ. A. No. 12-970

_____

## EMERGENCY MOTION OF DEFENDANTS-APPELLANTS
## TO ENFORCE THIS COURT'S OCTOBER 2 JUDGMENT
## AND FOR AN INJUNCTION

_____

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
R. Chris Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
(312) 862-2000

Theodore B. Olson
   *Counsel of Record*
Miguel A. Estrada
Thomas G. Hungar
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

*Counsel for Appellants*
[*additional counsel listed on next page*]

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
(202) 879-5000

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
(202) 942-5000

Jeffrey Lennard
DENTONS LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
(312) 876-8000

George H. Brown
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304
(650) 849-5300

S. Gene Fendler
Don K. Haycraft
R. Keith Jarrett
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA  70139
(504) 581-7979

Kevin M. Downey
F. Lane Heard III
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
(202) 434-5000

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ...................................4

LEGAL STANDARD ...............................................................9

ARGUMENT .......................................................................9

    I.    BP Is Likely To Succeed On The Merits. ............................10

        A.    The Settlement Agreement Limits Class Membership To Claimants Whose Losses Were Caused By The Spill. ....................................11

        B.    Refusal To Apply the Causal-Nexus Requirement Would Undermine Class Certification. ........................16

            1.    Adequacy Would Be Defeated. ...........................17

            2.    The Class Notice Would Be Rendered Defective. .............................................21

            3.    Commonality, Predominance, And Typicality Would Be Defeated. ..........................23

            4.    Fairness Would Be Destroyed. ...........................29

            5.    Class Membership Would Be Rendered Non-Ascertainable. ...........................................30

            6.    Class Members Would Lack Article III Standing. ................................................31

        C.    The "Causation" Criteria of Exhibit 4B Do Not Establish Class Membership. .....................................33

        D.    This Court Should Grant BP The Relief It Seeks Now. ...............................................................40

    II.    BP Will Be Irreparably Harmed Absent An Injunction. ......42

    III.    The Threatened Permanent Injury To BP Outweighs Any Alleged Harm To BEL Claimants. ...............................46

    IV.    An Injunction Will Promote The Public Interest. ................48

CONCLUSION ....................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amandola* v. *Town of Babylon*,
 251 F.3d 339 (2d Cir. 2001) ................................................................. 41

*Amchem Products, Inc.* v. *Windsor*,
 521 U.S. 591 (1997) ................................................................... *passim*

*Banda* v. *Corzine*,
 Civ. No. 07-4508, 2007 WL 3243917
 (D.N.J. Nov. 1, 2007) ............................................................................ 24

*Bell Atl. Corp.* v. *AT&T Corp.*,
 339 F.3d 294 (5th Cir. 2003) ......................................................... 25, 28

*Berger* v. *Compaq Computer Corp.*,
 257 F.3d 475 (5th Cir. 2001) ............................................................... 18

*Boca Raton Cmty. Hosp., Inc.* v. *Tenet Healthcare Corp.*,
 238 F.R.D. 679 (S.D. Fla. 2006) .......................................................... 30

*Certified Restoration Dry Cleaning Network, L.L.C.*
 v. *Tenke Corp.*,
 511 F.3d 535 (6th Cir. 2007) ............................................................... 48

*Comcast Corp.* v. *Behrend*,
 133 S. Ct. 1426 (2013) ................................................................... 25, 29

*Cooter & Gell* v. *Hartmarx Corp.*,
 496 U.S. 384 (1990) ............................................................................... 9

*Davis* v. *Hutchins*,
 321 F.3d 641 (7th Cir. 2003) ............................................................... 39

*Deerfield Med. Ctr.* v. *City of Deerfield Beach*,
 661 F.2d 328 (5th Cir. 1981) ............................................................... 48

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Denney* v. *Deustsche Bank AG,*
　　443 F.3d 253 (2d Cir. 2006) .................................................................. 31

*Dewey v. Volkswagen Aktiengesellschaft,*
　　681 F.3d 170 (3d Cir. 2012) .................................................................. 18

*FSLIC* v. *Dixon,*
　　835 F.2d 554 (5th Cir. 1987).................................................. 42, 43, 45

*Gasch* v. *Hartford Accident & Indem. Co.,*
　　491 F.3d 278 (5th Cir. 2007)................................................................. 36

*Gen. Tel. Co.* v. *Falcon,*
　　457 U.S. 147 (1982)............................................................................... 24

*Halvorson* v. *Auto-Owners Ins. Co.,*
　　718 F.3d 773 (8th Cir. 2013) ................................................................ 31

*Hobbs* v. *McLean,*
　　117 U.S. 567 (1886)............................................................................... 17

*Ignacio* v. *INS,*
　　955 F.2d 295 (5th Cir. 1992)................................................................... 9

*In re BankAmerica Corp. Sec. Litig.,*
　　210 F.R.D. 694 (E.D. Mo. 2002)........................................................... 29

*In re:  Deepwater Horizon,*
　　732 F.3d 326 (5th Cir. 2013)......................................................... *passim*

*In re Fredeman Litig.,*
　　843 F.2d 821 (5th Cir. 1988)................................................................. 43

*In re Monumental Life Ins. Co.,*
　　365 F.3d 408 (5th Cir. 2004)................................................................. 12

*In re Nissan Motor Corp. Antitrust Litig.,*
　　552 F.2d 1088 (5th Cir. 1977)............................................................... 22

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Prudential Ins. Co. Am. Sales*
  *Practice Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998) ................................................................. 29

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) ............................................................. 29

*In re Texas Wyoming Drilling, Inc.*,
  647 F.3d 547 (5th Cir. 2011) ............................................................... 40

*Ins. Corp. of Ireland, Ltd.* v. *Compagnie des Bauxites de Guinee*,
  456 U.S. 694 (1982) ............................................................................. 39

*Janvey* v. *Alguire*,
  647 F.3d 585 (5th Cir. 2011) ................................................... 43, 45, 47

*Kohen* v. *Pac. Inv. Mgmt. Co.*,
  571 F.3d 672 (7th Cir. 2009) ............................................................... 31

*Langbecker* v. *Elec. Data Sys. Corp.*,
  476 F.3d 299 (5th Cir. 2007) ............................................................... 18

*Lee* v. *Bickell*,
  292 U.S. 415 (1934) ............................................................................. 45

*Lujan* v. *Defenders of Wildlife*,
  504 U.S. 555 (1992) ....................................................................... 32, 35

*Mazza* v. *Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ............................................................... 31

*Montegut* v. *Williams Commc'ns, Inc.*,
  109 F. Supp. 2d 496 (E.D. La. 2000) ................................................. 36

*Nat'l Audubon Soc'y* v. *Watt*,
  678 F.2d 299 (D.C. Cir. 1982) ............................................................. 17

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Nken* v. *Holder*,
  556 U.S. 418 (2009) .................................................................. 9

*Opulent Life Church* v. *City of Holly Springs*,
  697 F.3d 279 (5th Cir. 2012) ............................................. 9, 48

*PCTV Gold, Inc.* v. *SpeedNet, LLC*,
  508 F.3d 1137 (8th Cir. 2007) ................................................ 48

*Piambino* v. *Bailey*,
  610 F.2d 1306 (5th Cir. 1980) ................................................ 29

*Placid Oil Co.* v. *Dep't of Interior*,
  491 F. Supp. 895 (N.D. Tex. 1980). ....................................... 48

*Planned Parenthood of Se. Pa.* v. *Casey*,
  505 U.S. 833 (1992) ................................................................ 41

*Reading & Bates Petroleum Co.* v. *Musslewhite*,
  14 F.3d 271, 272 (5th Cir. 1994) ............................................. 9

*Reed* v. *Gen. Motors Corp.*,
  703 F.2d 170 (5th Cir. 1983) ........................................... 29, 30

*Rivera* v. *Wyeth-Ayerst Labs.*,
  283 F.3d 315 (5th Cir. 2002) .................................................. 39

*Ruiz* v. *Estelle*,
  650 F.2d 555 (5th Cir. 1981) .................................................. 42

*Singer* v. *AT&T Corp.*,
  185 F.R.D. 681 (S.D. Fla. 1998) ............................................ 11

*Steering Comm.* v. *Exxon Mobil Corp.*,
  461 F.3d 598 (5th Cir. 2006) .................................................. 25

*Strong* v. *BellSouth Telecomms., Inc.*,
  137 F.3d 844 (5th Cir. 1998) ........................................... 36, 39

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Thornburgh* v. *Am. Coll. of Obstetricians and Gynecologists*,
476 U.S. 747 (1986) ................................................................. 41

*Transco Exploration Co.* v. *Pac. Emp'rs Ins. Co.*,
869 F.2d 862 (5th Cir. 1989) ................................................. 34

*UAW* v. *Gen. Motors Corp.*,
497 F.3d 615 (6th Cir. 2007) ................................................. 17

*Union Asset Mgmt. Holding A.G.* v. *Dell, Inc.*,
669 F.3d 632 (5th Cir. 2012) ................................................. 30

*Wal-Mart Stores, Inc.* v. *Dukes*,
131 S. Ct. 2541 (2011) ........................................................... 24

*Waterfowl L.L.C.* v. *United States*,
473 F.3d 135 (5th Cir. 2006) ............................................. 9, 41

*Wells Fargo Bank, N.A.* v.
*Titus Chinedu Oparaji* (*In re Titus Chinedu Oparaji*),
698 F.3d 231 (5th Cir. 2012) ................................................. 40

*W. Va. Ass'n of Cmty. Health Ctrs., Inc.* v. *Heckler*,
734 F.2d 1570 (D.C. Cir. 1984) ............................................. 40

*Wilson* v. *Sw. Airlines, Inc.*,
880 F.2d 807 (5th Cir. 1989) ................................................. 29

## Statutes

33 U.S.C. § 2702 .......................................................................... 28

28 U.S.C. § 2072 .......................................................................... 32

## Rules

Fed. R. Civ. P. 23 .............................................................. *passim*

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Other Authorities**

Paul M. Barrett, How BP Got Screwed on Gulf Oil Spill Claims,
  Bloomberg Businessweek (Jun 27, 2013)............................................43

3 Alba Conte, *et al.*,
  *Newberg on Class Actions* (4th ed. 2002) ............................................22

James W. Moore, *et al.*,
  Moore's Federal Practice (3d ed.2003) .................................................12

# CERTIFICATE OF INTERESTED PERSONS

No. 13-30315
(consolidated with No. 13-30329)

IN RE: DEEPWATER HORIZON

_____

LAKE EUGENIE LAND & DEVELOPMENT, INC.; BON SECOUR FISHERIES, INC.;
FORT MORGAN REALTY, INC.; LFBP #1, LLC D/B/A GW FINS;
PANAMA CITY BEACH DOLPHIN TOURS & MORE, LLC;
ZEKE'S CHARTER FLEET, LLC; WILLIAM SELLERS; KATHLEEN IRWIN;
RONALD LUNDY; CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY;
HENRY HUTTO; BRAD FRILOUX; AND JERRY J. KEE,
on behalf of themselves and all others similarly situated,
Plaintiffs–Appellees,

v.

BP EXPLORATION & PRODUCTION INC.;
BP AMERICA PRODUCTION COMPANY; AND BP P.L.C.,
Defendants–Appellants.

The undersigned counsel of record certifies that the following interested persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## A.    Plaintiffs–Appellees

This action (the *"Bon Secour"* action) is brought by fifteen class representatives: Lake Eugenie Land & Development, Inc.; Bon Secour Fisheries, Inc.; Fort Morgan Realty, Inc.; LFBP # 1, LLC d/b/a GW Fins; Panama City Beach Dolphin Tours & More, LLC; Zeke's Charter Fleet,

LLC; William Sellers; Kathleen Irwin; Ronald Lundy; Corliss Gallo; John Tesvich; Michael Guidry; Henry Hutto; Brad Friloux; and Jerry J. Kee.

The class representatives represent the Economic and Property Damages Class that the district court certified, for settlement purposes only, on December 21, 2012. *See* MDL 2179 D.E. 8138, 8139. The absent class members together comprise a "large group of persons [who] can be specified by a generic description, [such that] individual listing is not necessary." 5th Cir. R. 28.2.1.

## B.    Attorneys for Plaintiffs–Appellees

Stephen Jay Herman
Soren E. Gisleson
HERMAN HERMAN & KATZ LLP
820 O'Keefe Avenue
New Orleans, LA  70113
(504) 581-4892

James Parkerson Roy
DOMENGEAUX, WRIGHT, ROY & EDWARDS
Suite 500
556 Jefferson Street
Lafayette, LA  70501
(337) 233-3033

Elizabeth Joan Cabraser
LIEFF, CABRASER, HEIMANN & BERNSTEIN
29th Floor
275 Battery Street
San Francisco, CA  94111
(415) 956-1000

Samuel Issacharoff
NEW YORK UNIVERSITY SCHOOL OF LAW
40 Washington Square, S., Suite 411J
New York, NY  10012
(212) 998-6580

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
(843) 216-9159

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, LA  70360
(985) 876-7595

Brian H. Barr
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
   ECHSNER & PROCTOR, PA
316 South Baylen St., Suite 600
Pensacola, FL  32502-5996
(850) 435-7045

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
(212) 558-5802

Jeffrey A. Breit
BREIT DRESCHER IMPREVENTO & WALKER, P.C.
999 Waterside Drive, Suite 1000
Norfolk, VA  23510
(757) 670-3888

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
   PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL  36104
(334) 269-2343

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA  70601
(337) 439-0707

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
(504) 394-9000

Michael C. Palmintier
DEGRAVELLES, PALMINTIER, HOLTHAUS & FRUGÉ
618 Main Street
Baton Rouge, LA  70801-1910
(225) 344-3735

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P.O. Box 66705
Mobile, AL  36660
(251) 471-6191

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW & ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
(504) 588-1500

Alphonso Michael "Mike" Espy
Morgan & Morgan, P.A.
188 East Capitol Street, Suite 777
Jackson, MS  39201
(601) 949-3388

Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
(214) 521-3605

Calvin C. Fayard, Jr.
Fayard & Honeycutt
519 Florida Avenue, SW
Denham Springs, LA  70726
(225) 664-4193

Ervin A. Gonzalez
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL  33134
(305) 476-7400

Mikal C. Watts[1]
Watts Guerra Craft, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX  78257
(210) 447-0500

---

[1] Mr. Watts has resigned as counsel for Plaintiffs–Appellees.  In the interest of completeness, however, his prior involvement has been noted here exclusively for purposes of evaluating possible disqualification or recusal.

**C.     Defendants–Appellants**

BP Exploration & Production Inc.
BP America Production Company
BP p.l.c.

**D.     Attorneys for Defendants–Appellants**

Theodore B. Olson
Miguel A. Estrada
Thomas G. Hungar
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

George H. Brown
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304
(650) 849-5300

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
R. Chris Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
(312) 862-2000

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
(202) 879-5000

S. Gene Fendler
Don K. Haycraft
R. Keith Jarrett
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA  70139
(504) 581-7979

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 662-5985

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
(202) 942-5000

Jeffrey Lennard
Keith Moskowitz
DENTONS LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
(312) 876-8000

Kevin M. Downey
F. Lane Heard III
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
(202) 434-5000

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
(281) 366-2000

## E.     Defendants–Appellees

A separate action was brought against the defendants-appellees *Deepwater Horizon* Court Supervised Settlement Program and Patrick A. Juneau (Claims Administrator of the *Deepwater Horizon* Court Supervised Settlement Program).

**F.    Attorneys for Defendants–Appellees**

Attorneys for the Claims Administrator and Court Supervised Settlement Program:

Richard C. Stanley
Jennifer L. Thornton
Gina M. Palermo
Patrick H. Fourroux
STANLEY, REUTER, ROSS, THORNTON & ALFORD, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, LA  70112
(504) 523-1580

/s/ Theodore B. Olson
Theodore B. Olson
*Attorney of Record for BP Exploration*
*& Production Inc., BP America*
*Production Company, and BP p.l.c.*

## INTRODUCTION

BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. ("BP") respectfully request that this Court enforce its October 2 judgment in this case by entering an injunction that implements the settlement agreement's threshold causal-nexus requirement and prevents hundreds of millions of dollars from being irretrievably scattered to thousands of claimants who are not proper class members because their alleged injuries are not traceable to the *Deepwater Horizon* oil spill.  These impending windfall payments are the result of the district court's failure to implement the mandate of this Court's October 2 decision, which directed the district court to enter a stay "tailored" to prevent payments to claimants who did not "experience[] actual injury traceable to loss from the Deepwater Horizon accident" and made clear that the district court was required to address the issue of causation in accordance with the principles enunciated by this Court. *In re: Deepwater Horizon*, 732 F.3d 326, 345 (5th Cir. 2013); *id.* at 344 (opinion of Clement, J.); *id.* at 346-47 (Southwick, J., concurring).  Accordingly, this Court should enter the requested relief and hold that claimants who lack a colorable causal nexus between their injuries and the spill are not class members.

In this Court's October 2 opinion, both Judge Clement and Judge Southwick expressed serious concerns about the continued processing of claims with no causal nexus to the spill.  Judge Clement reasoned that,

in light of Federal Rule of Civil Procedure 23, the Rules Enabling Act, and Article III of the Constitution, "the district court had no authority to approve the settlement of a class that included members that had not sustained losses at all, or had sustained losses unrelated to the oil spill . . . ." *Id*. at 343. Accordingly, she concluded, the district court "should have rendered the Settlement lawful by adopting [an] interpretation" that "exclude[s] putative class members with no colorable legal claim." *Id*. Judge Southwick explained that this portion of Judge Clement's opinion was "logical," *id*. at 346 (Southwick, J., concurring), and agreed that "class actions are not meant to be vessels for achieving 'global peace' by creating substantive rights that would not otherwise exist," *id*. at 347. Judge Southwick recognized further that "the issue of causation" would need to be addressed on remand. *Id*.

In response to this Court's October 2 decision, the district court entered a preliminary injunction directing the Claims Administrator to prevent payment of claims where matching of revenues and expenses was at issue. Ex. B at 4-5. Despite this Court's directive to stay payments for alleged injuries not "traceable to loss from the Deepwater Horizon accident," *Deepwater Horizon*, 732 F.3d at 345, however, the district court rejected BP's request that it enter a preliminary injunction to that effect, and also rejected BP's showing that the settlement agreement in fact contains a threshold causal-nexus requirement that must be satisfied as a prerequisite to class

membership.  Ex. B at 2-4.  A week later, the district court issued a scheduling order that reiterated the Court's rejection of BP's causation arguments.  Ex. N at 1 n.1.  And on November 15, the district court denied BP's motion to amend the scheduling order and preliminary injunction to enforce the settlement agreement's causal-nexus requirement.  Ex. Y at 1.

As a result, the district court has refused to enjoin payments to claimants that suffered no harm traceable to the oil spill.  That ruling violates this Court's clear directive to enjoin such payments.  Moreover, the district court's refusal to enforce the causal-nexus requirement, unless corrected by this panel, will invalidate the class certification and settlement approval that are integral components of the parties' settlement, because Rule 23, the Rules Enabling Act, and Article III do not permit certification of a class that includes large numbers of claimants who have no injuries attributable to the defendant, and thus lack standing and fall outside the scope of a properly defined class.

The Court-Supervised Settlement Program ("CSSP") is now beginning to identify claims that can be paid in keeping with the district court's October 18 injunction, which permits the payment of claims that have no nexus to the spill.  Given the large number of awards to claimants who are not proper class members because their injuries lack a colorable nexus to the spill, the impending payments will inevitably include awards to such claimants, inflicting further

irreparable injury on BP in violation of this Court's judgment. Neither the existing injunction nor a ruling on the matching issue will prevent this result because neither does anything to address the numerous awards to claimants who suffered a loss (as determined by the settlement's loss calculation formula) that is unrelated to the spill. *See* Ex. Q ¶ 4. Emergency relief is necessary to prevent this unjust result. Accordingly, BP respectfully requests a decision on this emergency motion by Wednesday, November 27, 2013.

## FACTUAL AND PROCEDURAL BACKGROUND

As the panel is aware, BP previously appealed from the district court's Variable-Profit Decision construing the *Deepwater Horizon* settlement agreement's business economic loss ("BEL") framework. The Variable-Profit Decision misinterpreted the settlement agreement in a manner that produces awards for inflated and fictitious claims. In resisting BP's appeal, Class Counsel argued that the settlement agreement's causation framework allows awards to claimants whose injuries are unrelated to the spill, and that this justified the district court's Variable-Profit Decision.

In its October 2 decision, this panel vacated the Variable-Profit Decision and rejected the district court's interpretation of the BEL compensation framework. *Deepwater Horizon*, 732 F.3d at 329. Judge Clement and Judge Southwick also addressed Class Counsel's argument that the settlement authorized payment without regard to

4

causation.    Judge Clement explained that this interpretation was incompatible with the requirements of Rule 23, the Rules Enabling Act, and Article III.  She reasoned that "the Rules Enabling Act . . . instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right'" and therefore bars an expansive approach to Rule 23 that would allow class counsel to "include[e] claimants in the class definition that lack colorable claims."  *Id.* at 341.  Instead, a class "must . . . be defined in such a way that anyone within it would have standing"—that is, so that all members have colorable legal claims.  *Id.* at 342.

Accordingly, Judge Clement concluded that "the district court had no authority to approve the settlement of a class that included members that had not sustained losses at all, or had sustained losses unrelated to the oil spill, as BP alleges."  *Id.* at 343.   To the extent "the Administrator is interpreting the Settlement to include such claimants, the Settlement is unlawful."  *Id.*  Thus, the district court "should have rendered the Settlement lawful by adopting [BP's contrary] interpretation, as long as the interpretation is reasonable and effective." *Id*.   The panel therefore directed the district court to "expeditiously craft" a "stay tailored so that those who experienced [1] actual injury [2] *traceable to loss* from the Deepwater Horizon accident continue to receive recovery but those who did not do not receive their payments." *Id.* at 345 (emphasis added).

5

Judge Southwick agreed that Judge Clement's analysis of the causation issue was "logical in finding that constitutional infirmities would exist if certain corrections are not made to the interpretation of Exhibit 4C." *Id*. at 346 (Southwick, J., concurring). He explained that "class actions are not meant to be vessels for achieving 'global peace' by creating substantive rights that would not otherwise exist." *Id.* at 347. Accordingly, he expressed concern that, if the settlement agreement permitted payment on claims with no causal nexus to the spill, this could mean the "invalidity [of] the Settlement Agreement's causation framework." *Id.* at 346. Judge Southwick stated, however, that he "would defer the issue and allow the parties on remand to give it the attention it deserves." *Id.* But he emphasized the need for a stay "to allow the purposes of the remand to be realized," and therefore "agree[d]" with the portion of Judge Clement's opinion ordering a stay of payments to claimants with no injury traceable to the spill. *Id.*

In response, the district court temporarily enjoined payments by the CSSP with respect to BEL claims for which the proper matching of revenues and expenses was at issue. Ex. A at 1-2. The CSSP responded by effectively suspending payment of BEL claims pending further guidance from the district court. Ex. AA ¶ 3 (Cantor Decl.). After receiving briefing from the parties, the district court entered its preliminary injunction on October 18, barring payment of all BEL claims where matching is at issue but directing the Claims

Administrator to "process and pay all [BEL] claims" supported by properly matched accrual-type records.  Ex. B at 4-6.

The district court rejected BP's request that it enjoin the payment of claims that lacked any nexus to the spill.  The court held that "[t]here is no causation requirement" for certain claimants and that the only causation requirement applicable to other claimants is the objective revenue-based test of Exhibit 4B of the settlement agreement.  *Id*. at 3.

On November 7, BP moved to amend the scheduling order and preliminary injunction to implement this Court's judgment requiring a stay of payments for claimed injuries not traceable to the spill and to correct the district court's erroneous rejection of the settlement agreement's threshold causal-nexus requirement for class membership, which is an explicit prerequisite to the application of Exhibit 4B.  Ex. O at 1.  In support of its motion, BP explained that footnote 1 of Exhibit 4B expressly requires determination of class membership *before* Exhibit 4B becomes applicable, and that the BEL class definition encompasses only those claimants that "suffered" "[l]oss of income, earnings or profits" "as a result of the" spill.  Ex. P at 4, 17.  Accordingly, BP argued, the settlement agreement "empowers the Claims Administrator to request additional documentation" when "confronted with evidence that the loss is not traceable to the Spill."  *Id.* at 19 & n.43.

BP also showed that the Claims Administrator has awarded at least $76 million on 64 claims to claimants whose losses were clearly

caused by events other than the oil spill, as shown by the claims file itself. *See* Ex. *Id*. at 13 & n.28; Ex. Q ¶ 4. In addition, BP identified an additional $546 million in awards to numerous claimants that reside far from the spill and whose businesses (*e.g.*, farms, law firms, healthcare entities, manufacturing concerns) have no logical connection with the spill. Ex. Q ¶ 5. In short, as the Claims Administrator has acknowledged, the CSSP has reviewed and paid claims "for losses that a reasonable observer might conclude *were not in any way related to the Oil Spill*." Brief of Appellees Deepwater Horizon Court Supervised Settlement Program at 16, *In re Deepwater Horizon*, Nos. 13-30315 & 13-30329 (5th Cir. May 24, 2013) (emphasis added) ("CSSP Brief"). BP argued that payment of these claims was the result of the Claims Administrator's erroneous failure to enforce the settlement agreement's causal-nexus requirement for class membership. *See*, *e.g.*, Agreement § 1.3.1.2 (R. 4071).

Class Counsel opposed BP's motion, and the district court denied it on November 15, 2013. Ex. Y at 1. BP filed a protective notice of appeal on November 21. Absent intervention by this Court to enforce its judgment, the district court's erroneous refusal to implement the settlement agreement's causal-nexus requirement for class membership will not be corrected, and the Settlement Program will continue paying BEL claims even where the claimant is not a class member because its loss is not fairly traceable to the oil spill.

8

## LEGAL STANDARD

The district court's erroneous interpretation of the settlement agreement's causal-nexus requirement presents a question of law reviewed *de novo*. *Waterfowl L.L.C.* v. *United States*, 473 F.3d 135, 141 (5th Cir. 2006). The district court's denial of a preliminary injunction is reviewed for abuse of discretion. *Opulent Life Church* v. *City of Holly Springs*, 697 F.3d 279, 288 (5th Cir. 2012). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law . . . ." *Cooter & Gell* v. *Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

In determining whether to issue a stay, this Court balances four factors: (1) whether the movant has shown a "likelihood of success on the merits"; (2) whether "irreparable harm would occur if a stay is not granted"; (3) whether "the potential harm to the movant outweighs the harm to the opposing party if a stay is not granted"; and (4) whether "the granting of the stay would serve the public interest." *Ignacio* v. *INS*, 955 F.2d 295, 299 (5th Cir. 1992); *see Reading & Bates Petroleum Co.* v. *Musslewhite*, 14 F.3d 271, 272 (5th Cir. 1994). "[T]he same four-factor balancing test" governs requests for injunctive relief. *Ignacio*, 955 F.2d at 299 & n.5. "The first two factors of the traditional standard are the most critical." *Nken* v. *Holder*, 556 U.S. 418, 434 (2009).

## ARGUMENT

In light of Rule 23, the Rules Enabling Act, and Article III, the

settlement agreement can and must be construed to exclude from the class all claimants whose alleged injuries are not colorably traceable to the spill. Accordingly, this Court should issue an injunction to prevent further improper payments to such claimants, on the ground that the district court erred as a matter of law in refusing to enforce the agreement's threshold causal-nexus requirement.

## I.     BP Is Likely To Succeed On The Merits.

BP is entitled to prevail on its arguments that the district court erred in interpreting the settlement agreement to permit awards to claimants that are not class members because they lack a colorable causal nexus between their alleged injuries and the spill. Indeed, the settlement agreement compels a ruling in favor of BP on this issue, because it makes clear that BEL claimants are not class members unless they suffered actual losses "as a result of" the oil spill. The district court's single-minded focus on the objective "V-test" of Exhibit 4B as the agreement's sole causation requirement is indefensible, because footnote 1 of Exhibit 4B makes clear that it does not apply to claimants "not included within the Economic Class definition," Agreement Ex. 4B, at 1 n. 1 (R. 4260), and the agreement explicitly requires causal nexus as a prerequisite for class membership, *see* Agreement § 1.3.1.2 (R. 4071). This conclusion is further compelled by Rule 23, the Rules Enabling Act, and Article III, which prevent judicial approval of a class settlement that awards damages to substantial

10

numbers of claimants that lack colorable grounds for establishing causation.

### A. The Settlement Agreement Limits Class Membership To Claimants Whose Losses Were Caused By The Spill.

Properly interpreted, the settlement agreement excludes from the class any BEL claimant that lacks a colorable basis for tracing its alleged injuries to the oil spill. In processing claims, the Claims Administrator must begin by determining whether the claimant is a member of the class, as defined in the settlement agreement. The class definition, in turn, limits the class of BEL claimants to those who have "suffered" "[l]oss of income, earnings or profits . . . *as a result of* the Deepwater Horizon Incident." Agreement § 1.3.1.2 (R. 4071) (emphasis added). A claimant who has suffered no loss as a result of the spill is not a class member and therefore is not entitled to recover.

The settlement agreement thus plainly provides that relief is available only to class members. As Class Counsel explained at the preliminary approval hearing, the first step in processing a claim is to determine if the claimant is a member of the class. *See* R. 3556 ("[T]he general principles of the settlement is that one needs to determine if they've got class membership. Then they need to look at each of the damage categories . . . to determine if they have a claim in one or more of those categories."). The class definition "identifies the persons who are entitled to relief." *Singer* v. *AT&T Corp.*, 185 F.R.D. 681, 685 (S.D.

Fla. 1998); *see also*, *e.g.*, *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004) ("A precise class definition is necessary to identify properly 'those entitled to relief, those bound by the judgment, and those entitled to notice.'" (quoting 5 James W. Moore, et al., Moore's Federal Practice § 23.21[6], at 23-62.2 (3d ed.2003)).

The Claims Administrator often follows this procedure in part when he determines whether a claimant satisfies the geographic prerequisites for class membership and whether the claimant is an entity excluded from the class, such as a casino or oil and gas company, *see* Agreement § 1 (R. 4067), and he has sometimes acted on evidence from BP to exclude claimants who improperly failed to identify themselves as excluded entities, *see* Ex. P at 15. But he has refused to follow the same procedure with regards to the causal-nexus prerequisite for class membership.

That is improper. Under the class definition, individuals and entities who meet geographic prerequisites "are included in the Economic Class only if their Claims meet the descriptions of one or more of the Damage Categories." Agreement § 1 (R. 4067). Membership in the Economic Damage Category, which includes BEL claims, *see id*. § 5.3.2 (R. 4095), is limited to any "[l]oss of income, earnings or profits suffered by Natural Persons or Entities *as a result of* the Deepwater Horizon Incident." *Id.* § 1.3.1.2 (R. 4071) (emphasis added). Accordingly, in determining whether a claimant is a class member, the

Claims Administrator must make a threshold determination whether the claimant has suffered loss as a result of the spill. That threshold determination must be made *before* applying the causation criteria outlined in Exhibit 4B, which "*does not apply* to . . . Entities, Individuals or Claims not included with the Economic Class definition," Agreement Ex. 4B, at 1 n. 1 (R. 4260) (emphasis added). Thus, Exhibit 4B comes into play only *after* a claimant establishes that it is a class member.

This conclusion that the settlement agreement compensates only claimants who have suffered actual injury traceable to the spill is reinforced throughout the agreement. The agreement's preamble makes clear that the settlement applies to only those claims that it releases. *See* Agreement at 1 (R. 4067) ("The purpose of this Agreement is to settle all and *only the Released Claims* of the Economic Class, Plaintiffs, and Economic Class Members." (emphasis added)). Yet the settlement releases only "all claims *arising out of, due to, resulting from, or relating in any way to*, directly or indirectly, the Deepwater Horizon Incident." *Id.* § 10.2 (R. 4136) (emphasis added).

This same limitation is confirmed by the Class Notice, which informs potential class members that "[i]f you had economic loss or property damage *because of* the Deepwater Horizon oil spill, you could get money from a class action settlement." R. 6097 ("Detailed Class Notice") (emphasis added); *see also id.* ("If you are included in the

Economic & Property Damages Settlement, you may receive money if you have been *damaged by* the Deepwater Horizon oil spill . . . ." (emphasis added)).  Moreover, the Class Notice makes clear that class membership is predicated on an affirmative answer to one of the following questions:  "Do you have any economic loss *arising out of* the Deepwater Horizon Incident?" or "Was your real or personal property damaged *as a result of* the Deepwater Horizon Incident."  R. 6103 (emphasis added).

Other materials provided to potential claimants confirm that the settlement agreement governs only losses resulting from the oil spill. The Settlement Website states that "Economic Damage" is loss suffered "*as a result of* the Deepwater Horizon Incident."  Frequently Asked Questions, Deepwater Horizon Claims Center Economic & Property Damage Claims, https://cert.gardencitygroup.com/dwh/fs/faq?.delloginType=faqs#Q5 (last visited Nov. 21, 2013) (emphasis added).  The Instruction Booklet for completing a BEL claim explains that such claims are "for businesses . . . that assert economic loss *due to* the Spill."  R. 16839 (emphasis added); *see also*  R. 16840 (stating that the Economic Loss Class consists of individuals and entities "suffering an economic loss which was *a result of* the Deepwater Horizon Incident" (emphasis added)).

Finally, the Claim Form itself repeats the Instruction Booklet's explanation of BEL claims and indicates that the form is to be used "[t]o

make a Business Economic Loss Claim . . . for damages *arising from* the Deepwater Horizon Incident." R. 14868 (emphasis added). A claimant must make this claim under penalty of perjury. R. 14876. Importantly, moreover, the settlement agreement expressly empowers the Claims Administrator to "verif[y]" "[a]ll statements made in . . . the Claim Form." Agreement Ex. 4A at 1 (R.4255). Accordingly, the Claims Administrator has authority to seek additional proof of class membership from a claimant, and must exercise that authority whenever the available information suggests the lack of a causal nexus.

The district court's failure to enforce the settlement agreement's causal-nexus requirement for class membership thus disregards the plain text of the agreement, as abundantly confirmed throughout the agreement. The settlement agreement requires the Claims Administrator to make a threshold determination of causal nexus for class membership purposes before authorizing payment so as to prevent the wrongful payment of claims unrelated to the spill. To the extent the settlement agreement is at all ambiguous, and it is not, this conclusion is at the very least "reasonable and effective" and must therefore be adopted to avoid jeopardizing class certification and approval of the settlement. *Deepwater Horizon*, 732 F.3d at 343 (opinion of Clement, J.).

## B. Refusal To Apply the Causal-Nexus Requirement Would Undermine Class Certification.

BP is also entitled to prevail on its interpretation of the settlement agreement because the refusal to enforce the causal-nexus requirement is incompatible with Rule 23, the Rules Enabling Act, and Article III. "BP's proposed interpretation of the Settlement exclude[s] putative class members with no colorable legal claim," and is "reasonable and effective"; therefore "the district court should have rendered the Settlement lawful by adopting that interpretation." *Deepwater Horizon*, 732 F.3d at 343 (opinion of Clement, J.).

"A class settlement is not a private agreement between the parties." *Id*. Rather, as Judge Clement explained, "[i]t is a creature of Rule 23, which authorizes its use to resolve the legal claims of a class 'only with the court's approval'"—approval that "must, as always, adhere to the precepts of Article III and the Rules Enabling Act." *Id*. These precepts include the Rules Enabling Act's instruction "that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'" *Id*. at 341 (quoting *Amchem Products, Inc.* v. *Windsor*, 521 U.S. 591, 613 (1997)). If the class definition is interpreted to sweep within it significant numbers of claimants whose losses (if any) have no causal nexus to the spill—and who thus have no substantive right to recover from BP—the settlement cannot survive review under Rule 23, the Rules Enabling Act, or Article III.

BP's interpretation avoids the difficult class certification and standing problems that result from including such claimants within the class; accordingly, any ambiguity must be resolved in favor of a rigorous causal-nexus requirement in order to preserve the settlement. *See Hobbs* v. *McLean*, 117 U.S. 567, 576 (1886) ("[I]t is a rule of interpretation that, where a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former must be adopted."); *see also UAW* v. *Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) (if a serious constitutional question arose in interpreting a settlement agreement, "a court might well construe the provision to avoid or ameliorate it"); *Nat'l Audubon Soc'y* v. *Watt*, 678 F.2d 299, 301 (D.C. Cir. 1982) (adopting a construction of a contract between the Secretary of the Interior and an environmental group that "avoid[ed] potentially serious constitutional questions").

The district court's interpretation of the Settlement Agreement raises several problems under Rule 23, the Rules Enabling Act, and Article III that would preclude class certification and invalidate the settlement agreement unless that interpretation is rejected by this Court.

### 1.    Adequacy Would Be Defeated.

Rule 23(a)(4) provides that a class may be certified only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To satisfy this requirement, "[a]

class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem*, 521 U.S. at 625-26 (quotation marks omitted). Critically, the adequacy inquiry "'serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent.'" *Berger* v. *Compaq Computer Corp.*, 257 F.3d 475, 480 (5th Cir. 2001) (quoting *Amchem*, 521 U.S. at 625); *see also Langbecker* v. *Elec. Data Sys. Corp.*, 476 F.3d 299, 315 (5th Cir. 2007) ("Numerous courts have held that intraclass conflicts may negate adequacy under Rule 23(a)(4).").

Importantly, "[t]he adequacy requirement provides structural protections during the process of bargaining for settlement." *Dewey* v. *Volkswagen Aktiengesellschaft*, 681 F.3d 170, 189 n.19 (3d Cir. 2012). "[B]ecause absent class members are conclusively bound by the judgment in any class action brought on their behalf, the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times." *Berger*, 257 F.3d at 480. Adequacy is thus one of the "specifications of Rule 23 designed to 'block[] unwarranted or overbroad class definitions'" that, as Judge Clement noted, "'demand undiluted, even heightened, [judicial] attention in the settlement context.'" *Deepwater Horizon*, 732 F.3d at 343 (quoting *Amchem*, 521 U.S. at 620).

Although the class here encompasses individuals and businesses from across the Gulf who experienced different types of economic

injuries, the district court concluded that Class Counsel could represent the entire class because "the Settlement is crafted such that different payment levels reflect the relative value of the different claims" and "persons with marginal or potentially worthless claims, whose presence could have complicated the settlement process, were excluded from the proposed class." R. 12181-82. But the court's refusal to enforce the causal-nexus requirement of the class definition turns this understanding on its head and eviscerates Rule 23's structural protections for absent class members by including persons within the class who did not suffer injury as a result of the spill.

It is contrary to Rule 23(a)(4) to expect that the same class counsel can adequately represent both legitimate claimants, who were harmed by the spill, as well as illegitimate ones, who seek recovery from a party that did not harm them. The interests of these two groups are intractably conflicted. Legitimate claimants would seek to maximize compensation for their actual injuries by, for example, bargaining for greater Risk Transfer Premiums ("RTPs"), which magnify awards for actual damages by a fixed multiplier in order to compensate "for potential future loss, as well as pre-judgment interest, any risk of oil returning, any claims for consequential damages, inconvenience, aggravation, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors." R. 12156. By contrast, illegitimate claimants have no use for

RTP multipliers unless they can first get their fictitious claims for actual damages through the door; accordingly, they would gladly sacrifice greater RTP multipliers in exchange for a settlement that ignores the requirement of causation and thus increases the likelihood of a windfall.

Moreover, RTPs vary by Zone and by type of class member. Those different RTPs were negotiated based upon the strength of claims and claimant types. Thus, if BP truly entered into a settlement agreement that requires generous payments of hundreds of millions (if not billions) of dollars to entities with no loss traceable to the spill, surely Class Counsel could have secured higher RTP payments for only the actually injured parties by negotiating exclusively on their behalf. But BP did not reach such an agreement—as the district court previously admitted, BP bargained for a settlement that excluded "persons with marginal or potentially worthless claims" in order to avoid intraclass conflict and ensure that the settlement was compatible with Rule 23's structural protections for absent class members.

Class Counsel's latest efforts to defend the Claims Administrator's interpretation of the settlement agreement only perpetuate the intraclass conflict between legitimate and illegitimate claimants. Both Judge Clement and Judge Southwick recognized that, by arguing that the settlement permits payments to claimants with no colorable claim against BP, Class Counsel "could imperil a final approval of the

20

settlement," *Deepwater Horizon*, 732 F.3d at 344 (opinion of Clement, J.); *accord id.* at 346 (Southwick, J., concurring), thereby threatening the interests of class members who experienced actual loss as a result of the spill in an attempt to benefit those who did not (and, not incidentally, to maximize Class Counsel's fees). That conflict will persist unless this Court adopts BP's interpretation of the settlement agreement and clearly holds that the settlement bars payments to claimants with no colorable claim of causal nexus.

## 2. The Class Notice Would Be Rendered Defective.

The potential for intraclass conflict under the district court's interpretation of the settlement agreement is amplified by Class Counsel's failure to notify class members of that interpretation before the district court approved the settlement. Where parties seek certification of a settlement class pursuant to Rule 23(b)(3) and approval of a settlement pursuant to Rule 23(e), notice of the class settlement must satisfy the requirements of both Rule 23(c)(2)(B) and Rule 23(e)(1). Rule 23(c)(2)(B)(ii) provides that the class notice must state "the definition of the class certified," while Rule 23(e)(1) requires that the court "direct notice in a reasonable manner to all class members who would be bound by the proposal." Like adequacy, class notice is an important structural protection designed to provide absent class members with "information that a reasonable person would consider to be material in making an informed, intelligent decision of

whether or not to opt out or remain a member of the class and be bound by the final judgment." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977).   In particular, "[n]otice of the certification order and the *precise definition* of the class are most important for decisions by absent members."   3 Alba Conte, *et al.*, *Newberg on Class Actions* § 8:31 (4th ed. 2002) (emphasis added).

In this case, the class notice did not indicate that the class would include businesses that had suffered no economic loss as a result of the spill.  Indeed, the notice repeatedly said the opposite.  *See*, *e.g.*, R. 6097 ("Detailed Class Notice") ("If you had economic loss or property damage *because of* the Deepwater Horizon oil spill, you could get money from a class action settlement." (emphasis added)); *see also id*. ("If you are included in the Economic & Property Damages Settlement, you may receive money if you have been damaged *by the Deepwater Horizon oil spill* . . . ." (emphasis added)); R. 6103 (predicating class membership on an affirmative answer to one of the following questions:  "Do you have any economic loss *arising out of* the Deepwater Horizon Incident?" or "Was your real or personal property damaged *as a result of* the Deepwater Horizon Incident?" (emphasis added)).

If legitimate claimants had had any reason to believe that, despite this language, the settlement agreement actually authorized hundreds of millions or billions of dollars of awards to claimants with no spill-related injuries, they may have questioned whether the settlement

22

agreement was the best outcome they could achieve. But because the opt-out period ended on November 1, 2012, R. 7263, well before class members had any indication that the class might include claimants with no spill-related injuries, legitimate claimants must remain within the class and are bound by the settlement. Accordingly, this Court should hold Class Counsel to the class definition announced in the Class Notice and limit awards to claimants who suffered "economic loss or property damage *because of* the Deepwater Horizon oil spill."

### 3.    Commonality, Predominance, And Typicality Would Be Defeated.

Rules 23(a)(2) and 23(b)(3) require that class members share common issues, and that those common issues predominate over individual ones. As Judge Clement explained, "an interpretation of the Settlement that defines the class to include claimants who 'have suffered no actual injury from [BP's] allegedly [tortious acts] on the basis of a much smaller group of [claimants] who have sustained such injury' . . . may call into question whether the settlement class satisfies the predominance test for certification" and "also calls the related requirement of commonality into doubt." *Deepwater Horizon*, 732 F.3d 342 n.8 (citation omitted).

The commonality requirement of Rule 23(a)(2), as Judge Clement noted, "requires plaintiffs to show that the elements of their claim are capable of proof at trial through evidence that is common to the class

rather than individual to its members." *Id.* (citation omitted). To meet that requirement, class members must "have suffered the same injury." *Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541, 2551 (2011) (citation omitted). Yet under the district court's interpretation of the settlement agreement, the class includes claimants that have suffered no loss traceable to the spill and thus lack even a colorable claim that they have suffered the same injury as claimants that experienced actual loss due to the spill. *See Banda* v. *Corzine*, Civ. No. 07-4508, 2007 WL 3243917, at *17 (D.N.J. Nov. 1, 2007) (presence of persons who "have no claim whatsoever . . . prevent[s] fulfillment of the commonality-of-claims requirement"). As Judge Clement explained, "'for plaintiffs who lack any claim, there are certainly no elements of a claim that are capable of proof, either common or individual.'" *Deepwater Horizon*, 732 F.3d 342 n.8 (citation omitted). Accordingly, under the district court's interpretation, the settlement agreement would lack commonality. And since "[t]he commonality and typicality requirements of Rule 23(a) tend to merge," *Gen. Tel. Co.* v. *Falcon*, 457 U.S. 147, 157 n.13 (1982), the claims of the representative parties would no longer be typical.

The predominance requirement of Rule 23(b)(3) is even "more demanding than the commonality requirement," and "mandates caution, particularly where individual stakes are high and disparities among class members great." *Bell Atl. Corp.* v. *AT&T Corp.*, 339 F.3d 294, 301-02 (5th Cir. 2003) (citation omitted). Because Rule 23(b)(3) is

24

an "adventuresome innovation" that is "designed for situations in which class-action treatment is not as clearly called for," courts have a "duty to take a close look at whether common questions predominate over individual ones." *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426, 1432 (2013) (citations omitted).  In particular, the requirement is designed to "test[] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.

Predominance requires a reliable, common methodology for measuring classwide damages.  Certification under Rule 23(b)(3) is therefore improper "where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate." *Bell Atl.*, 339 F.3d at 307.  Even where class members share an injury resulting from a single incident, a damages class action cannot be certified if "[t]he amount of compensatory damages to which any individual class member might be entitled cannot be calculated by objective standards." *Steering Comm.* v. *Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006).  Moreover, under *Comcast*, "a model purporting to serve as evidence of damages . . . must measure only those damages attributable" to the class plaintiffs' theory of liability.  133 S. Ct. at 1433.

In this case, the *only* measure of damages that Class Counsel proffered below was the formula embodied in the settlement agreement.

R. 7690 n. 39.  The district court also relied upon only the settlement agreement's "common methodologies or formulaic calculations" to reject the objectors' damages-based arguments. R. 12194.  Thus, whether the class satisfies the predominance test rests entirely on whether the formula embodied in the settlement agreement satisfies the standards articulated in *Bell Atlantic*, *Steering Committee*, and *Comcast*.

Under the district court's interpretation, however, the settlement agreement cannot meet these demanding standards.  Indeed, the record contains numerous striking examples of awards to claimants whose losses were indisputably not caused by the oil spill but instead were caused by factors unrelated to the spill.  An excavation company in Alabama, for example, received an award upwards of $3.5 million even though its revenue drop during the relevant period was the result of the company's decision to sell substantially all of its assets in 2009—*before* the spill occurred.  Ex. Q App. A, ¶ 24 (Rumsey Decl.).  Similarly, the Claims Administrator awarded $4 million to a storm clean-up and construction company based on revenue decline from 2008—a year when it received $30 million in FEMA contracts in response to Hurricanes Gustav and Ike—to 2010, a year that saw no major hurricanes.  *Id.* App. A, ¶ 15.  And an attorney in northern Louisiana was awarded $172,000 from the settlement program even though his business license had been *revoked* before the spill in 2009.  *Id.* App. A,

¶ 2.  The record reflects numerous other awards to the same effect.  *See*, *e.g.*, *id.* App. A.

BP's review of these and other awards issued to date indicates that the Claims Administrator has already awarded over $76 million to entities whose losses were clearly caused by events other than the oil spill—such as the examples cited above—as well as an additional $546 million to claimants who reside far from the spill and are engaged in businesses with no logical connection to any injury from the spill, such as farms, law firms, healthcare entities, and manufacturing concerns. Ex. P at 13 & n.28.  In addition, economic analysis of BEL awards reveals that "a substantial portion of BEL claims and offers are concentrated in geographic areas and industries with little apparent economic connection to the DWH spill."  Ex. R ¶ 7 ; *see id.* ¶¶ 15, 22-27. This pattern "suggests that BEL offers frequently compensate claimants for losses that are not spill-related." *Id.* ¶ 27.

Similarly problematic is the fact that "the vast majority of BEL claims are from claimants that did not previously indicate that they had suffered spill-related harm" by participating in the Gulf Coast Claims Facility, *id*. ¶ 16, suggesting that they did not believe the spill caused them any damages but are now filing claims anyway. *Id.* ¶¶ 17-21; *see also* Ex. E ¶ 23-24.  Despite these objective indicators that many awards are going to claimants that suffered no spill-related loss, the Claims Administrator continues to issue such awards without requesting the

information necessary to determine whether such claimants are actually class members by virtue of having "suffered" "*as a result of* the Deepwater Horizon Incident."  Agreement § 1.3.1.2 (R. 4071) (emphasis added).

A formula resulting in such substantial payments to vast numbers of claimants who were not injured by the defendant's conduct is "clearly inadequate" to calculate individual damages.  *See*, *e.g*, *Bell Atl.*, 339 F.3d at 304-06 (noting inadequacy of using nationwide averages to measure antitrust damages where plaintiffs "failed to demonstrat[e] how for some businesses within each class, [defendant's conduct] would have had any effect whatever on those businesses' bottom lines").

Moreover, the Claims Administrator's approach divorces a claimant's damages from its theory of liability.  For a claimant to prevail at trial against BP, it would have to establish that it was injured by BP and show the extent of the injury.  *See*, *e.g.*, 33 U.S.C. § 2702(b)(2)(B) (imposing liability for "[d]amages for injury to, or economic losses resulting from destruction of, real or personal property" by oil spill).  Under the Claims Administrator's approach, however, the BEL framework permits a claimant to recover millions of dollars without suffering *any* injury traceable to the oil spill.  Thus, the district court's interpretation awards damages with no connection to many class members' causes of action, and the settlement class accordingly fails the predominance requirement unless the causal-nexus requirement is

enforced. *See Comcast*, 133 S. Ct. at 1433; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) (holding that, to satisfy the predominance requirement, the class proponents must "show that they can prove, through common evidence, that all class members were in fact injured" and explaining that a damages model that "detects injury where none could exist" would "shred" the case for certification).

### 4. Fairness Would Be Destroyed.

Rule 23(e) provides that a district court may approve only those class settlements that are "fair, reasonable, and adequate."  The purpose of Rule 23(e) is "'to protect the nonparty members of the class from unjust or unfair settlements affecting their rights.'" *Wilson* v. *Sw. Airlines, Inc.*, 880 F.2d 807, 818 (5th Cir. 1989) (quoting *Piambino* v. *Bailey*, 610 F.2d 1306, 1327 (5th Cir. 1980)).  Accordingly, a district court may approve a settlement as fair, reasonable, and adequate only if the benefits provided to class members represent a "fair approximation of [their] relative entitlement" to relief.  *Reed* v. *Gen. Motors Corp.*, 703 F.2d 170, 175 (5th Cir. 1983); *see also*, *e.g.*, *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 n.73 (3d Cir. 1998) (in evaluating fairness, courts should consider "[w]hether persons with similar claims will receive similar treatment"); *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 712 (E.D. Mo. 2002) ("The Court finds that to be fair, reasonable and

adequate, . . . the plan of allocation should reflect the strength of all of the October purchasers' claims as compared to the strength of all of the claims of other plaintiffs."). Put another way, benefits that a settlement agreement provides class members must correspond to the strength of their claims.

In approving the settlement here, the district court correctly recognized that, as written, the settlement agreement "ensures that similarly situated class members are treated similarly," adding that "[i]t is perfectly fair and reasonable, and indeed common and accepted, for settlement benefits to turn on the strength of class members' claims." R. 12156, 12235. The district court's misinterpretation of the settlement undermines these conclusions by authorizing millions of dollars in awards to claimants whose claims are neither strong nor even colorable. These awards are not even arguably a "fair approximation," *Reed*, 703 F.2d at 175, of their recipients' entitlement to relief.

### 5. Class Membership Would Be Rendered Non-Ascertainable.

Rule 23 requires that the class be "adequately defined and clearly ascertainable." *Union Asset Mgmt. Holding A.G.* v. *Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012) (internal quotation marks omitted). To satisfy this requirement, the class definition must base membership on a "rational demarcation." *See Boca Raton Cmty. Hosp., Inc.* v. *Tenet Healthcare Corp.*, 238 F.R.D. 679, 689 (S.D. Fla. 2006), *aff'd on other*

*grounds*, 582 F.3d 1227 (11th Cir. 2009). The agreed-to class definition meets that standard by limiting class membership for BEL claimants to persons or entities alleging "[l]oss of income, earnings or profits suffered . . . *as a result of* the Deepwater Horizon Incident." Agreement § 1.3.1.2 (R. 4071) (emphasis added). The district court's redefinition of the class to exclude a causal-nexus requirement, by contrast, eliminates any rational demarcation between legitimate claimants with losses resulting from the spill and illegitimate claimants with no spill-related losses.

### 6.    Class Members Would Lack Article III Standing.

Judge Clement recognized that Article III imposes an additional limitation on class certification. "To avoid dismissal based on a lack of standing, the court must be able to find that both the class and the representatives have suffered some injury requiring court intervention. The class must therefore be defined in such a way that anyone within it would have standing." *Deepwater Horizon*, 732 F.3d at 342 (quoting *Denney* v. *Deustsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)); *see also Halvorson* v. *Auto-Owners Ins. Co.*, 718 F.3d 773, 779 (8th Cir. 2013) ("[A] named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves." (citation omitted)); *Mazza* v. *Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012); *Kohen* v. *Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) ("[I]f the definition is so broad that it sweeps within it persons who could not have been injured

31

by the defendants' conduct, it is too broad.").

This requirement derives from the Rules Enabling Act, which, as Judge Clement explained, "instructs that rules of procedure [such as Rule 23] 'shall not abridge, enlarge or modify any substantive right.'" *Deepwater Horizon*, 732 F.3d at 341 (quoting *Amchem*, 521 U.S. at 613 (1997) (quoting 28 U.S.C. § 2072(b))). "By including claimants in the class definition that lack colorable claims, a court disregards this warning," "ignores the standing requirement of Article III and creates a substantive right where none existed before." *Id*. Accordingly, a court that "[a]llow[s] recovery from [a] settlement fund by those who have no case and cannot state a claim . . . acts *ultra vires*." *Id*. at 341-42.

Article III standing, in turn, requires that class members suffer an injury "fairly . . . trace[able]" to the defendant's challenged conduct. *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation omitted). That test of traceability, according to the Supreme Court, "is not 'an ingenious academic exercise in the conceivable.'" *Lujan*, 504 U.S. at 566 (citation omitted). Rather, the chain of causation cannot be so attenuated that the injury cannot be traced to the defendant's conduct. *See id.* Applying these standards, Judge Clement explained that "if a claimant has suffered a loss, but it has no colorable claim that the loss was caused by the spill, it . . . lacks standing and cannot state a claim . . . because it cannot allege 'a causal connection' between its loss and the spill." *Deepwater Horizon*, 732 F.3d at 340 (citation omitted).

Accordingly, "the district court had no authority to approve the settlement of a class that included members that had not sustained losses at all, or had sustained losses unrelated to the oil spill, as BP alleges." *Id.* at 343. The "payment of [these] admittedly non-spill-related claims is a legal nullity", *id.*, and class certification must be rejected unless the agreement is properly interpreted to exclude all claimants who lack a colorable basis for tracing their injuries to the spill.

As shown in Part I.A above, the parties crafted a definition of class membership that honors the constitutional standing requirement. The district court, however, has improperly rewritten the class definition by failing to enforce it and by reading the causal-nexus requirement out of the agreement. Faced with a choice between BP's "reasonable and effective" interpretation, which "exclude[s] putative class members with no colorable legal claim," and the Claims Administrator's "unlawful" interpretation, which includes them, "the district court should have rendered the Settlement lawful by adopting [BP's] interpretation." *Id*. This Court should conclusively reject the district court's misinterpretation in order to preserve the settlement agreement from invalidation.

## C.    The "Causation" Criteria of Exhibit 4B Do Not Establish Class Membership.

In the proceedings below, Class Counsel have contended that the

Claim Administrator must rely on the "causation" criteria established in Exhibit 4B of the settlement agreement in order to make a threshold determination of causation for purposes of class membership.  *See* Motion to Amend at 16.  This position misreads Exhibit 4B and misunderstands the requirements of Rule 23 and standing.  *See* Ex. P at 16-19.

*First*, plaintiffs' position disregards pivotal language in footnote 1 of Exhibit 4B, which expressly states that "Th[ese] Causation Requirements for Business Economic Claims *do[] not apply* to . . . Entities, Individuals or Claims not included with the Economic Class definition."  Agreement Ex. 4B, at 1 n. 1 (R. 4260) (emphasis added).  Far from supporting Class Counsel's assertion that Exhibit 4B governs the causal-nexus determination at the threshold class-membership stage, this language compels precisely the opposite conclusion:  the Claims Administrator must determine whether a claimant is a class member *before* considering eligibility for damages based on the criteria in Exhibit 4B.  Class Counsel's argument puts the cart before the horse in suggesting that the Claims Administrator can apply Exhibit 4B before applying the criteria in footnote 1 to determine whether Exhibit 4B applies at all.  That approach would effectively write footnote 1 out of the agreement.  The rules of contractual construction, however, forbid reducing contractual language to surplusage.  *See Transco Exploration Co.* v. *Pac. Emp'rs Ins. Co.*, 869

34

F.2d 862, 864 n.3 (5th Cir. 1989) (court must, "where possible, construe the words so as to harmonize all while rendering none superfluous").

*Second*, Exhibit 4B's criteria are designed to assess revenue declines only; nothing in the Exhibit purports to link any such decline to the oil spill. Evidence of revenue downturn is separate from proof of causal nexus, and the law is settled that plaintiffs must establish both. *See Lujan*, 504 U.S. at 560-61. Thus, despite Class Counsel's attempts to equate measuring revenue decline with proof of causation, the actual terms of Exhibit 4B have nothing to do with "prov[ing] that the loss had any factual relationship to BP's actions." *Deepwater Horizon*, 732 F.3d at 347 (Southwick, J., concurring).

*Third*, Exhibit 4B describes one of the showings a claimant must to recover, but it does not purport to limit the evidence the Claims Administrator may consider in determining class membership. Indeed, the Claims Administrator has broad authority under Exhibit 4A to require claimants to submit additional information where necessary to substantiate their claims. Agreement Ex. 4A at 1 (R.4255). Thus, while Class Counsel are correct that Exhibit 4B does not require claimants to submit proof linking economic loss to the spill, the Exhibit also does not bind the Claims Administrator's hands in determining class membership when the available information indicates that a given claimant's loss is not fairly traceable to the spill. To the contrary, footnote 1's instruction—that Exhibit 4B applies only to class

*members*—requires the Claims Administrator to seek additional proof of class membership from a claimant whenever the available information suggests the lack of a causal nexus, before the Claims Administrator can apply Exhibit 4B's revenue-loss metrics to the claim.

*Finally*, for all the reasons discussed above, BP's interpretation avoids serious constitutional and Rule 23 problems that would, unless corrected, invalidate the entire settlement. *See supra* Part I-B.  It is a "truism that subject matter jurisdiction 'cannot be conferred by consent, agreement, or other conduct of the parties'" (*Gasch* v. *Hartford Accident & Indem. Co.*, 491 F.3d 278, 284 (5th Cir. 2007)), and thus—even assuming Class Counsel were correct that BP had agreed to "causation" guidelines that require no evidence linking a claimant's injury to the spill—such a contractual agreement could not salvage judicial approval of the settlement agreement. *See also Strong* v. *BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998) (parties cannot agree to ignore or waive Rule 23 requirements); *Montegut* v. *Williams Commc'ns, Inc.*, 109 F. Supp. 2d 496, 498 n.2 (E.D. La. 2000) ("[I]t is black letter law that the parties may not consent to federal subject matter jurisdiction where it is lacking.").

Class Counsel argued below that BP is estopped from challenging the district court's refusal to enforce the causal-nexus requirement. *See* Ex. S at 7-8.  That is wrong.  BP did not waive, nor could it have waived, the requirement that each class member must have suffered an

injury caused by the defendant's conduct.   BP has consistently maintained throughout the settlement approval process that the settlement agreement grants relief only to claimants who suffered loss as a result of the spill.

During the final fairness hearing, for example, BP stated that the settlement agreement did not extend to individuals with no injury from the spill, but rather is "designed to fairly and generously compensate the legitimate claims of *those who were injured as a result of the oil spill*." R. 8239 (emphasis added).  Indeed, even before final approval of the settlement agreement, BP began to challenge claims that did not have a causal link to the spill through the CSSP appeals process."  BP's Initial Proposal For Claim No. XXX38 at 1 (Dec. 3, 2012), Motion of Defendants-Appellants to File Under Seal, Ex. A, Attachment 1, *In re: Deepwater Horizon*, Nos. 13-30315 & 13-30329 (5th Cir. Nov. 21, 2013) ("the Settlement Program erred by including in its assessment of causation and damages millions of dollars of earnings from two business lines that Claimant had dropped years before the spill").  Then, on December 7, 2012, before the district court approved the settlement, BP objected to proposed advertising that solicited claimants with no nexus to the spill.   BP stated that the proposed ads were "contrary to Rule 23[] and at odds with the terms of the Settlement Agreement" because they invited individuals with no connection to the oil spill to make claims.  Ex. W at 1.  BP distinguished statements in

37

prior advertising, which "reference a causal connection to the spill," from the new spots that impermissibly "omit[ted] any reference to the Class itself and fail[ed] to mention that the Settlement Agreement requires a connection to the spill." *Id*. at 3-4; *see also* Ex. Z (Ex. B) at 2 (stating that "claimant is only entitled to make a claim for damages *caused by* the DWH spill" as "expressly provided for both in the Settlement Agreement and in the Court-approved Notice describing it, and by the sworn Claims Form developed by the Settlement Program with the input and consent of the parties" (citation omitted) (emphasis added)).

BP continued to reiterate its position on causation. In December 2012 and January 2013, BP negotiated a disclaimer to the proposed ads—to which Class Counsel agreed—stating, "Damages *must be as a result of* the Deepwater Incident as provided in Deepwater Horizon Economic and Property Damages Settlement Agreement." Ex. Z ¶¶ 8-12 & n.2 (emphasis added). BP continue to object to other aspects of the proposed ads, explaining to the district court on February 15, 2013, that the ads "divorce[d], almost entirely, claimed damages from any causal nexus with the Deepwater Horizon Oil Spill. That is inappropriate, confusing and misleading — and also contrary to the express terms of the parties' Settlement Agreement." Ex. Z (Ex. I) at 1.

In any event, what BP previously said or did not say is not controlling, because the causal-nexus issue goes to the Court's Article

III jurisdiction and the settlement's compliance with Rule 23. A party cannot waive Article III standing, because it is a jurisdictional requirement that concerns the authority of federal courts to decide a case. *See, e.g.*, *Rivera* v. *Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 n.6 (5th Cir. 2002). Similarly, the Court has an independent duty to evaluate compliance with Rule 23; those requirements, too, cannot be waived. *See, e.g.*, *Strong* v. *BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998); *Davis* v. *Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003). As this panel recognized, "[i]t makes no difference that a defendant may bargain for global peace by agreeing to allow claimants with no colorable legal claim to recover from the settlement fund. A class settlement is not a private agreement between the parties. It is a creature of Rule 23, which authorizes its use to resolve the legal claims of a class 'only with the court's approval.'" *Deepwater Horizon*, 732 F.3d at 343 (quoting Fed. R. Civ. P. 23(e)); *accord id.* at 347 (Southwick, J., concurring) (agreeing that "class actions are not meant to be vessels for achieving 'global peace' by creating substantive rights that would not otherwise exist").

Class Counsel's attempt below to avoid these limitations by arguing "judicial estoppel," *see* Ex. S at 7-8, is unavailing, as "principles of estoppel [also] do not apply" to questions of federal court subject-matter jurisdiction. *Ins. Corp. of Ireland, Ltd.* v. *Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (citation omitted). In any

39

case, the high bar of judicial estoppel requires that a party adopt "clearly inconsistent positions," *In re Texas Wyoming Drilling, Inc.*, 647 F.3d 547, 552 (5th Cir. 2011), that "the court in the prior case accept[] that party's original position," and that "the party to be estopped has not acted inadvertently." *Wells Fargo Bank, N.A.* v. *Titus Chinedu Oparaji* (*In re Titus Chinedu Oparaji*), 698 F.3d 231, 235 (5th Cir. 2012). BP never purposefully or successfully misled the district court into believing that the settlement agreement permits awards to claimants who are not class members and have no colorable claim for relief, and Class Counsel's assertions about the meaning of Exhibit 4B—which has nothing to do with threshold determinations of class membership—are not to the contrary.

### D.     This Court Should Grant BP The Relief It Seeks Now.

This Court has ample authority to issue a final binding interpretation of the causation issue at this juncture and enjoin the payment of claims where the alleged injury is not traceable to the spill. "[A]n appellate court has jurisdiction to direct the entry of a final judgment even though the appeal is only from a district court's grant or denial of a preliminary injunction." *W. Va. Ass'n of Cmty. Health Ctrs., Inc.* v. *Heckler*, 734 F.2d 1570, 1579 n.11 (D.C. Cir. 1984). On appeal from a preliminary injunction ruling, "a greater amplitude of judicial review is called for when the appeal presents a substantial issue that the action of the trial judge was based on a premise as to the pertinent

rule of law that was erroneous." *Id*. (citations omitted).  Courts of appeals can also reverse the denial of a preliminary injunction with directions to enter declaratory relief for the appellants. *See*, *e.g., Amandola* v. *Town of Babylon*, 251 F.3d 339, 343-44 (2d Cir. 2001).

There is no need for further factual development before final appellate resolution the causation issue. *See Thornburgh* v. *Am. Coll. of Obstetricians and Gynecologists*, 476 U.S. 747, 756-57 (1986) ("[I]f a district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance, that ruling may be reviewed even though the appeal is from the entry of a preliminary injunction."), *overruled on other grounds by Planned Parenthood of Se. Pa.* v. *Casey*, 505 U.S. 833 (1992).  Here, question of the proper interpretation of the settlement agreement's causal-nexus requirement presents a pure question of law, *Waterfowl L.L.C.*, 473 F.3d at 141, as do the intertwined issues regarding the fatal Rule 23, Rules Enabling Act, and Article III problems created by the district court's erroneous interpretation of the agreement.

Moreover, the parties have fully briefed the interpretive question below, the district court has twice refused to construe the agreement in the manner urged by BP, and the record contains ample evidence of the dire consequences of the district court's and Claims Administrator's ongoing refusal to limit class membership to those claimants whose injuries are colorably traceable to the spill.  There is no reason to

further delay appellate resolution of this important question, which is of crucial significance to both the validity and the ongoing operation of the Settlement Program.  The interests of justice and of judicial economy require prompt resolution of this question.

## II.    BP Will Be Irreparably Harmed Absent An Injunction.

BP seeks an order preventing awards to claimants whose losses are not traceable to the oil spill—payments that, as a practical matter, BP can likely never recover once distributed.  The Claims Administrator's improper awards for claimants with no causal nexus already total hundreds of millions of dollars, and—because the district court has refused to enforce the settlement agreement's causal-nexus requirement—the irreparable harm to BP threatens to increase still further now that the CSSP is beginning to pay additional BEL claims. Ex. AA ¶¶ 4-5 (Cantor Decl.).  An order preventing such payments, and thus "maintaining the status quo," is "appropriate when . . . denial of the order would inflict irreparable injury on the movant."  *Ruiz* v. *Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (citation omitted).  Moreover, preventing such harm will "preserve the court's ability to render a meaningful decision on the merits."  *FSLIC* v. *Dixon*, 835 F.2d 554, 562 (5th Cir. 1987) (citation omitted).

This Court has already held that BP was entitled to a stay of payments to claimants whose injuries are not "traceable" to the spill. *Deepwater Horizon*, 732 F.3d at 345; *see id.* at 346 (Southwick, J.,

concurring).  That holding remains correct today.

*First*, an injunction pending appeal is necessary to prevent the dissipation of BP's assets.  "[A]n injunction may issue to protect assets that are the subject of the dispute," *In re Fredeman Litig.*, 843 F.2d 821, 827 (5th Cir. 1988), to preserve those assets pending "a final determination on the merits," *Dixon*, 835 F.2d at 561; *see also Janvey* v. *Alguire*, 647 F.3d 585, 601 (5th Cir. 2011).  Such an injunction is necessary here because the ongoing awards to claimants with no nexus to the spill will, unless restrained, dissipate BP's assets.

As the Claims Administrator previously admitted to this panel, the Settlement Program has deliberately paid claims "for losses that a reasonable observer might conclude *were not in any way related to the Oil Spill*."  CSSP Brief, *supra*, at 16 (emphasis added).  Indeed, as shown above (*supra* pp. 26-28), the CSSP has already issued countless awards to claimants who lack any colorable nexus to the spill, and is poised to issue many thousands more.  That result is hardly surprising given the Claims Administrator's refusal to enforce the causal-nexus requirement, which has predictably led to prominent advertisements that plaintiffs' counsel have placed throughout the Gulf Region urging entities to file claims even if their alleged losses had nothing to do with the oil spill but instead were caused by factors other than the spill.  *See*, *e.g.*, Paul M. Barrett, *How BP Got Screwed on Gulf Oil Spill Claims*, Bloomberg      Businessweek      (June      27,      2013),

http://www.businessweek.com/articles/2013-06-27/how-bp-got-screwed-on-gulf-oil-spill-claims ("The craziest thing about the settlement is that you can be compensated for losses that are UNRELATED to the spill."); R. 16715 ("*You may even have reason to believe that BP did not cause your reduced revenues.   Those things don't matter.*") (emphasis in original).

These egregious awards do not represent economic losses caused by the spill, and they contradict the plain terms and purpose of the settlement.   Yet the Claims Administrator nonetheless issued them, and under the district court's rulings is entitled to continue doing so. While the ultimate cost to BP is inestimable, and even if the matching problem is fixed, the improper awards due to the Claims Administrator's failure to enforce the causal-nexus requirement could total billions of dollars if left unchecked.   Only an injunction can avert further irreparable harm.

*Second*, BP lacks an adequate remedy to improper payments made to claimants with distorted or fictitious losses.   Once an improper award is paid, it will often be impossible for BP to recover that amount—even if this Court ultimately determines that it should never have been paid. As this panel recognized, BP cannot afford to wait for a stay until after the claims processing rules are finally resolved because "at that point, the improper awards will have been distributed to potentially thousands of claimants and BP will have no practical way of recovering

these funds should it prevail." *Deepwater Horizon*, 732 F.3d at 332 n.3. This is a classic case of irreparable injury: monetary remedies are inadequate because, as a practical matter, awards to thousands of mostly small business claimants cannot be recovered. *See Janvey*, 647 F.3d at 599 (rejecting argument that "difficulty securing economic damages is insufficient to demonstrate irreparable harm"). Injunctive relief is appropriate where, as here, the denial of such relief would force the defendant to "chase"—in all likelihood unsuccessfully—"assets disbursed to" various claimants. *Dixon*, 835 F.2d at 561.

*Ex post* recovery is practically impossible here. For one thing, BP cannot recover damages from the Settlement Program itself, which is funded by BP pursuant to the settlement. Agreement § 5.12 (R. 4108). The Claims Administrator lacks the funds to satisfy any judgment personally. Moreover, BP cannot feasibly sue all of the thousands of claimants receiving unjustified awards. And even if BP could somehow obtain judgments against all such recipients, the need to pursue such a large number of actions is precisely the sort of "asset chas[ing]" this Court has held demonstrates irreparable harm. *See Dixon*, 835 F.2d at 561; *see also Janvey*, 647 F.3d at 600 (citing *Lee* v. *Bickell*, 292 U.S. 415, 421 (1934)). Finally, BP is entitled to presume, as this Court has held, that class members who receive invalid awards will dissipate their assets. *See Janvey*, 647 F.3d at 600-01; *Dixon*, 835 F.2d at 561. There

is no reason to believe the claimants will maintain these funds, or reserve other assets sufficient to reimburse BP.

Nor is the continued processing of claims unrelated to the spill likely to be cured by a ruling on "the measurement of a claimant's loss under Exhibit 4C," the sole issue that remains for the district court to resolve on remand.  *See* Ex. B at 4.  A ruling on Exhibit 4C, while necessary to prevent further payments to claimants who suffered no actual injury, would do nothing to address payments to the numerous claimants who have suffered actual injury unrelated to the spill.  *See* Ex. Q ¶ 4 and App. A; Ex. R ¶ 7, 17-27.  The Claims Administrator's erroneous awards already total hundreds of millions of dollars.  The district court's November 15 Order will escalate that harm.  Because BP has no practical ability to recover all of these excessive payments, the harm is irreparable, and an injunction is appropriate.

## III. The Threatened Permanent Injury To BP Outweighs Any Alleged Harm To BEL Claimants.

This panel has already held that "the balance of equities favors a tailored stay" ensuring that "those who experienced actual injury traceable to loss from the Deepwater Horizon accident continue to receive recovery but those who did not do not receive their payments until this case is fully heard and decided through the judicial process." *Deepwater Horizon*, 732 F.3d at 345.  "The interests of individuals who may be reaping windfall recoveries because of an inappropriate

interpretation of the Settlement Agreement and those who could never have recovered in individual suits for failure to show causation are not outweighed by the potential loss to a company and its public shareholders of hundreds of millions of dollars of unrecoverable awards." *Id*. That conclusion has even greater force now in light of the district court's refusal to issue an injunction enforcing the settlement agreement's causal-nexus requirement consistent with this panel's instructions.

An injunction would cause no cognizable harm to claimants. As an initial matter, if BP's requested injunction is granted, the settlement program will continue to pay claimants who can demonstrate that they suffered *actual* economic losses as a result of the spill. Moreover, claimants seeking recovery for seafood, individual economic loss claims, property damage claims, subsistence, vessels of opportunity, and vessel physical damage will continue to have their claims processed and, if appropriate, paid by the settlement program. *See*, *e.g.*, *Janvey*, 647 F.3d at 601 (agreements to thaw "all but certain discrete categories of compensation" supported preliminary injunction).

As for those claimants that would be affected by the requested injunction, they have no legitimate interest in receiving payments for injuries not caused by the spill. By contrast, BP would suffer permanent harm absent an injunction. Under these circumstances, it is

"abundantly clear that the greater burden would rest upon" BP. *Placid Oil Co.* v. *Dep't of Interior*, 491 F. Supp. 895, 907 (N.D. Tex. 1980).

## IV.  An Injunction Will Promote The Public Interest.

Granting the requested injunction "will not disserve the public interest." *Opulent Life Church* v. *City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012).  There is no public interest in paying claimants for losses that were not caused by the spill.  *See Deerfield Med. Ctr.* v. *City of Deerfield Beach*, 661 F.2d 328, 338-39 (5th Cir. 1981).  If the injunction were issued, BP would continue to pay many other types of claims, serving the public interest by providing compensation for actual spill-related losses.

Moreover, there is a strong public interest in having class settlements, like all contracts, administered according to their terms and consistent with their objectives.  *See Certified Restoration Dry Cleaning Network, L.L.C.* v. *Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007); *PCTV Gold, Inc.* v. *SpeedNet, LLC*, 508 F.3d 1137, 1145 (8th Cir. 2007).   Litigation surrounding the *Deepwater Horizon* spill is of enormous public importance, *see Deepwater Horizon*, 732 F.3d at 345 (emphasizing the "significant legal questions" in this case "that will affect the course of class action law in this country going forward"), and sound administration of the allocation of costs associated with the spill must balance not only the interests of Gulf Coast residents and businesses being compensated for actual harm, but also their interest in

having energy companies, which are integral to the region's economy, be able to operate without the fear of illegitimate claims being forced upon them.

## CONCLUSION

The district court's orders conflict with this Court's October 2 decision, violate the settlement agreement's plain terms, cause irreparable harm to BP, and will, unless overturned, necessitate decertification of the class and invalidation of the parties' settlement agreement. This Court should hold that the district court has misinterpreted the settlement agreement by failing to enforce the causal-nexus requirement for class membership, and should enjoin any further payments to BEL claimants whose injuries are not traceable to the spill.

November 21, 2013                    Respectfully Submitted,

                                     /s/ Theodore B. Olson

Richard C. Godfrey, P.C.             Theodore B. Olson
J. Andrew Langan, P.C.                 *Counsel of Record*
Wendy L. Bloom                       Miguel A. Estrada
Andrew B. Bloomer, P.C.              Thomas G. Hungar
R. Chris Heck                        Scott P. Martin
KIRKLAND & ELLIS LLP                 GIBSON, DUNN & CRUTCHER LLP
300 North LaSalle Street             1050 Connecticut Avenue, N.W.
Chicago, IL 60654                    Washington, D.C.  20036
(312) 862-2000                       (202) 955-8500

Jeffrey Bossert Clark                George H. Brown
                                     GIBSON, DUNN & CRUTCHER LLP

Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
(202) 942-5000

Jeffrey Lennard
DENTONS LLP
233 S. Wacker Dr., Suite 7800
Chicago, IL 60606
(312) 876-8000

1881 Page Mill Road
Palo Alto, CA  94304
(650) 849-5300

S. Gene Fendler
Don K. Haycraft
R. Keith Jarrett
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139
(504) 581-7979

Kevin M. Downey
F. Lane Heard III
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
(202) 434-5000

*Attorneys for BP Exploration & Production Inc.,*
*BP America Production Company, and BP p.l.c.*

# APPENDIX:  EXHIBITS TO EMERGENCY MOTION OF DEFENDANTS-APPELLANTS TO ENFORCE THIS COURT'S OCTOBER 2 JUDGMENT AND FOR INJUNCTION

Exhibit A—Order, MDL 2179 Docket Entry ("D.E.") 11566, October 3, 2013

Exhibit B—Preliminary Injunction Related to BEL Claims, D.E. 11697, October 18, 2013

Exhibit C—[Proposed] Order Preliminarily Enjoining the Claims Administrator's January 15, 2013 Policy Decisions [Submitted by BP], D.E. 11726-2, October 9, 2013 (filed October 23, 2013)

Exhibit D—Letter Brief Regarding Entry of Preliminary Injunction and Nature of Remand Proceedings [Submitted by BP], D.E. 11726-3, October 9, 2013 (filed October 23, 2013)

Exhibit E—Exhibit E to Letter Brief Regarding Entry of Preliminary Injunction and Nature of Remand Proceedings [Submitted by BP], Declaration of Hal Sider, D.E. 11726-8, October 9, 2013 (filed October 23, 2013)

Exhibit F—Exhibit F to Letter Brief Regarding Entry of Preliminary Injunction and Nature of Remand Proceedings [Submitted by BP], [Proposed] Policy Regarding BEL Compensation Framework, D.E. 11726-9, October 9, 2013 (filed October 23, 2013)

Exhibit G—Letter from Richard C. Godfrey to the Honorable Carl Barbier re: BP's Memorandum in Support of its Motion for Entry of a Proposed Form of Preliminary Injunction and Motion to Strike, D.E. 11726-11, October 9, 2013 (filed October 23, 2013)

Exhibit H—BP's Motion for Entry of a Proposed Form of Preliminary Injunction in Compliance with the Fifth Circuit's Opinion of October 2, 2013, D.E. 11726-12, October 9, 2013 (filed October 23, 2013)

Exhibit I—BP's Memorandum in Support of Its Motion for Entry of a Proposed Form of Preliminary Injunction in Compliance with the

Fifth Circuit's Opinion of October 2, 2013, D.E. 11726-13, October 9, 2013 (filed October 23, 2013)

Exhibit J—[Proposed] Order Preliminarily Enjoining the Claims Administrator's January 15, 2013 Policy Decisions [Submitted by BP], D.E. 11726-17, October 15, 2013 (filed October 23, 2013)

Exhibit K—Letter from Class Counsel to Judge Barbier re: Fifth Circuit Ruling on BEL Appeal, D.E. 11728-1, October 9, 2013 (filed October 24, 2013)

Exhibit L—Draft Proposed Policy for Potential "Matching" of Expenses [Submitted by Class Counsel], D.E. 11728-2, October 9, 2013 (filed October 24, 2013)

Exhibit M—[Proposed] Order Modifying Temporary Injunction [Submitted by Class Counsel], D.E. 11728-3, October 15, 2013 (filed October 24, 2013)

Exhibit N—Scheduling Order Regarding BEL Remand, D.E. 11735, October 25, 2013

Exhibit O—Motion to Amend Scheduling Order re BEL Remand and Preliminary Injunction Relating to BEL Claims [Submitted by BP], D.E. 11819, November 7, 2013

Exhibit P—Memorandum in Support of Motion to Amend Scheduling Order re BEL Remand and Preliminary Injunction Relating to BEL Claims [Submitted by BP], D.E. 11819-1, November 7, 2013

Exhibit Q—Exhibit A to Memorandum in Support of Motion to Amend Scheduling Order re BEL Remand and Preliminary Injunction Relating to BEL Claims [Submitted by BP], Declaration of Allison B. Rumsey, D.E. 11819-2, November 7, 2013

Exhibit R—Exhibit B to Memorandum in Support of Motion to Amend Scheduling Order re BEL Remand and Preliminary Injunction Relating to BEL Claims [Submitted by BP], Declaration of Hal Sider, D.E. 11819-3, November 7, 2013

Exhibit S—Opposition to BP's Motion to Amend Scheduling Order and Motion to Amend Injunction, D.E. 11826, November 7, 2013

Exhibit T—Exhibit A to Opposition to BP's Motion to Amend Scheduling Order and Motion to Amend Injunction, Business Economic Loss Claims: Causation Revenue Trend Test, D.E. 11826-1, November 7, 2013

Exhibit U—Exhibit B to Opposition to BP's Motion to Amend Scheduling Order and Motion to Amend Injunction, Unofficial Transcript of July 8, 2013 Hearing before U.S. Fifth Circuit Court of Appeals in Case No. 13-30315, D.E. 11826-2, November 7, 2013

Exhibit V—Reply Memorandum in Support of Motion to Amend Scheduling Order re BEL Remand and Preliminary Injunction Relating to BEL Claims, D.E. 11838-2, November 12, 2013

Exhibit W—Exhibit A to Reply Memorandum in Support of Motion to Amend Scheduling Order re BEL Remand and Preliminary Injunction Relating to BEL Claims, Letter of December 7, 2012 from Richard C. Godfrey to the Honorable Sally Shushan re BP's Response to Class Counsel's Proposed Supplemental Information Program, D.E. 11838-3, November 12, 2013

Exhibit X—Sur-Reply in Opposition to BP's Motion to Amend Scheduling Order and Injunction, D.E. 11848-1, November 14, 2013

Exhibit Y—Order, D.E. 11857, November 15, 2013

Exhibit Z—Declaration of Richard C. Godfrey, D.E. 11876, November 20, 2013

Exhibit AA—Declaration of Daniel A. Cantor, November 21, 2013

## CERTIFICATE OF EMERGENCY

I hereby certify that the facts supporting emergency consideration of this motion are true and complete.

*/s/ Theodore B. Olson*

Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

## CERTIFICATE OF CONFERENCE

I hereby certify that, on November 21, 2013, counsel for Defendants–Appellants conferred by telephone with counsel for Plaintiffs–Appellees to (1) advise them of the intended filing of this motion, pursuant to this Court's Rule 27.3, and (2) determine, pursuant to this Court's Rule 27.4, whether an opposition will be filed. Plaintiffs–Appellees oppose this motion and reserve the right to file an opposition; the Claims Administrator and Settlement Program have not indicated their position.


   */s/ Theodore B. Olson*
Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2013, an electronic copy of the foregoing Emergency Motion for an Injunction and Stay Pending Appeal was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system.


   /s/ Theodore B. Olson
Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

# CERTIFICATE OF ELECTRONIC COMPLIANCE

I hereby certify that that, on November 21, 2013, this Emergency Motion for an Injunction and Stay Pending Appeal was transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit through the Court's CM/ECF document filing system, https://ecf.ca5.uscourts.gov.  I further certify that: (1) required privacy redactions have been made pursuant to this Court's Rule 25.2.13, (2) the electronic submission is an exact copy of the paper document pursuant to this Court's Rule 25.2.1, and (3) the document has been scanned with the most recent version of Microsoft Forefront Endpoint Protection and is free of viruses.

   /s/ Theodore B. Olson
Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

# Exhibit A

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | **MDL 2179** |
| "Deepwater Horizon" in the | * | |
| Gulf of Mexico, on April 20, 2010 | * | **SECTION "J"** |
| | * | |
| **Applies to:** | * | **JUDGE BARBIER** |
| | * | |
| **12-970 and All Cases** | * | **MAGISTRATE SHUSHAN** |
| | * | |

## ORDER

In view of the ruling rendered by the Fifth Circuit panel on October 2, 2013 in case number 13-30315 consolidated with 13-30329, the Claims Administrator is ordered to immediately suspend the issuance of any final determination notices or any payments with respect to those BEL claims in which the Claims Administrator determines that the matching of revenues and expenses is an issue.   The Section 6 claims  appeals process (filing of notices, briefs, and panel decisions) for similar BEL claims will be placed on hold pending implementation of the Fifth Circuit decision.  All other claims and appeals are to be processed and determinations, decisions, and payments made in the normal course of the Program's operation.

Further, in response to a question raised by the Fifth Circuit, the Court has confirmed with the Claims Administrator that claims based on an accrual accounting basis are <u>not</u> being converted to a cash accounting basis.[1]

---

[1]See attached declaration of Patrick A. Juneau, Claims Administrator dated October 3, 2013.

This order is issued only as an immediate and interim measure until the Court is able to confer with and receive input from the parties in order to confect an appropriate "narrowly tailored" preliminary injunction order as instructed by the Fifth Circuit.  Staying the processing or payment of <u>all</u> BEL claims would be overly broad and unnecessary as applied to those claims for which matching of revenues and expenses is not an issue.

The parties are instructed to submit to the Court *in camera* a proposed draft for a narrowly tailored preliminary injunction order, together with a letter brief, not exceeding five pages, as to how the Court should proceed to implement the Fifth Circuit ruling.  In addition, the parties shall submit proposed policy language for the Court's consideration. Such submissions shall be made not later than 3:00 p.m. on Wednesday, October 9, 2013.

The Court will hold a status conference in chambers with counsel for BP, Class Counsel, and the Claims Administrator on Friday, October 11, 2013 at 9:00 a.m.


Signed in New Orleans, Louisiana, this 3rd day of October, 2013.

_____

United States District Judge

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| In re: Oil Spill by the Oil Rig | * | **MDL No. 2179** |
|---|---|---|
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | **SECTION "J"** |
| | * | |
| | * | |
| **This Document Relates To:** | * | **JUDGE BARBIER** |
| 12-970 | * | |
| | * | **MAGISTRATE SHUSHAN** |

## DECLARATION OF PATRICK A. JUNEAU, CLAIMS ADMINISTRATOR
### [Regarding Processing of BEL Claims]

Patrick A. Juneau, Claims Administrator of the Court Supervised Settlement Program ("CSSP"), does hereby affirm and attest to the following:

1. The CSSP has adopted Policy 464, which addresses the permitted bases of accounting for submission of Business Economic Loss ("BEL") claims. This policy provides that a claimant who maintains accrual-basis financial records in the normal course of its business must submit such accrual-basis records and may not convert its records to cash-basis accounting for purposes of submitting a claim.

2. When a BEL claimant submits accrual-basis financial records in support of its claim, the CSSP uses those accrual-basis records in the evaluation of the claim. The CSSP does not instead convert such records to a cash-basis. Nor does the CSSP ignore accrual-basis records when submitted and instead evaluate the claim from a cash-basis perspective. This is the manner in which the CSSP has handled BEL claims from the program's inception.

Signed in New Orleans, Louisiana, this _____3ʳᵈ_____ day of _o ctober_____, 2013.

PATRICK A. JUNEAU
CLAIMS ADMINISTRATOR

## FINAL POLICY ANNOUNCEMENT

## POLICY 464: BUSINESS ECONOMIC LOSS CLAIMS: REQUIREMENT OF MONTHLY AND ANNUAL PROFIT AND LOSS STATEMENTS

### I.    Introduction.

Section 4 of Exhibit 4A to the Settlement Agreement requires Business Economic Loss ("BEL") claimants to submit monthly and annual profit and loss statements or alternative source documents establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011. To apply this requirement, the Claims Administrator previously adopted several policies:

1. **Policy 85:** *Business Economic Loss Claims: Profit and Loss Statements.* Addressed the requirement in Section 4 of Exhibit 4A that P&Ls "shall identify the dates on which they were created," and states that if a claimant has already submitted P&L statements that do not identify the dates on which they were created, the claimant may resubmit the P&L statements with the addition of the dates on which they were created or may provide a separate document identifying the dates on which the P&L statements were created.

2. **Policy 232:** *Profit and Loss Statements (P&Ls).* Addressed not requiring an annual P&L if 12 monthly P&Ls were provided, and not requiring a missing monthly P&L where 11 monthly P&Ls and an annual P&L had been provided.

3. **Policy 286:** *Creation of Monthly Profit and Loss Statements.* Addressed the requirement to submit P&Ls as kept in the regular course of business, creating P&Ls from contemporaneous source documents or submission of alternate source documents to the Claims Administrator. The language of this policy appeared in the 10/22/12 Alert Reminder Regarding Document Requirements for BEL Claims that was referred to in footnote 1 of the 3/5/13 memorandum to the Parties that became Policy 355 v.1, as explained below.

4. **Policy 355 v.0:** *Alternate Source Documents for Revenues and Expenses.* Addressed (a) monthly allocations of revenues/expenses; (b) monthly allocations of owner and officer payroll; and (c) the rule that BEL claimants were permitted to restate P&Ls from cash to accrual basis, but not from accrual to cash basis. This policy had a lengthy history. The Claims Administrator first announced this policy to the Parties by memorandum on 9/25/12. The Parties' responses on 9/28/12 led to a meeting of the Administrative Panel on 10/1/12, after which the Claims Administrator re-issued the policy, along with policies on other subjects, to the Parties by memorandum on 10/8/12. The Claims Administrator circulated on 4/2/13 an Excel Compendium of all policies that the Claims Administrator felt should be posted publicly. This policy bore Policy ID 259 in that Compendium. When the Claims Administrator placed this policy in the Policy Keeper software tracking application, it became Policy 355 v0 and was marked as superseded by Policy 355 v1.

1

426479

5. **Policy 355 v1:** *Business Economic Loss Claims: Documentation Requirements.*
Combined Policies 286 and 355 v.0 and became the controlling policy on this subject.
Included (1) a reminder of the BEL documentation requirements described in the
10/22/12 Alert (from Policy 286); (2) described the creation by claimants of P&Ls from
alternate source documents; (3) stated that claimants were not merely to allocate revenues
and expenses evenly over 12 months; and (4) described the Claims Administrator's
review where P&Ls were not maintained by a claimant in the regular course of business.
The Claims Administrator announced this policy in a 3/5/13 memorandum to the Parties
and later made it Policy 355 v1 in the Policy Keeper application, marking it as
superseding Policy 355 v.0.

6. **Policy 355 v.0 (c):** *Restatement of Profit and Loss Statements.* The Claims
Administrator issued this policy in a 10/8/12 memorandum to the Parties and marked it as
Policy 355 v.0(c) in the Policy Keeper application.

The Claims Administrator announces this comprehensive policy regarding the treatment
of P&Ls under the Settlement Agreement. Henceforth the Claims Administrator will consider
this policy to be the governing policy on this subject. All capitalized terms used in this policy
that are defined in the Settlement Agreement shall have the meanings given to them in the
Settlement Agreement.

## II. Policy Statement.

### A. General Requirement.

In support of a BEL claim, Section 4 of Exhibit 4A of the Settlement Agreement
Framework requires claimants to submit, for the claimed Benchmark Period, 2010 and, if
applicable, 2011, either (1) monthly and annual profit and loss statements or (2) alternate source
documents establishing monthly revenues and expenses. A claim without complete monthly
P&Ls and an annual P&L for an applicable period shall be considered incomplete and such
claimants shall be required to provide them or explain why they cannot provide them in an
explanation that the Claims Administrator considers to be reasonably reliable. Claimants are not
permitted merely to allocate revenues or expenses equally over a twelve month period. Rather,
claimants are required to submit sufficient documentation to establish actual monthly revenues
and expenses as required by the Settlement Agreement.

### B. Creation Date of P&Ls.

The Claims Administrator will require verification of the dates on which a claimant's
profit and loss statements were created. That verification may be verbal or in writing. The
Claims Administrator may, in his discretion, request source documents for profit and loss
statements. If there is a discrepancy between amounts reflected in a tax return and comparable
items reflected in a profit and loss statement for the same period, the Claims Administrator may
request the claimant to provide additional information or documentation.

2

426479

## C. Accounting Method for P&Ls: General Rule.

A BEL claimant is required to submit the monthly and annual profit and loss statements that were maintained in the regular course of the claimant's business, using the accounting method used in compiling such statements in the regular course of the claimant's business.

## D. Restatement of P&Ls Using Different Accounting Method: General Rule.

The Claims Administrator has adopted this general rule regarding the circumstances in which a claimant submitting monthly and annual P&Ls in support of a BEL claim may restate such statements to alter the accounting method by which they were prepared in the regular course of the claimant's business:

1. Cash to Accrual Restatement Permitted: If the claimant's profit and loss statements for a relevant period were prepared on a cash basis, the claimant is permitted to restate such statements on an accrual basis.

2. Accrual to Cash Restatement Not Permitted: If the claimant's profit and loss statements for a relevant period were prepared on an accrual basis, the claimant is not permitted to restate such statements on a cash basis.

This general rule is subject to the specific provisions of the remainder of this policy.

## E. Claimants With P&Ls Based on Different Accounting Methods.

The Claims Administrator will observe the following guidelines in connection with P&Ls based on different accounting methods:

### 1. Claimant Submits Cash Basis P&Ls Only:

(a) Accrual Basis Claimants: If the available information establishes that the claimant's regular accounting method for the applicable period was accrual basis, the Claims Administrator will typically not use the cash basis P&Ls for any purpose. The claim will typically be considered incomplete and the claimant must submit accrual basis P&Ls.

(b) Cash Basis Claimants: If the available information establishes that the claimant's regular accounting method for the applicable period was cash basis, the Claims Administrator will typically use the cash basis P&Ls for Causation Tests (if applicable) and for the Compensation Calculation on the claim.

### 2. Claimant Submits Accrual Basis P&Ls Only: The Claims Administrator typically will use the accrual basis P&Ls for Causation Tests (if applicable) and for the Compensation Calculation on the claim, regardless of whether the claimant's regular accounting method for the applicable period was cash basis or accrual basis.

426479

### 3. Claimant Submits Both Cash Basis and Accrual Basis P&Ls:

(a) Selection of P&Ls for Use in Review: If the claimant submits both cash basis P&Ls and accrual basis P&Ls, the Claims Administrator typically will not use the cash basis P&Ls for any purpose. Instead, the Claims Administrator typically will use the accrual basis P&Ls for Causation Tests (if applicable) and for the Compensation Calculation on the claim.

(b) No Mixing of P&Ls with Different Accounting Methods: The Claims Administrator will not mix cash basis P&Ls for some months with accrual based P&Ls for other months for any purpose. Instead, the Claims Administrator will use only cash basis P&Ls or accrual basis P&Ls consistently across all months of the applicable Benchmark Period and Compensation Periods.

(c) Same P&Ls for Causation and Compensation: For claimants in Zones B, C or D that must establish Causation, the Claims Administrator will use the same set of P&Ls (cash or accrual, but not both) in determining the monthly revenue amounts to perform the Revenue Pattern Causation Tests and in performing the Compensation calculation.

## F. Claimants That Cannot Submit P&Ls Maintained in the Regular Course of Business.

### 1. Claimants Subject to This Subsection of This Policy.

Subsection II.F of this policy applies to BEL claimants that: (1) did not maintain monthly and/or annual profit and loss statements in the regular course of their business, prepared at or near the time of the events recorded; or (2) did maintain such statements but after diligent efforts cannot locate or re-produce them to submit in support of a BEL claim.

### 2. Duty of Claimants to Create P&Ls.

A claimant subject to Subsection II.F may create such monthly statements based on contemporaneous alternate source documents (which may include, but are not limited to, invoices supporting revenues, invoices or bills supporting expenses, purchase orders, bills of lading, contracts, leases, bank statements, schedules, check registers, canceled checks, sales journals, credit card statements, etc.). To the extent that claimants are not in possession of such supporting documentation, they are encouraged to seek and obtain such documentation from relevant third parties. If the claimant engages an accountant to create these P&Ls, such accounting expenses may be submitted for reimbursement pursuant to the terms of the Claimant Accounting Support provisions in Section 4.4.13 of the Settlement Agreement. The Claims Administrator may allow a particular claimant to create such monthly P&Ls in "summary" form, provided the submission contains data regarding all revenue and expenses in sufficient detail to allow the Claims Administrator properly to apply the terms of the Settlement Agreement to that specific claim. The Claims Administrator reserves the right to require submission of all or parts

4

426479

of the underlying source documentation to verify the accuracy of any P&Ls that are created.

### 3. Claimants That Cannot Create P&Ls.

If creating monthly and/or annual P&Ls would result in an undue burden to a claimant subject to Subsection II.F despite the availability of the Claimant Accounting Support reimbursement, the claimant may be allowed to submit the contemporaneous alternate source documentation to the Claims Administrator. The Claims Administrator's Accountant Reviewers will determine whether, in the Claims Administrator's discretion, it is appropriate to assist the claimant with devising P&Ls sufficient to permit the Claims Administrator to conduct the causation and compensation evaluations required on the claim. In evaluating whether creating monthly and/or annual P&Ls would result in an undue burden to the claimant, the Claims Administrator will consider the following factors:

(a) The claimants eligible for treatment under this Section II.F.3 ("Eligible Claimants") typically will be *pro se* claimants.

(b) Accounting firms, tax preparers, attorneys, consultants, and other professional services typically will not be Eligible Claimants.

(c) Eligible Claimants typically are those that report income on a Form 1040 Tax Return with a Schedule C or E that includes documentation of expenses.

(d) Eligible Claimants typically are those with annual revenues less than $50,000 in each year included in the Causation and Compensation calculations (*i.e.*, the claimed Benchmark Period, 2010, and 2011, if applicable). The Claims Administrator's Accountant Reviewers may pro-rate this dollar threshold to account for partial years.

(e) Eligible Claimants typically are those that report income on Federal tax returns that were self-prepared. Claimants with tax returns prepared by an accountant typically will not be eligible for treatment under this Section II.F.3.

(f) Eligible Claimants typically will not have presented any support documentation generated with the assistance of accounting software (*e.g.*, claimants who have submitted quarterly or annual financials generated with the use of accounting software would typically not be eligible).

(g) Eligible Claimants will be able to provide support for actual revenues. If the claimant requires "Customer Mix" data to satisfy Causation, the claimant typically will not be eligible for treatment under this Section II.F.3.

### 4. Review of Claims From Claimants Subject to Subsection II.F.

In the review of BEL claims submitted by claimants subject to Subsection II.F, the Claims Administrator reserves the right to determine an appropriate level of supporting and/or explanatory documentation and information for the circumstances of a given claim. It is

5

anticipated that in such instances for those claims involving very small dollar amounts, a lesser level of detail may be required than may be required for larger or more complicated claims. The Claims Administrator's Accountant Reviewers will use their professional judgment in determining the appropriate level of detail required to resolve questions presented by a particular claim. In determining the level of detail required, the Claims Administrator may take into account such factors as the nature, size and complexity of the business and the historical patterns of revenues and expenses.

### G. Gaps in Information.

(a) If a BEL claimant has submitted 12 monthly P&Ls for an applicable period but is unable to produce an annual P&L statement, an annual P&L is not required and the claim shall not be considered incomplete for that reason. Instead, the Claims Administrator will create the annual P&L as necessary based upon the total revenues and expenses in the 12 monthly P&Ls.

(b) If a BEL claimant has submitted 11 out of 12 monthly P&Ls for an applicable period and an annual P&L for that period, the missing 12th monthly P&L is not typically required and the claim shall not be considered incomplete for that reason. Instead, the Claims Administrator will calculate the missing month's revenue and expenses as the difference between the 11-month total and the annual total for the period.

### H. Fraudulent Claims.

This policy is subject to the processes followed by the Claims Administrator to detect and deny payment on fraudulent claims.

426479

# Exhibit B

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig                  MDL NO. 2179
    "Deepwater Horizon" in the Gulf
    of Mexico, on April 20, 2010             SECTION J

Applies to:                                      JUDGE BARBIER
All Cases and 12-970                             MAGISTRATE JUDGE SHUSHAN


## Preliminary Injunction Related to BEL Claims


In view of the ruling rendered by the Fifth Circuit panel on October 2, 2013 in case no. 13-30315 consolidated with 13-30329, on October 3, 2013 the undersigned entered an order to suspend the issuance of any final determination notices or any payments on certain Business Economic Loss ("BEL") claims.  Rec. doc. 11566.  The Order was issued as an immediate and interim measure until the Court was able to confer with and receive input from the parties in order to confect a "narrowly tailored" preliminary injunction order as instructed by the Fifth Circuit.

The parties thereafter submitted *in camera* proposed preliminary injunctions, neither of which the Court found acceptable.  The proposal by Class Counsel was under-inclusive and that submitted by BP was over-inclusive.[1]  At the status conference held on October 11, 2013, the Court discussed

---

[1]For example, Class Counsel suggested that the injunction be limited only to claims based on cash accounting and only for certain industries.  BP suggested that the processing of all BEL claims be enjoined and that new or additional criteria be added to the causation requirements of Exhibit 4B of the Settlement Agreement.

the various Fifth Circuit opinions[2] and the parties were instructed to submit revised proposed language for a "narrowly tailored" preliminary injunction "consistent with the Court's interpretation and instructions provided in chambers... ." Rec. doc. 11635.

Having received the revised proposed draft orders from both Class Counsel and BP, and finding that both continue to have the same deficiencies, the Court sets forth its understanding of the issues before this Court on remand.

The issue before the Fifth Circuit on appeal was how economic loss is measured under the provisions of Exhibit 4C. The primary question was whether there is a requirement that "variable expenses" be matched to the revenues produced by those expenses, in order to calculate "variable profit." This issue is often associated with claims based on cash basis accounting, but not exclusively so. Part I of the majority opinion by Judge Clement, joined by Judge Southwick, was concerned that if this so-called "matching" was required for certain claims but not for others, the result might be that some claimants would receive compensation without proof of actual loss.

While the calculation or measurement of economic loss is measured under Exhibit 4C, the separate causation requirements for BEL claimants are set forth in Exhibit 4B. All BEL claimants must meet these requirements in order to be eligible for compensation. Section 5.3.2.3 of the settlement provides for causation for BEL claims:

---

[2]There are three separate opinions, including the partial majority opinion by Judge Clement, the concurring opinion by Judge Southwick, and the dissenting opinion by Judge Dennis. For purposes of the remand, the parties and the Court agreed that Judge Southwick's concurring opinion is controlling.

Causation Requirements For Business Economic Loss Claims Generally.

Business Economic Loss Claimants, unless causation is presumed, must establish that their loss was due to or resulting from the Deepwater Horizon incident. The causation requirements for such Claims are set forth in Exhibit 4B.

There is no causation requirement for a number of itemized businesses as set forth in Exhibit 4B I. The causation requirements for Zone B and Zone C businesses are objective tests set forth in Exhibit 4B II, and for Zone D businesses in Exhibit 4B III. If claimants fall into Section I, evidence of causation is <u>not</u> required. As to Sections II and III, claimants who meet the objective criteria satisfy the requirement of causation.

However, the issue of how causation is determined was not before the Fifth Circuit in the recent BEL appeal. This is evident from the following passages from the majority and concurring opinions.

In the Fifth Circuit opinion, as to causation, Judge Clement states:

BP did agree that alternative causes of losses were irrelevant if the financial figures supported that a loss occurred.

Slip op. at 21. Judge Southwick also recognizes that causation was agreed to by the parties:

If a BEL claimant could prove an economic loss, properly measured, that proof substituted for evidence of causation. Improper measurement of losses under Exhibit 4C might compensate claimants without actual losses.

. . .

Even so, the parties agreed by Exhibit 4B's causation framework to ignore alternative explanations for actual losses that occurred.

. . .

The agreement simplified the claims process by making proof of loss a substitute for proof of factual causation.

3

Id. at 37-38.  Judge Southwick further points out that "[n]o one on appeal is challenging Exhibit 4B."

Id. at 39.  Finally, Judge Southwick distinguishes causation from the measurement of a claimant's

loss and makes clear the purpose of the remand to this Court:

> Part I of the panel opinion identifies the crucial question for remand:  Should matching be required for *all* claims when it is clearly required for many?  I agree to remand with instructions to reconsider the interpretation of Exhibit 4C for unmatched claims in light of the necessity of revenue and expense matching to realistic measurement of economic loss.

Id. at 38.

Thus, Exhibit 4B of the Settlement Agreement is not before the undersigned on remand.

Rather, what is before the Court is the measurement of a claimant's loss under Exhibit 4C.  That

being clear, the Court orders as follows:

Upon consideration of the decision of the United States Court of Appeals for the Fifth

Circuit's decision in *In re: Deepwater Horizon,* No. 13-30315, dated October 2, 2013, and after

consultation with the Parties and the Claims Administrator, the Court hereby orders as follows:

1.    The Claims Administrator and Settlement Program shall continue to process and pay all

Business Economic Loss ("BEL") claims[3] presented on the basis of "properly-matched accrual-basis

records,"[4] which are "claims supported by sufficiently-matched, accrual-basis accounting."[5]  As to

---

[3] For the purposes of this Order, the term "BEL claims" shall include claims for Business Economic Loss, Failed Businesses and Start-up Businesses.
[4] *In re: Deepwater Horizon*, slip op., at 21.
[5] *Id.* at 18.

these claims, the Claims Appeal Process also shall proceed as set forth in Section 6 of the Settlement Agreement.

2.      The Claims Administrator shall continue the temporary suspension of the issuance of final determination notices and payments with respect to all other BEL claims unless the Claims Administrator determines that the matching of revenues and expenses is not an issue with respect to any such claim, regardless of whether the claim is supported by accrual or cash-basis accounting records.

3.      The Claims Administrator also shall suspend the issuance of final determination notices and payments with respect to Individual Economic Loss ("IEL") claims for which the claimant's economic loss claim is qualified solely upon his or her employer's satisfaction of the BEL requirements set out in Section II of Exhibit 4B of the Settlement Agreement, and the employer's claim also falls within paragraph 2 of this Order.  This temporary suspension of any such IEL claim shall remain in effect unless the Claims Administrator determines that the matching of revenues and expenses is not an issue as to the employer's BEL claim.

4.      As to BEL and IEL claims currently in the Claims Appeal Process, the Claims Administrator shall review such appeals to determine whether any party raised the matching of revenues and expenses as a basis for the appeal.  If the Claims Administrator determines that the matching of revenues and expenses was made a basis for the appeal, the Claims Appeal Process shall be temporarily suspended as to any such appeal.  As to all other such appeals, the Claims Appeal Process shall proceed to determination and payment.

---

5

5.      Notwithstanding any provision in this Order, the deadlines set forth in the Settlement Agreement for filing a Notice of Appeal shall remain in place and such deadlines are not stayed by this Order.  For any timely-filed appeal on a BEL or IEL claim after the date of this Order where a basis for the appeal is the matching of revenues and expenses, such an appeal first shall be reviewed by the Claims Administrator.  If the Claims Administrator agrees that the claim presents an issue as to whether revenues and expenses are sufficiently matched, then the Claims Appeal Process as to that claim shall be temporarily suspended.  Otherwise, the Claims Administrator shall permit the claim to proceed through the Claims Appeal Process to determination and payment.

6.      The Claims Administrator is further ordered to provide to the Court and the Parties, within seven days of the date of this Order, a declaration outlining the criteria that the Claims Administrator's Office will use to determine whether: (a) a claim is "supported by sufficiently-matched, accrual-basis accounting," as set forth in paragraph 1 of this Order; and (b) the matching of revenues and expenses is or is not an issue with respect to a BEL and IEL claim that falls within paragraphs 2, 3, or 5 of this Order, regardless of whether the claim is supported by accrual or cash-basis accounting records.

7.      This Order does not affect claims submitted to the Settlement Program for:  (I) Seafood Program Compensation, (ii) IEL other than those IEL claims identified in paragraph 3 of this Order; (iii) Subsistence, (iv) VoO Charter Payments, (v) Vessel Physical Damage, (vi) Coastal Real Property Damage, (vii) Wetlands Real Property Damage, or (viii) Real Property Sales Damage. These claims and appeals are to be processed, and determinations, decisions and payments are to be made, in the normal course of the Program's operation.

6

8.     This Order will remain in effect until modified by this Court.


New Orleans, Louisiana, this 18th day of October, 2013.

**Carl J. Barbier**
**United States District Judge**

# Exhibit C

# October 23, 2013
# Notice of Filing Exhibit I.1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | **MDL NO. 2179** |
| | * | **SECTION J** |
| | * | |
| | * | **HONORABLE CARL J. BARBIER** |
| This document relates to Civ. A. No. 12-970. | * * * | **MAGISTRATE JUDGE SHUSHAN** |

**[PROPOSED] ORDER PRELIMINARILY ENJOINING THE**
**CLAIMS ADMINISTRATOR'S JANUARY 15, 2013 POLICY DECISIONS**

Upon consideration of the decision of the United States Court of Appeals for the Fifth Circuit's decision in *In re: Deepwater Horizon*, Nos. 13-30315, 13-30329 (Oct. 2, 2013), reversing in part this Court's March 5, 2013 Order (Rec. Doc. 8812) (*see also* April 9, 2013 Order (Rec. Doc. 9232)), and the entire record herein, it is HEREBY ORDERED that the following:

1.     The Claims Administrator and Settlement Program are ENJOINED from implementing the Claims Administrator's January 15, 2013 Policy Decisions regarding business economic loss claims (the "BEL Policy Decisions").  The Fifth Circuit has reversed the order affirming the BEL Policy Decisions.  *See In re: Deepwater Horizon*, slip op. at 3; *see also id.* at 24 (concluding that the BEL Policy Decisions did not "acknowledge the requirement of matching that is foundational for accrual-basis claims" and "did not . . . explain why it was interpreting the same Exhibit 4C language that leads to matching for accrual-based claims as not requiring the matching of cash-basis claims").

2.      The Claims Administrator and Settlement Program are further ENJOINED from processing or further processing the claims of or making payments to claimants pursuing business economic loss recoveries under the Economic and Property Damages Settlement Agreement ("Settlement Agreement"), whose claims were processed under, in accord with, or in any way dependent upon the enjoined BEL Policy Decisions.

3.      The Claims Administrator and Settlement Program are further ENJOINED from paying any business economic loss claim unless the claimant first establishes that it "experienced actual injury traceable to loss from the Deepwater Horizon accident." *Id*. at 35.  Actual injury and Variable Profit shall be determined only with respect to "properly-matched accrual-basis claims" (*id*. at 21), *i.e.*, "claims supported by sufficiently-matched, accrual-basis accounting" (*id*. at 18), and only in a manner in keeping with the principles of "matching" and of "determining actual economic losses for . . . claimants whose records were maintained on an accrual-basis." *Id*. at 19, 21, 35.  No business economic loss claims shall be processed or paid on the basis of "a claimant's idiosyncratically-maintained records."  *Id*. at 21.

4.      The Claims Administrator and Settlement Program are ENJOINED from processing or deciding any Settlement Program appeals in which matching or the presence of "actual injury traceable to loss from the Deepwater Horizon accident," *id.* at 35, is at issue.  Such appeals shall be held in abeyance.  The deadlines for seeking discretionary review by this Court of any Program decision in which matching or the presence of "actual injury traceable to loss from the Deepwater Horizon accident," *id.* at 35, is at issue shall similarly be held in abeyance.

5.      The injunction set forth in Paragraphs 1, 2, 3, and 4 shall remain in effect "until [the remand ordered by the Fifth Circuit in *In re: Deepwater Horizon*] is fully heard and decided

through the judicial process." *Id.* at 35. This will "allow[] the time necessary for deliberate reconsideration of these significant issues on remand." *Id.*

IT IS SO ORDERED.

New Orleans, Louisiana, this _____ day of October, 2013.

_____

United States District Judge

# Exhibit D

# October 23, 2013
# Notice of Filing Exhibit I.2

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois 60654

Richard C. Godfrey
To Call Writer Directly:
(312) 862-2391
richard.godfrey@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

October 9, 2013

**By Electronic Mail**

The Honorable Carl Barbier
United States District Court
Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130

*IN CAMERA* **SUBMISSION**

Re:    Letter Brief Regarding Entry of Preliminary Injunction and Nature of
Remand Proceedings

Dear Judge Barbier:

On behalf of BP, we submit this letter brief in accordance with your Order of October 3, 2013.[1]  That Order asked the parties to address what steps the Court should take in light of the Fifth Circuit's reversal of the Claims Administrator's interpretation of the Deepwater Horizon Economic and Property Damages Settlement Agreement's ("Settlement") business economic loss ("BEL") framework.  *In re Deepwater Horizon*, Nos. 13-30315, 13-30329 (5th Cir. Oct. 2, 2013) ("slip op.").  The Fifth Circuit instructed the Court to "expeditiously craft" a "stay tailored so that those who experienced actual injury traceable to loss from the Deepwater Horizon accident continue to receive recovery but those who did not do not receive their payments until this case is fully heard and decided through the judicial process."  *Id.* at 35.  BP submits that there are two immediate questions:  what injunction should the Court enter, and what proceedings should the Court conduct on remand?

## I.    A Tailored Injunction Capable Of Preventing Interim Harm From All Forms of Legal Error Identified By The Fifth Circuit Should Be Entered.

### A.    The Fifth Circuit Opinion Identified Specific Issues That Must Be Corrected On Remand.

*First*, the Fifth Circuit held that the Settlement's BEL compensation framework, which is set forth in Exhibit 4C, "cannot be said to permit ignoring sufficiently matched data from

---

[1]  In compliance with the Order, BP submits this letter brief *in camera*.  *See* Rec. Doc. 11566 at 2.  Given the importance of these proceedings to BP, the Class, and the public, however, as well as the need to make a record for the Court of Appeals, BP respectfully submits that the remand proceedings should be conducted in public, and that the *in camera* filings should be made part of the public record and docketed.  *See* slip op. at 35.

## KIRKLAND & ELLIS LLP

accrual-basis claimants" and that the Claims Administrator cannot apply "the cash-in, cash-out interpretation to claims that are presented with matched revenues and expenses."  Slip op. at 16. To match properly, the Settlement Program must process accrual-basis claims consistent with accounting principles, including recognizing revenue "when the entity becomes entitled to receive payment, as opposed to when the payment is actually received" and ensuring that "[e]xpenses that can be readily traced to the recognized revenues are themselves recognized at the same time as those revenues." *Id.* at 11.

*Second*, the Fifth Circuit remanded for a determination of whether matching should apply to all claims, including those using the cash-basis method.  The Fifth Circuit held that BP's interpretation requiring matching for all claims was reasonable, *id.* at 18-20, and expressed strong doubt about the Claims Administrator's interpretation "due to the fact that only matching provides a realistic chance of achieving the ostensible goal of the settlement of compensating claimants for real losses," *id.* at 21; *see also id.* at 17, 21, 23.

*Third*, the Fifth Circuit concluded that the Settlement Program should not make awards to claimants suffering no losses.  Judge Clement emphasized that interpreting the Settlement to include "businesses without colorable legal claims . . . could imperil a final approval of the settlement and can be considered in evaluating the correct interpretation of possible ambiguities." *Id.* at 33.  Judge Southwick agreed that including claimants who had no losses would raise serious Rule 23 concerns. *Id.* at 39.  Moreover, the Fifth Circuit opinion requires an injunction against claimants with no actual injuries. *Id.* at 35.

*Fourth*, this Court and the parties must address whether claimants whose loss was not caused by the incident are included in the class.  Judge Clement stated that including such claimants "ignores the standing requirements of Article III," would imperil class certification, and would be contrary to fundamental notions of tort causation. *Id.* at 25-33.  Judge Southwick did not rule on this issue but agreed that the Court and parties must consider the issue of causation on remand. *Id.* at 39-40.  Both judges held that the Court should enter an injunction against claimants that cannot trace their losses to the *Deepwater Horizon* accident. *Id.* at 35.

### B.    The Court Should Enjoin The Numerous Matching Problems Caused By The Settlement Program's Policies And Practices.

The failure to match permeates all aspects of the Settlement Program's BEL awards. Although the Claims Administrator submitted a declaration regarding the CSSP's policies, Rec. Dec. 11566, that declaration does not provide assurance that the Claims Administrator is not applying the cash-in, cash-out interpretation to claims that are presented with matched revenues and expenses, which the Fifth Circuit required.  *See* slip op. at 16.  Moreover, the facts demonstrate that the Settlement Program's practices and policies cause claimant's revenues and expenses to fail to match in various different ways, for both cash-basis and accrual-basis claims.[2]

---

[2]  Furthermore, BP respectfully submits that it should have been given the opportunity to comment upon the Claims Administrator's declaration and present evidence showing that the declaration's statements are in error.  This issue is discussed more fully in BP's Motion To Strike To The October 3, 2013 Declaration Of Patrick Juneau, which BP is submitting also *in camera* but via a separate email.

## KIRKLAND & ELLIS LLP

*First*, under Policy 464 cited by the Claims Administrator, if a claimant submits both cash-basis and accrual-basis P&Ls, then the Settlement Program can use either one.  Policy 464 at 4.  Many claimants have elected to submit both types of P&Ls.  Of 35 such illustrative cases, for example, the Settlement Program in 17 cases computed the compensation determination using the cash-basis statements.  *See* Brents Decl. (Ex. C) ¶ 6.[3]

*Second*, significant numbers of both accrual and cash-basis claims are not "properly matched" as discussed in the Fifth Circuit's opinion.  Analysis "indicates that these problems are not limited to claimants that rely on cash basis P&L data, but instead are widespread in offers in which claimants indicate that their P&L data were prepared on an accrual basis."  Sider Decl. (Ex. E) ¶ 9; *see also* Gaspardo Decl. (Ex. D) ¶¶ 6-10.  These "problems are widespread in offers to claimants in all industries."  Sider Decl. (Ex. E) ¶ 9.

*Third*, many claimants have submitted financial statements that blend cash and accrual methods.  "Inconsistently or idiosyncratically applied accrual-basis principles either on a temporal (month-to-month) or account-by-account basis create mismatching distortions similar to cash basis statements."  Gaspardo Decl. (Ex. D) ¶ 10; *see also* Alexander Decl. (Ex. B) ¶ 13.

*Fourth*, inaccurate information can cause matching problems and result in awards to those with no actual losses.  A "claimant's idiosyncratically-maintained records" should not "dictate the way Exhibit 4C is applied to a claim, especially if Exhibit 4C is supposed to be an objective formula."  Slip op. at 21.  One example of incorrect data involves financials containing year-end "true ups" and/or corrections.  *See, e.g.* Rec. Doc. 8963-41 ¶¶ 10-13 (Supplemental Declaration of David A. Hall); *see also* Rec. Doc. 8963-36 ¶¶14-16 (Declaration of J. Lester Alexander, III); Rec. Doc. 8963-46 ¶ 40 (Declaration of Hal Sider); *see also* Gaspardo Decl. (Ex. D) ¶ 14.  Adjustments made at year end — or any other time of the year — mean that figures for both the month of the adjustment and for the prior months being corrected will be inaccurate.

*Fifth*, "[m]ost of the time (96%) P&Ls are submitted by BEL claimants with no date (47% of the time) or a non-contemporaneous date (49% of the time)."  Alexander Decl. (Ex. B) ¶ 15.  "Although this presents significant concerns that the documentation may be either inaccurate or drafted specifically for purposes of the claim – which raises serious fraud risks – the CSSP fails even to follow up on this issue to request additional information approximately 85% of the time."  *Id.* ¶ 15.  Moreover, a majority of BEL claims reviewed by BP's experts show "a discrepancy between the annual revenue and net income amounts reported in P&Ls submitted by the claimant and the claimant's tax returns."  *Id.* ¶ 16.

Because the Settlement Program has not addressed these issues, it has not properly matched revenues and expenses.  Thus, the injunction's scope must be sufficient to prevent harm to BP from all the ways in which failure to match revenues and expenses is occurring while the Court and parties develop new procedures to implement a new BEL compensation policy.  While that injunction is in effect, the Court and parties can develop procedures to properly match

---

[3]  The Court's October 3, 2013 Order requesting letter briefs did not specify whether the parties could support those letter briefs using declarations or other evidence.  Rec. Doc. 11566 at 2.  BP respectfully submits that the declarations accompanying this letter brief should be considered in determining what injunction should be entered and the proper proceedings on remand.

## KIRKLAND & ELLIS LLP

revenues and expenses, a task that is routinely performed by accountants and can be implemented easily here. *See* Rec. Doc. 8963-36 ¶ 32 (Declaration of J. Lester Alexander, III); Rec. Doc. 8963-37 ¶¶32-35 (Declaration of J. Richard Dietrich); Rec. Doc. 8963-47 at 9:341-11:389 (Declaration of Roman L. Weil); *see also* Gaspardo Decl. (Ex. D) ¶ 10.

### C.   Actual-Injury Problems Permeate Both Cash- And Accrual-Basis Claims.

"[F]or a class to be certified, each member must have standing and show an injury in fact that is traceable to the defendant and likely to be redressed in a favorable decision." *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013); *accord Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). A plaintiff cannot have standing absent an injury in fact causally connected to the defendant's conduct and redressable by a favorable court decision. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Thus, the Fifth Circuit instructed this Court to enter a "stay tailored so that those who experienced actual injury traceable to loss from the Deepwater Horizon accident continue to receive recovery but those who did not do not receive their payments." Slip op. at 35.

Under current Settlement Program policies, "[e]rrors in matching monthly revenue and corresponding variable expenses can result in BEL offers to claimants that suffered no loss in variable profit between the Benchmark Period and 2010." Sider Decl. (Ex. E) ¶ 13; *see also id.* ¶¶ 13-16. As one indication of this problem, expert analysis reveals that "31% of claimants receiving BEL offers did not experience a loss in variable profit measured over the May-December or January-December periods in 2010 relative to the same months in the Benchmark Period." *Id.* ¶ 16. Another indicator that many BEL claimants suffered no injury is that they never filed a claim with the GCCF, even though the GCCF did not require signed releases before claimants could receive emergency or interim payments. *See id.* ¶ 23. Roughly 85% of BEL claimants since March 2013 did not participate in the GCCF. *Id.*

In sum, current Settlement Program policies and practices that do not require matching and/or rely upon inaccurate or potentially erroneous data result in awards "completely disconnected from any reasonable understanding of calculation of damages." Slip op. at 23. By failing to accurately measure economic damages, the Settlement Program currently makes awards to, and includes in the class, claimants that have no actual losses. Compliance with the Fifth Circuit's directions requires claims where the question of actual injury is at issue be enjoined as the Court and parties develop new policies that require actual loss.

### D.   Causation Problems Permeate Both Cash- And Accrual-Basis Claims.

The Fifth Circuit's opinion recognizes that the payment of awards to claimants who have not suffered injuries causally related to the spill raises serious questions under Rule 23 and Article III of the Constitution. Slip op. at 25-33, 37; *see also id.* at 37. Large percentages of BEL claimants who were deemed eligible for compensation (i) only narrowly passed the V-test or (ii) would have failed the test had it been based on aggregate May-December information. Sider Decl. (Ex. E) ¶¶25-30. In either case, the "monthly revenue data that are the basis of claimant's eligibility must be carefully reviewed to ensure that eligibility is not due to errors in reported monthly revenue alone." *Id.* ¶ 29. Accordingly, the injunction should apply to BEL claimants who cannot establish causation using properly matched and determined revenues and

## KIRKLAND & ELLIS LLP

expenses or where the presence of an actual injury traceable to the *Deepwater Horizon* accident is at issue.

## II.    BP's Proposed Process For Resolving The Possible Ambiguity Found In the Settlement Agreement.

The Fifth Circuit rejected Class Counsel's position that the Settlement Agreement does not require matching, notwithstanding the "significant parol evidence" that Class Counsel cited in support of its position.  Slip op. at 21.  The Fifth Circuit held that "Exhibit 4C is ambiguous as to whether claims that are not based on matched revenues and expenditures are to be matched for Exhibit 4C purposes" and remanded to this Court to resolve the ambiguity.  *Id*. at 23-24.

BP submits that the remand proceedings should have three objectives:  (1) to determine whether Class Counsel relies on any parol evidence other than that already considered and rejected by the Fifth Circuit and/or to receive BP's parol evidence, as necessary; (2) to devise a solution to the problem of fictitious claims and inflated losses; and (3) to determine what policy and documentary changes are necessary to solve the "causation" problems identified by the Fifth Circuit.

To develop a record that will achieve these objectives and enable this Court to make the findings contemplated by the Fifth Circuit, BP proposes the following schedule and proceedings:

*First*, if Class Counsel contends that the parties agreed that matching principles do not apply to all claims, then within fourteen days they shall submit a brief and all additional evidence on which Class Counsel rely to support that contention.  If Class Counsel concedes that matching principles apply to all claims, their submission should focus on their proposals for having the Settlement Program comply with the Fifth Circuit's opinion.  In either case, BP would then have fourteen days to respond to Class Counsel's submission.  (Included as Exhibit F is a general description of a new BEL Compensation Policy and an outline of the procedures that should be undertaken to establish new policies as a result of the Fifth Circuit's remand.[4])

*Second*, following the exchange of these written submissions, the parties shall have ten days, or longer if appropriate, to meet and confer with Special Master Freeh to determine whether they can consensually resolve the issues raised in the respective submissions.

*Third*, if the parties cannot reach agreement, the Court shall hold an evidentiary hearing to resolve these issues and make the necessary findings.  In advance of the hearing, the parties shall identify any witnesses they intend to call and any evidence they intend to present.

Respectfully submitted,

/s/ Richard C. Godfrey, P.C.

Richard C. Godfrey, P.C.

---

[4]  Because other economic loss frameworks, including but not limited to the Multi-facility, Start-Up, and Failed Business Frameworks, require both proper determination and matching of revenues and expenses as well as causation, the new policy will also be applicable to these types of claims.

## KIRKLAND & ELLIS LLP

cc (by electronic mail):
The Honorably Sally Shushan
Special Master Louis Freeh
Frank Piantidosi
Patrick Juneau
Richard Stanley
Phillip Wittmann
Stephen Herman
James Roy
Joe Rice

# Exhibit E

# October 23, 2013
# Notice of Filing Exhibit I.2.E

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| | * * * * | HONORABLE CARL J. BARBIER |
| This document relates to Civ. A. No. 12-970. | * * * | MAGISTRATE JUDGE SHUSHAN |

**DECLARATION OF HAL SIDER**

I, Hal Sider, hereby declare and state as follows:

1.      I am over the age of 21 years and a resident of the State of Illinois.  Unless otherwise stated, I have personal knowledge of the facts set forth herein and, if called to do so, could testify truthfully thereto.

2.      I am an Executive Vice-President of Compass Lexecon, an economic consulting firm with its headquarters in Chicago, IL.  I have been retained by BP and my responsibilities include monitoring the implementation of the Settlement Agreement.  I previously submitted declarations in this matter on February 18, 2013, March 14, 2013, April 21, 2013, July 16, 2013, August 5, 2013, and September 20, 2013.  My February 18 declaration summarizes my qualifications and includes my curriculum vitae.

3.      I, and others under my supervision, review and evaluate BEL compensation awards made to claimants by the Court Supervised Settlement Program ("CSSP") as reflected in data posted by the Claims Administrator to the CSSP portal as well as claims activity as reported in computer files made available to BP by the CSSP.  I, and others under my supervision, have

1

compiled and evaluated the financial information reported in the profit and loss (P&L) statement

data files used by the CSSP in evaluating BEL offers. We also have reviewed a large number of

BEL claims files and offers.

## I.    Introduction and Overview of Conclusions

4.    I have been asked by counsel for BP to evaluate the scope of the matching

problems identified in the decision of the U.S. Court of Appeals for the Fifth Circuit ("Fifth

Circuit") and to evaluate the extent to which BEL offers have been made to claimants that were

unlikely to have suffered losses in variable profit due to the Deepwater Horizon spill. Much of

the analysis presented below is based on the line-item specific P&L data submitted by BEL

claimants and compiled by the CSSP in the ordinary course of its review of BEL claims.

5.    This declaration expands upon the analysis of related issues presented in my

February 18, 2013 and March 14, 2013 declarations. As discussed there, failure to match

monthly revenue earned with corresponding expenses incurred results in awards for claimants

that suffered no spill-related losses as well as awards greatly in excess of spill-related losses

suffered by certain claimants. The impact of the failure to match revenue with corresponding

variable expenses is magnified by the ability of claimants to be compensated based on the

months and benchmark years which yield the highest BEL offer, and the choice of these time

periods may be driven by matching errors. Thus, the failure to match revenue with

corresponding variable expenses transformed a feature of the Settlement Agreement negotiated

to provide BEL claimants with flexibility in choosing the appropriate damage period into a

mechanism for generating windfalls unrelated to the economic impact of the spill.

6.    My prior declarations presented a variety of metrics that identify (i) the presence

of matching problems in P&L data used by the CSSP in making BEL offers; (ii) BEL offers to

claimants that experienced no loss in variable profit in 2010 relative to the claimant's benchmark

period; and (iii) BEL base offers that are larger than the decline in variable profit experienced by certain claimants between the Benchmark Period and 2010, indicating that BEL base compensation is disproportionately large.

7.      Since my March 14 declaration, the cumulative number of BEL offers made by the CSSP increased by more than 150% -- from 4,801 on March 3, 2013 to 12,327 on September 29, 2013.  Data from the thousands of new BEL offers and review of on-going BEL appeals have generated new information about the CSSP's implementation of the BEL framework, the numerous matching problems observed in the financial data relied on by the CSSP, and the frequency of BEL offers to claimants that did not experience a loss in variable profit in 2010 compared to the years in the Benchmark Period.

8.      The analysis presented here relies on monthly line-item specific P&L data submitted by 9,844 BEL claimants and compiled by CSSP.  This includes information from virtually all BEL offers made by CSSP since mid-November 2012, when CSSP first started to make available this P&L information in Excel form.[1]  These data files provide a wealth of information establishing that:

- BEL offers rely pervasively on flawed and incomplete financial data that fail to match monthly revenue with corresponding variable expenses.  These flaws are reflected in a variety of irregular financial metrics.

- BEL offers are being extended to large numbers of claimants that suffered no loss in variable profit between the Benchmark Period and 2010, when losses are evaluated over longer time frames (such as May-December or January-December).  These longer time frames are less distorted by matching problems

---

1.  The 9,844 BEL claims included in the analysis are those for which the CSSP has provided the claimant's P&L data in spreadsheet form.  Prior to that, CSSP provided the claimant's P&L information only in PDF format.

than the limited set of months used to determine BEL compensation for many claimants. While the Settlement Agreement enables BEL compensation to be determined on periods as short as three months, the presence of substantial losses over brief periods when no losses are observed over somewhat longer periods indicates that it is likely that the shorter "loss" periods reflect the impact of errors in matching revenue with corresponding variable expenses, not a real economic loss.

- Base BEL offers often greatly overstate the claimant's loss in variable profits when evaluated over longer time frames, with exaggerated base offers compounded by the growth factors and RTP provided under Exhibit 4C of the Settlement Agreement. Again, matching problems contribute to the distorted base offers.

- A substantial share of BEL claimants would fail to gain eligibility based on the V-test established in Exhibit 4B of the Settlement Agreement. These claimants pass the V-test on only one of many possible windows or clear the thresholds by only a small amount. Distorted measures of monthly revenue that fail to identify when revenue was earned contribute to these distortions. Application of the V-test using revenue data from May-December, which are less subject to distortions from matching errors in the monthly data used by CSSP, would result in more than half of BEL claimants failing the V-test. While the V-test is based on 3-month windows, the presence, for example, of revenue declines over a 3-month period while revenue increased over a somewhat longer period implies that the the shorter "decline" reflects the impact of errors in the measurement of when revenue was earned, not a real decline in revenue.

4

9.     Analysis of the P&L data used in more than 9,000 BEL offers indicates that these problems are widespread in offers to claimants in all industries.  Moreover, the analysis indicates that these problems are not limited to claimants that rely on cash basis P&L data, but instead are widespread in offers in which claimants indicate that their P&L data were prepared on an accrual basis.

10.    The remainder of this declaration is organized as follows:

- Section II describes and summarizes metrics identifying offers made to BEL claimants based on financial data for which monthly revenue does not appear to be matched to corresponding variable expenses.  These metrics identify frequent incidence of highly irregular patterns such as spikes in monthly revenue and monthly expenses, wide monthly variation in variable margins (indicating that spike in revenue and variable expenses typically do not coincide), negative monthly revenue entries, negative monthly expense entries and negative monthly variable profit, each of which indicates that CSSP offers rely on financial data that fail to properly match revenue and corresponding variable expenses.

- Section III identifies frequent BEL offers to claimants that likely suffered no loss in variable profit in May-December or January-December 2010 relative to the same months of the Benchmark Period.  Claimants that obtain BEL offers despite earning higher variable profit in 2010 relative to the Benchmark Period are precisely those whose awards are most likely to depend on flawed and irregular financial data that fail to match monthly revenue with corresponding variable expenses.  Section III also identifies frequent BEL offers in which base compensation (pre-RTP and pre-growth factor) is larger than the decline in variable profit between May-December or January-December of the Benchmark

5

Period and the same months of 2010, indicating that BEL base compensation is disproportionately large. Such "disproportionately large" BEL offers are likely to be based on flawed financial data that fail to match monthly revenue with corresponding variable expenses. In addition, this section also shows that the vast majority of BEL participants did not previously claim harm from the spill by participating in GCCF or filing SFJs. This provides a further indication that CSSP's implementation of BEL is providing compensation to a large number claimants that were not affected by the DWH spill.

- Section IV summarizes metrics that identify claimants whose eligibility under the BEL V-test for establishing causation could be a result of even small errors in the timing of reported revenue. This large number of BEL claimants that "narrowly pass" the V-test, combined with the highly irregular revenue patterns observed in many claimants' financial data indicates that a substantial number of BEL claimants would not obtain offers if revenue was properly measured. Again, these results indicate that CSSP failure to properly measure claimants' monthly revenue results in BEL offers to claimants that were not affected by the DWH spill.

- Section V evaluates a random sample of BEL offers made to claimants submitting P&L data that they identify as being prepared on the accrual basis. As noted above, analysis of these offers indicates that the problems identified in CSSP's implementation of the BEL framework and documented in Sections II-IV are not limited to claimants relying on cash-basis financial statements but instead extend to offers based on financial data identified by claimants as reflecting accrual basis accounting.

## II.   BEL offers subject to errors in the measurement of revenue and corresponding variable expenses

11.     As discussed in my prior declarations, BP's accounting experts have developed objective data metrics that identify claims for which monthly revenue is unlikely to be matched to corresponding variable expenses.[2]  The metrics analyzed include:

- Claims with monthly revenue "spikes" as reflected in financial data used by the CSSP in making BEL offers, which indicates that it is likely that revenue is not recorded in the period in which it is earned.  Revenue spikes are identified when a claimant has a month with revenue in excess of 17% of annual revenue in any of the claimant's benchmark years or 2010.  The 17% threshold reflects months in which revenue reported by the BEL claimant is two times the claimant's average monthly revenue.  The results, summarized in Table 1 indicate that 56% of BEL offers include such a monthly revenue spike.

- Claims with monthly variable expense spikes as reflected in financial data used by the CSSP in making BEL offers, which indicates that expenses are not properly recorded in months in which they are incurred.  The tabulations reported in Table 1 identify claimants that have a month with variable expenses in excess of 17% of annual variable expenses in the claimant's benchmark years or 2010.  As above, the 17% threshold identifies months in which variable expenses are at least two times the claimant's average monthly variable expenses.  As shown in Table 1, 69% of BEL offers include such a monthly expense spike.

---

2.  Declaration of Hal Sider, February 18, 2013, ¶¶29-36; Declaration of Hal Sider, March 14, 2013, ¶¶8-10. Footnote 2 from the February 18 Declaration identifies the accounting and industry experts which prepared declarations for BP during this period.

- Claims with wide month-to-month swings in variable profit margin, which indicates that spikes and other month-to-month variation in revenue and variable expenses typically do not coincide.  The margin variability, or "share spike" metric identifies claimants for which at least one month's share of annual revenue deviates from the same month's share of annual variable expenses by more than 7.5 percentage points.  Thus, if a given month accounts for a pro-rata share of annual variable expenses (8.3%), this metric would identify a claimant only if the same month accounts for 15.8% or more of annual revenue.  As shown in Table 1, 65% of BEL offers exhibit wide month-to-month swings in variable profit measured in this way, indicating that revenue is not matched with corresponding variable expenses.

- Claims with negative revenue items reported in monthly financial data used by the CSSP in making BEL offers, which indicates that monthly revenue is not properly recorded in the month in which it is earned.  Negative monthly revenue typically reflects accounting adjustments to correct erroneous entries made in prior periods.  The presence of negative revenue items indicates that revenue is not properly recorded in the month in which it is earned.  Given the offsetting nature of such adjustments, negative revenue reported in one month implies that revenue is not accurately reported in at least two months.  As shown in Table 1, 6% of BEL offers include a month with negative revenue.

- Months with negative variable expenses as reflected in monthly financial data used by the CSSP in making BEL offers, which indicates that expenses are not properly reported in the months in which they are incurred.  Negative variable

expenses typically reflect accounting adjustments to correct erroneous entries made in prior periods. The presence of negative variable expense items suggests that expenses are not properly recorded in the month in which they were incurred. Given the offsetting nature of such adjustments, the presence of negative variable expense items indicates that variable expenses are not accurately reported in at least two months. As shown in Table 1, 45% of BEL offers include a month with a negative variable expense.

- The presence of negative variable profits in a month, as reflected in the CSSP's analysis of BEL offers, often indicates that monthly revenue is not properly matched with corresponding variable expenses because firms typically would not operate when revenue fails to cover variable expenses. As shown in Table 1, 60% of BEL offers include a month with negative variable profits.

- The presence of monthly bad debt expenses concentrated in a single month indicates that corresponding variable expenses, here bad debt, are not properly aligned with when revenue is earned. While not all claimants report bad debt expenses as a line item in their P&L, claimants that do so typically report bad debt in only a small number of months. Thus, bad debt entries in P&Ls typically reflect the recognition of debts that have accumulated over prior months or years. Available data indicate that a single monthly entry accounts for more than 50% of annual bad debt expenses recorded in 92% of claims in which bad debt is reported. The presence of bad debt as a line item thus indicates that bad debt expenses are not properly aligned with when revenue is earned. As shown in Table 1, 20% of BEL offers are based on P&L data that both (i) report bad debt

expenses, and (ii) report more than 50% of the claimant's annual bad debt

expenses in a given month, indicating that monthly revenue have not been

properly matched to the corresponding variable expenses.

**Table 1**
**Percent of BEL Offers that Meet Indicators of Matching Problems**

| Industry | Offers | Percent of Offers | | | | | | |
| | | Revenue Spike | Variable Expense Spike | Share Spike | Negative Revenue Line Item | Negative Variable Expense Line Item | Negative Variable Profit | Bad Debt |
|---|---|---|---|---|---|---|---|---|
| Agriculture: Crops | 190 | 99% | 98% | 99% | 9% | 39% | 100% | 5% |
| Agriculture: Other | 98 | 91% | 92% | 91% | 9% | 48% | 93% | 10% |
| Arts, Entertainment, and Recreation | 359 | 67% | 77% | 71% | 8% | 42% | 65% | 14% |
| Bars and Restaurants | 649 | 16% | 21% | 19% | 2% | 48% | 29% | 18% |
| Construction | 1,318 | 71% | 74% | 72% | 11% | 54% | 85% | 26% |
| Health Care | 534 | 17% | 65% | 74% | 3% | 54% | 25% | 12% |
| Hotels and Motels | 335 | 28% | 57% | 67% | 2% | 58% | 27% | 20% |
| Manufacturing | 332 | 43% | 58% | 61% | 5% | 64% | 73% | 43% |
| Professional Services: Lawyers | 320 | 74% | 90% | 95% | 9% | 63% | 53% | 18% |
| Professional Services: Other | 735 | 66% | 85% | 91% | 6% | 52% | 61% | 20% |
| Property Rental | 1,024 | 70% | 90% | 67% | 4% | 21% | 49% | 5% |
| Real Estate | 891 | 88% | 81% | 75% | 4% | 23% | 72% | 4% |
| Retail Trade | 966 | 38% | 46% | 40% | 5% | 62% | 68% | 39% |
| Seafood Processing | 118 | 61% | 63% | 28% | 6% | 37% | 87% | 30% |
| Services | 882 | 38% | 61% | 67% | 5% | 38% | 47% | 21% |
| Transportation and Warehousing | 207 | 44% | 57% | 58% | 5% | 47% | 57% | 24% |
| Wholesale Trade | 289 | 44% | 54% | 48% | 6% | 68% | 69% | 45% |
| All Other Industries | 295 | 54% | 77% | 78% | 7% | 52% | 59% | 25% |
| Missing | 302 | 83% | 91% | 56% | 5% | 9% | 55% | 1% |
| Total | 9,844 | 56% | 69% | 65% | 6% | 45% | 60% | 20% |

Source: CSSP data as of 9/30/2013.
Notes:
   1. Based on years in the claimants' Benchmark Period and 2010.
   2. Revenue and Variable Expense Spikes are identified when a single month accounts for at least 17 percent of annual revenue or variable expenses.
   3. A share spike occurs when the monthly share of annual revenues differs from the monthly share of annual variable expenses by at least 7.5 percentage points.
   4. Bad Debt indicator is met when bad debt expense in a single month accounts for at least 50 percent of annual bad debt expense.

12.    Table 1 provides data for each of these metrics by industry category.[3]  As the

table indicates, the metrics above identify the frequent presence of matching problems in each

industry category.  Overall, 94% of BEL claims meet at least one of the metrics identified in

---

3.  The set of industries reported in Table 1 includes seven more industry categories than reported in my February 2013 and March 2013 declarations.  The increased number of categories is attributable to the larger set of claims available for analysis.  Specifically, the new tables report two categories of agricultural claimants (crop farms and other agriculture) and professional service claimants (lawyers and other professional services).  The tables separate property rental claimants from other real estate claimants; and separately report the following industries previously included in the "other" industries category:  arts/entertainment/recreation; services; and transportation/ warehousing.

Table 1.  These metrics could be applied by the CSSP to identify claims that warrant additional

scrutiny in identifying matching problems.

**III.    BEL claimants that may not have suffered spill-related losses and BEL claimants for which base offers appear to substantially exceed loss.**

**1.    BEL claimants with no loss in variable profit between the Benchmark Period and 2010**

13.    Errors in matching monthly revenue and corresponding variable expenses can

result in BEL offers to claimants that suffered no loss in variable profit between the Benchmark

Period and 2010.  Because BEL compensation can be based on a period as short as three months,

errors in the measurement of revenue and corresponding variable expenses that work to

claimants' benefit can result in "losses" as measured by CSSP even where the claimant suffered

no actual loss in variable profit between 2010 and the claimant's Benchmark Period.   As

mentioned above, the presence of substantial losses over brief periods when no losses are

observed over somewhat longer periods indicates that it is likely that the shorter "loss" periods

reflect the impact of errors in matching revenue with corresponding variable expenses, not a real

economic loss.

14.    Evaluation of a claimant's losses in variable profits over longer periods reduces

the potential influence of errors in measurement of monthly revenue and corresponding variable

expenses.  Where BEL claimants appear not to have suffered reductions in variable profits

measured over longer periods but nonetheless obtain compensation under the CSSP's application

of the BEL framework, the CSSP award likely is the result of errors in matching monthly

revenue to the corresponding variable expenses.[4]

---

4.  The fact that a claimant had no loss measured over a longer period of months does not always imply that the claimant did not experience spill-related losses.  However, such circumstances are a valuable indictor of which claims should be subjected to further review to ensure that monthly revenue and variable expenses have been properly matched.

15.     BEL claimants that received a BEL offer without suffering a reduction in variable profit in 2010 relative to the benchmark year can be identified from the P&L data used by the CSSP in evaluating claims.[5]  Table 2 (below) reports the share of BEL offers made to claimants that suffered no loss in variable profit between either (i) May-December of the claimant's Benchmark Period and May-December of 2010, or (ii) January-December of the Benchmark Period and January-December of 2010.  Both the May-December and January-December time periods are used due to the possibility that problems in matching revenue with corresponding variable expenses can result in shifting revenue and/or variable expenses between the January-April and May-December time periods.  If so, analyzing changes in a variable profit only between May-December of the Benchmark Period and 2010 can yield a distorted view of whether the claimant experienced a loss in variable profit in 2010 relative to the Benchmark Period.

16.     As Table 2 indicates, 31% of claimants receiving BEL offers did not experience a loss in variable profit measured over the May-December or January-December periods in 2010 relative to the same months in the Benchmark Period.  Such offers warrant additional scrutiny due to the likelihood that they were the result of errors in the matching of monthly revenue and corresponding variable expenses, and the likelihood that these claimants experienced no loss following the DWH spill.

---

5.  For example, the loss in variable profit between May-December of the Benchmark Period and May-December 2010 is calculated by summing CSSP's calculation of variable for each month over these periods, and then calculating the difference.  The calculation incorporates no adjustments to CSSP's calculation of monthly variable profits.

**Table 2**
**BEL Offers with No Loss or Disproportionately Large Offer**

| Industry | Offers | Percent of Offers | |
|---|---|---|---|
| | | No Loss | 25% Disproportionate |
| Agriculture: Crop Farms | 190 | 53% | 83% |
| Agriculture: Other | 98 | 35% | 52% |
| Arts, Entertainment, and Recreation | 359 | 28% | 29% |
| Bars and Restaurants | 649 | 38% | 15% |
| Construction | 1,318 | 30% | 49% |
| Health Care | 534 | 31% | 14% |
| Hotels and Motels | 335 | 24% | 10% |
| Manufacturing | 332 | 27% | 33% |
| Professional Services: Lawyers | 320 | 36% | 34% |
| Professional Services: Other | 735 | 32% | 30% |
| Property Rental | 1,024 | 24% | 20% |
| Real Estate | 891 | 29% | 43% |
| Retail Trade | 966 | 36% | 35% |
| Seafood Processing | 118 | 31% | 40% |
| Services | 882 | 33% | 23% |
| Transportation and Warehousing | 207 | 31% | 36% |
| Wholesale Trade | 289 | 32% | 36% |
| All Other Industries | 295 | 32% | 27% |
| Missing | 302 | 32% | 27% |
| Total | 9,844 | 31% | 32% |

Source: CSSP data as of 9/30/2013.

Notes:

  1. No Loss offers are those for which 2010 Variable Profit is larger than Benchmark Period Variable Profit (on either May-December or January-December basis).

  2. Disproportionality (D) is defined as:

    D = (Base Offer − Lost VP) / Benchmark VP

    Lost VP = (Benchmark VP − 2010 VP)

  The calculation is performed alternatively using May-December in defining Benchmark VP and 2010 VP, or using January-December in defining Benchmark VP and 2010 VP. The claimant's disproportionality metric (D) reflects the larger of the two values. Base Offer is defined excluding the RTP and growth factor.

17.    Table 2 also reports results by industry, and shows that a substantial share of claimants from each industry suffered no loss in variable profit between the Benchmark Period and 2010 measured in this way. Appendix 1 presents 268 examples of BEL offers that did not

suffer a loss in variable profit between the Benchmark Period and 2010.[6]  These examples

include claimants in industries engaged in activities with no apparent direct connection to the

DWH spill, and/or examples of Zone D claimants that have received sizeable BEL offers.

### 2.    Claimants Receiving Disproportionately Large Offers

18.    Comparison of the size of the CSSP's base BEL offer (pre-RTP, pre-growth

factor) with the reduction in variable profit reported by the claimant between May-December

2010 or January-December 2010 and the comparable months of the Benchmark Period can be

used to identify BEL offers that are "disproportionately" large.

19.    The CSSP's base BEL offer is calculated as the claimant's reduction in variable

profit between the Benchmark Period and 2010 for the months included in the Compensation

Period.  The CSSP's use of P&L data that do not properly match monthly revenue with

corresponding variable expenses can yield base offers greatly in excess of the claimant's actual

reduction in variable profit measured over the May-December or January-December period.

Thus, a useful method of identifying offers that rely on data that do not properly match monthly

revenue and corresponding variable expenses is to identify claims for which the CSSP's base

offer is unrealistically large relative to the decline in variable profits experienced by the claimant

between May-December of 2010 and the same months of the benchmark period.

20.    A BEL offer which implies that a claimant's 2010 variable profit in the absence of

the spill would have been at least 25% greater than the claimant's variable profit in the

Benchmark Period is defined here (and in my March 14 declaration) as a "disproportionately

---

6.  Appendix 1 masks the CSSP Claimant ID for the selected claims to report only the last two digits.

large offer."[7]  The existence of a disproportionately large offer is a strong indicator that the

CSSP is compensating claimants for artificial losses due to reliance on financial data that do not

properly match monthly revenue with corresponding variable expenses.

21.    Table 2 shows that 32% of BEL offers are disproportionate, as defined in this

way.  While the percentages are highest in industries such as agriculture and construction, a

sizeable share of offers in all industries are disproportionate.  Appendix 2 presents 253 examples

of disproportionately large BEL offers.[8]  Overall, 43% of claimants meet at least one of the

metrics reported in Table 2.

22.    The "no loss" and "disproportionality" metrics could be applied by the CSSP to

identify claims that warrant additional scrutiny in identifying matching and causation problems.

### 3.    BEL claimants that did not participate in GCCF or file SFJs

23.    Another indication of the extent to which BEL claimants may have losses

unrelated to the spill is reflected in the share of BEL claimants that did not participate in GCCF.

Many businesses harmed by the spill would have been expected to make a claim with GCCF,

which did not require claimants to sign a release in exchange for receiving an emergency or

interim payment.  This pattern was highlighted in my February and March declarations and is

updated in Figure 1 below based on the inflow of new claimants since the inception of the CSSP.

As the Figure indicates, roughly 85% of new BEL claimants since March 2013 did not

participate in GCCF.

---

7.  Disproportionality (D) is defined as:
    D = (Base Offer – Lost VP) / Benchmark VP
    Lost VP = (Benchmark VP – 2010 VP)
The calculation is performed alternatively using May-December in defining Benchmark VP and 2010 VP, or using January-December in defining Benchmark VP and 2010 VP.  The claimant's disproportionality metric (D) reflects the larger of the two values.  Base offer is defined excluding the RTP and growth factor.
8.  Appendix 2 masks the CSSP Claimant ID for the selected claims to report only the last two digits.



**Figure 1**
**GCCF Participation Among New BEL Claimants**

Source: CSSP data as of 9/30/2013.

24.      A related indicator of the extent to which BEL claimants have losses unrelated to
the spill is the frequency with which the CSSP makes offers to claimants that did not file Short
Form Joinders to identify their intent to participate in MDL 2179.  While participation in the
Economic and Property Damages Settlement is not restricted to entities that filed SFJs, the fact
that few of the BEL claimants, including those that received large offers, had previously claimed
harm from the spill by filing SFJs suggests that other factors, including errors in the
measurement of monthly revenue and corresponding variable expenses, contribute in part or
whole to the large offers they received.  Table 3 shows that less than 20% of offers larger than
$500,000 have been made to claimants that filed SFJs.  In addition, crop farms, law firms,
manufacturers, and construction firms are among the industries with the smallest percent of

offers made to claimants that filed SFJs, indicating that few claimants in these industries would

have made claims for spill-related losses in court.

**Table 3**
**BEL Offers to Claimants that Filed Short Form Joinders**

| Industry | Offers Above $500,000 | | | All BEL Offers | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Offers | Claimant Filed SFJ | % of Total | Offers | Claimant Filed SFJ | % of Total |
| Agriculture: Crop Farms | 26 | 0 | 0.0% | 64 | 0 | 0.0% |
| Agriculture: Other | 11 | 1 | 9.1% | 53 | 1 | 1.9% |
| All Other Industries | 15 | 2 | 13.3% | 404 | 39 | 9.7% |
| Arts, Entertainment, and Recreation | 32 | 9 | 28.1% | 315 | 57 | 18.1% |
| Bars and Restaurants | 54 | 22 | 40.7% | 565 | 135 | 23.9% |
| Construction | 131 | 7 | 5.3% | 807 | 69 | 8.6% |
| Health Care | 27 | 3 | 11.1% | 344 | 17 | 4.9% |
| Hotels and Motels | 60 | 15 | 25.0% | 243 | 80 | 32.9% |
| Manufacturing | 46 | 2 | 4.3% | 243 | 19 | 7.8% |
| Professional Services: Lawyers | 71 | 0 | 0.0% | 212 | 8 | 3.8% |
| Professional Services: Other | 31 | 4 | 12.9% | 516 | 35 | 6.8% |
| Property Rental | 20 | 8 | 40.0% | 685 | 81 | 11.8% |
| Real Estate | 16 | 3 | 18.8% | 565 | 41 | 7.3% |
| Retail Trade | 88 | 32 | 36.4% | 710 | 122 | 17.2% |
| Seafood Processing | 35 | 21 | 60.0% | 98 | 51 | 52.0% |
| Services | 18 | 6 | 33.3% | 640 | 46 | 7.2% |
| Transportation and Warehousing | 11 | 0 | 0.0% | 141 | 11 | 7.8% |
| Wholesale Trade | 40 | 4 | 10.0% | 207 | 18 | 8.7% |
| Total | 732 | 139 | 19.0% | 6,812 | 830 | 12.2% |

Sources: CSSP data as of April 22, 2013; MDL 2179 Short Form Joinder data as of March 16, 2012.

## IV.    BEL Claims for which eligibility may be affected by errors in the measurement of revenue

25.    This section identifies claims for which errors by the CSSP in the measurement of

monthly revenue can affect a claimant's BEL eligibility and result in compensation for claimants

unaffected by the spill.  Claimants that pass the V-test due to errors in the measurement of

monthly revenue may receive compensation despite being unaffected by the DWH spill.

Potential eligibility for BEL compensation under the BEL V-test is based on a comparison of

revenue in three consecutive months in the benchmark period relative to the same three-month

periods in 2010 and 2011.  The threshold values of the V-test depend on a claimant's zone and industry.

     **1.**     **Claimants that would fail the V-test if applied based on May-December revenue**

26.     One approach to evaluating the potential impact of errors in the CSSP's approach to measurement of revenue in implementing the BEL's V-test set forth in Settlement Agreement Exhibit 4B causation framework is to determine whether claimants would have passed the V-test had it been applied using the claimant's aggregate revenue between May and December of the benchmark period, 2010 and 2011.[9]  Just as use of longer time periods provides a useful indicator of actual changes in a claimant's variable profit, the use of longer time periods also provide a useful indicator for evaluating the possibility that errors in monthly revenue reported in a claimant's P&L and used by CSSP influence eligibility under the V-test.  As mentioned above, while the V-test is based on 3-month windows, the presence, for example, of revenue declines over a 3-month period while revenue increased over a somewhat longer period implies that the the shorter "decline" reflects the impact of errors in the measurement of when revenue was earned, not a real decline in revenue.

27.     The results of this analysis are presented in Table 4, which indicates that fully 59% of BEL claimants that gained eligibility through the V-test would have failed this test had it been applied based on aggregate May-December revenue.[10]  When a claim fails the 6-month May-December V-test, it does not necessarily follow that the determination of a claimant's eligibility under the 3-month V-test is erroneous.  It raises concerns, however, and warrants a

---

9.  For example, the "down" leg of the V-test is evaluating based on revenue used in CSSP's analysis for May-December of the benchmark period relative to May-December 2010.  Similarly, the "up" leg of the V-test is evaluated using revenue used in CSSP's analysis for May-December 2010 and May-December 2011.

10.  Claimants with eligibility that is presumed (such as all claimants in Zone A) are not included in this analysis.

careful review of the monthly revenue data to ensure that eligibility is not due solely to errors in reported monthly revenue.

**Table 4**
**BEL Eligibility Determinations Potentially Affected by Measurement Error**

| Industry | Offers | Percent of Offers | |
|---|---|---|---|
| | | Fail May-Dec V-Test | Narrowly Pass V-Test |
| Agriculture: Crop Farms | 189 | 70% | 40% |
| Agriculture: Other | 98 | 53% | 38% |
| Arts, Entertainment, and Recreation | 154 | 60% | 45% |
| Bars and Restaurants | 305 | 65% | 65% |
| Construction | 1,133 | 51% | 28% |
| Health Care | 430 | 73% | 57% |
| Hotels and Motels | 215 | 56% | 47% |
| Manufacturing | 316 | 59% | 34% |
| Professional Services: Lawyers | 270 | 67% | 37% |
| Professional Services: Other | 601 | 59% | 39% |
| Property Rental | 326 | 54% | 36% |
| Real Estate | 647 | 51% | 24% |
| Retail Trade | 681 | 66% | 48% |
| Seafood Processing | 5 | 40% | 20% |
| Services | 641 | 60% | 41% |
| Transportation and Warehousing | 175 | 56% | 39% |
| Wholesale Trade | 260 | 63% | 46% |
| All Other Industries | 201 | 63% | 41% |
| Missing | 109 | 54% | 32% |
| All Industries Combined | 6,756 | 59% | 39% |

Source: CSSP data as of 9/30/2013.
Notes:
   1. Excludes offers that did not establish eligibility through the V-test.
   2. Offers that Narrowly Pass V-Test are those which pass only 1 of 6 potential windows or those
      with a maximum clearance of 2% or less of annual revenue.  See: Appendix 3.

## 2.    BEL claims that narrowly pass the V-test

28.     The revenue data used by the CSSP in determining BEL eligibility also have been analyzed to identify claimants that "narrowly passed" the V-test.  Under the V-test there are six possible three-month eligibility windows for the claimant's Benchmark Period:  May-July, June-August, July-September, August-October, September-November, and October-December. Claimants that pass the V-test in only one of these periods are considered to have "narrowly

passed" the V-test and warrant potential scrutiny to determine whether passage of the V-test is due solely to errors in reported monthly revenue. Similarly, claimants that would have failed the V-test if a "small" share of the claimant's annual revenue had been shifted into or out of the 3-month window in the claimant's most successful V-test warrant potential scrutiny to determine whether passage of the V-test is due solely to errors in reported monthly revenue. For present purposes, the "small" share is defined as 2% of the claimant's annual revenue for the purpose of identifying claimants that "narrowly pass" the V-test based on this criterion. [11]   (Appendix 3 explains how this metric is constructed.)

29.    The results of this analysis for all claimants that established eligibility through the V-test are also summarized in Table 4, which indicates that 39% of claimants "narrowly passed" the V-test based on these criteria.   Again, a sizeable share of claimants in all industry categories "narrowly pass" the V-test. The fact that a claimant "narrowly passed" the V-test does not necessarily imply that the eligibility determination in its favor is erroneous. However, as above, it implies that the monthly revenue data that are the basis of claimant's eligibility must be carefully reviewed to ensure that a favorable eligibility determination is not due to errors in reported monthly revenue alone.

30.    Overall, 63% of claimants meet at least one of the metrics identified in Table 4 that identify BEL Claims for which eligibility may be affected by errors in the measurement of revenue. These metrics could be applied by the CSSP to identify claims that warrant additional scrutiny in identifying matching and causation problems.

---

11. Similarly, certain claimants may be denied eligibility due to errors in the measurement of revenue. However, it is not possible to analyze the extent to which claimants may fail to obtain BEL eligibility due to errors in the measurement of revenue because CSSP only makes available financial information for claimants that receive BEL offers. Moreover, the claimants' ability to establish V-test eligibility based on any one of multiple windows makes it unlikely that errors in the measurement of monthly revenue would exclude significant numbers of claimants.

## V.  Matching problems are not limited to BEL claimants that rely on cash basis financial statements

31.  The accompanying declaration of expert accountants explain how monthly P&L statements identified as being prepared based on accrual methods often do not satisfy all the prerequisites for accrual-based accounting or meet the matching principles incorporated into the BEL framework.[12]  This section shows that BEL offers to claimants with documentation that indicates that that were prepared using accrual methods frequently exhibit each of the problems evaluated in Sections II-IV above among the full sample of BEL offers.

32.  The CSSP does not identify the claimant's method of accounting in CSSP data files made available to BP.  However, information available at the CSSP's portal has been used to identify the accounting basis reported by the claimant for a random sample of BEL offers.[13] Under my direction, documents for 500 randomly selected large BEL claims maintained at the CSSP portal have been have been reviewed in an attempt to determine the accounting method that claimant identified as the basis of the P&L data used in the CSSP's BEL evaluation.  For the 500 files reviewed, 145 included P&Ls identified by claimants as reflecting accrual methods, 74 were identified by claimants as reflecting cash basis methods, 2 were identified by claimants as using other methods, and no method of accounting was identified by claimants for 279 claims.

33.  The metrics identified in Sections II-IV above were calculated for the claims identified as based on accrual methods and are summarized in Table 5.  The results of the analysis for claims identified by claimants as using accrual-based P&Ls and the results for those observed in the full BEL sample are similar with respect to:  (i)  the frequency of P&L line items

---

12.  See, for example, Declaration of Brian L. Gaspardo, October 9, 2013, pp. 2-3.
13.  Analysis was based on a randomized list of BEL claimants that received pre-RTP offers of $100,000 or more. The accounting method was identified by reviewing monthly P&L and tax documents in the BEL claimant's file in the CSSP portal.  The P&L documents are generally identified as *20xx Financial – Income Statements / Profit & Loss (Claim ID: xxxxx)* and we have used related variants of this document title in identifying documents to review. Results from this analysis are limited to claims for which CSSP Excel files with P&L information are available.

that are indicative of matching problems; (ii) the frequency with which claimants had higher variable profit in May-December or January-December 2010 compared to the same months of the Benchmark Period; (iii) the frequency of offers substantially in excess of reductions in variable profit between May-December or January-December of the Benchmark Period relative to the same months of 2010; (iv) the frequency with which claimants would fail the V-test if calculated based on May-December revenue; and (v) the frequency with which claimants narrowly pass the V-test.

34.    In sum, these results indicate that claims identified by claimants as relying on accrual basis financial statements suffer from problems relating to improper and insufficient matching of monthly revenue to corresponding variable expenses that are comparable to those observed among BEL claims taken as a whole.

**Table 5**
**Comparison of Accrual Basis Offers to All Offers**

| Metric | Percent of Offers | |
| --- | --- | --- |
| | Accrual Basis | Total |
| Revenue Spike | 56% | 55% |
| Variable Expense Spike | 64% | 66% |
| Share Spike | 70% | 66% |
| Negative Revenue Line Item | 10% | 8% |
| Negative Variable Expense Line Item | 70% | 68% |
| Negative Variable Profit | 75% | 67% |
| Bad Debt | 48% | 35% |
| | | |
| No Loss | 26% | 26% |
| 25% Disproportionate | 40% | 35% |
| Number of Offers | 126 | 2,950 |
| | | |
| Fail May-Dec V-Test | 53% | 57% |
| Narrowly Pass V-Test | 37% | 37% |
| Number of Offers | 98 | 2,329 |

Source: CSSP data as of 9/30/2013.
Notes:
    1. Based on offers with $100,000 or more in pre-RTP compensation.

22

## VI.    Conclusion

35.    The analysis of monthly line-item specific P&L data submitted by 9,844 BEL claimants establishes CSSP's pervasive reliance on flawed and incomplete financial data that fail to match monthly revenue with corresponding variable expenses.  These matching problems are reflected in a wide variety of irregular financial metrics; result in BEL offers being extended to large numbers of claimants that suffered no loss in variable profit between the Benchmark Period and 2010 when evaluated over longer time frames (such as May-December or January-December) that are less distorted by matching issues than the limited set of months for which BEL compensation is determined for many claimants; result in base compensation that often greatly overstates the claimant's loss in variable profits when evaluated over longer time frames; and enable many BEL claimants to narrowly pass V-test eligibility tests based on highly distorted measures of monthly revenue that fail to identify when revenue was earned.

36.    As a result, the pattern of awards and outcomes often bear little relationship to economic reality.  The distortions resulting from CSSP's BEL implementation are highlighted in Table 6, which reports the number offers and the value of offers made by CSSP to date to Zone D BEL claimants in industries with little apparent relationship to the DWH spill.  As the Table shows, CSSP has made nearly 4,000 offers to date to Zone D claimants in the identified industries.  (I also include claims from law firms and crop farms in Zones A-C due to their equally implausible connection to the DWH spill.)  To date, the total value of these offers alone is nearly $1.3 billion.  Other claims in Zones A-C, such as manufacturing, health care, other professional services whose connection to the spill also might seem to be implausible are not included in Table 6.  Offers to Zone D claimants in the hotel, restaurant and entertainment industries also are not reported despite their tenuous connection with the DWH spill.  The data

present a stark reminder of the pervasiveness of problems relating to CSSP's BEL implementation.

**Table 6**
**BEL Offers in Remote Industries and Geographies**

| Industry | Offers | Amount Offered |
|---|---|---|
| Agriculture: Crop Farms | 216 | $96,125,368 |
| Agriculture: Other | 92 | $34,212,424 |
| Construction | 760 | $366,671,101 |
| Health Care | 192 | $36,865,656 |
| Manufacturing | 234 | $128,448,530 |
| Professional Services: Lawyers | 386 | $296,025,181 |
| Professional Services: Other | 415 | $70,140,810 |
| Property Rental | 186 | $10,724,822 |
| Real Estate | 365 | $26,896,303 |
| Retail Trade | 417 | $80,880,002 |
| Services | 379 | $36,048,404 |
| Transportation and Warehousing | 107 | $26,649,669 |
| Wholesale Trade | 205 | $77,064,956 |
| Total | 3,954 | $1,286,753,227 |

Source: CSSP data as of 9/30/2013.
Notes:
   1. Includes all offers to claimants in Zone D.
   2. Includes offers to crop farms and lawyers in Zones A-C.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is a true and correct statement of my analysis and opinions.

Dated:  October 9, 2013

_____

Hal Sider

# APPENDIX 1

**Appendix 1**
**Examples of BEL Offers with No Loss**
**Pre-RTP Offers of at Least $100,000 in Zone D (except for Crop Farms and Lawyers)**

| No. | Claimant ID | Offer Date | State | Zone | Industry | Offer | Benchmark VP - 2010 VP (May-December) *Negative Implies Gain in VP* |
|---|---|---|---|---|---|---|---|
| 1 | XXXXXXX15 | 7/12/2013 | MS | ZoneD | Agriculture: Crop Farms | 1,477,872 | -71,253 |
| 2 | XXXXXXX79 | 3/13/2013 | LA | ZoneD | Agriculture: Crop Farms | 1,242,063 | -715,588 |
| 3 | XXXXXXX39 | 7/1/2013 | MS | ZoneD | Agriculture: Crop Farms | 1,223,466 | -580,693 |
| 4 | XXXXXXX26 | 8/2/2013 | LA | ZoneD | Agriculture: Crop Farms | 1,154,739 | -224,302 |
| 5 | XXXXXXX20 | 8/23/2013 | MS | ZoneD | Agriculture: Crop Farms | 925,056 | -60,083 |
| 6 | XXXXXXX60 | 3/18/2013 | MS | ZoneD | Agriculture: Crop Farms | 879,573 | -225,490 |
| 7 | XXXXXXX81 | 9/26/2013 | MS | ZoneD | Agriculture: Crop Farms | 796,910 | -1,065,212 |
| 8 | XXXXXXX18 | 9/24/2013 | MS | ZoneD | Agriculture: Crop Farms | 792,945 | -45,578 |
| 9 | XXXXXXX84 | 7/16/2013 | AL | ZoneD | Agriculture: Crop Farms | 703,712 | -258,095 |
| 10 | XXXXXXX72 | 1/28/2013 | MS | ZoneD | Agriculture: Crop Farms | 649,160 | -140,159 |
| 11 | XXXXXXX73 | 8/16/2013 | MS | ZoneD | Agriculture: Crop Farms | 647,399 | -408,978 |
| 12 | XXXXXXX89 | 8/9/2013 | MS | ZoneD | Agriculture: Crop Farms | 637,704 | -160,406 |
| 13 | XXXXXXX44 | 5/13/2013 | MS | ZoneD | Agriculture: Crop Farms | 604,179 | -225,321 |
| 14 | XXXXXXX08 | 9/5/2013 | MS | ZoneD | Agriculture: Crop Farms | 591,638 | -119,645 |
| 15 | XXXXXXX34 | 4/12/2013 | MS | ZoneD | Agriculture: Crop Farms | 531,133 | -124,723 |
| 16 | XXXXXXX47 | 9/25/2013 | MS | ZoneD | Agriculture: Crop Farms | 514,731 | -161,964 |
| 17 | XXXXXXX98 | 12/3/2012 | MS | ZoneD | Agriculture: Crop Farms | 495,721 | -266,870 |
| 18 | XXXXXXX12 | 12/6/2012 | MS | ZoneD | Agriculture: Crop Farms | 478,572 | -268,765 |
| 19 | XXXXXXX38 | 7/25/2013 | MS | ZoneD | Agriculture: Crop Farms | 473,752 | -110,358 |
| 20 | XXXXXXX64 | 1/14/2013 | MS | ZoneD | Agriculture: Crop Farms | 452,143 | -1,755,815 |
| 21 | XXXXXXX84 | 6/7/2013 | AL | ZoneD | Agriculture: Crop Farms | 428,968 | -548,370 |
| 22 | XXXXXXX01 | 6/24/2013 | MS | ZoneD | Agriculture: Crop Farms | 404,318 | -23,083 |
| 23 | XXXXXXX97 | 5/13/2013 | MS | ZoneD | Agriculture: Crop Farms | 403,362 | -12,798 |
| 24 | XXXXXXX13 | 7/3/2013 | MS | ZoneD | Agriculture: Crop Farms | 396,485 | -591,127 |
| 25 | XXXXXXX66 | 8/16/2013 | MS | ZoneD | Agriculture: Crop Farms | 381,583 | -3,992 |
| 26 | XXXXXXX43 | 8/12/2013 | MS | ZoneD | Agriculture: Crop Farms | 368,873 | -1,284,365 |
| 27 | XXXXXXX25 | 7/19/2013 | AL | ZoneD | Agriculture: Crop Farms | 365,344 | -28,558 |
| 28 | XXXXXXX32 | 8/12/2013 | LA | ZoneD | Agriculture: Crop Farms | 362,834 | -58,150 |
| 29 | XXXXXXX36 | 12/7/2012 | MS | ZoneD | Agriculture: Crop Farms | 350,550 | -152,126 |
| 30 | XXXXXXX61 | 8/9/2013 | MS | ZoneD | Agriculture: Crop Farms | 333,112 | -243,289 |
| 31 | XXXXXXX90 | 9/20/2013 | MS | ZoneD | Agriculture: Crop Farms | 332,175 | -396,856 |
| 32 | XXXXXXX34 | 9/25/2013 | MS | ZoneD | Agriculture: Crop Farms | 319,031 | -745,630 |
| 33 | XXXXXXX66 | 3/14/2013 | LA | ZoneD | Agriculture: Crop Farms | 308,692 | -59,002 |
| 34 | XXXXXXX16 | 7/18/2013 | LA | ZoneB | Agriculture: Crop Farms | 301,417 | -177,722 |
| 35 | XXXXXXX20 | 1/15/2013 | MS | ZoneD | Agriculture: Crop Farms | 285,609 | -136,328 |
| 36 | XXXXXXX44 | 8/16/2013 | MS | ZoneD | Agriculture: Crop Farms | 282,979 | -139,715 |
| 37 | XXXXXXX95 | 2/6/2013 | MS | ZoneD | Agriculture: Crop Farms | 272,168 | -136,240 |
| 38 | XXXXXXX63 | 9/26/2013 | LA | ZoneD | Agriculture: Crop Farms | 257,077 | -14,554 |
| 39 | XXXXXXX07 | 12/11/2012 | MS | ZoneD | Agriculture: Crop Farms | 255,180 | -222,635 |
| 40 | XXXXXXX07 | 8/9/2013 | LA | ZoneD | Agriculture: Crop Farms | 250,519 | -87,978 |
| 41 | XXXXXXX96 | 4/17/2013 | LA | ZoneD | Agriculture: Crop Farms | 239,898 | -6,736 |
| 42 | XXXXXXX22 | 9/23/2013 | MS | ZoneD | Agriculture: Crop Farms | 232,153 | -962,511 |
| 43 | XXXXXXX23 | 7/16/2013 | MS | ZoneD | Agriculture: Crop Farms | 219,888 | -143,463 |
| 44 | XXXXXXX87 | 4/22/2013 | MS | ZoneD | Agriculture: Crop Farms | 211,019 | -42,994 |
| 45 | XXXXXXX37 | 9/24/2013 | MS | ZoneD | Agriculture: Crop Farms | 198,090 | -56,563 |
| 46 | XXXXXXX18 | 4/24/2013 | MS | ZoneD | Agriculture: Crop Farms | 186,869 | -79,674 |
| 47 | XXXXXXX40 | 4/12/2013 | MS | ZoneD | Agriculture: Crop Farms | 158,016 | -277,828 |

**Appendix 1**
**Examples of BEL Offers with No Loss**
**Pre-RTP Offers of at Least $100,000 in Zone D (except for Crop Farms and Lawyers)**

| No. | Claimant ID | Offer Date | State | Zone | Industry | Offer | Benchmark VP - 2010 VP (May-December) *Negative Implies Gain in VP* |
|-----|-------------|-----------|-------|------|----------|-------|--------------------------------------------------------------------|
| 48 | XXXXXXX34 | 2/6/2013 | MS | ZoneD | Agriculture: Crop Farms | 153,278 | -365,004 |
| 49 | XXXXXXX59 | 12/20/2012 | MS | ZoneD | Agriculture: Crop Farms | 151,484 | -215,177 |
| 50 | XXXXXXX82 | 1/21/2013 | LA | ZoneD | Agriculture: Crop Farms | 147,901 | -39,885 |
| 51 | XXXXXXX67 | 3/15/2013 | MS | ZoneD | Agriculture: Crop Farms | 141,961 | -18,119 |
| 52 | XXXXXXX39 | 1/31/2013 | MS | ZoneD | Agriculture: Crop Farms | 139,630 | -395,616 |
| 53 | XXXXXXX80 | 4/30/2013 | MS | ZoneD | Agriculture: Crop Farms | 133,100 | -262,416 |
| 54 | XXXXXXX28 | 9/25/2013 | MS | ZoneD | Agriculture: Crop Farms | 132,516 | -191,131 |
| 55 | XXXXXXX81 | 9/24/2013 | MS | ZoneD | Agriculture: Crop Farms | 131,963 | -125,298 |
| 56 | XXXXXXX86 | 9/16/2013 | LA | ZoneD | Agriculture: Crop Farms | 130,090 | -13,226 |
| 57 | XXXXXXX38 | 9/5/2013 | LA | ZoneD | Agriculture: Other | 2,128,118 | -1,180,973 |
| 58 | XXXXXXX78 | 6/21/2013 | MS | ZoneD | Agriculture: Other | 1,687,839 | -82,976 |
| 59 | XXXXXXX06 | 9/25/2013 | MS | ZoneD | Agriculture: Other | 1,118,017 | -896,034 |
| 60 | XXXXXXX16 | 7/11/2013 | MS | ZoneD | Agriculture: Other | 910,688 | -81,861 |
| 61 | XXXXXXX07 | 9/3/2013 | MS | ZoneD | Agriculture: Other | 777,723 | -3,028 |
| 62 | XXXXXXX57 | 9/6/2013 | LA | ZoneD | Agriculture: Other | 587,314 | -575,985 |
| 63 | XXXXXXX97 | 1/14/2013 | AL | ZoneD | Agriculture: Other | 413,214 | -555,863 |
| 64 | XXXXXXX15 | 3/11/2013 | MS | ZoneD | Agriculture: Other | 260,537 | -125,756 |
| 65 | XXXXXXX85 | 7/29/2013 | MS | ZoneD | Agriculture: Other | 172,412 | -50,228 |
| 66 | XXXXXXX82 | 7/23/2013 | MS | ZoneD | Agriculture: Other | 143,704 | -34,075 |
| 67 | XXXXXXX27 | 11/19/2012 | FL | ZoneD | Arts, Entertainment, and Recreation | 275,045 | -161,773 |
| 68 | XXXXXXX91 | 3/25/2013 | AL | ZoneD | Construction | 5,653,271 | -1,244,116 |
| 69 | XXXXXXX47 | 9/11/2013 | LA | ZoneD | Construction | 4,025,472 | -1,747,262 |
| 70 | XXXXXXX08 | 7/12/2013 | AL | ZoneD | Construction | 3,807,297 | -441,603 |
| 71 | XXXXXXX49 | 5/13/2013 | FL | ZoneD | Construction | 2,042,426 | -236,413 |
| 72 | XXXXXXX22 | 3/8/2013 | AL | ZoneD | Construction | 1,600,285 | -190,680 |
| 73 | XXXXXXX81 | 9/19/2013 | AL | ZoneD | Construction | 1,378,077 | -1,704,422 |
| 74 | XXXXXXX54 | 6/17/2013 | AL | ZoneD | Construction | 1,307,353 | -860,429 |
| 75 | XXXXXXX82 | 7/25/2013 | AL | ZoneD | Construction | 1,252,963 | -263,738 |
| 76 | XXXXXXX80 | 7/25/2013 | AL | ZoneD | Construction | 947,186 | -670,201 |
| 77 | XXXXXXX26 | 7/15/2013 | MS | ZoneD | Construction | 943,528 | -33,795 |
| 78 | XXXXXXX40 | 4/9/2013 | MS | ZoneD | Construction | 885,874 | -260,566 |
| 79 | XXXXXXX23 | 9/19/2013 | FL | ZoneD | Construction | 646,114 | -640,545 |
| 80 | XXXXXXX25 | 5/1/2013 | AL | ZoneD | Construction | 639,829 | -613,126 |
| 81 | XXXXXXX76 | 7/19/2013 | AL | ZoneD | Construction | 635,539 | -38,086 |
| 82 | XXXXXXX02 | 5/24/2013 | LA | ZoneD | Construction | 554,213 | -25,502 |
| 83 | XXXXXXX90 | 4/15/2013 | MS | ZoneD | Construction | 551,159 | -48,784 |
| 84 | XXXXXXX37 | 8/13/2013 | AL | ZoneD | Construction | 508,471 | -226,281 |
| 85 | XXXXXXX46 | 5/1/2013 | AL | ZoneD | Construction | 453,686 | -219,009 |
| 86 | XXXXXXX62 | 4/1/2013 | LA | ZoneD | Construction | 433,282 | -12,302 |
| 87 | XXXXXXX44 | 2/1/2013 | AL | ZoneD | Construction | 429,153 | -421,978 |
| 88 | XXXXXXX82 | 12/26/2012 | LA | ZoneD | Construction | 425,264 | -16,957 |
| 89 | XXXXXXX67 | 5/20/2013 | AL | ZoneD | Construction | 417,434 | -130,571 |
| 90 | XXXXXXX17 | 1/15/2013 | AL | ZoneD | Construction | 391,470 | -455,763 |
| 91 | XXXXXXX59 | 7/26/2013 | AL | ZoneD | Construction | 374,207 | -212,734 |
| 92 | XXXXXXX57 | 1/22/2013 | FL | ZoneD | Construction | 353,722 | -3,292 |
| 93 | XXXXXXX75 | 5/2/2013 | AL | ZoneD | Construction | 353,604 | -75,007 |
| 94 | XXXXXXX99 | 3/5/2013 | LA | ZoneD | Construction | 300,607 | -80,987 |

**Appendix 1**
**Examples of BEL Offers with No Loss**
**Pre-RTP Offers of at Least $100,000 in Zone D (except for Crop Farms and Lawyers)**

| No. | Claimant ID | Offer Date | State | Zone | Industry | Offer | Benchmark VP - 2010 VP (May–December) *Negative Implies Gain in VP* |
|---|---|---|---|---|---|---|---|
| 95 | XXXXXXX53 | 7/22/2013 | MS | ZoneD | Construction | 290,777 | -60,102 |
| 96 | XXXXXXX29 | 8/21/2013 | MS | ZoneD | Construction | 282,080 | -44,075 |
| 97 | XXXXXXX12 | 3/15/2013 | FL | ZoneD | Construction | 271,153 | -27,336 |
| 98 | XXXXXXX87 | 12/31/2012 | MS | ZoneD | Construction | 269,328 | -141,357 |
| 99 | XXXXXXX31 | 5/14/2013 | AL | ZoneD | Construction | 264,971 | -164,265 |
| 100 | XXXXXXX10 | 3/13/2013 | FL | ZoneD | Construction | 263,596 | -75,489 |
| 101 | XXXXXXX56 | 4/22/2013 | AL | ZoneD | Construction | 259,923 | -15,906 |
| 102 | XXXXXXX49 | 7/22/2013 | AL | ZoneD | Construction | 259,680 | -650,414 |
| 103 | XXXXXXX39 | 4/25/2013 | LA | ZoneD | Construction | 259,255 | -51,170 |
| 104 | XXXXXXX17 | 1/21/2013 | AL | ZoneD | Construction | 240,921 | -126,610 |
| 105 | XXXXXXX17 | 8/22/2013 | LA | ZoneD | Construction | 229,234 | -29,070 |
| 106 | XXXXXXX48 | 12/19/2012 | AL | ZoneD | Construction | 217,476 | -289,326 |
| 107 | XXXXXXX89 | 4/9/2013 | MS | ZoneD | Construction | 216,941 | -58,607 |
| 108 | XXXXXXX70 | 8/19/2013 | FL | ZoneD | Construction | 213,574 | -109,820 |
| 109 | XXXXXXX89 | 3/5/2013 | MS | ZoneD | Construction | 211,159 | -3,745 |
| 110 | XXXXXXX95 | 3/28/2013 | FL | ZoneD | Construction | 202,685 | -45,302 |
| 111 | XXXXXXX12 | 4/12/2013 | AL | ZoneD | Construction | 157,179 | -90,009 |
| 112 | XXXXXXX67 | 3/12/2013 | LA | ZoneD | Construction | 156,550 | -93,082 |
| 113 | XXXXXXX75 | 12/21/2012 | LA | ZoneD | Construction | 150,229 | -13,273 |
| 114 | XXXXXXX60 | 11/30/2012 | AL | ZoneD | Construction | 145,070 | -53,255 |
| 115 | XXXXXXX20 | 5/3/2013 | AL | ZoneD | Construction | 142,088 | -414,678 |
| 116 | XXXXXXX50 | 7/12/2013 | LA | ZoneD | Construction | 136,689 | -7,576 |
| 117 | XXXXXXX09 | 7/19/2013 | AL | ZoneD | Construction | 134,716 | -306,738 |
| 118 | XXXXXXX57 | 4/30/2013 | MS | ZoneD | Construction | 126,800 | -62,153 |
| 119 | XXXXXXX37 | 7/12/2013 | AL | ZoneD | Health Care | 1,249,521 | -1,226,291 |
| 120 | XXXXXXX47 | 9/18/2013 | LA | ZoneD | Health Care | 1,011,616 | -420,554 |
| 121 | XXXXXXX28 | 8/28/2013 | LA | ZoneD | Health Care | 357,378 | -87,134 |
| 122 | XXXXXXX97 | 11/29/2012 | LA | ZoneD | Health Care | 213,291 | -49,446 |
| 123 | XXXXXXX66 | 12/10/2012 | LA | ZoneD | Health Care | 167,809 | -1,473 |
| 124 | XXXXXXX01 | 2/8/2013 | LA | ZoneD | Health Care | 156,598 | -57,299 |
| 125 | XXXXXXX88 | 4/11/2013 | MS | ZoneD | Manufacturing | 3,891,868 | -240,372 |
| 126 | XXXXXXX55 | 7/9/2013 | TX | ZoneD | Manufacturing | 1,529,348 | -552,876 |
| 127 | XXXXXXX94 | 3/6/2013 | AL | ZoneD | Manufacturing | 1,229,151 | -369,113 |
| 128 | XXXXXXX26 | 3/13/2013 | AL | ZoneD | Manufacturing | 980,063 | -180,197 |
| 129 | XXXXXXX51 | 2/27/2013 | AL | ZoneD | Manufacturing | 738,922 | -124,146 |
| 130 | XXXXXXX51 | 11/12/2012 | AL | ZoneD | Manufacturing | 452,423 | -84,543 |
| 131 | XXXXXXX69 | 12/18/2012 | MS | ZoneD | Manufacturing | 451,514 | -34,653 |
| 132 | XXXXXXX89 | 12/10/2012 | LA | ZoneD | Manufacturing | 441,940 | -73,409 |
| 133 | XXXXXXX16 | 1/18/2013 | AL | ZoneD | Manufacturing | 344,081 | -39,650 |
| 134 | XXXXXXX46 | 9/9/2013 | AL | ZoneD | Manufacturing | 342,510 | -332,173 |
| 135 | XXXXXXX26 | 6/20/2013 | AL | ZoneD | Manufacturing | 290,375 | -47,200 |
| 136 | XXXXXXX79 | 7/26/2013 | LA | ZoneD | Manufacturing | 284,057 | -97,067 |
| 137 | XXXXXXX04 | 7/19/2013 | FL | ZoneD | Manufacturing | 277,546 | -259,941 |
| 138 | XXXXXXX84 | 1/29/2013 | AL | ZoneD | Manufacturing | 275,412 | -822,974 |
| 139 | XXXXXXX50 | 11/20/2012 | FL | ZoneD | Manufacturing | 228,597 | -73,501 |
| 140 | XXXXXXX76 | 3/11/2013 | MS | ZoneD | Manufacturing | 227,625 | -9,919 |
| 141 | XXXXXXX62 | 5/21/2013 | AL | ZoneD | Manufacturing | 223,301 | -90,175 |

**Appendix 1**
**Examples of BEL Offers with No Loss**
**Pre-RTP Offers of at Least $100,000 in Zone D (except for Crop Farms and Lawyers)**

| No. | Claimant ID | Offer Date | State | Zone | Industry | Offer | Benchmark VP - 2010 VP (May-December) *Negative Implies Gain in VP* |
|---|---|---|---|---|---|---|---|
| 142 | XXXXXXX87 | 7/16/2013 | AL | ZoneD | Manufacturing | 158,990 | -35,774 |
| 143 | XXXXXXX60 | 8/8/2013 | AL | ZoneD | Manufacturing | 151,865 | -34,053 |
| 144 | XXXXXXX37 | 6/24/2013 | AL | ZoneD | Manufacturing | 151,165 | -39,174 |
| 145 | XXXXXXX76 | 8/8/2013 | AL | ZoneD | Manufacturing | 150,079 | -27,210 |
| 146 | XXXXXXX46 | 4/17/2013 | LA | ZoneD | Manufacturing | 149,060 | -12,201 |
| 147 | XXXXXXX99 | 8/13/2013 | LA | ZoneD | Manufacturing | 143,196 | -85,520 |
| 148 | XXXXXXX44 | 2/25/2013 | MS | ZoneD | Manufacturing | 140,574 | -50,092 |
| 149 | XXXXXXX86 | 8/15/2013 | LA | ZoneB | Professional Services: Lawyers | 5,173,885 | -4,070,301 |
| 150 | XXXXXXX96 | 1/31/2013 | FL | ZoneB | Professional Services: Lawyers | 3,671,625 | -546,624 |
| 151 | XXXXXXX37 | 7/17/2013 | LA | ZoneB | Professional Services: Lawyers | 3,228,561 | -2,273,521 |
| 152 | XXXXXXX78 | 9/23/2013 | LA | ZoneA | Professional Services: Lawyers | 2,061,621 | -90,280 |
| 153 | XXXXXXX43 | 1/14/2013 | LA | ZoneB | Professional Services: Lawyers | 1,468,537 | -57,385 |
| 154 | XXXXXXX91 | 7/26/2013 | LA | ZoneB | Professional Services: Lawyers | 1,444,259 | -1,291,229 |
| 155 | XXXXXXX44 | 4/19/2013 | LA | ZoneD | Professional Services: Lawyers | 1,006,570 | -44,148 |
| 156 | XXXXXXX02 | 7/8/2013 | LA | ZoneC | Professional Services: Lawyers | 832,441 | -784,890 |
| 157 | XXXXXXX63 | 8/8/2013 | AL | ZoneD | Professional Services: Lawyers | 785,718 | -1,521,078 |
| 158 | XXXXXXX46 | 11/21/2012 | LA | ZoneB | Professional Services: Lawyers | 738,837 | -266,627 |
| 159 | XXXXXXX15 | 9/25/2013 | AL | ZoneD | Professional Services: Lawyers | 664,902 | -2,339,021 |
| 160 | XXXXXXX37 | 4/10/2013 | LA | ZoneA | Professional Services: Lawyers | 638,868 | -1,759 |
| 161 | XXXXXXX16 | 1/18/2013 | LA | ZoneB | Professional Services: Lawyers | 622,906 | -261,320 |
| 162 | XXXXXXX02 | 6/18/2013 | LA | ZoneD | Professional Services: Lawyers | 576,171 | -273,504 |
| 163 | XXXXXXX69 | 7/9/2013 | LA | ZoneB | Professional Services: Lawyers | 555,446 | -60,819 |
| 164 | XXXXXXX81 | 5/6/2013 | LA | ZoneB | Professional Services: Lawyers | 543,066 | -158,202 |
| 165 | XXXXXXX07 | 6/13/2013 | TX | ZoneD | Professional Services: Lawyers | 505,423 | -116,636 |
| 166 | XXXXXXX51 | 8/29/2013 | LA | ZoneD | Professional Services: Lawyers | 488,870 | -113,625 |
| 167 | XXXXXXX09 | 12/20/2012 | AL | ZoneD | Professional Services: Lawyers | 433,481 | -85,922 |
| 168 | XXXXXXX08 | 5/20/2013 | LA | ZoneA | Professional Services: Lawyers | 431,963 | -131,403 |
| 169 | XXXXXXX75 | 6/11/2013 | LA | ZoneD | Professional Services: Lawyers | 431,554 | -189,107 |
| 170 | XXXXXXX84 | 3/19/2013 | AL | ZoneD | Professional Services: Lawyers | 415,905 | -79,668 |
| 171 | XXXXXXX58 | 12/7/2012 | LA | ZoneD | Professional Services: Lawyers | 390,284 | -128,533 |
| 172 | XXXXXXX22 | 4/10/2013 | LA | ZoneD | Professional Services: Lawyers | 335,348 | -14,774 |
| 173 | XXXXXXX15 | 7/22/2013 | LA | ZoneD | Professional Services: Lawyers | 283,281 | -102,874 |
| 174 | XXXXXXX12 | 7/11/2013 | MS | ZoneA | Professional Services: Lawyers | 270,263 | -34,090 |
| 175 | XXXXXXX94 | 5/9/2013 | LA | ZoneC | Professional Services: Lawyers | 269,675 | -348,597 |
| 176 | XXXXXXX74 | 12/26/2012 | AL | ZoneC | Professional Services: Lawyers | 251,248 | -825,942 |
| 177 | XXXXXXX50 | 11/29/2012 | LA | ZoneD | Professional Services: Lawyers | 245,196 | -35,593 |
| 178 | XXXXXXX75 | 8/1/2013 | AL | ZoneC | Professional Services: Lawyers | 234,152 | -112,436 |
| 179 | XXXXXXX67 | 1/21/2013 | AL | ZoneD | Professional Services: Lawyers | 219,757 | -50,730 |
| 180 | XXXXXXX67 | 8/14/2013 | LA | ZoneD | Professional Services: Lawyers | 218,319 | -967,935 |
| 181 | XXXXXXX29 | 9/3/2013 | FL | ZoneC | Professional Services: Lawyers | 186,884 | -59,018 |
| 182 | XXXXXXX84 | 8/19/2013 | LA | ZoneD | Professional Services: Lawyers | 186,563 | -1,060,831 |
| 183 | XXXXXXX70 | 3/13/2013 | LA | ZoneD | Professional Services: Lawyers | 173,120 | -230,707 |
| 184 | XXXXXXX83 | 8/1/2013 | AL | ZoneD | Professional Services: Lawyers | 163,444 | -57,395 |
| 185 | XXXXXXX11 | 12/7/2012 | LA | ZoneD | Professional Services: Lawyers | 147,713 | -44,709 |
| 186 | XXXXXXX60 | 9/5/2013 | FL | ZoneD | Professional Services: Lawyers | 140,097 | -11,202 |
| 187 | XXXXXXX97 | 8/19/2013 | AL | ZoneD | Professional Services: Other | 578,121 | -327,724 |
| 188 | XXXXXXX70 | 1/23/2013 | FL | ZoneD | Professional Services: Other | 450,014 | -87,510 |

**Appendix 1**
**Examples of BEL Offers with No Loss**
**Pre-RTP Offers of at Least $100,000 in Zone D (except for Crop Farms and Lawyers)**

| No. | Claimant ID | Offer Date | State | Zone | Industry | Offer | Benchmark VP - 2010 VP (May-December) *Negative Implies Gain in VP* |
|---|---|---|---|---|---|---|---|
| 189 | XXXXXXX34 | 9/11/2013 | MS | ZoneD | Professional Services: Other | 321,709 | -36,558 |
| 190 | XXXXXXX41 | 11/26/2012 | LA | ZoneD | Professional Services: Other | 304,911 | -392,906 |
| 191 | XXXXXXX68 | 7/3/2013 | AL | ZoneD | Professional Services: Other | 276,025 | -276,880 |
| 192 | XXXXXXX69 | 7/31/2013 | LA | ZoneD | Professional Services: Other | 265,642 | -194,396 |
| 193 | XXXXXXX20 | 3/25/2013 | AL | ZoneD | Professional Services: Other | 219,064 | -53,179 |
| 194 | XXXXXXX01 | 4/12/2013 | AL | ZoneD | Professional Services: Other | 209,878 | -31,396 |
| 195 | XXXXXXX05 | 7/29/2013 | LA | ZoneD | Professional Services: Other | 209,361 | -21,814 |
| 196 | XXXXXXX93 | 7/12/2013 | TX | ZoneD | Professional Services: Other | 134,945 | -44,194 |
| 197 | XXXXXXX11 | 5/30/2013 | AL | ZoneD | Professional Services: Other | 133,685 | -122,450 |
| 198 | XXXXXXX54 | 8/19/2013 | LA | ZoneD | Professional Services: Other | 128,443 | -370,276 |
| 199 | XXXXXXX93 | 7/26/2013 | MS | ZoneD | Property Rental | 368,971 | -3,277 |
| 200 | XXXXXXX50 | 2/28/2013 | LA | ZoneD | Property Rental | 222,170 | -114,219 |
| 201 | XXXXXXX72 | 9/10/2013 | MS | ZoneD | Real Estate | 242,802 | -660,530 |
| 202 | XXXXXXX98 | 1/21/2013 | AL | ZoneD | Real Estate | 167,169 | -53,696 |
| 203 | XXXXXXX08 | 1/21/2013 | AL | ZoneD | Real Estate | 152,634 | -68,858 |
| 204 | XXXXXXX80 | 5/16/2013 | TX | ZoneD | Retail Trade | 1,004,388 | -209,645 |
| 205 | XXXXXXX81 | 1/14/2013 | MS | ZoneD | Retail Trade | 617,765 | -35,625 |
| 206 | XXXXXXX77 | 3/6/2013 | TX | ZoneD | Retail Trade | 574,964 | -30,304 |
| 207 | XXXXXXX28 | 6/17/2013 | LA | ZoneD | Retail Trade | 531,080 | -9,094 |
| 208 | XXXXXXX97 | 7/22/2013 | AL | ZoneD | Retail Trade | 477,300 | -20,434 |
| 209 | XXXXXXX74 | 1/30/2013 | AL | ZoneD | Retail Trade | 463,599 | -175,212 |
| 210 | XXXXXXX24 | 4/18/2013 | AL | ZoneD | Retail Trade | 428,601 | -7,589 |
| 211 | XXXXXXX34 | 10/25/2012 | AL | ZoneD | Retail Trade | 410,673 | -24,154 |
| 212 | XXXXXXX02 | 7/22/2013 | MS | ZoneD | Retail Trade | 370,804 | -1,688 |
| 213 | XXXXXXX67 | 6/11/2013 | AL | ZoneD | Retail Trade | 367,877 | -67,458 |
| 214 | XXXXXXX95 | 8/23/2013 | AL | ZoneD | Retail Trade | 306,263 | -367,457 |
| 215 | XXXXXXX60 | 2/13/2013 | AL | ZoneD | Retail Trade | 302,946 | -97,461 |
| 216 | XXXXXXX44 | 3/8/2013 | LA | ZoneD | Retail Trade | 281,551 | -142,620 |
| 217 | XXXXXXX89 | 6/20/2013 | AL | ZoneD | Retail Trade | 192,840 | -37,657 |
| 218 | XXXXXXX04 | 6/13/2013 | AL | ZoneD | Retail Trade | 185,699 | -3,518 |
| 219 | XXXXXXX01 | 3/20/2013 | LA | ZoneD | Retail Trade | 175,838 | -51,841 |
| 220 | XXXXXXX13 | 7/18/2013 | MS | ZoneD | Retail Trade | 166,897 | -25,831 |
| 221 | XXXXXXX96 | 4/1/2013 | LA | ZoneD | Retail Trade | 163,444 | -153,591 |
| 222 | XXXXXXX17 | 8/2/2013 | MS | ZoneD | Retail Trade | 158,106 | -89,377 |
| 223 | XXXXXXX83 | 9/24/2013 | AL | ZoneD | Retail Trade | 143,245 | -203,198 |
| 224 | XXXXXXX59 | 5/31/2013 | LA | ZoneD | Retail Trade | 130,977 | -35,784 |
| 225 | XXXXXXX45 | 12/19/2012 | TX | ZoneD | Seafood Processing | 1,034,228 | -157,817 |
| 226 | XXXXXXX75 | 1/4/2013 | TX | ZoneD | Seafood Processing | 702,435 | -142,072 |
| 227 | XXXXXXX34 | 1/29/2013 | LA | ZoneD | Services | 331,504 | -11,863 |
| 228 | XXXXXXX91 | 8/21/2013 | FL | ZoneD | Services | 253,704 | -8,974 |
| 229 | XXXXXXX82 | 6/24/2013 | LA | ZoneD | Services | 247,797 | -13,152 |
| 230 | XXXXXXX30 | 3/7/2013 | AL | ZoneD | Services | 236,387 | -32,784 |
| 231 | XXXXXXX64 | 7/23/2013 | FL | ZoneD | Services | 194,301 | -84,853 |
| 232 | XXXXXXX05 | 8/7/2013 | MS | ZoneD | Services | 180,870 | -47,242 |
| 233 | XXXXXXX80 | 7/30/2013 | MS | ZoneD | Services | 180,688 | -30,581 |
| 234 | XXXXXXX37 | 11/16/2012 | MS | ZoneD | Services | 173,385 | -157,739 |
| 235 | XXXXXXX66 | 2/19/2013 | AL | ZoneD | Services | 170,398 | -28,855 |

**Appendix 1**
**Examples of BEL Offers with No Loss**
**Pre-RTP Offers of at Least $100,000 in Zone D (except for Crop Farms and Lawyers)**

| No. | Claimant ID | Offer Date | State | Zone | Industry | Offer | Benchmark VP - 2010 VP (May-December) *Negative Implies Gain in VP* |
|---|---|---|---|---|---|---|---|
| 236 | XXXXXXX03 | 6/7/2013 | MS | ZoneD | Services | 162,757 | -70,937 |
| 237 | XXXXXXX15 | 3/7/2013 | AL | ZoneD | Transportation and Warehousing | 4,713,549 | -8,622,388 |
| 238 | XXXXXXX82 | 9/16/2013 | FL | ZoneD | Transportation and Warehousing | 1,032,462 | -572,421 |
| 239 | XXXXXXX52 | 11/29/2012 | MS | ZoneD | Transportation and Warehousing | 297,818 | -154,211 |
| 240 | XXXXXXX22 | 3/19/2013 | LA | ZoneD | Transportation and Warehousing | 240,499 | -52,599 |
| 241 | XXXXXXX58 | 9/27/2013 | LA | ZoneD | Transportation and Warehousing | 232,705 | -72,084 |
| 242 | XXXXXXX15 | 3/25/2013 | MS | ZoneD | Transportation and Warehousing | 206,270 | -37,162 |
| 243 | XXXXXXX88 | 11/20/2012 | LA | ZoneD | Transportation and Warehousing | 196,947 | -38,876 |
| 244 | XXXXXXX80 | 8/29/2013 | MS | ZoneD | Transportation and Warehousing | 140,815 | -37,466 |
| 245 | XXXXXXX39 | 9/20/2013 | FL | ZoneD | Wholesale Trade | 1,827,699 | -449,985 |
| 246 | XXXXXXX05 | 12/20/2012 | FL | ZoneD | Wholesale Trade | 1,045,755 | -161,651 |
| 247 | XXXXXXX98 | 7/18/2013 | LA | ZoneD | Wholesale Trade | 866,957 | -326,603 |
| 248 | XXXXXXX99 | 9/10/2013 | AL | ZoneD | Wholesale Trade | 800,763 | -211,838 |
| 249 | XXXXXXX66 | 4/24/2013 | AL | ZoneD | Wholesale Trade | 569,463 | -160,736 |
| 250 | XXXXXXX82 | 4/1/2013 | AL | ZoneD | Wholesale Trade | 556,062 | -355,544 |
| 251 | XXXXXXX75 | 7/31/2013 | AL | ZoneD | Wholesale Trade | 554,157 | -90,530 |
| 252 | XXXXXXX27 | 1/30/2013 | LA | ZoneD | Wholesale Trade | 548,356 | -296,553 |
| 253 | XXXXXXX83 | 9/3/2013 | AL | ZoneD | Wholesale Trade | 389,110 | -589,066 |
| 254 | XXXXXXX62 | 4/11/2013 | AL | ZoneD | Wholesale Trade | 385,720 | -18,946 |
| 255 | XXXXXXX22 | 5/20/2013 | AL | ZoneD | Wholesale Trade | 307,384 | -477,787 |
| 256 | XXXXXXX40 | 7/16/2013 | AL | ZoneD | Wholesale Trade | 276,422 | -86,744 |
| 257 | XXXXXXX71 | 1/9/2013 | LA | ZoneD | Wholesale Trade | 256,751 | -95,878 |
| 258 | XXXXXXX20 | 4/24/2013 | AL | ZoneD | Wholesale Trade | 253,694 | -332,389 |
| 259 | XXXXXXX13 | 1/22/2013 | AL | ZoneD | Wholesale Trade | 251,184 | -119,696 |
| 260 | XXXXXXX69 | 8/7/2013 | MS | ZoneD | Wholesale Trade | 238,547 | -161,496 |
| 261 | XXXXXXX11 | 8/23/2013 | LA | ZoneD | Wholesale Trade | 201,790 | -127,947 |
| 262 | XXXXXXX13 | 1/22/2013 | AL | ZoneD | Wholesale Trade | 177,877 | -331,843 |
| 263 | XXXXXXX70 | 2/22/2013 | AL | ZoneD | Wholesale Trade | 151,955 | -144,995 |
| 264 | XXXXXXX77 | 3/29/2013 | AL | ZoneD | All Other Industries | 205,287 | -231,971 |
| 265 | XXXXXXX65 | 5/21/2013 | MS | ZoneD | All Other Industries | 171,644 | -58,539 |
| 266 | XXXXXXX33 | 9/10/2013 | LA | ZoneD | All Other Industries | 144,831 | -91,512 |
| 267 | XXXXXXX28 | 4/26/2013 | LA | ZoneD | All Other Industries | 139,211 | -29,592 |
| 268 | XXXXXXX33 | 4/9/2013 | LA | ZoneD | All Other Industries | 133,216 | -33,934 |

Source: CSSP data as of 9/30/2013.
Notes:
1. No Loss offers are those for which 2010 Variable Profit is larger than Benchmark Period Variable Profit (on either May-December or January-December basis).

# APPENDIX 2

**Appendix 2**
**Examples of BEL Offers with Disproportionately Large Offer**
**Pre-RTP Offers of at Least $100,000 in Zone D (except for Crop Farms and Lawyers)**

| No. | Claimant ID | Offer Date | State | Zone | Industry | Offer | Disproportionate Percent: |
|---|---|---|---|---|---|---|---|
| 1 | XXXXXXX65 | 9/24/2013 | MS | ZoneD | Agriculture: Crop Farms | 3,472,163 | 164% |
| 2 | XXXXXXX76 | 12/7/2012 | LA | ZoneD | Agriculture: Crop Farms | 3,139,697 | 212% |
| 3 | XXXXXXX19 | 9/11/2013 | MS | ZoneD | Agriculture: Crop Farms | 2,172,435 | 47% |
| 4 | XXXXXXX44 | 4/24/2013 | MS | ZoneD | Agriculture: Crop Farms | 1,816,399 | 28% |
| 5 | XXXXXXX61 | 2/6/2013 | AL | ZoneD | Agriculture: Crop Farms | 1,365,718 | 57% |
| 6 | XXXXXXX96 | 7/29/2013 | MS | ZoneD | Agriculture: Crop Farms | 1,349,589 | 60% |
| 7 | XXXXXXX95 | 3/29/2013 | MS | ZoneD | Agriculture: Crop Farms | 1,216,308 | 150% |
| 8 | XXXXXXX72 | 9/12/2013 | MS | ZoneD | Agriculture: Crop Farms | 1,051,242 | 74% |
| 9 | XXXXXXX90 | 12/18/2012 | MS | ZoneD | Agriculture: Crop Farms | 891,300 | 108% |
| 10 | XXXXXXX94 | 8/6/2013 | MS | ZoneD | Agriculture: Crop Farms | 889,558 | 106% |
| 11 | XXXXXXX05 | 4/4/2013 | LA | ZoneD | Agriculture: Crop Farms | 862,509 | 74% |
| 12 | XXXXXXX52 | 8/12/2013 | MS | ZoneD | Agriculture: Crop Farms | 841,633 | 48% |
| 13 | XXXXXXX97 | 12/14/2012 | MS | ZoneD | Agriculture: Crop Farms | 827,928 | 68% |
| 14 | XXXXXXX95 | 9/27/2013 | MS | ZoneD | Agriculture: Crop Farms | 827,858 | 74% |
| 15 | XXXXXXX23 | 2/6/2013 | MS | ZoneD | Agriculture: Crop Farms | 814,397 | 50% |
| 16 | XXXXXXX09 | 4/4/2013 | MS | ZoneD | Agriculture: Crop Farms | 808,794 | 121% |
| 17 | XXXXXXX71 | 8/23/2013 | MS | ZoneD | Agriculture: Crop Farms | 709,426 | 682% |
| 18 | XXXXXXX36 | 7/17/2013 | MS | ZoneD | Agriculture: Crop Farms | 703,293 | 280% |
| 19 | XXXXXXX10 | 5/6/2013 | MS | ZoneD | Agriculture: Crop Farms | 701,692 | 34% |
| 20 | XXXXXXX23 | 3/18/2013 | MS | ZoneD | Agriculture: Crop Farms | 700,589 | 101% |
| 21 | XXXXXXX24 | 8/2/2013 | MS | ZoneD | Agriculture: Crop Farms | 649,494 | 27% |
| 22 | XXXXXXX33 | 9/10/2013 | MS | ZoneD | Agriculture: Crop Farms | 628,918 | 121% |
| 23 | XXXXXXX96 | 8/22/2013 | MS | ZoneD | Agriculture: Crop Farms | 599,949 | 89% |
| 24 | XXXXXXX94 | 9/9/2013 | AL | ZoneC | Agriculture: Crop Farms | 596,143 | 75% |
| 25 | XXXXXXX57 | 9/27/2013 | MS | ZoneD | Agriculture: Crop Farms | 585,313 | 74% |
| 26 | XXXXXXX80 | 12/6/2012 | MS | ZoneD | Agriculture: Crop Farms | 535,833 | 108% |
| 27 | XXXXXXX57 | 1/7/2013 | MS | ZoneD | Agriculture: Crop Farms | 518,697 | 62% |
| 28 | XXXXXXX23 | 5/1/2013 | MS | ZoneD | Agriculture: Crop Farms | 463,035 | 45% |
| 29 | XXXXXXX39 | 11/16/2012 | MS | ZoneD | Agriculture: Crop Farms | 392,956 | 38% |
| 30 | XXXXXXX73 | 8/14/2013 | MS | ZoneD | Agriculture: Crop Farms | 392,714 | 124% |
| 31 | XXXXXXX43 | 4/22/2013 | MS | ZoneD | Agriculture: Crop Farms | 389,276 | 200% |
| 32 | XXXXXXX07 | 8/5/2013 | MS | ZoneD | Agriculture: Crop Farms | 378,459 | 187% |
| 33 | XXXXXXX92 | 8/14/2013 | MS | ZoneD | Agriculture: Crop Farms | 308,075 | 51% |
| 34 | XXXXXXX92 | 9/17/2013 | LA | ZoneD | Agriculture: Crop Farms | 299,441 | 83% |
| 35 | XXXXXXX07 | 7/8/2013 | LA | ZoneD | Agriculture: Crop Farms | 294,227 | 42% |
| 36 | XXXXXXX25 | 8/5/2013 | MS | ZoneD | Agriculture: Crop Farms | 287,751 | 46% |
| 37 | XXXXXXX80 | 9/20/2013 | MS | ZoneD | Agriculture: Crop Farms | 283,984 | 60% |
| 38 | XXXXXXX76 | 8/14/2013 | MS | ZoneD | Agriculture: Crop Farms | 273,197 | 70% |
| 39 | XXXXXXX84 | 4/12/2013 | MS | ZoneD | Agriculture: Crop Farms | 268,619 | 372% |
| 40 | XXXXXXX40 | 8/5/2013 | MS | ZoneD | Agriculture: Crop Farms | 238,445 | 68% |
| 41 | XXXXXXX62 | 6/3/2013 | LA | ZoneD | Agriculture: Crop Farms | 227,914 | 74% |
| 42 | XXXXXXX69 | 5/10/2013 | LA | ZoneD | Agriculture: Crop Farms | 216,582 | 56% |
| 43 | XXXXXXX12 | 7/25/2013 | MS | ZoneD | Agriculture: Crop Farms | 211,533 | 41% |
| 44 | XXXXXXX41 | 8/2/2013 | MS | ZoneD | Agriculture: Crop Farms | 210,479 | 2368% |
| 45 | XXXXXXX38 | 8/19/2013 | MS | ZoneD | Agriculture: Crop Farms | 191,067 | 71% |
| 46 | XXXXXXX17 | 4/29/2013 | FL | ZoneD | Agriculture: Crop Farms | 175,895 | 116% |
| 47 | XXXXXXX25 | 9/3/2013 | MS | ZoneD | Agriculture: Crop Farms | 155,984 | 87% |
| 48 | XXXXXXX31 | 4/9/2013 | MS | ZoneD | Agriculture: Crop Farms | 143,464 | 94% |
| 49 | XXXXXXX65 | 9/13/2013 | MS | ZoneD | Agriculture: Crop Farms | 129,043 | 34% |
| 50 | XXXXXXX07 | 1/22/2013 | MS | ZoneD | Agriculture: Other | 1,633,012 | 342% |
| 51 | XXXXXXX64 | 8/8/2013 | AL | ZoneD | Agriculture: Other | 1,314,198 | 35% |
| 52 | XXXXXXX35 | 8/23/2013 | MS | ZoneD | Agriculture: Other | 637,965 | 30% |
| 53 | XXXXXXX45 | 5/31/2013 | AL | ZoneD | Agriculture: Other | 294,981 | 65% |
| 54 | XXXXXXX14 | 8/21/2013 | MS | ZoneD | Agriculture: Other | 247,842 | 49% |
| 55 | XXXXXXX63 | 8/5/2013 | MS | ZoneD | Agriculture: Other | 180,376 | 30% |

**Appendix 2**
**Examples of BEL Offers with Disproportionately Large Offer**
**Pre-RTP Offers of at Least $100,000 in Zone D (except for Crop Farms and Lawyers)**

| No. | Claimant ID | Offer Date | State | Zone | Industry | Offer | Disproportionate Percent: |
|---|---|---|---|---|---|---|---|
| 56 | XXXXXXX98 | 8/22/2013 | MS | ZoneD | Agriculture: Other | 129,411 | 35% |
| 57 | XXXXXXX68 | 9/18/2013 | LA | ZoneD | Arts, Entertainment, and Recreation | 242,548 | 30% |
| 58 | XXXXXXX47 | 5/23/2013 | LA | ZoneD | Bars and Restaurants | 309,255 | 70% |
| 59 | XXXXXXX79 | 1/31/2013 | AL | ZoneD | Construction | 13,185,695 | 92% |
| 60 | XXXXXXX92 | 12/14/2012 | LA | ZoneD | Construction | 4,977,688 | 37% |
| 61 | XXXXXXX07 | 12/7/2012 | MS | ZoneD | Construction | 4,976,486 | 31% |
| 62 | XXXXXXX51 | 6/4/2013 | AL | ZoneD | Construction | 3,969,513 | 307% |
| 63 | XXXXXXX34 | 9/27/2013 | AL | ZoneD | Construction | 2,430,142 | 97% |
| 64 | XXXXXXX35 | 7/29/2013 | MS | ZoneD | Construction | 1,937,354 | 25% |
| 65 | XXXXXXX38 | 8/6/2013 | AL | ZoneD | Construction | 1,680,718 | 46% |
| 66 | XXXXXXX81 | 5/7/2013 | LA | ZoneD | Construction | 1,639,033 | 35% |
| 67 | XXXXXXX30 | 7/8/2013 | MS | ZoneD | Construction | 1,556,680 | 29% |
| 68 | XXXXXXX03 | 1/31/2013 | FL | ZoneD | Construction | 1,536,311 | 50% |
| 69 | XXXXXXX72 | 4/9/2013 | MS | ZoneD | Construction | 1,488,003 | 27% |
| 70 | XXXXXXX88 | 12/14/2012 | AL | ZoneD | Construction | 1,443,717 | 58% |
| 71 | XXXXXXX78 | 6/14/2013 | AL | ZoneD | Construction | 1,432,126 | 328% |
| 72 | XXXXXXX67 | 4/17/2013 | LA | ZoneD | Construction | 1,271,646 | 97% |
| 73 | XXXXXXX54 | 9/3/2013 | AL | ZoneD | Construction | 1,200,165 | 27% |
| 74 | XXXXXXX73 | 1/9/2013 | MS | ZoneD | Construction | 1,190,713 | 137% |
| 75 | XXXXXXX47 | 12/17/2012 | LA | ZoneD | Construction | 1,177,517 | 155% |
| 76 | XXXXXXX47 | 1/23/2013 | LA | ZoneD | Construction | 1,122,194 | 94% |
| 77 | XXXXXXX33 | 11/26/2012 | AL | ZoneD | Construction | 1,010,018 | 38% |
| 78 | XXXXXXX00 | 4/24/2013 | AL | ZoneD | Construction | 942,434 | 32% |
| 79 | XXXXXXX71 | 6/20/2013 | AL | ZoneD | Construction | 935,915 | 29% |
| 80 | XXXXXXX60 | 12/5/2012 | LA | ZoneD | Construction | 899,111 | 70% |
| 81 | XXXXXXX99 | 8/20/2013 | LA | ZoneD | Construction | 862,839 | 89% |
| 82 | XXXXXXX43 | 7/10/2013 | AL | ZoneD | Construction | 822,584 | 29% |
| 83 | XXXXXXX72 | 5/2/2013 | AL | ZoneD | Construction | 794,839 | 28% |
| 84 | XXXXXXX24 | 3/14/2013 | AL | ZoneD | Construction | 765,668 | 267% |
| 85 | XXXXXXX14 | 5/20/2013 | FL | ZoneD | Construction | 755,678 | 67% |
| 86 | XXXXXXX01 | 8/1/2013 | LA | ZoneD | Construction | 692,991 | 195% |
| 87 | XXXXXXX87 | 8/5/2013 | AL | ZoneD | Construction | 674,247 | 26% |
| 88 | XXXXXXX10 | 4/25/2013 | LA | ZoneD | Construction | 626,825 | 110% |
| 89 | XXXXXXX17 | 4/17/2013 | MS | ZoneD | Construction | 624,331 | 28% |
| 90 | XXXXXXX51 | 7/8/2013 | AL | ZoneD | Construction | 622,114 | 64% |
| 91 | XXXXXXX02 | 4/25/2013 | AL | ZoneD | Construction | 576,353 | 28% |
| 92 | XXXXXXX29 | 8/16/2013 | LA | ZoneD | Construction | 574,060 | 35% |
| 93 | XXXXXXX06 | 7/26/2013 | AL | ZoneD | Construction | 569,595 | 69% |
| 94 | XXXXXXX46 | 9/26/2013 | LA | ZoneD | Construction | 556,989 | 60% |
| 95 | XXXXXXX02 | 5/20/2013 | LA | ZoneD | Construction | 551,132 | 39% |
| 96 | XXXXXXX52 | 9/11/2013 | AL | ZoneD | Construction | 543,111 | 29% |
| 97 | XXXXXXX84 | 11/20/2012 | AL | ZoneD | Construction | 523,694 | 34% |
| 98 | XXXXXXX96 | 8/2/2013 | AL | ZoneD | Construction | 517,638 | 88% |
| 99 | XXXXXXX28 | 9/27/2013 | AL | ZoneD | Construction | 466,565 | 44% |
| 100 | XXXXXXX40 | 12/7/2012 | AL | ZoneD | Construction | 426,183 | 27% |
| 101 | XXXXXXX66 | 4/11/2013 | MS | ZoneD | Construction | 424,807 | 104% |
| 102 | XXXXXXX39 | 9/24/2013 | LA | ZoneD | Construction | 420,037 | 259% |
| 103 | XXXXXXX87 | 8/2/2013 | AL | ZoneD | Construction | 406,846 | 35% |
| 104 | XXXXXXX58 | 11/28/2012 | MS | ZoneD | Construction | 397,544 | 115% |
| 105 | XXXXXXX64 | 3/18/2013 | FL | ZoneD | Construction | 396,214 | 156% |
| 106 | XXXXXXX60 | 1/28/2013 | AL | ZoneD | Construction | 387,212 | 61% |
| 107 | XXXXXXX85 | 7/29/2013 | AL | ZoneD | Construction | 378,321 | 46% |
| 108 | XXXXXXX14 | 8/1/2013 | AL | ZoneD | Construction | 375,259 | 51% |
| 109 | XXXXXXX36 | 1/29/2013 | LA | ZoneD | Construction | 349,102 | 31% |
| 110 | XXXXXXX97 | 4/25/2013 | LA | ZoneD | Construction | 331,689 | 75% |

**Appendix 2**
**Examples of BEL Offers with Disproportionately Large Offer**
**Pre-RTP Offers of at Least $100,000 in Zone D (except for Crop Farms and Lawyers)**

| No. | Claimant ID | Offer Date | State | Zone | Industry | Offer | Disproportionate Percent: |
|-----|-------------|------------|-------|------|----------|-------|---------------------------|
| 111 | XXXXXXX18 | 8/19/2013 | FL | ZoneD | Construction | 296,763 | 43% |
| 112 | XXXXXXX50 | 3/18/2013 | MS | ZoneD | Construction | 287,368 | 145% |
| 113 | XXXXXXX22 | 4/24/2013 | MS | ZoneD | Construction | 250,648 | 79% |
| 114 | XXXXXXX64 | 12/21/2012 | MS | ZoneD | Construction | 246,418 | 32% |
| 115 | XXXXXXX20 | 4/16/2013 | AL | ZoneD | Construction | 244,845 | 45% |
| 116 | XXXXXXX59 | 7/15/2013 | AL | ZoneD | Construction | 231,504 | 93% |
| 117 | XXXXXXX46 | 4/12/2013 | FL | ZoneD | Construction | 227,794 | 46% |
| 118 | XXXXXXX66 | 6/28/2013 | AL | ZoneD | Construction | 225,317 | 45% |
| 119 | XXXXXXX53 | 6/13/2013 | AL | ZoneD | Construction | 223,975 | 143% |
| 120 | XXXXXXX06 | 6/19/2013 | LA | ZoneD | Construction | 211,315 | 31% |
| 121 | XXXXXXX58 | 3/13/2013 | LA | ZoneD | Construction | 211,261 | 78% |
| 122 | XXXXXXX39 | 6/7/2013 | FL | ZoneD | Construction | 201,028 | 85% |
| 123 | XXXXXXX38 | 3/18/2013 | LA | ZoneD | Construction | 200,104 | 28% |
| 124 | XXXXXXX89 | 8/8/2013 | AL | ZoneD | Construction | 192,508 | 25% |
| 125 | XXXXXXX70 | 1/11/2013 | AL | ZoneD | Construction | 189,931 | 30% |
| 126 | XXXXXXX85 | 5/20/2013 | AL | ZoneD | Construction | 186,846 | 46% |
| 127 | XXXXXXX91 | 5/10/2013 | LA | ZoneD | Construction | 185,605 | 43% |
| 128 | XXXXXXX74 | 2/6/2013 | LA | ZoneD | Construction | 183,637 | 166% |
| 129 | XXXXXXX83 | 8/1/2013 | AL | ZoneD | Construction | 182,044 | 41% |
| 130 | XXXXXXX91 | 1/23/2013 | MS | ZoneD | Construction | 176,576 | 107% |
| 131 | XXXXXXX04 | 11/27/2012 | MS | ZoneD | Construction | 174,738 | 107% |
| 132 | XXXXXXX44 | 5/1/2013 | AL | ZoneD | Construction | 169,225 | 106% |
| 133 | XXXXXXX79 | 7/31/2013 | FL | ZoneD | Construction | 167,397 | 72% |
| 134 | XXXXXXX52 | 9/18/2013 | LA | ZoneD | Construction | 164,587 | 146% |
| 135 | XXXXXXX48 | 12/10/2012 | MS | ZoneD | Construction | 164,192 | 190% |
| 136 | XXXXXXX38 | 7/19/2013 | AL | ZoneD | Construction | 159,581 | 96% |
| 137 | XXXXXXX93 | 3/19/2013 | AL | ZoneD | Construction | 154,159 | 35% |
| 138 | XXXXXXX52 | 3/6/2013 | LA | ZoneD | Construction | 152,914 | 51% |
| 139 | XXXXXXX39 | 12/7/2013 | MS | ZoneD | Construction | 152,271 | 118% |
| 140 | XXXXXXX79 | 8/5/2013 | LA | ZoneD | Construction | 147,007 | 36% |
| 141 | XXXXXXX46 | 7/31/2013 | MS | ZoneD | Construction | 140,545 | 61% |
| 142 | XXXXXXX41 | 4/29/2013 | AL | ZoneD | Construction | 139,630 | 60% |
| 143 | XXXXXXX02 | 5/8/2013 | AL | ZoneD | Construction | 137,005 | 43% |
| 144 | XXXXXXX07 | 7/11/2013 | MS | ZoneD | Construction | 129,198 | 51% |
| 145 | XXXXXXX46 | 5/7/2013 | AL | ZoneD | Construction | 55,255 | 36% |
| 146 | XXXXXXX93 | 6/26/2013 | LA | ZoneD | Construction | 25,851 | 50% |
| 147 | XXXXXXX60 | 9/6/2013 | LA | ZoneD | Health Care | 388,059 | 30% |
| 148 | XXXXXXX16 | 11/29/2012 | MS | ZoneD | Health Care | 150,709 | 29% |
| 149 | XXXXXXX97 | 4/10/2013 | AL | ZoneD | Manufacturing | 3,683,492 | 145% |
| 150 | XXXXXXX52 | 12/13/2012 | AL | ZoneD | Manufacturing | 2,554,179 | 59% |
| 151 | XXXXXXX05 | 9/16/2013 | TX | ZoneD | Manufacturing | 2,463,074 | 47% |
| 152 | XXXXXXX90 | 7/17/2013 | MS | ZoneD | Manufacturing | 2,025,024 | 27% |
| 153 | XXXXXXX06 | 6/14/2013 | LA | ZoneD | Manufacturing | 1,164,666 | 102% |
| 154 | XXXXXXX74 | 12/26/2012 | LA | ZoneD | Manufacturing | 804,706 | 220% |
| 155 | XXXXXXX17 | 2/6/2013 | FL | ZoneD | Manufacturing | 724,735 | 28% |
| 156 | XXXXXXX42 | 9/26/2013 | LA | ZoneD | Manufacturing | 575,434 | 27% |
| 157 | XXXXXXX84 | 9/3/2013 | AL | ZoneD | Manufacturing | 571,504 | 40% |
| 158 | XXXXXXX05 | 5/2/2013 | AL | ZoneD | Manufacturing | 557,601 | 44% |
| 159 | XXXXXXX81 | 4/15/2013 | AL | ZoneD | Manufacturing | 460,673 | 57% |
| 160 | XXXXXXX56 | 2/22/2013 | FL | ZoneD | Manufacturing | 361,493 | 578% |
| 161 | XXXXXXX70 | 10/30/2012 | LA | ZoneD | Manufacturing | 325,235 | 52% |
| 162 | XXXXXXX74 | 7/31/2013 | TX | ZoneD | Manufacturing | 254,842 | 100% |
| 163 | XXXXXXX01 | 7/1/2013 | LA | ZoneD | Manufacturing | 251,114 | 29% |
| 164 | XXXXXXX06 | 4/22/2013 | AL | ZoneD | Manufacturing | 245,737 | 29% |
| 165 | XXXXXXX64 | 2/25/2013 | AL | ZoneD | Manufacturing | 213,375 | 30% |

**Appendix 2**
**Examples of BEL Offers with Disproportionately Large Offer**
**Pre-RTP Offers of at Least $100,000 in Zone D (except for Crop Farms and Lawyers)**

| No. | Claimant ID | Offer Date | State | Zone | Industry | Offer | Disproportionate Percent: |
|---|---|---|---|---|---|---|---|
| 166 | XXXXXXX32 | 3/28/2013 | MS | ZoneD | Manufacturing | 189,795 | 29% |
| 167 | XXXXXXX75 | 9/16/2013 | AL | ZoneD | Manufacturing | 184,152 | 33% |
| 168 | XXXXXXX18 | 4/1/2013 | AL | ZoneD | Manufacturing | 159,604 | 78% |
| 169 | XXXXXXX26 | 3/1/2013 | LA | ZoneD | Manufacturing | 150,796 | 79% |
| 170 | XXXXXXX81 | 1/21/2013 | LA | ZoneC | Professional Services: Lawyers | 3,456,126 | 75% |
| 171 | XXXXXXX80 | 5/10/2013 | AL | ZoneD | Professional Services: Lawyers | 2,927,563 | 72% |
| 172 | XXXXXXX63 | 5/6/2013 | LA | ZoneB | Professional Services: Lawyers | 1,850,423 | 25% |
| 173 | XXXXXXX88 | 5/16/2013 | LA | ZoneD | Professional Services: Lawyers | 1,837,777 | 32% |
| 174 | XXXXXXX44 | 11/26/2012 | LA | ZoneB | Professional Services: Lawyers | 1,476,776 | 29% |
| 175 | XXXXXXX42 | 7/29/2013 | LA | ZoneB | Professional Services: Lawyers | 1,207,423 | 27% |
| 176 | XXXXXXX19 | 9/3/2013 | FL | ZoneB | Professional Services: Lawyers | 946,275 | 56% |
| 177 | XXXXXXX15 | 12/20/2012 | LA | ZoneC | Professional Services: Lawyers | 808,390 | 37% |
| 178 | XXXXXXX92 | 8/7/2013 | LA | ZoneB | Professional Services: Lawyers | 664,272 | 34% |
| 179 | XXXXXXX24 | 9/26/2013 | LA | ZoneC | Professional Services: Lawyers | 655,994 | 36% |
| 180 | XXXXXXX81 | 7/10/2013 | LA | ZoneD | Professional Services: Lawyers | 523,445 | 32% |
| 181 | XXXXXXX80 | 1/30/2013 | LA | ZoneD | Professional Services: Lawyers | 446,245 | 35% |
| 182 | XXXXXXX50 | 2/1/2013 | LA | ZoneC | Professional Services: Lawyers | 424,339 | 29% |
| 183 | XXXXXXX35 | 8/12/2013 | LA | ZoneC | Professional Services: Lawyers | 333,494 | 33% |
| 184 | XXXXXXX23 | 2/6/2013 | LA | ZoneD | Professional Services: Lawyers | 323,081 | 34% |
| 185 | XXXXXXX82 | 7/15/2013 | LA | ZoneD | Professional Services: Lawyers | 322,019 | 37% |
| 186 | XXXXXXX24 | 8/12/2013 | LA | ZoneD | Professional Services: Lawyers | 238,831 | 71% |
| 187 | XXXXXXX51 | 8/21/2013 | LA | ZoneD | Professional Services: Lawyers | 231,103 | 28% |
| 188 | XXXXXXX86 | 4/19/2013 | LA | ZoneC | Professional Services: Lawyers | 200,636 | 39% |
| 189 | XXXXXXX41 | 8/21/2013 | LA | ZoneC | Professional Services: Lawyers | 197,087 | 47% |
| 190 | XXXXXXX51 | 8/8/2013 | LA | ZoneD | Professional Services: Lawyers | 186,554 | 28% |
| 191 | XXXXXXX95 | 1/30/2013 | MS | ZoneD | Professional Services: Lawyers | 143,864 | 42% |
| 192 | XXXXXXX78 | 11/19/2012 | AL | ZoneD | Professional Services: Other | 1,005,964 | 64% |
| 193 | XXXXXXX44 | 8/19/2013 | FL | ZoneD | Professional Services: Other | 686,508 | 53% |
| 194 | XXXXXXX67 | 5/23/2013 | LA | ZoneD | Professional Services: Other | 519,789 | 28% |
| 195 | XXXXXXX20 | 8/5/2013 | AL | ZoneD | Professional Services: Other | 500,150 | 38% |
| 196 | XXXXXXX89 | 3/7/2013 | AL | ZoneD | Professional Services: Other | 229,213 | 32% |
| 197 | XXXXXXX54 | 5/6/2013 | AL | ZoneD | Professional Services: Other | 225,519 | 27% |
| 198 | XXXXXXX48 | 3/6/2013 | LA | ZoneD | Professional Services: Other | 173,035 | 73% |
| 199 | XXXXXXX84 | 8/12/2013 | LA | ZoneD | Professional Services: Other | 160,015 | 36% |
| 200 | XXXXXXX23 | 12/28/2012 | AL | ZoneD | Professional Services: Other | 140,199 | 26% |
| 201 | XXXXXXX15 | 7/15/2013 | AL | ZoneD | Real Estate | 1,178,764 | 80% |
| 202 | XXXXXXX04 | 6/6/2013 | MS | ZoneD | Real Estate | 423,055 | 27% |
| 203 | XXXXXXX14 | 8/19/2013 | FL | ZoneD | Real Estate | 309,837 | 72% |
| 204 | XXXXXXX60 | 9/3/2013 | TX | ZoneD | Real Estate | 142,285 | 29% |
| 205 | XXXXXXX26 | 3/8/2013 | LA | ZoneD | Retail Trade | 734,323 | 98% |
| 206 | XXXXXXX23 | 9/13/2013 | LA | ZoneD | Retail Trade | 674,511 | 32% |
| 207 | XXXXXXX61 | 1/31/2013 | LA | ZoneD | Retail Trade | 651,386 | 30% |
| 208 | XXXXXXX75 | 3/21/2013 | LA | ZoneD | Retail Trade | 409,802 | 27% |
| 209 | XXXXXXX58 | 12/13/2012 | FL | ZoneD | Retail Trade | 359,952 | 26% |
| 210 | XXXXXXX34 | 7/31/2013 | AL | ZoneD | Retail Trade | 359,134 | 36% |
| 211 | XXXXXXX38 | 8/21/2013 | MS | ZoneD | Retail Trade | 279,078 | 26% |
| 212 | XXXXXXX26 | 2/20/2013 | AL | ZoneD | Retail Trade | 260,430 | 89% |
| 213 | XXXXXXX66 | 6/17/2013 | MS | ZoneD | Retail Trade | 255,282 | 28% |
| 214 | XXXXXXX97 | 7/8/2013 | AL | ZoneD | Retail Trade | 183,904 | 42% |
| 215 | XXXXXXX23 | 8/6/2013 | AL | ZoneD | Retail Trade | 169,629 | 29% |
| 216 | XXXXXXX76 | 8/13/2013 | AL | ZoneD | Retail Trade | 158,665 | 66% |
| 217 | XXXXXXX43 | 3/20/2013 | AL | ZoneD | Retail Trade | 148,183 | 46% |
| 218 | XXXXXXX74 | 4/4/2013 | AL | ZoneD | Retail Trade | 134,686 | 27% |
| 219 | XXXXXXX36 | 3/28/2013 | TX | ZoneD | Seafood Processing | 478,176 | 74% |
| 220 | XXXXXXX79 | 6/12/2013 | AL | ZoneD | Services | 2,741,751 | 27% |

**Appendix 2**
**Examples of BEL Offers with Disproportionately Large Offer**
**Pre-RTP Offers of at Least $100,000 in Zone D (except for Crop Farms and Lawyers)**

| No. | Claimant ID | Offer Date | State | Zone | Industry | Offer | Disproportionate Percent: |
|-----|-------------|------------|-------|------|----------|-------|---------------------------|
| 221 | XXXXXXX85 | 7/26/2013 | LA | ZoneD | Services | 659,378 | 77% |
| 222 | XXXXXXX77 | 9/6/2013 | TX | ZoneD | Services | 655,857 | 41% |
| 223 | XXXXXXX93 | 11/12/2012 | LA | ZoneD | Services | 619,303 | 145% |
| 224 | XXXXXXX18 | 7/31/2013 | FL | ZoneD | Services | 266,482 | 63% |
| 225 | XXXXXXX97 | 4/10/2013 | LA | ZoneD | Services | 241,635 | 45% |
| 226 | XXXXXXX08 | 9/20/2013 | LA | ZoneD | Services | 237,020 | 46% |
| 227 | XXXXXXX28 | 9/3/2013 | FL | ZoneD | Services | 225,581 | 42% |
| 228 | XXXXXXX12 | 12/7/2012 | FL | ZoneD | Services | 178,784 | 28% |
| 229 | XXXXXXX46 | 9/3/2013 | MS | ZoneD | Services | 142,931 | 28% |
| 230 | XXXXXXX64 | 5/22/2013 | MS | ZoneD | Transportation and Warehousing | 377,948 | 36% |
| 231 | XXXXXXX48 | 1/30/2013 | AL | ZoneD | Transportation and Warehousing | 185,172 | 38% |
| 232 | XXXXXXX16 | 9/13/2013 | LA | ZoneD | Wholesale Trade | 1,358,145 | 38% |
| 233 | XXXXXXX92 | 9/26/2013 | MS | ZoneD | Wholesale Trade | 1,170,763 | 28% |
| 234 | XXXXXXX61 | 6/3/2013 | TX | ZoneD | Wholesale Trade | 1,068,857 | 81% |
| 235 | XXXXXXX09 | 4/18/2013 | AL | ZoneD | Wholesale Trade | 909,391 | 82% |
| 236 | XXXXXXX35 | 12/12/2012 | FL | ZoneD | Wholesale Trade | 760,394 | 298% |
| 237 | XXXXXXX95 | 5/6/2013 | LA | ZoneD | Wholesale Trade | 670,088 | 38% |
| 238 | XXXXXXX05 | 7/1/2013 | MS | ZoneD | Wholesale Trade | 596,536 | 40% |
| 239 | XXXXXXX87 | 7/22/2013 | LA | ZoneD | Wholesale Trade | 534,589 | 29% |
| 240 | XXXXXXX94 | 6/7/2013 | FL | ZoneD | Wholesale Trade | 527,128 | 75% |
| 241 | XXXXXXX49 | 6/24/2013 | LA | ZoneD | Wholesale Trade | 518,857 | 31% |
| 242 | XXXXXXX72 | 8/16/2013 | LA | ZoneD | Wholesale Trade | 507,021 | 33% |
| 243 | XXXXXXX72 | 3/8/2013 | FL | ZoneD | Wholesale Trade | 469,098 | 29% |
| 244 | XXXXXXX98 | 7/22/2013 | AL | ZoneD | Wholesale Trade | 409,882 | 26% |
| 245 | XXXXXXX71 | 7/29/2013 | AL | ZoneD | Wholesale Trade | 319,641 | 25% |
| 246 | XXXXXXX67 | 9/13/2013 | LA | ZoneD | Wholesale Trade | 275,726 | 303% |
| 247 | XXXXXXX21 | 4/17/2013 | FL | ZoneD | Wholesale Trade | 233,482 | 62% |
| 248 | XXXXXXX39 | 3/22/2013 | MS | ZoneD | Wholesale Trade | 228,523 | 45% |
| 249 | XXXXXXX39 | 7/25/2013 | AL | ZoneD | Wholesale Trade | 194,904 | 41% |
| 250 | XXXXXXX75 | 3/28/2013 | LA | ZoneD | Wholesale Trade | 194,360 | 27% |
| 251 | XXXXXXX75 | 9/19/2013 | LA | ZoneD | All Other Industries | 634,174 | 37% |
| 252 | XXXXXXX54 | 3/8/2013 | LA | ZoneD | All Other Industries | 212,021 | 32% |
| 253 | XXXXXXX86 | 1/3/2013 | AL | ZoneD | All Other Industries | 162,400 | 29% |

Source: CSSP data as of 9/30/2013.

Notes:

1. Excludes any claims included in Examples of BEL Offers with No Loss.

2. Disproportionality (D) is defined as:

   D = (Base Offer − Lost VP) / Benchmark VP

   Lost VP = (Benchmark VP − 2010 VP)

   The calculation is performed alternatively using May-December in defining Benchmark VP and 2010 VP, or using January-December in defining Benchmark VP and 2010 VP. The claimant's disproportionality metric (D) reflects the larger of the two values. Base Offer defined excluding the RTP and growth factor.

# APPENDIX 3

## Appendix 3

## Claimants that "Narrowly Pass" the V-test

1.  Claimants that "narrowly pass" the V-test are identified if (i) the claimant passes the V-test for only one of six possible windows based on the selected Benchmark Period; or, (ii) a "small" shift in revenue into or out of the relevant 3-month period would result in the claimant failing the V-test.

2.  With respect to the second condition, a claimant that just met the -15% threshold for the "down" leg of the V-test would fail the test if revenue from the relevant 3 months Benchmark Period were lowered slightly.  Alternatively, the "down" leg of the test would be failed if revenue from the relevant period of 2010 were increased slightly. If such under- and over-statements were a result of errors in the measurement of monthly revenue, the claimant should have failed the V-test. Similar logic applies in evaluating whether errors in the measurement of monthly revenue may have affected eligibility for the "up" leg of the V-test.

3.  Claimants that "narrowly pass" the V-test based on the second condition are defined to include those for which a change in revenue of less than 2% of the claimant's annual revenue would result in the claimant failing the V-test.  For any given V-test window, the smallest percentage change in annual revenue that would result in failing the V-test defines the "clearance" which reflects how close the claimant was from failing the V-test.  If a claimant passes multiple V-test windows, the highest of these clearance values ("maximum clearance") identifies how close the claimant was from failing to obtain eligibility under the V-test.

4.  Table A-1 presents a detailed example of how the clearance is calculated for a hypothetical Zone D claimant, which gains eligibility by (i) experiencing a revenue decline of at least 15% in a 3-month window between the Benchmark Period and the same 3-month period in 2010; and (ii) experiencing a at least 10% increase in revenue between the same 3-month periods

in 2010 and 2011.  The claimant passes the V-test for May-July window, with a "down" YoY percentage change of -20% (=$20/$100) and an "up" YoY percentage change of 18.75% (=$15/$80).

5.  The table identifies the revenue changes necessary to result in the claimant failing the "down" and "up" legs of the V-test.

    i.    Revenue changes that result in claimant failing the "down" test:

- Reducing revenue for May-July of the benchmark year(s) by $5.9 makes YoY percentage change increase to -14.98% (=-$14.1/$94.1).  This reflects 1.31% of annual benchmark revenue.
- Alternatively, increasing revenue for May-July of 2010 by $5.01 makes YoY percentage change increase to -14.99% (=-$14.99/$100).  This reflects 1.25% of the annual 2010 revenue
- Therefore, a shift of only 1.25% (lower of 1.25% and 1.3%) of the annual revenue is sufficient to make the down leg of the V-test fail.

    ii.    Revenue changes that result in the claimant failing the "up" test

- Increasing revenue for May-July of 2010 by $6.4 makes YoY percentage change fall to 9.95% (=$8.6/$86.4).  This reflects 1.59% of annual 2010 revenue
- Alternatively, reducing revenue for May-July of 2011 by $7.01 makes YoY percentage change fall to 9.99% (=$7.99/$80).  $7.01 is 1.56% of the annual 2011 revenue.
- Therefore, a shift of only 1.56% (lower of 1.56% and 1.6%) of the annual revenue is sufficient to make the up leg of the V-test fail.

    iii.    Clearance for May-July Window

- Combining the results from up and down tests implies that a shift of 1.25% of the annual revenue (lower of down and up tests) would result in the claimant failing the V-test fail for May-July window.

6.  Similar calculations are performed for each 3-month window passing the V-test.  If, for example, another window yields a clearance of 1.0%, then the maximum clearance for the

claimant is 1.25% (the result from the May-July window), since this is largest clearance among all windows passing the V-test.

**Table A-1: Claimant that "Narrowly Passes" the V-test (A Hypothetical Example)**

| | | Benchmark Year | % Change Benchmark to 2010 | 2010 | % Change 2010 to 2011 | 2011 |
|---|---|---|---|---|---|---|
| **Data as Reported** | | | | | | |
| Annual Revenue | [A] | 450 | | 400 | | 450 |
| May-June Revenue | [B] | 100 | | 80 | | 95 |
| | | | | | | |
| **Threshold** | [C] | | -15% | | 10% | |
| | | | | | | |
| **V-test as Reported** | | | | | | |
| % Change | [D] | | -20% | | 19% | |
| Result | [E] | | Pass | | Pass | |
| | | | | | | |
| **Down Leg** | | | | | | |
|    Breakeven 1 | | | | | | |
| Adjust Benchmark Revenue | [F] = [B(2010)] / (1 + [C(Down)]) | *94* | -15% | 80 | | |
| Revenue Shifted Out ($) | [G] = [B(Bench)] - [F(Bench)] | *6* | | | | |
| Revenue Shifted Out as % of Annual Revenue | [H] = [G(Bench)] / [A(Bench)] | *1.31%* | | | | |
| | | | | | | |
|    Breakeven 2 | | | | | | |
| Adjust 2010 Revenue | [I] = [B(Bench)] * (1 + [C(Down)]) | 100 | -15% | *85* | | |
| Revenue Shifted In ($) | [J] = [I(2010)] - [B(2010)] | | | *5* | | |
| Revenue Shifted In as % of Annual Revenue | [K] = [J(2010)] / [A(2010)] | | | *1.25%* | | |
| | | | | | | |
|    Down Leg Clearance | [L] = min ([H], [K]) | *1.25%* | | | | |
| | | | | | | |
| **Up Leg** | | | | | | |
|    Breakeven 1 | | | | | | |
| Adjust 2010 Revenue | [M] = [B(2011)] / (1 + [C(Up)]) | | | *86* | 10% | 95 |
| Revenue Shifted In ($) | [N] = [M(2010)] - [B(2010)] | | | *6* | | |
| Revenue Shifted In as % of Annual Revenue | [O] = [N(2010)] / [A(2010)] | | | *1.59%* | | |
| | | | | | | |
|    Breakeven 2 | | | | | | |
| Adjust 2011 Revenue | [P] = [B(2010)] * (1 + [C(Up)]) | | | 80 | 10% | *88* |
| Revenue Shifted Out ($) | [Q] = [B(2011)] - [P(2011)] | | | | | *7* |
| Revenue Shifted Out as % of Annual Revenue | [R] = [Q(2011)] / [A(2011)] | | | | | *1.56%* |
| | | | | | | |
|    Up Leg Clearance | [S] = min ([O], [R]) | | | | *1.56%* | |
| | | | | | | |
| **Combined Test** | | | | | | |
|    Clearance | [T] = min ([L], [S]) | *1.25%* | | | | |

# LIST OF CLAIM FILES IN EXCEL SAMPLE

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX16 | XXXXXXX12 | XXXXXXX10 | XXXXXXX74 | XXXXXXX65 | XXXXXXX39 | XXXXXXX28 | XXXXXXX98 |
| XXXXXXX77 | XXXXXXX21 | XXXXXXX13 | XXXXXXX53 | XXXXXXX93 | XXXXXXX09 | XXXXXXX84 | XXXXXXX06 |
| XXXXXXX97 | XXXXXXX55 | XXXXXXX29 | XXXXXXX29 | XXXXXXX06 | XXXXXXX15 | XXXXXXX17 | XXXXXXX21 |
| XXXXXXX49 | XXXXXXX88 | XXXXXXX78 | XXXXXXX63 | XXXXXXX87 | XXXXXXX01 | XXXXXXX85 | XXXXXXX10 |
| XXXXXXX70 | XXXXXXX25 | XXXXXXX16 | XXXXXXX39 | XXXXXXX19 | XXXXXXX28 | XXXXXXX34 | XXXXXXX67 |
| XXXXXXX29 | XXXXXXX63 | XXXXXXX68 | XXXXXXX10 | XXXXXXX70 | XXXXXXX38 | XXXXXXX34 | XXXXXXX10 |
| XXXXXXX23 | XXXXXXX21 | XXXXXXX53 | XXXXXXX68 | XXXXXXX71 | XXXXXXX80 | XXXXXXX10 | XXXXXXX70 |
| XXXXXXX24 | XXXXXXX02 | XXXXXXX72 | XXXXXXX30 | XXXXXXX95 | XXXXXXX34 | XXXXXXX25 | XXXXXXX63 |
| XXXXXXX36 | XXXXXXX03 | XXXXXXX11 | XXXXXXX21 | XXXXXXX67 | XXXXXXX37 | XXXXXXX77 | XXXXXXX89 |
| XXXXXXX22 | XXXXXXX04 | XXXXXXX72 | XXXXXXX18 | XXXXXXX53 | XXXXXXX65 | XXXXXXX85 | XXXXXXX59 |
| XXXXXXX62 | XXXXXXX61 | XXXXXXX26 | XXXXXXX30 | XXXXXXX20 | XXXXXXX30 | XXXXXXX32 | XXXXXXX39 |
| XXXXXXX42 | XXXXXXX33 | XXXXXXX74 | XXXXXXX57 | XXXXXXX38 | XXXXXXX97 | XXXXXXX59 | XXXXXXX67 |
| XXXXXXX84 | XXXXXXX55 | XXXXXXX76 | XXXXXXX02 | XXXXXXX52 | XXXXXXX52 | XXXXXXX52 | XXXXXXX52 |
| XXXXXXX26 | XXXXXXX45 | XXXXXXX44 | XXXXXXX38 | XXXXXXX64 | XXXXXXX60 | XXXXXXX24 | XXXXXXX82 |
| XXXXXXX14 | XXXXXXX05 | XXXXXXX00 | XXXXXXX27 | XXXXXXX12 | XXXXXXX03 | XXXXXXX27 | XXXXXXX01 |
| XXXXXXX97 | XXXXXXX79 | XXXXXXX65 | XXXXXXX60 | XXXXXXX46 | XXXXXXX71 | XXXXXXX88 | XXXXXXX20 |
| XXXXXXX80 | XXXXXXX72 | XXXXXXX22 | XXXXXXX30 | XXXXXXX54 | XXXXXXX61 | XXXXXXX61 | XXXXXXX52 |
| XXXXXXX95 | XXXXXXX61 | XXXXXXX75 | XXXXXXX68 | XXXXXXX65 | XXXXXXX91 | XXXXXXX05 | XXXXXXX06 |
| XXXXXXX10 | XXXXXXX84 | XXXXXXX55 | XXXXXXX14 | XXXXXXX18 | XXXXXXX16 | XXXXXXX13 | XXXXXXX62 |
| XXXXXXX82 | XXXXXXX82 | XXXXXXX79 | XXXXXXX17 | XXXXXXX77 | XXXXXXX33 | XXXXXXX17 | XXXXXXX33 |
| XXXXXXX55 | XXXXXXX14 | XXXXXXX99 | XXXXXXX05 | XXXXXXX54 | XXXXXXX37 | XXXXXXX71 | XXXXXXX97 |
| XXXXXXX61 | XXXXXXX53 | XXXXXXX73 | XXXXXXX35 | XXXXXXX35 | XXXXXXX35 | XXXXXXX98 | XXXXXXX79 |
| XXXXXXX06 | XXXXXXX00 | XXXXXXX16 | XXXXXXX16 | XXXXXXX32 | XXXXXXX24 | XXXXXXX23 | XXXXXXX31 |
| XXXXXXX15 | XXXXXXX29 | XXXXXXX22 | XXXXXXX28 | XXXXXXX65 | XXXXXXX43 | XXXXXXX66 | XXXXXXX93 |
| XXXXXXX96 | XXXXXXX92 | XXXXXXX64 | XXXXXXX92 | XXXXXXX16 | XXXXXXX10 | XXXXXXX08 | XXXXXXX33 |
| XXXXXXX92 | XXXXXXX02 | XXXXXXX03 | XXXXXXX06 | XXXXXXX19 | XXXXXXX94 | XXXXXXX21 | XXXXXXX32 |
| XXXXXXX04 | XXXXXXX97 | XXXXXXX67 | XXXXXXX27 | XXXXXXX72 | XXXXXXX46 | XXXXXXX36 | XXXXXXX18 |
| XXXXXXX68 | XXXXXXX80 | XXXXXXX66 | XXXXXXX39 | XXXXXXX85 | XXXXXXX94 | XXXXXXX91 | XXXXXXX06 |
| XXXXXXX92 | XXXXXXX28 | XXXXXXX38 | XXXXXXX54 | XXXXXXX55 | XXXXXXX00 | XXXXXXX60 | XXXXXXX07 |
| XXXXXXX90 | XXXXXXX18 | XXXXXXX08 | XXXXXXX28 | XXXXXXX01 | XXXXXXX75 | XXXXXXX97 | XXXXXXX24 |
| XXXXXXX31 | XXXXXXX33 | XXXXXXX23 | XXXXXXX06 | XXXXXXX39 | XXXXXXX57 | XXXXXXX05 | XXXXXXX65 |
| XXXXXXX30 | XXXXXXX75 | XXXXXXX60 | XXXXXXX93 | XXXXXXX71 | XXXXXXX21 | XXXXXXX66 | XXXXXXX35 |
| XXXXXXX70 | XXXXXXX98 | XXXXXXX98 | XXXXXXX06 | XXXXXXX10 | XXXXXXX11 | XXXXXXX15 | XXXXXXX26 |
| XXXXXXX90 | XXXXXXX95 | XXXXXXX52 | XXXXXXX84 | XXXXXXX71 | XXXXXXX20 | XXXXXXX39 | XXXXXXX94 |
| XXXXXXX04 | XXXXXXX94 | XXXXXXX22 | XXXXXXX93 | XXXXXXX64 | XXXXXXX03 | XXXXXXX99 | XXXXXXX89 |
| XXXXXXX74 | XXXXXXX92 | XXXXXXX49 | XXXXXXX57 | XXXXXXX32 | XXXXXXX10 | XXXXXXX54 | XXXXXXX59 |
| XXXXXXX63 | XXXXXXX49 | XXXXXXX82 | XXXXXXX49 | XXXXXXX88 | XXXXXXX78 | XXXXXXX43 | XXXXXXX93 |
| XXXXXXX15 | XXXXXXX69 | XXXXXXX34 | XXXXXXX05 | XXXXXXX33 | XXXXXXX18 | XXXXXXX86 | XXXXXXX49 |
| XXXXXXX87 | XXXXXXX95 | XXXXXXX86 | XXXXXXX82 | XXXXXXX73 | XXXXXXX19 | XXXXXXX10 | XXXXXXX20 |
| XXXXXXX36 | XXXXXXX52 | XXXXXXX57 | XXXXXXX67 | XXXXXXX34 | XXXXXXX36 | XXXXXXX30 | XXXXXXX29 |
| XXXXXXX05 | XXXXXXX96 | XXXXXXX28 | XXXXXXX28 | XXXXXXX63 | XXXXXXX93 | XXXXXXX42 | XXXXXXX57 |
| XXXXXXX75 | XXXXXXX87 | XXXXXXX18 | XXXXXXX93 | XXXXXXX04 | XXXXXXX90 | XXXXXXX92 | XXXXXXX57 |
| XXXXXXX05 | XXXXXXX88 | XXXXXXX19 | XXXXXXX22 | XXXXXXX40 | XXXXXXX44 | XXXXXXX41 | XXXXXXX13 |
| XXXXXXX14 | XXXXXXX03 | XXXXXXX45 | XXXXXXX28 | XXXXXXX46 | XXXXXXX49 | XXXXXXX17 | XXXXXXX65 |
| XXXXXXX56 | XXXXXXX59 | XXXXXXX72 | XXXXXXX31 | XXXXXXX84 | XXXXXXX02 | XXXXXXX38 | XXXXXXX72 |
| XXXXXXX29 | XXXXXXX77 | XXXXXXX49 | XXXXXXX40 | XXXXXXX72 | XXXXXXX37 | XXXXXXX88 | XXXXXXX83 |
| XXXXXXX45 | XXXXXXX86 | XXXXXXX30 | XXXXXXX33 | XXXXXXX54 | XXXXXXX96 | XXXXXXX42 | XXXXXXX07 |
| XXXXXXX53 | XXXXXXX10 | XXXXXXX53 | XXXXXXX11 | XXXXXXX12 | XXXXXXX16 | XXXXXXX94 | XXXXXXX90 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX30 | XXXXXXX42 | XXXXXXX63 | XXXXXXX53 | XXXXXXX58 | XXXXXXX27 | XXXXXXX76 | XXXXXXX79 |
| XXXXXXX94 | XXXXXXX96 | XXXXXXX61 | XXXXXXX98 | XXXXXXX51 | XXXXXXX86 | XXXXXXX19 | XXXXXXX98 |
| XXXXXXX36 | XXXXXXX31 | XXXXXXX73 | XXXXXXX19 | XXXXXXX35 | XXXXXXX17 | XXXXXXX27 | XXXXXXX59 |
| XXXXXXX71 | XXXXXXX84 | XXXXXXX91 | XXXXXXX06 | XXXXXXX73 | XXXXXXX06 | XXXXXXX13 | XXXXXXX96 |
| XXXXXXX26 | XXXXXXX18 | XXXXXXX36 | XXXXXXX08 | XXXXXXX70 | XXXXXXX32 | XXXXXXX49 | XXXXXXX47 |
| XXXXXXX02 | XXXXXXX07 | XXXXXXX21 | XXXXXXX17 | XXXXXXX69 | XXXXXXX02 | XXXXXXX36 | XXXXXXX06 |
| XXXXXXX91 | XXXXXXX32 | XXXXXXX71 | XXXXXXX49 | XXXXXXX52 | XXXXXXX97 | XXXXXXX26 | XXXXXXX46 |
| XXXXXXX59 | XXXXXXX48 | XXXXXXX67 | XXXXXXX48 | XXXXXXX34 | XXXXXXX42 | XXXXXXX71 | XXXXXXX46 |
| XXXXXXX94 | XXXXXXX31 | XXXXXXX36 | XXXXXXX91 | XXXXXXX89 | XXXXXXX86 | XXXXXXX24 | XXXXXXX63 |
| XXXXXXX67 | XXXXXXX15 | XXXXXXX65 | XXXXXXX44 | XXXXXXX46 | XXXXXXX00 | XXXXXXX97 | XXXXXXX70 |
| XXXXXXX77 | XXXXXXX02 | XXXXXXX81 | XXXXXXX43 | XXXXXXX30 | XXXXXXX97 | XXXXXXX27 | XXXXXXX53 |
| XXXXXXX60 | XXXXXXX65 | XXXXXXX69 | XXXXXXX02 | XXXXXXX69 | XXXXXXX61 | XXXXXXX02 | XXXXXXX68 |
| XXXXXXX70 | XXXXXXX76 | XXXXXXX06 | XXXXXXX42 | XXXXXXX20 | XXXXXXX04 | XXXXXXX81 | XXXXXXX06 |
| XXXXXXX53 | XXXXXXX92 | XXXXXXX79 | XXXXXXX49 | XXXXXXX07 | XXXXXXX33 | XXXXXXX62 | XXXXXXX97 |
| XXXXXXX06 | XXXXXXX04 | XXXXXXX26 | XXXXXXX47 | XXXXXXX49 | XXXXXXX16 | XXXXXXX50 | XXXXXXX26 |
| XXXXXXX62 | XXXXXXX69 | XXXXXXX59 | XXXXXXX83 | XXXXXXX78 | XXXXXXX43 | XXXXXXX21 | XXXXXXX24 |
| XXXXXXX18 | XXXXXXX39 | XXXXXXX27 | XXXXXXX93 | XXXXXXX74 | XXXXXXX01 | XXXXXXX35 | XXXXXXX44 |
| XXXXXXX17 | XXXXXXX59 | XXXXXXX19 | XXXXXXX31 | XXXXXXX69 | XXXXXXX50 | XXXXXXX44 | XXXXXXX88 |
| XXXXXXX92 | XXXXXXX07 | XXXXXXX18 | XXXXXXX52 | XXXXXXX60 | XXXXXXX90 | XXXXXXX17 | XXXXXXX20 |
| XXXXXXX05 | XXXXXXX30 | XXXXXXX43 | XXXXXXX96 | XXXXXXX37 | XXXXXXX97 | XXXXXXX33 | XXXXXXX40 |
| XXXXXXX59 | XXXXXXX53 | XXXXXXX50 | XXXXXXX48 | XXXXXXX40 | XXXXXXX30 | XXXXXXX86 | XXXXXXX10 |
| XXXXXXX70 | XXXXXXX96 | XXXXXXX12 | XXXXXXX94 | XXXXXXX83 | XXXXXXX02 | XXXXXXX26 | XXXXXXX34 |
| XXXXXXX46 | XXXXXXX03 | XXXXXXX23 | XXXXXXX43 | XXXXXXX77 | XXXXXXX63 | XXXXXXX97 | XXXXXXX23 |
| XXXXXXX27 | XXXXXXX66 | XXXXXXX46 | XXXXXXX96 | XXXXXXX84 | XXXXXXX56 | XXXXXXX46 | XXXXXXX73 |
| XXXXXXX84 | XXXXXXX77 | XXXXXXX08 | XXXXXXX40 | XXXXXXX83 | XXXXXXX17 | XXXXXXX67 | XXXXXXX65 |
| XXXXXXX31 | XXXXXXX19 | XXXXXXX24 | XXXXXXX00 | XXXXXXX47 | XXXXXXX50 | XXXXXXX54 | XXXXXXX17 |
| XXXXXXX36 | XXXXXXX58 | XXXXXXX76 | XXXXXXX85 | XXXXXXX74 | XXXXXXX86 | XXXXXXX90 | XXXXXXX96 |
| XXXXXXX97 | XXXXXXX95 | XXXXXXX84 | XXXXXXX45 | XXXXXXX04 | XXXXXXX84 | XXXXXXX05 | XXXXXXX84 |
| XXXXXXX68 | XXXXXXX10 | XXXXXXX20 | XXXXXXX40 | XXXXXXX03 | XXXXXXX10 | XXXXXXX50 | XXXXXXX60 |
| XXXXXXX66 | XXXXXXX53 | XXXXXXX98 | XXXXXXX67 | XXXXXXX79 | XXXXXXX89 | XXXXXXX86 | XXXXXXX00 |
| XXXXXXX16 | XXXXXXX95 | XXXXXXX15 | XXXXXXX07 | XXXXXXX35 | XXXXXXX90 | XXXXXXX89 | XXXXXXX47 |
| XXXXXXX21 | XXXXXXX37 | XXXXXXX04 | XXXXXXX26 | XXXXXXX20 | XXXXXXX72 | XXXXXXX74 | XXXXXXX12 |
| XXXXXXX79 | XXXXXXX94 | XXXXXXX44 | XXXXXXX96 | XXXXXXX99 | XXXXXXX72 | XXXXXXX40 | XXXXXXX88 |
| XXXXXXX43 | XXXXXXX52 | XXXXXXX07 | XXXXXXX19 | XXXXXXX00 | XXXXXXX94 | XXXXXXX00 | XXXXXXX60 |
| XXXXXXX08 | XXXXXXX72 | XXXXXXX77 | XXXXXXX29 | XXXXXXX66 | XXXXXXX80 | XXXXXXX32 | XXXXXXX68 |
| XXXXXXX82 | XXXXXXX87 | XXXXXXX34 | XXXXXXX86 | XXXXXXX96 | XXXXXXX11 | XXXXXXX14 | XXXXXXX08 |
| XXXXXXX22 | XXXXXXX79 | XXXXXXX99 | XXXXXXX00 | XXXXXXX70 | XXXXXXX83 | XXXXXXX51 | XXXXXXX33 |
| XXXXXXX62 | XXXXXXX16 | XXXXXXX99 | XXXXXXX22 | XXXXXXX92 | XXXXXXX83 | XXXXXXX36 | XXXXXXX08 |
| XXXXXXX18 | XXXXXXX07 | XXXXXXX11 | XXXXXXX72 | XXXXXXX72 | XXXXXXX72 | XXXXXXX14 | XXXXXXX82 |
| XXXXXXX41 | XXXXXXX51 | XXXXXXX39 | XXXXXXX84 | XXXXXXX23 | XXXXXXX59 | XXXXXXX39 | XXXXXXX47 |
| XXXXXXX72 | XXXXXXX67 | XXXXXXX55 | XXXXXXX86 | XXXXXXX91 | XXXXXXX95 | XXXXXXX27 | XXXXXXX03 |
| XXXXXXX13 | XXXXXXX95 | XXXXXXX35 | XXXXXXX98 | XXXXXXX77 | XXXXXXX49 | XXXXXXX02 | XXXXXXX22 |
| XXXXXXX28 | XXXXXXX07 | XXXXXXX36 | XXXXXXX49 | XXXXXXX53 | XXXXXXX54 | XXXXXXX40 | XXXXXXX80 |
| XXXXXXX68 | XXXXXXX19 | XXXXXXX33 | XXXXXXX72 | XXXXXXX86 | XXXXXXX03 | XXXXXXX88 | XXXXXXX21 |
| XXXXXXX20 | XXXXXXX76 | XXXXXXX89 | XXXXXXX44 | XXXXXXX12 | XXXXXXX78 | XXXXXXX50 | XXXXXXX15 |
| XXXXXXX57 | XXXXXXX98 | XXXXXXX48 | XXXXXXX78 | XXXXXXX22 | XXXXXXX88 | XXXXXXX29 | XXXXXXX95 |
| XXXXXXX24 | XXXXXXX59 | XXXXXXX81 | XXXXXXX22 | XXXXXXX20 | XXXXXXX51 | XXXXXXX52 | XXXXXXX47 |
| XXXXXXX84 | XXXXXXX83 | XXXXXXX11 | XXXXXXX53 | XXXXXXX61 | XXXXXXX71 | XXXXXXX34 | XXXXXXX97 |

### List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX64 | XXXXXXX90 | XXXXXXX16 | XXXXXXX27 | XXXXXXX90 | XXXXXXX31 | XXXXXXX44 | XXXXXXX38 |
| XXXXXXX87 | XXXXXXX13 | XXXXXXX35 | XXXXXXX01 | XXXXXXX71 | XXXXXXX76 | XXXXXXX05 | XXXXXXX02 |
| XXXXXXX37 | XXXXXXX27 | XXXXXXX05 | XXXXXXX31 | XXXXXXX84 | XXXXXXX69 | XXXXXXX31 | XXXXXXX36 |
| XXXXXXX52 | XXXXXXX49 | XXXXXXX76 | XXXXXXX32 | XXXXXXX20 | XXXXXXX91 | XXXXXXX65 | XXXXXXX38 |
| XXXXXXX69 | XXXXXXX11 | XXXXXXX19 | XXXXXXX23 | XXXXXXX03 | XXXXXXX82 | XXXXXXX06 | XXXXXXX31 |
| XXXXXXX40 | XXXXXXX38 | XXXXXXX35 | XXXXXXX06 | XXXXXXX92 | XXXXXXX63 | XXXXXXX59 | XXXXXXX56 |
| XXXXXXX74 | XXXXXXX53 | XXXXXXX00 | XXXXXXX79 | XXXXXXX80 | XXXXXXX85 | XXXXXXX38 | XXXXXXX57 |
| XXXXXXX09 | XXXXXXX57 | XXXXXXX15 | XXXXXXX12 | XXXXXXX12 | XXXXXXX88 | XXXXXXX38 | XXXXXXX44 |
| XXXXXXX33 | XXXXXXX61 | XXXXXXX62 | XXXXXXX33 | XXXXXXX37 | XXXXXXX45 | XXXXXXX88 | XXXXXXX91 |
| XXXXXXX96 | XXXXXXX42 | XXXXXXX23 | XXXXXXX66 | XXXXXXX14 | XXXXXXX11 | XXXXXXX02 | XXXXXXX20 |
| XXXXXXX91 | XXXXXXX19 | XXXXXXX35 | XXXXXXX56 | XXXXXXX69 | XXXXXXX93 | XXXXXXX91 | XXXXXXX65 |
| XXXXXXX05 | XXXXXXX00 | XXXXXXX42 | XXXXXXX55 | XXXXXXX58 | XXXXXXX63 | XXXXXXX67 | XXXXXXX93 |
| XXXXXXX00 | XXXXXXX04 | XXXXXXX29 | XXXXXXX10 | XXXXXXX49 | XXXXXXX99 | XXXXXXX24 | XXXXXXX34 |
| XXXXXXX45 | XXXXXXX18 | XXXXXXX46 | XXXXXXX50 | XXXXXXX44 | XXXXXXX63 | XXXXXXX58 | XXXXXXX67 |
| XXXXXXX14 | XXXXXXX69 | XXXXXXX68 | XXXXXXX19 | XXXXXXX94 | XXXXXXX74 | XXXXXXX91 | XXXXXXX56 |
| XXXXXXX83 | XXXXXXX90 | XXXXXXX05 | XXXXXXX46 | XXXXXXX84 | XXXXXXX90 | XXXXXXX90 | XXXXXXX90 |
| XXXXXXX13 | XXXXXXX26 | XXXXXXX90 | XXXXXXX60 | XXXXXXX98 | XXXXXXX46 | XXXXXXX84 | XXXXXXX53 |
| XXXXXXX42 | XXXXXXX36 | XXXXXXX15 | XXXXXXX58 | XXXXXXX08 | XXXXXXX17 | XXXXXXX40 | XXXXXXX31 |
| XXXXXXX68 | XXXXXXX33 | XXXXXXX71 | XXXXXXX12 | XXXXXXX82 | XXXXXXX61 | XXXXXXX78 | XXXXXXX16 |
| XXXXXXX89 | XXXXXXX92 | XXXXXXX85 | XXXXXXX01 | XXXXXXX39 | XXXXXXX99 | XXXXXXX09 | XXXXXXX12 |
| XXXXXXX70 | XXXXXXX23 | XXXXXXX33 | XXXXXXX61 | XXXXXXX32 | XXXXXXX37 | XXXXXXX40 | XXXXXXX95 |
| XXXXXXX47 | XXXXXXX50 | XXXXXXX65 | XXXXXXX55 | XXXXXXX95 | XXXXXXX34 | XXXXXXX03 | XXXXXXX69 |
| XXXXXXX09 | XXXXXXX70 | XXXXXXX06 | XXXXXXX77 | XXXXXXX88 | XXXXXXX84 | XXXXXXX86 | XXXXXXX16 |
| XXXXXXX20 | XXXXXXX98 | XXXXXXX25 | XXXXXXX32 | XXXXXXX38 | XXXXXXX99 | XXXXXXX38 | XXXXXXX64 |
| XXXXXXX16 | XXXXXXX08 | XXXXXXX89 | XXXXXXX41 | XXXXXXX51 | XXXXXXX95 | XXXXXXX01 | XXXXXXX05 |
| XXXXXXX16 | XXXXXXX60 | XXXXXXX21 | XXXXXXX33 | XXXXXXX06 | XXXXXXX90 | XXXXXXX62 | XXXXXXX38 |
| XXXXXXX37 | XXXXXXX59 | XXXXXXX51 | XXXXXXX61 | XXXXXXX61 | XXXXXXX76 | XXXXXXX31 | XXXXXXX55 |
| XXXXXXX07 | XXXXXXX34 | XXXXXXX80 | XXXXXXX61 | XXXXXXX25 | XXXXXXX96 | XXXXXXX09 | XXXXXXX52 |
| XXXXXXX42 | XXXXXXX08 | XXXXXXX55 | XXXXXXX46 | XXXXXXX86 | XXXXXXX89 | XXXXXXX59 | XXXXXXX34 |
| XXXXXXX35 | XXXXXXX92 | XXXXXXX54 | XXXXXXX46 | XXXXXXX48 | XXXXXXX30 | XXXXXXX74 | XXXXXXX06 |
| XXXXXXX75 | XXXXXXX78 | XXXXXXX35 | XXXXXXX63 | XXXXXXX86 | XXXXXXX80 | XXXXXXX45 | XXXXXXX21 |
| XXXXXXX99 | XXXXXXX69 | XXXXXXX61 | XXXXXXX63 | XXXXXXX09 | XXXXXXX31 | XXXXXXX62 | XXXXXXX46 |
| XXXXXXX70 | XXXXXXX57 | XXXXXXX49 | XXXXXXX58 | XXXXXXX71 | XXXXXXX83 | XXXXXXX33 | XXXXXXX01 |
| XXXXXXX28 | XXXXXXX83 | XXXXXXX94 | XXXXXXX75 | XXXXXXX03 | XXXXXXX12 | XXXXXXX04 | XXXXXXX60 |
| XXXXXXX31 | XXXXXXX38 | XXXXXXX46 | XXXXXXX72 | XXXXXXX40 | XXXXXXX88 | XXXXXXX39 | XXXXXXX86 |
| XXXXXXX33 | XXXXXXX42 | XXXXXXX49 | XXXXXXX73 | XXXXXXX52 | XXXXXXX82 | XXXXXXX56 | XXXXXXX74 |
| XXXXXXX24 | XXXXXXX45 | XXXXXXX44 | XXXXXXX76 | XXXXXXX86 | XXXXXXX22 | XXXXXXX49 | XXXXXXX63 |
| XXXXXXX66 | XXXXXXX69 | XXXXXXX66 | XXXXXXX81 | XXXXXXX58 | XXXXXXX95 | XXXXXXX19 | XXXXXXX66 |
| XXXXXXX11 | XXXXXXX37 | XXXXXXX52 | XXXXXXX28 | XXXXXXX49 | XXXXXXX14 | XXXXXXX83 | XXXXXXX04 |
| XXXXXXX08 | XXXXXXX64 | XXXXXXX69 | XXXXXXX03 | XXXXXXX29 | XXXXXXX40 | XXXXXXX46 | XXXXXXX55 |
| XXXXXXX67 | XXXXXXX63 | XXXXXXX78 | XXXXXXX78 | XXXXXXX72 | XXXXXXX57 | XXXXXXX93 | XXXXXXX67 |
| XXXXXXX90 | XXXXXXX94 | XXXXXXX04 | XXXXXXX95 | XXXXXXX44 | XXXXXXX62 | XXXXXXX26 | XXXXXXX24 |
| XXXXXXX06 | XXXXXXX43 | XXXXXXX33 | XXXXXXX38 | XXXXXXX32 | XXXXXXX69 | XXXXXXX26 | XXXXXXX46 |
| XXXXXXX51 | XXXXXXX60 | XXXXXXX33 | XXXXXXX07 | XXXXXXX52 | XXXXXXX75 | XXXXXXX66 | XXXXXXX72 |
| XXXXXXX85 | XXXXXXX88 | XXXXXXX55 | XXXXXXX80 | XXXXXXX99 | XXXXXXX20 | XXXXXXX07 | XXXXXXX28 |
| XXXXXXX50 | XXXXXXX97 | XXXXXXX89 | XXXXXXX89 | XXXXXXX21 | XXXXXXX22 | XXXXXXX74 | XXXXXXX28 |
| XXXXXXX33 | XXXXXXX08 | XXXXXXX25 | XXXXXXX34 | XXXXXXX37 | XXXXXXX46 | XXXXXXX51 | XXXXXXX23 |
| XXXXXXX15 | XXXXXXX35 | XXXXXXX62 | XXXXXXX65 | XXXXXXX85 | XXXXXXX88 | XXXXXXX01 | XXXXXXX48 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX99 | XXXXXXX06 | XXXXXXX28 | XXXXXXX59 | XXXXXXX62 | XXXXXXX69 | XXXXXXX78 | XXXXXXX88 |
| XXXXXXX82 | XXXXXXX96 | XXXXXXX42 | XXXXXXX16 | XXXXXXX03 | XXXXXXX23 | XXXXXXX94 | XXXXXXX22 |
| XXXXXXX31 | XXXXXXX00 | XXXXXXX99 | XXXXXXX65 | XXXXXXX67 | XXXXXXX02 | XXXXXXX59 | XXXXXXX11 |
| XXXXXXX14 | XXXXXXX10 | XXXXXXX19 | XXXXXXX81 | XXXXXXX98 | XXXXXXX30 | XXXXXXX28 | XXXXXXX45 |
| XXXXXXX57 | XXXXXXX16 | XXXXXXX57 | XXXXXXX74 | XXXXXXX57 | XXXXXXX33 | XXXXXXX47 | XXXXXXX16 |
| XXXXXXX50 | XXXXXXX48 | XXXXXXX12 | XXXXXXX72 | XXXXXXX87 | XXXXXXX16 | XXXXXXX92 | XXXXXXX98 |
| XXXXXXX15 | XXXXXXX79 | XXXXXXX16 | XXXXXXX16 | XXXXXXX78 | XXXXXXX43 | XXXXXXX56 | XXXXXXX54 |
| XXXXXXX85 | XXXXXXX36 | XXXXXXX17 | XXXXXXX28 | XXXXXXX68 | XXXXXXX94 | XXXXXXX20 | XXXXXXX17 |
| XXXXXXX55 | XXXXXXX44 | XXXXXXX94 | XXXXXXX34 | XXXXXXX10 | XXXXXXX87 | XXXXXXX84 | XXXXXXX75 |
| XXXXXXX93 | XXXXXXX74 | XXXXXXX10 | XXXXXXX23 | XXXXXXX02 | XXXXXXX07 | XXXXXXX65 | XXXXXXX29 |
| XXXXXXX23 | XXXXXXX35 | XXXXXXX33 | XXXXXXX99 | XXXXXXX53 | XXXXXXX60 | XXXXXXX59 | XXXXXXX62 |
| XXXXXXX54 | XXXXXXX68 | XXXXXXX72 | XXXXXXX65 | XXXXXXX95 | XXXXXXX94 | XXXXXXX91 | XXXXXXX89 |
| XXXXXXX25 | XXXXXXX86 | XXXXXXX06 | XXXXXXX27 | XXXXXXX28 | XXXXXXX26 | XXXXXXX45 | XXXXXXX18 |
| XXXXXXX44 | XXXXXXX62 | XXXXXXX65 | XXXXXXX70 | XXXXXXX09 | XXXXXXX74 | XXXXXXX80 | XXXXXXX81 |
| XXXXXXX84 | XXXXXXX90 | XXXXXXX93 | XXXXXXX00 | XXXXXXX09 | XXXXXXX06 | XXXXXXX05 | XXXXXXX91 |
| XXXXXXX07 | XXXXXXX65 | XXXXXXX00 | XXXXXXX01 | XXXXXXX65 | XXXXXXX34 | XXXXXXX28 | XXXXXXX19 |
| XXXXXXX40 | XXXXXXX23 | XXXXXXX45 | XXXXXXX06 | XXXXXXX25 | XXXXXXX42 | XXXXXXX69 | XXXXXXX72 |
| XXXXXXX08 | XXXXXXX47 | XXXXXXX67 | XXXXXXX43 | XXXXXXX12 | XXXXXXX21 | XXXXXXX19 | XXXXXXX74 |
| XXXXXXX96 | XXXXXXX41 | XXXXXXX33 | XXXXXXX42 | XXXXXXX80 | XXXXXXX81 | XXXXXXX61 | XXXXXXX81 |
| XXXXXXX98 | XXXXXXX04 | XXXXXXX59 | XXXXXXX19 | XXXXXXX21 | XXXXXXX18 | XXXXXXX31 | XXXXXXX86 |
| XXXXXXX85 | XXXXXXX68 | XXXXXXX86 | XXXXXXX46 | XXXXXXX86 | XXXXXXX44 | XXXXXXX37 | XXXXXXX86 |
| XXXXXXX95 | XXXXXXX51 | XXXXXXX86 | XXXXXXX86 | XXXXXXX86 | XXXXXXX99 | XXXXXXX45 | XXXXXXX80 |
| XXXXXXX75 | XXXXXXX86 | XXXXXXX26 | XXXXXXX58 | XXXXXXX75 | XXXXXXX04 | XXXXXXX51 | XXXXXXX13 |
| XXXXXXX04 | XXXXXXX99 | XXXXXXX62 | XXXXXXX07 | XXXXXXX88 | XXXXXXX90 | XXXXXXX15 | XXXXXXX11 |
| XXXXXXX32 | XXXXXXX37 | XXXXXXX01 | XXXXXXX56 | XXXXXXX60 | XXXXXXX69 | XXXXXXX57 | XXXXXXX48 |
| XXXXXXX82 | XXXXXXX93 | XXXXXXX01 | XXXXXXX82 | XXXXXXX05 | XXXXXXX41 | XXXXXXX26 | XXXXXXX53 |
| XXXXXXX46 | XXXXXXX49 | XXXXXXX45 | XXXXXXX59 | XXXXXXX66 | XXXXXXX76 | XXXXXXX44 | XXXXXXX76 |
| XXXXXXX19 | XXXXXXX81 | XXXXXXX15 | XXXXXXX95 | XXXXXXX13 | XXXXXXX15 | XXXXXXX09 | XXXXXXX99 |
| XXXXXXX20 | XXXXXXX81 | XXXXXXX96 | XXXXXXX54 | XXXXXXX68 | XXXXXXX66 | XXXXXXX01 | XXXXXXX35 |
| XXXXXXX83 | XXXXXXX97 | XXXXXXX33 | XXXXXXX36 | XXXXXXX38 | XXXXXXX49 | XXXXXXX97 | XXXXXXX50 |
| XXXXXXX32 | XXXXXXX63 | XXXXXXX08 | XXXXXXX08 | XXXXXXX65 | XXXXXXX72 | XXXXXXX78 | XXXXXXX31 |
| XXXXXXX82 | XXXXXXX26 | XXXXXXX98 | XXXXXXX02 | XXXXXXX40 | XXXXXXX97 | XXXXXXX28 | XXXXXXX34 |
| XXXXXXX44 | XXXXXXX33 | XXXXXXX58 | XXXXXXX64 | XXXXXXX55 | XXXXXXX53 | XXXXXXX98 | XXXXXXX19 |
| XXXXXXX23 | XXXXXXX40 | XXXXXXX47 | XXXXXXX52 | XXXXXXX54 | XXXXXXX80 | XXXXXXX58 | XXXXXXX43 |
| XXXXXXX80 | XXXXXXX68 | XXXXXXX93 | XXXXXXX98 | XXXXXXX83 | XXXXXXX55 | XXXXXXX63 | XXXXXXX95 |
| XXXXXXX57 | XXXXXXX67 | XXXXXXX59 | XXXXXXX95 | XXXXXXX09 | XXXXXXX01 | XXXXXXX63 | XXXXXXX11 |
| XXXXXXX63 | XXXXXXX63 | XXXXXXX97 | XXXXXXX28 | XXXXXXX73 | XXXXXXX96 | XXXXXXX46 | XXXXXXX14 |
| XXXXXXX71 | XXXXXXX34 | XXXXXXX93 | XXXXXXX20 | XXXXXXX28 | XXXXXXX70 | XXXXXXX60 | XXXXXXX64 |
| XXXXXXX01 | XXXXXXX22 | XXXXXXX71 | XXXXXXX03 | XXXXXXX07 | XXXXXXX99 | XXXXXXX78 | XXXXXXX64 |
| XXXXXXX29 | XXXXXXX52 | XXXXXXX49 | XXXXXXX50 | XXXXXXX32 | XXXXXXX76 | XXXXXXX75 | XXXXXXX82 |
| XXXXXXX20 | XXXXXXX21 | XXXXXXX32 | XXXXXXX03 | XXXXXXX39 | XXXXXXX92 | XXXXXXX55 | XXXXXXX27 |
| XXXXXXX80 | XXXXXXX54 | XXXXXXX81 | XXXXXXX89 | XXXXXXX20 | XXXXXXX70 | XXXXXXX18 | XXXXXXX24 |
| XXXXXXX23 | XXXXXXX42 | XXXXXXX64 | XXXXXXX45 | XXXXXXX33 | XXXXXXX32 | XXXXXXX18 | XXXXXXX79 |
| XXXXXXX83 | XXXXXXX96 | XXXXXXX98 | XXXXXXX23 | XXXXXXX60 | XXXXXXX10 | XXXXXXX49 | XXXXXXX46 |
| XXXXXXX10 | XXXXXXX26 | XXXXXXX88 | XXXXXXX60 | XXXXXXX53 | XXXXXXX24 | XXXXXXX73 | XXXXXXX71 |
| XXXXXXX79 | XXXXXXX87 | XXXXXXX61 | XXXXXXX01 | XXXXXXX12 | XXXXXXX09 | XXXXXXX26 | XXXXXXX39 |
| XXXXXXX39 | XXXXXXX51 | XXXXXXX54 | XXXXXXX63 | XXXXXXX84 | XXXXXXX35 | XXXXXXX87 | XXXXXXX32 |
| XXXXXXX98 | XXXXXXX09 | XXXXXXX00 | XXXXXXX26 | XXXXXXX96 | XXXXXXX33 | XXXXXXX28 | XXXXXXX56 |

### List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX49 | XXXXXXX28 | XXXXXXX41 | XXXXXXX54 | XXXXXXX01 | XXXXXXX02 | XXXXXXX14 | XXXXXXX62 |
| XXXXXXX50 | XXXXXXX88 | XXXXXXX20 | XXXXXXX87 | XXXXXXX40 | XXXXXXX88 | XXXXXXX06 | XXXXXXX07 |
| XXXXXXX91 | XXXXXXX97 | XXXXXXX60 | XXXXXXX27 | XXXXXXX87 | XXXXXXX18 | XXXXXXX37 | XXXXXXX04 |
| XXXXXXX01 | XXXXXXX83 | XXXXXXX67 | XXXXXXX45 | XXXXXXX73 | XXXXXXX88 | XXXXXXX50 | XXXXXXX04 |
| XXXXXXX02 | XXXXXXX92 | XXXXXXX65 | XXXXXXX86 | XXXXXXX93 | XXXXXXX36 | XXXXXXX53 | XXXXXXX42 |
| XXXXXXX43 | XXXXXXX49 | XXXXXXX93 | XXXXXXX11 | XXXXXXX50 | XXXXXXX71 | XXXXXXX99 | XXXXXXX70 |
| XXXXXXX80 | XXXXXXX94 | XXXXXXX12 | XXXXXXX36 | XXXXXXX40 | XXXXXXX03 | XXXXXXX73 | XXXXXXX61 |
| XXXXXXX03 | XXXXXXX57 | XXXXXXX80 | XXXXXXX18 | XXXXXXX29 | XXXXXXX87 | XXXXXXX25 | XXXXXXX07 |
| XXXXXXX29 | XXXXXXX32 | XXXXXXX35 | XXXXXXX23 | XXXXXXX28 | XXXXXXX55 | XXXXXXX94 | XXXXXXX66 |
| XXXXXXX62 | XXXXXXX79 | XXXXXXX64 | XXXXXXX76 | XXXXXXX80 | XXXXXXX85 | XXXXXXX04 | XXXXXXX22 |
| XXXXXXX02 | XXXXXXX40 | XXXXXXX19 | XXXXXXX66 | XXXXXXX98 | XXXXXXX88 | XXXXXXX13 | XXXXXXX28 |
| XXXXXXX33 | XXXXXXX01 | XXXXXXX10 | XXXXXXX07 | XXXXXXX10 | XXXXXXX71 | XXXXXXX10 | XXXXXXX10 |
| XXXXXXX10 | XXXXXXX10 | XXXXXXX10 | XXXXXXX10 | XXXXXXX78 | XXXXXXX17 | XXXXXXX86 | XXXXXXX45 |
| XXXXXXX11 | XXXXXXX58 | XXXXXXX12 | XXXXXXX56 | XXXXXXX12 | XXXXXXX48 | XXXXXXX68 | XXXXXXX86 |
| XXXXXXX99 | XXXXXXX02 | XXXXXXX32 | XXXXXXX05 | XXXXXXX98 | XXXXXXX22 | XXXXXXX06 | XXXXXXX58 |
| XXXXXXX85 | XXXXXXX26 | XXXXXXX01 | XXXXXXX63 | XXXXXXX65 | XXXXXXX69 | XXXXXXX90 | XXXXXXX89 |
| XXXXXXX55 | XXXXXXX13 | XXXXXXX16 | XXXXXXX51 | XXXXXXX74 | XXXXXXX91 | XXXXXXX20 | XXXXXXX21 |
| XXXXXXX24 | XXXXXXX67 | XXXXXXX06 | XXXXXXX45 | XXXXXXX64 | XXXXXXX28 | XXXXXXX71 | XXXXXXX76 |
| XXXXXXX98 | XXXXXXX90 | XXXXXXX02 | XXXXXXX43 | XXXXXXX43 | XXXXXXX30 | XXXXXXX49 | XXXXXXX55 |
| XXXXXXX63 | XXXXXXX67 | XXXXXXX70 | XXXXXXX81 | XXXXXXX45 | XXXXXXX93 | XXXXXXX02 | XXXXXXX07 |
| XXXXXXX01 | XXXXXXX03 | XXXXXXX03 | XXXXXXX54 | XXXXXXX00 | XXXXXXX90 | XXXXXXX17 | XXXXXXX13 |
| XXXXXXX71 | XXXXXXX29 | XXXXXXX87 | XXXXXXX77 | XXXXXXX62 | XXXXXXX10 | XXXXXXX04 | XXXXXXX03 |
| XXXXXXX53 | XXXXXXX25 | XXXXXXX32 | XXXXXXX75 | XXXXXXX64 | XXXXXXX24 | XXXXXXX44 | XXXXXXX43 |
| XXXXXXX53 | XXXXXXX88 | XXXXXXX83 | XXXXXXX10 | XXXXXXX87 | XXXXXXX65 | XXXXXXX75 | XXXXXXX21 |
| XXXXXXX92 | XXXXXXX91 | XXXXXXX95 | XXXXXXX20 | XXXXXXX95 | XXXXXXX25 | XXXXXXX78 | XXXXXXX13 |
| XXXXXXX12 | XXXXXXX52 | XXXXXXX54 | XXXXXXX57 | XXXXXXX00 | XXXXXXX55 | XXXXXXX56 | XXXXXXX86 |
| XXXXXXX50 | XXXXXXX31 | XXXXXXX14 | XXXXXXX98 | XXXXXXX84 | XXXXXXX96 | XXXXXXX04 | XXXXXXX23 |
| XXXXXXX31 | XXXXXXX44 | XXXXXXX99 | XXXXXXX15 | XXXXXXX09 | XXXXXXX14 | XXXXXXX03 | XXXXXXX34 |
| XXXXXXX32 | XXXXXXX29 | XXXXXXX38 | XXXXXXX55 | XXXXXXX27 | XXXXXXX62 | XXXXXXX44 | XXXXXXX46 |
| XXXXXXX86 | XXXXXXX85 | XXXXXXX89 | XXXXXXX01 | XXXXXXX52 | XXXXXXX80 | XXXXXXX25 | XXXXXXX00 |
| XXXXXXX17 | XXXXXXX33 | XXXXXXX39 | XXXXXXX43 | XXXXXXX98 | XXXXXXX34 | XXXXXXX99 | XXXXXXX64 |
| XXXXXXX65 | XXXXXXX51 | XXXXXXX80 | XXXXXXX66 | XXXXXXX58 | XXXXXXX95 | XXXXXXX41 | XXXXXXX96 |
| XXXXXXX50 | XXXXXXX18 | XXXXXXX35 | XXXXXXX41 | XXXXXXX67 | XXXXXXX62 | XXXXXXX05 | XXXXXXX07 |
| XXXXXXX65 | XXXXXXX04 | XXXXXXX10 | XXXXXXX85 | XXXXXXX14 | XXXXXXX16 | XXXXXXX60 | XXXXXXX91 |
| XXXXXXX33 | XXXXXXX85 | XXXXXXX57 | XXXXXXX57 | XXXXXXX38 | XXXXXXX77 | XXXXXXX57 | XXXXXXX04 |
| XXXXXXX82 | XXXXXXX68 | XXXXXXX70 | XXXXXXX29 | XXXXXXX76 | XXXXXXX94 | XXXXXXX69 | XXXXXXX96 |
| XXXXXXX28 | XXXXXXX10 | XXXXXXX95 | XXXXXXX01 | XXXXXXX43 | XXXXXXX07 | XXXXXXX12 | XXXXXXX01 |
| XXXXXXX13 | XXXXXXX34 | XXXXXXX37 | XXXXXXX42 | XXXXXXX20 | XXXXXXX43 | XXXXXXX45 | XXXXXXX49 |
| XXXXXXX72 | XXXXXXX76 | XXXXXXX76 | XXXXXXX76 | XXXXXXX76 | XXXXXXX55 | XXXXXXX46 | XXXXXXX61 |
| XXXXXXX64 | XXXXXXX00 | XXXXXXX68 | XXXXXXX70 | XXXXXXX75 | XXXXXXX43 | XXXXXXX71 | XXXXXXX81 |
| XXXXXXX92 | XXXXXXX74 | XXXXXXX25 | XXXXXXX10 | XXXXXXX16 | XXXXXXX21 | XXXXXXX25 | XXXXXXX28 |
| XXXXXXX32 | XXXXXXX49 | XXXXXXX33 | XXXXXXX22 | XXXXXXX51 | XXXXXXX63 | XXXXXXX74 | XXXXXXX71 |
| XXXXXXX99 | XXXXXXX89 | XXXXXXX63 | XXXXXXX81 | XXXXXXX32 | XXXXXXX35 | XXXXXXX34 | XXXXXXX20 |
| XXXXXXX71 | XXXXXXX11 | XXXXXXX89 | XXXXXXX85 | XXXXXXX80 | XXXXXXX86 | XXXXXXX91 | XXXXXXX23 |
| XXXXXXX68 | XXXXXXX59 | XXXXXXX36 | XXXXXXX07 | XXXXXXX05 | XXXXXXX98 | XXXXXXX26 | XXXXXXX57 |
| XXXXXXX18 | XXXXXXX03 | XXXXXXX87 | XXXXXXX82 | XXXXXXX23 | XXXXXXX42 | XXXXXXX52 | XXXXXXX51 |
| XXXXXXX49 | XXXXXXX93 | XXXXXXX58 | XXXXXXX70 | XXXXXXX32 | XXXXXXX56 | XXXXXXX92 | XXXXXXX71 |
| XXXXXXX83 | XXXXXXX00 | XXXXXXX93 | XXXXXXX90 | XXXXXXX17 | XXXXXXX68 | XXXXXXX67 | XXXXXXX23 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX13 | XXXXXXX84 | XXXXXXX44 | XXXXXXX43 | XXXXXXX57 | XXXXXXX61 | XXXXXXX06 | XXXXXXX27 |
| XXXXXXX61 | XXXXXXX39 | XXXXXXX82 | XXXXXXX97 | XXXXXXX72 | XXXXXXX86 | XXXXXXX96 | XXXXXXX07 |
| XXXXXXX08 | XXXXXXX03 | XXXXXXX80 | XXXXXXX65 | XXXXXXX22 | XXXXXXX19 | XXXXXXX81 | XXXXXXX32 |
| XXXXXXX63 | XXXXXXX57 | XXXXXXX43 | XXXXXXX67 | XXXXXXX82 | XXXXXXX72 | XXXXXXX44 | XXXXXXX90 |
| XXXXXXX46 | XXXXXXX49 | XXXXXXX38 | XXXXXXX19 | XXXXXXX81 | XXXXXXX96 | XXXXXXX97 | XXXXXXX15 |
| XXXXXXX15 | XXXXXXX50 | XXXXXXX18 | XXXXXXX79 | XXXXXXX07 | XXXXXXX18 | XXXXXXX29 | XXXXXXX39 |
| XXXXXXX33 | XXXXXXX52 | XXXXXXX61 | XXXXXXX53 | XXXXXXX43 | XXXXXXX69 | XXXXXXX64 | XXXXXXX34 |
| XXXXXXX21 | XXXXXXX15 | XXXXXXX56 | XXXXXXX25 | XXXXXXX80 | XXXXXXX38 | XXXXXXX59 | XXXXXXX57 |
| XXXXXXX94 | XXXXXXX91 | XXXXXXX25 | XXXXXXX92 | XXXXXXX26 | XXXXXXX68 | XXXXXXX52 | XXXXXXX87 |
| XXXXXXX32 | XXXXXXX55 | XXXXXXX82 | XXXXXXX27 | XXXXXXX64 | XXXXXXX72 | XXXXXXX60 | XXXXXXX93 |
| XXXXXXX83 | XXXXXXX86 | XXXXXXX13 | XXXXXXX09 | XXXXXXX30 | XXXXXXX92 | XXXXXXX59 | XXXXXXX75 |
| XXXXXXX50 | XXXXXXX96 | XXXXXXX21 | XXXXXXX65 | XXXXXXX11 | XXXXXXX12 | XXXXXXX35 | XXXXXXX09 |
| XXXXXXX28 | XXXXXXX41 | XXXXXXX17 | XXXXXXX61 | XXXXXXX40 | XXXXXXX54 | XXXXXXX42 | XXXXXXX64 |
| XXXXXXX20 | XXXXXXX50 | XXXXXXX89 | XXXXXXX39 | XXXXXXX93 | XXXXXXX94 | XXXXXXX27 | XXXXXXX24 |
| XXXXXXX31 | XXXXXXX33 | XXXXXXX99 | XXXXXXX52 | XXXXXXX72 | XXXXXXX61 | XXXXXXX27 | XXXXXXX55 |
| XXXXXXX91 | XXXXXXX15 | XXXXXXX28 | XXXXXXX21 | XXXXXXX50 | XXXXXXX30 | XXXXXXX06 | XXXXXXX24 |
| XXXXXXX29 | XXXXXXX43 | XXXXXXX25 | XXXXXXX59 | XXXXXXX24 | XXXXXXX19 | XXXXXXX98 | XXXXXXX69 |
| XXXXXXX73 | XXXXXXX76 | XXXXXXX78 | XXXXXXX36 | XXXXXXX85 | XXXXXXX77 | XXXXXXX90 | XXXXXXX73 |
| XXXXXXX61 | XXXXXXX81 | XXXXXXX95 | XXXXXXX62 | XXXXXXX87 | XXXXXXX11 | XXXXXXX17 | XXXXXXX84 |
| XXXXXXX15 | XXXXXXX32 | XXXXXXX00 | XXXXXXX74 | XXXXXXX65 | XXXXXXX51 | XXXXXXX83 | XXXXXXX47 |
| XXXXXXX25 | XXXXXXX84 | XXXXXXX85 | XXXXXXX10 | XXXXXXX18 | XXXXXXX20 | XXXXXXX94 | XXXXXXX40 |
| XXXXXXX10 | XXXXXXX45 | XXXXXXX48 | XXXXXXX60 | XXXXXXX62 | XXXXXXX46 | XXXXXXX71 | XXXXXXX96 |
| XXXXXXX57 | XXXXXXX76 | XXXXXXX22 | XXXXXXX27 | XXXXXXX46 | XXXXXXX10 | XXXXXXX92 | XXXXXXX20 |
| XXXXXXX78 | XXXXXXX49 | XXXXXXX60 | XXXXXXX57 | XXXXXXX70 | XXXXXXX77 | XXXXXXX91 | XXXXXXX30 |
| XXXXXXX68 | XXXXXXX77 | XXXXXXX55 | XXXXXXX60 | XXXXXXX42 | XXXXXXX05 | XXXXXXX50 | XXXXXXX08 |
| XXXXXXX03 | XXXXXXX72 | XXXXXXX36 | XXXXXXX00 | XXXXXXX91 | XXXXXXX26 | XXXXXXX91 | XXXXXXX20 |
| XXXXXXX85 | XXXXXXX36 | XXXXXXX76 | XXXXXXX99 | XXXXXXX04 | XXXXXXX75 | XXXXXXX32 | XXXXXXX72 |
| XXXXXXX89 | XXXXXXX59 | XXXXXXX18 | XXXXXXX61 | XXXXXXX00 | XXXXXXX93 | XXXXXXX56 | XXXXXXX73 |
| XXXXXXX16 | XXXXXXX02 | XXXXXXX02 | XXXXXXX23 | XXXXXXX79 | XXXXXXX75 | XXXXXXX75 | XXXXXXX17 |
| XXXXXXX75 | XXXXXXX75 | XXXXXXX32 | XXXXXXX47 | XXXXXXX75 | XXXXXXX94 | XXXXXXX56 | XXXXXXX48 |
| XXXXXXX49 | XXXXXXX61 | XXXXXXX57 | XXXXXXX74 | XXXXXXX86 | XXXXXXX83 | XXXXXXX50 | XXXXXXX98 |
| XXXXXXX92 | XXXXXXX94 | XXXXXXX23 | XXXXXXX03 | XXXXXXX05 | XXXXXXX63 | XXXXXXX04 | XXXXXXX09 |
| XXXXXXX84 | XXXXXXX10 | XXXXXXX27 | XXXXXXX11 | XXXXXXX74 | XXXXXXX23 | XXXXXXX22 | XXXXXXX27 |
| XXXXXXX91 | XXXXXXX12 | XXXXXXX81 | XXXXXXX83 | XXXXXXX88 | XXXXXXX15 | XXXXXXX00 | XXXXXXX20 |
| XXXXXXX15 | XXXXXXX06 | XXXXXXX76 | XXXXXXX03 | XXXXXXX95 | XXXXXXX46 | XXXXXXX37 | XXXXXXX30 |
| XXXXXXX15 | XXXXXXX35 | XXXXXXX97 | XXXXXXX50 | XXXXXXX02 | XXXXXXX60 | XXXXXXX60 | XXXXXXX72 |
| XXXXXXX77 | XXXXXXX87 | XXXXXXX78 | XXXXXXX63 | XXXXXXX53 | XXXXXXX07 | XXXXXXX45 | XXXXXXX11 |
| XXXXXXX34 | XXXXXXX37 | XXXXXXX53 | XXXXXXX31 | XXXXXXX66 | XXXXXXX70 | XXXXXXX22 | XXXXXXX18 |
| XXXXXXX72 | XXXXXXX90 | XXXXXXX82 | XXXXXXX05 | XXXXXXX36 | XXXXXXX79 | XXXXXXX67 | XXXXXXX77 |
| XXXXXXX11 | XXXXXXX82 | XXXXXXX05 | XXXXXXX00 | XXXXXXX11 | XXXXXXX16 | XXXXXXX50 | XXXXXXX50 |
| XXXXXXX35 | XXXXXXX48 | XXXXXXX29 | XXXXXXX79 | XXXXXXX49 | XXXXXXX61 | XXXXXXX67 | XXXXXXX19 |
| XXXXXXX45 | XXXXXXX36 | XXXXXXX65 | XXXXXXX32 | XXXXXXX79 | XXXXXXX49 | XXXXXXX80 | XXXXXXX56 |
| XXXXXXX78 | XXXXXXX13 | XXXXXXX07 | XXXXXXX34 | XXXXXXX42 | XXXXXXX01 | XXXXXXX60 | XXXXXXX61 |
| XXXXXXX64 | XXXXXXX73 | XXXXXXX72 | XXXXXXX76 | XXXXXXX78 | XXXXXXX03 | XXXXXXX02 | XXXXXXX58 |
| XXXXXXX84 | XXXXXXX39 | XXXXXXX26 | XXXXXXX20 | XXXXXXX82 | XXXXXXX49 | XXXXXXX30 | XXXXXXX69 |
| XXXXXXX46 | XXXXXXX72 | XXXXXXX23 | XXXXXXX92 | XXXXXXX31 | XXXXXXX39 | XXXXXXX31 | XXXXXXX10 |
| XXXXXXX81 | XXXXXXX42 | XXXXXXX89 | XXXXXXX99 | XXXXXXX27 | XXXXXXX58 | XXXXXXX61 | XXXXXXX34 |
| XXXXXXX23 | XXXXXXX53 | XXXXXXX58 | XXXXXXX65 | XXXXXXX69 | XXXXXXX82 | XXXXXXX89 | XXXXXXX08 |

### List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX17 | XXXXXXX13 | XXXXXXX26 | XXXXXXX93 | XXXXXXX39 | XXXXXXX44 | XXXXXXX69 | XXXXXXX35 |
| XXXXXXX72 | XXXXXXX78 | XXXXXXX54 | XXXXXXX73 | XXXXXXX76 | XXXXXXX19 | XXXXXXX64 | XXXXXXX75 |
| XXXXXXX03 | XXXXXXX99 | XXXXXXX73 | XXXXXXX12 | XXXXXXX10 | XXXXXXX41 | XXXXXXX17 | XXXXXXX11 |
| XXXXXXX38 | XXXXXXX50 | XXXXXXX48 | XXXXXXX54 | XXXXXXX40 | XXXXXXX61 | XXXXXXX44 | XXXXXXX89 |
| XXXXXXX65 | XXXXXXX96 | XXXXXXX67 | XXXXXXX89 | XXXXXXX94 | XXXXXXX08 | XXXXXXX68 | XXXXXXX28 |
| XXXXXXX98 | XXXXXXX74 | XXXXXXX38 | XXXXXXX24 | XXXXXXX18 | XXXXXXX25 | XXXXXXX67 | XXXXXXX07 |
| XXXXXXX79 | XXXXXXX90 | XXXXXXX52 | XXXXXXX94 | XXXXXXX89 | XXXXXXX31 | XXXXXXX44 | XXXXXXX11 |
| XXXXXXX20 | XXXXXXX31 | XXXXXXX33 | XXXXXXX49 | XXXXXXX57 | XXXXXXX71 | XXXXXXX81 | XXXXXXX16 |
| XXXXXXX93 | XXXXXXX62 | XXXXXXX09 | XXXXXXX99 | XXXXXXX31 | XXXXXXX65 | XXXXXXX45 | XXXXXXX06 |
| XXXXXXX92 | XXXXXXX14 | XXXXXXX85 | XXXXXXX97 | XXXXXXX69 | XXXXXXX73 | XXXXXXX50 | XXXXXXX54 |
| XXXXXXX78 | XXXXXXX71 | XXXXXXX42 | XXXXXXX68 | XXXXXXX96 | XXXXXXX14 | XXXXXXX30 | XXXXXXX17 |
| XXXXXXX27 | XXXXXXX51 | XXXXXXX33 | XXXXXXX40 | XXXXXXX85 | XXXXXXX78 | XXXXXXX78 | XXXXXXX69 |
| XXXXXXX07 | XXXXXXX75 | XXXXXXX03 | XXXXXXX14 | XXXXXXX46 | XXXXXXX88 | XXXXXXX48 | XXXXXXX76 |
| XXXXXXX07 | XXXXXXX36 | XXXXXXX90 | XXXXXXX14 | XXXXXXX15 | XXXXXXX13 | XXXXXXX09 | XXXXXXX20 |
| XXXXXXX14 | XXXXXXX22 | XXXXXXX31 | XXXXXXX18 | XXXXXXX38 | XXXXXXX45 | XXXXXXX43 | XXXXXXX41 |
| XXXXXXX02 | XXXXXXX54 | XXXXXXX80 | XXXXXXX40 | XXXXXXX49 | XXXXXXX99 | XXXXXXX74 | XXXXXXX28 |
| XXXXXXX70 | XXXXXXX12 | XXXXXXX36 | XXXXXXX11 | XXXXXXX95 | XXXXXXX27 | XXXXXXX46 | XXXXXXX73 |
| XXXXXXX19 | XXXXXXX99 | XXXXXXX21 | XXXXXXX48 | XXXXXXX62 | XXXXXXX48 | XXXXXXX56 | XXXXXXX41 |
| XXXXXXX52 | XXXXXXX93 | XXXXXXX62 | XXXXXXX40 | XXXXXXX91 | XXXXXXX00 | XXXXXXX76 | XXXXXXX01 |
| XXXXXXX28 | XXXXXXX69 | XXXXXXX77 | XXXXXXX57 | XXXXXXX58 | XXXXXXX67 | XXXXXXX68 | XXXXXXX56 |
| XXXXXXX32 | XXXXXXX85 | XXXXXXX19 | XXXXXXX58 | XXXXXXX06 | XXXXXXX06 | XXXXXXX06 | XXXXXXX09 |
| XXXXXXX50 | XXXXXXX58 | XXXXXXX93 | XXXXXXX72 | XXXXXXX22 | XXXXXXX23 | XXXXXXX95 | XXXXXXX31 |
| XXXXXXX32 | XXXXXXX99 | XXXXXXX44 | XXXXXXX41 | XXXXXXX29 | XXXXXXX57 | XXXXXXX61 | XXXXXXX38 |
| XXXXXXX71 | XXXXXXX55 | XXXXXXX99 | XXXXXXX69 | XXXXXXX07 | XXXXXXX03 | XXXXXXX88 | XXXXXXX81 |
| XXXXXXX61 | XXXXXXX82 | XXXXXXX49 | XXXXXXX21 | XXXXXXX03 | XXXXXXX43 | XXXXXXX11 | XXXXXXX07 |
| XXXXXXX66 | XXXXXXX30 | XXXXXXX72 | XXXXXXX61 | XXXXXXX65 | XXXXXXX83 | XXXXXXX36 | XXXXXXX45 |
| XXXXXXX43 | XXXXXXX71 | XXXXXXX42 | XXXXXXX79 | XXXXXXX67 | XXXXXXX57 | XXXXXXX13 | XXXXXXX38 |
| XXXXXXX32 | XXXXXXX47 | XXXXXXX47 | XXXXXXX47 | XXXXXXX29 | XXXXXXX50 | XXXXXXX57 | XXXXXXX92 |
| XXXXXXX95 | XXXXXXX81 | XXXXXXX01 | XXXXXXX86 | XXXXXXX34 | XXXXXXX47 | XXXXXXX71 | XXXXXXX77 |
| XXXXXXX81 | XXXXXXX41 | XXXXXXX83 | XXXXXXX12 | XXXXXXX05 | XXXXXXX15 | XXXXXXX18 | XXXXXXX39 |
| XXXXXXX99 | XXXXXXX19 | XXXXXXX06 | XXXXXXX41 | XXXXXXX58 | XXXXXXX75 | XXXXXXX36 | XXXXXXX75 |
| XXXXXXX60 | XXXXXXX68 | XXXXXXX81 | XXXXXXX93 | XXXXXXX15 | XXXXXXX27 | XXXXXXX21 | XXXXXXX26 |
| XXXXXXX41 | XXXXXXX67 | XXXXXXX69 | XXXXXXX52 | XXXXXXX52 | XXXXXXX52 | XXXXXXX77 | XXXXXXX82 |
| XXXXXXX88 | XXXXXXX42 | XXXXXXX40 | XXXXXXX91 | XXXXXXX39 | XXXXXXX35 | XXXXXXX60 | XXXXXXX20 |
| XXXXXXX16 | XXXXXXX44 | XXXXXXX08 | XXXXXXX40 | XXXXXXX04 | XXXXXXX62 | XXXXXXX70 | XXXXXXX77 |
| XXXXXXX74 | XXXXXXX80 | XXXXXXX02 | XXXXXXX14 | XXXXXXX09 | XXXXXXX10 | XXXXXXX03 | XXXXXXX68 |
| XXXXXXX67 | XXXXXXX63 | XXXXXXX82 | XXXXXXX11 | XXXXXXX64 | XXXXXXX58 | XXXXXXX95 | XXXXXXX58 |
| XXXXXXX58 | XXXXXXX75 | XXXXXXX05 | XXXXXXX20 | XXXXXXX57 | XXXXXXX53 | XXXXXXX58 | XXXXXXX80 |
| XXXXXXX72 | XXXXXXX44 | XXXXXXX83 | XXXXXXX87 | XXXXXXX33 | XXXXXXX89 | XXXXXXX83 | XXXXXXX06 |
| XXXXXXX01 | XXXXXXX03 | XXXXXXX32 | XXXXXXX48 | XXXXXXX41 | XXXXXXX42 | XXXXXXX43 | XXXXXXX59 |
| XXXXXXX17 | XXXXXXX41 | XXXXXXX92 | XXXXXXX55 | XXXXXXX11 | XXXXXXX83 | XXXXXXX80 | XXXXXXX51 |
| XXXXXXX32 | XXXXXXX35 | XXXXXXX46 | XXXXXXX43 | XXXXXXX85 | XXXXXXX20 | XXXXXXX46 | XXXXXXX74 |
| XXXXXXX64 | XXXXXXX61 | XXXXXXX87 | XXXXXXX91 | XXXXXXX95 | XXXXXXX63 | XXXXXXX07 | XXXXXXX99 |
| XXXXXXX80 | XXXXXXX51 | XXXXXXX19 | XXXXXXX19 | XXXXXXX74 | XXXXXXX75 | XXXXXXX24 | XXXXXXX66 |
| XXXXXXX77 | XXXXXXX11 | XXXXXXX57 | XXXXXXX35 | XXXXXXX70 | XXXXXXX28 | XXXXXXX12 | XXXXXXX69 |
| XXXXXXX44 | XXXXXXX60 | XXXXXXX50 | XXXXXXX91 | XXXXXXX30 | XXXXXXX54 | XXXXXXX04 | XXXXXXX64 |
| XXXXXXX24 | XXXXXXX74 | XXXXXXX74 | XXXXXXX74 | XXXXXXX41 | XXXXXXX64 | XXXXXXX26 | XXXXXXX70 |
| XXXXXXX53 | XXXXXXX62 | XXXXXXX98 | XXXXXXX23 | XXXXXXX67 | XXXXXXX16 | XXXXXXX79 | XXXXXXX84 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX90 | XXXXXXX67 | XXXXXXX47 | XXXXXXX18 | XXXXXXX02 | XXXXXXX58 | XXXXXXX39 | XXXXXXX44 |
| XXXXXXX38 | XXXXXXX28 | XXXXXXX20 | XXXXXXX97 | XXXXXXX65 | XXXXXXX58 | XXXXXXX95 | XXXXXXX84 |
| XXXXXXX87 | XXXXXXX17 | XXXXXXX09 | XXXXXXX88 | XXXXXXX92 | XXXXXXX10 | XXXXXXX00 | XXXXXXX36 |
| XXXXXXX15 | XXXXXXX11 | XXXXXXX16 | XXXXXXX23 | XXXXXXX48 | XXXXXXX92 | XXXXXXX20 | XXXXXXX29 |
| XXXXXXX90 | XXXXXXX52 | XXXXXXX45 | XXXXXXX39 | XXXXXXX44 | XXXXXXX52 | XXXXXXX63 | XXXXXXX11 |
| XXXXXXX93 | XXXXXXX53 | XXXXXXX08 | XXXXXXX96 | XXXXXXX18 | XXXXXXX56 | XXXXXXX31 | XXXXXXX50 |
| XXXXXXX43 | XXXXXXX09 | XXXXXXX64 | XXXXXXX15 | XXXXXXX85 | XXXXXXX01 | XXXXXXX66 | XXXXXXX18 |
| XXXXXXX58 | XXXXXXX52 | XXXXXXX37 | XXXXXXX55 | XXXXXXX80 | XXXXXXX74 | XXXXXXX75 | XXXXXXX83 |
| XXXXXXX66 | XXXXXXX76 | XXXXXXX93 | XXXXXXX92 | XXXXXXX94 | XXXXXXX00 | XXXXXXX02 | XXXXXXX61 |
| XXXXXXX08 | XXXXXXX28 | XXXXXXX46 | XXXXXXX66 | XXXXXXX17 | XXXXXXX42 | XXXXXXX07 | XXXXXXX40 |
| XXXXXXX05 | XXXXXXX54 | XXXXXXX12 | XXXXXXX44 | XXXXXXX57 | XXXXXXX18 | XXXXXXX61 | XXXXXXX02 |
| XXXXXXX54 | XXXXXXX96 | XXXXXXX60 | XXXXXXX29 | XXXXXXX18 | XXXXXXX23 | XXXXXXX40 | XXXXXXX46 |
| XXXXXXX48 | XXXXXXX52 | XXXXXXX65 | XXXXXXX92 | XXXXXXX48 | XXXXXXX87 | XXXXXXX94 | XXXXXXX79 |
| XXXXXXX19 | XXXXXXX70 | XXXXXXX56 | XXXXXXX65 | XXXXXXX71 | XXXXXXX81 | XXXXXXX83 | XXXXXXX38 |
| XXXXXXX37 | XXXXXXX98 | XXXXXXX06 | XXXXXXX22 | XXXXXXX30 | XXXXXXX99 | XXXXXXX39 | XXXXXXX12 |
| XXXXXXX06 | XXXXXXX56 | XXXXXXX82 | XXXXXXX81 | XXXXXXX88 | XXXXXXX91 | XXXXXXX33 | XXXXXXX14 |
| XXXXXXX99 | XXXXXXX41 | XXXXXXX53 | XXXXXXX04 | XXXXXXX06 | XXXXXXX07 | XXXXXXX10 | XXXXXXX87 |
| XXXXXXX13 | XXXXXXX36 | XXXXXXX84 | XXXXXXX29 | XXXXXXX39 | XXXXXXX50 | XXXXXXX59 | XXXXXXX72 |
| XXXXXXX55 | XXXXXXX75 | XXXXXXX34 | XXXXXXX36 | XXXXXXX77 | XXXXXXX88 | XXXXXXX34 | XXXXXXX94 |
| XXXXXXX98 | XXXXXXX59 | XXXXXXX03 | XXXXXXX27 | XXXXXXX37 | XXXXXXX33 | XXXXXXX32 | XXXXXXX40 |
| XXXXXXX43 | XXXXXXX91 | XXXXXXX04 | XXXXXXX96 | XXXXXXX09 | XXXXXXX20 | XXXXXXX93 | XXXXXXX37 |
| XXXXXXX74 | XXXXXXX86 | XXXXXXX92 | XXXXXXX94 | XXXXXXX78 | XXXXXXX08 | XXXXXXX13 | XXXXXXX12 |
| XXXXXXX22 | XXXXXXX54 | XXXXXXX29 | XXXXXXX08 | XXXXXXX46 | XXXXXXX85 | XXXXXXX55 | XXXXXXX49 |
| XXXXXXX34 | XXXXXXX96 | XXXXXXX30 | XXXXXXX58 | XXXXXXX69 | XXXXXXX21 | XXXXXXX81 | XXXXXXX92 |
| XXXXXXX53 | XXXXXXX53 | XXXXXXX54 | XXXXXXX69 | XXXXXXX10 | XXXXXXX87 | XXXXXXX08 | XXXXXXX50 |
| XXXXXXX65 | XXXXXXX76 | XXXXXXX14 | XXXXXXX70 | XXXXXXX85 | XXXXXXX26 | XXXXXXX24 | XXXXXXX26 |
| XXXXXXX34 | XXXXXXX16 | XXXXXXX35 | XXXXXXX80 | XXXXXXX41 | XXXXXXX63 | XXXXXXX73 | XXXXXXX95 |
| XXXXXXX29 | XXXXXXX66 | XXXXXXX55 | XXXXXXX58 | XXXXXXX10 | XXXXXXX68 | XXXXXXX70 | XXXXXXX34 |
| XXXXXXX89 | XXXXXXX84 | XXXXXXX94 | XXXXXXX90 | XXXXXXX69 | XXXXXXX08 | XXXXXXX12 | XXXXXXX96 |
| XXXXXXX92 | XXXXXXX06 | XXXXXXX49 | XXXXXXX50 | XXXXXXX75 | XXXXXXX10 | XXXXXXX07 | XXXXXXX67 |
| XXXXXXX67 | XXXXXXX98 | XXXXXXX67 | XXXXXXX67 | XXXXXXX67 | XXXXXXX67 | XXXXXXX57 | XXXXXXX50 |
| XXXXXXX85 | XXXXXXX54 | XXXXXXX87 | XXXXXXX89 | XXXXXXX16 | XXXXXXX52 | XXXXXXX97 | XXXXXXX16 |
| XXXXXXX01 | XXXXXXX03 | XXXXXXX16 | XXXXXXX20 | XXXXXXX43 | XXXXXXX32 | XXXXXXX94 | XXXXXXX39 |
| XXXXXXX59 | XXXXXXX88 | XXXXXXX33 | XXXXXXX44 | XXXXXXX86 | XXXXXXX24 | XXXXXXX54 | XXXXXXX47 |
| XXXXXXX54 | XXXXXXX67 | XXXXXXX96 | XXXXXXX45 | XXXXXXX26 | XXXXXXX08 | XXXXXXX01 | XXXXXXX07 |
| XXXXXXX25 | XXXXXXX18 | XXXXXXX22 | XXXXXXX25 | XXXXXXX25 | XXXXXXX25 | XXXXXXX25 | XXXXXXX29 |
| XXXXXXX67 | XXXXXXX52 | XXXXXXX88 | XXXXXXX09 | XXXXXXX09 | XXXXXXX09 | XXXXXXX24 | XXXXXXX96 |
| XXXXXXX94 | XXXXXXX38 | XXXXXXX17 | XXXXXXX38 | XXXXXXX39 | XXXXXXX34 | XXXXXXX47 | XXXXXXX96 |
| XXXXXXX80 | XXXXXXX66 | XXXXXXX91 | XXXXXXX98 | XXXXXXX94 | XXXXXXX09 | XXXXXXX95 | XXXXXXX32 |
| XXXXXXX95 | XXXXXXX14 | XXXXXXX04 | XXXXXXX19 | XXXXXXX23 | XXXXXXX34 | XXXXXXX90 | XXXXXXX43 |
| XXXXXXX83 | XXXXXXX64 | XXXXXXX34 | XXXXXXX79 | XXXXXXX44 | XXXXXXX39 | XXXXXXX67 | XXXXXXX65 |
| XXXXXXX11 | XXXXXXX63 | XXXXXXX00 | XXXXXXX37 | XXXXXXX58 | XXXXXXX16 | XXXXXXX29 | XXXXXXX34 |
| XXXXXXX36 | XXXXXXX33 | XXXXXXX67 | XXXXXXX61 | XXXXXXX58 | XXXXXXX45 | XXXXXXX95 | XXXXXXX90 |
| XXXXXXX12 | XXXXXXX02 | XXXXXXX90 | XXXXXXX90 | XXXXXXX20 | XXXXXXX21 | XXXXXXX19 | XXXXXXX85 |
| XXXXXXX12 | XXXXXXX90 | XXXXXXX80 | XXXXXXX83 | XXXXXXX06 | XXXXXXX31 | XXXXXXX36 | XXXXXXX33 |
| XXXXXXX34 | XXXXXXX44 | XXXXXXX44 | XXXXXXX68 | XXXXXXX64 | XXXXXXX67 | XXXXXXX72 | XXXXXXX93 |
| XXXXXXX34 | XXXXXXX01 | XXXXXXX45 | XXXXXXX56 | XXXXXXX18 | XXXXXXX07 | XXXXXXX22 | XXXXXXX89 |
| XXXXXXX56 | XXXXXXX55 | XXXXXXX89 | XXXXXXX05 | XXXXXXX85 | XXXXXXX11 | XXXXXXX52 | XXXXXXX67 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX99 | XXXXXXX03 | XXXXXXX19 | XXXXXXX52 | XXXXXXX17 | XXXXXXX76 | XXXXXXX84 | XXXXXXX07 |
| XXXXXXX09 | XXXXXXX15 | XXXXXXX21 | XXXXXXX68 | XXXXXXX86 | XXXXXXX16 | XXXXXXX19 | XXXXXXX60 |
| XXXXXXX79 | XXXXXXX99 | XXXXXXX08 | XXXXXXX14 | XXXXXXX36 | XXXXXXX51 | XXXXXXX77 | XXXXXXX54 |
| XXXXXXX56 | XXXXXXX53 | XXXXXXX44 | XXXXXXX08 | XXXXXXX64 | XXXXXXX15 | XXXXXXX49 | XXXXXXX21 |
| XXXXXXX74 | XXXXXXX40 | XXXXXXX53 | XXXXXXX43 | XXXXXXX46 | XXXXXXX88 | XXXXXXX83 | XXXXXXX13 |
| XXXXXXX59 | XXXXXXX97 | XXXXXXX43 | XXXXXXX76 | XXXXXXX44 | XXXXXXX49 | XXXXXXX05 | XXXXXXX17 |
| XXXXXXX74 | XXXXXXX27 | XXXXXXX31 | XXXXXXX55 | XXXXXXX48 | XXXXXXX57 | XXXXXXX44 | XXXXXXX07 |
| XXXXXXX01 | XXXXXXX71 | XXXXXXX96 | XXXXXXX55 | XXXXXXX24 | XXXXXXX58 | XXXXXXX26 | XXXXXXX84 |
| XXXXXXX63 | XXXXXXX58 | XXXXXXX98 | XXXXXXX05 | XXXXXXX18 | XXXXXXX33 | XXXXXXX99 | XXXXXXX57 |
| XXXXXXX53 | XXXXXXX65 | XXXXXXX58 | XXXXXXX17 | XXXXXXX95 | XXXXXXX58 | XXXXXXX13 | XXXXXXX40 |
| XXXXXXX49 | XXXXXXX11 | XXXXXXX58 | XXXXXXX32 | XXXXXXX56 | XXXXXXX38 | XXXXXXX58 | XXXXXXX86 |
| XXXXXXX94 | XXXXXXX10 | XXXXXXX41 | XXXXXXX63 | XXXXXXX99 | XXXXXXX84 | XXXXXXX01 | XXXXXXX93 |
| XXXXXXX60 | XXXXXXX63 | XXXXXXX10 | XXXXXXX37 | XXXXXXX08 | XXXXXXX74 | XXXXXXX51 | XXXXXXX13 |
| XXXXXXX11 | XXXXXXX36 | XXXXXXX03 | XXXXXXX68 | XXXXXXX18 | XXXXXXX79 | XXXXXXX00 | XXXXXXX02 |
| XXXXXXX07 | XXXXXXX15 | XXXXXXX82 | XXXXXXX59 | XXXXXXX50 | XXXXXXX79 | XXXXXXX70 | XXXXXXX71 |
| XXXXXXX82 | XXXXXXX91 | XXXXXXX11 | XXXXXXX26 | XXXXXXX38 | XXXXXXX40 | XXXXXXX43 | XXXXXXX71 |
| XXXXXXX92 | XXXXXXX75 | XXXXXXX83 | XXXXXXX87 | XXXXXXX08 | XXXXXXX98 | XXXXXXX11 | XXXXXXX21 |
| XXXXXXX42 | XXXXXXX54 | XXXXXXX93 | XXXXXXX16 | XXXXXXX08 | XXXXXXX28 | XXXXXXX59 | XXXXXXX76 |
| XXXXXXX60 | XXXXXXX53 | XXXXXXX58 | XXXXXXX15 | XXXXXXX58 | XXXXXXX00 | XXXXXXX39 | XXXXXXX86 |
| XXXXXXX46 | XXXXXXX95 | XXXXXXX98 | XXXXXXX10 | XXXXXXX02 | XXXXXXX43 | XXXXXXX91 | XXXXXXX29 |
| XXXXXXX21 | XXXXXXX21 | XXXXXXX21 | XXXXXXX21 | XXXXXXX32 | XXXXXXX64 | XXXXXXX35 | XXXXXXX24 |
| XXXXXXX18 | XXXXXXX05 | XXXXXXX35 | XXXXXXX13 | XXXXXXX24 | XXXXXXX04 | XXXXXXX54 | XXXXXXX43 |
| XXXXXXX28 | XXXXXXX28 | XXXXXXX28 | XXXXXXX28 | XXXXXXX28 | XXXXXXX28 | XXXXXXX28 | XXXXXXX28 |
| XXXXXXX28 | XXXXXXX78 | XXXXXXX15 | XXXXXXX29 | XXXXXXX98 | XXXXXXX90 | XXXXXXX30 | XXXXXXX25 |
| XXXXXXX17 | XXXXXXX04 | XXXXXXX89 | XXXXXXX55 | XXXXXXX74 | XXXXXXX85 | XXXXXXX00 | XXXXXXX09 |
| XXXXXXX07 | XXXXXXX21 | XXXXXXX62 | XXXXXXX86 | XXXXXXX17 | XXXXXXX45 | XXXXXXX59 | XXXXXXX36 |
| XXXXXXX30 | XXXXXXX90 | XXXXXXX17 | XXXXXXX92 | XXXXXXX76 | XXXXXXX05 | XXXXXXX64 | XXXXXXX32 |
| XXXXXXX05 | XXXXXXX88 | XXXXXXX82 | XXXXXXX10 | XXXXXXX03 | XXXXXXX93 | XXXXXXX78 | XXXXXXX81 |
| XXXXXXX47 | XXXXXXX81 | XXXXXXX50 | XXXXXXX96 | XXXXXXX28 | XXXXXXX13 | XXXXXXX13 | XXXXXXX02 |
| XXXXXXX00 | XXXXXXX99 | XXXXXXX56 | XXXXXXX49 | XXXXXXX64 | XXXXXXX01 | XXXXXXX03 | XXXXXXX04 |
| XXXXXXX59 | XXXXXXX70 | XXXXXXX64 | XXXXXXX94 | XXXXXXX07 | XXXXXXX85 | XXXXXXX44 | XXXXXXX90 |
| XXXXXXX02 | XXXXXXX18 | XXXXXXX05 | XXXXXXX79 | XXXXXXX12 | XXXXXXX22 | XXXXXXX75 | XXXXXXX20 |
| XXXXXXX21 | XXXXXXX21 | XXXXXXX47 | XXXXXXX53 | XXXXXXX35 | XXXXXXX64 | XXXXXXX81 | XXXXXXX15 |
| XXXXXXX39 | XXXXXXX39 | XXXXXXX37 | XXXXXXX86 | XXXXXXX51 | XXXXXXX05 | XXXXXXX93 | XXXXXXX29 |
| XXXXXXX30 | XXXXXXX55 | XXXXXXX88 | XXXXXXX08 | XXXXXXX26 | XXXXXXX32 | XXXXXXX46 | XXXXXXX10 |
| XXXXXXX68 | XXXXXXX40 | XXXXXXX49 | XXXXXXX01 | XXXXXXX66 | XXXXXXX31 | XXXXXXX08 | XXXXXXX67 |
| XXXXXXX42 | XXXXXXX27 | XXXXXXX13 | XXXXXXX75 | XXXXXXX19 | XXXXXXX75 | XXXXXXX53 | XXXXXXX77 |
| XXXXXXX84 | XXXXXXX94 | XXXXXXX15 | XXXXXXX27 | XXXXXXX46 | XXXXXXX34 | XXXXXXX49 | XXXXXXX73 |
| XXXXXXX64 | XXXXXXX00 | XXXXXXX02 | XXXXXXX26 | XXXXXXX27 | XXXXXXX33 | XXXXXXX34 | XXXXXXX68 |
| XXXXXXX02 | XXXXXXX14 | XXXXXXX32 | XXXXXXX19 | XXXXXXX38 | XXXXXXX28 | XXXXXXX14 | XXXXXXX72 |
| XXXXXXX58 | XXXXXXX23 | XXXXXXX57 | XXXXXXX50 | XXXXXXX10 | XXXXXXX77 | XXXXXXX65 | XXXXXXX44 |
| XXXXXXX53 | XXXXXXX80 | XXXXXXX49 | XXXXXXX91 | XXXXXXX67 | XXXXXXX08 | XXXXXXX01 | XXXXXXX08 |
| XXXXXXX28 | XXXXXXX21 | XXXXXXX03 | XXXXXXX00 | XXXXXXX87 | XXXXXXX43 | XXXXXXX43 | XXXXXXX21 |
| XXXXXXX32 | XXXXXXX58 | XXXXXXX53 | XXXXXXX43 | XXXXXXX90 | XXXXXXX93 | XXXXXXX44 | XXXXXXX33 |
| XXXXXXX45 | XXXXXXX24 | XXXXXXX73 | XXXXXXX13 | XXXXXXX36 | XXXXXXX58 | XXXXXXX08 | XXXXXXX22 |
| XXXXXXX99 | XXXXXXX39 | XXXXXXX77 | XXXXXXX77 | XXXXXXX67 | XXXXXXX28 | XXXXXXX30 | XXXXXXX20 |
| XXXXXXX61 | XXXXXXX50 | XXXXXXX27 | XXXXXXX14 | XXXXXXX91 | XXXXXXX94 | XXXXXXX39 | XXXXXXX05 |
| XXXXXXX97 | XXXXXXX41 | XXXXXXX66 | XXXXXXX74 | XXXXXXX51 | XXXXXXX75 | XXXXXXX28 | XXXXXXX43 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX74 | XXXXXXX98 | XXXXXXX46 | XXXXXXX92 | XXXXXXX57 | XXXXXXX43 | XXXXXXX00 | XXXXXXX48 |
| XXXXXXX89 | XXXXXXX25 | XXXXXXX33 | XXXXXXX52 | XXXXXXX92 | XXXXXXX23 | XXXXXXX92 | XXXXXXX86 |
| XXXXXXX92 | XXXXXXX57 | XXXXXXX92 | XXXXXXX92 | XXXXXXX84 | XXXXXXX52 | XXXXXXX66 | XXXXXXX31 |
| XXXXXXX36 | XXXXXXX31 | XXXXXXX31 | XXXXXXX08 | XXXXXXX95 | XXXXXXX81 | XXXXXXX93 | XXXXXXX93 |
| XXXXXXX43 | XXXXXXX43 | XXXXXXX09 | XXXXXXX82 | XXXXXXX57 | XXXXXXX75 | XXXXXXX56 | XXXXXXX33 |
| XXXXXXX13 | XXXXXXX69 | XXXXXXX36 | XXXXXXX97 | XXXXXXX97 | XXXXXXX43 | XXXXXXX63 | XXXXXXX17 |
| XXXXXXX30 | XXXXXXX10 | XXXXXXX27 | XXXXXXX49 | XXXXXXX87 | XXXXXXX63 | XXXXXXX13 | XXXXXXX81 |
| XXXXXXX81 | XXXXXXX26 | XXXXXXX36 | XXXXXXX85 | XXXXXXX73 | XXXXXXX59 | XXXXXXX67 | XXXXXXX70 |
| XXXXXXX52 | XXXXXXX65 | XXXXXXX62 | XXXXXXX63 | XXXXXXX48 | XXXXXXX74 | XXXXXXX95 | XXXXXXX89 |
| XXXXXXX36 | XXXXXXX03 | XXXXXXX56 | XXXXXXX13 | XXXXXXX20 | XXXXXXX65 | XXXXXXX23 | XXXXXXX72 |
| XXXXXXX94 | XXXXXXX51 | XXXXXXX57 | XXXXXXX78 | XXXXXXX81 | XXXXXXX33 | XXXXXXX74 | XXXXXXX00 |
| XXXXXXX19 | XXXXXXX21 | XXXXXXX30 | XXXXXXX88 | XXXXXXX25 | XXXXXXX17 | XXXXXXX09 | XXXXXXX30 |
| XXXXXXX56 | XXXXXXX69 | XXXXXXX23 | XXXXXXX83 | XXXXXXX11 | XXXXXXX99 | XXXXXXX21 | XXXXXXX86 |
| XXXXXXX74 | XXXXXXX29 | XXXXXXX02 | XXXXXXX77 | XXXXXXX38 | XXXXXXX23 | XXXXXXX31 | XXXXXXX84 |
| XXXXXXX35 | XXXXXXX76 | XXXXXXX85 | XXXXXXX67 | XXXXXXX55 | XXXXXXX27 | XXXXXXX48 | XXXXXXX60 |
| XXXXXXX61 | XXXXXXX04 | XXXXXXX99 | XXXXXXX44 | XXXXXXX71 | XXXXXXX12 | XXXXXXX52 | XXXXXXX16 |
| XXXXXXX36 | XXXXXXX11 | XXXXXXX79 | XXXXXXX60 | XXXXXXX05 | XXXXXXX26 | XXXXXXX41 | XXXXXXX22 |
| XXXXXXX45 | XXXXXXX83 | XXXXXXX85 | XXXXXXX84 | XXXXXXX11 | XXXXXXX89 | XXXXXXX32 | XXXXXXX39 |
| XXXXXXX13 | XXXXXXX29 | XXXXXXX66 | XXXXXXX04 | XXXXXXX74 | XXXXXXX91 | XXXXXXX20 | XXXXXXX18 |
| XXXXXXX30 | XXXXXXX26 | XXXXXXX68 | XXXXXXX49 | XXXXXXX70 | XXXXXXX22 | XXXXXXX71 | XXXXXXX62 |
| XXXXXXX52 | XXXXXXX24 | XXXXXXX51 | XXXXXXX49 | XXXXXXX71 | XXXXXXX47 | XXXXXXX49 | XXXXXXX06 |
| XXXXXXX18 | XXXXXXX03 | XXXXXXX22 | XXXXXXX76 | XXXXXXX24 | XXXXXXX41 | XXXXXXX78 | XXXXXXX57 |
| XXXXXXX99 | XXXXXXX54 | XXXXXXX89 | XXXXXXX83 | XXXXXXX84 | XXXXXXX81 | XXXXXXX35 | XXXXXXX25 |
| XXXXXXX15 | XXXXXXX55 | XXXXXXX97 | XXXXXXX65 | XXXXXXX65 | XXXXXXX35 | XXXXXXX25 | XXXXXXX04 |
| XXXXXXX51 | XXXXXXX31 | XXXXXXX06 | XXXXXXX61 | XXXXXXX37 | XXXXXXX54 | XXXXXXX13 | XXXXXXX05 |
| XXXXXXX32 | XXXXXXX17 | XXXXXXX32 | XXXXXXX74 | XXXXXXX45 | XXXXXXX70 | XXXXXXX63 | XXXXXXX65 |
| XXXXXXX93 | XXXXXXX92 | XXXXXXX80 | XXXXXXX73 | XXXXXXX98 | XXXXXXX95 | XXXXXXX35 | XXXXXXX63 |
| XXXXXXX81 | XXXXXXX96 | XXXXXXX42 | XXXXXXX38 | XXXXXXX55 | XXXXXXX75 | XXXXXXX59 | XXXXXXX91 |
| XXXXXXX48 | XXXXXXX48 | XXXXXXX02 | XXXXXXX17 | XXXXXXX15 | XXXXXXX60 | XXXXXXX17 | XXXXXXX81 |
| XXXXXXX83 | XXXXXXX23 | XXXXXXX78 | XXXXXXX42 | XXXXXXX15 | XXXXXXX76 | XXXXXXX78 | XXXXXXX79 |
| XXXXXXX18 | XXXXXXX39 | XXXXXXX35 | XXXXXXX86 | XXXXXXX27 | XXXXXXX40 | XXXXXXX11 | XXXXXXX29 |
| XXXXXXX61 | XXXXXXX09 | XXXXXXX73 | XXXXXXX76 | XXXXXXX94 | XXXXXXX05 | XXXXXXX87 | XXXXXXX83 |
| XXXXXXX23 | XXXXXXX03 | XXXXXXX19 | XXXXXXX90 | XXXXXXX87 | XXXXXXX15 | XXXXXXX50 | XXXXXXX50 |
| XXXXXXX78 | XXXXXXX81 | XXXXXXX35 | XXXXXXX80 | XXXXXXX84 | XXXXXXX44 | XXXXXXX82 | XXXXXXX10 |
| XXXXXXX94 | XXXXXXX27 | XXXXXXX78 | XXXXXXX08 | XXXXXXX23 | XXXXXXX69 | XXXXXXX18 | XXXXXXX56 |
| XXXXXXX54 | XXXXXXX34 | XXXXXXX33 | XXXXXXX23 | XXXXXXX54 | XXXXXXX57 | XXXXXXX68 | XXXXXXX41 |
| XXXXXXX05 | XXXXXXX07 | XXXXXXX36 | XXXXXXX51 | XXXXXXX84 | XXXXXXX89 | XXXXXXX60 | XXXXXXX89 |
| XXXXXXX77 | XXXXXXX34 | XXXXXXX28 | XXXXXXX27 | XXXXXXX42 | XXXXXXX20 | XXXXXXX30 | XXXXXXX23 |
| XXXXXXX22 | XXXXXXX42 | XXXXXXX77 | XXXXXXX18 | XXXXXXX21 | XXXXXXX34 | XXXXXXX53 | XXXXXXX92 |
| XXXXXXX29 | XXXXXXX62 | XXXXXXX86 | XXXXXXX11 | XXXXXXX51 | XXXXXXX95 | XXXXXXX54 | XXXXXXX75 |
| XXXXXXX52 | XXXXXXX88 | XXXXXXX85 | XXXXXXX51 | XXXXXXX21 | XXXXXXX83 | XXXXXXX25 | XXXXXXX35 |
| XXXXXXX83 | XXXXXXX23 | XXXXXXX63 | XXXXXXX70 | XXXXXXX04 | XXXXXXX60 | XXXXXXX60 | XXXXXXX10 |
| XXXXXXX29 | XXXXXXX34 | XXXXXXX06 | XXXXXXX78 | XXXXXXX34 | XXXXXXX69 | XXXXXXX27 | XXXXXXX89 |
| XXXXXXX11 | XXXXXXX19 | XXXXXXX22 | XXXXXXX46 | XXXXXXX47 | XXXXXXX23 | XXXXXXX89 | XXXXXXX77 |
| XXXXXXX74 | XXXXXXX49 | XXXXXXX03 | XXXXXXX05 | XXXXXXX59 | XXXXXXX63 | XXXXXXX46 | XXXXXXX03 |
| XXXXXXX55 | XXXXXXX15 | XXXXXXX13 | XXXXXXX53 | XXXXXXX60 | XXXXXXX82 | XXXXXXX06 | XXXXXXX86 |
| XXXXXXX14 | XXXXXXX86 | XXXXXXX60 | XXXXXXX87 | XXXXXXX50 | XXXXXXX39 | XXXXXXX73 | XXXXXXX50 |
| XXXXXXX62 | XXXXXXX78 | XXXXXXX09 | XXXXXXX34 | XXXXXXX88 | XXXXXXX89 | XXXXXXX99 | XXXXXXX59 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX40 | XXXXXXX78 | XXXXXXX15 | XXXXXXX44 | XXXXXXX06 | XXXXXXX31 | XXXXXXX09 | XXXXXXX82 |
| XXXXXXX07 | XXXXXXX48 | XXXXXXX74 | XXXXXXX87 | XXXXXXX30 | XXXXXXX91 | XXXXXXX63 | XXXXXXX86 |
| XXXXXXX03 | XXXXXXX00 | XXXXXXX90 | XXXXXXX38 | XXXXXXX82 | XXXXXXX34 | XXXXXXX52 | XXXXXXX17 |
| XXXXXXX46 | XXXXXXX58 | XXXXXXX93 | XXXXXXX48 | XXXXXXX55 | XXXXXXX97 | XXXXXXX25 | XXXXXXX18 |
| XXXXXXX23 | XXXXXXX03 | XXXXXXX59 | XXXXXXX47 | XXXXXXX18 | XXXXXXX34 | XXXXXXX90 | XXXXXXX19 |
| XXXXXXX77 | XXXXXXX38 | XXXXXXX87 | XXXXXXX50 | XXXXXXX33 | XXXXXXX86 | XXXXXXX03 | XXXXXXX11 |
| XXXXXXX72 | XXXXXXX87 | XXXXXXX42 | XXXXXXX49 | XXXXXXX38 | XXXXXXX45 | XXXXXXX49 | XXXXXXX36 |
| XXXXXXX59 | XXXXXXX92 | XXXXXXX15 | XXXXXXX53 | XXXXXXX90 | XXXXXXX36 | XXXXXXX18 | XXXXXXX22 |
| XXXXXXX62 | XXXXXXX82 | XXXXXXX82 | XXXXXXX82 | XXXXXXX14 | XXXXXXX69 | XXXXXXX41 | XXXXXXX35 |
| XXXXXXX91 | XXXXXXX26 | XXXXXXX59 | XXXXXXX04 | XXXXXXX69 | XXXXXXX51 | XXXXXXX02 | XXXXXXX85 |
| XXXXXXX80 | XXXXXXX68 | XXXXXXX90 | XXXXXXX50 | XXXXXXX54 | XXXXXXX89 | XXXXXXX22 | XXXXXXX09 |
| XXXXXXX57 | XXXXXXX77 | XXXXXXX86 | XXXXXXX72 | XXXXXXX82 | XXXXXXX98 | XXXXXXX19 | XXXXXXX25 |
| XXXXXXX86 | XXXXXXX04 | XXXXXXX10 | XXXXXXX29 | XXXXXXX76 | XXXXXXX03 | XXXXXXX91 | XXXXXXX01 |
| XXXXXXX19 | XXXXXXX19 | XXXXXXX07 | XXXXXXX28 | XXXXXXX45 | XXXXXXX35 | XXXXXXX06 | XXXXXXX63 |
| XXXXXXX19 | XXXXXXX63 | XXXXXXX55 | XXXXXXX12 | XXXXXXX63 | XXXXXXX68 | XXXXXXX87 | XXXXXXX63 |
| XXXXXXX60 | XXXXXXX79 | XXXXXXX63 | XXXXXXX37 | XXXXXXX70 | XXXXXXX07 | XXXXXXX55 | XXXXXXX33 |
| XXXXXXX49 | XXXXXXX63 | XXXXXXX61 | XXXXXXX21 | XXXXXXX80 | XXXXXXX98 | XXXXXXX46 | XXXXXXX65 |
| XXXXXXX44 | XXXXXXX55 | XXXXXXX62 | XXXXXXX83 | XXXXXXX43 | XXXXXXX60 | XXXXXXX38 | XXXXXXX35 |
| XXXXXXX14 | XXXXXXX78 | XXXXXXX75 | XXXXXXX90 | XXXXXXX47 | XXXXXXX39 | XXXXXXX99 | XXXXXXX20 |
| XXXXXXX37 | XXXXXXX37 | XXXXXXX31 | XXXXXXX01 | XXXXXXX01 | XXXXXXX32 | XXXXXXX13 | XXXXXXX29 |
| XXXXXXX79 | XXXXXXX94 | XXXXXXX61 | XXXXXXX04 | XXXXXXX37 | XXXXXXX56 | XXXXXXX07 | XXXXXXX57 |
| XXXXXXX08 | XXXXXXX96 | XXXXXXX04 | XXXXXXX82 | XXXXXXX90 | XXXXXXX50 | XXXXXXX50 | XXXXXXX76 |
| XXXXXXX08 | XXXXXXX23 | XXXXXXX11 | XXXXXXX23 | XXXXXXX01 | XXXXXXX01 | XXXXXXX01 | XXXXXXX76 |
| XXXXXXX70 | XXXXXXX37 | XXXXXXX92 | XXXXXXX99 | XXXXXXX89 | XXXXXXX40 | XXXXXXX72 | XXXXXXX24 |
| XXXXXXX10 | XXXXXXX09 | XXXXXXX09 | XXXXXXX09 | XXXXXXX92 | XXXXXXX93 | XXXXXXX06 | XXXXXXX87 |
| XXXXXXX75 | XXXXXXX34 | XXXXXXX90 | XXXXXXX13 | XXXXXXX65 | XXXXXXX93 | XXXXXXX04 | XXXXXXX97 |
| XXXXXXX74 | XXXXXXX67 | XXXXXXX81 | XXXXXXX57 | XXXXXXX26 | XXXXXXX72 | XXXXXXX42 | XXXXXXX49 |
| XXXXXXX87 | XXXXXXX44 | XXXXXXX24 | XXXXXXX94 | XXXXXXX30 | XXXXXXX72 | XXXXXXX91 | XXXXXXX54 |
| XXXXXXX62 | XXXXXXX02 | XXXXXXX04 | XXXXXXX72 | XXXXXXX70 | XXXXXXX02 | XXXXXXX29 | XXXXXXX27 |
| XXXXXXX87 | XXXXXXX21 | XXXXXXX30 | XXXXXXX72 | XXXXXXX09 | XXXXXXX07 | XXXXXXX23 | XXXXXXX15 |
| XXXXXXX94 | XXXXXXX61 | XXXXXXX32 | XXXXXXX98 | XXXXXXX94 | XXXXXXX55 | XXXXXXX53 | XXXXXXX84 |
| XXXXXXX60 | XXXXXXX09 | XXXXXXX69 | XXXXXXX96 | XXXXXXX68 | XXXXXXX22 | XXXXXXX54 | XXXXXXX01 |
| XXXXXXX45 | XXXXXXX81 | XXXXXXX28 | XXXXXXX13 | XXXXXXX42 | XXXXXXX25 | XXXXXXX33 | XXXXXXX25 |
| XXXXXXX11 | XXXXXXX74 | XXXXXXX11 | XXXXXXX86 | XXXXXXX97 | XXXXXXX93 | XXXXXXX50 | XXXXXXX42 |
| XXXXXXX20 | XXXXXXX73 | XXXXXXX55 | XXXXXXX50 | XXXXXXX29 | XXXXXXX21 | XXXXXXX04 | XXXXXXX57 |
| XXXXXXX54 | XXXXXXX01 | XXXXXXX09 | XXXXXXX15 | XXXXXXX46 | XXXXXXX46 | XXXXXXX15 | XXXXXXX62 |
| XXXXXXX63 | XXXXXXX25 | XXXXXXX36 | XXXXXXX50 | XXXXXXX51 | XXXXXXX88 | XXXXXXX73 | XXXXXXX33 |
| XXXXXXX60 | XXXXXXX94 | XXXXXXX19 | XXXXXXX73 | XXXXXXX34 | XXXXXXX58 | XXXXXXX94 | XXXXXXX13 |
| XXXXXXX17 | XXXXXXX76 | XXXXXXX26 | XXXXXXX01 | XXXXXXX71 | XXXXXXX75 | XXXXXXX39 | XXXXXXX12 |
| XXXXXXX43 | XXXXXXX59 | XXXXXXX06 | XXXXXXX80 | XXXXXXX55 | XXXXXXX69 | XXXXXXX07 | XXXXXXX67 |
| XXXXXXX40 | XXXXXXX30 | XXXXXXX24 | XXXXXXX33 | XXXXXXX92 | XXXXXXX01 | XXXXXXX68 | XXXXXXX75 |
| XXXXXXX53 | XXXXXXX09 | XXXXXXX39 | XXXXXXX82 | XXXXXXX43 | XXXXXXX48 | XXXXXXX79 | XXXXXXX72 |
| XXXXXXX41 | XXXXXXX82 | XXXXXXX16 | XXXXXXX03 | XXXXXXX85 | XXXXXXX42 | XXXXXXX87 | XXXXXXX56 |
| XXXXXXX08 | XXXXXXX08 | XXXXXXX38 | XXXXXXX38 | XXXXXXX54 | XXXXXXX65 | XXXXXXX07 | XXXXXXX28 |
| XXXXXXX91 | XXXXXXX12 | XXXXXXX46 | XXXXXXX05 | XXXXXXX44 | XXXXXXX96 | XXXXXXX93 | XXXXXXX23 |
| XXXXXXX51 | XXXXXXX51 | XXXXXXX92 | XXXXXXX32 | XXXXXXX32 | XXXXXXX32 | XXXXXXX50 | XXXXXXX12 |
| XXXXXXX29 | XXXXXXX29 | XXXXXXX20 | XXXXXXX67 | XXXXXXX90 | XXXXXXX94 | XXXXXXX28 | XXXXXXX28 |
| XXXXXXX28 | XXXXXXX20 | XXXXXXX30 | XXXXXXX38 | XXXXXXX75 | XXXXXXX38 | XXXXXXX80 | XXXXXXX80 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX80 | XXXXXXX80 | XXXXXXX80 | XXXXXXX80 | XXXXXXX09 | XXXXXXX24 | XXXXXXX69 | XXXXXXX78 |
| XXXXXXX03 | XXXXXXX37 | XXXXXXX04 | XXXXXXX21 | XXXXXXX13 | XXXXXXX62 | XXXXXXX37 | XXXXXXX04 |
| XXXXXXX29 | XXXXXXX11 | XXXXXXX02 | XXXXXXX70 | XXXXXXX76 | XXXXXXX59 | XXXXXXX59 | XXXXXXX59 |
| XXXXXXX18 | XXXXXXX06 | XXXXXXX52 | XXXXXXX44 | XXXXXXX67 | XXXXXXX98 | XXXXXXX14 | XXXXXXX61 |
| XXXXXXX38 | XXXXXXX38 | XXXXXXX88 | XXXXXXX20 | XXXXXXX24 | XXXXXXX78 | XXXXXXX71 | XXXXXXX11 |
| XXXXXXX18 | XXXXXXX77 | XXXXXXX02 | XXXXXXX71 | XXXXXXX60 | XXXXXXX71 | XXXXXXX93 | XXXXXXX82 |
| XXXXXXX03 | XXXXXXX28 | XXXXXXX91 | XXXXXXX34 | XXXXXXX95 | XXXXXXX32 | XXXXXXX28 | XXXXXXX80 |
| XXXXXXX20 | XXXXXXX82 | XXXXXXX91 | XXXXXXX63 | XXXXXXX00 | XXXXXXX88 | XXXXXXX09 | XXXXXXX77 |
| XXXXXXX93 | XXXXXXX83 | XXXXXXX55 | XXXXXXX52 | XXXXXXX72 | XXXXXXX69 | XXXXXXX59 | XXXXXXX60 |
| XXXXXXX79 | XXXXXXX10 | XXXXXXX10 | XXXXXXX43 | XXXXXXX00 | XXXXXXX45 | XXXXXXX07 | XXXXXXX24 |
| XXXXXXX04 | XXXXXXX49 | XXXXXXX78 | XXXXXXX00 | XXXXXXX14 | XXXXXXX97 | XXXXXXX94 | XXXXXXX12 |
| XXXXXXX15 | XXXXXXX47 | XXXXXXX18 | XXXXXXX30 | XXXXXXX10 | XXXXXXX95 | XXXXXXX95 | XXXXXXX95 |
| XXXXXXX75 | XXXXXXX50 | XXXXXXX84 | XXXXXXX04 | XXXXXXX77 | XXXXXXX14 | XXXXXXX91 | XXXXXXX78 |
| XXXXXXX66 | XXXXXXX05 | XXXXXXX85 | XXXXXXX69 | XXXXXXX78 | XXXXXXX03 | XXXXXXX27 | XXXXXXX23 |
| XXXXXXX33 | XXXXXXX46 | XXXXXXX64 | XXXXXXX93 | XXXXXXX47 | XXXXXXX23 | XXXXXXX05 | XXXXXXX48 |
| XXXXXXX20 | XXXXXXX48 | XXXXXXX71 | XXXXXXX50 | XXXXXXX37 | XXXXXXX53 | XXXXXXX15 | XXXXXXX63 |
| XXXXXXX08 | XXXXXXX41 | XXXXXXX83 | XXXXXXX64 | XXXXXXX72 | XXXXXXX84 | XXXXXXX28 | XXXXXXX51 |
| XXXXXXX05 | XXXXXXX80 | XXXXXXX30 | XXXXXXX27 | XXXXXXX54 | XXXXXXX42 | XXXXXXX34 | XXXXXXX32 |
| XXXXXXX31 | XXXXXXX28 | XXXXXXX86 | XXXXXXX91 | XXXXXXX22 | XXXXXXX16 | XXXXXXX81 | XXXXXXX30 |
| XXXXXXX06 | XXXXXXX32 | XXXXXXX23 | XXXXXXX72 | XXXXXXX40 | XXXXXXX98 | XXXXXXX35 | XXXXXXX35 |
| XXXXXXX35 | XXXXXXX35 | XXXXXXX68 | XXXXXXX77 | XXXXXXX90 | XXXXXXX90 | XXXXXXX37 | XXXXXXX84 |
| XXXXXXX50 | XXXXXXX59 | XXXXXXX37 | XXXXXXX37 | XXXXXXX37 | XXXXXXX18 | XXXXXXX39 | XXXXXXX53 |
| XXXXXXX75 | XXXXXXX75 | XXXXXXX70 | XXXXXXX65 | XXXXXXX32 | XXXXXXX47 | XXXXXXX53 | XXXXXXX62 |
| XXXXXXX81 | XXXXXXX93 | XXXXXXX94 | XXXXXXX94 | XXXXXXX52 | XXXXXXX03 | XXXXXXX13 | XXXXXXX54 |
| XXXXXXX48 | XXXXXXX91 | XXXXXXX61 | XXXXXXX02 | XXXXXXX09 | XXXXXXX45 | XXXXXXX07 | XXXXXXX02 |
| XXXXXXX19 | XXXXXXX01 | XXXXXXX48 | XXXXXXX71 | XXXXXXX78 | XXXXXXX87 | XXXXXXX15 | XXXXXXX12 |
| XXXXXXX14 | XXXXXXX25 | XXXXXXX46 | XXXXXXX26 | XXXXXXX45 | XXXXXXX31 | XXXXXXX70 | XXXXXXX11 |
| XXXXXXX17 | XXXXXXX95 | XXXXXXX92 | XXXXXXX45 | XXXXXXX68 | XXXXXXX91 | XXXXXXX80 | XXXXXXX94 |
| XXXXXXX98 | XXXXXXX92 | XXXXXXX77 | XXXXXXX96 | XXXXXXX15 | XXXXXXX94 | XXXXXXX29 | XXXXXXX42 |
| XXXXXXX51 | XXXXXXX77 | XXXXXXX77 | XXXXXXX28 | XXXXXXX39 | XXXXXXX54 | XXXXXXX27 | XXXXXXX31 |
| XXXXXXX89 | XXXXXXX44 | XXXXXXX75 | XXXXXXX75 | XXXXXXX75 | XXXXXXX52 | XXXXXXX67 | XXXXXXX67 |
| XXXXXXX86 | XXXXXXX75 | XXXXXXX90 | XXXXXXX10 | XXXXXXX58 | XXXXXXX82 | XXXXXXX71 | XXXXXXX49 |
| XXXXXXX90 | XXXXXXX91 | XXXXXXX63 | XXXXXXX76 | XXXXXXX97 | XXXXXXX88 | XXXXXXX52 | XXXXXXX54 |
| XXXXXXX67 | XXXXXXX76 | XXXXXXX18 | XXXXXXX97 | XXXXXXX37 | XXXXXXX92 | XXXXXXX19 | XXXXXXX38 |
| XXXXXXX44 | XXXXXXX84 | XXXXXXX78 | XXXXXXX61 | XXXXXXX73 | XXXXXXX65 | XXXXXXX78 | XXXXXXX13 |
| XXXXXXX60 | XXXXXXX65 | XXXXXXX53 | XXXXXXX47 | XXXXXXX46 | XXXXXXX24 | XXXXXXX68 | XXXXXXX98 |
| XXXXXXX32 | XXXXXXX95 | XXXXXXX39 | XXXXXXX35 | XXXXXXX04 | XXXXXXX93 | XXXXXXX31 | XXXXXXX17 |
| XXXXXXX97 | XXXXXXX21 | XXXXXXX51 | XXXXXXX90 | XXXXXXX27 | XXXXXXX95 | XXXXXXX98 | XXXXXXX10 |
| XXXXXXX61 | XXXXXXX32 | XXXXXXX14 | XXXXXXX82 | XXXXXXX82 | XXXXXXX56 | XXXXXXX51 | XXXXXXX52 |
| XXXXXXX34 | XXXXXXX56 | XXXXXXX54 | XXXXXXX93 | XXXXXXX25 | XXXXXXX11 | XXXXXXX47 | XXXXXXX12 |
| XXXXXXX10 | XXXXXXX08 | XXXXXXX35 | XXXXXXX65 | XXXXXXX36 | XXXXXXX18 | XXXXXXX85 | XXXXXXX59 |
| XXXXXXX94 | XXXXXXX70 | XXXXXXX10 | XXXXXXX73 | XXXXXXX02 | XXXXXXX22 | XXXXXXX77 | XXXXXXX30 |
| XXXXXXX40 | XXXXXXX20 | XXXXXXX28 | XXXXXXX53 | XXXXXXX34 | XXXXXXX84 | XXXXXXX41 | XXXXXXX68 |
| XXXXXXX63 | XXXXXXX27 | XXXXXXX03 | XXXXXXX10 | XXXXXXX18 | XXXXXXX73 | XXXXXXX11 | XXXXXXX01 |
| XXXXXXX99 | XXXXXXX49 | XXXXXXX46 | XXXXXXX85 | XXXXXXX06 | XXXXXXX96 | XXXXXXX32 | XXXXXXX18 |
| XXXXXXX19 | XXXXXXX78 | XXXXXXX58 | XXXXXXX04 | XXXXXXX03 | XXXXXXX25 | XXXXXXX72 | XXXXXXX72 |
| XXXXXXX71 | XXXXXXX04 | XXXXXXX39 | XXXXXXX37 | XXXXXXX93 | XXXXXXX57 | XXXXXXX14 | XXXXXXX36 |
| XXXXXXX14 | XXXXXXX78 | XXXXXXX34 | XXXXXXX67 | XXXXXXX33 | XXXXXXX00 | XXXXXXX09 | XXXXXXX05 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX71 | XXXXXXX62 | XXXXXXX57 | XXXXXXX67 | XXXXXXX47 | XXXXXXX21 | XXXXXXX57 | XXXXXXX65 |
| XXXXXXX92 | XXXXXXX73 | XXXXXXX94 | XXXXXXX76 | XXXXXXX47 | XXXXXXX78 | XXXXXXX76 | XXXXXXX28 |
| XXXXXXX90 | XXXXXXX96 | XXXXXXX20 | XXXXXXX85 | XXXXXXX22 | XXXXXXX08 | XXXXXXX01 | XXXXXXX84 |
| XXXXXXX02 | XXXXXXX23 | XXXXXXX71 | XXXXXXX67 | XXXXXXX94 | XXXXXXX17 | XXXXXXX83 | XXXXXXX67 |
| XXXXXXX40 | XXXXXXX98 | XXXXXXX68 | XXXXXXX83 | XXXXXXX89 | XXXXXXX76 | XXXXXXX66 | XXXXXXX44 |
| XXXXXXX45 | XXXXXXX50 | XXXXXXX40 | XXXXXXX78 | XXXXXXX55 | XXXXXXX50 | XXXXXXX22 | XXXXXXX25 |
| XXXXXXX38 | XXXXXXX24 | XXXXXXX29 | XXXXXXX04 | XXXXXXX44 | XXXXXXX86 | XXXXXXX47 | XXXXXXX33 |
| XXXXXXX42 | XXXXXXX53 | XXXXXXX48 | XXXXXXX75 | XXXXXXX71 | XXXXXXX12 | XXXXXXX12 | XXXXXXX76 |
| XXXXXXX81 | XXXXXXX14 | XXXXXXX05 | XXXXXXX02 | XXXXXXX26 | XXXXXXX00 | XXXXXXX40 | XXXXXXX54 |
| XXXXXXX63 | XXXXXXX98 | XXXXXXX13 | XXXXXXX24 | XXXXXXX81 | XXXXXXX01 | XXXXXXX70 | XXXXXXX06 |
| XXXXXXX30 | XXXXXXX03 | XXXXXXX33 | XXXXXXX02 | XXXXXXX83 | XXXXXXX40 | XXXXXXX07 | XXXXXXX23 |
| XXXXXXX32 | XXXXXXX75 | XXXXXXX25 | XXXXXXX36 | XXXXXXX13 | XXXXXXX87 | XXXXXXX68 | XXXXXXX14 |
| XXXXXXX60 | XXXXXXX82 | XXXXXXX94 | XXXXXXX57 | XXXXXXX56 | XXXXXXX25 | XXXXXXX92 | XXXXXXX36 |
| XXXXXXX23 | XXXXXXX77 | XXXXXXX90 | XXXXXXX44 | XXXXXXX73 | XXXXXXX30 | XXXXXXX45 | XXXXXXX76 |
| XXXXXXX12 | XXXXXXX05 | XXXXXXX12 | XXXXXXX56 | XXXXXXX08 | XXXXXXX26 | XXXXXXX10 | XXXXXXX30 |
| XXXXXXX47 | XXXXXXX28 | XXXXXXX29 | XXXXXXX02 | XXXXXXX16 | XXXXXXX56 | XXXXXXX33 | XXXXXXX46 |
| XXXXXXX49 | XXXXXXX25 | XXXXXXX36 | XXXXXXX02 | XXXXXXX61 | XXXXXXX50 | XXXXXXX59 | XXXXXXX46 |
| XXXXXXX69 | XXXXXXX28 | XXXXXXX50 | XXXXXXX32 | XXXXXXX01 | XXXXXXX13 | XXXXXXX13 | XXXXXXX13 |
| XXXXXXX13 | XXXXXXX13 | XXXXXXX13 | XXXXXXX13 | XXXXXXX04 | XXXXXXX62 | XXXXXXX44 | XXXXXXX88 |
| XXXXXXX65 | XXXXXXX95 | XXXXXXX79 | XXXXXXX69 | XXXXXXX80 | XXXXXXX85 | XXXXXXX88 | XXXXXXX50 |
| XXXXXXX99 | XXXXXXX55 | XXXXXXX78 | XXXXXXX06 | XXXXXXX15 | XXXXXXX83 | XXXXXXX58 | XXXXXXX29 |
| XXXXXXX10 | XXXXXXX36 | XXXXXXX12 | XXXXXXX83 | XXXXXXX72 | XXXXXXX89 | XXXXXXX49 | XXXXXXX49 |
| XXXXXXX23 | XXXXXXX64 | XXXXXXX51 | XXXXXXX26 | XXXXXXX47 | XXXXXXX62 | XXXXXXX48 | XXXXXXX53 |
| XXXXXXX02 | XXXXXXX52 | XXXXXXX32 | XXXXXXX64 | XXXXXXX55 | XXXXXXX50 | XXXXXXX08 | XXXXXXX61 |
| XXXXXXX82 | XXXXXXX10 | XXXXXXX98 | XXXXXXX96 | XXXXXXX38 | XXXXXXX28 | XXXXXXX57 | XXXXXXX56 |
| XXXXXXX64 | XXXXXXX96 | XXXXXXX38 | XXXXXXX46 | XXXXXXX35 | XXXXXXX99 | XXXXXXX41 | XXXXXXX20 |
| XXXXXXX87 | XXXXXXX56 | XXXXXXX81 | XXXXXXX31 | XXXXXXX55 | XXXXXXX20 | XXXXXXX24 | XXXXXXX23 |
| XXXXXXX96 | XXXXXXX51 | XXXXXXX67 | XXXXXXX89 | XXXXXXX78 | XXXXXXX47 | XXXXXXX27 | XXXXXXX75 |
| XXXXXXX37 | XXXXXXX73 | XXXXXXX74 | XXXXXXX70 | XXXXXXX61 | XXXXXXX12 | XXXXXXX86 | XXXXXXX56 |
| XXXXXXX29 | XXXXXXX44 | XXXXXXX79 | XXXXXXX42 | XXXXXXX45 | XXXXXXX85 | XXXXXXX82 | XXXXXXX53 |
| XXXXXXX48 | XXXXXXX95 | XXXXXXX17 | XXXXXXX99 | XXXXXXX60 | XXXXXXX47 | XXXXXXX16 | XXXXXXX72 |
| XXXXXXX99 | XXXXXXX72 | XXXXXXX44 | XXXXXXX66 | XXXXXXX77 | XXXXXXX35 | XXXXXXX89 | XXXXXXX07 |
| XXXXXXX38 | XXXXXXX22 | XXXXXXX33 | XXXXXXX27 | XXXXXXX83 | XXXXXXX86 | XXXXXXX31 | XXXXXXX42 |
| XXXXXXX31 | XXXXXXX88 | XXXXXXX46 | XXXXXXX75 | XXXXXXX99 | XXXXXXX08 | XXXXXXX58 | XXXXXXX67 |
| XXXXXXX84 | XXXXXXX03 | XXXXXXX05 | XXXXXXX82 | XXXXXXX08 | XXXXXXX83 | XXXXXXX67 | XXXXXXX72 |
| XXXXXXX13 | XXXXXXX09 | XXXXXXX09 | XXXXXXX88 | XXXXXXX59 | XXXXXXX47 | XXXXXXX07 | XXXXXXX23 |
| XXXXXXX21 | XXXXXXX48 | XXXXXXX93 | XXXXXXX24 | XXXXXXX10 | XXXXXXX96 | XXXXXXX76 | XXXXXXX69 |
| XXXXXXX83 | XXXXXXX25 | XXXXXXX28 | XXXXXXX54 | XXXXXXX47 | XXXXXXX10 | XXXXXXX78 | XXXXXXX72 |
| XXXXXXX93 | XXXXXXX07 | XXXXXXX14 | XXXXXXX99 | XXXXXXX29 | XXXXXXX95 | XXXXXXX44 | XXXXXXX99 |
| XXXXXXX16 | XXXXXXX23 | XXXXXXX53 | XXXXXXX36 | XXXXXXX08 | XXXXXXX00 | XXXXXXX32 | XXXXXXX36 |
| XXXXXXX91 | XXXXXXX91 | XXXXXXX18 | XXXXXXX07 | XXXXXXX90 | XXXXXXX87 | XXXXXXX77 | XXXXXXX65 |
| XXXXXXX99 | XXXXXXX89 | XXXXXXX79 | XXXXXXX13 | XXXXXXX04 | XXXXXXX53 | XXXXXXX44 | XXXXXXX64 |
| XXXXXXX07 | XXXXXXX47 | XXXXXXX95 | XXXXXXX21 | XXXXXXX13 | XXXXXXX99 | XXXXXXX49 | XXXXXXX68 |
| XXXXXXX20 | XXXXXXX50 | XXXXXXX23 | XXXXXXX24 | XXXXXXX35 | XXXXXXX39 | XXXXXXX48 | XXXXXXX77 |
| XXXXXXX98 | XXXXXXX46 | XXXXXXX64 | XXXXXXX61 | XXXXXXX87 | XXXXXXX49 | XXXXXXX82 | XXXXXXX43 |
| XXXXXXX82 | XXXXXXX96 | XXXXXXX96 | XXXXXXX69 | XXXXXXX31 | XXXXXXX82 | XXXXXXX02 | XXXXXXX48 |
| XXXXXXX75 | XXXXXXX28 | XXXXXXX32 | XXXXXXX31 | XXXXXXX98 | XXXXXXX40 | XXXXXXX68 | XXXXXXX58 |
| XXXXXXX78 | XXXXXXX19 | XXXXXXX39 | XXXXXXX34 | XXXXXXX50 | XXXXXXX94 | XXXXXXX06 | XXXXXXX71 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX85 | XXXXXXX52 | XXXXXXX54 | XXXXXXX51 | XXXXXXX51 | XXXXXXX03 | XXXXXXX22 | XXXXXXX99 |
| XXXXXXX78 | XXXXXXX89 | XXXXXXX70 | XXXXXXX89 | XXXXXXX34 | XXXXXXX71 | XXXXXXX89 | XXXXXXX50 |
| XXXXXXX28 | XXXXXXX06 | XXXXXXX40 | XXXXXXX96 | XXXXXXX50 | XXXXXXX71 | XXXXXXX26 | XXXXXXX74 |
| XXXXXXX86 | XXXXXXX04 | XXXXXXX12 | XXXXXXX32 | XXXXXXX35 | XXXXXXX12 | XXXXXXX79 | XXXXXXX70 |
| XXXXXXX75 | XXXXXXX26 | XXXXXXX63 | XXXXXXX08 | XXXXXXX65 | XXXXXXX99 | XXXXXXX43 | XXXXXXX92 |
| XXXXXXX13 | XXXXXXX32 | XXXXXXX20 | XXXXXXX20 | XXXXXXX86 | XXXXXXX82 | XXXXXXX90 | XXXXXXX97 |
| XXXXXXX40 | XXXXXXX74 | XXXXXXX36 | XXXXXXX91 | XXXXXXX81 | XXXXXXX92 | XXXXXXX17 | XXXXXXX96 |
| XXXXXXX25 | XXXXXXX58 | XXXXXXX40 | XXXXXXX95 | XXXXXXX98 | XXXXXXX15 | XXXXXXX15 | XXXXXXX59 |
| XXXXXXX95 | XXXXXXX33 | XXXXXXX97 | XXXXXXX77 | XXXXXXX10 | XXXXXXX17 | XXXXXXX63 | XXXXXXX34 |
| XXXXXXX38 | XXXXXXX38 | XXXXXXX38 | XXXXXXX60 | XXXXXXX96 | XXXXXXX62 | XXXXXXX73 | XXXXXXX26 |
| XXXXXXX59 | XXXXXXX73 | XXXXXXX07 | XXXXXXX35 | XXXXXXX43 | XXXXXXX74 | XXXXXXX34 | XXXXXXX96 |
| XXXXXXX80 | XXXXXXX68 | XXXXXXX28 | XXXXXXX84 | XXXXXXX58 | XXXXXXX11 | XXXXXXX94 | XXXXXXX42 |
| XXXXXXX26 | XXXXXXX53 | XXXXXXX11 | XXXXXXX95 | XXXXXXX45 | XXXXXXX15 | XXXXXXX87 | XXXXXXX68 |
| XXXXXXX76 | XXXXXXX78 | XXXXXXX12 | XXXXXXX16 | XXXXXXX87 | XXXXXXX16 | XXXXXXX16 | XXXXXXX50 |
| XXXXXXX19 | XXXXXXX23 | XXXXXXX73 | XXXXXXX29 | XXXXXXX59 | XXXXXXX10 | XXXXXXX20 | XXXXXXX08 |
| XXXXXXX97 | XXXXXXX30 | XXXXXXX56 | XXXXXXX93 | XXXXXXX16 | XXXXXXX06 | XXXXXXX94 | XXXXXXX74 |
| XXXXXXX10 | XXXXXXX93 | XXXXXXX45 | XXXXXXX14 | XXXXXXX26 | XXXXXXX51 | XXXXXXX73 | XXXXXXX35 |
| XXXXXXX46 | XXXXXXX49 | XXXXXXX29 | XXXXXXX17 | XXXXXXX78 | XXXXXXX61 | XXXXXXX06 | XXXXXXX98 |
| XXXXXXX86 | XXXXXXX93 | XXXXXXX99 | XXXXXXX06 | XXXXXXX33 | XXXXXXX29 | XXXXXXX14 | XXXXXXX19 |
| XXXXXXX77 | XXXXXXX04 | XXXXXXX12 | XXXXXXX93 | XXXXXXX84 | XXXXXXX81 | XXXXXXX50 | XXXXXXX22 |
| XXXXXXX46 | XXXXXXX27 | XXXXXXX65 | XXXXXXX79 | XXXXXXX40 | XXXXXXX96 | XXXXXXX70 | XXXXXXX17 |
| XXXXXXX69 | XXXXXXX39 | XXXXXXX00 | XXXXXXX88 | XXXXXXX62 | XXXXXXX35 | XXXXXXX69 | XXXXXXX94 |
| XXXXXXX35 | XXXXXXX35 | XXXXXXX35 | XXXXXXX63 | XXXXXXX35 | XXXXXXX35 | XXXXXXX35 | XXXXXXX35 |
| XXXXXXX04 | XXXXXXX45 | XXXXXXX96 | XXXXXXX40 | XXXXXXX92 | XXXXXXX72 | XXXXXXX22 | XXXXXXX73 |
| XXXXXXX06 | XXXXXXX73 | XXXXXXX70 | XXXXXXX19 | XXXXXXX53 | XXXXXXX56 | XXXXXXX81 | XXXXXXX62 |
| XXXXXXX07 | XXXXXXX77 | XXXXXXX50 | XXXXXXX91 | XXXXXXX61 | XXXXXXX56 | XXXXXXX82 | XXXXXXX36 |
| XXXXXXX97 | XXXXXXX24 | XXXXXXX99 | XXXXXXX95 | XXXXXXX71 | XXXXXXX02 | XXXXXXX20 | XXXXXXX77 |
| XXXXXXX35 | XXXXXXX35 | XXXXXXX64 | XXXXXXX82 | XXXXXXX30 | XXXXXXX98 | XXXXXXX95 | XXXXXXX36 |
| XXXXXXX92 | XXXXXXX04 | XXXXXXX79 | XXXXXXX34 | XXXXXXX09 | XXXXXXX75 | XXXXXXX27 | XXXXXXX17 |
| XXXXXXX15 | XXXXXXX37 | XXXXXXX88 | XXXXXXX83 | XXXXXXX67 | XXXXXXX56 | XXXXXXX57 | XXXXXXX61 |
| XXXXXXX46 | XXXXXXX82 | XXXXXXX17 | XXXXXXX90 | XXXXXXX31 | XXXXXXX38 | XXXXXXX52 | XXXXXXX08 |
| XXXXXXX30 | XXXXXXX99 | XXXXXXX69 | XXXXXXX33 | XXXXXXX76 | XXXXXXX71 | XXXXXXX79 | XXXXXXX97 |
| XXXXXXX37 | XXXXXXX46 | XXXXXXX99 | XXXXXXX35 | XXXXXXX44 | XXXXXXX65 | XXXXXXX29 | XXXXXXX83 |
| XXXXXXX83 | XXXXXXX26 | XXXXXXX56 | XXXXXXX19 | XXXXXXX29 | XXXXXXX17 | XXXXXXX85 | XXXXXXX61 |
| XXXXXXX85 | XXXXXXX18 | XXXXXXX96 | XXXXXXX52 | XXXXXXX82 | XXXXXXX82 | XXXXXXX67 | XXXXXXX27 |
| XXXXXXX01 | XXXXXXX97 | XXXXXXX87 | XXXXXXX24 | XXXXXXX36 | XXXXXXX54 | XXXXXXX87 | XXXXXXX08 |
| XXXXXXX93 | XXXXXXX32 | XXXXXXX18 | XXXXXXX44 | XXXXXXX38 | XXXXXXX68 | XXXXXXX07 | XXXXXXX75 |
| XXXXXXX36 | XXXXXXX26 | XXXXXXX33 | XXXXXXX10 | XXXXXXX61 | XXXXXXX06 | XXXXXXX11 | XXXXXXX93 |
| XXXXXXX69 | XXXXXXX03 | XXXXXXX50 | XXXXXXX69 | XXXXXXX92 | XXXXXXX09 | XXXXXXX94 | XXXXXXX86 |
| XXXXXXX99 | XXXXXXX99 | XXXXXXX29 | XXXXXXX45 | XXXXXXX35 | XXXXXXX01 | XXXXXXX41 | XXXXXXX60 |
| XXXXXXX72 | XXXXXXX92 | XXXXXXX70 | XXXXXXX46 | XXXXXXX48 | XXXXXXX93 | XXXXXXX52 | XXXXXXX29 |
| XXXXXXX81 | XXXXXXX76 | XXXXXXX80 | XXXXXXX04 | XXXXXXX14 | XXXXXXX16 | XXXXXXX69 | XXXXXXX97 |
| XXXXXXX71 | XXXXXXX51 | XXXXXXX20 | XXXXXXX41 | XXXXXXX96 | XXXXXXX04 | XXXXXXX19 | XXXXXXX29 |
| XXXXXXX26 | XXXXXXX08 | XXXXXXX76 | XXXXXXX76 | XXXXXXX45 | XXXXXXX28 | XXXXXXX41 | XXXXXXX23 |
| XXXXXXX60 | XXXXXXX65 | XXXXXXX47 | XXXXXXX75 | XXXXXXX93 | XXXXXXX73 | XXXXXXX53 | XXXXXXX96 |
| XXXXXXX11 | XXXXXXX33 | XXXXXXX32 | XXXXXXX91 | XXXXXXX81 | XXXXXXX29 | XXXXXXX97 | XXXXXXX33 |
| XXXXXXX28 | XXXXXXX34 | XXXXXXX36 | XXXXXXX48 | XXXXXXX76 | XXXXXXX95 | XXXXXXX10 | XXXXXXX10 |
| XXXXXXX40 | XXXXXXX00 | XXXXXXX35 | XXXXXXX61 | XXXXXXX18 | XXXXXXX18 | XXXXXXX51 | XXXXXXX30 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX30 | XXXXXXX90 | XXXXXXX59 | XXXXXXX59 | XXXXXXX52 | XXXXXXX84 | XXXXXXX09 | XXXXXXX01 |
| XXXXXXX53 | XXXXXXX44 | XXXXXXX41 | XXXXXXX42 | XXXXXXX77 | XXXXXXX98 | XXXXXXX21 | XXXXXXX26 |
| XXXXXXX80 | XXXXXXX81 | XXXXXXX50 | XXXXXXX61 | XXXXXXX53 | XXXXXXX25 | XXXXXXX19 | XXXXXXX51 |
| XXXXXXX51 | XXXXXXX18 | XXXXXXX66 | XXXXXXX61 | XXXXXXX68 | XXXXXXX12 | XXXXXXX49 | XXXXXXX19 |
| XXXXXXX21 | XXXXXXX36 | XXXXXXX02 | XXXXXXX66 | XXXXXXX19 | XXXXXXX01 | XXXXXXX12 | XXXXXXX23 |
| XXXXXXX38 | XXXXXXX03 | XXXXXXX33 | XXXXXXX26 | XXXXXXX40 | XXXXXXX73 | XXXXXXX92 | XXXXXXX77 |
| XXXXXXX28 | XXXXXXX22 | XXXXXXX66 | XXXXXXX27 | XXXXXXX79 | XXXXXXX84 | XXXXXXX77 | XXXXXXX66 |
| XXXXXXX89 | XXXXXXX95 | XXXXXXX16 | XXXXXXX23 | XXXXXXX02 | XXXXXXX42 | XXXXXXX37 | XXXXXXX73 |
| XXXXXXX62 | XXXXXXX02 | XXXXXXX59 | XXXXXXX82 | XXXXXXX52 | XXXXXXX79 | XXXXXXX73 | XXXXXXX58 |
| XXXXXXX02 | XXXXXXX25 | XXXXXXX03 | XXXXXXX28 | XXXXXXX20 | XXXXXXX18 | XXXXXXX66 | XXXXXXX02 |
| XXXXXXX60 | XXXXXXX29 | XXXXXXX14 | XXXXXXX44 | XXXXXXX24 | XXXXXXX33 | XXXXXXX81 | XXXXXXX18 |
| XXXXXXX73 | XXXXXXX73 | XXXXXXX73 | XXXXXXX98 | XXXXXXX15 | XXXXXXX87 | XXXXXXX26 | XXXXXXX54 |
| XXXXXXX57 | XXXXXXX79 | XXXXXXX44 | XXXXXXX43 | XXXXXXX72 | XXXXXXX42 | XXXXXXX06 | XXXXXXX10 |
| XXXXXXX53 | XXXXXXX64 | XXXXXXX99 | XXXXXXX89 | XXXXXXX06 | XXXXXXX52 | XXXXXXX38 | XXXXXXX34 |
| XXXXXXX42 | XXXXXXX85 | XXXXXXX84 | XXXXXXX15 | XXXXXXX08 | XXXXXXX40 | XXXXXXX26 | XXXXXXX81 |
| XXXXXXX29 | XXXXXXX96 | XXXXXXX76 | XXXXXXX18 | XXXXXXX24 | XXXXXXX77 | XXXXXXX03 | XXXXXXX44 |
| XXXXXXX84 | XXXXXXX00 | XXXXXXX23 | XXXXXXX49 | XXXXXXX56 | XXXXXXX56 | XXXXXXX24 | XXXXXXX56 |
| XXXXXXX80 | XXXXXXX75 | XXXXXXX51 | XXXXXXX71 | XXXXXXX16 | XXXXXXX16 | XXXXXXX82 | XXXXXXX46 |
| XXXXXXX70 | XXXXXXX33 | XXXXXXX70 | XXXXXXX28 | XXXXXXX48 | XXXXXXX64 | XXXXXXX65 | XXXXXXX95 |
| XXXXXXX86 | XXXXXXX16 | XXXXXXX98 | XXXXXXX27 | XXXXXXX05 | XXXXXXX09 | XXXXXXX44 | XXXXXXX30 |
| XXXXXXX06 | XXXXXXX86 | XXXXXXX22 | XXXXXXX01 | XXXXXXX89 | XXXXXXX27 | XXXXXXX57 | XXXXXXX93 |
| XXXXXXX77 | XXXXXXX10 | XXXXXXX18 | XXXXXXX30 | XXXXXXX12 | XXXXXXX14 | XXXXXXX81 | XXXXXXX55 |
| XXXXXXX77 | XXXXXXX30 | XXXXXXX61 | XXXXXXX16 | XXXXXXX38 | XXXXXXX54 | XXXXXXX99 | XXXXXXX13 |
| XXXXXXX66 | XXXXXXX77 | XXXXXXX63 | XXXXXXX93 | XXXXXXX51 | XXXXXXX18 | XXXXXXX18 | XXXXXXX04 |
| XXXXXXX73 | XXXXXXX30 | XXXXXXX92 | XXXXXXX47 | XXXXXXX96 | XXXXXXX08 | XXXXXXX77 | XXXXXXX39 |
| XXXXXXX01 | XXXXXXX15 | XXXXXXX70 | XXXXXXX49 | XXXXXXX65 | XXXXXXX75 | XXXXXXX03 | XXXXXXX76 |
| XXXXXXX02 | XXXXXXX57 | XXXXXXX50 | XXXXXXX03 | XXXXXXX01 | XXXXXXX36 | XXXXXXX62 | XXXXXXX49 |
| XXXXXXX18 | XXXXXXX57 | XXXXXXX95 | XXXXXXX71 | XXXXXXX91 | XXXXXXX07 | XXXXXXX97 | XXXXXXX63 |
| XXXXXXX56 | XXXXXXX12 | XXXXXXX57 | XXXXXXX06 | XXXXXXX15 | XXXXXXX08 | XXXXXXX63 | XXXXXXX25 |
| XXXXXXX80 | XXXXXXX14 | XXXXXXX91 | XXXXXXX63 | XXXXXXX67 | XXXXXXX16 | XXXXXXX88 | XXXXXXX29 |
| XXXXXXX68 | XXXXXXX94 | XXXXXXX55 | XXXXXXX04 | XXXXXXX06 | XXXXXXX65 | XXXXXXX34 | XXXXXXX39 |
| XXXXXXX06 | XXXXXXX02 | XXXXXXX52 | XXXXXXX68 | XXXXXXX11 | XXXXXXX65 | XXXXXXX65 | XXXXXXX17 |
| XXXXXXX44 | XXXXXXX34 | XXXXXXX57 | XXXXXXX98 | XXXXXXX09 | XXXXXXX92 | XXXXXXX69 | XXXXXXX40 |
| XXXXXXX15 | XXXXXXX53 | XXXXXXX61 | XXXXXXX59 | XXXXXXX97 | XXXXXXX24 | XXXXXXX26 | XXXXXXX87 |
| XXXXXXX49 | XXXXXXX34 | XXXXXXX44 | XXXXXXX74 | XXXXXXX64 | XXXXXXX45 | XXXXXXX33 | XXXXXXX21 |
| XXXXXXX70 | XXXXXXX67 | XXXXXXX09 | XXXXXXX29 | XXXXXXX69 | XXXXXXX10 | XXXXXXX12 | XXXXXXX83 |
| XXXXXXX81 | XXXXXXX04 | XXXXXXX73 | XXXXXXX14 | XXXXXXX32 | XXXXXXX63 | XXXXXXX35 | XXXXXXX48 |
| XXXXXXX39 | XXXXXXX24 | XXXXXXX16 | XXXXXXX44 | XXXXXXX28 | XXXXXXX96 | XXXXXXX97 | XXXXXXX60 |
| XXXXXXX85 | XXXXXXX97 | XXXXXXX16 | XXXXXXX91 | XXXXXXX46 | XXXXXXX50 | XXXXXXX92 | XXXXXXX72 |
| XXXXXXX06 | XXXXXXX44 | XXXXXXX67 | XXXXXXX43 | XXXXXXX28 | XXXXXXX00 | XXXXXXX31 | XXXXXXX90 |
| XXXXXXX13 | XXXXXXX76 | XXXXXXX57 | XXXXXXX25 | XXXXXXX70 | XXXXXXX48 | XXXXXXX05 | XXXXXXX76 |
| XXXXXXX02 | XXXXXXX82 | XXXXXXX64 | XXXXXXX58 | XXXXXXX75 | XXXXXXX17 | XXXXXXX79 | XXXXXXX07 |
| XXXXXXX86 | XXXXXXX63 | XXXXXXX58 | XXXXXXX77 | XXXXXXX81 | XXXXXXX60 | XXXXXXX72 | XXXXXXX82 |
| XXXXXXX50 | XXXXXXX18 | XXXXXXX30 | XXXXXXX30 | XXXXXXX74 | XXXXXXX60 | XXXXXXX69 | XXXXXXX61 |
| XXXXXXX74 | XXXXXXX44 | XXXXXXX98 | XXXXXXX12 | XXXXXXX21 | XXXXXXX39 | XXXXXXX49 | XXXXXXX65 |
| XXXXXXX16 | XXXXXXX87 | XXXXXXX26 | XXXXXXX14 | XXXXXXX90 | XXXXXXX53 | XXXXXXX00 | XXXXXXX74 |
| XXXXXXX53 | XXXXXXX05 | XXXXXXX92 | XXXXXXX00 | XXXXXXX37 | XXXXXXX72 | XXXXXXX92 | XXXXXXX13 |
| XXXXXXX37 | XXXXXXX56 | XXXXXXX08 | XXXXXXX15 | XXXXXXX64 | XXXXXXX27 | XXXXXXX01 | XXXXXXX02 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX41 | XXXXXXX95 | XXXXXXX32 | XXXXXXX57 | XXXXXXX03 | XXXXXXX50 | XXXXXXX09 | XXXXXXX04 |
| XXXXXXX36 | XXXXXXX53 | XXXXXXX30 | XXXXXXX41 | XXXXXXX41 | XXXXXXX01 | XXXXXXX22 | XXXXXXX09 |
| XXXXXXX23 | XXXXXXX51 | XXXXXXX07 | XXXXXXX24 | XXXXXXX98 | XXXXXXX01 | XXXXXXX36 | XXXXXXX24 |
| XXXXXXX58 | XXXXXXX64 | XXXXXXX21 | XXXXXXX76 | XXXXXXX55 | XXXXXXX73 | XXXXXXX06 | XXXXXXX47 |
| XXXXXXX36 | XXXXXXX11 | XXXXXXX79 | XXXXXXX09 | XXXXXXX03 | XXXXXXX88 | XXXXXXX65 | XXXXXXX99 |
| XXXXXXX33 | XXXXXXX66 | XXXXXXX11 | XXXXXXX28 | XXXXXXX44 | XXXXXXX48 | XXXXXXX53 | XXXXXXX68 |
| XXXXXXX87 | XXXXXXX32 | XXXXXXX48 | XXXXXXX57 | XXXXXXX64 | XXXXXXX51 | XXXXXXX76 | XXXXXXX42 |
| XXXXXXX63 | XXXXXXX30 | XXXXXXX47 | XXXXXXX43 | XXXXXXX09 | XXXXXXX36 | XXXXXXX45 | XXXXXXX39 |
| XXXXXXX34 | XXXXXXX41 | XXXXXXX84 | XXXXXXX64 | XXXXXXX88 | XXXXXXX82 | XXXXXXX88 | XXXXXXX70 |
| XXXXXXX17 | XXXXXXX04 | XXXXXXX56 | XXXXXXX27 | XXXXXXX14 | XXXXXXX20 | XXXXXXX67 | XXXXXXX09 |
| XXXXXXX36 | XXXXXXX83 | XXXXXXX04 | XXXXXXX04 | XXXXXXX04 | XXXXXXX19 | XXXXXXX83 | XXXXXXX95 |
| XXXXXXX57 | XXXXXXX49 | XXXXXXX80 | XXXXXXX15 | XXXXXXX31 | XXXXXXX38 | XXXXXXX22 | XXXXXXX22 |
| XXXXXXX98 | XXXXXXX86 | XXXXXXX13 | XXXXXXX21 | XXXXXXX30 | XXXXXXX60 | XXXXXXX77 | XXXXXXX24 |
| XXXXXXX45 | XXXXXXX96 | XXXXXXX78 | XXXXXXX53 | XXXXXXX33 | XXXXXXX26 | XXXXXXX65 | XXXXXXX68 |
| XXXXXXX90 | XXXXXXX89 | XXXXXXX96 | XXXXXXX39 | XXXXXXX46 | XXXXXXX11 | XXXXXXX23 | XXXXXXX77 |
| XXXXXXX14 | XXXXXXX97 | XXXXXXX75 | XXXXXXX82 | XXXXXXX96 | XXXXXXX25 | XXXXXXX47 | XXXXXXX03 |
| XXXXXXX70 | XXXXXXX35 | XXXXXXX36 | XXXXXXX40 | XXXXXXX30 | XXXXXXX81 | XXXXXXX57 | XXXXXXX85 |
| XXXXXXX75 | XXXXXXX45 | XXXXXXX04 | XXXXXXX12 | XXXXXXX16 | XXXXXXX13 | XXXXXXX07 | XXXXXXX67 |
| XXXXXXX73 | XXXXXXX76 | XXXXXXX43 | XXXXXXX19 | XXXXXXX16 | XXXXXXX93 | XXXXXXX18 | XXXXXXX56 |
| XXXXXXX47 | XXXXXXX48 | XXXXXXX14 | XXXXXXX58 | XXXXXXX41 | XXXXXXX64 | XXXXXXX66 | XXXXXXX98 |
| XXXXXXX00 | XXXXXXX11 | XXXXXXX95 | XXXXXXX55 | XXXXXXX28 | XXXXXXX48 | XXXXXXX24 | XXXXXXX70 |
| XXXXXXX63 | XXXXXXX95 | XXXXXXX09 | XXXXXXX19 | XXXXXXX09 | XXXXXXX12 | XXXXXXX44 | XXXXXXX54 |
| XXXXXXX21 | XXXXXXX69 | XXXXXXX09 | XXXXXXX44 | XXXXXXX09 | XXXXXXX25 | XXXXXXX18 | XXXXXXX62 |
| XXXXXXX09 | XXXXXXX14 | XXXXXXX39 | XXXXXXX61 | XXXXXXX77 | XXXXXXX42 | XXXXXXX26 | XXXXXXX49 |
| XXXXXXX04 | XXXXXXX93 | XXXXXXX85 | XXXXXXX16 | XXXXXXX81 | XXXXXXX13 | XXXXXXX29 | XXXXXXX51 |
| XXXXXXX05 | XXXXXXX64 | XXXXXXX17 | XXXXXXX86 | XXXXXXX91 | XXXXXXX25 | XXXXXXX35 | XXXXXXX05 |
| XXXXXXX39 | XXXXXXX08 | XXXXXXX76 | XXXXXXX31 | XXXXXXX70 | XXXXXXX89 | XXXXXXX69 | XXXXXXX45 |
| XXXXXXX05 | XXXXXXX69 | XXXXXXX69 | XXXXXXX69 | XXXXXXX69 | XXXXXXX69 | XXXXXXX69 | XXXXXXX69 |
| XXXXXXX19 | XXXXXXX88 | XXXXXXX86 | XXXXXXX87 | XXXXXXX86 | XXXXXXX75 | XXXXXXX05 | XXXXXXX22 |
| XXXXXXX26 | XXXXXXX48 | XXXXXXX71 | XXXXXXX90 | XXXXXXX79 | XXXXXXX23 | XXXXXXX54 | XXXXXXX22 |
| XXXXXXX33 | XXXXXXX33 | XXXXXXX88 | XXXXXXX04 | XXXXXXX97 | XXXXXXX86 | XXXXXXX36 | XXXXXXX84 |
| XXXXXXX40 | XXXXXXX52 | XXXXXXX66 | XXXXXXX64 | XXXXXXX64 | XXXXXXX30 | XXXXXXX86 | XXXXXXX69 |
| XXXXXXX86 | XXXXXXX61 | XXXXXXX28 | XXXXXXX16 | XXXXXXX99 | XXXXXXX00 | XXXXXXX83 | XXXXXXX26 |
| XXXXXXX75 | XXXXXXX57 | XXXXXXX44 | XXXXXXX66 | XXXXXXX66 | XXXXXXX96 | XXXXXXX02 | XXXXXXX03 |
| XXXXXXX76 | XXXXXXX26 | XXXXXXX12 | XXXXXXX51 | XXXXXXX47 | XXXXXXX32 | XXXXXXX15 | XXXXXXX70 |
| XXXXXXX20 | XXXXXXX56 | XXXXXXX18 | XXXXXXX22 | XXXXXXX93 | XXXXXXX55 | XXXXXXX75 | XXXXXXX21 |
| XXXXXXX58 | XXXXXXX01 | XXXXXXX17 | XXXXXXX40 | XXXXXXX08 | XXXXXXX37 | XXXXXXX96 | XXXXXXX95 |
| XXXXXXX14 | XXXXXXX42 | XXXXXXX23 | XXXXXXX18 | XXXXXXX41 | XXXXXXX59 | XXXXXXX12 | XXXXXXX90 |
| XXXXXXX15 | XXXXXXX84 | XXXXXXX50 | XXXXXXX96 | XXXXXXX87 | XXXXXXX87 | XXXXXXX30 | XXXXXXX09 |
| XXXXXXX43 | XXXXXXX20 | XXXXXXX80 | XXXXXXX97 | XXXXXXX13 | XXXXXXX25 | XXXXXXX87 | XXXXXXX48 |
| XXXXXXX35 | XXXXXXX53 | XXXXXXX38 | XXXXXXX53 | XXXXXXX86 | XXXXXXX05 | XXXXXXX38 | XXXXXXX57 |
| XXXXXXX62 | XXXXXXX98 | XXXXXXX46 | XXXXXXX92 | XXXXXXX32 | XXXXXXX30 | XXXXXXX27 | XXXXXXX72 |
| XXXXXXX86 | XXXXXXX56 | XXXXXXX67 | XXXXXXX78 | XXXXXXX31 | XXXXXXX95 | XXXXXXX01 | XXXXXXX08 |
| XXXXXXX31 | XXXXXXX34 | XXXXXXX51 | XXXXXXX73 | XXXXXXX96 | XXXXXXX96 | XXXXXXX56 | XXXXXXX49 |
| XXXXXXX62 | XXXXXXX45 | XXXXXXX12 | XXXXXXX76 | XXXXXXX39 | XXXXXXX25 | XXXXXXX62 | XXXXXXX05 |
| XXXXXXX28 | XXXXXXX11 | XXXXXXX18 | XXXXXXX34 | XXXXXXX19 | XXXXXXX88 | XXXXXXX11 | XXXXXXX27 |
| XXXXXXX53 | XXXXXXX62 | XXXXXXX13 | XXXXXXX13 | XXXXXXX47 | XXXXXXX89 | XXXXXXX06 | XXXXXXX96 |
| XXXXXXX69 | XXXXXXX48 | XXXXXXX66 | XXXXXXX14 | XXXXXXX90 | XXXXXXX69 | XXXXXXX98 | XXXXXXX91 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX57 | XXXXXXX33 | XXXXXXX63 | XXXXXXX44 | XXXXXXX10 | XXXXXXX02 | XXXXXXX61 | XXXXXXX54 |
| XXXXXXX00 | XXXXXXX57 | XXXXXXX37 | XXXXXXX12 | XXXXXXX45 | XXXXXXX72 | XXXXXXX84 | XXXXXXX85 |
| XXXXXXX58 | XXXXXXX06 | XXXXXXX47 | XXXXXXX61 | XXXXXXX79 | XXXXXXX96 | XXXXXXX81 | XXXXXXX43 |
| XXXXXXX43 | XXXXXXX43 | XXXXXXX62 | XXXXXXX43 | XXXXXXX43 | XXXXXXX63 | XXXXXXX43 | XXXXXXX24 |
| XXXXXXX24 | XXXXXXX95 | XXXXXXX04 | XXXXXXX82 | XXXXXXX73 | XXXXXXX10 | XXXXXXX77 | XXXXXXX78 |
| XXXXXXX39 | XXXXXXX55 | XXXXXXX84 | XXXXXXX44 | XXXXXXX02 | XXXXXXX13 | XXXXXXX96 | XXXXXXX15 |
| XXXXXXX52 | XXXXXXX57 | XXXXXXX03 | XXXXXXX07 | XXXXXXX73 | XXXXXXX78 | XXXXXXX34 | XXXXXXX46 |
| XXXXXXX61 | XXXXXXX96 | XXXXXXX60 | XXXXXXX07 | XXXXXXX79 | XXXXXXX08 | XXXXXXX77 | XXXXXXX50 |
| XXXXXXX05 | XXXXXXX22 | XXXXXXX29 | XXXXXXX81 | XXXXXXX17 | XXXXXXX39 | XXXXXXX27 | XXXXXXX17 |
| XXXXXXX56 | XXXXXXX24 | XXXXXXX88 | XXXXXXX91 | XXXXXXX37 | XXXXXXX68 | XXXXXXX09 | XXXXXXX80 |
| XXXXXXX87 | XXXXXXX77 | XXXXXXX92 | XXXXXXX02 | XXXXXXX38 | XXXXXXX29 | XXXXXXX39 | XXXXXXX86 |
| XXXXXXX77 | XXXXXXX01 | XXXXXXX31 | XXXXXXX21 | XXXXXXX35 | XXXXXXX77 | XXXXXXX27 | XXXXXXX15 |
| XXXXXXX37 | XXXXXXX91 | XXXXXXX36 | XXXXXXX75 | XXXXXXX22 | XXXXXXX07 | XXXXXXX28 | XXXXXXX43 |
| XXXXXXX62 | XXXXXXX99 | XXXXXXX48 | XXXXXXX52 | XXXXXXX76 | XXXXXXX84 | XXXXXXX10 | XXXXXXX92 |
| XXXXXXX70 | XXXXXXX76 | XXXXXXX10 | XXXXXXX68 | XXXXXXX94 | XXXXXXX43 | XXXXXXX92 | XXXXXXX78 |
| XXXXXXX09 | XXXXXXX43 | XXXXXXX93 | XXXXXXX36 | XXXXXXX69 | XXXXXXX26 | XXXXXXX67 | XXXXXXX40 |
| XXXXXXX48 | XXXXXXX31 | XXXXXXX60 | XXXXXXX74 | XXXXXXX88 | XXXXXXX66 | XXXXXXX30 | XXXXXXX16 |
| XXXXXXX72 | XXXXXXX14 | XXXXXXX09 | XXXXXXX75 | XXXXXXX60 | XXXXXXX41 | XXXXXXX33 | XXXXXXX70 |
| XXXXXXX13 | XXXXXXX93 | XXXXXXX80 | XXXXXXX06 | XXXXXXX73 | XXXXXXX03 | XXXXXXX81 | XXXXXXX57 |
| XXXXXXX68 | XXXXXXX99 | XXXXXXX07 | XXXXXXX57 | XXXXXXX63 | XXXXXXX10 | XXXXXXX69 | XXXXXXX25 |
| XXXXXXX96 | XXXXXXX42 | XXXXXXX69 | XXXXXXX48 | XXXXXXX47 | XXXXXXX48 | XXXXXXX22 | XXXXXXX24 |
| XXXXXXX98 | XXXXXXX32 | XXXXXXX74 | XXXXXXX91 | XXXXXXX54 | XXXXXXX73 | XXXXXXX54 | XXXXXXX43 |
| XXXXXXX72 | XXXXXXX51 | XXXXXXX35 | XXXXXXX04 | XXXXXXX39 | XXXXXXX15 | XXXXXXX56 | XXXXXXX89 |
| XXXXXXX17 | XXXXXXX49 | XXXXXXX51 | XXXXXXX06 | XXXXXXX36 | XXXXXXX98 | XXXXXXX93 | XXXXXXX98 |
| XXXXXXX98 | XXXXXXX37 | XXXXXXX58 | XXXXXXX47 | XXXXXXX62 | XXXXXXX22 | XXXXXXX62 | XXXXXXX65 |
| XXXXXXX57 | XXXXXXX85 | XXXXXXX74 | XXXXXXX61 | XXXXXXX47 | XXXXXXX92 | XXXXXXX66 | XXXXXXX55 |
| XXXXXXX90 | XXXXXXX74 | XXXXXXX86 | XXXXXXX02 | XXXXXXX83 | XXXXXXX15 | XXXXXXX91 | XXXXXXX04 |
| XXXXXXX00 | XXXXXXX25 | XXXXXXX36 | XXXXXXX13 | XXXXXXX74 | XXXXXXX72 | XXXXXXX04 | XXXXXXX19 |
| XXXXXXX30 | XXXXXXX40 | XXXXXXX41 | XXXXXXX21 | XXXXXXX88 | XXXXXXX16 | XXXXXXX10 | XXXXXXX65 |
| XXXXXXX48 | XXXXXXX44 | XXXXXXX97 | XXXXXXX06 | XXXXXXX24 | XXXXXXX18 | XXXXXXX95 | XXXXXXX04 |
| XXXXXXX38 | XXXXXXX49 | XXXXXXX16 | XXXXXXX96 | XXXXXXX71 | XXXXXXX96 | XXXXXXX76 | XXXXXXX90 |
| XXXXXXX06 | XXXXXXX11 | XXXXXXX45 | XXXXXXX40 | XXXXXXX59 | XXXXXXX59 | XXXXXXX91 | XXXXXXX89 |
| XXXXXXX42 | XXXXXXX87 | XXXXXXX92 | XXXXXXX93 | XXXXXXX98 | XXXXXXX11 | XXXXXXX07 | XXXXXXX84 |
| XXXXXXX37 | XXXXXXX28 | XXXXXXX25 | XXXXXXX69 | XXXXXXX47 | XXXXXXX99 | XXXXXXX57 | XXXXXXX93 |
| XXXXXXX02 | XXXXXXX48 | XXXXXXX78 | XXXXXXX84 | XXXXXXX32 | XXXXXXX89 | XXXXXXX30 | XXXXXXX81 |
| XXXXXXX62 | XXXXXXX54 | XXXXXXX48 | XXXXXXX00 | XXXXXXX14 | XXXXXXX22 | XXXXXXX38 | XXXXXXX91 |
| XXXXXXX83 | XXXXXXX24 | XXXXXXX17 | XXXXXXX03 | XXXXXXX09 | XXXXXXX71 | XXXXXXX70 | XXXXXXX72 |
| XXXXXXX59 | XXXXXXX57 | XXXXXXX89 | XXXXXXX46 | XXXXXXX52 | XXXXXXX34 | XXXXXXX87 | XXXXXXX07 |
| XXXXXXX55 | XXXXXXX37 | XXXXXXX49 | XXXXXXX68 | XXXXXXX67 | XXXXXXX01 | XXXXXXX04 | XXXXXXX77 |
| XXXXXXX09 | XXXXXXX55 | XXXXXXX89 | XXXXXXX76 | XXXXXXX43 | XXXXXXX26 | XXXXXXX50 | XXXXXXX42 |
| XXXXXXX05 | XXXXXXX93 | XXXXXXX83 | XXXXXXX92 | XXXXXXX17 | XXXXXXX33 | XXXXXXX93 | XXXXXXX53 |
| XXXXXXX30 | XXXXXXX07 | XXXXXXX21 | XXXXXXX71 | XXXXXXX14 | XXXXXXX14 | XXXXXXX82 | XXXXXXX10 |
| XXXXXXX90 | XXXXXXX03 | XXXXXXX25 | XXXXXXX97 | XXXXXXX01 | XXXXXXX11 | XXXXXXX65 | XXXXXXX09 |
| XXXXXXX14 | XXXXXXX53 | XXXXXXX93 | XXXXXXX87 | XXXXXXX12 | XXXXXXX87 | XXXXXXX35 | XXXXXXX81 |
| XXXXXXX74 | XXXXXXX00 | XXXXXXX13 | XXXXXXX23 | XXXXXXX06 | XXXXXXX86 | XXXXXXX48 | XXXXXXX37 |
| XXXXXXX64 | XXXXXXX23 | XXXXXXX87 | XXXXXXX97 | XXXXXXX16 | XXXXXXX21 | XXXXXXX39 | XXXXXXX77 |
| XXXXXXX30 | XXXXXXX48 | XXXXXXX57 | XXXXXXX73 | XXXXXXX83 | XXXXXXX89 | XXXXXXX85 | XXXXXXX89 |
| XXXXXXX55 | XXXXXXX38 | XXXXXXX81 | XXXXXXX68 | XXXXXXX76 | XXXXXXX16 | XXXXXXX90 | XXXXXXX92 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX33 | XXXXXXX57 | XXXXXXX99 | XXXXXXX21 | XXXXXXX28 | XXXXXXX75 | XXXXXXX13 | XXXXXXX84 |
| XXXXXXX89 | XXXXXXX33 | XXXXXXX42 | XXXXXXX57 | XXXXXXX51 | XXXXXXX32 | XXXXXXX89 | XXXXXXX91 |
| XXXXXXX26 | XXXXXXX62 | XXXXXXX43 | XXXXXXX57 | XXXXXXX15 | XXXXXXX15 | XXXXXXX15 | XXXXXXX15 |
| XXXXXXX15 | XXXXXXX25 | XXXXXXX00 | XXXXXXX17 | XXXXXXX75 | XXXXXXX97 | XXXXXXX63 | XXXXXXX31 |
| XXXXXXX70 | XXXXXXX93 | XXXXXXX02 | XXXXXXX46 | XXXXXXX33 | XXXXXXX94 | XXXXXXX42 | XXXXXXX74 |
| XXXXXXX71 | XXXXXXX12 | XXXXXXX19 | XXXXXXX85 | XXXXXXX94 | XXXXXXX65 | XXXXXXX99 | XXXXXXX50 |
| XXXXXXX25 | XXXXXXX06 | XXXXXXX06 | XXXXXXX07 | XXXXXXX37 | XXXXXXX63 | XXXXXXX17 | XXXXXXX56 |
| XXXXXXX03 | XXXXXXX52 | XXXXXXX60 | XXXXXXX79 | XXXXXXX10 | XXXXXXX70 | XXXXXXX87 | XXXXXXX68 |
| XXXXXXX87 | XXXXXXX58 | XXXXXXX17 | XXXXXXX65 | XXXXXXX04 | XXXXXXX61 | XXXXXXX17 | XXXXXXX13 |
| XXXXXXX40 | XXXXXXX62 | XXXXXXX78 | XXXXXXX12 | XXXXXXX72 | XXXXXXX98 | XXXXXXX00 | XXXXXXX71 |
| XXXXXXX35 | XXXXXXX67 | XXXXXXX56 | XXXXXXX57 | XXXXXXX35 | XXXXXXX53 | XXXXXXX53 | XXXXXXX14 |
| XXXXXXX81 | XXXXXXX54 | XXXXXXX38 | XXXXXXX06 | XXXXXXX55 | XXXXXXX74 | XXXXXXX90 | XXXXXXX92 |
| XXXXXXX09 | XXXXXXX21 | XXXXXXX71 | XXXXXXX00 | XXXXXXX57 | XXXXXXX17 | XXXXXXX56 | XXXXXXX55 |
| XXXXXXX86 | XXXXXXX81 | XXXXXXX76 | XXXXXXX39 | XXXXXXX51 | XXXXXXX50 | XXXXXXX54 | XXXXXXX37 |
| XXXXXXX72 | XXXXXXX81 | XXXXXXX15 | XXXXXXX18 | XXXXXXX55 | XXXXXXX24 | XXXXXXX74 | XXXXXXX58 |
| XXXXXXX18 | XXXXXXX69 | XXXXXXX71 | XXXXXXX03 | XXXXXXX43 | XXXXXXX59 | XXXXXXX44 | XXXXXXX46 |
| XXXXXXX28 | XXXXXXX34 | XXXXXXX46 | XXXXXXX70 | XXXXXXX40 | XXXXXXX51 | XXXXXXX25 | XXXXXXX21 |
| XXXXXXX59 | XXXXXXX52 | XXXXXXX60 | XXXXXXX99 | XXXXXXX59 | XXXXXXX65 | XXXXXXX04 | XXXXXXX19 |
| XXXXXXX75 | XXXXXXX61 | XXXXXXX75 | XXXXXXX43 | XXXXXXX73 | XXXXXXX21 | XXXXXXX67 | XXXXXXX13 |
| XXXXXXX92 | XXXXXXX86 | XXXXXXX72 | XXXXXXX46 | XXXXXXX89 | XXXXXXX36 | XXXXXXX26 | XXXXXXX08 |
| XXXXXXX51 | XXXXXXX01 | XXXXXXX36 | XXXXXXX35 | XXXXXXX44 | XXXXXXX71 | XXXXXXX61 | XXXXXXX50 |
| XXXXXXX17 | XXXXXXX25 | XXXXXXX95 | XXXXXXX85 | XXXXXXX38 | XXXXXXX93 | XXXXXXX79 | XXXXXXX00 |
| XXXXXXX47 | XXXXXXX18 | XXXXXXX56 | XXXXXXX57 | XXXXXXX86 | XXXXXXX61 | XXXXXXX76 | XXXXXXX31 |
| XXXXXXX89 | XXXXXXX74 | XXXXXXX04 | XXXXXXX90 | XXXXXXX23 | XXXXXXX10 | XXXXXXX74 | XXXXXXX24 |
| XXXXXXX70 | XXXXXXX38 | XXXXXXX92 | XXXXXXX79 | XXXXXXX43 | XXXXXXX53 | XXXXXXX84 | XXXXXXX59 |
| XXXXXXX76 | XXXXXXX83 | XXXXXXX75 | XXXXXXX92 | XXXXXXX28 | XXXXXXX90 | XXXXXXX02 | XXXXXXX51 |
| XXXXXXX89 | XXXXXXX12 | XXXXXXX19 | XXXXXXX55 | XXXXXXX99 | XXXXXXX07 | XXXXXXX04 | XXXXXXX22 |
| XXXXXXX00 | XXXXXXX62 | XXXXXXX59 | XXXXXXX59 | XXXXXXX08 | XXXXXXX16 | XXXXXXX27 | XXXXXXX84 |
| XXXXXXX86 | XXXXXXX31 | XXXXXXX52 | XXXXXXX59 | XXXXXXX26 | XXXXXXX76 | XXXXXXX84 | XXXXXXX45 |
| XXXXXXX03 | XXXXXXX09 | XXXXXXX05 | XXXXXXX21 | XXXXXXX71 | XXXXXXX40 | XXXXXXX03 | XXXXXXX72 |
| XXXXXXX61 | XXXXXXX39 | XXXXXXX12 | XXXXXXX63 | XXXXXXX92 | XXXXXXX60 | XXXXXXX61 | XXXXXXX20 |
| XXXXXXX94 | XXXXXXX92 | XXXXXXX80 | XXXXXXX26 | XXXXXXX21 | XXXXXXX05 | XXXXXXX21 | XXXXXXX25 |
| XXXXXXX01 | XXXXXXX29 | XXXXXXX58 | XXXXXXX58 | XXXXXXX12 | XXXXXXX78 | XXXXXXX77 | XXXXXXX98 |
| XXXXXXX91 | XXXXXXX01 | XXXXXXX30 | XXXXXXX78 | XXXXXXX67 | XXXXXXX62 | XXXXXXX02 | XXXXXXX45 |
| XXXXXXX97 | XXXXXXX76 | XXXXXXX57 | XXXXXXX54 | XXXXXXX54 | XXXXXXX54 | XXXXXXX54 | XXXXXXX67 |
| XXXXXXX61 | XXXXXXX78 | XXXXXXX39 | XXXXXXX98 | XXXXXXX35 | XXXXXXX63 | XXXXXXX30 | XXXXXXX33 |
| XXXXXXX25 | XXXXXXX34 | XXXXXXX64 | XXXXXXX36 | XXXXXXX74 | XXXXXXX67 | XXXXXXX57 | XXXXXXX51 |
| XXXXXXX09 | XXXXXXX05 | XXXXXXX28 | XXXXXXX23 | XXXXXXX17 | XXXXXXX41 | XXXXXXX94 | XXXXXXX26 |
| XXXXXXX31 | XXXXXXX36 | XXXXXXX42 | XXXXXXX51 | XXXXXXX63 | XXXXXXX31 | XXXXXXX00 | XXXXXXX34 |
| XXXXXXX41 | XXXXXXX25 | XXXXXXX59 | XXXXXXX67 | XXXXXXX70 | XXXXXXX91 | XXXXXXX80 | XXXXXXX97 |
| XXXXXXX12 | XXXXXXX17 | XXXXXXX06 | XXXXXXX44 | XXXXXXX48 | XXXXXXX70 | XXXXXXX36 | XXXXXXX21 |
| XXXXXXX73 | XXXXXXX88 | XXXXXXX14 | XXXXXXX04 | XXXXXXX04 | XXXXXXX20 | XXXXXXX22 | XXXXXXX36 |
| XXXXXXX29 | XXXXXXX03 | XXXXXXX79 | XXXXXXX67 | XXXXXXX17 | XXXXXXX70 | XXXXXXX72 | XXXXXXX85 |
| XXXXXXX80 | XXXXXXX64 | XXXXXXX14 | XXXXXXX61 | XXXXXXX41 | XXXXXXX55 | XXXXXXX92 | XXXXXXX82 |
| XXXXXXX25 | XXXXXXX14 | XXXXXXX14 | XXXXXXX72 | XXXXXXX38 | XXXXXXX81 | XXXXXXX89 | XXXXXXX17 |
| XXXXXXX69 | XXXXXXX54 | XXXXXXX03 | XXXXXXX40 | XXXXXXX28 | XXXXXXX28 | XXXXXXX46 | XXXXXXX68 |
| XXXXXXX85 | XXXXXXX94 | XXXXXXX39 | XXXXXXX30 | XXXXXXX95 | XXXXXXX63 | XXXXXXX87 | XXXXXXX36 |
| XXXXXXX28 | XXXXXXX04 | XXXXXXX26 | XXXXXXX29 | XXXXXXX97 | XXXXXXX47 | XXXXXXX37 | XXXXXXX64 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX55 | XXXXXXX54 | XXXXXXX74 | XXXXXXX13 | XXXXXXX14 | XXXXXXX85 | XXXXXXX85 | XXXXXXX12 |
| XXXXXXX58 | XXXXXXX48 | XXXXXXX67 | XXXXXXX61 | XXXXXXX66 | XXXXXXX26 | XXXXXXX24 | XXXXXXX90 |
| XXXXXXX88 | XXXXXXX33 | XXXXXXX15 | XXXXXXX15 | XXXXXXX36 | XXXXXXX15 | XXXXXXX15 | XXXXXXX15 |
| XXXXXXX90 | XXXXXXX15 | XXXXXXX15 | XXXXXXX15 | XXXXXXX93 | XXXXXXX81 | XXXXXXX57 | XXXXXXX91 |
| XXXXXXX77 | XXXXXXX31 | XXXXXXX44 | XXXXXXX44 | XXXXXXX57 | XXXXXXX35 | XXXXXXX81 | XXXXXXX59 |
| XXXXXXX59 | XXXXXXX02 | XXXXXXX99 | XXXXXXX66 | XXXXXXX53 | XXXXXXX42 | XXXXXXX48 | XXXXXXX99 |
| XXXXXXX87 | XXXXXXX78 | XXXXXXX59 | XXXXXXX45 | XXXXXXX02 | XXXXXXX95 | XXXXXXX55 | XXXXXXX76 |
| XXXXXXX93 | XXXXXXX04 | XXXXXXX99 | XXXXXXX43 | XXXXXXX87 | XXXXXXX19 | XXXXXXX08 | XXXXXXX57 |
| XXXXXXX52 | XXXXXXX25 | XXXXXXX75 | XXXXXXX89 | XXXXXXX24 | XXXXXXX41 | XXXXXXX65 | XXXXXXX48 |
| XXXXXXX99 | XXXXXXX12 | XXXXXXX54 | XXXXXXX71 | XXXXXXX78 | XXXXXXX65 | XXXXXXX57 | XXXXXXX17 |
| XXXXXXX78 | XXXXXXX68 | XXXXXXX31 | XXXXXXX24 | XXXXXXX03 | XXXXXXX75 | XXXXXXX75 | XXXXXXX58 |
| XXXXXXX79 | XXXXXXX30 | XXXXXXX82 | XXXXXXX39 | XXXXXXX69 | XXXXXXX70 | XXXXXXX41 | XXXXXXX71 |
| XXXXXXX92 | XXXXXXX14 | XXXXXXX26 | XXXXXXX44 | XXXXXXX97 | XXXXXXX01 | XXXXXXX99 | XXXXXXX08 |
| XXXXXXX58 | XXXXXXX68 | XXXXXXX30 | XXXXXXX77 | XXXXXXX88 | XXXXXXX88 | XXXXXXX44 | XXXXXXX10 |
| XXXXXXX13 | XXXXXXX55 | XXXXXXX23 | XXXXXXX99 | XXXXXXX74 | XXXXXXX19 | XXXXXXX59 | XXXXXXX82 |
| XXXXXXX61 | XXXXXXX61 | XXXXXXX37 | XXXXXXX20 | XXXXXXX69 | XXXXXXX92 | XXXXXXX17 | XXXXXXX75 |
| XXXXXXX80 | XXXXXXX43 | XXXXXXX69 | XXXXXXX49 | XXXXXXX82 | XXXXXXX12 | XXXXXXX20 | XXXXXXX53 |
| XXXXXXX79 | XXXXXXX10 | XXXXXXX40 | XXXXXXX48 | XXXXXXX61 | XXXXXXX35 | XXXXXXX48 | XXXXXXX48 |
| XXXXXXX23 | XXXXXXX75 | XXXXXXX09 | XXXXXXX25 | XXXXXXX77 | XXXXXXX59 | XXXXXXX12 | XXXXXXX45 |
| XXXXXXX09 | XXXXXXX25 | XXXXXXX54 | XXXXXXX30 | XXXXXXX10 | XXXXXXX28 | XXXXXXX43 | XXXXXXX79 |
| XXXXXXX53 | XXXXXXX79 | XXXXXXX20 | XXXXXXX93 | XXXXXXX83 | XXXXXXX20 | XXXXXXX25 | XXXXXXX98 |
| XXXXXXX38 | XXXXXXX59 | XXXXXXX49 | XXXXXXX38 | XXXXXXX59 | XXXXXXX54 | XXXXXXX92 | XXXXXXX91 |
| XXXXXXX41 | XXXXXXX96 | XXXXXXX31 | XXXXXXX67 | XXXXXXX45 | XXXXXXX57 | XXXXXXX71 | XXXXXXX88 |
| XXXXXXX82 | XXXXXXX90 | XXXXXXX40 | XXXXXXX94 | XXXXXXX19 | XXXXXXX96 | XXXXXXX53 | XXXXXXX65 |
| XXXXXXX53 | XXXXXXX06 | XXXXXXX54 | XXXXXXX66 | XXXXXXX64 | XXXXXXX29 | XXXXXXX11 | XXXXXXX12 |
| XXXXXXX45 | XXXXXXX07 | XXXXXXX96 | XXXXXXX48 | XXXXXXX57 | XXXXXXX87 | XXXXXXX95 | XXXXXXX55 |
| XXXXXXX81 | XXXXXXX23 | XXXXXXX36 | XXXXXXX86 | XXXXXXX86 | XXXXXXX70 | XXXXXXX54 | XXXXXXX30 |
| XXXXXXX64 | XXXXXXX21 | XXXXXXX54 | XXXXXXX90 | XXXXXXX65 | XXXXXXX51 | XXXXXXX11 | XXXXXXX25 |
| XXXXXXX48 | XXXXXXX41 | XXXXXXX39 | XXXXXXX30 | XXXXXXX53 | XXXXXXX44 | XXXXXXX62 | XXXXXXX89 |
| XXXXXXX39 | XXXXXXX56 | XXXXXXX63 | XXXXXXX76 | XXXXXXX77 | XXXXXXX31 | XXXXXXX48 | XXXXXXX00 |
| XXXXXXX39 | XXXXXXX28 | XXXXXXX68 | XXXXXXX43 | XXXXXXX88 | XXXXXXX72 | XXXXXXX92 | XXXXXXX99 |
| XXXXXXX53 | XXXXXXX10 | XXXXXXX29 | XXXXXXX21 | XXXXXXX17 | XXXXXXX12 | XXXXXXX48 | XXXXXXX02 |
| XXXXXXX13 | XXXXXXX82 | XXXXXXX24 | XXXXXXX40 | XXXXXXX30 | XXXXXXX33 | XXXXXXX94 | XXXXXXX60 |
| XXXXXXX43 | XXXXXXX89 | XXXXXXX09 | XXXXXXX51 | XXXXXXX34 | XXXXXXX92 | XXXXXXX65 | XXXXXXX60 |
| XXXXXXX90 | XXXXXXX95 | XXXXXXX01 | XXXXXXX06 | XXXXXXX51 | XXXXXXX20 | XXXXXXX24 | XXXXXXX56 |
| XXXXXXX72 | XXXXXXX79 | XXXXXXX64 | XXXXXXX39 | XXXXXXX24 | XXXXXXX71 | XXXXXXX15 | XXXXXXX35 |
| XXXXXXX96 | XXXXXXX03 | XXXXXXX85 | XXXXXXX68 | XXXXXXX77 | XXXXXXX44 | XXXXXXX75 | XXXXXXX52 |
| XXXXXXX89 | XXXXXXX33 | XXXXXXX03 | XXXXXXX22 | XXXXXXX36 | XXXXXXX41 | XXXXXXX89 | XXXXXXX50 |
| XXXXXXX46 | XXXXXXX60 | XXXXXXX15 | XXXXXXX60 | XXXXXXX18 | XXXXXXX34 | XXXXXXX35 | XXXXXXX79 |
| XXXXXXX43 | XXXXXXX99 | XXXXXXX96 | XXXXXXX28 | XXXXXXX02 | XXXXXXX97 | XXXXXXX17 | XXXXXXX13 |
| XXXXXXX03 | XXXXXXX20 | XXXXXXX99 | XXXXXXX30 | XXXXXXX76 | XXXXXXX55 | XXXXXXX87 | XXXXXXX21 |
| XXXXXXX64 | XXXXXXX55 | XXXXXXX37 | XXXXXXX14 | XXXXXXX72 | XXXXXXX74 | XXXXXXX27 | XXXXXXX47 |
| XXXXXXX03 | XXXXXXX50 | XXXXXXX41 | XXXXXXX40 | XXXXXXX47 | XXXXXXX29 | XXXXXXX41 | XXXXXXX51 |
| XXXXXXX42 | XXXXXXX36 | XXXXXXX50 | XXXXXXX07 | XXXXXXX70 | XXXXXXX02 | XXXXXXX06 | XXXXXXX62 |
| XXXXXXX84 | XXXXXXX11 | XXXXXXX75 | XXXXXXX52 | XXXXXXX66 | XXXXXXX67 | XXXXXXX72 | XXXXXXX65 |
| XXXXXXX32 | XXXXXXX57 | XXXXXXX01 | XXXXXXX03 | XXXXXXX67 | XXXXXXX11 | XXXXXXX24 | XXXXXXX06 |
| XXXXXXX02 | XXXXXXX40 | XXXXXXX89 | XXXXXXX19 | XXXXXXX28 | XXXXXXX14 | XXXXXXX05 | XXXXXXX58 |
| XXXXXXX87 | XXXXXXX00 | XXXXXXX17 | XXXXXXX79 | XXXXXXX34 | XXXXXXX04 | XXXXXXX30 | XXXXXXX99 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX86 | XXXXXXX03 | XXXXXXX24 | XXXXXXX33 | XXXXXXX49 | XXXXXXX98 | XXXXXXX10 | XXXXXXX98 |
| XXXXXXX34 | XXXXXXX37 | XXXXXXX68 | XXXXXXX26 | XXXXXXX22 | XXXXXXX94 | XXXXXXX72 | XXXXXXX92 |
| XXXXXXX72 | XXXXXXX56 | XXXXXXX64 | XXXXXXX70 | XXXXXXX22 | XXXXXXX53 | XXXXXXX79 | XXXXXXX88 |
| XXXXXXX99 | XXXXXXX00 | XXXXXXX65 | XXXXXXX75 | XXXXXXX82 | XXXXXXX83 | XXXXXXX93 | XXXXXXX09 |
| XXXXXXX31 | XXXXXXX32 | XXXXXXX10 | XXXXXXX71 | XXXXXXX56 | XXXXXXX02 | XXXXXXX76 | XXXXXXX36 |
| XXXXXXX37 | XXXXXXX83 | XXXXXXX86 | XXXXXXX45 | XXXXXXX00 | XXXXXXX72 | XXXXXXX53 | XXXXXXX43 |
| XXXXXXX48 | XXXXXXX06 | XXXXXXX95 | XXXXXXX30 | XXXXXXX06 | XXXXXXX37 | XXXXXXX71 | XXXXXXX96 |
| XXXXXXX75 | XXXXXXX74 | XXXXXXX95 | XXXXXXX31 | XXXXXXX39 | XXXXXXX39 | XXXXXXX71 | XXXXXXX39 |
| XXXXXXX39 | XXXXXXX39 | XXXXXXX39 | XXXXXXX39 | XXXXXXX39 | XXXXXXX39 | XXXXXXX39 | XXXXXXX60 |
| XXXXXXX92 | XXXXXXX00 | XXXXXXX64 | XXXXXXX50 | XXXXXXX89 | XXXXXXX71 | XXXXXXX73 | XXXXXXX12 |
| XXXXXXX89 | XXXXXXX20 | XXXXXXX36 | XXXXXXX05 | XXXXXXX62 | XXXXXXX56 | XXXXXXX51 | XXXXXXX89 |
| XXXXXXX86 | XXXXXXX39 | XXXXXXX39 | XXXXXXX89 | XXXXXXX76 | XXXXXXX44 | XXXXXXX63 | XXXXXXX13 |
| XXXXXXX93 | XXXXXXX00 | XXXXXXX18 | XXXXXXX91 | XXXXXXX24 | XXXXXXX57 | XXXXXXX04 | XXXXXXX28 |
| XXXXXXX85 | XXXXXXX53 | XXXXXXX45 | XXXXXXX79 | XXXXXXX60 | XXXXXXX98 | XXXXXXX33 | XXXXXXX44 |
| XXXXXXX84 | XXXXXXX34 | XXXXXXX60 | XXXXXXX01 | XXXXXXX04 | XXXXXXX96 | XXXXXXX95 | XXXXXXX40 |
| XXXXXXX24 | XXXXXXX49 | XXXXXXX97 | XXXXXXX60 | XXXXXXX67 | XXXXXXX53 | XXXXXXX67 | XXXXXXX30 |
| XXXXXXX94 | XXXXXXX44 | XXXXXXX38 | XXXXXXX45 | XXXXXXX87 | XXXXXXX51 | XXXXXXX74 | XXXXXXX45 |
| XXXXXXX20 | XXXXXXX90 | XXXXXXX92 | XXXXXXX74 | XXXXXXX03 | XXXXXXX91 | XXXXXXX69 | XXXXXXX17 |
| XXXXXXX34 | XXXXXXX20 | XXXXXXX14 | XXXXXXX31 | XXXXXXX35 | XXXXXXX39 | XXXXXXX85 | XXXXXXX08 |
| XXXXXXX56 | XXXXXXX56 | XXXXXXX63 | XXXXXXX33 | XXXXXXX47 | XXXXXXX70 | XXXXXXX34 | XXXXXXX92 |
| XXXXXXX01 | XXXXXXX27 | XXXXXXX12 | XXXXXXX13 | XXXXXXX26 | XXXXXXX44 | XXXXXXX20 | XXXXXXX66 |
| XXXXXXX49 | XXXXXXX52 | XXXXXXX95 | XXXXXXX85 | XXXXXXX76 | XXXXXXX77 | XXXXXXX31 | XXXXXXX05 |
| XXXXXXX76 | XXXXXXX38 | XXXXXXX81 | XXXXXXX25 | XXXXXXX70 | XXXXXXX31 | XXXXXXX76 | XXXXXXX36 |
| XXXXXXX99 | XXXXXXX51 | XXXXXXX73 | XXXXXXX60 | XXXXXXX69 | XXXXXXX68 | XXXXXXX16 | XXXXXXX13 |
| XXXXXXX82 | XXXXXXX05 | XXXXXXX86 | XXXXXXX78 | XXXXXXX32 | XXXXXXX09 | XXXXXXX06 | XXXXXXX44 |
| XXXXXXX89 | XXXXXXX47 | XXXXXXX46 | XXXXXXX49 | XXXXXXX80 | XXXXXXX95 | XXXXXXX63 | XXXXXXX63 |
| XXXXXXX89 | XXXXXXX42 | XXXXXXX45 | XXXXXXX60 | XXXXXXX66 | XXXXXXX13 | XXXXXXX14 | XXXXXXX32 |
| XXXXXXX22 | XXXXXXX74 | XXXXXXX43 | XXXXXXX35 | XXXXXXX21 | XXXXXXX65 | XXXXXXX69 | XXXXXXX80 |
| XXXXXXX34 | XXXXXXX83 | XXXXXXX48 | XXXXXXX87 | XXXXXXX05 | XXXXXXX86 | XXXXXXX91 | XXXXXXX84 |
| XXXXXXX52 | XXXXXXX06 | XXXXXXX60 | XXXXXXX62 | XXXXXXX64 | XXXXXXX41 | XXXXXXX46 | XXXXXXX65 |
| XXXXXXX20 | XXXXXXX12 | XXXXXXX03 | XXXXXXX72 | XXXXXXX32 | XXXXXXX52 | XXXXXXX46 | XXXXXXX46 |
| XXXXXXX53 | XXXXXXX54 | XXXXXXX51 | XXXXXXX02 | XXXXXXX84 | XXXXXXX40 | XXXXXXX83 | XXXXXXX10 |
| XXXXXXX28 | XXXXXXX54 | XXXXXXX29 | XXXXXXX51 | XXXXXXX13 | XXXXXXX31 | XXXXXXX71 | XXXXXXX35 |
| XXXXXXX35 | XXXXXXX01 | XXXXXXX45 | XXXXXXX29 | XXXXXXX29 | XXXXXXX91 | XXXXXXX66 | XXXXXXX92 |
| XXXXXXX72 | XXXXXXX94 | XXXXXXX97 | XXXXXXX98 | XXXXXXX03 | XXXXXXX93 | XXXXXXX48 | XXXXXXX57 |
| XXXXXXX58 | XXXXXXX58 | XXXXXXX58 | XXXXXXX48 | XXXXXXX14 | XXXXXXX08 | XXXXXXX05 | XXXXXXX07 |
| XXXXXXX58 | XXXXXXX15 | XXXXXXX87 | XXXXXXX07 | XXXXXXX90 | XXXXXXX31 | XXXXXXX15 | XXXXXXX36 |
| XXXXXXX55 | XXXXXXX80 | XXXXXXX24 | XXXXXXX73 | XXXXXXX51 | XXXXXXX88 | XXXXXXX85 | XXXXXXX04 |
| XXXXXXX36 | XXXXXXX07 | XXXXXXX47 | XXXXXXX15 | XXXXXXX26 | XXXXXXX66 | XXXXXXX26 | XXXXXXX57 |
| XXXXXXX95 | XXXXXXX85 | XXXXXXX73 | XXXXXXX95 | XXXXXXX99 | XXXXXXX79 | XXXXXXX10 | XXXXXXX45 |
| XXXXXXX65 | XXXXXXX77 | XXXXXXX25 | XXXXXXX10 | XXXXXXX55 | XXXXXXX50 | XXXXXXX44 | XXXXXXX39 |
| XXXXXXX51 | XXXXXXX55 | XXXXXXX58 | XXXXXXX24 | XXXXXXX28 | XXXXXXX74 | XXXXXXX01 | XXXXXXX01 |
| XXXXXXX55 | XXXXXXX18 | XXXXXXX56 | XXXXXXX29 | XXXXXXX36 | XXXXXXX49 | XXXXXXX21 | XXXXXXX82 |
| XXXXXXX08 | XXXXXXX05 | XXXXXXX30 | XXXXXXX05 | XXXXXXX18 | XXXXXXX87 | XXXXXXX84 | XXXXXXX11 |
| XXXXXXX57 | XXXXXXX87 | XXXXXXX68 | XXXXXXX79 | XXXXXXX75 | XXXXXXX91 | XXXXXXX67 | XXXXXXX98 |
| XXXXXXX14 | XXXXXXX60 | XXXXXXX87 | XXXXXXX19 | XXXXXXX87 | XXXXXXX54 | XXXXXXX58 | XXXXXXX50 |
| XXXXXXX95 | XXXXXXX92 | XXXXXXX81 | XXXXXXX41 | XXXXXXX31 | XXXXXXX93 | XXXXXXX40 | XXXXXXX21 |
| XXXXXXX79 | XXXXXXX91 | XXXXXXX79 | XXXXXXX06 | XXXXXXX88 | XXXXXXX09 | XXXXXXX99 | XXXXXXX34 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX51 | XXXXXXX13 | XXXXXXX09 | XXXXXXX05 | XXXXXXX03 | XXXXXXX93 | XXXXXXX90 | XXXXXXX87 |
| XXXXXXX47 | XXXXXXX68 | XXXXXXX58 | XXXXXXX60 | XXXXXXX70 | XXXXXXX71 | XXXXXXX83 | XXXXXXX78 |
| XXXXXXX12 | XXXXXXX38 | XXXXXXX33 | XXXXXXX23 | XXXXXXX13 | XXXXXXX48 | XXXXXXX30 | XXXXXXX15 |
| XXXXXXX05 | XXXXXXX69 | XXXXXXX85 | XXXXXXX28 | XXXXXXX67 | XXXXXXX37 | XXXXXXX47 | XXXXXXX53 |
| XXXXXXX80 | XXXXXXX16 | XXXXXXX50 | XXXXXXX36 | XXXXXXX47 | XXXXXXX23 | XXXXXXX31 | XXXXXXX16 |
| XXXXXXX01 | XXXXXXX87 | XXXXXXX79 | XXXXXXX06 | XXXXXXX35 | XXXXXXX33 | XXXXXXX35 | XXXXXXX32 |
| XXXXXXX82 | XXXXXXX95 | XXXXXXX50 | XXXXXXX65 | XXXXXXX03 | XXXXXXX40 | XXXXXXX53 | XXXXXXX72 |
| XXXXXXX43 | XXXXXXX85 | XXXXXXX26 | XXXXXXX37 | XXXXXXX20 | XXXXXXX78 | XXXXXXX34 | XXXXXXX14 |
| XXXXXXX65 | XXXXXXX21 | XXXXXXX25 | XXXXXXX83 | XXXXXXX81 | XXXXXXX10 | XXXXXXX28 | XXXXXXX37 |
| XXXXXXX78 | XXXXXXX46 | XXXXXXX48 | XXXXXXX18 | XXXXXXX53 | XXXXXXX33 | XXXXXXX85 | XXXXXXX77 |
| XXXXXXX31 | XXXXXXX66 | XXXXXXX38 | XXXXXXX19 | XXXXXXX50 | XXXXXXX37 | XXXXXXX37 | XXXXXXX35 |
| XXXXXXX82 | XXXXXXX11 | XXXXXXX86 | XXXXXXX84 | XXXXXXX49 | XXXXXXX94 | XXXXXXX19 | XXXXXXX50 |
| XXXXXXX81 | XXXXXXX59 | XXXXXXX66 | XXXXXXX59 | XXXXXXX43 | XXXXXXX59 | XXXXXXX70 | XXXXXXX91 |
| XXXXXXX33 | XXXXXXX33 | XXXXXXX88 | XXXXXXX64 | XXXXXXX19 | XXXXXXX47 | XXXXXXX69 | XXXXXXX30 |
| XXXXXXX29 | XXXXXXX63 | XXXXXXX77 | XXXXXXX17 | XXXXXXX40 | XXXXXXX43 | XXXXXXX41 | XXXXXXX04 |
| XXXXXXX98 | XXXXXXX02 | XXXXXXX57 | XXXXXXX76 | XXXXXXX67 | XXXXXXX96 | XXXXXXX33 | XXXXXXX23 |
| XXXXXXX60 | XXXXXXX08 | XXXXXXX61 | XXXXXXX40 | XXXXXXX83 | XXXXXXX02 | XXXXXXX69 | XXXXXXX51 |
| XXXXXXX23 | XXXXXXX47 | XXXXXXX44 | XXXXXXX24 | XXXXXXX18 | XXXXXXX95 | XXXXXXX78 | XXXXXXX21 |
| XXXXXXX09 | XXXXXXX52 | XXXXXXX75 | XXXXXXX05 | XXXXXXX52 | XXXXXXX42 | XXXXXXX37 | XXXXXXX37 |
| XXXXXXX03 | XXXXXXX69 | XXXXXXX29 | XXXXXXX36 | XXXXXXX49 | XXXXXXX66 | XXXXXXX25 | XXXXXXX99 |
| XXXXXXX34 | XXXXXXX77 | XXXXXXX60 | XXXXXXX42 | XXXXXXX58 | XXXXXXX19 | XXXXXXX04 | XXXXXXX16 |
| XXXXXXX25 | XXXXXXX22 | XXXXXXX43 | XXXXXXX78 | XXXXXXX71 | XXXXXXX10 | XXXXXXX40 | XXXXXXX14 |
| XXXXXXX93 | XXXXXXX07 | XXXXXXX51 | XXXXXXX74 | XXXXXXX83 | XXXXXXX19 | XXXXXXX92 | XXXXXXX31 |
| XXXXXXX26 | XXXXXXX77 | XXXXXXX77 | XXXXXXX29 | XXXXXXX95 | XXXXXXX71 | XXXXXXX78 | XXXXXXX22 |
| XXXXXXX10 | XXXXXXX70 | XXXXXXX03 | XXXXXXX74 | XXXXXXX84 | XXXXXXX66 | XXXXXXX40 | XXXXXXX53 |
| XXXXXXX20 | XXXXXXX39 | XXXXXXX70 | XXXXXXX59 | XXXXXXX22 | XXXXXXX69 | XXXXXXX98 | XXXXXXX81 |
| XXXXXXX83 | XXXXXXX45 | XXXXXXX96 | XXXXXXX61 | XXXXXXX06 | XXXXXXX12 | XXXXXXX08 | XXXXXXX42 |
| XXXXXXX48 | XXXXXXX98 | XXXXXXX29 | XXXXXXX80 | XXXXXXX17 | XXXXXXX42 | XXXXXXX19 | XXXXXXX55 |
| XXXXXXX32 | XXXXXXX74 | XXXXXXX78 | XXXXXXX22 | XXXXXXX09 | XXXXXXX69 | XXXXXXX26 | XXXXXXX35 |
| XXXXXXX75 | XXXXXXX26 | XXXXXXX50 | XXXXXXX76 | XXXXXXX67 | XXXXXXX78 | XXXXXXX92 | XXXXXXX89 |
| XXXXXXX07 | XXXXXXX47 | XXXXXXX43 | XXXXXXX74 | XXXXXXX38 | XXXXXXX28 | XXXXXXX21 | XXXXXXX84 |
| XXXXXXX67 | XXXXXXX02 | XXXXXXX89 | XXXXXXX63 | XXXXXXX99 | XXXXXXX07 | XXXXXXX63 | XXXXXXX63 |
| XXXXXXX48 | XXXXXXX46 | XXXXXXX87 | XXXXXXX63 | XXXXXXX62 | XXXXXXX39 | XXXXXXX75 | XXXXXXX90 |
| XXXXXXX64 | XXXXXXX26 | XXXXXXX21 | XXXXXXX93 | XXXXXXX76 | XXXXXXX93 | XXXXXXX93 | XXXXXXX76 |
| XXXXXXX76 | XXXXXXX08 | XXXXXXX20 | XXXXXXX76 | XXXXXXX36 | XXXXXXX26 | XXXXXXX41 | XXXXXXX34 |
| XXXXXXX94 | XXXXXXX95 | XXXXXXX53 | XXXXXXX26 | XXXXXXX49 | XXXXXXX86 | XXXXXXX66 | XXXXXXX30 |
| XXXXXXX60 | XXXXXXX73 | XXXXXXX86 | XXXXXXX41 | XXXXXXX71 | XXXXXXX81 | XXXXXXX20 | XXXXXXX99 |
| XXXXXXX93 | XXXXXXX21 | XXXXXXX84 | XXXXXXX93 | XXXXXXX33 | XXXXXXX42 | XXXXXXX52 | XXXXXXX80 |
| XXXXXXX92 | XXXXXXX12 | XXXXXXX42 | XXXXXXX62 | XXXXXXX79 | XXXXXXX74 | XXXXXXX16 | XXXXXXX44 |
| XXXXXXX03 | XXXXXXX06 | XXXXXXX45 | XXXXXXX47 | XXXXXXX23 | XXXXXXX86 | XXXXXXX39 | XXXXXXX25 |
| XXXXXXX81 | XXXXXXX15 | XXXXXXX38 | XXXXXXX70 | XXXXXXX40 | XXXXXXX80 | XXXXXXX44 | XXXXXXX72 |
| XXXXXXX86 | XXXXXXX87 | XXXXXXX85 | XXXXXXX58 | XXXXXXX89 | XXXXXXX62 | XXXXXXX50 | XXXXXXX82 |
| XXXXXXX28 | XXXXXXX93 | XXXXXXX06 | XXXXXXX22 | XXXXXXX49 | XXXXXXX37 | XXXXXXX46 | XXXXXXX46 |
| XXXXXXX46 | XXXXXXX44 | XXXXXXX86 | XXXXXXX44 | XXXXXXX65 | XXXXXXX01 | XXXXXXX93 | XXXXXXX45 |
| XXXXXXX11 | XXXXXXX15 | XXXXXXX77 | XXXXXXX95 | XXXXXXX69 | XXXXXXX40 | XXXXXXX74 | XXXXXXX86 |
| XXXXXXX66 | XXXXXXX94 | XXXXXXX52 | XXXXXXX21 | XXXXXXX15 | XXXXXXX90 | XXXXXXX29 | XXXXXXX57 |
| XXXXXXX36 | XXXXXXX60 | XXXXXXX40 | XXXXXXX40 | XXXXXXX11 | XXXXXXX54 | XXXXXXX53 | XXXXXXX21 |
| XXXXXXX22 | XXXXXXX20 | XXXXXXX50 | XXXXXXX41 | XXXXXXX97 | XXXXXXX97 | XXXXXXX60 | XXXXXXX50 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX63 | XXXXXXX44 | XXXXXXX54 | XXXXXXX60 | XXXXXXX00 | XXXXXXX99 | XXXXXXX86 | XXXXXXX64 |
| XXXXXXX86 | XXXXXXX31 | XXXXXXX92 | XXXXXXX39 | XXXXXXX48 | XXXXXXX09 | XXXXXXX80 | XXXXXXX93 |
| XXXXXXX79 | XXXXXXX93 | XXXXXXX91 | XXXXXXX11 | XXXXXXX30 | XXXXXXX11 | XXXXXXX96 | XXXXXXX49 |
| XXXXXXX42 | XXXXXXX42 | XXXXXXX61 | XXXXXXX96 | XXXXXXX26 | XXXXXXX31 | XXXXXXX96 | XXXXXXX26 |
| XXXXXXX31 | XXXXXXX57 | XXXXXXX40 | XXXXXXX88 | XXXXXXX93 | XXXXXXX60 | XXXXXXX81 | XXXXXXX09 |
| XXXXXXX69 | XXXXXXX94 | XXXXXXX59 | XXXXXXX41 | XXXXXXX75 | XXXXXXX65 | XXXXXXX51 | XXXXXXX30 |
| XXXXXXX07 | XXXXXXX30 | XXXXXXX42 | XXXXXXX64 | XXXXXXX51 | XXXXXXX20 | XXXXXXX55 | XXXXXXX02 |
| XXXXXXX89 | XXXXXXX96 | XXXXXXX28 | XXXXXXX72 | XXXXXXX34 | XXXXXXX24 | XXXXXXX79 | XXXXXXX00 |
| XXXXXXX43 | XXXXXXX54 | XXXXXXX16 | XXXXXXX13 | XXXXXXX16 | XXXXXXX70 | XXXXXXX16 | XXXXXXX16 |
| XXXXXXX21 | XXXXXXX16 | XXXXXXX16 | XXXXXXX17 | XXXXXXX62 | XXXXXXX30 | XXXXXXX03 | XXXXXXX21 |
| XXXXXXX25 | XXXXXXX06 | XXXXXXX92 | XXXXXXX89 | XXXXXXX21 | XXXXXXX02 | XXXXXXX01 | XXXXXXX99 |
| XXXXXXX41 | XXXXXXX63 | XXXXXXX04 | XXXXXXX21 | XXXXXXX57 | XXXXXXX81 | XXXXXXX03 | XXXXXXX50 |
| XXXXXXX34 | XXXXXXX96 | XXXXXXX41 | XXXXXXX91 | XXXXXXX06 | XXXXXXX05 | XXXXXXX46 | XXXXXXX82 |
| XXXXXXX00 | XXXXXXX27 | XXXXXXX28 | XXXXXXX00 | XXXXXXX70 | XXXXXXX04 | XXXXXXX12 | XXXXXXX73 |
| XXXXXXX01 | XXXXXXX16 | XXXXXXX27 | XXXXXXX99 | XXXXXXX29 | XXXXXXX07 | XXXXXXX40 | XXXXXXX55 |
| XXXXXXX08 | XXXXXXX31 | XXXXXXX35 | XXXXXXX65 | XXXXXXX87 | XXXXXXX52 | XXXXXXX51 | XXXXXXX87 |
| XXXXXXX75 | XXXXXXX71 | XXXXXXX80 | XXXXXXX71 | XXXXXXX95 | XXXXXXX78 | XXXXXXX56 | XXXXXXX85 |
| XXXXXXX01 | XXXXXXX88 | XXXXXXX82 | XXXXXXX72 | XXXXXXX74 | XXXXXXX73 | XXXXXXX30 | XXXXXXX74 |
| XXXXXXX81 | XXXXXXX20 | XXXXXXX48 | XXXXXXX66 | XXXXXXX50 | XXXXXXX18 | XXXXXXX66 | XXXXXXX54 |
| XXXXXXX59 | XXXXXXX86 | XXXXXXX12 | XXXXXXX09 | XXXXXXX30 | XXXXXXX14 | XXXXXXX73 | XXXXXXX19 |
| XXXXXXX62 | XXXXXXX04 | XXXXXXX99 | XXXXXXX73 | XXXXXXX52 | XXXXXXX58 | XXXXXXX67 | XXXXXXX95 |
| XXXXXXX44 | XXXXXXX63 | XXXXXXX13 | XXXXXXX65 | XXXXXXX40 | XXXXXXX94 | XXXXXXX06 | XXXXXXX23 |
| XXXXXXX99 | XXXXXXX31 | XXXXXXX45 | XXXXXXX80 | XXXXXXX12 | XXXXXXX76 | XXXXXXX10 | XXXXXXX23 |
| XXXXXXX63 | XXXXXXX70 | XXXXXXX28 | XXXXXXX34 | XXXXXXX38 | XXXXXXX10 | XXXXXXX21 | XXXXXXX74 |
| XXXXXXX70 | XXXXXXX74 | XXXXXXX97 | XXXXXXX03 | XXXXXXX28 | XXXXXXX71 | XXXXXXX16 | XXXXXXX68 |
| XXXXXXX71 | XXXXXXX11 | XXXXXXX81 | XXXXXXX12 | XXXXXXX03 | XXXXXXX07 | XXXXXXX44 | XXXXXXX48 |
| XXXXXXX15 | XXXXXXX79 | XXXXXXX96 | XXXXXXX27 | XXXXXXX57 | XXXXXXX20 | XXXXXXX44 | XXXXXXX52 |
| XXXXXXX46 | XXXXXXX23 | XXXXXXX89 | XXXXXXX92 | XXXXXXX75 | XXXXXXX05 | XXXXXXX74 | XXXXXXX04 |
| XXXXXXX25 | XXXXXXX76 | XXXXXXX66 | XXXXXXX61 | XXXXXXX61 | XXXXXXX84 | XXXXXXX40 | XXXXXXX98 |
| XXXXXXX87 | XXXXXXX01 | XXXXXXX00 | XXXXXXX36 | XXXXXXX19 | XXXXXXX41 | XXXXXXX44 | XXXXXXX27 |
| XXXXXXX70 | XXXXXXX60 | XXXXXXX19 | XXXXXXX73 | XXXXXXX76 | XXXXXXX02 | XXXXXXX23 | XXXXXXX65 |
| XXXXXXX60 | XXXXXXX44 | XXXXXXX79 | XXXXXXX25 | XXXXXXX26 | XXXXXXX05 | XXXXXXX09 | XXXXXXX14 |
| XXXXXXX04 | XXXXXXX64 | XXXXXXX80 | XXXXXXX06 | XXXXXXX28 | XXXXXXX78 | XXXXXXX12 | XXXXXXX37 |
| XXXXXXX88 | XXXXXXX39 | XXXXXXX87 | XXXXXXX24 | XXXXXXX70 | XXXXXXX51 | XXXXXXX01 | XXXXXXX51 |
| XXXXXXX53 | XXXXXXX01 | XXXXXXX24 | XXXXXXX22 | XXXXXXX36 | XXXXXXX45 | XXXXXXX49 | XXXXXXX84 |
| XXXXXXX14 | XXXXXXX29 | XXXXXXX42 | XXXXXXX83 | XXXXXXX31 | XXXXXXX39 | XXXXXXX38 | XXXXXXX07 |
| XXXXXXX75 | XXXXXXX46 | XXXXXXX12 | XXXXXXX50 | XXXXXXX55 | XXXXXXX64 | XXXXXXX78 | XXXXXXX76 |
| XXXXXXX41 | XXXXXXX90 | XXXXXXX33 | XXXXXXX57 | XXXXXXX12 | XXXXXXX86 | XXXXXXX23 | XXXXXXX05 |
| XXXXXXX30 | XXXXXXX64 | XXXXXXX30 | XXXXXXX00 | XXXXXXX40 | XXXXXXX10 | XXXXXXX82 | XXXXXXX50 |
| XXXXXXX63 | XXXXXXX62 | XXXXXXX60 | XXXXXXX72 | XXXXXXX13 | XXXXXXX59 | XXXXXXX94 | XXXXXXX63 |
| XXXXXXX15 | XXXXXXX26 | XXXXXXX30 | XXXXXXX91 | XXXXXXX71 | XXXXXXX49 | XXXXXXX97 | XXXXXXX99 |
| XXXXXXX98 | XXXXXXX37 | XXXXXXX07 | XXXXXXX61 | XXXXXXX67 | XXXXXXX58 | XXXXXXX57 | XXXXXXX57 |
| XXXXXXX44 | XXXXXXX77 | XXXXXXX65 | XXXXXXX76 | XXXXXXX25 | XXXXXXX28 | XXXXXXX62 | XXXXXXX32 |
| XXXXXXX39 | XXXXXXX17 | XXXXXXX98 | XXXXXXX80 | XXXXXXX62 | XXXXXXX95 | XXXXXXX17 | XXXXXXX34 |
| XXXXXXX47 | XXXXXXX64 | XXXXXXX60 | XXXXXXX55 | XXXXXXX80 | XXXXXXX75 | XXXXXXX08 | XXXXXXX89 |
| XXXXXXX46 | XXXXXXX68 | XXXXXXX06 | XXXXXXX28 | XXXXXXX53 | XXXXXXX67 | XXXXXXX97 | XXXXXXX24 |
| XXXXXXX49 | XXXXXXX97 | XXXXXXX24 | XXXXXXX06 | XXXXXXX08 | XXXXXXX98 | XXXXXXX45 | XXXXXXX85 |
| XXXXXXX74 | XXXXXXX47 | XXXXXXX43 | XXXXXXX83 | XXXXXXX82 | XXXXXXX03 | XXXXXXX75 | XXXXXXX30 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX20 | XXXXXXX56 | XXXXXXX03 | XXXXXXX88 | XXXXXXX79 | XXXXXXX96 | XXXXXXX19 | XXXXXXX34 |
| XXXXXXX89 | XXXXXXX36 | XXXXXXX59 | XXXXXXX77 | XXXXXXX33 | XXXXXXX07 | XXXXXXX20 | XXXXXXX50 |
| XXXXXXX91 | XXXXXXX11 | XXXXXXX00 | XXXXXXX69 | XXXXXXX85 | XXXXXXX80 | XXXXXXX84 | XXXXXXX99 |
| XXXXXXX95 | XXXXXXX03 | XXXXXXX24 | XXXXXXX06 | XXXXXXX22 | XXXXXXX12 | XXXXXXX20 | XXXXXXX34 |
| XXXXXXX06 | XXXXXXX97 | XXXXXXX11 | XXXXXXX56 | XXXXXXX63 | XXXXXXX70 | XXXXXXX81 | XXXXXXX12 |
| XXXXXXX37 | XXXXXXX71 | XXXXXXX41 | XXXXXXX97 | XXXXXXX98 | XXXXXXX68 | XXXXXXX78 | XXXXXXX29 |
| XXXXXXX30 | XXXXXXX09 | XXXXXXX76 | XXXXXXX15 | XXXXXXX17 | XXXXXXX94 | XXXXXXX34 | XXXXXXX01 |
| XXXXXXX42 | XXXXXXX60 | XXXXXXX84 | XXXXXXX93 | XXXXXXX78 | XXXXXXX07 | XXXXXXX03 | XXXXXXX59 |
| XXXXXXX65 | XXXXXXX10 | XXXXXXX61 | XXXXXXX93 | XXXXXXX60 | XXXXXXX23 | XXXXXXX30 | XXXXXXX90 |
| XXXXXXX76 | XXXXXXX88 | XXXXXXX52 | XXXXXXX66 | XXXXXXX91 | XXXXXXX96 | XXXXXXX27 | XXXXXXX28 |
| XXXXXXX38 | XXXXXXX53 | XXXXXXX55 | XXXXXXX47 | XXXXXXX47 | XXXXXXX85 | XXXXXXX58 | XXXXXXX43 |
| XXXXXXX70 | XXXXXXX58 | XXXXXXX09 | XXXXXXX88 | XXXXXXX43 | XXXXXXX63 | XXXXXXX89 | XXXXXXX81 |
| XXXXXXX78 | XXXXXXX16 | XXXXXXX95 | XXXXXXX39 | XXXXXXX32 | XXXXXXX41 | XXXXXXX23 | XXXXXXX16 |
| XXXXXXX77 | XXXXXXX94 | XXXXXXX33 | XXXXXXX36 | XXXXXXX37 | XXXXXXX41 | XXXXXXX35 | XXXXXXX19 |
| XXXXXXX69 | XXXXXXX08 | XXXXXXX80 | XXXXXXX08 | XXXXXXX68 | XXXXXXX91 | XXXXXXX83 | XXXXXXX11 |
| XXXXXXX06 | XXXXXXX05 | XXXXXXX14 | XXXXXXX14 | XXXXXXX04 | XXXXXXX81 | XXXXXXX47 | XXXXXXX35 |
| XXXXXXX14 | XXXXXXX69 | XXXXXXX64 | XXXXXXX77 | XXXXXXX11 | XXXXXXX12 | XXXXXXX65 | XXXXXXX97 |
| XXXXXXX11 | XXXXXXX98 | XXXXXXX70 | XXXXXXX93 | XXXXXXX97 | XXXXXXX51 | XXXXXXX38 | XXXXXXX65 |
| XXXXXXX15 | XXXXXXX72 | XXXXXXX72 | XXXXXXX94 | XXXXXXX01 | XXXXXXX75 | XXXXXXX46 | XXXXXXX43 |
| XXXXXXX01 | XXXXXXX86 | XXXXXXX21 | XXXXXXX39 | XXXXXXX05 | XXXXXXX33 | XXXXXXX65 | XXXXXXX34 |
| XXXXXXX47 | XXXXXXX99 | XXXXXXX68 | XXXXXXX11 | XXXXXXX32 | XXXXXXX94 | XXXXXXX26 | XXXXXXX80 |
| XXXXXXX05 | XXXXXXX39 | XXXXXXX66 | XXXXXXX71 | XXXXXXX77 | XXXXXXX42 | XXXXXXX31 | XXXXXXX55 |
| XXXXXXX17 | XXXXXXX68 | XXXXXXX31 | XXXXXXX98 | XXXXXXX98 | XXXXXXX71 | XXXXXXX74 | XXXXXXX26 |
| XXXXXXX40 | XXXXXXX58 | XXXXXXX45 | XXXXXXX84 | XXXXXXX64 | XXXXXXX79 | XXXXXXX25 | XXXXXXX28 |
| XXXXXXX93 | XXXXXXX27 | XXXXXXX92 | XXXXXXX73 | XXXXXXX58 | XXXXXXX29 | XXXXXXX94 | XXXXXXX93 |
| XXXXXXX23 | XXXXXXX66 | XXXXXXX83 | XXXXXXX32 | XXXXXXX87 | XXXXXXX05 | XXXXXXX17 | XXXXXXX93 |
| XXXXXXX51 | XXXXXXX36 | XXXXXXX39 | XXXXXXX31 | XXXXXXX46 | XXXXXXX63 | XXXXXXX19 | XXXXXXX47 |
| XXXXXXX98 | XXXXXXX73 | XXXXXXX02 | XXXXXXX14 | XXXXXXX32 | XXXXXXX46 | XXXXXXX39 | XXXXXXX11 |
| XXXXXXX49 | XXXXXXX96 | XXXXXXX48 | XXXXXXX26 | XXXXXXX40 | XXXXXXX32 | XXXXXXX31 | XXXXXXX77 |
| XXXXXXX28 | XXXXXXX40 | XXXXXXX46 | XXXXXXX52 | XXXXXXX37 | XXXXXXX62 | XXXXXXX15 | XXXXXXX67 |
| XXXXXXX64 | XXXXXXX13 | XXXXXXX14 | XXXXXXX98 | XXXXXXX84 | XXXXXXX75 | XXXXXXX29 | XXXXXXX60 |
| XXXXXXX46 | XXXXXXX36 | XXXXXXX81 | XXXXXXX41 | XXXXXXX20 | XXXXXXX20 | XXXXXXX91 | XXXXXXX47 |
| XXXXXXX20 | XXXXXXX06 | XXXXXXX11 | XXXXXXX49 | XXXXXXX29 | XXXXXXX78 | XXXXXXX35 | XXXXXXX65 |
| XXXXXXX20 | XXXXXXX81 | XXXXXXX64 | XXXXXXX29 | XXXXXXX25 | XXXXXXX34 | XXXXXXX44 | XXXXXXX27 |
| XXXXXXX19 | XXXXXXX92 | XXXXXXX76 | XXXXXXX14 | XXXXXXX82 | XXXXXXX85 | XXXXXXX16 | XXXXXXX74 |
| XXXXXXX64 | XXXXXXX95 | XXXXXXX49 | XXXXXXX53 | XXXXXXX79 | XXXXXXX75 | XXXXXXX84 | XXXXXXX83 |
| XXXXXXX73 | XXXXXXX99 | XXXXXXX00 | XXXXXXX83 | XXXXXXX50 | XXXXXXX66 | XXXXXXX44 | XXXXXXX74 |
| XXXXXXX97 | XXXXXXX88 | XXXXXXX33 | XXXXXXX29 | XXXXXXX50 | XXXXXXX90 | XXXXXXX78 | XXXXXXX31 |
| XXXXXXX47 | XXXXXXX47 | XXXXXXX10 | XXXXXXX42 | XXXXXXX43 | XXXXXXX74 | XXXXXXX64 | XXXXXXX78 |
| XXXXXXX85 | XXXXXXX23 | XXXXXXX49 | XXXXXXX88 | XXXXXXX15 | XXXXXXX33 | XXXXXXX82 | XXXXXXX75 |
| XXXXXXX45 | XXXXXXX81 | XXXXXXX29 | XXXXXXX05 | XXXXXXX04 | XXXXXXX61 | XXXXXXX37 | XXXXXXX65 |
| XXXXXXX68 | XXXXXXX40 | XXXXXXX30 | XXXXXXX57 | XXXXXXX86 | XXXXXXX56 | XXXXXXX91 | XXXXXXX02 |
| XXXXXXX81 | XXXXXXX06 | XXXXXXX40 | XXXXXXX46 | XXXXXXX47 | XXXXXXX36 | XXXXXXX58 | XXXXXXX57 |
| XXXXXXX90 | XXXXXXX42 | XXXXXXX29 | XXXXXXX25 | XXXXXXX64 | XXXXXXX99 | XXXXXXX76 | XXXXXXX93 |
| XXXXXXX14 | XXXXXXX03 | XXXXXXX18 | XXXXXXX24 | XXXXXXX06 | XXXXXXX81 | XXXXXXX67 | XXXXXXX90 |
| XXXXXXX60 | XXXXXXX86 | XXXXXXX97 | XXXXXXX39 | XXXXXXX37 | XXXXXXX03 | XXXXXXX17 | XXXXXXX39 |
| XXXXXXX49 | XXXXXXX20 | XXXXXXX34 | XXXXXXX49 | XXXXXXX20 | XXXXXXX07 | XXXXXXX48 | XXXXXXX77 |
| XXXXXXX89 | XXXXXXX77 | XXXXXXX71 | XXXXXXX77 | XXXXXXX04 | XXXXXXX04 | XXXXXXX04 | XXXXXXX94 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX04 | XXXXXXX68 | XXXXXXX68 | XXXXXXX72 | XXXXXXX04 | XXXXXXX08 | XXXXXXX64 | XXXXXXX21 |
| XXXXXXX77 | XXXXXXX96 | XXXXXXX95 | XXXXXXX77 | XXXXXXX51 | XXXXXXX77 | XXXXXXX77 | XXXXXXX77 |
| XXXXXXX93 | XXXXXXX71 | XXXXXXX46 | XXXXXXX97 | XXXXXXX85 | XXXXXXX71 | XXXXXXX71 | XXXXXXX71 |
| XXXXXXX72 | XXXXXXX87 | XXXXXXX38 | XXXXXXX49 | XXXXXXX51 | XXXXXXX64 | XXXXXXX69 | XXXXXXX82 |
| XXXXXXX72 | XXXXXXX36 | XXXXXXX20 | XXXXXXX12 | XXXXXXX16 | XXXXXXX83 | XXXXXXX68 | XXXXXXX58 |
| XXXXXXX88 | XXXXXXX42 | XXXXXXX81 | XXXXXXX70 | XXXXXXX09 | XXXXXXX72 | XXXXXXX34 | XXXXXXX38 |
| XXXXXXX53 | XXXXXXX75 | XXXXXXX78 | XXXXXXX39 | XXXXXXX44 | XXXXXXX71 | XXXXXXX01 | XXXXXXX11 |
| XXXXXXX21 | XXXXXXX67 | XXXXXXX57 | XXXXXXX77 | XXXXXXX12 | XXXXXXX95 | XXXXXXX07 | XXXXXXX57 |
| XXXXXXX38 | XXXXXXX00 | XXXXXXX46 | XXXXXXX42 | XXXXXXX95 | XXXXXXX04 | XXXXXXX29 | XXXXXXX88 |
| XXXXXXX40 | XXXXXXX35 | XXXXXXX41 | XXXXXXX37 | XXXXXXX59 | XXXXXXX17 | XXXXXXX70 | XXXXXXX25 |
| XXXXXXX02 | XXXXXXX42 | XXXXXXX37 | XXXXXXX65 | XXXXXXX33 | XXXXXXX17 | XXXXXXX05 | XXXXXXX21 |
| XXXXXXX44 | XXXXXXX95 | XXXXXXX68 | XXXXXXX17 | XXXXXXX76 | XXXXXXX79 | XXXXXXX68 | XXXXXXX05 |
| XXXXXXX44 | XXXXXXX82 | XXXXXXX17 | XXXXXXX44 | XXXXXXX46 | XXXXXXX33 | XXXXXXX31 | XXXXXXX78 |
| XXXXXXX68 | XXXXXXX63 | XXXXXXX19 | XXXXXXX77 | XXXXXXX51 | XXXXXXX14 | XXXXXXX51 | XXXXXXX02 |
| XXXXXXX32 | XXXXXXX96 | XXXXXXX28 | XXXXXXX78 | XXXXXXX16 | XXXXXXX21 | XXXXXXX67 | XXXXXXX11 |
| XXXXXXX43 | XXXXXXX16 | XXXXXXX58 | XXXXXXX34 | XXXXXXX54 | XXXXXXX73 | XXXXXXX47 | XXXXXXX47 |
| XXXXXXX39 | XXXXXXX71 | XXXXXXX41 | XXXXXXX38 | XXXXXXX60 | XXXXXXX28 | XXXXXXX28 | XXXXXXX72 |
| XXXXXXX74 | XXXXXXX87 | XXXXXXX48 | XXXXXXX28 | XXXXXXX16 | XXXXXXX41 | XXXXXXX96 | XXXXXXX56 |
| XXXXXXX73 | XXXXXXX73 | XXXXXXX73 | XXXXXXX73 | XXXXXXX73 | XXXXXXX59 | XXXXXXX45 | XXXXXXX60 |
| XXXXXXX88 | XXXXXXX55 | XXXXXXX23 | XXXXXXX63 | XXXXXXX62 | XXXXXXX21 | XXXXXXX80 | XXXXXXX88 |
| XXXXXXX41 | XXXXXXX41 | XXXXXXX88 | XXXXXXX08 | XXXXXXX37 | XXXXXXX68 | XXXXXXX53 | XXXXXXX62 |
| XXXXXXX35 | XXXXXXX94 | XXXXXXX55 | XXXXXXX55 | XXXXXXX53 | XXXXXXX73 | XXXXXXX47 | XXXXXXX56 |
| XXXXXXX75 | XXXXXXX61 | XXXXXXX13 | XXXXXXX58 | XXXXXXX49 | XXXXXXX68 | XXXXXXX48 | XXXXXXX31 |
| XXXXXXX98 | XXXXXXX01 | XXXXXXX21 | XXXXXXX24 | XXXXXXX16 | XXXXXXX91 | XXXXXXX20 | XXXXXXX64 |
| XXXXXXX10 | XXXXXXX03 | XXXXXXX15 | XXXXXXX40 | XXXXXXX43 | XXXXXXX34 | XXXXXXX40 | XXXXXXX69 |
| XXXXXXX62 | XXXXXXX28 | XXXXXXX12 | XXXXXXX91 | XXXXXXX64 | XXXXXXX47 | XXXXXXX69 | XXXXXXX64 |
| XXXXXXX13 | XXXXXXX02 | XXXXXXX46 | XXXXXXX05 | XXXXXXX00 | XXXXXXX09 | XXXXXXX08 | XXXXXXX15 |
| XXXXXXX91 | XXXXXXX00 | XXXXXXX06 | XXXXXXX29 | XXXXXXX49 | XXXXXXX52 | XXXXXXX61 | XXXXXXX27 |
| XXXXXXX67 | XXXXXXX43 | XXXXXXX63 | XXXXXXX72 | XXXXXXX54 | XXXXXXX52 | XXXXXXX56 | XXXXXXX26 |
| XXXXXXX74 | XXXXXXX18 | XXXXXXX79 | XXXXXXX90 | XXXXXXX03 | XXXXXXX94 | XXXXXXX29 | XXXXXXX38 |
| XXXXXXX08 | XXXXXXX27 | XXXXXXX64 | XXXXXXX18 | XXXXXXX28 | XXXXXXX09 | XXXXXXX82 | XXXXXXX93 |
| XXXXXXX06 | XXXXXXX00 | XXXXXXX20 | XXXXXXX63 | XXXXXXX90 | XXXXXXX28 | XXXXXXX91 | XXXXXXX26 |
| XXXXXXX76 | XXXXXXX74 | XXXXXXX68 | XXXXXXX28 | XXXXXXX82 | XXXXXXX72 | XXXXXXX60 | XXXXXXX98 |
| XXXXXXX89 | XXXXXXX11 | XXXXXXX48 | XXXXXXX48 | XXXXXXX48 | XXXXXXX48 | XXXXXXX07 | XXXXXXX07 |
| XXXXXXX58 | XXXXXXX34 | XXXXXXX12 | XXXXXXX87 | XXXXXXX17 | XXXXXXX72 | XXXXXXX88 | XXXXXXX93 |
| XXXXXXX69 | XXXXXXX26 | XXXXXXX35 | XXXXXXX59 | XXXXXXX59 | XXXXXXX72 | XXXXXXX87 | XXXXXXX85 |
| XXXXXXX83 | XXXXXXX92 | XXXXXXX23 | XXXXXXX71 | XXXXXXX14 | XXXXXXX95 | XXXXXXX93 | XXXXXXX10 |
| XXXXXXX12 | XXXXXXX53 | XXXXXXX73 | XXXXXXX02 | XXXXXXX40 | XXXXXXX60 | XXXXXXX37 | XXXXXXX33 |
| XXXXXXX87 | XXXXXXX05 | XXXXXXX10 | XXXXXXX47 | XXXXXXX92 | XXXXXXX24 | XXXXXXX43 | XXXXXXX13 |
| XXXXXXX63 | XXXXXXX81 | XXXXXXX97 | XXXXXXX19 | XXXXXXX83 | XXXXXXX70 | XXXXXXX79 | XXXXXXX27 |
| XXXXXXX70 | XXXXXXX87 | XXXXXXX79 | XXXXXXX97 | XXXXXXX05 | XXXXXXX65 | XXXXXXX11 | XXXXXXX29 |
| XXXXXXX23 | XXXXXXX43 | XXXXXXX45 | XXXXXXX09 | XXXXXXX20 | XXXXXXX62 | XXXXXXX63 | XXXXXXX99 |
| XXXXXXX98 | XXXXXXX46 | XXXXXXX89 | XXXXXXX56 | XXXXXXX07 | XXXXXXX44 | XXXXXXX49 | XXXXXXX14 |
| XXXXXXX47 | XXXXXXX87 | XXXXXXX70 | XXXXXXX57 | XXXXXXX69 | XXXXXXX57 | XXXXXXX35 | XXXXXXX57 |
| XXXXXXX96 | XXXXXXX57 | XXXXXXX71 | XXXXXXX82 | XXXXXXX88 | XXXXXXX09 | XXXXXXX92 | XXXXXXX11 |
| XXXXXXX18 | XXXXXXX49 | XXXXXXX89 | XXXXXXX15 | XXXXXXX20 | XXXXXXX23 | XXXXXXX25 | XXXXXXX05 |
| XXXXXXX94 | XXXXXXX07 | XXXXXXX31 | XXXXXXX42 | XXXXXXX34 | XXXXXXX84 | XXXXXXX35 | XXXXXXX50 |
| XXXXXXX22 | XXXXXXX18 | XXXXXXX49 | XXXXXXX97 | XXXXXXX09 | XXXXXXX26 | XXXXXXX81 | XXXXXXX04 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX60 | XXXXXXX63 | XXXXXXX04 | XXXXXXX12 | XXXXXXX24 | XXXXXXX77 | XXXXXXX45 | XXXXXXX66 |
| XXXXXXX53 | XXXXXXX79 | XXXXXXX03 | XXXXXXX81 | XXXXXXX67 | XXXXXXX85 | XXXXXXX70 | XXXXXXX44 |
| XXXXXXX80 | XXXXXXX31 | XXXXXXX53 | XXXXXXX01 | XXXXXXX58 | XXXXXXX32 | XXXXXXX47 | XXXXXXX52 |
| XXXXXXX69 | XXXXXXX40 | XXXXXXX90 | XXXXXXX54 | XXXXXXX54 | XXXXXXX99 | XXXXXXX26 | XXXXXXX32 |
| XXXXXXX77 | XXXXXXX51 | XXXXXXX68 | XXXXXXX53 | XXXXXXX02 | XXXXXXX05 | XXXXXXX94 | XXXXXXX15 |
| XXXXXXX72 | XXXXXXX22 | XXXXXXX25 | XXXXXXX10 | XXXXXXX46 | XXXXXXX41 | XXXXXXX41 | XXXXXXX13 |
| XXXXXXX55 | XXXXXXX64 | XXXXXXX30 | XXXXXXX17 | XXXXXXX12 | XXXXXXX04 | XXXXXXX26 | XXXXXXX18 |
| XXXXXXX22 | XXXXXXX73 | XXXXXXX06 | XXXXXXX41 | XXXXXXX42 | XXXXXXX23 | XXXXXXX24 | XXXXXXX74 |
| XXXXXXX49 | XXXXXXX60 | XXXXXXX37 | XXXXXXX99 | XXXXXXX92 | XXXXXXX78 | XXXXXXX88 | XXXXXXX32 |
| XXXXXXX66 | XXXXXXX93 | XXXXXXX72 | XXXXXXX37 | XXXXXXX67 | XXXXXXX14 | XXXXXXX15 | XXXXXXX62 |
| XXXXXXX57 | XXXXXXX24 | XXXXXXX37 | XXXXXXX93 | XXXXXXX85 | XXXXXXX25 | XXXXXXX94 | XXXXXXX98 |
| XXXXXXX00 | XXXXXXX93 | XXXXXXX32 | XXXXXXX30 | XXXXXXX22 | XXXXXXX52 | XXXXXXX47 | XXXXXXX04 |
| XXXXXXX91 | XXXXXXX91 | XXXXXXX54 | XXXXXXX76 | XXXXXXX61 | XXXXXXX44 | XXXXXXX61 | XXXXXXX24 |
| XXXXXXX26 | XXXXXXX05 | XXXXXXX17 | XXXXXXX06 | XXXXXXX67 | XXXXXXX79 | XXXXXXX14 | XXXXXXX23 |
| XXXXXXX19 | XXXXXXX03 | XXXXXXX12 | XXXXXXX17 | XXXXXXX21 | XXXXXXX64 | XXXXXXX63 | XXXXXXX31 |
| XXXXXXX97 | XXXXXXX36 | XXXXXXX91 | XXXXXXX99 | XXXXXXX87 | XXXXXXX08 | XXXXXXX70 | XXXXXXX22 |
| XXXXXXX20 | XXXXXXX86 | XXXXXXX10 | XXXXXXX78 | XXXXXXX06 | XXXXXXX96 | XXXXXXX45 | XXXXXXX58 |
| XXXXXXX65 | XXXXXXX10 | XXXXXXX37 | XXXXXXX81 | XXXXXXX32 | XXXXXXX40 | XXXXXXX31 | XXXXXXX00 |
| XXXXXXX41 | XXXXXXX59 | XXXXXXX61 | XXXXXXX57 | XXXXXXX72 | XXXXXXX43 | XXXXXXX70 | XXXXXXX69 |
| XXXXXXX79 | XXXXXXX25 | XXXXXXX79 | XXXXXXX24 | XXXXXXX28 | XXXXXXX22 | XXXXXXX71 | XXXXXXX98 |
| XXXXXXX07 | XXXXXXX18 | XXXXXXX86 | XXXXXXX82 | XXXXXXX00 | XXXXXXX45 | XXXXXXX22 | XXXXXXX65 |
| XXXXXXX20 | XXXXXXX15 | XXXXXXX46 | XXXXXXX46 | XXXXXXX10 | XXXXXXX37 | XXXXXXX43 | XXXXXXX87 |
| XXXXXXX89 | XXXXXXX27 | XXXXXXX28 | XXXXXXX75 | XXXXXXX54 | XXXXXXX40 | XXXXXXX22 | XXXXXXX70 |
| XXXXXXX83 | XXXXXXX18 | XXXXXXX11 | XXXXXXX25 | XXXXXXX97 | XXXXXXX40 | XXXXXXX69 | XXXXXXX04 |
| XXXXXXX87 | XXXXXXX20 | XXXXXXX08 | XXXXXXX77 | XXXXXXX10 | XXXXXXX63 | XXXXXXX03 | XXXXXXX24 |
| XXXXXXX45 | XXXXXXX26 | XXXXXXX35 | XXXXXXX74 | XXXXXXX00 | XXXXXXX74 | XXXXXXX21 | XXXXXXX46 |
| XXXXXXX78 | XXXXXXX12 | XXXXXXX30 | XXXXXXX50 | XXXXXXX38 | XXXXXXX24 | XXXXXXX20 | XXXXXXX70 |
| XXXXXXX59 | XXXXXXX64 | XXXXXXX92 | XXXXXXX73 | XXXXXXX32 | XXXXXXX12 | XXXXXXX14 | XXXXXXX23 |
| XXXXXXX16 | XXXXXXX26 | XXXXXXX54 | XXXXXXX26 | XXXXXXX75 | XXXXXXX26 | XXXXXXX02 | XXXXXXX31 |
| XXXXXXX59 | XXXXXXX11 | XXXXXXX17 | XXXXXXX67 | XXXXXXX04 | XXXXXXX53 | XXXXXXX70 | XXXXXXX64 |
| XXXXXXX67 | XXXXXXX10 | XXXXXXX49 | XXXXXXX03 | XXXXXXX18 | XXXXXXX48 | XXXXXXX31 | XXXXXXX53 |
| XXXXXXX17 | XXXXXXX60 | XXXXXXX65 | XXXXXXX59 | XXXXXXX70 | XXXXXXX16 | XXXXXXX36 | XXXXXXX62 |
| XXXXXXX88 | XXXXXXX62 | XXXXXXX96 | XXXXXXX19 | XXXXXXX22 | XXXXXXX39 | XXXXXXX28 | XXXXXXX59 |
| XXXXXXX67 | XXXXXXX65 | XXXXXXX46 | XXXXXXX00 | XXXXXXX01 | XXXXXXX03 | XXXXXXX83 | XXXXXXX83 |
| XXXXXXX14 | XXXXXXX79 | XXXXXXX09 | XXXXXXX37 | XXXXXXX36 | XXXXXXX52 | XXXXXXX74 | XXXXXXX71 |
| XXXXXXX60 | XXXXXXX89 | XXXXXXX94 | XXXXXXX67 | XXXXXXX68 | XXXXXXX71 | XXXXXXX87 | XXXXXXX15 |
| XXXXXXX18 | XXXXXXX15 | XXXXXXX10 | XXXXXXX13 | XXXXXXX16 | XXXXXXX17 | XXXXXXX66 | XXXXXXX40 |
| XXXXXXX63 | XXXXXXX57 | XXXXXXX05 | XXXXXXX11 | XXXXXXX67 | XXXXXXX67 | XXXXXXX03 | XXXXXXX19 |
| XXXXXXX94 | XXXXXXX61 | XXXXXXX03 | XXXXXXX66 | XXXXXXX66 | XXXXXXX59 | XXXXXXX66 | XXXXXXX66 |
| XXXXXXX03 | XXXXXXX70 | XXXXXXX43 | XXXXXXX51 | XXXXXXX98 | XXXXXXX62 | XXXXXXX90 | XXXXXXX04 |
| XXXXXXX06 | XXXXXXX38 | XXXXXXX82 | XXXXXXX50 | XXXXXXX00 | XXXXXXX57 | XXXXXXX07 | XXXXXXX65 |
| XXXXXXX57 | XXXXXXX81 | XXXXXXX89 | XXXXXXX88 | XXXXXXX55 | XXXXXXX87 | XXXXXXX35 | XXXXXXX03 |
| XXXXXXX41 | XXXXXXX18 | XXXXXXX81 | XXXXXXX13 | XXXXXXX15 | XXXXXXX06 | XXXXXXX03 | XXXXXXX33 |
| XXXXXXX63 | XXXXXXX54 | XXXXXXX37 | XXXXXXX46 | XXXXXXX95 | XXXXXXX56 | XXXXXXX57 | XXXXXXX84 |
| XXXXXXX98 | XXXXXXX81 | XXXXXXX80 | XXXXXXX77 | XXXXXXX78 | XXXXXXX68 | XXXXXXX64 | XXXXXXX05 |
| XXXXXXX37 | XXXXXXX09 | XXXXXXX82 | XXXXXXX41 | XXXXXXX14 | XXXXXXX94 | XXXXXXX08 | XXXXXXX78 |
| XXXXXXX90 | XXXXXXX47 | XXXXXXX04 | XXXXXXX01 | XXXXXXX56 | XXXXXXX26 | XXXXXXX01 | XXXXXXX55 |
| XXXXXXX51 | XXXXXXX65 | XXXXXXX66 | XXXXXXX69 | XXXXXXX22 | XXXXXXX63 | XXXXXXX60 | XXXXXXX96 |

## List of 9844 Claims in Excel Sample

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| XXXXXXX69 | XXXXXXX70 | XXXXXXX76 | XXXXXXX95 | XXXXXXX00 | XXXXXXX08 | XXXXXXX16 | XXXXXXX35 |
| XXXXXXX30 | XXXXXXX33 | XXXXXXX45 | XXXXXXX38 | XXXXXXX55 | XXXXXXX88 | XXXXXXX88 | XXXXXXX67 |
| XXXXXXX12 | XXXXXXX18 | XXXXXXX95 | XXXXXXX76 | XXXXXXX84 | XXXXXXX14 | XXXXXXX87 | XXXXXXX54 |
| XXXXXXX15 | XXXXXXX17 | XXXXXXX30 | XXXXXXX34 | XXXXXXX68 | XXXXXXX58 | XXXXXXX29 | XXXXXXX94 |
| XXXXXXX65 | XXXXXXX67 | XXXXXXX78 | XXXXXXX20 | XXXXXXX26 | XXXXXXX84 | XXXXXXX61 | XXXXXXX55 |
| XXXXXXX20 | XXXXXXX65 | XXXXXXX53 | XXXXXXX74 | XXXXXXX72 | XXXXXXX01 | XXXXXXX69 | XXXXXXX21 |
| XXXXXXX68 | XXXXXXX37 | XXXXXXX17 | XXXXXXX07 | XXXXXXX07 | XXXXXXX21 | XXXXXXX25 | XXXXXXX25 |
| XXXXXXX28 | XXXXXXX02 | XXXXXXX54 | XXXXXXX51 | XXXXXXX44 | XXXXXXX57 | XXXXXXX80 | XXXXXXX67 |
| XXXXXXX72 | XXXXXXX98 | XXXXXXX03 | XXXXXXX27 | XXXXXXX44 | XXXXXXX21 | XXXXXXX94 | XXXXXXX67 |
| XXXXXXX29 | XXXXXXX74 | XXXXXXX42 | XXXXXXX77 | XXXXXXX57 | XXXXXXX03 | XXXXXXX90 | XXXXXXX63 |
| XXXXXXX63 | XXXXXXX63 | XXXXXXX27 | XXXXXXX79 | XXXXXXX29 | XXXXXXX72 | XXXXXXX15 | XXXXXXX42 |
| XXXXXXX66 | XXXXXXX92 | XXXXXXX83 | XXXXXXX05 | XXXXXXX77 | XXXXXXX79 | XXXXXXX81 | XXXXXXX57 |
| XXXXXXX41 | XXXXXXX46 | XXXXXXX84 | XXXXXXX70 | XXXXXXX90 | XXXXXXX29 | XXXXXXX81 | XXXXXXX81 |
| XXXXXXX81 | XXXXXXX32 | XXXXXXX32 | XXXXXXX32 | XXXXXXX68 | XXXXXXX91 | XXXXXXX91 | XXXXXXX05 |
| XXXXXXX89 | XXXXXXX07 | XXXXXXX37 | XXXXXXX27 | XXXXXXX43 | XXXXXXX44 | XXXXXXX27 | XXXXXXX13 |
| XXXXXXX71 | XXXXXXX02 | XXXXXXX15 | XXXXXXX65 | XXXXXXX98 | XXXXXXX12 | XXXXXXX12 | XXXXXXX62 |
| XXXXXXX78 | XXXXXXX23 | XXXXXXX28 | XXXXXXX39 | XXXXXXX42 | XXXXXXX44 | XXXXXXX61 | XXXXXXX39 |
| XXXXXXX54 | XXXXXXX04 | XXXXXXX07 | XXXXXXX88 | XXXXXXX14 | XXXXXXX38 | XXXXXXX53 | XXXXXXX51 |
| XXXXXXX57 | XXXXXXX98 | XXXXXXX57 | XXXXXXX58 | XXXXXXX80 | XXXXXXX79 | XXXXXXX23 | XXXXXXX84 |
| XXXXXXX70 | XXXXXXX11 | XXXXXXX97 | XXXXXXX38 | XXXXXXX03 | XXXXXXX30 | XXXXXXX11 | XXXXXXX02 |
| XXXXXXX85 | XXXXXXX00 | XXXXXXX21 | XXXXXXX23 | XXXXXXX88 | XXXXXXX84 | XXXXXXX76 | XXXXXXX36 |
| XXXXXXX50 | XXXXXXX65 | XXXXXXX15 | XXXXXXX68 | XXXXXXX32 | XXXXXXX99 | XXXXXXX07 | XXXXXXX11 |
| XXXXXXX21 | XXXXXXX39 | XXXXXXX01 | XXXXXXX55 | XXXXXXX40 | XXXXXXX34 | XXXXXXX60 | XXXXXXX59 |
| XXXXXXX63 | XXXXXXX30 | XXXXXXX30 | XXXXXXX27 | XXXXXXX78 | XXXXXXX19 | XXXXXXX71 | XXXXXXX03 |
| XXXXXXX03 | XXXXXXX37 | XXXXXXX39 | XXXXXXX68 | XXXXXXX84 | XXXXXXX37 | XXXXXXX27 | XXXXXXX67 |
| XXXXXXX76 | XXXXXXX48 | XXXXXXX91 | XXXXXXX28 | XXXXXXX13 | XXXXXXX15 | XXXXXXX16 | XXXXXXX35 |
| XXXXXXX53 | XXXXXXX70 | XXXXXXX90 | XXXXXXX54 | XXXXXXX63 | XXXXXXX72 | XXXXXXX45 | XXXXXXX80 |
| XXXXXXX91 | XXXXXXX89 | XXXXXXX29 | XXXXXXX33 | XXXXXXX33 | XXXXXXX42 | XXXXXXX09 | XXXXXXX99 |
| XXXXXXX92 | XXXXXXX83 | XXXXXXX50 | XXXXXXX22 | XXXXXXX21 | XXXXXXX95 | XXXXXXX21 | XXXXXXX43 |
| XXXXXXX01 | XXXXXXX77 | XXXXXXX61 | XXXXXXX62 | XXXXXXX55 | XXXXXXX19 | XXXXXXX30 | XXXXXXX87 |
| XXXXXXX82 | XXXXXXX07 | XXXXXXX03 | XXXXXXX02 | | | | |

# LIST OF CLAIM AND DOCUMENTS REVIEWED FOR ACCOUNTING BASIS

## List of Claims and Documents Reviewed for Accounting Basis

| Claimant ID | Document | Claimant ID | Document | Claimant ID | Document | Claimant ID | Document |
|---|---|---|---|---|---|---|---|
| XXXXXXX57 | 1200 | XXXXXXX57 | 1201 | XXXXXXX57 | 1209 | XXXXXXX57 | 16246581 |
| XXXXXXX95 | 16416871 | XXXXXXX95 | 5322 | XXXXXXX95 | 5323 | XXXXXXX23 | 6048 |
| XXXXXXX23 | 6050 | XXXXXXX23 | 6051 | XXXXXXX23 | 6067 | XXXXXXX03 | 15724807 |
| XXXXXXX03 | 15724812 | XXXXXXX03 | 15724824 | XXXXXXX03 | 17458244 | XXXXXXX03 | 48264 |
| XXXXXXX02 | 419499 | XXXXXXX19 | 15903273 | XXXXXXX23 | 552451 | XXXXXXX23 | 60750 |
| XXXXXXX23 | 60773 | XXXXXXX38 | 260195 | XXXXXXX38 | 260204 | XXXXXXX38 | 61148 |
| XXXXXXX38 | 61149 | XXXXXXX82 | 62335 | XXXXXXX54 | 15917715 | XXXXXXX54 | 63554 |
| XXXXXXX60 | 17013459 | XXXXXXX60 | 17013463 | XXXXXXX60 | 63641 | XXXXXXX54 | 420338 |
| XXXXXXX54 | 420377 | XXXXXXX25 | 69029 | XXXXXXX25 | 69037 | XXXXXXX12 | 17471527 |
| XXXXXXX12 | 72842 | XXXXXXX63 | 16532650 | XXXXXXX63 | 78752 | XXXXXXX63 | 78777 |
| XXXXXXX63 | 78778 | XXXXXXX08 | 16168883 | XXXXXXX08 | 16892946 | XXXXXXX08 | 16892956 |
| XXXXXXX08 | 79619 | XXXXXXX60 | 80958 | XXXXXXX60 | 80961 | XXXXXXX87 | 15828484 |
| XXXXXXX87 | 15828485 | XXXXXXX87 | 15828486 | XXXXXXX87 | 15828487 | XXXXXXX28 | 16490517 |
| XXXXXXX28 | 16490522 | XXXXXXX28 | 17516638 | XXXXXXX28 | 17516640 | XXXXXXX40 | 702235 |
| XXXXXXX40 | 702259 | XXXXXXX40 | 702280 | XXXXXXX40 | 82247 | XXXXXXX11 | 18340695 |
| XXXXXXX11 | 18340696 | XXXXXXX11 | 19418636 | XXXXXXX11 | 19418657 | XXXXXXX76 | 15950342 |
| XXXXXXX76 | 15950343 | XXXXXXX76 | 15950383 | XXXXXXX67 | 18274683 | XXXXXXX67 | 456822 |
| XXXXXXX67 | 458283 | XXXXXXX67 | 458338 | XXXXXXX67 | 458354 | XXXXXXX79 | 16341127 |
| XXXXXXX79 | 16341128 | XXXXXXX79 | 16341137 | XXXXXXX79 | 16341143 | XXXXXXX38 | 139915 |
| XXXXXXX38 | 139922 | XXXXXXX38 | 139926 | XXXXXXX41 | 147354 | XXXXXXX41 | 147361 |
| XXXXXXX41 | 147383 | XXXXXXX09 | 16430778 | XXXXXXX09 | 16430789 | XXXXXXX09 | 16612084 |
| XXXXXXX07 | 157897 | XXXXXXX07 | 157900 | XXXXXXX07 | 17170851 | XXXXXXX10 | 16483928 |
| XXXXXXX10 | 18237030 | XXXXXXX83 | 16578601 | XXXXXXX83 | 16578657 | XXXXXXX99 | 159914 |
| XXXXXXX99 | 159917 | XXXXXXX99 | 16592261 | XXXXXXX01 | 16878355 | XXXXXXX01 | 16878358 |
| XXXXXXX01 | 16878472 | XXXXXXX01 | 16878492 | XXXXXXX41 | 16599585 | XXXXXXX41 | 180772 |
| XXXXXXX41 | 180838 | XXXXXXX99 | 184865 | XXXXXXX99 | 184869 | XXXXXXX35 | 187083 |
| XXXXXXX35 | 187086 | XXXXXXX35 | 187087 | XXXXXXX35 | 187095 | XXXXXXX19 | 16642202 |
| XXXXXXX19 | 199430 | XXXXXXX69 | 211038 | XXXXXXX69 | 211066 | XXXXXXX69 | 211439 |
| XXXXXXX69 | 211496 | XXXXXXX21 | 213165 | XXXXXXX21 | 215282 | XXXXXXX21 | 215357 |
| XXXXXXX06 | 16247591 | XXXXXXX06 | 213824 | XXXXXXX26 | 17529798 | XXXXXXX26 | 17529810 |
| XXXXXXX26 | 214509 | XXXXXXX90 | 18327772 | XXXXXXX90 | 217371 | XXXXXXX90 | 217388 |
| XXXXXXX79 | 17017911 | XXXXXXX79 | 17119123 | XXXXXXX79 | 17119132 | XXXXXXX63 | 275807 |
| XXXXXXX07 | 16986927 | XXXXXXX07 | 16986942 | XXXXXXX07 | 17100279 | XXXXXXX03 | 281494 |
| XXXXXXX03 | 281497 | XXXXXXX03 | 281498 | XXXXXXX03 | 281508 | XXXXXXX25 | 17107544 |
| XXXXXXX25 | 17108046 | XXXXXXX25 | 17108053 | XXXXXXX25 | 307147 | XXXXXXX89 | 15952373 |
| XXXXXXX89 | 16630587 | XXXXXXX89 | 16630588 | XXXXXXX55 | 313265 | XXXXXXX55 | 379406 |
| XXXXXXX55 | 379409 | XXXXXXX55 | 379416 | XXXXXXX78 | 16676592 | XXXXXXX78 | 328227 |
| XXXXXXX58 | 16114884 | XXXXXXX58 | 16114888 | XXXXXXX58 | 16114889 | XXXXXXX51 | 15783081 |
| XXXXXXX51 | 17503104 | XXXXXXX51 | 18090709 | XXXXXXX51 | 18504909 | XXXXXXX93 | 17218816 |
| XXXXXXX93 | 719752 | XXXXXXX93 | 719759 | XXXXXXX93 | 719766 | XXXXXXX99 | 16627291 |
| XXXXXXX99 | 612823 | XXXXXXX00 | 16848107 | XXXXXXX00 | 345328 | XXXXXXX33 | 16303126 |
| XXXXXXX33 | 16303128 | XXXXXXX33 | 16690634 | XXXXXXX25 | 15924784 | XXXXXXX25 | 16593871 |
| XXXXXXX25 | 362872 | XXXXXXX25 | 362880 | XXXXXXX25 | 362888 | XXXXXXX19 | 17330410 |
| XXXXXXX19 | 388046 | XXXXXXX19 | 660313 | XXXXXXX44 | 15936659 | XXXXXXX44 | 15936660 |
| XXXXXXX44 | 394572 | XXXXXXX93 | 16677741 | XXXXXXX93 | 400304 | XXXXXXX34 | 15790208 |
| XXXXXXX34 | 15810261 | XXXXXXX34 | 16897554 | XXXXXXX90 | 17219703 | XXXXXXX90 | 17219727 |
| XXXXXXX90 | 403993 | XXXXXXX01 | 17414931 | XXXXXXX01 | 420255 | XXXXXXX01 | 420263 |

## List of Claims and Documents Reviewed for Accounting Basis

| Claimant ID | Document | Claimant ID | Document | Claimant ID | Document | Claimant ID | Document |
|---|---|---|---|---|---|---|---|
| XXXXXXX59 | 424682 | XXXXXXX59 | 468994 | XXXXXXX59 | 468996 | XXXXXXX59 | 468997 |
| XXXXXXX03 | 16510015 | XXXXXXX03 | 16510020 | XXXXXXX03 | 16510022 | XXXXXXX03 | 17213634 |
| XXXXXXX87 | 16478219 | XXXXXXX87 | 16478227 | XXXXXXX87 | 16478244 | XXXXXXX87 | 16478261 |
| XXXXXXX39 | 473672 | XXXXXXX39 | 473674 | XXXXXXX39 | 473680 | XXXXXXX39 | 473681 |
| XXXXXXX03 | 16281071 | XXXXXXX03 | 16335770 | XXXXXXX03 | 16335775 | XXXXXXX79 | 17017131 |
| XXXXXXX79 | 17017139 | XXXXXXX79 | 17017398 | XXXXXXX79 | 17017401 | XXXXXXX13 | 17736965 |
| XXXXXXX25 | 507101 | XXXXXXX93 | 18497475 | XXXXXXX93 | 18497476 | XXXXXXX93 | 511883 |
| XXXXXXX94 | 16812367 | XXXXXXX94 | 16812391 | XXXXXXX94 | 16812550 | XXXXXXX94 | 16812558 |
| XXXXXXX81 | 15716437 | XXXXXXX81 | 527079 | XXXXXXX81 | 527123 | XXXXXXX82 | 15924146 |
| XXXXXXX82 | 15924148 | XXXXXXX69 | 15594224 | XXXXXXX69 | 15594226 | XXXXXXX69 | 15594235 |
| XXXXXXX81 | 15792219 | XXXXXXX81 | 701593 | XXXXXXX81 | 701596 | XXXXXXX81 | 701638 |
| XXXXXXX80 | 15790418 | XXXXXXX80 | 15811245 | XXXXXXX80 | 16234360 | XXXXXXX80 | 16234361 |
| XXXXXXX52 | 609542 | XXXXXXX52 | 609546 | XXXXXXX60 | 15783243 | XXXXXXX60 | 705006 |
| XXXXXXX33 | 16151580 | XXXXXXX33 | 623894 | XXXXXXX24 | 16666771 | XXXXXXX91 | 629228 |
| XXXXXXX91 | 629230 | XXXXXXX50 | 631920 | XXXXXXX50 | 634972 | XXXXXXX50 | 635170 |
| XXXXXXX24 | 17230347 | XXXXXXX63 | 16653834 | XXXXXXX63 | 634211 | XXXXXXX06 | 694338 |
| XXXXXXX06 | 694348 | XXXXXXX06 | 694382 | XXXXXXX06 | 694389 | XXXXXXX68 | 16278899 |
| XXXXXXX39 | 16852700 | XXXXXXX39 | 689512 | XXXXXXX39 | 689517 | XXXXXXX68 | 720621 |
| XXXXXXX68 | 720643 | XXXXXXX66 | 15537898 | XXXXXXX30 | 15680103 | XXXXXXX30 | 15680172 |
| XXXXXXX30 | 15680172 | XXXXXXX36 | 15713732 | XXXXXXX36 | 15785958 | XXXXXXX36 | 15793585 |
| XXXXXXX36 | 17968774 | XXXXXXX84 | 15718493 | XXXXXXX84 | 15718528 | XXXXXXX84 | 15718561 |
| XXXXXXX93 | 15720351 | XXXXXXX93 | 17287770 | XXXXXXX93 | 18025940 | XXXXXXX65 | 15900454 |
| XXXXXXX65 | 17007093 | XXXXXXX65 | 17007100 | XXXXXXX71 | 15827381 | XXXXXXX71 | 15827389 |
| XXXXXXX71 | 15827711 | XXXXXXX71 | 15827790 | XXXXXXX83 | 17034601 | XXXXXXX83 | 17034620 |
| XXXXXXX83 | 17034632 | XXXXXXX83 | 17034638 | XXXXXXX93 | 15900472 | XXXXXXX93 | 17926793 |
| XXXXXXX06 | 16342223 | XXXXXXX06 | 16342224 | XXXXXXX06 | 16436585 | XXXXXXX06 | 16436591 |
| XXXXXXX68 | 15852325 | XXXXXXX68 | 15853298 | XXXXXXX68 | 17398067 | XXXXXXX68 | 18195790 |
| XXXXXXX56 | 15858019 | XXXXXXX56 | 17913026 | XXXXXXX53 | 15907801 | XXXXXXX53 | 16554137 |
| XXXXXXX53 | 16554224 | XXXXXXX53 | 16554298 | XXXXXXX38 | 15901683 | XXXXXXX38 | 15901689 |
| XXXXXXX38 | 15901788 | XXXXXXX38 | 15908606 | XXXXXXX54 | 15929492 | XXXXXXX54 | 15929525 |
| XXXXXXX54 | 16434716 | XXXXXXX89 | 16363776 | XXXXXXX89 | 17383952 | XXXXXXX89 | 17383959 |
| XXXXXXX13 | 15935506 | XXXXXXX13 | 15935509 | XXXXXXX13 | 15935511 | XXXXXXX78 | 15994103 |
| XXXXXXX45 | 16420012 | XXXXXXX41 | 15959048 | XXXXXXX41 | 15959067 | XXXXXXX41 | 15961745 |
| XXXXXXX41 | 15968760 | XXXXXXX77 | 15972889 | XXXXXXX77 | 17103710 | XXXXXXX77 | 17103713 |
| XXXXXXX12 | 15976729 | XXXXXXX67 | 15995615 | XXXXXXX67 | 15995617 | XXXXXXX67 | 15995622 |
| XXXXXXX25 | 16103594 | XXXXXXX25 | 16447068 | XXXXXXX25 | 17118032 | XXXXXXX29 | 16002908 |
| XXXXXXX29 | 17945484 | XXXXXXX70 | 16463684 | XXXXXXX70 | 16098182 | XXXXXXX70 | 16098188 |
| XXXXXXX70 | 16198404 | XXXXXXX70 | 16198432 | XXXXXXX90 | 16111052 | XXXXXXX90 | 16111055 |
| XXXXXXX90 | 16111071 | XXXXXXX12 | 16120811 | XXXXXXX12 | 16120813 | XXXXXXX12 | 16120814 |
| XXXXXXX12 | 16120819 | XXXXXXX35 | 16170110 | XXXXXXX35 | 16846645 | XXXXXXX35 | 16847338 |
| XXXXXXX43 | 16128275 | XXXXXXX43 | 16128276 | XXXXXXX43 | 16128280 | XXXXXXX43 | 16128281 |
| XXXXXXX04 | 16261160 | XXXXXXX04 | 16261165 | XXXXXXX30 | 16179087 | XXXXXXX30 | 16179089 |
| XXXXXXX30 | 16179105 | XXXXXXX30 | 16179108 | XXXXXXX15 | 16135544 | XXXXXXX15 | 16135546 |
| XXXXXXX15 | 16135898 | XXXXXXX15 | 16135900 | XXXXXXX94 | 16141461 | XXXXXXX94 | 16141462 |
| XXXXXXX94 | 16141463 | XXXXXXX93 | 16147359 | XXXXXXX26 | 16148859 | XXXXXXX26 | 16163744 |
| XXXXXXX26 | 16163783 | XXXXXXX26 | 16528679 | XXXXXXX14 | 16272378 | XXXXXXX47 | 16202743 |
| XXXXXXX29 | 16237223 | XXXXXXX29 | 16237229 | XXXXXXX29 | 16237275 | XXXXXXX92 | 16195962 |

## List of Claims and Documents Reviewed for Accounting Basis

| Claimant ID | Document | Claimant ID | Document | Claimant ID | Document | Claimant ID | Document |
|---|---|---|---|---|---|---|---|
| XXXXXXX92 | 16195972 | XXXXXXX92 | 16195986 | XXXXXXX92 | 16196007 | XXXXXXX08 | 16393875 |
| XXXXXXX08 | 16393921 | XXXXXXX08 | 16393952 | XXXXXXX04 | 16203814 | XXXXXXX14 | 16242464 |
| XXXXXXX14 | 16242487 | XXXXXXX14 | 16242535 | XXXXXXX28 | 16242624 | XXXXXXX28 | 16242662 |
| XXXXXXX28 | 16242666 | XXXXXXX28 | 16242670 | XXXXXXX74 | 16655191 | XXXXXXX08 | 16248642 |
| XXXXXXX08 | 16248717 | XXXXXXX22 | 16654978 | XXXXXXX22 | 17569688 | XXXXXXX28 | 16654775 |
| XXXXXXX48 | 16266242 | XXXXXXX48 | 19428366 | XXXXXXX48 | 19428371 | XXXXXXX55 | 16521811 |
| XXXXXXX55 | 16521897 | XXXXXXX55 | 17565761 | XXXXXXX30 | 16339176 | XXXXXXX30 | 16339181 |
| XXXXXXX30 | 18252734 | XXXXXXX30 | 18252737 | XXXXXXX66 | 16276307 | XXXXXXX66 | 16276328 |
| XXXXXXX66 | 16276346 | XXXXXXX66 | 16276348 | XXXXXXX16 | 16303200 | XXXXXXX16 | 16303204 |
| XXXXXXX16 | 16304523 | XXXXXXX16 | 16304524 | XXXXXXX92 | 16297000 | XXXXXXX71 | 16483822 |
| XXXXXXX63 | 16373168 | XXXXXXX12 | 16850241 | XXXXXXX12 | 16850248 | XXXXXXX12 | 16850251 |
| XXXXXXX69 | 16324635 | XXXXXXX48 | 16810290 | XXXXXXX48 | 16810291 | XXXXXXX48 | 16810305 |
| XXXXXXX48 | 16810306 | XXXXXXX98 | 16325365 | XXXXXXX47 | 16415940 | XXXXXXX47 | 16415941 |
| XXXXXXX47 | 16415947 | XXXXXXX47 | 16415948 | XXXXXXX90 | 16399454 | XXXXXXX90 | 17334570 |
| XXXXXXX90 | 17334574 | XXXXXXX48 | 16370221 | XXXXXXX19 | 16753813 | XXXXXXX19 | 16753823 |
| XXXXXXX19 | 17615683 | XXXXXXX15 | 16375807 | XXXXXXX15 | 17770290 | XXXXXXX22 | 16392790 |
| XXXXXXX75 | 16392655 | XXXXXXX75 | 16436710 | XXXXXXX96 | 16431115 | XXXXXXX96 | 17526730 |
| XXXXXXX22 | 16441184 | XXXXXXX36 | 16440186 | XXXXXXX36 | 16456355 | XXXXXXX68 | 16445684 |
| XXXXXXX70 | 16477151 | XXXXXXX70 | 17464415 | XXXXXXX70 | 17464569 | XXXXXXX05 | 16663712 |
| XXXXXXX05 | 16663713 | XXXXXXX05 | 16663716 | XXXXXXX05 | 16663717 | XXXXXXX05 | 16663718 |
| XXXXXXX05 | 18485353 | XXXXXXX73 | 16931526 | XXXXXXX73 | 16931559 | XXXXXXX73 | 16931626 |
| XXXXXXX73 | 16931635 | XXXXXXX72 | 16461168 | XXXXXXX72 | 17845426 | XXXXXXX65 | 16465802 |
| XXXXXXX65 | 16509964 | XXXXXXX65 | 16854396 | XXXXXXX95 | 16466440 | XXXXXXX95 | 16466457 |
| XXXXXXX95 | 16466460 | XXXXXXX93 | 16485652 | XXXXXXX97 | 16611522 | XXXXXXX97 | 16611527 |
| XXXXXXX97 | 16611656 | XXXXXXX97 | 16611658 | XXXXXXX71 | 16484179 | XXXXXXX07 | 16486202 |
| XXXXXXX07 | 17418372 | XXXXXXX75 | 16513750 | XXXXXXX75 | 17549158 | XXXXXXX75 | 17549161 |
| XXXXXXX07 | 16497439 | XXXXXXX07 | 16497446 | XXXXXXX04 | 16498622 | XXXXXXX04 | 16498624 |
| XXXXXXX04 | 16531651 | XXXXXXX35 | 16502142 | XXXXXXX53 | 16502769 | XXXXXXX53 | 16502771 |
| XXXXXXX66 | 17225730 | XXXXXXX03 | 16901921 | XXXXXXX03 | 16901928 | XXXXXXX03 | 16902147 |
| XXXXXXX03 | 16902171 | XXXXXXX83 | 16521261 | XXXXXXX83 | 18573569 | XXXXXXX14 | 16537950 |
| XXXXXXX14 | 16537951 | XXXXXXX14 | 16537956 | XXXXXXX14 | 16525175 | XXXXXXX31 | 16525175 |
| XXXXXXX31 | 16525176 | XXXXXXX31 | 16525177 | XXXXXXX39 | 16548219 | XXXXXXX39 | 16548248 |
| XXXXXXX39 | 16548271 | XXXXXXX51 | 16537254 | XXXXXXX51 | 17452493 | XXXXXXX09 | 16538079 |
| XXXXXXX09 | 16538082 | XXXXXXX09 | 16538115 | XXXXXXX09 | 16538119 | XXXXXXX17 | 16541055 |
| XXXXXXX17 | 7029495 | XXXXXXX86 | 16600538 | XXXXXXX86 | 17769773 | XXXXXXX86 | 17769775 |
| XXXXXXX48 | 16548388 | XXXXXXX48 | 16588205 | XXXXXXX51 | 16679737 | XXXXXXX51 | 16679746 |
| XXXXXXX51 | 17197484 | XXXXXXX39 | 16552863 | XXXXXXX39 | 17494186 | XXXXXXX72 | 16596812 |
| XXXXXXX72 | 16596828 | XXXXXXX72 | 16596866 | XXXXXXX72 | 16596875 | XXXXXXX43 | 16571707 |
| XXXXXXX43 | 16571712 | XXXXXXX43 | 16572248 | XXXXXXX43 | 16572268 | XXXXXXX25 | 16574340 |
| XXXXXXX25 | 16574344 | XXXXXXX25 | 16574345 | XXXXXXX95 | 16677516 | XXXXXXX95 | 16677537 |
| XXXXXXX95 | 16677593 | XXXXXXX95 | 16677602 | XXXXXXX24 | 16597092 | XXXXXXX24 | 16597101 |
| XXXXXXX24 | 16597144 | XXXXXXX24 | 16597145 | XXXXXXX53 | 16582084 | XXXXXXX53 | 16582094 |
| XXXXXXX53 | 18233174 | XXXXXXX53 | 18233181 | XXXXXXX86 | 16584505 | XXXXXXX86 | 16584535 |
| XXXXXXX86 | 16584547 | XXXXXXX86 | 16584548 | XXXXXXX06 | 16822241 | XXXXXXX06 | 16822263 |
| XXXXXXX06 | 16822267 | XXXXXXX56 | 16589344 | XXXXXXX56 | 16589394 | XXXXXXX99 | 16633273 |
| XXXXXXX99 | 16634797 | XXXXXXX99 | 17033138 | XXXXXXX95 | 16594307 | XXXXXXX95 | 16594318 |
| XXXXXXX95 | 16594319 | XXXXXXX28 | 16601109 | XXXXXXX28 | 16601110 | XXXXXXX28 | 16601111 |

## List of Claims and Documents Reviewed for Accounting Basis

| Claimant ID | Document | Claimant ID | Document | Claimant ID | Document | Claimant ID | Document |
|---|---|---|---|---|---|---|---|
| XXXXXXX74 | 16602773 | XXXXXXX74 | 16602776 | XXXXXXX74 | 16602778 | XXXXXXX22 | 16616372 |
| XXXXXXX22 | 16616382 | XXXXXXX22 | 16616627 | XXXXXXX22 | 16616632 | XXXXXXX45 | 16799599 |
| XXXXXXX45 | 16799603 | XXXXXXX45 | 16799615 | XXXXXXX45 | 16799619 | XXXXXXX06 | 17289619 |
| XXXXXXX06 | 17546539 | XXXXXXX06 | 17546543 | XXXXXXX99 | 16619482 | XXXXXXX99 | 16860113 |
| XXXXXXX76 | 16967251 | XXXXXXX76 | 16967252 | XXXXXXX76 | 16967275 | XXXXXXX76 | 16967276 |
| XXXXXXX40 | 16630324 | XXXXXXX12 | 17118339 | XXXXXXX12 | 17118405 | XXXXXXX12 | 17118410 |
| XXXXXXX19 | 16815610 | XXXXXXX19 | 16815612 | XXXXXXX19 | 16815616 | XXXXXXX19 | 16815619 |
| XXXXXXX50 | 16824135 | XXXXXXX50 | 16824177 | XXXXXXX50 | 16824179 | XXXXXXX50 | 18615288 |
| XXXXXXX40 | 16639603 | XXXXXXX40 | 16639613 | XXXXXXX40 | 17033151 | XXXXXXX40 | 17978775 |
| XXXXXXX67 | 16641882 | XXXXXXX67 | 16641884 | XXXXXXX67 | 16641886 | XXXXXXX67 | 16641889 |
| XXXXXXX08 | 16901320 | XXXXXXX08 | 16901322 | XXXXXXX08 | 16901421 | XXXXXXX08 | 16901499 |
| XXXXXXX20 | 16645533 | XXXXXXX20 | 16645537 | XXXXXXX20 | 16645548 | XXXXXXX20 | 16645552 |
| XXXXXXX64 | 16658066 | XXXXXXX64 | 16658083 | XXXXXXX85 | 16649668 | XXXXXXX85 | 16649695 |
| XXXXXXX85 | 16649711 | XXXXXXX85 | 16649727 | XXXXXXX38 | 16649897 | XXXXXXX38 | 16649912 |
| XXXXXXX60 | 16657277 | XXXXXXX60 | 16657280 | XXXXXXX60 | 16657287 | XXXXXXX60 | 16657292 |
| XXXXXXX03 | 16657716 | XXXXXXX03 | 16657717 | XXXXXXX03 | 16657721 | XXXXXXX26 | 16796502 |
| XXXXXXX26 | 16796515 | XXXXXXX26 | 16796558 | XXXXXXX01 | 16669294 | XXXXXXX87 | 16675744 |
| XXXXXXX87 | 16675748 | XXXXXXX87 | 16675771 | XXXXXXX87 | 16675777 | XXXXXXX37 | 16787681 |
| XXXXXXX37 | 16787719 | XXXXXXX05 | 16690285 | XXXXXXX05 | 18036071 | XXXXXXX05 | 18036074 |
| XXXXXXX65 | 16691149 | XXXXXXX65 | 16691158 | XXXXXXX65 | 16691161 | XXXXXXX02 | 16802444 |
| XXXXXXX02 | 16802447 | XXXXXXX02 | 16802484 | XXXXXXX02 | 16802485 | XXXXXXX86 | 16783830 |
| XXXXXXX86 | 16783837 | XXXXXXX86 | 16783938 | XXXXXXX86 | 16783962 | XXXXXXX81 | 16837119 |
| XXXXXXX81 | 16837120 | XXXXXXX81 | 16837136 | XXXXXXX81 | 16837139 | XXXXXXX96 | 16784625 |
| XXXXXXX96 | 16835482 | XXXXXXX96 | 16835506 | XXXXXXX96 | 16835704 | XXXXXXX88 | 16785945 |
| XXXXXXX93 | 16794980 | XXXXXXX36 | 16841649 | XXXXXXX36 | 16841652 | XXXXXXX36 | 17192359 |
| XXXXXXX49 | 16793755 | XXXXXXX49 | 16793763 | XXXXXXX49 | 16793811 | XXXXXXX49 | 16793813 |
| XXXXXXX81 | 16798428 | XXXXXXX81 | 16798435 | XXXXXXX81 | 16798441 | XXXXXXX37 | 17224985 |
| XXXXXXX37 | 17225000 | XXXXXXX37 | 17225005 | XXXXXXX37 | 19010271 | XXXXXXX05 | 16942369 |
| XXXXXXX05 | 16942371 | XXXXXXX05 | 16945048 | XXXXXXX94 | 16945100 | XXXXXXX94 | 16945105 |
| XXXXXXX94 | 16945195 | XXXXXXX94 | 17268102 | XXXXXXX81 | 16820485 | XXXXXXX81 | 16820512 |
| XXXXXXX05 | 16927604 | XXXXXXX05 | 16927608 | XXXXXXX05 | 16927612 | XXXXXXX05 | 16927619 |
| XXXXXXX93 | 16816098 | XXXXXXX93 | 16816101 | XXXXXXX93 | 16816103 | XXXXXXX46 | 16823150 |
| XXXXXXX46 | 16823152 | XXXXXXX46 | 16823310 | XXXXXXX77 | 16829906 | XXXXXXX77 | 16830342 |
| XXXXXXX77 | 16830343 | XXXXXXX77 | 16933980 | XXXXXXX86 | 16823313 | XXXXXXX11 | 16823780 |
| XXXXXXX11 | 16823795 | XXXXXXX40 | 16827525 | XXXXXXX40 | 16827530 | XXXXXXX40 | 16878505 |
| XXXXXXX40 | 16878511 | XXXXXXX52 | 17368427 | XXXXXXX52 | 17368433 | XXXXXXX52 | 17368449 |
| XXXXXXX52 | 17368453 | XXXXXXX74 | 16824377 | XXXXXXX74 | 16824413 | XXXXXXX74 | 16824418 |
| XXXXXXX74 | 17186949 | XXXXXXX07 | 16963017 | XXXXXXX07 | 16963019 | XXXXXXX07 | 16963023 |
| XXXXXXX41 | 16830643 | XXXXXXX41 | 16833052 | XXXXXXX41 | 16833055 | XXXXXXX91 | 16876555 |
| XXXXXXX91 | 16885095 | XXXXXXX91 | 16885096 | XXXXXXX80 | 16834041 | XXXXXXX80 | 16834107 |
| XXXXXXX80 | 19427426 | XXXXXXX65 | 16851259 | XXXXXXX65 | 16851296 | XXXXXXX07 | 16838898 |
| XXXXXXX89 | 16844360 | XXXXXXX89 | 16844364 | XXXXXXX89 | 16844383 | XXXXXXX89 | 16844388 |
| XXXXXXX94 | 17233326 | XXXXXXX63 | 16857505 | XXXXXXX63 | 16857508 | XXXXXXX63 | 16857509 |
| XXXXXXX76 | 16869467 | XXXXXXX76 | 16869479 | XXXXXXX57 | 16855314 | XXXXXXX57 | 16855339 |
| XXXXXXX09 | 16906187 | XXXXXXX09 | 16906201 | XXXXXXX09 | 16906202 | XXXXXXX09 | 16906203 |
| XXXXXXX89 | 16900830 | XXXXXXX89 | 16900833 | XXXXXXX89 | 18023421 | XXXXXXX89 | 18023423 |
| XXXXXXX74 | 17048151 | XXXXXXX74 | 17048168 | XXXXXXX74 | 17048177 | XXXXXXX25 | 16868796 |

## List of Claims and Documents Reviewed for Accounting Basis

| Claimant ID | Document | Claimant ID | Document | Claimant ID | Document | Claimant ID | Document |
|---|---|---|---|---|---|---|---|
| XXXXXXX25 | 16868815 | XXXXXXX25 | 16868817 | XXXXXXX27 | 16871957 | XXXXXXX27 | 16871969 |
| XXXXXXX27 | 16871978 | XXXXXXX09 | 16912343 | XXXXXXX09 | 16912346 | XXXXXXX09 | 16912353 |
| XXXXXXX66 | 17064568 | XXXXXXX66 | 17064605 | XXXXXXX66 | 17064610 | XXXXXXX84 | 16907692 |
| XXXXXXX84 | 16907697 | XXXXXXX84 | 16907711 | XXXXXXX84 | 16907716 | XXXXXXX60 | 16883793 |
| XXXXXXX60 | 16883798 | XXXXXXX60 | 16883821 | XXXXXXX60 | 16883839 | XXXXXXX98 | 17014278 |
| XXXXXXX98 | 17014280 | XXXXXXX98 | 17014290 | XXXXXXX98 | 17014293 | XXXXXXX33 | 16887004 |
| XXXXXXX33 | 16887068 | XXXXXXX33 | 16887075 | XXXXXXX20 | 17225818 | XXXXXXX20 | 17249853 |
| XXXXXXX90 | 17135555 | XXXXXXX90 | 17135558 | XXXXXXX90 | 17135571 | XXXXXXX07 | 16901514 |
| XXXXXXX07 | 16901525 | XXXXXXX07 | 16901540 | XXXXXXX72 | 16922681 | XXXXXXX24 | 16902230 |
| XXXXXXX12 | 17501883 | XXXXXXX34 | 16904364 | XXXXXXX34 | 18242741 | XXXXXXX34 | 18242744 |
| XXXXXXX43 | 16906699 | XXXXXXX43 | 16912034 | XXXXXXX84 | 16938380 | XXXXXXX84 | 16938383 |
| XXXXXXX84 | 16938384 | XXXXXXX84 | 18177296 | XXXXXXX84 | 18177304 | XXXXXXX87 | 16967839 |
| XXXXXXX87 | 16967844 | XXXXXXX87 | 16967845 | XXXXXXX45 | 16918863 | XXXXXXX45 | 16918865 |
| XXXXXXX26 | 16920108 | XXXXXXX64 | 16920862 | XXXXXXX64 | 16921117 | XXXXXXX64 | 16921136 |
| XXXXXXX30 | 16923412 | XXXXXXX30 | 16923427 | XXXXXXX30 | 16923430 | XXXXXXX58 | 16984179 |
| XXXXXXX58 | 16984186 | XXXXXXX58 | 16984216 | XXXXXXX58 | 16984218 | XXXXXXX09 | 17069189 |
| XXXXXXX76 | 16930437 | XXXXXXX76 | 16930447 | XXXXXXX76 | 16930449 | XXXXXXX07 | 16934124 |
| XXXXXXX32 | 16935241 | XXXXXXX32 | 16935244 | XXXXXXX32 | 16935262 | XXXXXXX46 | 16936298 |
| XXXXXXX62 | 16936458 | XXXXXXX62 | 16936462 | XXXXXXX62 | 16936463 | XXXXXXX12 | 16971470 |
| XXXXXXX12 | 16971492 | XXXXXXX12 | 17060020 | XXXXXXX66 | 16947123 | XXXXXXX66 | 16947300 |
| XXXXXXX25 | 16942263 | XXXXXXX25 | 16942504 | XXXXXXX44 | 16942868 | XXXXXXX44 | 17353693 |
| XXXXXXX44 | 17353711 | XXXXXXX44 | 17353717 | XXXXXXX50 | 16947492 | XXXXXXX50 | 16947503 |
| XXXXXXX50 | 16947505 | XXXXXXX50 | 18562632 | XXXXXXX50 | 18583612 | XXXXXXX50 | 18975606 |
| XXXXXXX53 | 16945249 | XXXXXXX53 | 16945254 | XXXXXXX53 | 16945257 | XXXXXXX49 | 16951087 |
| XXXXXXX49 | 17173578 | XXXXXXX76 | 16958545 | XXXXXXX76 | 16958549 | XXXXXXX76 | 16958581 |
| XXXXXXX76 | 16958588 | XXXXXXX96 | 17051746 | XXXXXXX96 | 17051748 | XXXXXXX96 | 17081601 |
| XXXXXXX71 | 16967251 | XXXXXXX71 | 16967252 | XXXXXXX71 | 16967271 | XXXXXXX71 | 16967275 |
| XXXXXXX71 | 16967276 | XXXXXXX71 | 16967312 | XXXXXXX38 | 16968713 | XXXXXXX38 | 16968716 |
| XXXXXXX38 | 16968717 | XXXXXXX38 | 16968719 | XXXXXXX38 | 16968724 | XXXXXXX38 | 16968731 |
| XXXXXXX82 | 16969710 | XXXXXXX82 | 16969713 | XXXXXXX82 | 16969716 | XXXXXXX81 | 16971924 |
| XXXXXXX81 | 16971926 | XXXXXXX81 | 18885267 | XXXXXXX57 | 17086025 | XXXXXXX57 | 17086039 |
| XXXXXXX57 | 17086044 | XXXXXXX33 | 17015100 | XXXXXXX33 | 17190230 | XXXXXXX33 | 17190236 |
| XXXXXXX05 | 16985386 | XXXXXXX05 | 16985737 | XXXXXXX94 | 17023230 | XXXXXXX94 | 17023231 |
| XXXXXXX94 | 17164826 | XXXXXXX94 | 17164829 | XXXXXXX68 | 16987189 | XXXXXXX68 | 16987199 |
| XXXXXXX74 | 16990285 | XXXXXXX74 | 16990287 | XXXXXXX74 | 16990291 | XXXXXXX35 | 16994817 |
| XXXXXXX35 | 16994827 | XXXXXXX35 | 17001222 | XXXXXXX35 | 17001519 | XXXXXXX72 | 17004287 |
| XXXXXXX72 | 17004301 | XXXXXXX72 | 17325579 | XXXXXXX83 | 17288378 | XXXXXXX83 | 17288397 |
| XXXXXXX83 | 17288423 | XXXXXXX76 | 17008506 | XXXXXXX76 | 17008572 | XXXXXXX76 | 17008574 |
| XXXXXXX63 | 17017881 | XXXXXXX63 | 17017882 | XXXXXXX63 | 17018094 | XXXXXXX50 | 17024633 |
| XXXXXXX50 | 17024637 | XXXXXXX50 | 17024644 | XXXXXXX50 | 17024647 | XXXXXXX92 | 17030441 |
| XXXXXXX92 | 17030443 | XXXXXXX86 | 17031874 | XXXXXXX86 | 17031876 | XXXXXXX86 | 17031877 |
| XXXXXXX86 | 17214393 | XXXXXXX86 | 17214408 | XXXXXXX82 | 17067601 | XXXXXXX82 | 17067681 |
| XXXXXXX82 | 17068214 | XXXXXXX82 | 17068218 | XXXXXXX66 | 17072992 | XXXXXXX69 | 17190188 |
| XXXXXXX69 | 17190194 | XXXXXXX69 | 17195162 | XXXXXXX11 | 17054285 | XXXXXXX11 | 17054313 |
| XXXXXXX11 | 17054344 | XXXXXXX65 | 17041331 | XXXXXXX65 | 17041379 | XXXXXXX65 | 17041380 |
| XXXXXXX00 | 17042168 | XXXXXXX00 | 17042169 | XXXXXXX00 | 17042171 | XXXXXXX79 | 17043812 |
| XXXXXXX79 | 17043817 | XXXXXXX79 | 17043821 | XXXXXXX03 | 17097457 | XXXXXXX03 | 17097459 |

## List of Claims and Documents Reviewed for Accounting Basis

| Claimant ID | Document | Claimant ID | Document | Claimant ID | Document | Claimant ID | Document |
|---|---|---|---|---|---|---|---|
| XXXXXXX03 | 17097503 | XXXXXXX03 | 17097511 | XXXXXXX15 | 17045501 | XXXXXXX17 | 17210616 |
| XXXXXXX17 | 17210648 | XXXXXXX17 | 17210701 | XXXXXXX17 | 17210706 | XXXXXXX16 | 17051565 |
| XXXXXXX16 | 17051576 | XXXXXXX06 | 17415351 | XXXXXXX06 | 17415359 | XXXXXXX06 | 19328847 |
| XXXXXXX16 | 17210776 | XXXXXXX16 | 17210779 | XXXXXXX16 | 17210820 | XXXXXXX16 | 17210827 |
| XXXXXXX03 | 17067236 | XXXXXXX03 | 17067243 | XXXXXXX03 | 17852373 | XXXXXXX78 | 17068710 |
| XXXXXXX78 | 17068720 | XXXXXXX78 | 17068721 | XXXXXXX78 | 17068730 | XXXXXXX76 | 17073426 |
| XXXXXXX76 | 17073430 | XXXXXXX76 | 17073431 | XXXXXXX33 | 17075319 | XXXXXXX33 | 17082160 |
| XXXXXXX33 | 17082198 | XXXXXXX20 | 17079546 | XXXXXXX20 | 17079549 | XXXXXXX20 | 17079558 |
| XXXXXXX94 | 17082776 | XXXXXXX94 | 17082803 | XXXXXXX51 | 17107407 | XXXXXXX75 | 17386272 |
| XXXXXXX74 | 17083152 | XXXXXXX74 | 17083160 | XXXXXXX74 | 17106667 | XXXXXXX46 | 17222705 |
| XXXXXXX46 | 17222713 | XXXXXXX46 | 17222738 | XXXXXXX46 | 17222742 | XXXXXXX44 | 17090693 |
| XXXXXXX44 | 17090702 | XXXXXXX44 | 17090737 | XXXXXXX44 | 17090744 | XXXXXXX23 | 17092477 |
| XXXXXXX23 | 17092503 | XXXXXXX23 | 17092504 | XXXXXXX40 | 17096225 | XXXXXXX40 | 17096226 |
| XXXXXXX40 | 18878747 | XXXXXXX99 | 17097371 | XXXXXXX99 | 17097377 | XXXXXXX99 | 17282509 |
| XXXXXXX49 | 17173572 | XXXXXXX49 | 17173577 | XXXXXXX49 | 17173590 | XXXXXXX49 | 17173596 |
| XXXXXXX30 | 17102037 | XXXXXXX30 | 17102049 | XXXXXXX30 | 17102052 | XXXXXXX82 | 17102207 |
| XXXXXXX82 | 17102217 | XXXXXXX82 | 17102398 | XXXXXXX43 | 17196556 | XXXXXXX43 | 17196568 |
| XXXXXXX43 | 17355496 | XXXXXXX43 | 17355501 | XXXXXXX01 | 18982656 | XXXXXXX01 | 19427836 |
| XXXXXXX01 | 19427845 | XXXXXXX59 | 17113932 | XXXXXXX59 | 18184670 | XXXXXXX59 | 18184673 |
| XXXXXXX30 | 17113862 | XXXXXXX30 | 17113877 | XXXXXXX30 | 17113912 | XXXXXXX67 | 17114427 |
| XXXXXXX67 | 17114430 | XXXXXXX67 | 17114447 | XXXXXXX67 | 17114449 | XXXXXXX00 | 17118323 |
| XXXXXXX00 | 17118457 | XXXXXXX68 | 17201157 | XXXXXXX68 | 17201381 | XXXXXXX68 | 17201390 |
| XXXXXXX30 | 17120191 | XXXXXXX30 | 17120302 | XXXXXXX30 | 17120425 | XXXXXXX46 | 17180210 |
| XXXXXXX46 | 17180226 | XXXXXXX60 | 17138523 | XXXXXXX60 | 17138532 | XXXXXXX60 | 17138775 |
| XXXXXXX60 | 17138782 | XXXXXXX60 | 18544450 | XXXXXXX36 | 17133149 | XXXXXXX36 | 17133156 |
| XXXXXXX36 | 17133314 | XXXXXXX55 | 17134871 | XXXXXXX55 | 17134912 | XXXXXXX55 | 17134913 |
| XXXXXXX66 | 17137977 | XXXXXXX66 | 17137997 | XXXXXXX66 | 17234705 | XXXXXXX54 | 17140757 |
| XXXXXXX54 | 17140761 | XXXXXXX54 | 17140763 | XXXXXXX17 | 17175566 | XXXXXXX17 | 17175707 |
| XXXXXXX48 | 17179771 | XXXXXXX48 | 17179787 | XXXXXXX48 | 17179793 | XXXXXXX84 | 17176841 |
| XXXXXXX84 | 17176847 | XXXXXXX84 | 17176879 | XXXXXXX60 | 17383498 | XXXXXXX70 | 17185014 |
| XXXXXXX70 | 17194264 | XXXXXXX70 | 17194251 | XXXXXXX74 | 17189176 | XXXXXXX74 | 17189182 |
| XXXXXXX74 | 17189195 | XXXXXXX03 | 17432627 | XXXXXXX07 | 17190107 | XXXXXXX07 | 17190108 |
| XXXXXXX07 | 17190137 | XXXXXXX07 | 17190140 | XXXXXXX18 | 17190465 | XXXXXXX86 | 17191395 |
| XXXXXXX86 | 17199706 | XXXXXXX86 | 17199717 | XXXXXXX66 | 17201405 | XXXXXXX96 | 17204786 |
| XXXXXXX96 | 17204799 | XXXXXXX32 | 17309486 | XXXXXXX28 | 17376228 | XXXXXXX28 | 17376607 |
| XXXXXXX28 | 17376894 | XXXXXXX28 | 17376901 | XXXXXXX69 | 17222215 | XXXXXXX69 | 17222289 |
| XXXXXXX44 | 17271117 | XXXXXXX44 | 17271466 | XXXXXXX44 | 17271475 | XXXXXXX56 | 17222895 |
| XXXXXXX56 | 17222900 | XXXXXXX96 | 17263195 | XXXXXXX96 | 17263204 | XXXXXXX96 | 17263255 |
| XXXXXXX28 | 17265014 | XXXXXXX28 | 17265018 | XXXXXXX34 | 17233013 | XXXXXXX34 | 17233016 |
| XXXXXXX34 | 17233034 | XXXXXXX69 | 17233772 | XXXXXXX69 | 17233774 | XXXXXXX69 | 17233788 |
| XXXXXXX91 | 17234102 | XXXXXXX91 | 17234447 | XXXXXXX65 | 17237077 | XXXXXXX65 | 17237167 |
| XXXXXXX65 | 17237174 | XXXXXXX38 | 17238476 | XXXXXXX44 | 17250287 | XXXXXXX44 | 17250289 |
| XXXXXXX44 | 17250295 | XXXXXXX44 | 17250297 | XXXXXXX06 | 17294711 | XXXXXXX06 | 17294712 |
| XXXXXXX06 | 17294715 | XXXXXXX06 | 17294722 | XXXXXXX49 | 17250935 | XXXXXXX49 | 17250937 |
| XXXXXXX49 | 17251008 | XXXXXXX49 | 17251014 | XXXXXXX49 | 17251104 | XXXXXXX62 | 17373726 |
| XXXXXXX62 | 17373731 | XXXXXXX62 | 17374101 | XXXXXXX62 | 17374108 | XXXXXXX05 | 17344384 |
| XXXXXXX05 | 17344488 | XXXXXXX50 | 17268336 | XXXXXXX50 | 17268338 | XXXXXXX50 | 17268356 |

## List of Claims and Documents Reviewed for Accounting Basis

| Claimant ID | Document | Claimant ID | Document | Claimant ID | Document | Claimant ID | Document |
|---|---|---|---|---|---|---|---|
| XXXXXXX36 | 17414373 | XXXXXXX36 | 17937435 | XXXXXXX36 | 17937437 | XXXXXXX84 | 17270830 |
| XXXXXXX84 | 17270832 | XXXXXXX84 | 17270859 | XXXXXXX84 | 17270866 | XXXXXXX26 | 17273417 |
| XXXXXXX26 | 17273448 | XXXXXXX25 | 17276949 | XXXXXXX37 | 17280127 | XXXXXXX37 | 17280156 |
| XXXXXXX37 | 17280162 | XXXXXXX46 | 17280216 | XXXXXXX46 | 17280220 | XXXXXXX75 | 17280858 |
| XXXXXXX75 | 17280863 | XXXXXXX75 | 17280896 | XXXXXXX75 | 17280899 | XXXXXXX76 | 17285830 |
| XXXXXXX76 | 17285834 | XXXXXXX76 | 17291746 | XXXXXXX18 | 17319882 | XXXXXXX18 | 17319885 |
| XXXXXXX18 | 17319928 | XXXXXXX18 | 17319933 | XXXXXXX49 | 17300941 | XXXXXXX49 | 17300962 |
| XXXXXXX80 | 17302210 | XXXXXXX80 | 17302248 | XXXXXXX80 | 17302254 | XXXXXXX23 | 17304280 |
| XXXXXXX23 | 17304783 | XXXXXXX23 | 17304787 | XXXXXXX03 | 17306871 | XXXXXXX03 | 17306876 |
| XXXXXXX03 | 17306891 | XXXXXXX03 | 17306894 | XXXXXXX92 | 17314518 | XXXXXXX92 | 17314525 |
| XXXXXXX92 | 17314620 | XXXXXXX92 | 17314650 | XXXXXXX59 | 17365272 | XXXXXXX60 | 17364795 |
| XXXXXXX86 | 17520202 | XXXXXXX86 | 17520211 | XXXXXXX86 | 17520217 | XXXXXXX33 | 17323910 |
| XXXXXXX66 | 17323030 | XXXXXXX66 | 17323035 | XXXXXXX66 | 17323135 | XXXXXXX89 | 17326713 |
| XXXXXXX89 | 17326721 | XXXXXXX20 | 17327260 | XXXXXXX20 | 17327262 | XXXXXXX20 | 17327263 |
| XXXXXXX21 | 17344254 | XXXXXXX21 | 17344260 | XXXXXXX21 | 17344321 | XXXXXXX21 | 17344329 |
| XXXXXXX21 | 18559902 | XXXXXXX24 | 17331997 | XXXXXXX24 | 17332018 | XXXXXXX24 | 17332129 |
| XXXXXXX63 | 17330946 | XXXXXXX63 | 17330956 | XXXXXXX63 | 19117187 | XXXXXXX71 | 17332616 |
| XXXXXXX71 | 17332623 | XXXXXXX71 | 17332625 | XXXXXXX03 | 17332954 | XXXXXXX03 | 17332981 |
| XXXXXXX03 | 17332987 | XXXXXXX46 | 17361041 | XXXXXXX46 | 17361045 | XXXXXXX46 | 17361051 |
| XXXXXXX46 | 17361053 | XXXXXXX62 | 17377459 | XXXXXXX62 | 17377460 | XXXXXXX62 | 17377477 |
| XXXXXXX18 | 17343201 | XXXXXXX18 | 17343204 | XXXXXXX18 | 17343313 | XXXXXXX18 | 17343317 |
| XXXXXXX38 | 17344861 | XXXXXXX38 | 17344862 | XXXXXXX37 | 17346471 | XXXXXXX37 | 17346473 |
| XXXXXXX37 | 17346479 | XXXXXXX37 | 18516866 | XXXXXXX49 | 17346971 | XXXXXXX49 | 17346981 |
| XXXXXXX49 | 17346983 | XXXXXXX74 | 17347833 | XXXXXXX74 | 17347836 | XXXXXXX74 | 17347837 |
| XXXXXXX32 | 17348298 | XXXXXXX32 | 17348300 | XXXXXXX85 | 17407289 | XXXXXXX18 | 17353877 |
| XXXXXXX18 | 17353922 | XXXXXXX18 | 17353925 | XXXXXXX03 | 17357683 | XXXXXXX03 | 17357691 |
| XXXXXXX03 | 17357696 | XXXXXXX34 | 17369706 | XXXXXXX34 | 17369712 | XXXXXXX34 | 18920315 |
| XXXXXXX34 | 18920317 | XXXXXXX30 | 17365363 | XXXXXXX10 | 17490262 | XXXXXXX92 | 17372090 |
| XXXXXXX92 | 17372092 | XXXXXXX92 | 17372114 | XXXXXXX92 | 17372153 | XXXXXXX99 | 17374161 |
| XXXXXXX99 | 17374166 | XXXXXXX99 | 17374202 | XXXXXXX74 | 17453307 | XXXXXXX74 | 17453310 |
| XXXXXXX78 | 17376535 | XXXXXXX78 | 17376573 | XXXXXXX95 | 17380107 | XXXXXXX95 | 17380171 |
| XXXXXXX95 | 17380207 | XXXXXXX44 | 17513638 | XXXXXXX44 | 17513641 | XXXXXXX44 | 17513669 |
| XXXXXXX44 | 17513672 | XXXXXXX36 | 17398197 | XXXXXXX36 | 17398204 | XXXXXXX36 | 17398220 |
| XXXXXXX36 | 17398222 | XXXXXXX03 | 17392743 | XXXXXXX03 | 17399443 | XXXXXXX87 | 17394479 |
| XXXXXXX87 | 17398997 | XXXXXXX87 | 17399004 | XXXXXXX87 | 17399100 | XXXXXXX87 | 17399265 |
| XXXXXXX87 | 17401620 | XXXXXXX87 | 17401623 | XXXXXXX87 | 17401627 | XXXXXXX87 | 17401635 |
| XXXXXXX07 | 17394983 | XXXXXXX07 | 17394985 | XXXXXXX07 | 17394997 | XXXXXXX07 | 17395000 |
| XXXXXXX67 | 17396807 | XXXXXXX67 | 17396854 | XXXXXXX13 | 17407245 | XXXXXXX13 | 17407249 |
| XXXXXXX13 | 17407253 | XXXXXXX13 | 17407256 | XXXXXXX17 | 17407092 | XXXXXXX17 | 17407094 |
| XXXXXXX17 | 17407158 | XXXXXXX17 | 17407181 | XXXXXXX26 | 17407493 | XXXXXXX26 | 17407502 |
| XXXXXXX26 | 18705042 | XXXXXXX26 | 18705048 | XXXXXXX20 | 17413335 | XXXXXXX20 | 17413369 |
| XXXXXXX20 | 17413370 | XXXXXXX20 | 18970328 | XXXXXXX38 | 17430953 | XXXXXXX38 | 17430963 |
| XXXXXXX38 | 17430966 | XXXXXXX57 | 17414359 | XXXXXXX57 | 17414436 | XXXXXXX57 | 17414460 |
| XXXXXXX96 | 17416569 | XXXXXXX96 | 17416578 | XXXXXXX96 | 17416608 | XXXXXXX96 | 17416613 |
| XXXXXXX93 | 17429886 | XXXXXXX93 | 17429891 | XXXXXXX93 | 17429907 | XXXXXXX93 | 17429914 |
| XXXXXXX47 | 17437945 | XXXXXXX47 | 17437961 | XXXXXXX47 | 17437968 | XXXXXXX26 | 17440959 |
| XXXXXXX70 | 17445223 | XXXXXXX70 | 17445226 | XXXXXXX70 | 17445255 | XXXXXXX70 | 17445259 |

## List of Claims and Documents Reviewed for Accounting Basis

| Claimant ID | Document | Claimant ID | Document | Claimant ID | Document | Claimant ID | Document |
|---|---|---|---|---|---|---|---|
| XXXXXXX77 | 17459859 | XXXXXXX77 | 17459864 | XXXXXXX77 | 17468435 | XXXXXXX65 | 17471485 |
| XXXXXXX65 | 17471489 | XXXXXXX28 | 17459816 | XXXXXXX28 | 17459829 | XXXXXXX28 | 17459870 |
| XXXXXXX93 | 17459974 | XXXXXXX93 | 17462607 | XXXXXXX93 | 18067452 | XXXXXXX93 | 18067456 |
| XXXXXXX19 | 17473007 | XXXXXXX19 | 17473035 | XXXXXXX06 | 17474413 | XXXXXXX06 | 17474415 |
| XXXXXXX06 | 17474423 | XXXXXXX12 | 17489025 | XXXXXXX12 | 17489028 | XXXXXXX12 | 19207321 |
| XXXXXXX08 | 17482128 | XXXXXXX08 | 17482143 | XXXXXXX08 | 17482149 | XXXXXXX81 | 17484252 |
| XXXXXXX75 | 17490193 | XXXXXXX75 | 17490195 | XXXXXXX75 | 17490221 | XXXXXXX75 | 17490225 |
| XXXXXXX12 | 17506049 | XXXXXXX12 | 17506052 | XXXXXXX12 | 17506058 | XXXXXXX43 | 17499607 |
| XXXXXXX43 | 17499608 | XXXXXXX43 | 17499610 | XXXXXXX43 | 17499611 | XXXXXXX63 | 17502212 |
| XXXXXXX02 | 17504968 | XXXXXXX02 | 17504978 | XXXXXXX02 | 17504979 | XXXXXXX02 | 17504989 |
| XXXXXXX02 | 17504993 | XXXXXXX93 | 17513768 | XXXXXXX93 | 17513806 | XXXXXXX93 | 17513812 |
| XXXXXXX76 | 17517957 | XXXXXXX76 | 17517958 | XXXXXXX76 | 17517963 | XXXXXXX76 | 17517964 |
| XXXXXXX18 | 17544229 | XXXXXXX18 | 17544233 | XXXXXXX18 | 17544322 | XXXXXXX18 | 17544325 |
| XXXXXXX79 | 17548232 | XXXXXXX79 | 17548236 | XXXXXXX79 | 17548245 | XXXXXXX79 | 17548248 |
| XXXXXXX26 | 17552137 | XXXXXXX26 | 17552140 | XXXXXXX29 | 17552154 | XXXXXXX10 | 17560096 |
| XXXXXXX10 | 17560129 | XXXXXXX10 | 17560133 | XXXXXXX92 | 17575233 | XXXXXXX92 | 17575237 |
| XXXXXXX92 | 19246033 | XXXXXXX26 | 17593706 | XXXXXXX26 | 17593708 | XXXXXXX26 | 17593771 |
| XXXXXXX26 | 17596909 | XXXXXXX82 | 17842011 | XXXXXXX82 | 17842043 | XXXXXXX82 | 17842050 |
| XXXXXXX01 | 17616826 | XXXXXXX01 | 17616864 | XXXXXXX01 | 17616867 | XXXXXXX28 | 17624658 |
| XXXXXXX28 | 17624735 | XXXXXXX28 | 17624740 | XXXXXXX52 | 17636547 | XXXXXXX52 | 17636586 |
| XXXXXXX52 | 17636600 | XXXXXXX04 | 17700909 | XXXXXXX04 | 18646896 | XXXXXXX04 | 18646902 |
| XXXXXXX17 | 17749824 | XXXXXXX17 | 17749825 | XXXXXXX17 | 17749896 | XXXXXXX17 | 17749899 |
| XXXXXXX29 | 17716867 | XXXXXXX29 | 17717662 | XXXXXXX29 | 17717666 | XXXXXXX25 | 17729228 |
| XXXXXXX91 | 17747347 | XXXXXXX83 | 17761643 | XXXXXXX83 | 17761652 | XXXXXXX83 | 17761741 |
| XXXXXXX83 | 17761765 | XXXXXXX83 | 17761770 | XXXXXXX83 | 17761784 | XXXXXXX83 | 17761789 |
| XXXXXXX83 | 19113825 | XXXXXXX83 | 19113834 | XXXXXXX83 | 19113847 | XXXXXXX83 | 19113861 |
| XXXXXXX83 | 19113872 | XXXXXXX83 | 19113890 | XXXXXXX83 | 19113905 | XXXXXXX83 | 19113915 |
| XXXXXXX78 | 17764412 | XXXXXXX78 | 17774597 | XXXXXXX78 | 18799152 | XXXXXXX21 | 17789115 |
| XXXXXXX21 | 17789119 | XXXXXXX21 | 17789167 | XXXXXXX93 | 17844471 | XXXXXXX93 | 17844474 |
| XXXXXXX93 | 17844489 | XXXXXXX23 | 17847174 | XXXXXXX23 | 8197961 | XXXXXXX23 | 8410615 |
| XXXXXXX91 | 17872264 | XXXXXXX91 | 17872267 | XXXXXXX82 | 17960734 | XXXXXXX82 | 17960754 |
| XXXXXXX82 | 17960770 | XXXXXXX11 | 18074994 | XXXXXXX11 | 18075001 | XXXXXXX11 | 18075019 |
| XXXXXXX39 | 18208977 | XXXXXXX39 | 18208983 | XXXXXXX39 | 18209014 | XXXXXXX39 | 18209016 |
| XXXXXXX55 | 18699433 | | | | | | |

# Exhibit F

October 23, 2013
Notice of Filing Exhibit I.2.F

# EXHIBIT F

# Policy Regarding BEL Compensation Framework

## I.  **Background**

On October 2, 2013, a panel of the United States Court of Appeals for the Fifth Circuit issued its decision ("BEL Ruling") concerning the dispute over the evaluation of BEL claims. The BEL Ruling reversed the district court's March 5, 2013 order which had affirmed the Claims Administrator's January 15, 2013 BEL Policy.  The purpose of this Policy is to explain the general framework required for evaluation of BEL claims in response to the BEL Ruling.  As explained further below, this Policy framework requires the withdrawal of existing BEL Policies and the implementation of new and updated Policies to implement the BEL Ruling.[1]

## II.  **Calculation of Step One Compensation Under the BEL Framework**

### A.  **In General**

The "goal of the settlement"[2] is to "compensate claimants for real losses" resulting from the Deepwater Horizon incident.  Therefore, the calculation of Variable Profit under Exhibit 4C of the Settlement must accord "with economic reality" and with a "reasonable understanding of calculation of damages" that is consistent with what "damages recoverable in civil litigation actually are."  An "accrual-style framework" is necessary to "determine actual economic losses," because cash-basis accounting does "not result in numbers that could fairly be said to represent actual economic losses or lost 'variable profits'" and creates a "risk of artificially-inflated or entirely fictitious losses."  The "requirement of matching … is foundational for accrual-basis claims," and "only matching provides a realistic chance of achieving the … goal of the settlement of compensating claimants for real losses."  Accordingly, regardless of the accounting method used by a claimant, the Settlement Program must calculate all BEL awards pursuant to a "properly-matched accrual-basis" approach, because only "properly matched claims lead to fair and proper results."

Under accrual accounting a "fundamental principle" is that revenue is recognized "when the entity becomes entitled to receive payment, as opposed to when the payment is actually received," and in developing the "accrual style framework" consideration should be given to how and when revenue is earned in order to "determine actual economic losses."  Also, "expenses that can be readily traced to the recognized revenues are themselves recognized at the same time as those revenues."  "This correlation gives … a real time view of the net economic value of a

---

[1]   In addition, because other economic loss frameworks, including but not limited to the Multi-facility, Start-Up and Failed Business Frameworks, require both causation and accurate determination of monthly revenue and corresponding variable expense, the principles in this Policy are fully applicable to those types of claims as well.

[2]   All quotations are from the BEL Ruling unless otherwise indicated.

transaction in the period most relevant to its overall economic significance." The "matching" process "is a fundamental aspect of day-to-day record-keeping on the accrual-basis."

Determination of the Step One Compensation amount is based on the instructions in Exhibit 4C. For computation of Variable Profit, under Exhibit 4C, the claims shall be processed by following the two step calculation described on page 2 of Exhibit 4C:

1. Sum the monthly revenue over the period.

2. Subtract the corresponding variable expenses from revenue over the same period.

This two-step process requires the use of matching principles as stated above. This means that "the expenses to be subtracted must be those that correspond to the revenue earned" during the Benchmark and Compensation Periods under review. This interpretation is "consistent with general accounting and economic norms."

The determination of "variable expenses" in the above calculation shall be based upon the instructions contained on Exhibit 4C under the definition of Variable Profits as well as Exhibit 4D, which lists specific categories of variable as contrasted with fixed expenses.

## B. Determination of Revenue

The revenue to be recognized in each month in the Benchmark and Compensation Periods shall be based on accrual-style revenue recognition rules and principles to be applied to the BEL claimant's financial records based on the nature of the business and the industry in which it operates. The Claims Administrator shall develop, in consultation with the parties and in keeping with the governing principles stated above, the revenue recognition rules and principles to be used for major sub-categories of BEL claimants. The revenue recognition rules and principles shall be consistent with accrual accounting and applied consistently to BEL claimants to accurately reflect economic reality regardless of whether their contemporaneously prepared monthly income statements were maintained on an accrual basis or cash basis. Moreover, "idiosyncratically-maintained records" cannot "dictate the way Exhibit 4C is applied to a claim." Accordingly, the Claims Administrator shall develop appropriate procedures to review the financial information provided by each BEL claimant, make inquiries and seek additional records allowed under Exhibit 4A whenever necessary or appropriate "to process claims in accordance with economic reality," and then evaluate and make all adjustments necessary to ensure that the revenue earned in each month is being recognized in a manner consistent with the revenue recognition rules for that category of BEL claimant.

As further noted below, the determination of monthly revenue shall be conducted by professional accountants with the appropriate training and supervision.

## C. Determination of Corresponding Variable Expenses

The Claims Administrator shall review each BEL claim to ensure that expenses that relate to the revenue properly recognized in each month according to the foregoing principles are

properly matched.  Only the variable expenses that relate to the revenue properly recognized in a particular month shall be used for purposes of calculating Variable Profit.  The Claims Administrator shall develop specific rules and policies for categories of variable expenses that may involve different matching treatment based upon the industry or business model of the major sub-categories of BEL claimants.

The Claims Administrator shall also develop appropriate procedures to review the financial information provided by the BEL claimant, make inquiries and seek additional records allowed under Exhibit 4A, as necessary, and then evaluate and make adjustments necessary to ensure that the corresponding variable expenses to be matched to the revenue properly recognized in each month is being determined in a manner consistent with economic reality and the rules for that category of BEL claimant.

As further noted below, the determination of corresponding variable expenses shall be conducted by professional accountants with the appropriate training and supervision.

### D.  Cash Basis Claimants

"Typically, only very small and fledgling businesses keep their primary financial records in accordance with cash accounting" procedures.  These businesses report "revenue when cash from a given transaction is received and expenses when cash is paid."  "Cash accounting" for most businesses "is largely unrelated to the concepts of revenue and expenses."

BEL claimants using cash accounting must be evaluated using accrual and matching concepts.  Otherwise, the resulting calculation would lack "economic []coherence."  Cash accounting cannot properly be used to calculate lost variable profit because "subtracting temporally-related revenues and expenses recorded by cash-basis claimants would not result in numbers that could fairly be said to represent actual economic losses or lost 'variable profits.'"  Failure to adjust cash-basis records to correspond to an "accrual-style framework" would result in "some claimants … be[ing] compensated for lost 'variable profits' while others" – the cash basis claimants – "would be compensated for negative cash flows, based solely on how claimants maintained their financial records."

The Claims Administrator shall, in consultation with the parties, develop appropriate procedures for evaluating cash basis BEL claimants and applying matching principles and an accrual-style framework in keeping with the foregoing principles in order to ensure that the resulting calculation of Variable Profits is consistent with measuring actual economic performance.

### E.  Proper Matching Procedures Must Be Used

When evaluating a BEL claim for claimants that use accrual accounting, the Claims Administrator shall take appropriate steps to ensure that the financial data submitted by the claimant are accurate and properly matched.  It would be inappropriate to treat accrual basis claimants as if they were cash basis claimants.  This could occur, for example, if the CSSP were processing claims based on simply what was recorded in the financial records in certain months,

without giving appropriate consideration to other data indicating that proper matching was not fully reflected in the monthly financial statements. For example, if an accrual claimant failed to adjust its inventory records and compute cost of goods sold, instead recording purchases of inventory as if they were expenses and not assets, the CSSP would have to correct those errors and properly compute cost of goods sold in order to avoid treating the accrual claimant as a cash basis claimant. Similarly, if the accrual claimant made year-end or periodic adjusting or correcting entries outside the Compensation or Benchmark Period, the CSSP would have to adjust the monthly financial records during the relevant period as appropriate to reflect those entries, and the adjustments or corrections attributable to each month, in order to avoid treating the accrual claimant as a cash basis claimant. These two examples of treating accrual claimants as if they were cash claimants would also constitute the use of "inconsistent methodologies," and BEL claimants "are not permitted to present statements which contain inconsistent methodologies."

### III.   **Rules and Procedures for Processing BEL Claims**

The Claims Administrator, in consultation with the parties, shall develop new procedures or modify existing procedures for processing BEL Claims to ensure that such claims are being processed in accordance with the rules and principles set forth in this policy, the BEL Ruling, and any related provisions of the Settlement, or as directed by the court. Those procedures shall include instructions for identifying relevant information, making inquiries of claimants, seeking additional documentation where appropriate, and conducting analytical procedures to identify potential issues requiring further consideration. The Claims Administrator shall take into account differences based upon the industry or business model of significant categories of claimants and adopt procedures and policies specifically tailored to those claimant categories.

The determination of accounting related matters such as monthly revenue, corresponding variable expenses, and Variable Profit shall be conducted by professional accountants with appropriate training and supervision.

### IV.   **Rules for Prevention, Detection and Mitigation of Errors and Fraud**

The Claims Administrator, in consultation with the parties, shall develop new controls and procedures or modify existing controls and procedures designed to provide reasonable assurance that significant errors, irregularities, or fraud do not occur and remain undetected prior to determining and paying BEL claims. Such procedures shall include the use of properly trained professionals for the determination of monthly revenue, corresponding variable expenses, Variable Profit and other accounting related matters, and the proper supervision of employees engaged in processing claims. The Claims Administrator shall take into account differences based upon the industry or business model of significant categories of claimants and adopt procedures and policies specifically tailored to those claimant categories.

The error and fraud prevention controls and procedures shall include procedures for recovering amounts paid to BEL claimants that were paid based on erroneous or fraudulent documentation or representations, or improperly processed claims.

## V.   Causation

### A.  Background

The BEL Ruling states that if a claimant "has no colorable claim that the loss was caused by the spill, it also lacks standing and cannot state a claim."  The class cannot include "members that had not sustained losses at all, or had sustained losses unrelated to the oil spill."  It is necessary that the causation methodology be modified to conform to the BEL Ruling.

Until the BEL Ruling, the Claims Administrator evaluated causation solely by applying the methodology set forth in Exhibit 4B.  Moreover, to the extent that monthly revenue amounts were relevant to an evaluation under Exhibit 4B, the Claims Administrator relied on claimant-supplied data that was subject to the types of errors specified in the BEL Ruling.  Furthermore, the Claims Administrator did not consider any objective facts or data indicating that the claim included, in whole or in part, purported losses that could not have been "traceable to loss from the Deepwater Horizon accident." Accordingly, the Policy Announcement of October 10, 2012 is vacated, as are any other causation-related Policies or practices and the Claims Administrator shall formulate new policies and practices intended to preclude payment to claimants who did not "experience[] actual injury traceable to loss from the Deepwater Horizon accident." The following principles will direct that formulation.

### B.  Initial Causation Review and Evaluation

The Claims Administrator shall develop rules and procedures to identify and distinguish BEL claims from claimants who are not proper class members or are otherwise not entitled to payment.  Claimants who have not suffered any economic loss at all during the period May-December 2010 (taking into account the presumed growth factor reflected in Settlement Agreement Exhibit 4C), or whose loss is shown by objective data not to have been caused by the oil spill are not class members and lack standing to maintain a legal claim against BP.  Only claimants who satisfy these requirements and, therefore, have "colorable claims" for economic loss due to the oil spill are class members whose claims are then subject to evaluation under the existing requirements of Exhibit 4B to determine whether they have sufficiently shown that any losses may be deemed caused by the oil spill for purposes of the settlement.

 If there are any objective facts in the claimant file or available from other reliable sources which indicate that in whole or in part the claimant did not suffer any spill-related loss, then the claimant is not a class member and such damages are not compensable under the settlement.  Detailed programs shall be developed to assure adequate investigation and identification of such facts.

### C.  Objective Indicators Requiring Further Review/Investigation

In addition to the foregoing, a set of objective indicators shall be established which shall cause the Claims Administrator to engage in appropriate review and investigation to assure compliance with the BEL Ruling that a claimant's injuries not traceable to the Deepwater

Horizon accident are excluded.  These objective indicators shall include, but are not limited to, the following:

    1.  Facts indicating that the claimant's injury were due to a claimant dropping selling or changing a line of business; or

    2.  The claimant suffered a casualty loss; or

    3.  The injury was the result of regulatory restrictions or limitations; or

    4.  The injury was the result of illness or other infirmity of key personnel; or

    5.  The claimant experienced a diminution of revenues because of repairs or refurbishing of business facilities independent of the Deepwater Horizon accident; or

    6.  The losses were the result of the termination of business relations with a customer outside the Class geographic scope; or

    7.  The claimant's losses were the result of an independent business decision or course of action unrelated to the Deepwater Horizon accident; or

    8. Numerical tests, standards or measurements which would reasonably indicate that there should be further investigation to determine the cause of the claimed economic loss; or

    9.  Other objective facts meriting further investigation.

### D.  Application of the V-Test Under Exhibit 4B

    The Claims Administrator shall develop new procedures and policies to ensure that the causation tests under Exhibit 4B are applied using the revenue that is determined as a result of the policies and procedures referenced in this policy.  The new procedures may require that the causation assessment be applied upon the initial review of a claim based upon the claimant's original submission, but, in any event, shall require a subsequent review and consideration of the causation requirement after a final identification of monthly revenue is completed as part of the BEL claims review process.

    The procedures for evaluating causation must include a requirement that the causation assessment and decision-making be reviewed by a professional accountant trained in evaluating revenue recognition concepts and accounting.

### E.   Withdrawal of Prior Policies and Claimant Communications

    All prior Policies related to the determination of causation for BEL claimants are withdrawn.

### F.    Claimant Communications and Claims Forms

The Claims Administrator shall develop rules and procedures to deter BEL claims, Start-Up claims, or Failed Business claims from claimants who are not proper class members or are otherwise not entitled to payment.  Claimants who have not suffered injury caused by the oil spill are not class members and lack standing to maintain a legal claim against BP.  Thus the claim forms for such claims will be modified to include the following revised language which is consistent with the terms of the Settlement Agreement and the existing claim forms.  This language and other consistent modifications will be designed to assure that claimants are fully notified that they are not to submit claims if they are seeking damages not traceable to loss from the Deepwater Horizon accident.  In particular, the following changes shall be made:

1.    After the first sentence of the second paragraph of the claim form, the following language shall be added:

Such economic loss only includes actual loss of profits, income or earnings that was caused by, due to, or arising or resulting  from the Deepwater Horizon Oil Incident, including the oil spill and response activities and, therefore, constitutes [1] actual injury that is [2] traceable to loss from the Deepwater Horizon accident.  It does not include reductions in profits, income or earnings that are traceable to causes other than the Deepwater Horizon accident where objective data negate the possibility of causation by the Deepwater Horizon accident.

2.    The Signature section of the form shall be revised to read as follows:

*I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that this Claim to the Court-Supervised Settlement Program under the Deepwater Horizon Economic and Property Damages Settlement  is submitted in compliance with the Instructions for Completing the Registration Form and the  Instructions for Completing the Business Economic Loss Claim Form; that this Claim is submitted for loss of profits income or earnings; that I believe in good faith that such claimed actual losses were caused by, due to, or arising or resulting  from the Deepwater Horizon Oil Incident, including the oil spill and response activities; that the information provided in this Claim Form is true and accurate to the best of my knowledge; and that supporting documents attached to or submitted in connection with this form and the information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Claim Form may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.*

3.    The Registration form and other claims forms shall be revised as appropriate to conform to the Fifth Circuit's ruling.

The updated claims forms should be substantially in the form of the exemplar accompanying this Policy as Attachment A.

The Claims Administrator shall update the Settlement Program's website and other communications directed to claimants to clearly communicate the updated policies.

VI.     **Existing Policies and Procedures to be Reconsidered and Updated**

All prior BEL claims-related policies or procedures are vacated until further notice.  The Claims Administrator shall review and evaluate each existing BEL claims policy and, in consultation with the parties, revise and update those policies as needed to conform to this policy and the BEL Ruling, and any related determinations by the court.

# ATTACHMENT 1

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
# BUSINESS ECONOMIC LOSS CLAIM FORM
# (PURPLE FORM)



After you complete and sign your Claim Form, submit it to the Claims Administrator as directed in the Instructions Booklet that accompanies this Claim Form.  If you submit your Claim Form by mail or delivery, do not separate this cover page from the Claim Form.  If you have to take this Claim Form apart to photocopy or fax it, make sure you include this cover page as the first page when you submit it.

**Business Economic Loss Claim Form**

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
## BUSINESS ECONOMIC LOSS CLAIM FORM
## (PURPLE FORM)

To make a **Business Economic Loss Claim** under the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement") for damages arising from the Deepwater Horizon Incident on April 20, 2010 (the "Spill"), you must complete and submit this Claim Form and all documentation required by the Settlement ("Supporting Documentation") to the Claims Administrator on or before April 22, 2014, or six months after the Effective Date of the Settlement, whichever is later.

The **Business Economic Loss Clai**m is for businesses (including those reporting on Form 1040 Schedules C, E, or F) that assert economic loss due to the Spill. Commercial Fishermen, Seafood Vessel Owners, Seafood Boat Captains, Seafood Crew, and Oyster Leaseholders who want to make a claim for economic losses relating to Seafood must use the Seafood Compensation Program Claim Form (Yellow Form) and not this Business Economic Loss Claim Form.

Such economic loss only includes actual loss of profits, income or earnings that was caused by, due to, or arising or resulting from the Deepwater Horizon Oil Incident, including the oil spill and response activities and, therefore, constitutes [1] actual injury that is [2] traceable to loss from the Deepwater Horizon accident. It does not include reductions in profits, income or earnings that are traceable to causes other than the Deepwater Horizon accident where objective data negate the possibility of causation by the Deepwater Horizon accident.

When completing this Claim Form, refer to the accompanying booklet called "Instructions for Completing the Business Economic Loss Claim Form (Purple Form)," which contains detailed instructions for completing and submitting this Claim Form, helpful definitions, and the list of Supporting Documentation required to prove your claim.

If you have access to a computer with an internet connection, it will be far easier for you to fill out and submit your Claim Form online, rather than on this paper Claim Form. The online claim process will guide you through only the specific questions you need to answer, and will instruct you about the specific Supporting Documentation you must submit, based on the answers you enter as you go along. Go to www.deepwaterhorizonsettlements.com to submit a claim online.

If you do not have access to the internet, you may visit a Claimant Assistance Center for assistance with submitting a claim in person. Section 5 of the Business Economic Loss Instructions Booklet lists the Claimant Assistance Centers.

## A. Claimant Information

Provide the following information about your Failed Business on behalf of which you are filing this claim for Business Economic Loss.

**1. Business Name:**

**2. Social Security Number:**
or
**Individual Taxpayer Identification Number:**
or
**Employer Identification Number:**

SSN or ITIN | | | - | | - | | |

EIN | | - | | | | | | |

**3. Claimant Number:** If you previously filed a claim with the Gulf Coast Claims Facility ("GCCF"), you will keep that same seven-digit Claimant Number in the Deepwater Horizon Settlement Program. Check the box at the right called "GCCF Claimant Number" and provide that seven-digit Claimant Number.

If you did not file a claim with the GCCF, you will receive a new Claimant Number when you file your initial Registration Form with the Deepwater Horizon Settlement Program. If you have already received your new Settlement Program Claimant Number, check the box called "Deepwater Horizon Settlement Program Claimant Number" and provide that nine-digit Claimant Number.

If you do not yet have a Claimant Number, leave this question blank.

☐ GCCF Claimant Number:

OR

☐ Deepwater Horizon Settlement Program Claimant Number:

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

## B. Information Required for a Business Economic Loss Claim

If you are making a Business Economic Loss Claim for more than one Claiming Facility, photocopy this section of the Claim Form before completing it and attach the copy to the Claim Form for submission. Make one copy for each additional Claiming Facility.

**1. You cannot make an economic loss claim for a business that falls into any of the categories listed below. Check any and all boxes that describe your business.**

Refer to Section 2 of the Business Economic Loss Instructions Booklet for more detailed descriptions of these categories.

☐ (a) Financial Institution.

☐ (b) Fund, financial trust, or other financial vehicle.

☐ (c) Gaming.

☐ (d) Insurance.

☐ (e) Oil and gas industry.

☐ (f) Defense contractor or subcontractor.

☐ (g) Real estate development.

☐ (h) Selling or marketing BP-branded fuel at anytime from April 20, 2010, through April 16, 2012.

**If you check the box next to any of the above categories, your business is not eligible to make an Economic Loss Claim, and you should not complete or submit this Claim Form.**

| | |
|---|---|
| **2. During the period from April 1, 2010, through December 31, 2010, did your business maintain more than one separate and distinct physical location?** If you check "Yes," continue to Question 3. If you check "No," go to Question 7. | ☐ **Yes**    ☐ **No** |
| **3. Is your business's headquarters located within the Gulf Coast Areas?** | ☐ **Yes**    ☐ **No** |
| **4. Are all of your business's Facilities located within the Gulf Coast Areas?** | ☐ **Yes**    ☐ **No** |
| **5. Does your business maintain separate profit and loss statements for each Claiming Facility?** | ☐ **Yes**    ☐ **No** |
| **6. Is your business submitting a claim for all Facilities located within the Gulf Coast Areas?** If you checked "Yes" for Question 3, you may file a consolidated claim for all Facilities or you may elect to file individual claims for each Claiming Facility separately. If you checked "No" for Question 3, information must be provided on a Facility-by-Facility basis, but you may send in each of those claims together to facilitate efficient processing.<br><br>By checking "Yes" to this question, you are indicating that you are submitting a consolidated Claim for *all* Facilities located within the Gulf Coast Areas. If you wish to file a claim for each Facility separately, check "No." You may not file a consolidated Claim for only a subset of your business's Facilities located within the Gulf Coast Areas.<br><br>If you are filing a Business Economic Loss Claim for a Multi-Facility Business and are providing information on a Facility-by-Facility basis, you must complete Section B, C, D, and E for each Claiming Facility. Questions 2 through 6 in this section are not required for each individual Facility. Only Question 1 is required for each individual Facility. Photocopy each section before completing it and attach the copy to this Claim Form for submission. Make as many copies as you need. | ☐ **Yes**    ☐ **No** |

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

**7. What is the address of your business?** Provide the address of your business. If you are a Multi-Facility business, provide the address of each Facility for which you are claiming, regardless of whether you have elected to have your Facilities in the Gulf Coast Area evaluated as a consolidated claim or as separate Facilities.

| **Business Name** | |
|---|---|

| **Business Address:**<br><br>Headquarters ☐ | Street<br><br>City \| State \| Zip Code<br><br>Parish/County |
|---|---|

| **Business Phone Number:** | ( \| \| ) \| \| \| - \| \| \| \| |
|---|---|

**8. In which Economic Loss Zone is your business located?** Go to www.deepwaterhorizonsettlements.com, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located.

☐ **Zone A**
☐ **Zone B**
☐ **Zone C**
☐ **Zone D**

**9. Provide the NAICS (North American Industry Classification System) Code for your business that forms the basis of your Economic Loss Claim.** You can search for your code using www.census.gov/naics.

_____

**Provide a description of your business:**




**10.** Businesses/employers that fall within the NAICS codes and descriptions marked with an "x" in Exhibit 19, Section II must answer the following question:

**In 2009, did your business provide significant services, goods, and/or supplies to businesses in the offshore Oil & Gas Industry in the Gulf of Mexico?** The Claims Administrator considers that an entity provided "significant" services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico in 2009 if 33% or more of its 2009 net revenue was derived from such activities.

☐ **Yes**      ☐ **No**

**11. Has your business ceased operations, declared bankruptcy or liquidated substantially all of its assets since May 1, 2010?** If your business failed between May 1, 2010, and December 31, 2011, stop filling out this Claim Form and submit the **Failed Business Economic Loss Claim Form (Red Form)** instead.

☐ **Yes**      ☐ **No**

If "Yes," provide the date your business ceased operations:

_____/_____/_____
(Month/Day/Year)

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

| | |
|---|---|
| **12. Is your business a Start-Up Business?** If your business's operations began on or after January 1, 2009, stop filling out this Claim Form and submit the **Start-up Business Economic Loss Claim Form (Gray Form)** instead. If your business's operations began after October 20, 2008, but before January 1, 2009, you have the option of using this Business Economic Loss Claim Form (Purple Form) and selecting 2009 as your Benchmark Period or proceeding under the Start-Up Business Economic Loss Claim Form (Gray Form). | ☐ **Yes**    ☐ **No** |
| **13. Did your business participate in the Vessels of Opportunity ("VoO") program?** | ☐ **Yes**    ☐ **No** |

**Identify any months after the Spill in which your business received revenue from the VoO program, and the amount of that revenue. Leave this section blank if your business did not receive any revenue because of participation in the VoO program.**

| | | | |
|---|---|---|---|
| ☐ **May 2010** | $ _____ | ☐ **September 2010** | $ _____ |
| ☐ **June 2010** | $ _____ | ☐ **October 2010** | $ _____ |
| ☐ **July 2010** | $ _____ | ☐ **November 2010** | $ _____ |
| ☐ **August 2010** | $ _____ | ☐ **December 2010** | $ _____ |
| | | ☐ **All Months 2011** | $ _____ |

**Identify any months after the Spill in which your business incurred expenses because of participation in the VoO program, and the amount of those expenses. Leave this section blank if your business did not incur expenses because of participation in the VoO program.**

| | | | |
|---|---|---|---|
| ☐ **May 2010** | $ _____ | ☐ **September 2010** | $ _____ |
| ☐ **June 2010** | $ _____ | ☐ **October 2010** | $ _____ |
| ☐ **July 2010** | $ _____ | ☐ **November 2010** | $ _____ |
| ☐ **August 2010** | $ _____ | ☐ **December 2010** | $ _____ |
| | | ☐ **All Months 2011** | $ _____ |

**14. Identify other sources of income to your business that can be used to reconcile tax returns with business financial statements, if any.**

| Business Economic Loss Claim Form | Page 4 |
|---|---|

For Questions 15 – 19, consult the definition section in the Business Economic Loss Instructions Booklet to determine if your business meets the definition or criteria. Go online to www.deepwaterhorizonsettlements.com, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located and whether it meets the Tourism Definition.

| | |
|---|---|
| **15. Does your business sell to customers in multiple Economic Loss Zones?** | ☐ **Yes**   ☐ **No** |
| **16. Is your business a Landing Site, Commercial Wholesale or Retail Dealer A, or a Primary Seafood Processor?** | ☐ **Yes**   ☐ **No** |
| **17. Is your business a Commercial Wholesale or Retail Dealer B, a Secondary Seafood Processor, a Seafood Wholesaler or Distributor, or a Seafood Retailer?** | ☐ **Yes**   ☐ **No** |
| **18. Does your business fall within the Tourism Definition?** | ☐ **Yes**   ☐ **No** |
| **19. Is your business a Charter Fishing Operation?** | ☐ **Yes**   ☐ **No** |
| **20. Did specific market changes outside your control, unrelated to the Spill, and occurring after April 20, 2010, prevent your business from earning revenues in 2011 that were comparable to pre-Spill periods?** | ☐ **Yes**   ☐ **No** |

**If Yes, describe these market changes.** Examples may include, but are not limited to, the following: (1) the entry of a competitor in 2011; (2) the bankruptcy of a significant customer in 2011; (3) nearby road closures affecting your business; (4) unanticipated interruption resulting in closure of your business; (5) the replacement of a product or service by a customer; or (6) the loss of financing and/or reasonable terms of renewal.

| | |
|---|---|
| **21. Did the Spill directly result in the cancellation of a contract that your business was unable to replace?** A Canceled Contract is a contract that was in place on April 20, 2010, and which was to be performed between April 21, 2010, and December 31, 2010, but was canceled between April 21, 2010, and December 31, 2010, and that you were unable to replace on the same or similar terms. | ☐ **Yes**    ☐ **No** |

**If Yes, attach the contract and describe your efforts and inability to replace the contract:**

| **22. Did the Spill result in reservation cancellations that your business was unable to rebook?** A Canceled Reservation is a reservation that was in place on April 20, 2010, and which was to occur between April 21, 2010, and December 31, 2010, but was canceled between April 21, 2010, and December 31, 2010, and that you were unable to replace on the same or similar terms. | ☐ **Yes**    ☐ **No** |
| --- | --- |

**If Yes, describe the cancellations and your efforts and inability to rebook the cancellations:**

## C. Selection of Benchmark and Compensation Periods

Claimants must make several elections to qualify for benefits. Claimants select one historical set of years for all comparisons throughout the claims process (the Benchmark Period year(s)). In addition, claimants select two Compensation Periods. Consult the "Instructions for Completing the Business Economic Claim Form (Purple Form)" for more information.

1. **Select Benchmark Period years.** Choose one of the following periods, which will serve as the baseline for measuring your business's historical financial performance. The Claims Administrator will review all the documents and information you submit to determine the best Benchmark Period that maximizes your recovery, even if that differs from the period you select. If you do not wish to pick a Benchmark Period at all and instead would like the Claims Administrator to select your best Benchmark Period, select "Claims Administrator Selected Benchmark Period."

   ☐   **2009; or**

   ☐   **Average of 2008 and 2009; or**

   ☐   **Average of 2007, 2008, and 2009; or**

   ☐   **Claims Administrator Selected Benchmark.**

2. **Select Step 1 Compensation Period.** Choose three or more consecutive months from May 2010 through December 2010. You can check all of the boxes or as few as three. However, all boxes checked must be consecutive. The Claims Administrator will review all the documents and information you submit to determine the best Step 1 Compensation Period that maximizes your recovery, even if that differs from the period you select. If you do not wish to pick a Step 1 Compensation Period at all and instead would like the Claims Administrator to select your best Step 1 Compensation Period, select "Claims Administrator Selected Step 1 Compensation Period." If you are eligible for compensation, a different Compensation Period may be selected to determine your Total Compensation. Refer to the Settlement for further information on how your business's Step 1 Compensation Period will be used in calculating Total Compensation.

   ☐   **May 2010**          ☐   **September 2010**

   ☐   **June 2010**          ☐   **October 2010**

   ☐   **July 2010**          ☐   **November 2010**

   ☐   **August 2010**          ☐   **December 2010**

   ☐   **Claims Administrator Selected Step 1 Compensation Period**

3. **Select Step 2 Compensation Period.** Choose one of the following periods, which will serve as your business's Step 2 Compensation Period. If your business is eligible for compensation, the Step 2 Compensation Period you select will be used to determine your business's Total Compensation. The Claims Administrator will review all the documents and information you submit to determine the best Step 2 Compensation Period that maximizes your recovery, even if that differs from the period you select. If you do not wish to pick a Step 2 Compensation Period at all and instead would like the Claims Administrator to select your best Step 2 Compensation Period, select "Claims Administrator Selected Step 2 Compensation Period." Refer to the Settlement for further information on how your business's Step 2 Compensation Period will be used in calculating Total Compensation. NOTE: If you select a seven-consecutive-month or eight-consecutive-month period for your Step 1 Compensation Period in Question 2, that same period of consecutive months in 2010 shall be used as your Step 2 Compensation Period.

   ☐   **May – October 2010; or**

   ☐   **June – November 2010; or**

   ☐   **July – December 2010; or**

   ☐   **Use same 7 or 8 month period as in Question 2; or**

   ☐   **Claims Administrator Selected Step 2 Compensation Period**

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

## D. Documentation Required for a Business Economic Loss Claim

Such business economic loss includes actual loss of profits, income or earnings that was caused by, due to, or arising or resulting from the Deepwater Horizon Oil Incident, including the oil spill and response activities and, therefore, constitutes actual injury traceable to loss from the Deepwater Horizon accident. It does not include reductions in profits, income or earnings that are traceable to causes other than the Deepwater Horizon accident where objective data negate the possibility of causation by the Deepwater Horizon accident.

## E. Payment

1. **If You Have Your Own Attorney.** Unless you check the box below, the Claims Administrator will make any payments jointly to you and to your attorney, which means that both you and your attorney will need to endorse the check before a bank will honor it.

   ☐ Check here if you want the Claims Administrator to make payments in connection with this and any other claim you may file in the Deepwater Horizon Economic and Property Settlement *only to your attorney*. This means that the Claims Administrator will send your payment to your attorney, who will then pay you pursuant to the retainer agreement you have with him/her.

2. **If You Do Not Have Your Own Attorney.** If you have not retained an attorney to represent you in connection with your Spill-related claim, the Claims Administrator will make any payments to which you are entitled directly to you by check. Payment checks will be sent by First Class Mail to the address you provided in the Registration Form or to the address that the Claims Administrator confirms for you during the processing of your Claim. **You have an obligation to notify the Claims Administrator if your address changes.**

   The Claims Administrator will report annually to federal and state taxing authorities, using a Form 1099 or state form equivalent, for certain payments made. The Claims Administrator will send you a copy of that form, but cannot give you any tax advice regarding any payment issued to you. You should consult with your own tax advisor to determine the tax impact of any payment you receive from the Claims Administrator.

3. **Garnishments, Liens and other Attachments.** Legally authorized garnishments, liens, or similar forms of attachments relating to your claim will be honored and deducted from your payment.

4. **W-9 Form Requirement.** All claimants must provide a W-9 Form. To obtain a copy of that form, go to www.deepwaterhorizonsettlements.com, or request one at a Claimant Assistance Center or by calling 1-866-992-6174.

5. **Do you intend to seek reimbursement for Claimant Accounting Support Services in connection with your claim?**

   ☐ **Yes**     ☐ **No**

   If you check "Yes" for Question E.5, you must submit the documents listed in Section 4.E of the Business Economic Loss Instructions Booklet.

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

## F. Signature

I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that this Claim to the Court-Supervised Settlement Program under the Deepwater Horizon Economic and Property Damages Settlement is submitted in compliance with the Instructions for Completing the Registration Form and the  Instructions for Completing the Business Economic Loss Claim Form; that this Claim is submitted for loss of profits income or earnings; that I believe in good faith that such claimed actual losses were caused by, due to, or arising or resulting from the Deepwater Horizon Oil Incident, including the oil spill and response activities; that the information provided in this Claim Form is true and accurate to the best of my knowledge; and that supporting documents attached to or submitted in connection with this form and the information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Claim Form may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.

I certify that I am authorized to act on behalf of the business submitting this Claim Form.

By submitting this Claim Form, I consent to the use and disclosure by the Claims Administrator and those assisting the Claims Administrator of any information about me that they believe necessary and/or helpful to process my claim for compensation and any payment resulting from that claim.

| Signature: | | Date: | _____/_____/_____ <br> (Month/Day/Year) |
|---|---|---|---|
| **Printed Name:** | First         Middle       Last | | |
| **Title:** | | | |

An authorized business representative must sign this Claim Form personally.

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT START-UP BUSINESS ECONOMIC LOSS CLAIM FORM (GRAY FORM)



After you complete and sign your Claim Form, submit it to the Claims Administrator as directed in the Instructions Booklet that accompanies this Claim Form.  If you submit your Claim Form by mail or delivery, do not separate this cover page from the Claim Form.  If you have to take this Claim Form apart to photocopy or fax it, make sure you include this cover page as the first page when you submit it.

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
## START-UP BUSINESS ECONOMIC LOSS CLAIM FORM
## (GRAY FORM)

To make a **Start-Up Business Economic Loss Claim** under the Deepwater Horizon Economic and Property Damages for damages arising from the Deepwater Horizon Incident on April 20, 2010 (the "Spill"), you must complete and submit this Claim Form and all documentation required by the Settlement ("supporting Documentation") to the Claims Administrator on or before April 22, 2014, or six months after the Effective Date of the Settlement, whichever is later.

The **Start-Up Business Economic Loss Claim** is for businesses (including those reporting on Form 1040 Schedules C, E, or F) that began operations after October 20, 2008, who prove economic loss as a result of the Spill. If your business began operations on or before October 20, 2008, see the Business Economic Loss Claim Form (Purple Form). If your business began operations after October 20, 2008, but before January 1, 2009, you have the option of using this Start-Up Business Claim Form or proceeding under the Business Economic Loss Claim Form.

Such economic loss only includes actual loss of profits, income or earnings that was caused by, due to, or arising or resulting from the Deepwater Horizon Oil Incident, including the oil spill and response activities and, therefore, constitutes [1] actual injury that is [2] traceable to loss from the Deepwater Horizon accident.  It does not include reductions in profits, income or earnings that are traceable to causes other than the Deepwater Horizon accident where objective data negate the possibility of causation by the Deepwater Horizon accident.

When completing this Claim Form, refer to the accompanying booklet Start-Up Business Economic Loss Claim Form (Gray Form), which contains detailed instructions for completing this Claim Form, guidance on how to submit it, helpful definitions, and the list of Supporting Documentation required to prove your claim.

If you have access to a computer with an internet connection, it will be far easier for you to fill out and submit your Claim Form online, rather than on this paper Claim Form. The online claim process will guide you through only the specific questions you need to answer, and will instruct you about the specific documentation you must submit, based on the answers you enter as you go along. Go to www.deepwaterhorizonsettlements.com to submit a claim online.

If you do not have access to the internet, you may visit a Claimant Assistance Center for assistance with submitting a claim in person. Section 5 of the Start-Up Business Instructions Booklet lists the Claimant Assistance Centers.

## A. Claimant Information

Provide the following information about your Failed Business on behalf of which you are filing this claim for Business Economic Loss.

**1. Business Name:**

**2. Social Security Number:**
*or*
**Individual Taxpayer Identification Number:**
*or*
**Employer Identification Number:**

SSN or ITIN
| | | | – | | | – | | | | |

EIN
| | | – | | | | | | | |

**3. Claimant Number:** If you previously filed a claim with the Gulf Coast Claims Facility ("GCCF"), you will keep that same seven-digit Claimant Number in the Deepwater Horizon Settlement Program. Check the box at the right called "GCCF Claimant Number" and provide that seven-digit Claimant Number.

If you did not file a claim with the GCCF, you will receive a new Claimant Number when you file your initial Registration Form with the Deepwater Horizon Settlement Program. If you have already received your new Settlement Program Claimant Number, check the box called "Deepwater Horizon Settlement Program Claimant Number" and provide that nine-digit Claimant Number.

If you do not yet have a Claimant Number, leave this question blank.

☐ GCCF Claimant Number:

| | | | | | | |

OR

☐ Deepwater Horizon Settlement Program Claimant Number:

| | | | | | | | |

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-5
v.1

## B. Information Required for a Start-Up Business Economic Loss Claim

If you are making a Start-Up Business Economic Loss Claim for more than one Claiming Facility, photocopy this section of the Claim Form before completing it and attach the copy to the Claim Form for submission. Make one copy for each additional Claiming Facility.

**1. You cannot make an economic loss claim for a business that falls into any of the categories listed below. Check any and all boxes that describe your business.**

Refer to Section 2 of the Start-Up Business Economic Loss Instructions Booklet for more detailed descriptions of these categories.

☐ (a) Financial Institution.

☐ (b) Fund, financial trust, or other financial vehicle.

☐ (c) Gaming.

☐ (d) Insurance.

☐ (e) Oil and gas industry.

☐ (f) Defense contractor or subcontractor.

☐ (g) Real estate development.

☐ (h) Selling or marketing BP-branded fuel at anytime from April 20, 2010, through April 16, 2012.

**If you check the box next to any of the above categories, your business is not eligible to make an Economic Loss Claim, and you should not complete or submit this Claim Form.**

| | |
|---|---|
| **2. During the period from April 1, 2010, through December 31, 2010, did your business maintain more than one separate and distinct physical location?** If you check "Yes," continue to Question 3. If you check "No," go to Question 7. | ☐ **Yes**    ☐ **No** |
| **3. Is your business's headquarters located within the Gulf Coast Areas?** | ☐ **Yes**    ☐ **No** |
| **4. Are all of your business's Facilities located within the Gulf Coast Areas?** | ☐ **Yes**    ☐ **No** |
| **5. Does your business maintain separate profit and loss statements for each Claiming Facility?** | ☐ **Yes**    ☐ **No** |
| **6. Is your business submitting a claim for all Facilities located within the Gulf Coast Areas?** If you checked "Yes" for Question 3, you may file a consolidated claim for all Facilities or you may elect to file individual claims for each Claiming Facility separately. If you checked "No" for Question 3, information must be provided on a Facility-by-Facility basis, but you may send in each of those claims together to facilitate efficient processing.<br><br>By checking "Yes" to this question, you are indicating that you are submitting a consolidated Claim for *all* Facilities located within the Gulf Coast Areas. If you wish to file a claim for each Facility separately, check "No." You may not file a consolidated Claim for only a subset of your business's Facilities located within the Gulf Coast Areas.<br><br>If you are filing a Business Economic Loss Claim for a Multi-Facility Business and are providing information on a Facility-by-Facility basis, you must complete Section B, C, D, and E for each Claiming Facility. Questions 2 through 6 in this section are not required for each individual facility. Only Question 1 is required for each individual facility. Photocopy each section before completing it and attach the copy to this Claim Form for submission. Make as many copies as you need. | ☐ **Yes**    ☐ **No** |

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-5
v.1

**7. What is the address of your business**  Provide the address of your business.  If you are a Multi-Facility business, provide the address of each Facility for which you are claiming, regardless of whether you have elected to have your Facilities in the Gulf Coast Area evaluated as a consolidated claim or as separate Facilities.

| Business Name: | |
|---|---|

**Business Address:**
Headquarters ☐

| Street | | |
|---|---|---|
| City | State | Zip Code |
| Parish/County | | |

**Business Phone Number:**    (  |    |    )    |    |    |    |  -  |    |    |    |    |

**8. In which Economic Loss Zone is your business located?**  Go to www.deepwaterhorizonsettlements.com, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located.

☐ **Zone A**
☐ **Zone B**
☐ **Zone C**
☐ **Zone D**

**9. Provide the NAICS (North American Industry Classification System) Code for your business that forms the basis of your Economic Loss Claim.**  You can search for your code using www.census.gov/naics.

_____

**Provide a description of your business:**




**10.** Businesses/employers that fall within the NAICS codes and descriptions marked with an "x" in Exhibit 19, Section II must answer the following question:

**In 2009, did your business provide significant services, goods, and/or supplies to businesses in the offshore Oil & Gas Industry in the Gulf of Mexico?**  The Claims Administrator considers that an entity provided "significant" services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico in 2009 if 33% or more of its 2009 net revenue was derived from such activities.

☐ **Yes**      ☐ **No**

**11. What was the date on which your business commenced operations?**  If your business commenced operations after , 2008, but before January 1, 2009, you may alternatively choose to file under the Business Economic Loss framework and use 2009 as your Benchmark Period year.

____/_____/_____
(Month/Day/Year)

**12.** **Has your business ceased operations, declared bankruptcy or liquidated substantially all of its assets since May 1, 2010?**  If your business failed between May 1, 2010, and December 31, 2011, stop filling out this Claim Form and submit the **Failed Business Economic Loss Claim Form (Red Form)** instead.

☐ **Yes**      ☐ **No**

If "Yes," provide the date your business ceased operations:

____/_____/_____

| Start-Up Business Economic Loss Claim Form | Page 3 |
|---|---|

CF-5
v.1

| | (Month/Day/Year) |
|---|---|
| | |

| 13. Did your business participate in the Vessels of Opportunity ("VoO") Program? | ☐ Yes  ☐ No |
|---|---|

Identify any months after the Spill in which your business received revenue from the VoO program, and the amount of that revenue. Leave this section blank if your business did not receive any revenue because of participation in the VoO program.

| | | | | | |
|---|---|---|---|---|---|
| ☐ | **May 2010** | $ _____ | ☐ | **September 2010** | $ _____ |
| ☐ | **June 2010** | $ _____ | ☐ | **October 2010** | $ _____ |
| ☐ | **July 2010** | $ _____ | ☐ | **November 2010** | $ _____ |
| ☐ | **August 2010** | $ _____ | ☐ | **December 2010** | $ _____ |
| | | | ☐ | **All Months 2011** | $ _____ |

Identify any months after the Spill in which your business incurred expenses because of participation in the VoO Program, and the amount of those expenses. Leave this section blank if your business did not incur expenses because of participation in the VoO program.

| | | | | | |
|---|---|---|---|---|---|
| ☐ | **May 2010** | $ _____ | ☐ | **September 2010** | $ _____ |
| ☐ | **June 2010** | $ _____ | ☐ | **October 2010** | $ _____ |
| ☐ | **July 2010** | $ _____ | ☐ | **November 2010** | $ _____ |
| ☐ | **August 2010** | $ _____ | ☐ | **December 2010** | $ _____ |
| | | | ☐ | **All Months 2011** | $ _____ |

14. Identify other sources of income to your business that can be used to reconcile tax returns with business financial statements, if any.

For Questions 15 – 19, consult the definition section in the accompanying booklet called "Instructions for Completing the Start-Up Business Economic Claim Form (Grey Form)" to determine if your business meets the definition or criteria. Go online to www.deepwaterhorizonsettlements.com, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located and whether it meets the Tourism Definition.

| | | |
|---|---|---|
| 15. Does your business sell to customers in multiple Economic Loss Zones? | ☐ Yes | ☐ No |
| 16. Is your business a Commercial Fisherman, Landing Site, Commercial Wholesale or Retail Dealer A, or a Primary Seafood Processor? | ☐ Yes | ☐ No |
| 17. Is your business a Commercial Wholesale or Retail Dealer B, a Secondary Seafood Processor, a Seafood Wholesaler or Distributor, or a Seafood Retailer? | ☐ Yes | ☐ No |
| 18. Does your business fall within the Tourism Definition? | ☐ Yes | ☐ No |
| 19. Is your business a Charter Fishing Operation? | ☐ Yes | ☐ No |
| 20. Did specific market changes outside your control, unrelated to the Spill and occurring after April 20, 2010, prevent your business from earning revenues in 2011 that were comparable to pre-Spill periods? | ☐ Yes | ☐ No |

If Yes, describe these market changes. Examples may include, but are not limited to, the following: (1) the entry of a competitor in 2011; (2) the bankruptcy of a significant customer in 2011; (3) nearby road closures affecting your business; (4) unanticipated interruption resulting in closure of your business; (5) the replacement of a product or service by a customer; or (6) the loss of financing and/or reasonable terms of renewal.

| | | |
|---|---|---|
| 21. Did the Spill directly result in the cancellation of a contract that your business was unable to replace? A Canceled Contract is a contract that was in place on April 20, 2010, and which was to be performed between April 21, 2010, and December 31, 2010, but was canceled between April 21, 2010, and December 31, 2010, and that you were unable to replace on the same or similar terms. | ☐ Yes | ☐ No |

If Yes, attach the contract and describe your efforts and inability to replace the contract:

| 22. **Did the Spill result in reservation cancellations that your business was unable to rebook?** A Canceled Reservation is a reservation that was in place on April 20, 2010, and which was to occur between April 21, 2010, and December 31, 2010, but was canceled between April 21, 2010, and December 31, 2010, and that you were unable to replace on the same or similar terms. | ☐ **Yes**    ☐ **No** |
|---|---|

**If Yes, describe the cancellations and your efforts and inability to rebook the cancellations:**

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-5
v.1

## C. Selection of Benchmark and Compensation Periods

**You may elect to establish expected revenue and expected costs based on financial projections for the Start-Up Business. Consult the "Instructions for Completing the Start-Up Business Economic Claim Form (Grey Form)" for more information.**

1. **Select Benchmark Period.** Select three or more consecutive months from May 2011 through April 2012 to use as your business's Benchmark Period. You can check all of the boxes or as few as three. However, all boxes checked must be consecutive. The Benchmark Period you choose will be compared to the same months between May 2010 and April 2011 (the Compensation Period) to estimate your business's Expected Profit during 2010. The Claims Administrator will review all the documents and information you submit to determine the best Benchmark Period that maximizes your recovery, even if that differs from the period you select. If you do not wish to pick a Benchmark Period at all and instead would like the Claims Administrator to select your best Benchmark Period, select "Claims Administrator Selected Benchmark Period." Refer to the Settlement for further information on how your business's Benchmark Period will be used in calculating your business's Compensation.

| | | | |
|---|---|---|---|
| ☐ | **May 2011** | ☐ | **November 2011** |
| ☐ | **June 2011** | ☐ | **December 2011** |
| ☐ | **July 2011** | ☐ | **January 2012** |
| ☐ | **August 2011** | ☐ | **February 2012** |
| ☐ | **September 2011** | ☐ | **March 2012** |
| ☐ | **October 2011** | ☐ | **April 2012** |
| ☐ | **Claims Administrator Selected Benchmark Period** | | |

2. **Select Compensation Period.** Select three or more consecutive months from May 2010 through April 2011 to use as your business's Compensation Period. You can check all of the boxes or as few as three. However, all boxes checked must be consecutive. The months you select for Compensation Period must match the months you selected above. The Compensation Period you choose will be compared to the same months between May 2011 and April 2012 (the Benchmark Period) to estimate your business's Expected Profit during 2010. The Claims Administrator will review all the documents and information you submit to determine the best Compensation Period that maximizes your recovery, even if that differs from the period you select. If you do not wish to pick a Compensation Period at all and instead would like the Claims Administrator to select your best Compensation Period, select "Claims Administrator Selected Compensation Period." Refer to the Settlement for further information on how your business's Compensation Period will be used in calculating your business's Compensation.

| | | | |
|---|---|---|---|
| ☐ | **May 2010** | ☐ | **November 2010** |
| ☐ | **June 2010** | ☐ | **December 2010** |
| ☐ | **July 2010** | ☐ | **January 2011** |
| ☐ | **August 2010** | ☐ | **February 2011** |
| ☐ | **September 2010** | ☐ | **March 2011** |
| ☐ | **October 2010** | ☐ | **April 2011** |
| ☐ | **Claims Administrator Selected Compensation Period** | | |

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-5
v.1

| **D. Documentation Required for a Start-Up Business Economic Loss Claim** |
|---|

In addition to this Claim Form, you must submit certain Supporting Documentation to prove your Start-Up Business Economic Loss Claim.  The list of required documents, and instructions for how to submit them, are in Section 4 of the Start-Up Business Economic Loss Instructions Booklet.  If you do not submit the required Supporting Documentation, the Claims Administrator will not be able to review your claim and you will not receive payment for your claim.

| **E. Payment** |
|---|

1.  **If You Have Your Own Attorney.**  Unless you check the box below, the Claims Administrator will make any payments jointly to you and to your attorney, which means that both you and your attorney will need to endorse the check before a bank will honor it.

☐ Check here if you want the Claims Administrator to make payments in connection with this and any other claim you may file in the Deepwater Horizon Economic and Property Settlement *only to your attorney*.  This means that the Claims Administrator will send your payment to your attorney, who will then pay you pursuant to the retainer agreement you have with him/her.

2.  **If You Do Not Have Your Own Attorney.**  If you have not retained an attorney to represent you in connection with your Spill-related claim, the Claims Administrator will make any payments to which you are entitled directly to you by check.  Payment checks will be sent by First Class Mail to the address you provided in the Registration Form or to the address that the Claims Administrator confirms for you during the processing of your Claim.  **You have an obligation to notify the Claims Administrator if your address changes.**

The Claims Administrator will report annually to federal and state taxing authorities, using a Form 1099 or state form equivalent, for certain payments made.  The Claims Administrator will send you a copy of that form, but cannot give you any tax advice regarding any payment issued to you.  You should consult with your own tax advisor to determine the tax impact of any payment you receive from the Claims Administrator.

3.  **Garnishments, Liens and other Attachments.**  Legally authorized garnishments, liens, or similar forms of attachments relating to your claim will be honored and deducted from your payment.

4.  **W-9 Form Requirement.**  All claimants must provide a W-9 Form.  To obtain a copy of that form, go to www.deepwaterhorizonsettlements.com, or request one at a Claimant Assistance Center or by calling 1-866-992-6174.

5.  **Do you intend to seek reimbursement for Claimant Accounting Support Services in connection with your claim?**

☐ **Yes**      ☐ **No**

If you check "Yes" for Question E.5, you must submit the documents listed in Section 4.E of the Start-Up Business Economic Loss Instructions Booklet.

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-5
v.1

## F. Signature

I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that this Claim to the Court-Supervised Settlement Program under the Deepwater Horizon Economic and Property Damages Settlement is submitted in compliance with the Instructions for Completing the Registration Form and the  Instructions for Completing the Business Economic Loss Claim Form; that this Claim is submitted for loss of profits income or earnings; that I believe in good faith that such claimed actual losses were caused by, due to, or arising or resulting from the Deepwater Horizon Oil Incident, including the oil spill and response activities; that the information provided in this Claim Form is true and accurate to the best of my knowledge; and that supporting documents attached to or submitted in connection with this form and the information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Claim Form may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.

I certify that I am authorized to act on behalf of the business submitting this Claim Form.

By submitting this Claim Form, I consent to the use and disclosure by the Claims Administrator and those assisting the Claims Administrator of any information about me that they believe necessary and/or helpful to process my claim for compensation and any payment resulting from that claim.

| Signature: | | Date: | _____/_____/_____ <br> (Month/Day/Year) |
|---|---|---|---|
| **Printed Name:** | First           Middle        Last | | |
| **Title:** | | | |

An authorized business representative must sign this Claim Form personally.

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-5
v.1

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
# FAILED BUSINESS ECONOMIC LOSS CLAIM FORM
# (RED FORM)



After you complete and sign your Claim Form, submit it to the Claims Administrator as directed in the Instructions Booklet that accompanies this Claim Form. If you submit your Claim Form by mail or delivery, do not separate this cover page from the Claim Form. If you have to take this Claim Form apart to photocopy or fax it, make sure you include this cover page as the first page when you submit it.

**Failed Business Economic Loss Claim Form**

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-6
v.1

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
# FAILED BUSINESS ECONOMIC LOSS CLAIM FORM
# (RED FORM)

To make a **Failed Business Economic Loss Claim** under the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement") for damages arising from the Deepwater Horizon Incident on April 20, 2010 (the "Spill"), you must complete and submit this Claim Form and all documentation required by the Settlement ("Supporting Documentation") to the Claims Administrator on or before April 22, 2014, or six months after the Effective Date of the Settlement, whichever is later.

The **Failed Business Economic Loss Claim** is for businesses (including those reporting on Form 1040 Schedules C, E, or F) that, after May 1, 2010, but before December 31, 2011, either: (1) ceased operations and wound down; (2) entered bankruptcy (through the filing of a petition for bankruptcy protection in a court or competent jurisdiction); or (3) otherwise initiated or completed a liquidation of substantially all of its assets.

Such economic loss only includes actual loss of profits, income or earnings that was caused by, due to, or arising or resulting from the Deepwater Horizon Oil Incident, including the oil spill and response activities and, therefore, constitutes [1] actual injury that is [2] traceable to loss from the Deepwater Horizon accident.  It does not include reductions in profits, income or earnings that are traceable to causes other than the Deepwater Horizon accident where objective data negate the possibility of causation by the Deepwater Horizon accident.

When completing this Claim Form, refer to the accompanying booklet called "Instructions for Completing the Failed Business Economic Loss Claim Form (Red Form)," which contains detailed instructions for completing this Claim Form, guidance on how to submit it, helpful definitions, and the list of Supporting Documentation required to prove your Claim.

If you have access to a computer with an internet connection, it will be far easier for you to fill out and submit your Claim Form online, rather than on this paper Claim Form. The online claim process will guide you through only the specific questions you need to answer, and will instruct you about the specific Supporting Documentation you must submit, based on the answers you enter as you go along. Go to www.deepwaterhorizonsettlements.com to submit a claim online.

If you do not have access to the internet, you may visit a Claimant Assistance Center for assistance with submitting a claim in person. Section 5 of the Failed Business Economic Loss Instructions Booklet lists all the Claimant Assistance Centers.

## A. Claimant Information

Provide the following information about your Failed Business on behalf of which you are filing this claim for Business Economic Loss.

**1. Business Name:**

**2. Social Security Number:**
*or*
**Individual Taxpayer Identification Number:**
*or*
**Employer Identification Number:**

SSN or ITIN | | | - | | | - | | | | |

EIN | | | - | | | | | | |

**3. Claimant Number:** If you previously filed a claim with the Gulf Coast Claims Facility ("GCCF"), you will keep that same seven-digit Claimant Number in the Deepwater Horizon Settlement Program. Check the box at the right called "GCCF Claimant Number" and provide that seven-digit Claimant Number.

If you did not file a claim with the GCCF, you will receive a new Claimant Number when you file your initial Registration Form with the Deepwater Horizon Settlement Program. If you have already received your new Settlement Program Claimant Number, check the box called "Deepwater Horizon Settlement Program Claimant Number" and provide that nine-digit Claimant Number.

If you do not yet have a Claimant Number, leave this question blank.

☐ GCCF Claimant Number:

| | | | | | | |

OR

☐ Deepwater Horizon Settlement Program Claimant Number:

| | | | | | | | |

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-6
v.1

## B. Information Required for a Failed Business Economic Loss Claim

If you are making a Failed Business Economic Loss Claim for more than one Claiming Facility, photocopy this section of the Claim Form before completing it and attach the copy to the Claim Form for submission.  Make one copy for each additional Claiming Facility.

**1.  You cannot make an economic loss claim for a business that falls into any of the categories listed below.  Check any and all boxes that describe your business.**

Refer to Section 2 of the Failed Business Economic Loss Instructions Booklet for more detailed descriptions of these categories.

☐  (a)  Financial Institution.

☐  (b)  Fund, financial trust, or other financial vehicle.

☐  (c)  Gaming.

☐  (d)  Insurance.

☐  (e)  Oil and gas industry.

☐  (f)  Defense contractor or subcontractor.

☐  (g)  Real estate development.

☐  (h)  Selling or marketing BP-branded fuel at anytime from April 20, 2010, through April 16, 2012.

**If you check the box next to any of the above categories, your business is not eligible to make an Economic Loss Claim, and you should not complete or submit this Claim Form.**

| | | |
|---|---|---|
| **2.  During the period from April 1, 2010, through December 31, 2010, did your business maintain more than one separate and distinct physical location?**  If you check "Yes," continue to Question 3.  If you check "No," go to Question 7. | ☐ **Yes** | ☐ **No** |
| **3.  Is your business's headquarters located within the Gulf Coast Areas?** | ☐ **Yes** | ☐ **No** |
| **4.  Are all of your business's Facilities located within the Gulf Coast Areas?** | ☐ **Yes** | ☐ **No** |
| **5.  Does your business maintain separate profit and loss statements for each Claiming Facility?** | ☐ **Yes** | ☐ **No** |
| **6.  Is your business submitting a claim for all Facilities located within the Gulf Coast Areas?**  If you checked "Yes" for Question 3, you may file a consolidated claim for all Facilities or you may elect to file individual claims for each Claiming Facility separately.  If you checked "No" for Question 3, information must be provided on a Facility-by-Facility basis, but you may send in each of those claims together to facilitate efficient processing.<br><br>By checking "Yes" to this question, you are indicating that you are submitting a consolidated Claim for *all* Facilities located within the Gulf Coast Areas.  If you wish to file a claim for **each Facility separately, check "No."**  You may not file a consolidated Claim for only a subset of your business's Facilities located within the Gulf Coast Areas.<br><br>If you are filing a Business Economic Loss Claim for a Multi-Facility Business and are providing information on a Facility-by-Facility basis, you must complete Section B, C, D, and E for each Claiming Facility.  Questions 2 through 6 in this section are not required for each individual facility.  Only Question 1 is required for each individual facility.  Photocopy each section before completing it and attach the copy to this Claim Form for submission.  Make as many copies as you need. | ☐ **Yes** | ☐ **No** |

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

**7. What is the address of your business?** Provide the address of your business. If you are a Multi-Facility business, provide the address of each Facility for which you are claiming, regardless of whether you have elected to have your Facilities in the Gulf Coast Area evaluated as a consolidated claim or as separate Facilities.

| Business Name: | |
|---|---|

**Business Address:**

Headquarters ☐

| Street | | | |
|---|---|---|---|
| City | State | | Zip Code |
| Parish/County | | | |

| Business Phone Number: | ( \_\_ \| \_\_ \| \_\_ ) \_\_ \| \_\_ \| \_\_ \| \_\_ - \_\_ \| \_\_ \| \_\_ \| \_\_ \| \_\_ |
|---|---|

---

**8. In which Economic Loss Zone is your business located?** Go to www.deepwaterhorizonsettlements.com, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located.

☐ **Zone A**
☐ **Zone B**
☐ **Zone C**
☐ **Zone D**

---

**9. Provide the NAICS (North American Industry Classification System) Code for your business that forms the basis of your Economic Loss Claim.** You can search for your code using www.census.gov/naics.

---

**Provide a description of your business:**

---

**10.** Businesses/employers that fall within the NAICS codes and descriptions marked with an "x" in Exhibit 19, Section II must answer the following question:

**In 2009, did your business provide significant services, goods, and/or supplies to businesses in the offshore Oil & Gas Industry in the Gulf of Mexico?** The Claims Administrator considers that an entity provided "significant" services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico in 2009 if 33% or more of its 2009 net revenue was derived from such activities.

☐ **Yes**    ☐ **No**

---

**If you are seeking Sweat Equity Compensation, complete questions 11-15 which apply only to Failed Start-Up Businesses as defined in the accompanying booklet called "Instructions for Completing the Failed Business Economic Loss Claim Form (Red Form)."** That booklet also explains Sweat Equity Compensation. Sweat Equity Compensation provides payment to Start-Up Business owners who provided services to the Failed Start-Up Business prior to when the business began operations but received no compensation or less than fair market value compensation. If you are not seeking Sweat Equity Compensation, go to Question 16.

---

**11. Did your business begin operations on or after November 1, 2008, and subsequently cease operations, declare bankruptcy or complete a liquidation of substantially all of its assets since May 1, 2010?**

☐ **Yes**    ☐ **No**

---

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-6
v.1

| | |
|---|---|
| **12.** **What is the Commencement Date of the Failed Start-Up Business?** The Commencement Date is the day that the Failed Start-Up Business began operations. | _____/_____/_____ <br> (Month/Day/Year) |
| **13.** **If your business began after November 1, 2008, what is the Sweat Equity Contribution Start Date?** Refer to the **Instructions for Completing the Failed Business Economic Loss Claim Form (Red Form)** to determine your Sweat Equity Contribution Start Date. | _____/_____/_____ <br> (Month/Day/Year) |
| **14.** **What is the Sweat Equity Benchmark Period Start Date?** Refer to the **Instructions for Completing the Failed Business Economic Loss Claim Form** to determine your Sweat Equity Benchmark Period Start Date. | _____/_____/_____ <br> (Month/Day/Year) |
| **15.** **What is the Sweat Equity Benchmark Period End Date?** The Sweat Equity Benchmark Period End Date means the end of the last full month preceding the Sweat Equity Contribution Start Date. | _____/_____/_____ <br> (Month/Day/Year) |
| **16.** **Did your business participate in the Vessels of Opportunity ("VoO") program?** | ☐ Yes     ☐ No |

**Identify any months after the Spill in which your business received revenue from the VoO program, and the amount of that revenue. Leave this section blank if your business did not receive any revenue because of participation in the VoO program.**

| | | | |
|---|---|---|---|
| ☐ **May 2010** | $ _____ | ☐ **September 2010** | $ _____ |
| ☐ **June 2010** | $ _____ | ☐ **October 2010** | $ _____ |
| ☐ **July 2010** | $ _____ | ☐ **November 2010** | $ _____ |
| ☐ **August 2010** | $ _____ | ☐ **December 2010** | $ _____ |
| | | ☐ **All Months 2011** | $ _____ |

**Identify any months after the Spill in which your business incurred expenses because of participation in the VoO program, and the amount of those expenses. Leave this section blank if your business did not incur expenses because of participation in the VoO program.**

| | | | |
|---|---|---|---|
| ☐ **May 2010** | $ _____ | ☐ **September 2010** | $ _____ |
| ☐ **June 2010** | $ _____ | ☐ **October 2010** | $ _____ |
| ☐ **July 2010** | $ _____ | ☐ **November 2010** | $ _____ |
| ☐ **August 2010** | $ _____ | ☐ **December 2010** | $ _____ |
| | | ☐ **All Months 2011** | $ _____ |

**17.** **Identify other sources of income to your business that can be used to reconcile tax returns with business financial statements, if any.**

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-6
v.1

**For Questions B.18 − B.21,** consult the Failed Business Economic Loss Instructions Booklet to determine if your business meets the definition or criteria.  Go online to www.deepwaterhorizonsettlements.com, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located and whether it meets the Tourism Definition.

| | |
|---|---|
| **18.** Is your business a Landing Site, Commercial Wholesale or Retail Dealer A, or a Primary Seafood Processor? | ☐ **Yes**       ☐ **No** |
| **19.** Is your business a Commercial Wholesale or Retail Dealer B, a Secondary Seafood Processor, a Seafood Wholesaler or Distributor, or a Seafood Retailer? | ☐ **Yes**       ☐ **No** |
| **20.** Does your business fall within the Tourism Definition? | ☐ **Yes**       ☐ **No** |
| **21.** Is your business a Charter Fishing Operation? | ☐ **Yes**       ☐ **No** |

## C. Documentation Required for a Failed Business Economic Loss Claim

In addition to this Claim Form, you must submit certain Supporting Documentation to prove your Failed Business Economic Loss Claim.  The list of required documents, and instructions for how to submit them, are in Section 4 of the Failed Business Economic Loss Instructions Booklet.  If you do not submit the required Supporting Documentation, the Claims Administrator will not be able to review your claim and you will not receive payment for your claim.

## D. Payment

1. **If You Have Your Own Attorney.**  Unless you check the box below, the Claims Administrator will make any payments jointly to you and to your attorney, which means that both you and your attorney will need to endorse the check before a bank will honor it.

   ☐ Check here if you want the Claims Administrator to make payments in connection with this and any other claim you may file in the Deepwater Horizon Economic and Property Settlement *only to your attorney*.  This means that the Claims Administrator will send your payment to your attorney, who will then pay you pursuant to the retainer agreement you have with him/her.

2. **If You Do Not Have Your Own Attorney.**  If you have not retained an attorney to represent you in connection with your Spill-related claim, the Claims Administrator will make any payments to which you are entitled directly to you by check.  Payment checks will be sent by First Class Mail to the address you provided in the Registration Form or to the address that the Claims Administrator confirms for you during the processing of your Claim.  **You have an obligation to notify the Claims Administrator if your address changes.**

   The Claims Administrator will report annually to federal and state taxing authorities, using a Form 1099 or state form equivalent, for certain payments made.  The Claims Administrator will send you a copy of that form, but cannot give you any tax advice regarding any payment issued to you.  You should consult with your own tax advisor to determine the tax impact of any payment you receive from the Claims Administrator.

3. **Garnishments, Liens and other Attachments.**  Legally authorized garnishments, liens, or similar forms of attachments relating to your claim will be honored and deducted from your payment.

4. **W-9 Form Requirement.**  All claimants must provide a W-9 Form.  To obtain a copy of that form, go to www.deepwaterhorizonsettlements.com, or request one at a Claimant Assistance Center or by calling 1-866-992-6174.

5. **Do you intend to seek reimbursement for Claimant Accounting Support Services in connection with your claim?**

   ☐ **Yes**        ☐ **No**

   If you check "Yes" for Question D.5, you must submit the documents listed in Section 4.F of the Failed Business Economic Loss Instructions Booklet.

CF-6
v.1

## E. Signature

I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that this Claim to the Court-Supervised Settlement Program under the Deepwater Horizon Economic and Property Damages Settlement is submitted in compliance with the Instructions for Completing the Registration Form and the  Instructions for Completing the Business Economic Loss Claim Form; that this Claim is submitted for loss of profits income or earnings; that I believe in good faith that such claimed actual losses were caused by, due to, or arising or resulting from the Deepwater Horizon Oil Incident, including the oil spill and response activities; that the information provided in this Claim Form is true and accurate to the best of my knowledge; and that supporting documents attached to or submitted in connection with this form and the information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Claim Form may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.

I certify that I am authorized to act on behalf of the business submitting this Claim Form.

By submitting this Claim Form, I consent to the use and disclosure by the Claims Administrator and those assisting the Claims Administrator of any information about me that they believe necessary and/or helpful to process my claim for compensation and any payment resulting from that claim.

| Signature: | | Date: | _____/_____/_____ (Month/Day/Year) |
|---|---|---|---|
| **Printed Name:** | First          Middle          Last | | |
| **Title:** | | | |

An authorized business representative must sign this Claim Form personally.

# Exhibit G

# October 23, 2013
# Notice of Filing Exhibit II.1

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois 60654

Richard C. Godfrey
To Call Writer Directly:                    (312) 862-2000                                    Facsimile:
(312) 862-2391                                                                          (312) 862-2200
richard.godfrey@kirkland.com              www.kirkland.com

October 9, 2013

**By Electronic Mail**

The Honorable Carl Barbier                          *IN CAMERA* SUBMISSION
United States District Court
Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130

Re:    BP's Memorandum in Support of its Motion for Entry of a Proposed Form
of Preliminary Injunction and Motion to Strike

Dear Judge Barbier:

Pursuant to the Court's October 3, 2013 Order, BP has submitted separately today its 5-page letter brief, with accompanying materials, in anticipation of this Friday's *in camera* setting.

However, in order for the Court to craft and enter an appropriate injunction in accord with the Fifth Circuit's October 2, 2013 decision, BP believes that the record for that injunction should not be so limited, and instead that BP should be provided with the opportunity to submit a more comprehensive memorandum, including declarations, addressing the specific issues raised by the Fifth Circuit. The complexity of the injunction issue, the public importance of the issue, and the amount of money implicated all justify more comprehensive briefing.

BP recognizes that the Court has limited the *in camera* submissions to 5-page letter briefs with their related materials. Nonetheless, BP would ask that the Court provide it with an opportunity to consider BP's more comprehensive memorandum in connection with the entry of a preliminary injunction. Rather than simply filing a public motion attaching its more comprehensive memorandum prior to this Friday's *in camera* hearing, BP is instead providing the Court and parties with courtesy copies of its Motion for Entry of a Proposed Form of Preliminary Injunction and the memorandum in support of the same. Then, during Friday's *in camera* hearing, BP would appreciate it if the Court would discuss with the parties the opportunity and procedures for making a more complete public record in connection with entry of the preliminary injunction ordered by the Fifth Circuit.

In addition, BP is providing a courtesy copy of its Motion To Strike the October 3, 2013 Declaration of Patrick Juneau, along with a Memorandum in Support. BP respectfully believes that the Declaration of Mr. Juneau is not correct, as BP has concluded based upon its review of claim files that the Settlement Program often uses cash-basis rather than accrual-basis accounting

Chicago      Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai

# KIRKLAND & ELLIS LLP

The Honorable Carl Barbier
October 9, 2013
Page 2

records when both are submitted by a claimant, and that even when the Settlement Program uses accrual-basis records it often does so in a manner that does not result in proper matching. BP believes that it should have had an opportunity to bring these issues to the Court's attention before the Court relied on the Declaration, and thus requests that Mr. Juneau's Declaration be stricken. As with the memorandum, BP respectfully requests time during Friday's *in camera* hearing to discuss its Motion to Strike.

We greatly appreciate the Court's time and consideration regarding these issues.

Respectfully submitted,

/s/ Richard C. Godfrey, P.C.

Richard C. Godfrey, P.C.

cc (by electronic mail):
The Honorably Sally Shushan
Special Master Louis Freeh
Frank Piantidosi
Patrick Juneau
Richard Stanley
Phillip Wittmann
Stephen Herman
James Roy
Joe Rice

# Exhibit H

# October 23, 2013
# Notice of Filing Exhibit II.2

SUBMITTED *IN CAMERA*
PURSUANT TO BP'S 10/9/13 LETTER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| This document relates to all actions. | * * * | |
| | | Honorable CARL J. BARBIER |
| | * * | |
| | | Magistrate Judge SHUSHAN |
| | * * * | |

## BP'S MOTION FOR ENTRY OF A PROPOSED FORM OF PRELIMINARY INJUNCTION IN COMPLIANCE WITH THE FIFTH CIRCUIT'S OPINION OF OCTOBER 2, 2013

On October 2, 2013, the United States Court of Appeals for the Fifth Circuit issued an opinion in *In re Deepwater Horizon*, Nos. 13-30315, 13-30329 (5th Cir. Oct. 2, 2013). That opinion concluded that the Claims Administrator's interpretation of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement's Business Economic Loss ("BEL") Framework "too quickly dismissed the concept of matching, and did not deal with the inconsistent results the court's interpretation gives to claims presented on an accrual-basis and those on a cash-basis." *In re Deepwater Horizon*, slip op. at 17-18. As the Fifth Circuit explained, the critical language of Exhibit 4C "cannot be interpreted so that it always means cash received and cash disbursed," *id.* at 10. While the Court of Appeals has suggested what it believes is the correct interpretation of Exhibit 4C, it has remanded the issue to the District Court to reconsider its analysis in the first instance. *See id.* at 18.

The Court of Appeals has concluded that the "balance of equities favors a tailored stay" during the pendency of proceedings on remand, and it has ordered this Court to "expeditiously

craft a narrowly-tailored injunction that allows the time necessary for deliberate reconsideration of these significant issues on remand." *Id.* at 35. According to the Fifth Circuit, that stay must be "tailored so that those who experienced [1] ***actual injury*** [2] ***traceable to loss*** from the Deepwater Horizon accident continue to receive recovery but those who did not do not receive their payments." *Id.* (emphasis added).

Following the Fifth Circuit's decision, this Court directed the parties to submit "a proposed draft for a narrowly tailored preliminary injunction order" by October 9, 2013. Rec. Doc. 11566 at 2. In compliance with the orders of the Fifth Circuit and this Court, BP is proposing a preliminary injunction that: (1) prohibits the Claims Administrator from implementing the January 15, 2013 Policy Decisions; (2) prohibits the Claims Administrator from processing or further processing the claims of or making payments to claimants whose claims were processed under, in accord with, or in any way dependent upon the Policy Decisions; (3) prohibits the Claims Administrator from making payments to claimants unable to establish actual injury traceable to the *Deepwater Horizon* accident, using "properly-matched"/"sufficiently-matched" financial data to support claims for lost profits and rejecting the use of "idiosyncratically-maintained records;" and (4) enjoins the Claims Administrator from (a) processing and holds in abeyance all Settlement Program appeals in which matching or the presence of an actual injury traceable to the *Deepwater Horizon* Incident is at issue and (b) all deadlines for seeking discretionary review in this Court of any Settlement Program decisions involving matching or the presence of an actual injury traceable to the *Deepwater Horizon* Incident.

For the reasons described in the accompanying memorandum of law, the form of injunction proposed by BP is necessary to comply with the Fifth Circuit's order, as well as to

avoid "the potential loss to a company and its public shareholders of hundreds of millions of dollars of unrecoverable awards." *In re Deepwater Horizon*, slip op. at 35. This form of injunction best comports with all of the requirements referenced in Part III of the Fifth Circuit's opinion as well as the supporting evidence BP submits today indicating that the matching problem has also become prevalent in additional industries beyond those where matching problems were apparent in March 2013, when BP first sought preliminary injunctive relief.

Accordingly, BP respectfully requests that the proposed form of preliminary injunction be entered as an order by the Court.

October 9, 2013

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

*OF COUNSEL*

Respectfully submitted,

     */s/ Richard C. Godfrey, P.C.*
Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kevin T. Van Wart, P.C.
Wendy L. Bloom
Jeffrey J. Zeiger
R. Chris Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Bossert Clark
Dominic E. Draye
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

_/s/ Don K. Haycraft_
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291


**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

# Exhibit I

# October 23, 2013
# Notice of Filing Exhibit II.3

SUBMITTED *IN CAMERA*
PURSUANT TO BP'S 10/9/13 LETTER

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | **MDL NO. 2179**<br><br>**SECTION J** |
| This document relates to all actions. | * * * * * * * * | **Honorable CARL J. BARBIER**<br><br>**Magistrate Judge SHUSHAN** |

## BP'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR ENTRY OF A PROPOSED FORM OF PRELIMINARY INJUNCTION IN COMPLIANCE WITH THE FIFTH CIRCUIT'S OPINION OF OCTOBER 2, 2013

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................. iv

INTRODUCTION .................................................................................................... 1

ARGUMENT ............................................................................................................ 3

I.  The Fifth Circuit Reversed The Claims Administrator's BEL Policy,
    Ordered A Preliminary Injunction, And Provided Significant Guidance To
    Frame The Remand Proceedings. ................................................................... 3

    A.  The Fifth Circuit Held That Matching Is Required For Accrual-Basis
        Claims, And Strongly Indicated That Matching Must Apply To All
        Claims. ...................................................................................................... 3

    B.  A Preliminary Injunction Should Be Entered So That Only Claimants
        Experiencing Actual Injury *And* Injury Traceable To The Incident Can
        Recover — Properly Preserving BP's Ability To Seek That Same
        Relief On A Permanent Basis. .................................................................. 5

II. A Tailored Injunction Capable Of Preventing Interim Harm From All Forms
    of Legal Error Identified By The Fifth Circuit Should Be Entered. ............... 7

    A.  Matching Problems Permeate *Both* Cash- And Accrual-Basis Business
        Claims. ...................................................................................................... 8

        1.  Multiple Current Settlement Program Policies Are Grounded
            On The Concept That Matching Is Not Required. ........................... 8

        2.  Significant Numbers Of Accrual- *And* Cash-Basis Claims
            Are Not "Properly Matched" And "Sufficiently Matched,"
            As The Fifth Circuit Held Is Required ........................................... 10

        3.  Even Where Claimants Purport To Match Because They
            Supposedly Use Accrual Accounting, The Settlement
            Program Fails To Require Such Claimants To Submit
            Accurate Financials ......................................................................... 13

        4.  Failing to Halt Matching Errors For All Types Of Claimants
            Risks Further Irreparable Harm Being Inflicted On BP. ................ 14

    B.  Causation Problems Independently Permeate Both Cash- And Accrual-
        Basis Claims ............................................................................................ 15

C.      Actual-Injury Problems Permeate Both Cash- And Accrual-Basis
        Claims. ................................................................................................16

III.    **BP's Proposed Process For Resolving The Possible Ambiguity Found In the
        Settlement Agreement.** ................................................................................**18**

IV.     **Putting An Appropriate Remand Process In Place And Then Developing A
        Detailed And Error-Free Substitute Policy And Accompanying Procedures
        In Conformity With The Principles Identified By The Fifth Circuit Will Take
        Time** .................................................................................................................**20**

        A.      BP's Proposed Matching And BEL Implementation Policy ................................20

        B.      BP's Proposed Actual Injury Approach ................................................23

        C.      The Fifth Circuit Contemplates A Deliberate Approach To Crafting A
                New Set Of BEL Policies And Procedures To Comply With Its
                Opinion. ................................................................................................24

        **CONCLUSION** ................................................................................................**25**

# TABLE OF AUTHORITIES

**Page**

## Cases

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) ................................................................................. 16

*Denney v. Deutsche Bank AG,*
  443 F.3d 253 (2d Cir. 2006) ................................................................... 16

*E\*Trade Fin. Corp. v. Deutsche Bank AG,*
  74 F. App'x 119 (2d Cir. 2010) .............................................................. 14

*Halvorson v. Auto-Owners Ins. Co.,*
  718 F.3d 773 (8th Cir. 2013) .................................................................. 16

*H-D Mich., LLC v. Hellenic Duty Free Shops S.A.,*
  694 F.3d 827 (7th Cir. 2012) .................................................................... 9

*In re Deepwater Horizon,*
  Nos. 13-30315, 13-30329 (5th Cir. Oct. 2, 2013) .......................... passim

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ................................................................................. 16

# INTRODUCTION

On October 2, 2013, the United States Court of Appeals for the Fifth Circuit decided *In re Deepwater Horizon*, Nos. 13-30315, 13-30329 (5th Cir. Oct. 2, 2013), reversing the Claims Administrator's interpretation of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement's Business Economic Loss ("BEL") Framework.  As the Fifth Circuit explained, the Claims Administrator's interpretation "is completely disconnected from any reasonable understanding of calculation of damages."  Slip op. at 23.  In contrast, the interpretation advanced by BP "seems amply supported by the language of Exhibit 4C and much more consistent with general accounting and economic norms."  *Id.* at 18.

The Fifth Circuit nonetheless remanded to the District Court to address BP's interpretation in the first instance.  It instructed this Court to "expeditiously craft" a "stay tailored so that those who experienced actual injury traceable to loss from the Deepwater Horizon accident continue to receive recovery but those who did not do not receive their payments until this case is fully heard and decided through the judicial process."  *Id.* at 35.

In the wake of the Fifth Circuit's ruling, there are two immediate questions for this Court: what injunction should the Court enter, and what proceedings should the Court conduct on remand?  This memorandum offers BP's answers to those two questions, while also outlining the substitute BEL Policy and accompanying procedures necessary to correct the prior misinterpretations of the BEL Framework.[1]

---

[1] In compliance with the Court's order of October 3, 2013, BP is submitting this memorandum *in camera*.  *See* Rec. Doc. 11566 at 2.  Given the importance of these proceedings to BP, the Class, and the public at large, however, BP respectfully submits that this Court's remand proceedings should be conducted in public.  *See In re Deepwater Horizon*, slip op. at 35.  BP accordingly requests that the Court issue an order docketing BP's submissions and providing that the status conference scheduled for October 11, 2013, will be held on the record in open court.

*First*, the Fifth Circuit held that proper matching of revenue and expenses is required for claims submitted using accrual-basis financials, and strongly suggested that such matching should also be required for claims submitted using cash-basis financials. Yet under existing policies, proper matching is not required *at all* — either for cash-basis, *or* for accrual-basis financials. The result is that claimants with no injury, or with no injury arising from the spill, receive significant payments. BP submits that the injunction entered by this Court must be sufficient to prevent the irreparable harm to BP of unmatched claims being paid, whether those claims purport to rely on the accrual basis, the cash basis, or some idiosyncratic amalgam.

*Second*, with respect to the proceedings on remand, the Fifth Circuit indicated that BP's interpretation is reasonable as it comports with the text and purposes of the Settlement. *See In re Deepwater Horizon*, slip op. at 18. Indeed, it reached this conclusion and vacated the Claims Administrator's interpretation despite reviewing the "significant parol evidence" advanced by Class Counsel and relied upon by the Claims Administrator. *Id.* at 21. For that reason, and in compliance with the Court's order, BP has proposed policy language that complies with the Fifth Circuit's opinion. If Class Counsel have any additional parol evidence to add, they should be permitted to present it on a schedule set by the Court (with BP having a corresponding right to respond). But if — as BP suspects — they do not, the Court should instruct the Claims Administrator to implement policies guaranteeing sufficient matching of revenues and expenses for all claims while also ensuring that claimants that did not suffer injuries attributable to the *Deepwater Horizon* spill are ineligible for payment. The new policy and its accompanying procedures cannot be devised and implemented immediately, but the parties and the Court can work to prepare the necessary reforms within the sixty days that the Fifth Circuit has allotted for these remand proceedings.

**ARGUMENT**

I.      **The Fifth Circuit Reversed The Claims Administrator's BEL Policy, Ordered A Preliminary Injunction, And Provided Significant Guidance To Frame The Remand Proceedings.**

The Fifth Circuit's decision reversed the order affirming the Claims Administrator's BEL Policy and remanded for entry of a protective injunction and for this Court and the parties to address several issues necessary to craft a BEL compensation policy compliant with the Settlement Agreement, Federal Rule of Civil Procedure 23, and Article III of the Constitution. *See In re Deepwater Horizon*, slip op. at 35-36. The issues that must be addressed on remand to bring the Program into compliance include matching revenues and expenses using accurate data ("sufficient" and "proper" matching, *id.* at 18-21), and ensuring that claimants have experienced actual injuries traceable to the *Deepwater Horizon* incident.

A.      **The Fifth Circuit Held That Matching Is Required For Accrual-Basis Claims, And Strongly Indicated That Matching Must Apply To All Claims.**

The Fifth Circuit laid out several fundamental principles of accrual accounting. *See In re Deepwater Horizon*, slip op. at 11-12 & n.4. Accrual accounting "recogni[zes] revenue when the entity becomes entitled to receive payment, as opposed to the when the payment is actually received." *Id.* at 11. "Expenses that can be readily traced to the recognized revenues are themselves recognized at the same time as those revenues." *Id.* Indeed, "even those expenses that cannot be directly traced to certain revenues are often allocated over multiple time periods, even if the cash outlay occurs all at once." *Id.* at 11 n.4. This correspondence of revenues and expenses "is sometimes referred to as 'matching' revenues and expenses, but in any case [] is a fundamental aspect of day-to-day record-keeping on the accrual-basis." *Id.* at 11-12. In contrast, "[c]ash accounting can be useful for many enterprises as a method of analyzing periodic cash

needs, but this use is largely unrelated to the concepts of 'revenue' and 'expenses,'" *id.* at 11, which are the words in the Settlement's BEL compensation framework.

The Fifth Circuit noted that the BEL order under review might have been "holding that the cash-in, cash-out interpretation applied to all claims, including those supported by accrual accounting." *See id.* at 15. The Fifth Circuit clarified that the BEL compensation framework set forth in Exhibit 4C "cannot be said to permit ignoring sufficiently matched data from accrual-basis claimants." *Id.*

For claims using cash-basis accounting or other methods that necessarily do not include matching, the Fifth Circuit ultimately held that "Exhibit 4C is ambiguous as to whether claims that are not based on matched revenues and expenditures are to be matched for Exhibit 4C purposes." *See id.* at 23. The Fifth Circuit remanded to this Court to develop the factual record, including "whether, before the agreement was signed, the parties discussed the divergent effects of cash- and accrual-basis accounting records on the Exhibit 4C formula." *Id.* at 23-24.

The Fifth Circuit opined that several interpretive principles weigh powerfully in BP's favor with respect to the interpretation of Exhibit 4C. Exhibit 4C's language "reasonably could be interpreted to mean that the expenses to be subtracted must be those that 'correspond' to the revenue earned and that the 'same time period' refers to the Benchmark period on the one hand, and to the Compensation period on the other, whichever is being calculated." *Id.* at 18. Indeed, such "an interpretation seems amply supported by the language of Exhibit 4C and much more consistent with general accounting and economic norms." *Id.* This interpretation also is supported by the Settlement's requiring "'sufficiently-matched' revenue and expenses from accrual-basis claimants." *Id.* Moreover, because "cash accounting does not inherently recognize relationships between cash flows and their underlying transactions, the term 'corresponding

4

variable expenses' reasonably could imply an accrual-style framework inherent in Exhibit 4C." *Id.* at 19-20.

In contrast, the Fifth Circuit expressed serious doubt about the reasonableness of interpreting Exhibit 4C as not requiring matching for all claims. That "doubt is particularly strong due to the fact that only matching provides a realistic chance of achieving the ostensible goal of the settlement of compensating claimants for real losses." *Id.* at 21. "[S]ubtracting temporally-related revenues and expenses recorded by cash-basis claimants would not result in numbers that could fairly be said to represent actual economic losses or lost 'variable profits.'" *Id.* at 17. Indeed, such an interpretation would lead to some claimants being compensated for lost variable profits while others would be compensated for negative cash flows "based solely on how claimants maintained their financial records," a result "difficult to understand." *Id.* A "claimant's idiosyncratically-maintained records" cannot "dictate the way Exhibit 4C is applied to a claim, especially if Exhibit 4C is supposed to be an objective formula." *Id.* at 21. Finally, the Fifth Circuit cautioned that after "all the other arguments are considered, it remains of significance that the interpretation urged by the Administrator is completely disconnected from any reasonable understanding of calculation of damages." *Id.* at 23.

**B.    A Preliminary Injunction Should Be Entered So That Only Claimants Experiencing Actual Injury *And* Injury Traceable To The Incident Can Recover — Properly Preserving BP's Ability To Seek That Same Relief On A Permanent Basis.**

Part III of the opinion, which was adopted by a majority of the panel, requires this Court to enter a preliminary injunction limiting payment to "those who experienced [1] ***actual injury*** [2] ***traceable to loss from the Deepwater Horizon accident***." *In re Deepwater Horizon*, slip op. at 35 (emphasis added); *see also id.* at 37 (Southwick, J., concurring) (agreeing that injunction

should be entered "as stated in Part III" of the majority opinion). Part III of the opinion is clear as to the fundamental parameters of the preliminary injunction the Fifth Circuit ordered.

An injunction of that scope will preserve the Court's ability to order such relief on a permanent basis. Indeed, Part II of the opinion written by Judge Clement explained her view that "BEL claimants who admittedly either have suffered no loss at all or have suffered losses that were not caused by the oil spill … would have no colorable legal claim." *Id.* at 25. Such claimants lack standing. Significantly, a class "must therefore be defined in such a way that anyone within it would have standing," meaning that the class must be defined so that all class members have colorable legal claims. *Id.* at 27-28 (internal quotation omitted). Even if a defendant attempted to achieve "global peace" by allowing claimants without standing to recover from the settlement (which BP did not agree to allow), such a motive could not remedy the class certification problem. *Id.* at 30-31. Applying these principles to the Settlement, Judge Clement found that the Settlement must be interpreted so as to exclude those without colorable claims:

> Turning to the present case, the district court had no authority to approve the settlement of a class that included members that had not sustained losses at all, or had sustained losses unrelated to the oil spill, as BP alleges. If the Administrator is interpreting the Settlement to include such claimants, the Settlement is unlawful. Should BP's proposed interpretation of the Settlement exclude putative class members with no colorable legal claim, the district court should have rendered the Settlement lawful by adopting that interpretation, as long as the interpretation is reasonable and effective.

*Id.* at 31. Judge Clement emphasized that interpreting the Settlement to include "businesses without colorable legal claims . . . could imperil a final approval of the settlement and can be considered in evaluating the correct interpretation of possible ambiguities." *Id.* at 33.

Judge Southwick explained that this portion of Judge Clement's opinion "is logical in finding that constitutional infirmities would exist if certain corrections are not made to the

6

interpretation of Exhibit 4C." *Id.* at 37 (Southwick, J., concurring). Judge Southwick divided his concurrence into a discussion of (1) loss measurement, meaning proof of "properly" computed "economic loss"; and (2) loss causation, meaning weeding out those who have suffered losses that were not caused by the oil spill. *Id.* at 37-38. He agreed with Judge Clement that including claimants who had no losses at all would raise serious Rule 23 concerns. "[I]f the methods of computing losses do not, at least for a large number of claimants, determine in any reasonable fashion whether a financial loss actually occurred, there are significant Rule 23 problems in the incoherence of the calculation method. … [T]o allow the means of showing loss to become disconnected from economic realities threatens to distort entry into the class and is a defect under Rule 23." *Id.* at 39. Thus, both Judges Clement and Southwick agreed that allowing persons with no losses into the class would jeopardize certification under Rule 23.[2]

## II.    A Tailored Injunction Capable Of Preventing Interim Harm From All Forms of Legal Error Identified By The Fifth Circuit Should Be Entered.

The Fifth Circuit directed this Court to determine, *inter alia*, whether the Claims Administrator and Settlement Program were matching revenues and expenses properly and sufficiently. *See id.* at 16-24. Unfortunately, the Settlement Program does not in fact do so for many claimants, and instead accepts whatever financial records are tendered by a claimant without performing or requiring sufficient matching even as to claimants purporting to use accrual accounting. Additionally, the Court also remanded for consideration of the issue of

---

[2] As for causation, Judge Southwick stated that this issue had not been briefed and he therefore declined to address it on the merits at this stage of the appeal. *See In re Deepwater Horizon*, slip op. at 37, 39. Instead, Judge Southwick "would only have identified the relevant principles and authorities, then remanded for such consideration as the parties and the district court bring to ***the issue of causation*** as they address the measurement of loss." *Id.* at 39-40 (emphasis added). Therefore, Judges Clement and Southwick both held that this Court and the parties must consider the impact on class certification of including persons without losses caused by the *Deepwater Horizon* Incident in the class when framing a policy for compensating BEL claims. This is an undeniable part of the issues remanded by the majority.

causation in light of its potential impacts on the ability of the Settlement to secure final approval. *See id.* at 33; *see also id.* at 37-40 (Southwick, J., concurring).

As described below, there are four overarching problems with the Program as it currently operates. **First**, the Settlement Program's formal policies do not require matching, a problem that includes but certainly is not limited to the BEL policy itself. *See infra* Section II.A.1. **Second**, in reliance upon those policies, the Settlement Program has not required matching, either for cash-basis or accrual basis claims. *See infra* Section II.A.2. **Third**, even where claimants purport to match or engage in accrual accounting, the Program uses flawed revenue and expense data for purposes of both loss calculations under Exhibit 4C and the causation tests under Exhibit 4B. *See infra* Section II.A.3. **Fourth**, the Program is improperly (and in a fashion that threatens the viability of the entire Settlement) paying the claims of those who have no actual losses or who have no losses caused by the spill. *See infra* Section II.B.-C.

## A. Matching Problems Permeate *Both* Cash- And Accrual-Basis Business Claims.

The Claims Administrator's defective notion that matching is not required permeates all aspects of the Settlement Program. For that reason, BP submits that the injunction issued by the Court must stop payment of *all* BEL claims that are affected by the Settlement Program's failure to match. The proposed form of injunction BP is filing in compliance with this Court's Order of October 3, 2013, *see* Rec. Doc. 11566, is designed to comply with the Fifth Circuit's instructions in Part III of its opinion.

### 1. Multiple Current Settlement Program Policies Are Grounded On The Concept That Matching Is Not Required.

Any injunction adequate to meet the Fifth Circuit's standards must encompass every Settlement Program policy or procedure erroneously premised on the view that matching

8

revenues and expenses was unnecessary. This defective view manifests itself in a variety of settings, and locating and correcting all of them will require an injunction that is not underinclusive by being directed solely at the January 15, 2013 Policy Decisions. After all, "tailored" does not mean "tiny" — the pervasiveness of the Program's erroneous no-matching premise requires a correspondingly protective injunction. *See, e.g.*, *In re Deepwater Horizon*, slip op. at 35 (stay should be tailored so that those who did not "experience[] actual injury traceable to loss from the Deepwater Horizon accident . . . do not receive their payments"); *see also H-D Mich., LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 843 (7th Cir. 2012) ("[T]he injunction must also be broad enough to be effective.").

The Claims Administrator contends that one of the key BEL policies does not need reconsideration and is already compliant with the Fifth Circuit's remand, but in reality Policy 464 plainly requires reconsideration. *See* Decl. of Patrick A. Juneau, Rec. Doc. 11566 (Oct. 3, 2013). Policy 464 concerns the Settlement Program's treatment of monthly and annual Profit and Loss ("P&L") statements, which could reflect either (or both) cash- and accrual-basis accounting. As the Fifth Circuit observed, accrual-basis accounting lends itself to the type of matching that is necessary to apply the terms of the Settlement Agreement. In fact, the Fifth Circuit expressed its expectation that the Program would never convert accrual-basis P&L statements to cash-basis, thereby "ignoring already-matched revenues and expenses." *In re Deepwater Horizon*, slip op. at 15. Yet, Policy 464 states only that "the Claims Administrator *typically* will use the accrual-basis P&Ls." Policy 464 (emphasis added). An exception appears available, *inter alia*, when a claimant has submitted both cash-basis and accrual-basis P&Ls; in that case, "the Claims Administrator will use only cash basis P&Ls or accrual basis P&Ls consistently across all months . . . ." *Id.* at 4. This policy does not commit the Claims

Administrator to using available accrual-basis financials. This policy needs revision to remove any possibility of disregarding properly matched accrual-basis accounting.

In addition, notwithstanding the Claims Administrator's specific assertion that the Settlement Program always processes the accrual-basis financials submitted by claimants, *see* Rec. Doc. 11566 at 3, many claimants have elected to submit both accrual- *and* cash-basis statements. Of 35 such cases, the Settlement Program in 17 cases computed the compensation determination using the cash-basis statements. *See* Brents Decl. (Ex. C) ¶ 6.

Other examples abound. As Gaspardo explains, "[t]here are over 100 CSSP policies relating to BEL implementation," and "all BEL-related policies should be reviewed during the remand process for compliance with the Fifth Circuit's opinion." Gaspardo Decl. (Ex. D) ¶ 24; *see also* Gaspardo Decl. (Ex. D) Ex. C (identifying a non-exhaustive list of twelve specific Settlement Program policies that require reevaluation). While those examples are not exhaustive, they illustrate the variety of contexts in which the premise that matching is not required by the Agreement has woven itself into the fabric of the Program.

## 2. Significant Numbers Of Accrual- *And* Cash-Basis Claims Are Not "Properly Matched" And "Sufficiently Matched," As The Fifth Circuit Held Is Required.

In reliance on its flawed policies, the Settlement Program is not engaging in matching — the only method that "provides a realistic chance of achieving the ostensible goal of the settlement of compensating claimants for real losses." *In re Deepwater Horizon*, slip op. at 21. Critically, "even where BEL claimants purport to follow accrual basis accounting, and where the claimant's annual P&Ls are accurately prepared on the accrual basis, the monthly P&Ls will frequently be inaccurate and unreliable." Gaspardo Decl. (Ex. D) ¶ 8.

10

Expert economist Hal Sider analyzed a significant sample of profit and loss data "submitted by BEL claimants and compiled by the CSSP in the ordinary course of its review of BEL claims." Sider Decl. (Ex. E) ¶ 4. His analysis confirms that matching problems "are not limited to claimants that rely on cash basis P&L data." *Id.* ¶ 9. Specifically, Sider used seven metrics to identify "identify claims for which monthly revenue is unlikely to be matched to corresponding variable expenses." *Id.* ¶ 11. Those include (1) claims with monthly revenue spikes (56% of BEL offers);[3] (2) claims with monthly variable expense spikes (69% of BEL offers); (3) claims with wide month-to-month swings in variable profit margin ("share spike") (65% of BEL offers); (4) claims with negative revenue items reported in monthly financial data (6% of BEL offers); (5) claims with months with negative variable expenses (45% of BEL offers); (6) claims with months with negative variable profit (60% of BEL offers); and (7) claims with bad debt expenses clustered in a single month (20% of BEL offers). *Id.* Overall, 94% of claims meet at least one of these metrics. *Id.* ¶ 12.

The accrual-basis label is no panacea. *See* Gaspardo Decl. (Ex. D) ¶ 8 ("In short, the label 'accrual basis' on a P&L submitted by a BEL claimant in and of itself does not mean the P&L is 'accurate and reliable' or 'sufficiently matched' as the Fifth Circuit confirmed is required . . . ."). In fact, the accrual claims appear to suffer matching problems at least as frequently as the sample as a whole. From a random sample of 500 BEL claims, Sider concluded that 56% of accrual claimants satisfied the revenue spike criterion, compared to 55% for the full BEL sample; 64% of accrual claimants satisfied the variable cost criterion, compared to 66% for the full sample; 70% satisfied the share spike criterion, compared to 66% for the full BEL sample;

---

[3] "Where accrual basis P&Ls are consistently and accurately prepared, in many cases "margins" (the profit from each dollar of revenue) tend to remain relatively consistent over time. This makes sense as most businesses operate similarly from month-to-month, and generally show consistent operating results and profits from those operations. Gaspardo Decl. (Ex. D) ¶ 9.

10% of accrual claimants satisfied the negative revenue criterion, compared to 8% for the full sample; 70% of accrual claimants satisfied the negative variable cost criterion, compared to 68% for the full sample; 75% of accrual claimants satisfied the negative variable profit criterion, compared to 67% for the full sample; and 48% of accrual claimants satisfied the bad debt criterion, compared to 35% for the full sample.  *See* Sider Decl. (Ex. E) ¶ 32 & tbl. 5.

A further problem arises from the practice of many business claimants of idiosyncratically blending cash and accrual methods.  As Gaspardo explained, "[i]nconsistently or idiosyncratically applied accrual-basis principles either on a temporal (month-to-month) or account-by-account basis create mismatching distortions similar to cash basis statements." Gaspardo Decl. (Ex. D) ¶ 10.  For example, records purporting to employ the accrual basis nevertheless "will not reflect cost of inventory sold, will not contain proper accruals for payroll bonuses, will not update estimates, will contain cut-off errors, will maintain certain accounts on the cash basis, or will include other inaccuracies where accrual principles are not followed on a monthly basis." *Id.* ¶ 12.

Notwithstanding the fact that ostensible accrual records are often not properly matched, claimants have suggested in the wake of the Fifth Circuit opinion that as long as they submit accounting records that they say were kept on an accrual basis, no further analysis by the Settlement Program is necessary.  *See, e.g.*, Final Proposal Regarding Claim No. XXXX21 ("This argument is without merit because [claimant] utilizes the accrual method of accounting, and thus sufficiently 'matches' revenue and expenses as a matter of its ordinary record-keeping.").  This position represents a gross misreading of the Fifth Circuit's opinion.  The Fifth Circuit did not craft a safe harbor or transform the purported use of accrual accounting into a talisman that would exempt claimants from true matching — particularly where the financial

12

records presented are not accurately maintained using the accrual method. To the contrary, the Court recognized only that "**_properly-matched_** accrual-basis claims should not be disturbed." *In re Deepwater Horizon*, slip. op. at 21 (emphasis added); *see also id.* at 19. Accrual claims that do not reflect properly-matched/sufficiently-matched revenue and corresponding variable expenses must be scrutinized and corrected to ensure accurate matching.

### 3. Even Where Claimants Purport To Match Because They Supposedly Use Accrual Accounting, The Settlement Program Fails To Require Such Claimants To Submit Accurate Financials.

Nor is it accurate to describe the problem as simply matching *vel non.* The Fifth Circuit held that "a claimant's idiosyncratically-maintained records" should not "dictate the way Exhibit 4C is applied to a claim, especially if Exhibit 4C is supposed to be an objective formula." *In re Deepwater Horizon*, slip. op. at 21. As BP has explained, an equally serious problem is the submission and continued processing of **_knowingly incorrect financial data_**.

One example of incorrect data involves financials that are corrected in the year-end "true ups" common in certain industries. *See, e.g.*, Hall Supp. Decl. (Rec. Doc. 8963-41) ¶¶ 10-13 (example of a construction firm that corrects its inaccurate monthly revenue data only at the end of the year); *see also* Alexander Decl. (Rec. Doc. 8963-36) ¶¶ 14-16; Sider Decl. (Rec. Doc. 8963-46) ¶ 40; *see also* Gaspardo Decl. (Ex. D) ¶ 14. For these businesses, the Claims Administrator's interpretation miscalculates lost profits because adjustments made at year end — or any other time of the year — mean that figures for both the month of the adjustment and for the months being corrected will be inaccurate. *Id.* Program accountants have flagged errors caused by year-end "true ups," and yet claims awards have ultimately been made without correction. *See* Gaspardo Decl. (Ex. D) ¶ 18. As BP established in the Fifth Circuit, failure to use the "foundational" method of matching, which is necessary to "provide[] a realistic chance of

. . . compensating claimants for real losses" inevitably leads to a process of garbage-in/garbage-out. *In re Deepwater Horizon*, slip op. at 21, 24; *see also* BP 5th Cir. Merits Br. at 25 (citing *E*Trade Fin. Corp. v. Deutsche Bank AG*, 374 F. App'x 119, 121 (2d Cir. 2010)).

A related problem is that a "P&Ls . . . created for purposes of submitting a BEL claim present[] an additional risk of intentional use of mismatched monthly revenue and variable expenses to obtain a BEL award under the Settlement." Alexander Decl. (Ex. B) ¶ 15. "Although this presents significant concerns that the documentation may be either inaccurate or drafted specifically for purposes of the claim — which raises serious fraud risks — the CSSP fails even to follow up on this issue to request additional information approximately 85% of the time." *Id.*; *see also id.* ("Most of the time (96%) P&Ls are submitted by BEL claimants with no date (47% of the time) or a non-contemporaneous date (49% of the time).") Moreover, in more than 60% of the claims that Alexander reviewed, "there is a discrepancy between the annual revenue and net income amounts reported in P&Ls submitted by the claimant and the claimant's tax returns." *Id.* ¶ 16. "These differences are indicative of misapplication of claimants' bases of accounting, the use of different accounting bases for the preparation of the claim and/or other errors. However, the CSSP does not request additional information to reconcile these significant discrepancies 34% of the time, posing a significant risk of inaccurate submissions and potential fraudulent activity." *Id.*

### 4. Failing to Halt Matching Errors For All Types Of Claimants Risks Further Irreparable Harm Being Inflicted On BP.

These proceedings involve the "potential loss to [BP] and its public shareholders of hundreds of millions of dollars of unrecoverable awards." *In re Deepwater Horizon*, slip. op. at 35. And indeed, between the beginning of March and the end of September 2013, "the

14

cumulative number of BEL offers made by the CSSP increased by more than 150% — from 4,801 on March 3, 2013 to 12,327 on September 29, 2013." Sider Decl. (Ex. E) ¶ 7. The injunction should appropriately reflect the risk of serious irreparable harm to BP.

> **B.    Causation Problems Independently Permeate Both Cash- And Accrual-Basis Claims.**

As described above, the Fifth Circuit's opinion recognizes that the payment of awards to claimants who have not suffered injuries causally related to the spill raises serious questions under both Rule 23 and Article III. *See supra* Section I.B; *see also In re Deepwater Horizon*, slip op. at 35 (payment should be limited "those who experienced [1] ***actual injury*** [2] ***traceable to loss from the Deepwater Horizon accident***") (emphasis added). Moreover, the Claims Form that is submitted by Business Economic Loss claimants describes how to make a claim "for damages arising from the Deepwater Horizon Incident on April 20, 2010." *Deepwater Horizon* Economic and Property Settlement Business Economic Loss Claim Form (Purple Form) at 1, *available* at http://www.deepwaterhorizoneconomicsettlement.com/docs/claim/Business_Economic_Loss_Claim_Form.pdf, and the form further requires the claimant to certify that all information submitted on the claim form is true and accurate. *See id.* at 9.

Many claimants have asserted losses with no apparent connection relation to the oil spill. For example:

- Claim No. XXXX02:  Claimant is a Zone D excavating company located in Alabama. The Settlement Program awarded Claimant $2,798,893 pre-RTP ($3,502,760 post-RTP). Claimant sold substantially all of its assets in August 2009.

- Claim No. XXXX60:  Claimant is a Zone D attorney located in Northern Louisiana. The Settlement Program awarded Claimant $136,066.86 pre-RTP ($172,252.58 post-RTP). Because Claimant's business license was revoked on November 21, 2009 and was not reinstated until September 11, 2012, Claimant only recorded approximately $3,000 in revenue during the entirety of 2010 and 2011.

*See* Gaspardo Decl. (Ex. D) Ex. B ¶¶ 8, 9.

Indeed, Sider's analysis demonstrates that "fully 59% of BEL claimants that gained eligibility through the V-test would have failed this test had it been applied based on aggregate May-December revenue." Sider Decl. (Ex. E) ¶ 27. Such a finding "raises concerns . . . and warrants a careful review of the monthly revenue data to ensure that eligibility is not due solely to errors in reported monthly revenue." *Id.* Moreover, 39% of claimants "narrowly passed" the V-test, implying that "the monthly revenue data that are the basis of claimant's eligibility must be carefully reviewed to ensure that a favorable eligibility determination is not due to errors in reported monthly revenue alone." *Id.* ¶ 29. Accordingly, it is necessary to develop procedures to identify claims suspected to have no causal connection to the spill. *See* Ex. F at 5-7.

### C.     Actual-Injury Problems Permeate Both Cash- And Accrual-Basis Claims.

Rule 23 "must be interpreted in keeping with Article III constraints." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Consistent with this principle, courts have regularly held that "for a class to be certified, each member must have standing and show an injury in fact that is traceable to the defendant and likely to be redressed in a favorable decision." *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013); *accord Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("[N]o class may be certified that contains members lacking Article III standing."). And it is of course black-letter law that a plaintiff cannot have standing absent an ***injury in fact*** that is causally connected to the defendant's conduct and redressable by a favorable court decision. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). It is for that reason that the Fifth Circuit has instructed this Court to enter a "stay tailored so that those who experienced ***actual injury traceable to loss from the Deepwater***

16

*Horizon accident* continue to receive recovery but those who did not do not receive their payments." *In re Deepwater Horizon*, slip op. at 35 (emphasis added).

In light of these legal principles, the Settlement Program must reform its policies so that claimants who have suffered no injury do not receive payments. Yet under current policies, "matching problems . . . result in BEL offers being extended to large numbers of claimants that suffered no loss in variable profit" Sider Decl. (Ex. E) ¶ 35. "Evaluation of a claimant's losses in variable profits over longer periods reduces the potential influence of errors in measurement of monthly revenue and corresponding variable expenses." *Id.* ¶ 14. "Where BEL claimants appear not to have suffered reductions in variable profits measured over longer periods but nonetheless obtain compensation under the CSSP's application of the BEL framework, the CSSP award likely is the result of errors in matching monthly revenue to the corresponding variable expenses." *Id.* The results indicate that "31% of claimants receiving BEL offers did not experience a loss in variable profit measured over the May-December or January-December periods in 2010 relative to the same months in the Benchmark Period." *Id.* ¶ 16.

Another method for identifying claims that were unlikely to have suffered any losses is to ask whether they participated in the Gulf Coast Claims Facility ("GCCF") process, which did not require a release to receive an emergency or interim payment. *See* Sider Decl. (Ex. E) ¶ 23. Remarkably, approximately *85%* of BEL offers since March have been made to businesses that did not participate in the GCCF. *Id.* Had these businesses believed that they suffered actual losses, it is unclear why they would not have participated because no release was required and thus their participation to obtain emergency or interim GCCF payments had no downside.

Finally, actual awards confirm what the statistics reveal. For example:

- <u>Claim No. XXX76</u>:  Claimant is a cotton, corn, soybean and wheat farm located more than 300 miles from the Gulf of Mexico.  The Settlement Program awarded Claimant more than $550,000, even though Claimant's 2010 variable profit before payroll exceeded its variable profit from the three preceding years by more than 42%.

- <u>Claim No. XX18</u>:  Claimant is a highway paving contractor located hundreds of miles from the Gulf of Mexico.  The Settlement Program awarded the claimant $7.7 million in pre-RTP compensation ($9.6 million post-RTP), notwithstanding that 2010 was the Company's best year on record (gross profits were $1.3 million greater than any other year).  This award implies that, in the absence of the Spill, Claimant's 2010 profit margin would have doubled over its actual record 2010.

Gaspardo Decl. (Ex. D) ¶¶ 23, 25.

## III.  BP's Proposed Process For Resolving The Possible Ambiguity Found In the Settlement Agreement.

The Fifth Circuit rejected Class Counsel's position that the Settlement Agreement does not require matching, notwithstanding the "significant parol evidence" that Class Counsel cited in support of its position.  *See In re Deepwater Horizon*, slip op. at 21.  Hence, it would be improper to revisit that parol evidence; its insufficiency is law of the case because the Fifth Circuit already has considered and rejected it.  The Fifth Circuit nonetheless held that "Exhibit 4C is ambiguous as to whether claims that are not based on matched revenues and expenditures are to be matched for Exhibit 4C purposes."  *Id.* at 23.  Rather than resolve this ambiguity immediately, the Fifth Circuit "remand[ed] to the district court to develop a more complete factual record regarding the meaning of Exhibit 4C or other relevant parts of the agreement and make relevant findings."  *Id.* at 23-24.

BP submits that the remand proceedings should have three objectives:  (1) to determine whether Class Counsel relies on any parol evidence other than that already considered and rejected by the Fifth Circuit and/or to receive BP's parol evidence, as necessary; (2) to devise a solution to the problem of fictitious claims and inflated losses; and (3) to determine what policy

and documentary changes are necessary to solve the "causation" problems identified by the Fifth Circuit.

To develop a record that will achieve these objectives and enable this Court to make the findings contemplated by the Fifth Circuit, BP proposes the following schedule and proceedings:

*First*, if Class Counsel still contend that the parties agreed that matching principles do not apply to cash-basis claims, Class Counsel shall submit within fourteen days a brief and all additional evidence on which Class Counsel rely to support this contention. This submission should not rehash arguments and evidence that the Fifth Circuit already has considered and found insufficient. If Class Counsel have no evidence to add, their submission should focus on their proposals to ensure that matching principles are properly applied. BP would then have fourteen days to respond to Class Counsel's submission with its proposals and, if necessary, supporting parol evidence.

*Second*, following the exchange of these written submissions, the parties should have a ten-day period, or longer if appropriate, to meet and confer with Special Master Freeh to determine whether agreement can be reached to resolve the issues raised in the respective submissions.

*Third* and finally, if the parties cannot reach agreement on the issues raised by these submissions, the Court would hold an evidentiary hearing to resolve these issues and make the findings contemplated by the Fifth Circuit. In advance of the hearing, the parties would identify any witnesses they intend to call and evidence they intend to present.

**IV.    Putting An Appropriate Remand Process In Place And Then Developing A Detailed And Error-Free Substitute Policy And Accompanying Procedures In Conformity With The Principles Identified By The Fifth Circuit Will Take Time.**

In this final section, BP describes in broad strokes the new policy that it submits the Settlement Program should enter as a result of the Fifth Circuit's remand. Nonetheless, it will take time to (1) put the right remand process in place and exchange the party submissions described in Section III above; and (2) fully develop substitute Program procedures, including correcting and/or modifying existing Program policies that are based upon the assumption that matching is not required. Thus, the preliminary injunction must remain in place long enough to prevent the payment of illegitimate or suspect claims while that important work is completed.

**A.    BP's Proposed Matching And BEL Implementation Policy**

BP's draft policy (Ex. F) is based upon the Fifth Circuit's BEL Ruling, which confirms BP's prior submissions in this Court. It sets forth the overall conceptual framework that must be used in developing new procedures for the proper handling of BEL claims.[4]

***General Framework For BEL Claims***. The "goal of the settlement" is to "compensat[e] claimants for real losses" resulting from the Deepwater Horizon incident. *See* Ex. F at 1 (quoting *In re Deepwater Horizon*, slip op. at 21). Furthermore, an "accrual-style framework" is necessary to "determin[e] actual economic losses," because cash-basis accounting does "not result in numbers that could fairly be said to represent actual economic losses or lost 'variable profits.'" *See id.* (quoting *In re Deepwater Horizon*, slip op. at 17, 19-21).

The "requirement of matching is foundational for accrual-basis claims," and "only matching provides a realistic chance of achieving the ostensible goal of the settlement of

---

[4]  In addition, because other economic loss frameworks, including but not limited to the Multi-facility, Start-Up and Failed Business Frameworks, require both accurate determination of monthly revenue and corresponding variable expense and actual injury caused by the spill, the principles in BP's proposed policy are fully applicable to those types of claims as well.

compensating claimants for real losses." *See id.* (quoting *In re Deepwater Horizon*, slip op. at 21, 24). Accordingly, regardless of the accounting method used by a claimant, the Settlement Program must calculate all BEL awards pursuant to a "properly-matched accrual-basis" approach, because only "properly matched claims lead to fair and proper results." *See id.* (quoting *In re Deepwater Horizon*, slip op at 20-21).

*Step One Compensation*. Determination of the Step One Compensation amount is based on Exhibit 4C. For computation of Variable Profit, under Exhibit 4C, the claims shall be processed by following the two-step calculation described on page 2 of Exhibit 4C:

1. Sum the monthly revenue over the period.

2. Subtract the corresponding variable expenses from revenue over the same period.

This two-step process requires the use of matching principles as stated above. *See id.* at 2.

*Revenue Recognition*. The revenue to be recognized in each month in the Benchmark and Compensation Periods shall be based on accrual-style revenue recognition rules and principles to be applied to the BEL claimant's financial records based on the nature of the business and the industry in which it operates. *See id.*

*Corresponding Variable Expenses*. The Claims Administrator must review each BEL claim to ensure that expenses that relate to the revenue properly recognized in each month according to the foregoing principles are properly matched. Only the variable expenses that relate to the revenue properly recognized in a particular month shall be used for purposes of calculating Variable Profit. *See id.* at 2-3.

*Cash Basis Accounting Must Be Adjusted*. Claimants using cash accounting must be evaluated using accrual and matching concepts. Otherwise, the resulting calculation would lack

"economic []coherence." *See id.* at 3 (quoting *In re Deepwater Horizon*, slip op. at 17). The adjustments shall be made by the Settlement Program's accountants.

*Matching Must Be Proper*. The Claims Administrator must also take appropriate steps to ensure that the financial data submitted by the claimant are accurate and properly matched. It would be inappropriate to treat accrual-basis claimants as if they were cash-basis claimants. *See id.* at 3-4. This could occur, for example, if the Settlement Program were processing claims based on simply what was recorded in the financial records in certain months, without giving appropriate consideration to other data indicating that proper matching was not fully reflected in the monthly financial statements. *See id.* Again, the Settlement Program accountants shall be responsible for ensuring that proper matching takes place.

*Error And Fraud Controls*. The Claims Administrator must develop new controls and procedures or modify existing controls and procedures designed to provide reasonable assurance that significant errors, irregularities, or fraud do not occur and remain undetected prior to determining and paying BEL claims. *See id.* at 4.

*Causation Requirements*. Claimants that have not suffered injury caused by the oil spill are not class members and lack standing to maintain a legal claim against BP. *See id.* at 5. The Claims Administrator must develop rules and procedures to identify BEL claims from claimants who are not proper class members or are otherwise not entitled to payment. If there are any objective facts in the claimant file or available from other reliable sources which indicate that in whole or in part the claimant did not suffer any spill-related loss, then the claimant is not a class member and such damages are not compensable under the settlement. Detailed programs shall be developed to assure adequate investigation and identification of such facts. BP has proposed certain objective indicators that, if triggered, should cause the Claims Administrator to engage in

22

appropriate review and investigation to assure that a claimant's injuries not traceable to the Deepwater Horizon accident are excluded. *See id.* at 6.

  ***Application Of Exhibit 4B V-Test***.  The Claims Administrator must develop new procedures to ensure that the causation tests under Exhibit 4B are applied using the revenue that is determined as a result of the policy and procedures proposed by BP.  The new procedures would require a subsequent review and consideration of causation after monthly revenue is finally identified as part of the BEL claims review process.  *See id.*

  ***Prior Policies***.  All prior Policies related to the determination of causation for BEL claimants are withdrawn.  All prior BEL claims-related policies or procedures are vacated until further notice.  The Claims Administrator shall review and evaluate each existing BEL claims policy and, in consultation with the parties, revise and update those policies.  *See id.* at 6.

  ***Claimant Communications and Claims Form***.  The Claims Administrator shall develop rules and procedures to deter BEL claims from claimants who are not proper class members or are otherwise not entitled to payment, including a modified Claims Form.  *See id.* Attach. 1 (BP's Proposed Claims Forms).

  **B. BP's Proposed Actual Injury Approach**

  The Fifth Circuit's opinion and the Article III principles discussed in Section II.C compel a simple and obvious conclusion:  if payments are not limited to those who have suffered an actual injury sufficient to give them standing, the class settlement will fail and thus harm valid class members who, by deciding not to opt out, had clearly decided that their opportunities to try to recover under the Settlement were superior to their litigation options.  Nevertheless, as BP has observed, the Settlement Program has frequently granted awards to claimants whose own submissions make plain (or even admit) that they have not suffered any injury.  For example:

- <u>Claim No. XXX65</u>:  Claimant is a Zone D nursing home facility in Central Louisiana.  The Settlement Program awarded the Claimant $522,083 in pre-RTP lost profits ($662,834 post-RTP). Almost a full year before the Deepwater Horizon Incident, Claimant shut down its facility and transferred its license to operate the business.

- <u>Claim No. XXX15</u>:  Claimant is a Zone D family medical practice clinic located in Alabama. The Settlement Program awarded Claimant $528,198 pre-RTP ($662,586 post-RTP) in lost profits. During Claimant's Compensation Period, the physician who had previously generated the most revenue for the Clinic was unable to practice medicine because his medical license had been revoked by the State of Alabama.

Gaspardo Decl. (Ex. D) Ex. B. ¶¶ 2, 10.[5]  The Settlement Program must be given time to amend existing policies and procedures to ensure that claimants are not awarded money notwithstanding their failure to assert an injury sufficient to give rise to standing under Article III and to meet the injury requirement that is an element of black-letter tort law.  *See In re Deepwater Horizon*, slip op. at 25, 28, 31. Claimants without injury not only cannot recover from the Program, they are not class members.  *See* Settlement Agreement Section 1.3.1.2 (Rec. Doc. 6430-1).

### C.   The Fifth Circuit Contemplates A Deliberate Approach To Crafting A New Set Of BEL Policies And Procedures To Comply With Its Opinion.

BP's approach is reasonable and can be implemented in due course.  *See, e.g.*, Rec. Doc. 8963-16 at 1 ("The Claims Administrator recognizes that the type frameworks proposed by BP constitute a reasonable approach to evaluating such claims."); *see also* Alexander Decl. (Ex. B) ¶ 6; Gaspardo Decl. (Ex. D) ¶ 10; Finch Supp. Decl. (Rec. Doc. 8965-7) ¶¶ 27-37; Weil Decl. (Rec. Doc. 8965-19) at 10:383-11:389.  Yet working through these issues to ensure fidelity to the Settlement and ameliorate the dangers to class certification identified by the Fifth Circuit will take time and should be approached systematically.   The Fifth Circuit itself encouraged the

---

[5]  It is also possible to conceptualize claims like the two examples above as failing for lack of causation.  Whether claims of this nature are classified as improper for lack of causation or for lack of actual injury (or both), BP submits that they cannot be paid under the Fifth Circuit's ruling.  *See supra* Parts I.B, II.C.

parties and the Court to be deliberate and calculated in resolving these issues. *See In re Deepwater Horizon*, slip op. at 35.

To consider these questions, this Court must enter an injunction "that allows the time necessary for *deliberate reconsideration* of these significant issues on remand." *Id.* (emphasis added). Moreover, the Fifth Circuit has opted to hold the case in abeyance for 60 days pending resolution of the remand proceedings, strongly signaling that a hurry-up or truncated remand process was not contemplated. *See* Oct. 2, 2013 L. Cayce Ltr. To W. Blevins (Ex. A).

## CONCLUSION

The Court should enter a preliminary injunction fully compliant with all aspects of the Fifth Circuit's decision. Such a preliminary injunction would avoid inflicting further irreparable harm on BP due to Settlement Program errors including (1) improper or insufficient matching; (2) use of inaccurate and flawed data; (3) the payment of claims that fail to meet the causation requirements imposed by the Settlement interpreted consistent with basic tort law, Rule 23, and Article III of the Constitution; and (4) the failure of the Settlement Program to ensure that claimants have suffered actual injury before issuing awards.

Additionally, such a preliminary injunction must remain in place long enough to allow substitute Settlement Program policies to replace the many currently operative, yet defective policies built on a foundation of legal errors — whether errors already identified by the Fifth Circuit or those remaining yet to be exposed in these remand proceedings. The preliminary injunction ordered by the Court must be carefully crafted or it will fail to provide the requisite time to root out the Program's many errors and reform the Program going forward. In short, the remand should not be rushed.

October 9, 2013

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax: (312) 862-2200

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax: (202) 942-5999

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax: (312) 876-7934

**OF COUNSEL**

Respectfully submitted,

   */s/ Richard C. Godfrey, P.C.*
Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Kevin T. Van Wart, P.C.
Wendy L. Bloom
Jeffrey J. Zeiger
R. Chris Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax: (312) 862-2200

Jeffrey Bossert Clark
Dominic E. Draye
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax: (202) 879-5200

   */s/ Don K. Haycraft*
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax: (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax: (202) 662-6291

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

# Exhibit J

# October 23, 2013
# Notice of Filing Exhibit III.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | **MDL NO. 2179** |
| | | **SECTION J** |
| | * * * | **HONORABLE CARL J. BARBIER** |
| This document relates to Civ. A. No. 12-970. | * * * | **MAGISTRATE JUDGE SHUSHAN** |

**[PROPOSED] ORDER PRELIMINARILY ENJOINING THE
CLAIMS ADMINISTRATOR'S JANUARY 15, 2013 POLICY DECISIONS**

Upon consideration of the decision of the United States Court of Appeals for the Fifth Circuit in *In re: Deepwater Horizon*, Nos. 13-30315 & 13-30329 (Oct. 2, 2013), reversing in part this Court's March 5, 2013 Order (Rec. Doc. 8812), and the entire record herein, it is HEREBY ORDERED as follows:

*January 15, 2013 Policy Decisions*

1.      The Claims Administrator and Settlement Program are ENJOINED from implementing the Claims Administrator's January 15, 2013 Policy Decisions regarding business economic loss claims (the "BEL Policy Decisions").  The Fifth Circuit has reversed the order affirming the BEL Policy Decisions.  *See In re: Deepwater Horizon*, slip op. at 3; *see also id.* at 24 (concluding that the BEL Policy Decisions did not "acknowledge the requirement of matching that is foundational for accrual-basis claims" and "did not . . . explain why it was interpreting the same Exhibit 4C language that leads to matching for accrual-based claims as not requiring the matching of cash-basis claims").

*Matching*

2.　The Claims Administrator and Settlement Program are further ENJOINED from processing or further processing the claims of or making payments to claimants pursuing business economic loss recoveries under the Economic and Property Damages Settlement Agreement ("Settlement Agreement"), where the amount of the determination depends, in whole or in part, on the enjoined BEL Policy Decisions.

3.　The Claims Administrator and Settlement Program are further ENJOINED from paying any business economic loss claim except to the extent that Variable Profit has been determined only on the basis of "properly-matched accrual-basis claims" (*id*. at 21), *i.e.*, "claims supported by sufficiently-matched, accrual-basis accounting" (*id*. at 18), and only in a manner in keeping with the principles of "matching" and of "determining actual economic losses for . . . claimants whose records were maintained on an accrual-basis." *Id*. at 19, 21, 35.  No business economic loss claims shall be processed or paid on the basis of "a claimant's idiosyncratically-maintained records," *id*. at 21, or on the basis of inaccurate or unreliable financial records.  Only "revenues" and "expenses" as properly matched are to be used as inputs for purposes of applying the Settlement Agreement.

4.　For purposes of this Order, matching is defined as it is in the Fifth Circuit's opinion, where the Court laid out the applicable principles of accrual-style accounting.[1]  *See In re Deepwater Horizon*, slip op. at 11-12 & n.4 (5th Cir. Oct. 2, 2013).  Accrual-style accounting

---

[1] *See In re Deepwater Horizon*, slip op. at 11 (citing Statement of Financial Accounting Concepts No. 6, Fin. Accounting Standards Bd.); *see also* Statement of Financial Accounting Concepts No. 6, Fin. Accounting Standards Bd., ¶ 145 ("Accrual accounting uses accrual, deferral, and allocation procedures whose goal is to relate revenues, expenses, gains, and losses to periods to reflect an entity's performance during a period instead of merely listing its cash receipts and outlays. Thus, recognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities—including matching of costs and revenues, allocation, and amortization—is the essence of using accrual accounting to measure performance of entities.") (excerpt).

"recogni[zes] revenue when the entity becomes entitled to receive payment, as opposed to when the payment is actually received." *Id.* at 11. "Expenses that can be readily traced to the recognized revenues are themselves recognized at the same time as those revenues." *Id.* Indeed, "even those expenses that cannot be directly traced to certain revenues are often allocated over multiple time periods, even if the cash outlay occurs all at once." *Id.* at 11 n.4. This correspondence of revenues and expenses "is sometimes referred to as 'matching' revenues and expenses, but in any case [] is a fundamental aspect of day-to-day record-keeping on the accrual-basis." *Id.* at 11-12. The purpose of accrual-style accounting is designed to "determin[e] actual economic losses." *Id.* at 19.

5.     The Claims Administrator and Settlement Program are further ENJOINED from processing or deciding any Settlement Program appeals in which matching is at issue. Such appeals shall be held in abeyance. The deadlines for seeking discretionary review by this Court of any Program decision in which matching is at issue shall similarly be held in abeyance.

### *Actual Injury Traceable to Loss from the Deepwater Horizon Accident*

6.     The Claims Administrator and Settlement Program are further ENJOINED from paying any business economic loss claim unless the claimant "experienced actual injury traceable to loss from the Deepwater Horizon accident." *Id*. at 35. "A stay tailored so that those who experienced actual injury traceable to loss from the Deepwater Horizon accident continue to receive recovery but those who did not do not receive their payments until this case is fully heard and decided through the judicial process weighs in favor of BP." *Id.*

7.     The Claims Administrator and Settlement Program are further ENJOINED from processing or deciding any Settlement Program appeals in which the presence of "actual injury traceable to loss from the Deepwater Horizon accident," *id.* at 35, is at issue. Such appeals shall

be held in abeyance. The deadlines for seeking discretionary review by this Court of any Program decision in which the presence of "actual injury traceable to loss from the Deepwater Horizon accident," *id.*, is at issue shall similarly be held in abeyance.

### Other Claims

8.      To the extent that any claim submitted to the Settlement Program for recovery other than business economic loss, including but not limited to claims for individual economic loss, relies on the submission, validity, or payment of a business economic loss claim subject to the injunctions in any of paragraphs 1 through 7, the Claims Administrator and Settlement Program are further ENJOINED from processing or further processing any such claim.

### Duration

9.      The injunction set forth in Paragraphs 1 through 8 shall remain in effect "until [the remand ordered by the Fifth Circuit in *In re: Deepwater Horizon*] is fully heard and decided through the judicial process." *Id.* at 35. This will "allow[] the time necessary for deliberate reconsideration of these significant issues on remand." *Id.*

IT IS SO ORDERED.

New Orleans, Louisiana, this _____ day of October, 2013.

_____
United States District Judge

# Exhibit K

# IN CAMERA SUBMISSION

**To:** Judge Barbier

**From:** Class Counsel

**Re:** In re: _Deepwater Horizon_
  **MDL No. 2179**

**Subject:** Fifth Circuit Ruling on BEL Appeal

**Date:** October 9, 2013

In response to the Court's Order of October 3, 2013 [Doc 11566], Class Counsel respectfully submit the following letter brief regarding the interpretation and potential application of the decision of the U.S. Fifth Circuit Court of Appeals in No. 13-30315 dated October 2, 2013:

## The Fifth Circuit's Decision

Class Counsel interpret the Fifth Circuit's decision as follows:

- **Revenue is _not_ to be "smoothed".** All three judges on the Panel rejected BP's argument that the Settlement Program should "smooth" occasional "spikes" in revenue that might occur within the claimants' "comparable" Benchmark and Compensation Periods. As noted by Judge Clement: "BP's primary concern seems to be the uneven cash flows of certain types of businesses. We accept this possibility, but we see nothing in the agreement that provides a basis for BP's interpretation. Despite the potential existence of this kind of distortion, the parties may not have considered it, agreed to ignore it, or failed for other reasons to provide clearly for this eventuality. The district court was correct that BP's proposed interpretation as not what the parties agreed." OPINION, p.25. This finding appears in Part I of Judge Clement's opinion, which was joined by Judge Southwick. And it is clear that Judge Dennis also agrees.[1]

- **Any further "matching" of Expenses that the Court might direct is _not_ necessary where the claimant's financials were prepared and submitted on an Accrual Basis.** As the Claims Administrator has already addressed the issue of

---

[1]"This appellate court must uphold the district court's judgments affirming the Administrator's rejection of BP's actions to force him to modify, or to revise his interpretation of, the district court's consent decree incorporating the parties' settlement agreement." OPINION, p.41 (Dennis, concurring in part, and dissenting in part).

"Accrual-based Claimants" as referenced in Part I.B. of the opinion,[2] the only potential matching of expenses issue relates to "Cash-basis Claimants" as referenced in Part 1.C.[3]   The Court's remand, therefore, clearly does _not_ apply to claimants who maintained and submitted their financials on an Accrual basis.   In addition to the headings, the Court specifically characterizes revenue and expenses from Accrual-based claimants as already "sufficiently matched" and makes clear that the Court's inquiry on remand is limited to a potential modification of the treatment of Cash-based claims. OPINION, p.18 ("The fact that Exhibit 4C requires processing of claims supported by sufficiently-matched, accrual-based accounting should inform but does not control how cash-basis claims are to be analyzed"); *see also,* OPINION, p.20 ("At least as to claims presented on an accrual basis, not only did BP not assent to ignoring the need for matching revenues with expenses, it clearly insisted on it"). Similarly, the Court characterizes BP's position as an argument that "Exhibit 4C represents an agreement on a specific accounting methodology, based loosely on *accrual* accounting revenue and expense recognition principles." OPINION, p.19 (emphasis supplied).   Along these lines, the Court notes that: "Because *cash* accounting does not inherently recognize relationships between cash flows and their underlying transactions, the term 'corresponding variable expenses' reasonably could imply an *accrual*-style framework inherent in Exhibit 4C." OPINION, pp.19-20 (emphasis supplied). Clearly, Judge Clement, joined by Judge Southwick, only found BP's matching of expenses arguments applicable to Cash-based claims.

- **The standards for Causation under Exhibit 4B were not before the Court, and have not been disturbed or affected.**   Despite the opinions expressed in Part II of Judge Clement's opinion, Judge Southwick writes that "I do not join in the broader Rule 23 analysis that appears in Part II" and "I would not make the pronouncements that appear in Part II." OPINION, p.37 (Southwick, concurring).   While Judge Southwick seems to suggest that the Court might give some attention to the issue on remand, it is worth noting that: **(i)** the propriety of class certification and settlement approval under Rule 23 is separately raised by Objectors in a different Fifth Circuit

---

[2]*See* JUNEAU DECLARATION (Oct. 3, 2013) [Doc 11566].

[3]*See* OPINION, p.16.

appeal scheduled for oral argument on November 4, 2013, in No. 13-30095;[4] and **(ii)** Judge Southwick, in his concurrence, correctly recognizes the fact that "Exhibit 4B of the Settlement Agreement allowed causation to be supported by loss calculations under Exhibit 4C rather than by requiring the claimant to prove that the loss had any factual relationship to BP's actions. No one on appeal is challenging Exhibit 4B." OPINION, pp.38-39 (Southwick, concurring). Class Counsel do not know whether BP intends to attempt to ask the Court to reconsider the causation issue, but, in that event, Class Counsel would suggest that: **(iii)** BP is judicially estopped from raising the issue on remand (or otherwise) based on the representations in BP's filings in support of Settlement Approval as well as the statements made by BP Counsel to the Court on December 12, 2012;[5] and **(iv)** the parol evidence in the record clearly and unambiguously establishes that the Settlement Agreement was intended to be applied in the way that the Claims Administrator has always interpreted and applied it.[6]

- **To the extent any additional "matching" of Expenses in Cash Basis Claims might be required, it should <u>not</u> require additional Documentation.** Addressing the argument that matching of expenses in Cash Basis claims was precluded by the Documentation provisions set forth in Exhibit 4A of the Settlement Agreement, which require claimants who prepared their financials on a Cash Basis to submit

---

[4]The Settlement Agreement, in this regard, is a contract between the Parties, which is valid and enforceable irrespective of whether the Court approves it as a Class Settlement under Rule 23. *See, e.g.,* SETTLEMENT AGREEMENT, Sections 4.1, 4.4, 5.12, 21.2, 21.3, 26.1 and Exhibit 26. Even assuming *arguendo* that Rule 23 concerns might have implications for the continued certification of the class or enforceability of the class-wide release in favor of BP, (which is denied), there is no "Article III inquiry" into the validity or enforceability of a private settlement agreement or individual release.

[5]*See* Rec. Docs. 8963-60 (from 7114-1), 8963-73 (from 7945), and 8963-75. BP's Appeal Counsel, Mr. Olsen, also represented to the Fifth Circuit Panel during oral argument that the alternative causation issue BP was complaining about in the press was not actually before the Court, and that BP disagreed with Judge Clement's implication that there might be no consideration with respect to some of the classmembers' claims. According to our unofficial transcript:

> Q.   If you look at 4B, where is BB's consideration for agreeing to pay those claims without proving they were caused by the Oil Spill?

> A.   This is a settlement, and with respect to the causation issue, that is not the issue that is before this court.... The settlement agreement, with respect to 4B as to causation, provided a mechanism which allowed someone to come through the door to be then entitled to prove the amount of actual lost profits. It was a compromise, which every settlement agreement is, with respect to causation issues....

[6]*See, e.g.,* Rec. Docs. 8963-61, 8963-62, 8963-66, 8963-67, 8963-68, 8963-71, and 9087-1.

those Contemporaneous Cash Basis financials to the Settlement Program, the Court comments that: "The difference is between what claimants had to present – either cash-basis or accrual-basis claims – and what the Administrator thereafter was to do." OPINION, p.20. Hence, it is clear that whatever (if any) further matching of expenses the Claims Administrator might be called upon to make with respect to Cash-based claimants, the Settlement Program is to do it utilizing the existing Documentation.

## Temporary and Limited Injunction

Class Counsel propose the following:

The Settlement Program is enjoined from issuing or paying determinations on: **(i)** Business Economic Loss (BEL) claims, that are **(ii)** predicated on monthly profit and loss (P&L) statements that were prepared and submitted utilizing a Cash Basis accounting method; **(iii)** within the agriculture, construction, professional services, real estate, wholesale trade, manufacturing, and retail trade industries.

The North American Industry Classification System ("NAICS") codes for these specified industries are all codes starting with 11 (except 114111, 114112, 114119, and 114210), 23, 31 (except 311711 and 311712), 32, 33, 42 (except 424460), 44, 45, 53, or 54.

This injunction does not affect the Business Economic Loss (BEL) claims of Entities in other, non-specified industries.

This injunction does not affect the Business Economic Loss (BEL) claims of any Entities who prepared and submitted monthly profit and loss (P&L) statements utilized an Accrual-based accounting method.

This injunction does not affect claims submitted to the Settlement Program for: **(i)** Seafood Program Compensation, **(ii)** Individual Economic Loss, **(iii)** Subsistence, **(iv)** VoO Charter Payments, **(v)** Vessel Physical Damage, **(vi)** Coastal Real Property Damage, **(vii)** Wetlands Real Property Damage, or **(viii)** Real Property Sales Damage.

## Effect on Settlement Program Appeal Orders

The Court's Orders of April 9, 2013 and April 24, 2013 [Rec. Docs. 9232 and 9538] should remain in effect with respect to (a) the "Contributions/Grant Revenue for Non-Profits issue" and (b) the "Alternative Causation issue". Where BP has previously identified a (c) "Matching Revenue and Expenses issue", the appealed claim should be remanded to the Settlement Program for a prompt determination as to whether it is a Cash-based claim for which BP is complaining about the matching of expenses; in which case the claim should be held, and, in the event matching of expenses is ultimately directed by the Court, re-processed by the Settlement Program in accordance with the new policy (if any). Where, however, the claim is based on Accrual financials, or where BP is complaining about the "smoothing" of revenue, such appeals should be summarily denied.

## Potential Policy for "Matching" of Expenses in Cash Basis Claims, (Should the Court Direct)

As noted, the Court indicates in Part I of Judge Clement's opinion that it is the Settlement Program's responsibility to conduct any matching of expenses that might be necessary, (if any).[7] Therefore, while claimants should generally be given the option of converting their financial statements to accrual-based statements, at their own expense, (subject to a claim for reimbursement under Section 4.4.13), the burden should generally be on the Program to do any "matching" of expenses on Cash Basis financials from the existing Documentation. And BP is required to reasonably fund any such additional accounting or other Administrative Expenses, pursuant to Section 5.12.1.4.

While Class Counsel believe that the Court could, consistent with Part I of the Fifth Circuit opinion, determine on remand that no matching of expenses in Cash Basis claims was ever intended, Class Counsel respectfully submit herewith a potential Policy which could be applied in the event that the Court determines that such matching of expenses should be undertaken by the Settlement Program.

Class Counsel note that their Draft Proposed Policy is easy to understand, can be mechanically accomplished with existing documentation, and is generally supported by existing Claims Administrator Policies which have not been challenged by BP.[8]

---

[7] *See* OPINION, p.20 ("The difference is between what claimants had to present – either cash-basis or accrual-basis claims – and what the Administrator thereafter was to do"). *See also,* SETTLEMENT AGREEMENT, Sections 4.3.7, 4.3.8 and 4.4.7.

[8] *See, e.g.,* Policy No. 466; (*see also, e.g.,* Policy Nos. 355).

# Exhibit L

## Draft Proposed Policy for Potential "Matching" of Expenses [1]

### Submitted by Class Counsel

*In Camera*

Oct. 9, 2013

Based on the decision of the U.S. Fifth Circuit Court of Appeals in No. 13-30315 dated October 2, 2013, the Claims Administrator will apply the "Variable Profit" calculation contained within the Compensation Framework set forth in Exhibit 4C to Business Economic Loss (BEL) Claims as follows:

1.  Accrual-basis claims are "sufficiently matched" to require no additional modification. Completed-contract and percentage-completion methods of accounting employ accrual concepts resulting in statements that are "sufficiently matched" to require no additional modification.

2.  In order to "sufficiently match" expenses to Benchmark and Compensation revenues in selected cash-basis claims, cash-basis claimants identified with North American Industry Classification System ("NAICS") codes starting with 11 (except 114111, 114112, 114119, and 114210), 23, 31 (except 311711 and 311712), 32, 33, 42 (except 424460), 44, 45, 53, or 54, will have the option of:

    A.  Restating their financials as accrual-basis and re-submitting to the Program; or

    B.  The Program will allocate total annual variable expenses (which typically vary in relationship to revenues) to each month of the calendar year in proportion to that month's percentage of total annual revenue.

        The variable expenses to be allocated are typically the Variable Costs identified in Exhibit 4D and the variable portion of Payroll Expense and Costs of Goods Sold (COGS) as calculated in Exhibit 4C.

        However, claimants will be provided with the opportunity to show that certain "Variable Costs" are atypical, and should not be re-allocated.

        Expenses identified as fixed or listed as Fixed Costs on Exhibit 4D would not be subject to re-allocation.

---

[1] Class Counsel believe that the Court could, consistent with Part I of the Fifth Circuit opinion, determine on remand that no matching of expenses in Cash Basis claims was ever intended. However, in accordance with the Court's Order of October 3, 2013 [Doc 11566], Class Counsel respectfully submit this potential draft Policy which could be applied in the event that the Court determines that such matching of expenses should be undertaken by the Settlement Program.

# Exhibit M

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010 | * * * * * | **MDL NO. 2179** **SECTION J** |
| This document relates to: No. 12-970 | * * * * * * | **HONORABLE CARL J. BARBIER** **MAGISTRATE JUDGE SHUSHAN** |

### [PROPOSED] ORDER MODIFYING TEMPORARY INJUNCTION

Upon consideration of the decision of the United States Court of Appeals for the Fifth Circuit's decision in *In re: Deepwater Horizon*, No. 13-30315, dated October 2, 2013, and, pending a Status Conference with the Parties that was held on October 11, 2013, this Court, on October 3, 2013, issued a temporary injunction enjoining the Claims Administrator from the issuance of any final determination notices or any payments with respect to those Business Economic Loss ("BEL") claims in which the Claims Administrator determined that the matching of expenses was an issue. The Claims Appeals process as detailed in Section 6 (filing of notices, briefs, and panel decisions) for similar BEL claims was also placed on hold. See Rec. Doc. 11566.

After consultation with the Parties, and in accordance with the Minute Entry issued on October 11, 2013 (Rec. Doc. 11635), the Court now MODIFIES its previous Order and LIFTS, in part, the previous Injunction, such that any BEL Claimants who satisfy ***any* *one*** of the below criteria shall continue to be processed according to the "Variable Profit" calculation contained

within the Compensation Framework set forth in Exhibit 4C to Business Economic Loss (BEL) Claims:

1. Claims submitted where the average monthly variable expense for the optimal benchmark period does not exceed two times the variable expense for the benchmark year or years divided by twelve; _**or**_

2. Claims submitted where the average monthly variable expense for the optimal compensation period does not exceed two times the variable expenses for the benchmark year or years divided by twelve; _**or**_

3. Claims that pass the Variable Margin Reasonability ("VMR") Test;[1] _**or**_

4. Claims submitted in accordance with existing Claims Administrator Policy 466; _**or**_

5. Claims submitted with Audited Financial Statements as evidenced by an accountant's "Audit Opinion;"[2] _**or**_

6. Claims submitted with Reviewed Financial Statements as evidenced by a "Review Report;"[3] _**or**_

7. Claims submitted where the federal tax return lists Accrual as its method of accounting and there is no reconciling item on schedule M-1 or M-3 to the contrary;[4] _**or**_

---

[1] The Variable Margin Reasonability Test ("VMR") is a two-prong test. Prong One determines the variance between the compensation period and the annual 2010 Variable Margin. Prong Two determines the variance between the benchmark period and the annual benchmark period variable margins. *See* EXHIBIT A.

[2] See AICPA Auditing and Standards Section AU-C 700.19.36, AU-C 700.39-41

[3] See *Statement of Standards for Accounting and Review Services* No. 19

[4] The claimants' Tax Return, whether it be Schedule C, Form 1065, Form 1120 or 1120S, requires the taxpayer to disclose its method of accounting, *i.e.,* "Cash," "Accrual," or "Other." Furthermore, in the case of all of the above, except Schedule C, Claimants are required on Schedule M-1 or M-3 to reconcile book to taxable income. If the books are kept on a method other than the tax return's accounting method there will be reconciling items identifying the book tax returns difference.

Additionally federal returns are signed as follows: "Under penalties of perjury. I declare that I have examined the return, including accompanying schedules and statements, and to the best of my

8.  Claims submitted wherein the Benchmark Period and Compensation Period present

consistently applied accrual-based accounting methods.[5]

Additionally the Fifth Circuit indicates in Part I of the aforementioned Opinion that it is

the Settlement Program's responsibility to conduct any matching of expenses that might be

necessary. *See* Opinion, p.20.  The Court notes that under Section 4.3.7, 4.3.8, and 4.4.7 of

the Settlement Agreement, the burden remains on the Settlement Program to do any

"matching" of expenses on Contemporaneous profit and loss statements (P&Ls) and/or other

financials from the existing Documentation.    However, in order to expedite processing,

every Claimant has the option of re-stating their financial statements to accrual-based

statements, at their own expense, (subject to a claim for reimbursement under Section

4.4.13), and re-submitting in accordance with the options outlined above.

Accordingly,

The injunction as to the Claims meeting any of the above listed criteria is hereby

LIFTED, and the Claims Administrator is hereby ORDERED to process and pay said Claims

and Claimants under the terms of Exhibit 4C as outlined in the Settlement Agreement.

The Settlement Program remains ENJOINED from the issuance of any final

determination notices or any payments with respect to those BEL claims in which the Claims

Administrator determines that the matching of expenses is an issue and which is not

otherwise submitted or re-submitted in accordance with the above.  The Settlement Program

is also ENJOINED from deciding any settlement program appeals in which matching is at

issue, and such appeals shall continue be held in abeyance.  However this abeyance shall be

---

knowledge and belief, it is true and correct and complete.  Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge."
[5] See Opinion, p.16 fn.5; see also *Statement of Financial Accounting Concepts No. 6 ¶147.*

prospective only, and shall NOT apply to those appeals wherein the time to seek discretionary review has expired.

This injunction does not affect claims submitted to the Settlement Program for: **(i)** Seafood Program Compensation, **(ii)** Individual Economic Loss ("IEL"), **(iii)** Subsistence, **(iv)** VoO Charter Payments, **(v)** Vessel Physical Damage, **(vi)** Coastal Real Property Damage, **(vii)** Wetlands Real Property Damage, or **(viii)** Real Property Sales Damage. These claims and appeals are to be processed, and determinations, decisions and payments are to be made in the normal course of the Program's operation.

IT IS SO ORDERED.

New Orleans, Louisiana, this _____ day of <u>October</u>, <u>2013</u>.

_____

Hon. Carl J. Barbier

**Exhibit A [Proposed]**
**Second Addendum to Exhibit 4C**
**Variable Margin Reasonability ("VMR") Test**

The term "Variable Profit" is defined as the sum of monthly revenues (over the Benchmark and/or Compensation Periods) less the "corresponding variable expenses from revenue over the same time period." (Page 2, Exhibit 4C)

The documentation requirements set forth in Exhibit 4A include the production of monthly and annual profit and loss statements and annual tax returns, however, the requirements do not state a specific basis of accounting for the required documentation. As such, it is possible for a Claimant to provide documentation sufficient to meet the requirements set forth in Exhibit 4A, however, the provided monthly profit and loss statements may not adequately reflect the Variable Profit (as defined in Exhibit 4C) on a monthly basis.

Accordingly, and regardless of accounting basis, it is necessary to determine if the monthly profit and loss data, provided by the Claimant in support of the claim, reasonably matches corresponding variable expenses to the recognition of revenues over the relevant periods or if further analysis of corresponding variable expenses will be required.

The following proposed Variable Margin Reasonability Test could be an indicator of which claims might need further variable profit analysis. Claims passing the Variable Margin Reasonability Test would be processed as presently described in the Settlement Agreement and should not be subject to further review regarding the timing of expenses relative to revenues. Claims failing the test will be subject to further analysis of the timing of certain variable expenses relative to the recognition of revenues as will be set forth in the Court's forthcoming policy decision on the matter.

**Variable Margin Reasonability Test** (2-prong test)

Prior to conducting the Variable Margin Reasonability Test, calculate the claim according to Exhibit 4C to determine the applicable Benchmark and Compensation Periods.

The first prong of the test is to determine the variance between the Compensation Period and Annual 2010 Variable Margins:

1. Calculate the Compensation Period Variable Margin Percentage ("Compensation Period VMP"):
   a. Sum Variable Profit (in dollars) for the consecutive months selected as the claim's Compensation Period for Step 1 of the calculation.
   b. Sum total revenue for the same Compensation Period as selected above (1a).
   c. Calculate the Variable Margin percentage for the Compensation Period by dividing Variable Profit calculated in (1a) by total revenue calculated in (1b). This will be the Compensation Period VMP.
2. Calculate the Annual 2010 Variable Margin Percentage ("Annual 2010 VMP"):
   a. Sum Variable Profit (in dollars) for all months in 2010, January through December.
   b. Sum total revenue for all months in 2010.
   c. Calculate Variable Margin percentage as Variable Profit calculated in (2a) divided by total revenue calculated in (2b). This will be the Annual 2010 VMP.
3. Calculate the variance between the Compensation Period VMP and the Annual 2010 VMP as a percentage of the Annual 2010 VMP.
4. Results:

    a.   If the variance calculated in (3) is +/- 30.0% or less <u>or</u> the nominal difference between the Annual 2010 VMP and Compensation Period VMP is +/-7.5%[1] or less, the claim passes the first prong of the Variable Margin Reasonability Test and the claim should proceed to the second prong of the test (5).

    b.   If the variance is greater than +/- 30.0% <u>and</u> the nominal difference between the Annual 2010 VMP and Compensation Period VMP is greater than +/-7.5%, the claim fails the Variable Margin Reasonability Test and will be subject to additional analysis as determined by the Court. (I.E. The claim will be subject to injunction until the Court-determined policy regarding corresponding expenses is in place.)

The second prong of the test determines the variance between the Benchmark Period and Annual Benchmark Period Variable Margins:

5.   Perform steps (1) and (2) as described above, for the same months selected in (1) for the claim's Benchmark Period, to determine the Benchmark Period VMP and the Annual Benchmark Period VMP.

6.   Calculate the variance between the Benchmark Period VMP and the Annual Benchmark Period VMP as a percentage of the Annual Benchmark Period VMP.

7.   Results:

    a.   If the variance calculated in (6) is +/- 30.0% or less <u>or</u> the nominal difference between the Annual Benchmark Period VMP and Benchmark Period VMP is +/-7.5% or less, the claim passes the second prong of the Variable Margin Reasonability Test and the claim should be processed as described in the Settlement Agreement and should not be subject to further review regarding the timing of expenses relative to revenues. (I.E. The claim will not be subject to injunction and should be processed as normal.)

    b.   If the variance is greater than +/- 30.0% <u>and</u> the nominal difference between the Annual Benchmark Period VMP and Benchmark Period VMP is greater than +/-7.5%, the claim fails the Variable Margin Reasonability Test and will be subject to additional analysis as determined by the Court. (I.E. The claim will be subject to injunction until the Court-determined policy regarding corresponding expenses is in place.)

Note: While the methodology above is described in relation to regular BEL claims calculated under Exhibit 4C, the same principles should be applied to Multi-Facility Business claims (Exhibit 5) and Start-Up Business claims (Exhibit 7).

There are industries in which the determination of variable profit and the adequacy of the matching of variable costs to revenue should not be an issue. For instance, this should not be an issue for restaurants. Essentially, goods and services are paid at the time of delivery, payment terms to suppliers are within 30 days, and inventory is not material, and thus, not subject to large year-end adjustments resulting from a physical inventory count. Additionally, construction companies keeping their books on the percentage of completion method and several other industries could be identified. However, we are proposing this test as a solution as we recognize within every industry there may be exceptions. Therefore, this objective test can avoid the anticipated hesitancy to give any one industry a blanket exemption from further due diligence than is currently in place.

---

[1] 7.5 percentage points based on page 8 of the Declaration by Hal Sider dated October 9, 2013.

**Examples of Variable Margin Reasonability Test**

**Example 1: Passing Result**

| **First Prong**: Variable Margins as calculated in Steps 1 and 2 | |
|---|---|
| Compensation Period VMP | 42% |
| Annual 2010 VMP | 50% |

Step 3:          (Compensation Period VMP - Annual 2010 VMP) / Annual 2010 VMP =
                 (42% - 50%) / 50% =
                 -8% / 50% = -16% variance

Step 4 Result:   The Claimant passes the first prong of the Variable Margin Reasonability Test as -16% is within
                 +/- 30% threshold.

| **Second Prong**: Variable Margins as calculated in Step 5 | |
|---|---|
| Benchmark Period VMP | 58% |
| Annual Benchmark Period VMP | 55% |

Step 6:          (Benchmark Period VMP - Annual Benchmark Period VMP) / Annual Benchmark Period VMP =
                 (58% - 55%) / 55% =
                 3% / 55% = 5.5% variance

Step 7 Result:   The Claimant passes the second prong of the Variable Margin Reasonability Test as 5.5% is
                 within +/- 30% threshold. The claim will not be subject to further variable expense analysis and
                 should be processed in accordance with Exhibit 4C.

**Example 2: Fails First Prong**

| **First Prong**: Variable Margins as calculated in Steps 1 and 2 | |
|---|---|
| Compensation Period VMP | 30% |
| Annual 2010 VMP | 50% |

Step 3:          (Compensation Period VMP - Annual 2010 VMP) / Annual 2010 VMP =
                 (30% - 50%) / 50% =
                 -20% / 50% = -40% variance

Step 4 Result:   The Claimant fails the first prong of the Variable Margin Reasonability Test as -40% is outside
                 of +/- 30% threshold <u>and</u> the -20% nominal difference is greater than +/-7.5%. The claim will
                 be subject to further review of variable expenses.

**Example 3: Fails Second Prong**

| **First Prong**: Variable Margins as calculated in Steps 1 and 2 | |
|---|---|
| Compensation Period VMP | 42% |
| Annual 2010 VMP | 50% |

Step 3:        (Compensation Period VMP - Annual 2010 VMP) / Annual 2010 VMP =
                (42% - 50%) / 50% =
                -8% / 50% = -16% variance

Step 4 Result:  The Claimant passes the first prong of the Variable Margin Reasonability Test as -16% is within
                +/- 30% threshold.

| **Second Prong**: Variable Margins as calculated in Step 5 | |
|---|---|
| Benchmark Period VMP | 73% |
| Annual Benchmark Period VMP | 55% |

Step 6:        (Benchmark Period VMP - Annual Benchmark Period VMP) / Annual Benchmark Period VMP =
                (73% - 55%) / 55% =
                18% / 55% = 32.7% variance

Step 7 Result:  The Claimant fails the second prong of the Variable Margin Reasonability Test as 32.7% is
                outside of +/- 30% threshold <u>and</u> the 18% nominal difference is greater than +/-7.5%. The
                claim will be subject to further review of variable expenses.

# Exhibit N

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re: Oil Spill by the Oil Rig** | **MDL NO. 2179** |
| **"Deepwater Horizon" in the Gulf** | |
| **of Mexico, on April 20, 2010** | **SECTION J** |
| | |
| **Applies to:** | **JUDGE BARBIER** |
| **No. 12-970** | **MAGISTRATE JUDGE SHUSHAN** |

### Scheduling Order Regarding BEL Remand

The Fifth Circuit panel on October 2, 2013, in case no. 13-30315 c/w 13-30329, remanded to this Court to develop a more complete factual record and make further factual findings, including specifically whether the parties to the Settlement Agreement had discussed the intended meaning of Exhibit 4C insofar as it applies to the use of cash versus accrual basis accounting to calculate loss of variable profits. In order to confect a scheduling order, the Court considered the proposals by BP and Class Counsel, and now orders as follows[1]:

1.     For purposes of the remand ordered by the Court of Appeals, all evidence and other submissions in the record regarding the Claims Administrator's Policy Announcement of January 15, 2013, the Court's March 5, 2013 ruling, BP's Motion for Preliminary Injunction, and U.S. Fifth Circuit Case Nos. 13-30315 c/w 13-30329, already form part of the record,

---

[1] The Court of Appeals also required that this Court issue a preliminary injunction relative to certain claims within the Settlement Program. The next day this Court issued an interim order suspending certain claims. (Rec. Doc. 11566) After meeting with and receiving submissions from BP and Class Counsel, the Court issued a Preliminary Injunction Order on October 18. (Rec. Doc. 11697) There the Court explained what it understands to be the scope of remand: "Exhibit 4B of the Settlement Agreement is not before the undersigned on remand. Rather, what is before the Court is the measurement of a claimant's loss under Exhibit 4C." (*Id.* at 4) This Scheduling Order reflects that understanding.

and need not be re-introduced or re-submitted.

2.      By 5:00 p.m. on <u>Thursday, November 7, 2013</u>, BP and Class Counsel shall file any and all **additional fact** evidence (in the form of  affidavits, declarations, documents, etc.) that purports to show whether the parties discussed, *prior to the time the Settlement Agreement was executed,* [2]  the intended meaning of Exhibit 4C  (i.e., whether or not Exhibit 4C requires that expenses and revenues be matched for all claims, or only some claims).  If a party contends that no such discussions occurred,  it may state this fact in a single affidavit or declaration.  No expert opinions shall be filed.  No evidence concerning events after the execution of the Settlement shall be filed.

3.      By <u>noon on Tuesday, November 12, 2013</u>, BP and Class Counsel shall submit any rebuttal evidence they may have.  Similar to the above, rebuttal evidence shall be limited to fact evidence from prior to the time the Settlement was executed and shall include no expert opinions.

4.      By <u>noon on Monday, November 18, 2013</u>, BP and Class Counsel shall file briefs, limited to 10 pages and double-spaced (with no exhibits), as to whether Exhibit 4C requires matching of revenue and expenses for all claims.  Should the parties choose to file proposed findings and conclusions, such will count against the 10-page limit.  After this time the Court will take the matter under advisement.  The Court will inform the parties if it requires a formal hearing with live testimony.  If such a hearing is necessary, it will be held on Monday,

---

[2] Judge Clement's majority opinion states: " We have not discovered whether, *before the agreement was signed,* the parties discussed the divergent effects of cash- and accrual-basis accounting records on the Exhibit 4C formula." Slip op. at 23. (emphasis added)

December 2, 2013 at 9:30 a.m.


New Orleans, Louisiana, this 25th day of October, 2013.


**Carl J. Barbier**
**United States District Judge**

3

# Exhibit O

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 SECTION J |
| This document relates to: All Cases and No. 12-970 | * * * * * | Honorable CARL J. BARBIER Magistrate Judge SHUSHAN |

## MOTION TO AMEND SCHEDULING ORDER RE BEL REMAND AND PRELIMINARY INJUNCTION RELATING TO BEL CLAIMS

Pursuant to Rules 16(b)(4), 23(d)(1)(E), and 65 of the Federal Rules of Civil Procedure, with reference to the Scheduling Order Regarding BEL Remand [Doc. No. 11735] and the Preliminary Injunction Related to BEL Claims [Doc. No. 11697], and for the reasons set forth in the accompanying memorandum, BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. (collectively, "BP") move the Court:

1. To amend the Scheduling Order and to accept the proffer of evidence regarding the causal-nexus issue and

2. To amend the Preliminary Injunction to enjoin the Claims Administrator and Settlement Program from paying any business economic loss claim unless they first determine that the claimant is a member of the class, including that the claimant is "within the Economic Class definition"[1] and has suffered loss of income, earnings or profits "as a result of the Deepwater Horizon Incident."[2]

---

[1] Settlement Agreement Ex. 4B n.1, Doc. No. 6430-9.

[2] Settlement Agreement ¶ 1.3.1.2, Doc. No. 6430-1.

November 7, 2013

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200


Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934


*OF COUNSEL*

Respectfully submitted,

  */s/ Kevin M. Downey*
Kevin M. Downey
F. Lane Heard III
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
Telefax:  (202) 434-5029

  */s/ Don K. Haycraft*
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger
Wendy L. Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

*ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.*
*AND BP AMERICA PRODUCTION COMPANY*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 7th day of November, 2013.

<u>/s/ Don K. Haycraft</u>
Don K. Haycraft

# Exhibit P

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * MDL NO. 2179 |
| | * SECTION J |
| This document relates to: All Cases and No. 12-970 | * Honorable CARL J. BARBIER |
| | * Magistrate Judge SHUSHAN |

## MEMORANDUM IN SUPPORT OF
## MOTION TO AMEND SCHEDULING ORDER RE BEL REMAND AND
## PRELIMINARY INJUNCTION RELATING TO BEL CLAIMS

The class definition agreed to by the parties and approved by the Court includes within the class *only* those persons who suffered damages and whose damages arose "as a result of" the Oil Spill.  The agreed-to class definition satisfies Article III because it ensures that the class members have standing.  The agreed-to class definition also satisfies Rule 23 because it joins as class members only those persons whose damages were incurred "as a result of" a common accident – the Oil Spill.  As this Court recognized in approving the Settlement, "persons with marginal or potentially worthless claims, whose presence could have complicated the settlement process, were excluded from the proposed class."[1]

The Claims Administrator, however, has rewritten the class definition as a matter of policy or practice by consciously and systematically paying claimants whose losses lack a causal connection with the Oil Spill.  He has done this, in part, by misreading Exhibit 4B to permit such a result, missing the import of the pivotal language in footnote 1 of that Exhibit:  "Th[ese] Causation Requirements for Business Economic Claims do[] *not* apply to . . . Entities,

---

[1]    Order and Reasons Granting Final Approval of the Economic and Property Damages Settlement Agreement at 33, Dec. 21, 2012, Doc. No. 8138.

Individuals or Claims **not** included with the Economic Class definition . . . ."[2]  In place of the

agreed-to definition, which confines the class to claimants who suffered loss "as a result of" the

Oil Spill, the Claims Administrator has further erred by substituting a definition of economic loss

that awards compensation to claimants in the Gulf region who assert that they suffered loss

shortly after the Oil Spill, without regard to any actual causal connection between their loss and

the Spill.  As the Claims Administrator forthrightly informed the Fifth Circuit "BEL" panel, his

accounting team has reviewed and paid claims "for losses that a reasonable observer might

conclude **were not in any way related to** the Oil Spill."[3]  He has certainly paid at least $76

million in claims where it was clear from the claims file itself that the Oil Spill was not the cause

of any losses.  And he has paid another $546 million or more in claims where any "reasonable

observer" would conclude that the losses "were not in any way related" to the Spill.

Recognizing the grave Article III and Rule 23 problems that would result if the class

were defined to include persons and businesses that did not suffer losses resulting from the spill,

Judge Clement concluded that in "[a]llowing recovery from the settlement fund by those who

have no case and cannot state a claim" — i.e., claimants who suffered no loss or loss that was not

caused by the oil spill – "the court acts *ultra vires*."[4]  Thus, "[s]hould BP's proposed

interpretation of the Settlement exclude putative class members with no colorable legal claim,

---

[2]    Settlement Agreement Ex. 4B n.1, May 3, 2012, Doc. No. 6430-9.

[3]    Brief of Appellees Deepwater Horizon Court Supervised Settlement Program at 16, *In re Deepwater Horizon*, Nos. 13-30315 & 13-30329 (5th Cir. May 24, 2013) (emphasis added).

[4]    *In re Deepwater Horizon*, No. 13-30315, slip op. at 28 (5th Cir. Oct. 2, 2013) ("BEL Decision").

the district court should have rendered the Settlement lawful by adopting that interpretation, as long as the interpretation is reasonable and effective."[5]

Regarding the remand's scope, Judge Clement stated that issues concerning standing "can be considered in evaluating the correct interpretation of possible ambiguities in this agreement" lest an interpretation of the Settlement Agreement continue that perpetuates *ultra vires* acts and "imperil[s] a final approval of the settlement."[6]  Judge Southwick concurred about the scope of the remand proceedings.  He "would not make the pronouncements that appear in Part II," believing them to be premature, but said that "[i]nstead, I would defer the issue and allow the parties on remand to give it the attention it deserves."[7]  Thus, while Judge Southwick declined to address the causation issues ***pre-remand*** absent further factual development, he joined Judge Clement in saying that it is appropriate for this Court to give the issue "the attention it deserves" ***after*** remand.[8]

---

[5]   *Id.* at 31.

[6]   *Id.* at 33.

[7]   *Id.* at 37 (Southwick, J., concurring).

[8]   It was Class Counsel who first called attention to the interaction of loss and causation, arguing that proof of loss pursuant to Exhibit 4B substituted for proof of causal nexus.  The issue of standing was before the Fifth Circuit in any event, as it is before every court at every stage in the proceedings.  *See Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 n.6 (5th Cir. 2002) ("[B]ecause 'standing is a jurisdictional requirement, [it] may always be addressed for the first time on appeal.'") (quoting *Public Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2001)); *see also Ford v. Nylcare Health Plans of the Gulf Coast, Inc.*, 301 F.3d 329, 331-32 (5th Cir. 2002) ("Although Article III constitutional standing was not raised by the parties or considered by the district court, we must – where necessary – raise it *sua sponte*."); *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 496 (5th Cir. 2007) (en banc) (after voting to hear the appeal en banc, upon further review of the record "which we are bound to make," *sua sponte* vacating the judgment of the district court for lack of standing).

Similarly, the Court has an independent duty to evaluate compliance with Rule 23; this issue cannot be waived.  *See, e.g.*, *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998); *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003).

Thus, BP respectfully disagrees with the Court's determination that the parties may not submit evidence regarding causation as it concerns Article III standing and Rule 23, but may only file additional fact evidence regarding "the intended meaning of Exhibit 4C."[9]  BP accordingly seeks to show that the Administrator (i) has adopted a policy or practice (ii) that rewrites the class definition and (iii) authorizes the payment of claims that lack a causal nexus to the Oil Spill.

This memorandum sets forth in summary fashion BP's proffer of evidence and argument.

## I. THE SETTLEMENT AGREEMENT, AS APPROVED BY THE COURT, CONFINES THE CLASS TO PERSONS INJURED AS A RESULT OF THE OIL SPILL

### A. The Class Definition

The class definition is paramount for determining whether the class satisfies the requirements of Article III and Rule 23, and whether paying claims without a causal nexus to the Oil Spill are *ultra vires*.  The Settlement Agreement did not define the class in terms of economic loss alone.  Individuals and entities who meet the geographical prerequisites for class membership "are included in the Economic Class only if their Claims meet the descriptions of one or more of the Damage Categories."  And the "Economic Damage Category" is limited to any "[l]oss of income, earnings or profits suffered by Natural Persons or Entities *as a result of* the Deepwater Horizon Incident . . . ."[10]

---

[9]   Scheduling Order Regarding BEL Remand at 2, Oct. 25, 2013, Doc. No. 11735.

[10]   Settlement Agreement ¶¶ 1.3, 1.3.1.2, May 3, 2012, ECF No. 6430-1 (emphasis added).  Similarly, the Subsistence Damage Category is limited to persons who relied on subsistence resources that were "diminished or restricted . . . due to or resulting from the Deepwater Horizon Incident"; the Vessel Damage Category is limited to physical damage sustained by an eligible vessel "due to or resulting from the Deepwater Horizon Incident"; and employees of businesses in Support Services to Oil and Gas Industry are limited to "non-oil and gas industry Economic Damages due to or resulting from the Deepwater Horizon Incident."  *Id.* ¶¶ 1.3.1.3, 1.3.1.5, 1.3.1.10.

4

### B.   The Settlement Agreement Taken As a Whole

Not just the class definition, but the Settlement Agreement as a whole requires that claimants have suffered economic loss that can be causally connected to the Oil Spill.  The Agreement preamble, the class notice, the settlement website, the claims form, and the release all reflect this requirement.

1.   The preamble to the Settlement Agreement states that the Agreement's purpose "is to settle all **and only** the Released Claims of the Economic Class, Plaintiffs, and Economic Class Members . . . ."[11]  Released Claims, in turn, are defined as "all claims **arising out of, due to, resulting from, or relating in any way to, directly or indirectly,** the Deepwater Horizon Incident."[12]

2.   The detailed class notice advises potential class members that "[i]f you had economic loss or property damage **because of** the Deepwater Horizon oil spill, you could get money from a class action settlement," and that "[i]f you are included in the Economic & Property Damages Settlement, you may receive money if you have been **damaged by** the Deepwater Horizon oil spill . . . ."  The notice further explains that in order for a claimant to determine whether he is a class member, he must answer two questions: "Do you have any economic loss **arising out of** the Deepwater Horizon Incident?" or "Was your real or personal property damaged **as a result of** the Deepwater Horizon Incident?"[13]  At no time did the Court or

---

[11]   Settlement Agreement at 1 (emphasis added).

[12]   *Id.* ¶ 10.2 (emphasis added).

[13]   Detailed Class Notice at 1, 6-7, Deepwater Horizon Claims Center Economic & Property Damage Claims, http://www.deepwaterhorizoneconomicsettlement.com/docs/Economic_Detailed_Notice_English_8.28.2012.pdf (last visited Nov. 7, 2013) (emphasis added).

Class Counsel tell class members before final approval of the settlement that a person or business could claim for losses under the Settlement that were ***not*** caused by the oil spill.

3.   The settlement website also tells potential class members that recoverable damage is loss suffered "***as a result of*** the Deepwater Horizon Incident."[14]

4.   The instruction booklet for the claims form explains that a Business Economic Loss Claim "is for businesses . . . that assert economic loss ***due to*** the Spill," and that the Economic Loss Class includes those natural persons and entities "suffering an economic loss which was ***a result of*** the Deepwater Horizon Incident."[15]

5.   And the first page of the claims form itself, which must be signed under penalty of perjury, states that "[t]he Business Economic Loss Claim is for businesses . . . that assert economic loss ***due to*** the Spill."[16]

Each of these elements of the Settlement Agreement provides an independent reason to avoid the Rule 23, Rules Enabling Act, and Article III problems that, as Judge Clement said, should be avoided if at all possible in construing the Agreement.  ***Together***, these elements constitute a mutually reinforcing thicket of provisions that negate any reading of the Agreement that would pay for losses both causally connected to the spill and not causally connected.

---

[14]   FAQs, Deepwater Horizon Claims Center Economic & Property Damage Claims, https://cert.gardencitygroup.com/dwh/fs/faq?.delloginType=faqs#Q2 (last visited Nov. 7, 2013) (emphasis added).

[15]   Instructions for Completing the Business Economic Loss Claim Form at 3-4, Mar. 20, 2013, Doc. No. 8964-34 (emphasis added).

[16]   Business Economic Loss Claim Form at 1, Mar. 20, 2013, Doc. No. 8964-33 (emphasis added).

### C.   Rule 23 Does Not Permit Certification of a Class Defined to Include Members Who Suffered No Injury At All or No Injury Caused by BP.

The class definition's requirement that loss be "as a result of" the spill is not a happenstance of the parties' agreement, but both a constitutional imperative and a requirement for court-approved class certification pursuant to Rule 23 and the Rules Enabling Act. In a private settlement, the parties can make whatever agreement they wish. But "[a] class settlement is not a private agreement between the parties."[17]  Rather, as Judge Clement explained, "[i]t is a creature of Rule 23, which authorizes its use to resolve the legal claims of a class 'only with the court's approval'" – approval that "must, as always, adhere to the precepts of Article III and the Rules Enabling Act."[18] If the class definition is interpreted to sweep within it significant numbers of businesses that did not suffer any loss resulting from the Oil Spill — and thus would have no claim against BP — the Settlement cannot survive review under Rule 23. This is true for the reasons fully set forth in BP's briefs in the BEL Appeal[19] and summarized here:

1.   ***Adequacy Would Be Defeated.***  Rule 23(a)(4) provides that a class may be certified only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  To satisfy this requirement, "[a] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (quotation omitted). Notwithstanding the fact that the class encompasses individuals and businesses from across the Gulf who experienced different types of economic injuries, the Court concluded that Class

---

[17]   BEL Decision at 30.

[18]   *Id.*

[19]   *See* Brief for Appellants BP Exploration & Production Inc., BP America Production Company, and BP p.l.c., *In re Deepwater Horizon*, Nos. 13-30315 & 13-30329 (5th Cir. May 3, 2013).

Counsel could represent the entire class, in part because "persons with marginal or potentially worthless claims . . . were excluded from the proposed class."[20]  The Claims Administrator's misinterpretation of the class definition turns this understanding on its head by including persons within the class who did not suffer injury as a result of the Oil Spill.  Moreover, it is contrary to Rule 23(a)(4) to expect that the same class counsel can adequately represent both legitimate claimants, who were harmed by the Spill, as well as interlopers, who seek recovery based on an incident that did not harm them.

     2.    ***Commonality, Predominance, and Typicality Would Be Defeated.***  Rule 23(a)(2) and 23(b)(3) require that class members share common issues, and that those common issues predominate over individual ones.  The commonality requirement of Rule 23(a)(2) requires that the class members "have suffered the same injury," *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (internal quotation omitted), and the predominance requirement of Rule 23(b)(3) is even "more stringent."  *See Amchem Prods.*, 521 U.S. at 609.[21]  These demanding tests cannot be satisfied where the class is redefined to include potentially unlimited numbers of individuals and businesses whose losses did not result from the Spill and who, by definition, have not therefore suffered the same injury as other class members.[22]

---

[20]   Order and Reasons Granting Final Approval of the Economic and Property Damages Settlement Agreement at 33.

[21]   *See also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (holding that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable" to plaintiffs' theory of liability); *accord Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006).

[22]   *See Banda v. Corzine*, Civ. No. 07-4508, 2007 WL 3243917, at *17 (D.N.J. Nov. 1, 2007) (presence of persons who "have no claim whatsoever . . . prevent[s] fulfillment of the commonality-of-claims requirement").  And since "[t]he commonality and typicality requirements of Rule 23(a) tend to merge," *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982), the claims of the representative parties are also no longer typical in light of the Claims Administrator's interpretation of the class definition.

3.      ***The Class Notice Would Be Rendered Defective.***  Rule 23(c)(2)(B)(ii) provides

that the class notice must state "the definition of the class certified."  Yet the class notice here

did not say that persons without losses caused by the spill were part of the class, as the Claims

Administrator has now interpreted and applied the definition; the notice said the opposite.  *See*

*supra* I.B(2).  Thus, the class notice was inadequate.

4.      ***Superiority and Fairness Would Be Destroyed.***  The superiority requirement of

Rule 23(b)(3) seeks to "'achieve economies of time, effort, and expense, and promote ***uniformity***

***of decision as to persons similarly situated*** . . . .'" *Amchem*, 521 U.S. at 615 (emphasis added)

(quoting Fed. R. Civ. P. 23 Advisory Committee's Note, 39 F.R.D. 69, 102-03 (1966)).  But by

reading the causal-nexus requirement out of the class definition, the Claims Administrator treats

uniformly persons who are not similarly situated – that is, persons whose injuries are causally

connected to the Spill and those whose injuries are, at most, temporally connected.

5.      ***Class Membership Would Be Rendered Non-Ascertainable.***  Rule 23 requires

that the class be "adequately defined and clearly ascertainable." *Union Asset Mgmt. Holding*

*A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012) (internal quotation marks omitted).  The

agreed-to definition meets that standard.  The Claims Administrator's redefinition of the class to

exclude a causal nexus requirement does not meet the standard, because no one can be sure

which losses lacking any certain connection to the Spill will be compensated.  *See Boca Raton*

*Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 238 F.R.D. 679, 689 (S.D. Fla. 2006) (the class

definition must base membership on a "rational demarcation"), *aff'd on other grounds by* 582

F.3d 1227 (11th Cir. 2009).

The Claims Administrator's rewritten class definition would thus be fatal to certification under Rule 23. For that reason, BP submits, it cannot be a correct interpretation of the parties' agreement.

### D. Article III Standing Requires That a Class Member's Injury Be Causally Connected to the Defendant's Conduct

Article III standing requires that the plaintiff's injury be "fairly . . . trace[able]" to the defendant's challenged conduct. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). That test of traceability, according to the Supreme Court, "is not 'an ingenious academic exercise in the conceivable.'" *Id.* at 566 (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688 (1973)). Thus, for purposes of Article III, the plaintiff lacks standing who sues the blacksmith for failing to secure the nail in the horseshoe that hobbled the horse that threw the general who hit his head and lost the battle, and thereby the war, leading to the destruction of plaintiff's property. The plaintiff's claim is no stronger when he simply alleges that his property was destroyed around the same time that the blacksmith failed to secure the nail. The parties' joint expert, Professor John Coffee, assured the Court that the Settlement Agreement's class definition excluded persons with just such indirect claims of economic loss:

> [N]ot only is the class compact, but ***the chain of causation is kept short***. Causation of the injuries covered by the Settlement Agreement inevitably leads back to the Macondo well blowout, the Deepwater Horizon explosion and the resulting oil spill. ***Although it might be possible to argue that persons at considerable distance from the explosion and oil spill were economically injured through layoffs or reduced business activity, the class definition stops well short of attempting to incorporate such claims***.[23]

---

[23]    Decl. of John Coffee ¶ 5, Aug. 10, 2012, Doc. No. 7110-3 (emphasis added).

It is broadly accepted that a class must be so defined that the members will have standing. *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) ("[I]f the definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad."); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("The class must therefore be defined in such a way that anyone within it would have standing."); *Red v. Kraft Foods, Inc.*, No. CV 10-1028-GW, 2011 WL 4599833, at *5 (C.D. Cal. Sept. 29, 2011) ("[A] class definition can only include prospective plaintiffs who have Article III standing.").[24]  Here, the parties crafted a definition of class membership that honors the constitutional standing requirement.  The definition keeps the chain of causation short precisely because a plaintiff's injury must be fairly traceable to the defendant's conduct.  The Claims Administrator, however, has rewritten the class definition by adopting a policy and following a practice that reads the causal-nexus requirement out of the definition.  And pursuant to that rewritten definition, he has systematically paid claimants whose "loss of income, earnings, or profits" was not suffered "as a result of" the Oil Spill.

## II.   CONTRARY TO THE CLASS DEFINITION AND IN VIOLATION OF ARTICLE III AND RULE 23 REQUIREMENTS, THE CLAIMS ADMINISTRATOR HAS PAID $600 MILLION OR MORE IN CLAIMS FOR LOSSES THAT LACK CAUSAL NEXUS TO THE OIL SPILL

Despite the class definition's requirement that class members have losses suffered "as a result of" the Oil Spill, and despite Professor Coffee's explanation that the definition keeps the chain of causation "short," the Claims Administrator has systematically disregarded the class

---

[24]   The courts of appeals for the Second, Eighth and Ninth Circuits go further and state that every member of the class must have standing.  *Denney*, 443 F.3d at 264 ("[N]o class may be certified that contains members lacking Article III standing"); *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 779 (8th Cir. 2013) ("'[A] named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves.'" (quoting *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010))); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) (citing *Denney*).

definition and paid claims for losses that lack a causal connection to the Spill. He has paid, to use his own words, claims "for losses that a reasonable observer might conclude *were not in any way related to* the Oil Spill." And he has done so deliberately, pursuant to a policy or practice that changes the class definition to include persons and entities who lack standing.

Representative of such no-nexus claims is Claim No. XXXX60, filed by an attorney in Northern Louisiana (Zone D). The Claims Administrator awarded him $172,000. His lower revenues were not due to the Oil Spill, however, but to the fact that his business license was revoked *in 2009* and not reinstated until 2012.[25] Much the same is true of the excavation company located Zone D (Alabama) that sold substantially all of its assets in 2009 and therefore saw a drop in revenue from more than $20 million in 2009 to less than $1 million in 2010. The decline in revenue had absolutely nothing to do with the Spill, of course, but was the direct result of the company's pre-Spill sale of its business-generating assets.[26] The Claims Administrator nevertheless awarded the company more than $3.5 million. And he paid $4 million to a storm clean-up and construction company that had a banner year in 2008 when it received $30 million in FEMA contracts for clean-up activities following Hurricanes Gustav and Ike, but had dramatically reduced revenues in 2010 when there were no major hurricanes.[27] The Oil Spill had nothing to do with the fact that, *before* the Spill, the lawyer lost his license, the excavation company sold its assets, and the clean-up company enjoyed a revenue spike because of a hurricane season double-whammy.

---

[25]   Decl. of Allison B. Rumsey App. A, ¶ 2, Nov. 7, 2013 (attached as Exhibit A).

[26]   *Id.* App. A, ¶ 24.

[27]   *Id.* App. A, ¶ 15.

We cannot be sure precisely how many such claims the Administrator has paid so far. But our review indicates that he has paid $76 million to claimants whose losses were clearly caused by events other than the Oil Spill (as in the examples above) and approximately $546 million to claimants far-removed from the Spill whose businesses (e.g., farms, law firms, healthcare, manufacturing, etc.) have no logical connection with the Spill, and certainly not by a short chain of causation.[28]

It is no surprise that such claims have been filed, for plaintiffs' counsel have placed advertisements that contradict the class definition and tell residents in the Gulf region that "[t]he craziest thing about the settlement is that you can be compensated for losses that are

---

[28] Rumsey Decl. ¶¶ 4, 5 & App. B. BP believes that the number of claim awards paid to those having damages unrelated to the Spill is much greater than the list in paragraph 4 for the reasons given in that paragraph. Moreover, as noted in prior submissions, the pattern of claims is at odds with economic reality. If the class definition ensures that the chain of causation is short, as Professor Coffee explained, then the fewest number of claims should arise in those areas at the greatest distance from the Spill. Instead, the pattern is of increasing claims *from Zone D* – and from businesses like farming, manufacturing, healthcare and professional services, whose economic vitality has no apparent connection to oil drilling in the Gulf – with the total value of such claims exceeding $1 billion. Decl. of Hal Sider ¶ 4, Feb. 18, 2013, Doc. No. 8964-17; Supplemental Decl. of Hal Sider ¶¶ 22-29, March 14, 2013, Doc. No. 8964-18; Decl. of Hal Sider ¶ 36, Oct. 9, 2013, Doc. No. 11726-8; Decl of Hal Sider ¶¶ 7, 22-27, Nov. 7, 2013 (attached as Exhibit B).

The pattern of claims under the Settlement Agreement is also at odds with Professor Coffee's assurance that the chain of causation is short in two additional ways: (1) the upward trend in claims from Zone D is at odds with what is known about the larger economic impact of the Spill on the region; and (2) the upward trend in claims from persons who did not participate in the GCCF indicates that persons who initially did not believe the Spill caused them any damages now do. Sider Decl., Nov. 7, 2013, ¶¶ 9-21.

UNRELATED to the spill";[29] and that "*[y]ou may even have reason to believe that BP did not cause your reduced revenues. Those things don't matter.*"[30]

The Article III and Rule 23 problems that result from the Administrator's actions are not that the agreed-to and approved class definition inadvertently results in some small number of claimants who lack standing receiving awards. The problem is that, by reading the "as a result of the Deepwater Horizon Incident" limitation out of the class definition as a matter of practice or policy, the Administrator has opened membership in the class to an ***unlimited*** number of persons and businesses who simply suffered a claimed loss in the relevant time periods. The situation here is like the hypothetical posed and answered by the court in *Messner v. Northshore University Healthsystem*, 669 F.3d 802 (7th Cir. 2012) (cited approvingly by Judge Clement, *see* BEL Decision at 29). In that antitrust case, the court posed the following hypothetical class definition – "if plaintiffs had sought certification of a class shown to include an high percentage of individuals who paid for medical services at Northshore's hospitals after the merger but under Northshore's pre-merger contracts with insurers" – and explained that such a class "obviously could not be certified [because] it would contain a vast number of people who could not have been harmed by the merger because they purchased medical services in the absence of the market power allegedly created by that merger." *Id.* at 824-25 (citing *Oshana v. Coca-Cola Corp.*, 472 F.3d 506, 514 (7th Cir. 2006)).[31] Likewise here, a class cannot be certified or

---

[29] Paul M. Barrett, *How BP Got Screwed on Gulf Oil Spill Claims*, Bloomberg Businessweek (June 27, 2013), http://www.businessweek.com/articles/2013-06-27/how-bp-got-screwed-on-gulf-oil-spill-claims.

[30] Plaintiffs' Attorneys' Advertisements at 4, Mar. 20, 2013, Doc. No. 8964-25 (emphasis in original).

[31] *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298 (5th Cir. 2009), is not to the contrary. In *Mims*, this Court merely held the district court did not abuse its discretion where the defendant speculated that "the class as defined *may* include plaintiffs who are not in fact

maintained that does not incorporate and apply a causal-nexus requirement; otherwise, the class would include persons whose losses were not (i) "as a result of" the Oil Spill (for purposes of Article III standing) or (ii) "typical" of those suffered by the class representatives or "common" to the class members as a whole (for purposes of Rule 23).

Apart from the importance of a causal nexus to compliance with Article III and Rule 23 requirements, however, the Settlement Agreement by its terms requires the Administrator to recognize and apply the class definition before doing anything else. In other words, the Administrator is to make a threshold determination of class membership before proceeding to any other term in the Agreement. Thus, when he receives a claims form, the Administrator's first order of business is to determine whether the claimant is a class member. Plaintiffs' counsel explained the workings of the claims process in just that way at the preliminary approval hearing: "I think sort of ***the general principles of the settlement is that one needs to determine if they've got class membership. Then*** they need to look at each of the damage categories . . . to determine if they have a claim in one or more of those categories."[32] The Administrator makes this threshold determination for businesses that are expressly excluded from the class, such as casinos and oil and gas companies. And when he himself has failed to identify the claimant as an excluded entity, he has acted on evidence from BP challenging class membership. The Settlement Agreement requires him to do so the same for claimants who are not members of the

---

eligible for the discount," by looking to the defendant's own criteria as to which customers were eligible for the unlawfully withheld discount. 590 F.3d at 307-08 (emphasis added). *Mims* did not address the question whether Rule 23 should be read to avoid Article III concerns that arise from (i) a class definition that lacks a causal-nexus element or (ii) the certification of a class that demonstrably includes a substantial number of class members that have suffered no constitutional injury.

[32]  Tr. of Hr'g on the Mots. for Conditional Certification of Rule 23(b)(3) Classes for Settlement Purposes at 20, Apr. 25, 2012, Doc. No. 6395 (emphasis added) ("Preliminary Approval Tr.").

class because their loss is not due to the Spill. "[P]ayment of *admittedly* non-spill-related claims," the BEL Decision said, "is a legal nullity." BEL Decision at 31; *see id.* at 28 ("Allowing recovery from the settlement fund by those who have no case and cannot state a claim, the court acts *ultra vires*.").[33]

## III. A CLAIMANT DOES NOT HAVE STANDING BECAUSE HE SATISFIES THE "CAUSATION" CRITERIA OF EXHIBIT 4B

Plaintiffs argue that paying claimants whose losses clearly were not caused by the Oil Spill is not *ultra vires* for lack of standing (i) because "BP agreed to the class definition and to the specific injuries and losses it agreed to be sufficiently related to the oil spill to be deserving of compensation" and (ii) because Exhibit 4B's criteria define causation.[34]

BP agreed to the class definition, of course, but that definition expressly requires that class members have suffered economic damage "as a result of" the Oil Spill. Plaintiffs are mistaken in saying that BP agreed to the Administrator's re-definition of class membership that disregards objective and undeniable evidence that a claimant's damages were not due to the Spill. In any event, it is a "truism that subject matter jurisdiction 'cannot be conferred by consent, agreement, or other conduct of the parties.'" *Gasch v. Hartford Acc. & Indem. Co.*, 491 F.3d 278, 284 (5th Cir. 2007); *Di Vosta Rentals, Inc. v. Lee*, 488 F.2d 674, 679 (5th Cir. 1973)

---

[33] The class definition has meaning independent of the causation issues presented by Exhibit 4B. This proffer focuses on claimants who are *not* class members, but may be able to show economic loss under Exhibits 4B & C. But there are surely other potential claimants who *are* class members, but cannot satisfy the causation requirements of Exhibits 4B, such as a business that suffered a downturn in revenue due to the Spill, but only after 2010 (i.e., the deadline under Exhibit 4B). No one would question the authority and duty of the Administrator to deny such a claim, nor would they deny that such a class member would be bound by the class release.

[34] Letter Brief to the Honorable Judges of the U.S. Fifth Circuit Court of Appeals from James Parkerson Roy and Stephen J. Herman at 5, *In re Deepwater Horizon*, No. 13-30095 (5th Cir. Oct. 18, 2013) ("PSC Letter Brief").

("Parties may not agree to expand the jurisdiction of the federal courts."); *Montegut v. Williams Commc'ns, Inc.*, 109 F. Supp. 2d 496, 498 n.2 (E.D. La. 2000) ("[I]t is black letter law that the parties may not consent to federal subject matter jurisdiction where it is lacking.") (citing *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982)).   And it likewise true that parties cannot agree to ignore or waive the requirements of Rule 23; either the certification complies with the Rule or it doesn't.  *See Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998).

Nor are plaintiffs correct that Exhibit 4B contains the "mechanism" to establish causation.[35] First, Exhibit 4B itself expressly provides that it does not apply to any claimant who is not a class member.  Footnote 1 to the Exhibit states: "Th[ese] Causation Requirements for Business Economic Claims do[] ***not*** apply to . . . Entities, Individuals or Claims ***not*** included with the Economic Class definition . . . ."[36]  In short, the Administrator must determine first whether a claimant is a member of the class before even considering the damage categories and applying Exhibit 4B.[37]  As noted above,[38] Plaintiffs' counsel said so at the preliminary approval hearing; the first step, he explained, is to determine whether a claimant is a member of the class, and only after making that determination does one even proceed to consider whether the claimant meets the criteria for one of the damage categories: "Now, the standard approach one needs to

---

[35]   *Id.* at 6.

[36]   Settlement Agreement Ex. 4B n.1.

[37]   *See supra* notes 10-16 and accompanying text.

[38]   *See supra* p. 15.

take *after they determine if they are a class member* is they need to look for causation, and then they need to look at each damage category . . . .[39]

Second, Exhibit 4B contains criteria for assessing declines in revenue; it contains no criteria for linking any such decline to the Oil Spill. Thus, while the Alabama excavation company that sold its assets in 2009 suffered a revenue decline under the Exhibit 4B criteria and received a $3.5 million award, that decline was not due to the Spill under any form of logic. In fact, there was not a loss at all. As plaintiffs' counsel also explained at the preliminary approval hearing, "When I talk about looking for *causation*, . . . what we're looking for is a *downturn in revenue*, and we have percentage guidance."[40] Plaintiffs' argument, then, is merely semantic – Exhibit 4B may be labeled "Causation Requirements," but, as Judge Southwick said, they have nothing to do with "prov[ing] that the loss had *any factual relationship* to BP's actions."[41] Proof of decline in revenue is distinct from proof of a causal nexus, and the Supreme Court has been clear that a plaintiff must establish both.[42]

Third, Exhibit 4B describes what showing a claimant must make; it does not limit what evidence the Administrator may consider. That is why Exhibit 4A gives the Administrator broad rights to obtain additional documentation from the claimant. So while it is true that a claimant

---

[39]  Preliminary Approval Tr. at 24 (emphasis added). The Constitution, as well as the contract, requires focusing on class membership first. The Supreme Court has held that constitutional standing is a threshold issue, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("[T]he first and fundamental question is that of jurisdiction . . . ."), as has the Fifth Circuit, *see Rivera*, 283 F.3d at 319. If determining class membership was not the first step, then the claims form would not require the claimant to affirm under penalty of perjury that he had suffered damages due to the Spill.

[40]  Preliminary Approval Tr. at 25 (emphasis added).

[41]  BEL Decision at 38-39 (Southwick, J., concurring) (emphasis added).

[42]  *See Lujan*, 504 U.S. at 560-61.

need not submit proof expressly linking his economic loss to the Oil Spill, when the Administrator is confronted with evidence that the loss is not traceable to the Spill, Exhibit 4B does not tell him to ignore that evidence.[43]  On the contrary, footnote 1 instructs him that Exhibit 4B "does not apply" because the claimant is not a member of the class.

Fourth, it is a commonplace rule of statutory and contract construction that any ambiguity should be resolved in a way that avoids constitutional questions and that renders a contract legal and enforceable.  Footnote 1 to Exhibit 4B restricts its applicability to class members.  But even if the relationship between the class definition and Exhibit 4B were ambiguous, that ambiguity must be resolved in favor of the class definition in order to remove any question of standing.  *See* BEL Opinion at 31 ("Should BP's proposed interpretation of the Settlement exclude putative class members with no colorable legal claim, the district court should have rendered the Settlement lawful by adopting that interpretation, as long as the interpretation is reasonable and effective.").[44]  BP's interpretation of the Settlement Agreement is the only one that avoids the serious Article III and Rule 23 questions that arise if the Claims Administrator continues to grant awards to claimants who have no causal nexus to the Oil Spill.

---

[43]  Exhibit 4A empowers the Claims Administrator to request additional documentation.  *See* Settlement Agreement Ex. 4A ¶¶ 1, 4, May 3, 2012, Doc. No. 6430-8.

[44]  *See, e.g.*, *Hobbs v. McLean*, 117 U.S. 567, 576 (1886) ("[I]t is a rule of interpretation that, where a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former must be adopted."); *see also Int'l Union, United Auto., Aerospace, & Agric. Implement Workers v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) (if a serious constitutional question arose in interpreting a settlement agreement, "a court might well construe the provision to avoid or ameliorate it"); *Nat'l Audubon Soc'y v. Watt*, 678 F.2d 299, 301 (D.C. Cir. 1982) (adopting a construction of a contract between the Secretary of the Interior and an environmental group that "avoid[ed] potentially serious constitutional questions").

## CONCLUSION

For these reasons, the Court should: (1) amend the scheduling order on remand to permit BP to submit evidence and argument regarding the payment of claims for losses not causally connected to the Oil Spill and (2) modify the preliminary injunction to include the following provision: "The Claims Administrator and Settlement Program are further ENJOINED from paying any business economic loss claim unless they first determine that the claimant is a member of the class, including that the claimant is within the economic class definition and has suffered loss of income, earnings or profits as a result of the Deepwater Horizon Incident."

November 7, 2013

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200

Respectfully submitted,

    /s/ Kevin M. Downey
Kevin M. Downey
F. Lane Heard, III
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 434-5000
Telefax:  (202) 434-5029

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone: (202) 942-5000
Telefax: (202) 942-5999

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 662-5985
Telefax: (202) 662-6291

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL 60606
Telephone: (312) 876-8000
Telefax: (312) 876-7934

***OF COUNSEL***

    */s/ Don K. Haycraft*
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger
Wendy L. Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Telefax: (312) 862-2200

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Telefax: (202) 879-5200

***ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.***
***AND BP AMERICA PRODUCTION COMPANY***

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 7th day of November, 2013.

/s/ Don K. Haycraft
Don K. Haycraft

# Exhibit Q

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>This document relates to all actions. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | MDL NO. 2179<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Bon Secour Fisheries, Inc., *et al.*, individually and on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>BP Exploration & Production Inc; BP America Production Company; BP p.l.c.,<br><br>    Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | Civil Action No. 12-970<br><br>SECTION J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

**DECLARATION OF ALLISON B. RUMSEY**

1.   I am a partner in the law firm of Arnold & Porter LLP, resident in the firm's Washington, D.C. office.  I am counsel for BP Exploration & Production Inc., BP American Production Company, and BP p.l.c. (collectively, "BP") in the above-captioned case.  I am over the age of 18 and, if called, competent to testify to the facts set forth herein.

2.   In connection with my representation of BP, I have reviewed and become familiar with the Economic and Property Damages Settlement, as amended, in the above-captioned case. I have reviewed numerous claims awards made by the Court-Supervised Settlement Program

(CSSP) pursuant to that Settlement, the briefing of appeals of claims awards by BP or Claimants, and related claims files available through the Settlement Program portal.

3. The appendices to this Declaration were created by me, and by attorneys at my firm and experts under my supervision who also are familiar with the Settlement Agreement and have reviewed claims awards and appeals and materials in claims files for which awards have been made by the Settlement Program. The appendices summarize the results of our review of claims awards made by the Settlement Program. The summaries in the appendices are true and accurate representations of the data in the claims files to the best of my knowledge. Upon request, the full claims files could be produced to the Court.

4. Appendix A summarizes the results of a review of claims awards and underlying claims files to identify claims where documentation in the file suggests that there is an identifiable and non-Spill related loss that appears to account for the change in circumstances for the Claimant in question. Appendix A includes summaries of the facts of 64 such claims as reflected in the documentation contained in the Settlement Program claims files. The awarded value of these 64 claims is approximately $76,000,000. In almost every case, BP claims reviewers identified the non-Spill related cause of the loss by searching the internet or other publicly-available documents. This additional search was not routinely conducted on every claim. As a result, this list is a sample and does not purport to represent the entire universe of claims where documentation in the file indicates that there is an identifiable and non-Spill related loss that appears to account for the change in circumstances for the Claimant in question. Although the Claimants' identification names and full claim numbers do not appear on the Appendix, in order to preserve confidentiality pursuant to outstanding orders of the Court, I could provide the identification information if requested to do so by the Court.

5.    Appendix B contains a list of 1,196 claims, offers for which were issued as of October 28, 2013, that met the following criteria:  (1) in Zone D, (2) more than 100 miles from the Gulf, and (3) in one of the following industries -- agriculture:  crops;  agriculture:  other; construction; health care; manufacturing; professional services:  lawyers; professional services: other; real estate; transportation and warehousing; and wholesale trade.  We selected these criteria because there is no apparent reason why these losses, so far from the Gulf coast and in industries that are unlikely to have been impacted by the Spill, would have any nexus to the Spill.  It is my belief that further investigation into these claims would reveal many of them to have an identifiable non-Spill related cause responsible for any loss they may have suffered, similar to the examples in Appendix A.  The total value of the award offers of these claims is approximately $546,000,000.  An economic consultant that routinely reviews claims files of Claimants and the Settlement Program data assisted in the preparation of the list.  Although the Claimants' identification names and numbers do not appear on the Appendix, I could provide the identification information if requested to do so by the Court.

6.    The total value of the awards cited herein reflect total Award Amounts in the most recently filed eligibility notice for each claim.  So, for example, where a post-appeal eligibility notice has been issued, the amount will reflect, where applicable, any award decreases conceded by claimant as well as the 5% review cost increase.  These numbers may differ from those used in the description of claims in Appendix A because the amount reflected in each claim description is the pre-appeal Award Amount generated by the Settlement Program.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of November, 2013 in Washington DC.

/s/ Allison B. Rumsey
Allison B. Rumsey

# APPENDIX A

## All claimants listed below did not incur an injury due to the Spill and thus are not Class Members

1. **Claim No. XXX86:** Claimant is a Zone C wireless phone retailer and service company in central Louisiana. The Settlement Program awarded Claimant a total of $135,258.94. Claimant did not incur a loss due to the Spill. In late 2009 or early 2010, Claimant's facility had a fire, which resulted in the facility being shut down for all of 2010. Claimant could not have lost profit as a result of the Spill when, as a result of the fire, it was not engaged in profit-generating activity in 2010.

2. **Claim No. XXXX60:** Claimant, a Zone D attorney in Louisiana, approximately 200 miles from the Gulf, had his business license revoked in November 2009. From January 2010 to December 2011, Claimant recorded revenue in just four months, totaling only $3,250. The Settlement Program awarded Claimant a total award of $172,253, notwithstanding the fact that Claimant was not fully engaged in the practice of law during the Compensation Period. Claimant did not incur an injury due to the Spill. Claimant's decline in revenue is directly traceable to the revocation of his law license.

3. **Claim No. XXX08:** Claimant is a Zone D dental office located over 200 miles away from the Gulf of Mexico. Claimant's documentation shows that Claimant generated less revenue in October, November, and December 2010 because Claimant's building suffered water damage (unrelated to the Spill) and was forced to close. Claimant's sworn statement to its insurance company asserts that the water damage from the building caused over $47,000 a month in lost business income during October, November, and December 2010. Accordingly, Claimant had no injury due to the Spill. Claimant's decline in revenue in late 2010 was caused by this water damage that forced its office to close. The Settlement Program nonetheless awarded Claimant a total of $137,518.89.

4. **Claim No. XXXX10:** A farm located in Zone D, more than 200 miles from the Gulf elected not to grow wheat in 2010, although it had grown wheat in 2008 and 2009. Claimant did not incur a loss due to the Spill. Rather, the decrease in revenue was due to Claimant's voluntary election not to grow a crop. Yet, the Settlement Program awarded Claimant $266,730.

5. **Claim No. XXX81:** Claimant in this appeal is a technology firm located in Alabama approximately 300 miles from the Gulf of Mexico. The Settlement Program awarded Claimant $221,000, more than its total revenue in 2009. Claimant did not incur an injury due to the Spill. Rather, Claimant made an elective business development decision in January of 2010 not to charge its client a licensing fee. As Claimant stated, "[i]n January of 2010, [Claimant] executed a new agreement with [redacted] Health System . . . and under this agreement the setup fee and annual license fees were $0. . . . This explains why revenues were $0 on a monthly basis for most of 2010." As a direct result of this elective business decision, Claimant did not have one penny of revenue from January 2010 until December 2010, when it recognized revenue from a contract with a new client.

# APPENDIX A

## All claims listed below did not incur an injury due to the Spill and thus are not Class Members

6. Claim No. XXXX20: Claimant is a Zone D inland marine towing business located in Louisiana. Claimant operates a single tugboat. The Settlement Program awarded Claimant $231,272 in total. Claimant's Variable Profit in May to October 2010 exceeded its Variable Profit during the same months in the Benchmark year 2009. In November 2010, Claimant's tugboat—its only source of revenue—was not operating because the tugboat was undergoing major repairs unrelated to the Spill. Indeed, Claimant acknowledged these repairs, explaining that it "took [the tugboat] out of service *therefore lowering revenues*." (emphasis added). Thus, Claimant did not incur any injury due to the Spill or for any other reason. Claimant simply earned less revenue at the end of 2010 because it performed necessary repairs on its boat.

7. Claim No. XXX72: Claimant is a disaster recovery contractor that assists the federal government with hurricane recovery efforts. Claimant did not suffer any lost profits due to the Spill. Rather, Claimant did not have any business during the post-Spill period in 2010 because there were not any hurricanes requiring its services. Nonetheless, the Settlement Program awarded Claimant more than $2.6 million, treating the absence of hurricanes and thus the absence of any ability to conduct its business as a Spill-related loss of profits.

8. Claim No. XXX38: Claimant is a Zone C company that provides water filtration solutions in Alabama. The Settlement Program awarded Claimant a total of $4,181,890. The Settlement Program included in its calculation commercial rental revenues for properties that Claimant sold in 2007 and that Claimant no longer owned at the time of the Spill. The Settlement Program's calculation also included $26.6 million in revenues from a FEMA contract related to Hurricane Katrina in 2007—revenue that Claimant could not have expected to earn in 2010, a year in which there were no hurricanes requiring its services. The award was driven by two events—the sale of properties from which Claimant previously earned income and the end of Hurricane Katrina contracts— that pre-dated and were entirely unrelated to the Spill.

9. Claim No. XXX65: Claimant is a Zone D nursing home facility in Central Louisiana. The Settlement Program awarded Claimant $662,834 in total. Almost a full year before the Spill, Claimant shut down its facility and transferred its license to operate the business. Yet, the Settlement Program engaged in the fiction that the absence of revenue in 2010, after Claimant had closed and transferred its license, was an injury due to the Spill.

10. Claim No. XXX51: Claimant is a hotel in Mississippi. The Settlement Program awarded Claimant $453,045.84. Claimant experienced a fire in mid-September 2010 that caused the hotel to remain closed from October 2010 until the Spring of 2011. Claimant recorded no revenue during those months. Claimant's Compensation Period included October 2010. The Settlement Program created the fiction that the absence of revenue in

# APPENDIX A

## All claims listed below did not incur an injury due to the Spill and thus are not Class Members

October 2010 was a loss resulting from the Spill, when in fact it was due to the fact that the fire caused the business to shut down.

11. Claim No. XXX08:  Claimant is a psychiatric hospital located more than 100 miles from the Gulf of Mexico.  The Settlement Program awarded Claimant more than $2 million, notwithstanding the fact that Claimant was busier in 2010 than in 2009.  Claimant's decrease of profit in 2010 was directly attributable to a reduction, which took effect prior to the Spill, in rates paid by third-party payors (*e.g.* government programs and private insurers).

12. Claim No. XXX26:  Claimant, a non-residential land leasing company in Alabama, renegotiated a lease to reduce annual rent by $300,000 on January 5, 2010 through May 31, 2010.  On July 2, 2010, Claimant again renegotiated the lease, extending the $300,000 annual reduction in rent through December 31, 2010.  Claimant did not incur an injury due to the Spill.  The decrease in rent revenue was due to a decision to reduce rent prior to the Spill.  Yet, the Settlement Program awarded Claimant a total of $585,033.50.

13. Claim No. XXXX78:  Claimant, a commercial real estate lessor located in Zone D Alabama, stopped receiving rental payments in April 2009 when FEMA cancelled its lease.  This meant, of course, that Claimant also did not receive any rental payments from the cancelled lease in 2010.  Additionally, in July 2007 (a month that was included in the Benchmark Period) Claimant received a $500,000 one-time payment from Dillard's (a tenant) for "rental termination pay out."  The Settlement Program awarded Claimant $601,323 even though Claimant did not incur an injury due to the Spill.  The large award was driven by the non-recurrence of  revenue from (i) a lease that was cancelled a year before the Spill and (ii) a one-time lease cancellation payment in 2007.

14. Claim No. XXX60:  Claimant is a Zone C painting contractor, who, according to Claimant's tax returns and communication to the Settlement Program, sold a portion of its business in December 2009.  Following this sale, Claimant's revenue, as expected, dropped by almost 50%.  Despite the fact that Claimant did not incur an injury due to the Spill, the Settlement Program gave it a total award of $169,185.14.

15. Claim No. XXX98:  Claimant, a storm cleanup and construction company located in Louisiana, was awarded more than $4 million.  Yet, Claimant did not incur an injury due to the Spill.  Claimant had a banner year in 2008 when it received approximately $30 million in FEMA contracts for cleanup activities following Hurricanes Gustav and Ike.  Claimant earned much less revenue in 2010 because there were no major hurricanes requiring its services.

16. Claim No. XXX17:  Claimant, a Zone D dentist located in Louisiana, received an award of more than $71,000 from the Settlement Program.  Claimant did not incur a loss due to

# APPENDIX A

# All claims listed below did not incur an injury due to the Spill and thus are not Class Members

the Spill. Claimant, a solo practitioner, opened a second office at the beginning of the Compensation Period. The claim at issue is only for the original office. When Claimant opened his second office, he could not work at both offices at the same time, and thus the opening of the second office resulted in a decrease in revenues earned at the first office during the Compensation Period.

17. Claim No. XXXX37: Claimant is a builder of luxury homes located in Florida (Zone D). The Settlement Program awarded Claimant more than $1 million. Claimant did not incur an injury due to the Spill. Rather, in 2010, Claimant made an elective business strategy decision to defer several projects (and thus the generation of substantial revenue) until 2011 to focus on a single large project. This business decision resulted in Claimant not generating as much revenue in 2010 as it did in prior years.

18. Claim No. XXXX59: Claimant is a Zone B landlord of a large New Orleans commercial office tower. The Settlement Program awarded Claimant more than $4 million, even though Claimant did not incur a loss due to the Spill. Claimant's decline in revenue was driven by the termination/restructuring of two leases prior to the Spill, in October 2009 and February 2010. In both cases, Claimant received a large lease termination/restructuring payment, thereby increasing pre-Spill performance, and agreed to a termination/restructuring which resulted in the absence of revenue from the leases after the Spill.

19. Claim No. XXX80: Claimant, a Zone D freight brokerage firm in Alabama, admitted that its decrease in revenue in November and December 2010, two months in the Compensation Period, was unrelated to the Spill and "was due to a usual and normal seasonal pattern . . . of customers slowing down, and in some instances, stopping their shipments at year end." Moreover, Claimant acknowledged that it experienced inflated revenues during the Benchmark Years of 2008 and 2009 due to unique market factors that did not exist in 2010. Specifically, Claimant explained that its revenues in November and December of 2008 and 2009 were unusually high because "aluminum prices dropped during these periods and aluminum was at 5 year lows causing businesses to start 'stocking-up' on aluminum during these periods, therefore increasing shipments of aluminum." Despite the absence of an injury due to the Spill, the brokerage firm received a total award of $880,263.08.

20. Claim No. XXXX69: Claimant is a Zone D truck leasing entity in Alabama, approximately 250 miles from the Gulf of Mexico. The Settlement Program awarded Claimant more than $1.7 million. Yet, Claimant did not incur an injury due to the Spill. Claimant's revenue in 2010 decreased because of Claimant's pre-Spill decision to significantly decrease the size of its trucking fleet. For example, Claimant began 2007 with $31.19 million in depreciable assets, presumably its trucks for lease. By the end of 2008, the value of Claimant's depreciable assets had decreased to $13.83 million, less than half of the value at the beginning of 2007. As a result of this pre-Spill reduction in

# APPENDIX A

## All claims listed below did not incur an injury due to the Spill and thus are not Class Members

its trucking fleet, Claimant could not generate the same revenue in 2010 that it had in prior years.

21. Claim No. XXX30:  Claimant is a Zone C janitorial services company in Louisiana.  The Settlement Program awarded Claimant $1.67 million, even though Claimant did not incur an injury due to the Spill.  In the years prior to the Spill, Claimant earned 87% of its revenue from its top 10 contracts.  By the end of 2009, Claimant lost 9 of 10 of these top contracts.  As a result, Claimant's revenue dropped substantially in 2010.

22. Claim No. XXX64:  Claimant operates a Zone D hotel approximately 115 miles from the Gulf of Mexico.  In December, Claimant rebranded its hotel to a lower quality brand.  At the same time, Claimant opened a second, high-level hotel right next door.  The combination of the rebranding of the existing hotel and the opening by Claimant itself of a competing operation right next door led to decreased revenue for the original hotel (the subject of the claim) in 2010.  Claimant did not incur an injury due to the Spill.  Yet, the Settlement Program awarded Claimant a total of $601,527.

23. Claim No. XXX15:  Claimant is a Zone D family medical practice clinic located in Alabama.  The Settlement Program awarded Claimant a total of $662,586.  Claimant did not incur an injury due to the Spill.  During Claimant's Compensation Period, the physician who had previously generated the most revenue for the Clinic was unable to practice medicine because his medical license had been revoked by the State of Alabama.  Claimant could not have had a loss due to the Spill in a situation where its chief revenue generator was prohibited by the State of Alabama from generating revenue.

24. Claim No. XXXX02:  Claimant is a Zone D excavating company located in Alabama.  The Settlement Program awarded Claimant more than $3.5 million, notwithstanding the fact that Claimant did not incur an injury due to the Spill.  Claimant sold substantially all of its assets and received over $2 million for the sale of its "goodwill" in August 2009.  Having sold most of the assets used previously to generate profit, Claimant's revenue dropped from more than $20 million in 2009 to less than $1 million in 2010.  The decline in revenue had absolutely nothing to do with the Spill.  It was the direct result of Claimant's pre-Spill sale of its business-generating assets.

25. Claim No. XXX03:  Claimant, a Zone D hotel in Mississippi, experienced extensive damage from a fire in 2010, and as a result, was not in operation in May, June or July of 2010.  The Settlement Program engaged in the fiction that the $0 in revenue generated in May, June and July of 2010 was a loss due to the Spill rather than the fact that, due to the crippling fire, Claimant was out of business.  Based on this fiction, the Settlement Program awarded Claimant a total of $216,374.84.

26. Claim No. XXX23:  Claimant operates a retail store in Florida.  Prior to April of 2010, Claimant also owned an RV Park.  On April 6, 2010, *two weeks before the Spill*,

# APPENDIX A

# All claims listed below did not incur an injury due to the Spill and thus are not Class Members

Claimant's creditors foreclosed on the RV Park. However, the Settlement Program included the revenue generated by the RV Park during prior years in its calculation of Claimant's loss, comparing those prior revenues against revenues that did not exist after Claimant's RV business was foreclosed. The absence of revenue from the RV Park was due to the foreclosure, not the Spill. Yet, the Settlement Program awarded Claimant more than $704,000.

27. Claim No. XXX59: Claimant was a two-partner law firm located in Zone C that, in 2010, merged with a new law firm. According to the calculation notes, the new firm consumed much of the two partners' time and thus Claimant's revenue declined. According to Claimant, it remained a separate entity to handle only limited litigation; the loss was caused therefore by the winding down of the majority of Claimant's legal practice, not the Spill. The Settlement Program awarded Claimant $579,510.96 in total.

28. Claim No. XXXX56: Claimant is a restaurant equipment sales business located in Zone D. The Settlement Program awarded Claimant more than $125,000. This award is driven by the fact that Claimant's financial records do not accurately reflect Claimant's December 2010 revenue. The business did in fact earn revenue in December 2010, a month in its Compensation Period. Claimant admits that the drastic decline in revenue for the December 2010 records is "due to the fact [that the owner] was out of the office for a family emergency and [he] did not enter the revenues nor do the deposits until January 1, 2011." In other words, Claimant's delay in inputting information into its books caused the appearance of a loss where there was none.

29. Claim No. XXX00: Claimant is a non-profit in Florida that provides counseling for at-risk youth and their families. Claimant's economic performance in 2010 changed not as a result of an injury due to the Spill—or indeed any injury at all—but rather due to an elective change in the matter in which Claimant receives funding. In the years 2007-2009, Claimant received a $160,000 lump sum payment each year from the State of Florida Department of Juvenile Justice, as well as a series of monthly payments. In 2010, however, Claimant voluntarily elected to change its business model and to no longer receive the lump sum annual payment from the State. Because it erroneously treated Claimant's voluntary election not to receive certain State funding in 2010 as an injury due to the Spill, the Settlement Program awarded Claimant $261,811.20.

30. Claim No. XXXX41: Claimant is a Zone D farm in Northern Mississippi approximately 275 miles from the Gulf of Mexico. The Settlement Program awarded Claimant $116,110.51 in lost profit. Claimant's financial documentation demonstrates that it did not engage in farming operations in either 2009 or 2010. Claimant recorded no crop revenue and zero variable costs in 2009. In 2010, Claimant similarly recorded no crop revenue, and its only variable costs were for fuel in November 2010, and for seeds/plants in December 2010. These costs related to preparing land for crops to be raised in 2011, which is the first year Claimant raised and sold crops since 2008. Accordingly, Claimant

# APPENDIX A

## All claims listed below did not incur an injury due to the Spill and thus are not Class Members

could not have experienced an injury due to the Spill—or indeed any injury regardless of cause—as Claimant opted not to plant crops in either 2009 or 2010.

31. Claim No. XXX66:  Claimant is a restaurant located in Zone D, approximately 180 miles from the Gulf.  Claimant operated a restaurant from January 2007 to August 2009.  Claimant closed the restaurant in January 2010.  Claimant then leased the land to a third party and, thus, received only rental income, which was significantly less than its prior restaurant income.  In 2011, Claimant again opened its own restaurant at the property.  Claimant thus did not incur an injury due to the Spill.  In fact, Claimant did not incur any injury regardless of cause.  Claimant's 2010 profits decreased because, prior to the Spill, Claimant elected to change its business model and business operations.  The Settlement Program nonetheless awarded Claimant $252,388.

32. Claim No. XXX27:  Claimant operates a car dealership in Louisiana (Zone C).  General Motors eliminated the Pontiac brand of automobiles, which Claimant sold, prior to Claimant's Compensation Period.  Accordingly, Claimant's losses related to the elimination of the Pontiac brand were entirely unrelated to the Spill.  Despite this, Claimant was awarded $1,591,996.

33. Claim No. XXX60:  Claimant is a Zone C real estate rental company which, prior to the Spill, earned revenue from leasing two properties to Saturn car dealerships.  The Settlement Program awarded Claimant a total of $238,448.50.  Claimant's only major sources of income, the Saturn dealership leases, dried up prior to the Spill because those dealerships went out of business in 2009.  In 2010, the year of the Spill, Claimant did not earn any revenue because it had, prior to the Spill, lost its tenants.  Claimant did not incur an injury due to the Spill.

34. Claim No. XXX60:  Claimant is a Zone D waste management company located in Alabama.  The Settlement Program awarded Claimant a total award of $1,704,690.  Claimant's revenue spiked significantly in 2008 due to two major hurricanes, Gustav and Ike, hitting Louisiana and Texas.  Notably, Claimant recorded $2,564,249 in Variable Profit in September 2008 alone, which represents 67% of 2008 annual revenue and more Variable Profit than is recorded in any full year 2009-2011.  This revenue spike was never repeated in subsequent years.  The $1.7 million award is entirely driven by the fact that a natural catastrophe on the scale of Hurricane Ike did not repeat.

35. Claim No. XXX58:  Claimant is a Zone B catering service and restaurant located in Louisiana.  The Settlement Program awarded Claimant $2,038,639.52.  Among other services, Claimant provides catering to emergency response clean-up personnel, particularly after hurricanes.  Claimant's revenue spiked in December 2007 as well as September/October 2008 due to Hurricanes Katrina and Gustav.  For example, Claimant recorded approximately $894,000 in revenue in December 2007 alone, which represents close to 50% of its 2007 revenue, from a large catering event for volunteers providing

7

# APPENDIX A

## All claims listed below did not incur an injury due to the Spill and thus are not Class Members

Hurricane Katrina clean-up. Claimant never came anywhere close to repeating that revenue, and the lack of a similar spike in 2010 was due to the lack of a repeat major natural disaster rather than an injury due to the Spill.

36. Claim No. XXX89: Claimant is a Zone C hotel located in Texas. The Settlement Program awarded Claimant $1,442,937.30. Claimant experienced a significant spike in revenue from September 22, 2008 through February 2009 as a result of Hurricane Ike. Specifically, the hotel was fully occupied during this period as residents of Galveston returned to the city following a mandatory evacuation resulting from Hurricane Ike's landfall in the Galveston area on September 13, 2008. Claimant's occupancy levels returned to pre-hurricane levels after February 2009. Accordingly, Claimant could not "have expected to earn" after the Spill the same profit as in prior years because there were no major hurricanes. Thus, Claimant did not incur an injury due to the Spill; rather, there simply was no repeat of a one-time natural disaster on the scope of Hurricane Ike.

37. Claim No. XXX86: Claimant is a Zone C investment holding company located in Florida. The Settlement Program awarded Claimant $103,989, notwithstanding the fact that Claimant did not suffer any injury due to the Spill. Claimant did not record *any* revenue or expenses—except for $138.75 in licenses and taxes in February 2010—from December 2009-February 2011. Claimant admitted that this lack of revenue was due to a loss of clients in 2009.

38. Claim No. XXX51: Claimant is a Zone D six-lawyer law firm located in Mississippi. The Settlement Program awarded Claimant $5,281,336. The record demonstrates that Claimant "devoted nearly all of its resources" to litigating a personal-injury case from 2006 until it settled in September 2009, with Claimant receiving a more than $7 million contingent fee. Based predominantly on that single fee, which Claimant received during its 2009 Benchmark Period, the Settlement Program awarded Claimant $4,225,069 in lost profit; however, Claimant earned more revenue in 2010 than in 2008 or in 2011. The decline in Claimant's 2010 revenue as compared to 2009 is an artificial loss caused not by the Spill, but by the mere coincidence that Claimant had received and recorded in September 2009 an enormous fee that was the result of three years of work.

39. Claim No. XXX92: Claimant is a Zone C single family home construction company. The Settlement Program awarded Claimant $720,900.21. Claimant did not suffer economic damage as a result of the Spill. Claimant admitted that its profits had been declining for several years due to the collapse of the housing market: "[*b*]*ecause of the housing situation* over the past several years, there have been very few new homes built over the past years."

40. Claim No. XXX53: Claimant, an emergency room physician's group in Zone C, received a total award of $2,273,510. Over half of the "loss" and award is the result of the Settlement Program counting as revenue an account Claimant admitted was not revenue

# APPENDIX A

## All claims listed below did not incur an injury due to the Spill and thus are not Class Members

earned in that month, but rather was an accounting adjustment recorded once (December 2009) in 5 years that was used to clean up Claimant's accounts receivable over a number of months or years.

41. Claim No. XXXX46: Claimant is a Zone C home construction company located in Florida that appears to have not been in business from July 2009 to July 2010 (it recognized $0 revenue for that year). The Settlement Program awarded Claimant a total award of $273,006.59.

42. Claim No. XXX80: Claimant, a commercial building contractor located Zone D, recorded a large revenue amount in the first half of 2009 and then did not record any revenue from August 2009 through November 2010. A business cannot incur a loss of profit and thus cannot have Economic Damage, when it is not engaged in an attempt to earn profit, which is precisely what is reflected in the record evidence. This building contractor received a total award of $53,636.45.

43. Claim No. XXX48: Claimant, a Zone B emergency room physician's group operating in Louisiana, entered into a contractual relationship with a hospital pursuant to which it received certain subsidies until its patient volume or billings increased. The subsidy began to decrease in December 2009 and further still in January 2010 due to an increase in Claimant's business. The lower subsidy in 2010 was not the result of an injury due to the Spill, but, to the contrary, the elimination of an agreed-to subsidy when Claimant's business expanded. Yet, the Settlement Program awarded Claimant $272,722.

44. Claim No. XXX30: Claimant, a computer equipment and sales services company in Florida, was awarded more than $278,000 largely as a result of the sale of a client. Claimant did not incur an injury due to the Spill. Rather, Claimant received $12,500 on a monthly basis from its major client from May 2008 to January 2010. When this client was sold in pre-Spill February 2010, this income ended as well. Claimant recorded only $14,000 in revenue after February 2010, including $0 in 2011.

45. Claim No. XXX26: Claimant, a law firm located in Alabama more than 200 miles from the Gulf, reported only two months of positive net income from April 2009 to December 2010 ($3,579.42 in September 2009 and $581.56 in June 2010). In nineteen of those months, Claimant reported no revenue. Yet, the Settlement Program awarded Claimant $64,986.24. Claimant could not have incurred an injury due to the Spill when it was not in operation for most of the relevant period, and even when it was in operation earned net income that was a fraction of the award issued by the Settlement Program.

46. Claim No. XXXX19: Claimant is a Louisiana law firm. The Settlement Program awarded Claimant more than $539,000, even though Claimant did not incur an injury due to the Spill. Rather, Claimant's business changed materially as a result of events unrelated to the Spill. Prior to the Spill, Claimant represented hospitals that were forced

9

# APPENDIX A

## All claims listed below did not incur an injury due to the Spill and thus are not Class Members

to close due to Hurricane Katrina. According to Claimant, this defense work, and the associated revenue, ended shortly after May 2010. Due to the termination of its prior revenue stream, Claimant evolved into to a predominantly plaintiff-oriented firm. The decline in revenue after the Spill was associated with the end of Claimant's prior line of work and the commencement of a new line of work, not the Spill.

47. Claim No. XXXX12: Claimant is an equipment leasing company located more than 100 miles from the Gulf Coast. Claimant admits that it lost its clients in 2009, and, as a result, earned no revenue from May 2009 to March 2010. It then began to rebuild its client base. Claimant did not incur an injury due to the Spill. Rather, Claimant's post-Spill revenue in 2010 was lower than its revenue in similar Benchmark Period months because it was still in the process of replacing its entire client base, which it had lost in 2009. Yet, the Settlement Program awarded Claimant $108,000.

48. Claim No. XXXX25: Claimant is a Zone C dentist office located in Florida. The Settlement Program awarded Claimant $237,000. Claimant did not incur an injury due to the Spill. Rather, Claimant's revenue declined because of the departure of one of Claimant's dentists prior to the Spill.

49. Claim No. XXX40: Claimant is a Zone C cancer diagnosis and treatment center located in Alabama. Claimant's award was driven by a problem in Claimant's internal billing practices. In October 2008 and September 2009, two months in the Benchmark Period, Claimant recorded a contractual discount of 10%, the difference between what Claimant charged and what it received from insurance carriers or government payors. This suggests Claimant received 90% of what it billed patients for the services provided. In the months directly following these low contractual discount rates in 2008 and 2009, Claimant recorded discount rates of 56% and 58%, respectively. This suggests Claimant experienced a one-time lag in processing its insurance reimbursements causing spikes in revenue during the Benchmark Period—an event that had nothing to do with the Spill and yet inflated Claimant's award. Despite this, and the fact that Claimant's 2010 Variable Profit was more than $293,000 greater than its Benchmark Year Variable Profit, the Settlement Program awarded Claimant $543,419 in total.

50. Claim No. XXX95: Claimant is a Zone D law firm located in Louisiana. Despite Claimant recording an 86% increase in Variable Profit from 2009, its Benchmark Year, to 2010, the Settlement awarded Claimant more than $82,000. According to Claimant, it was founded in 2007 as a law firm focused on representing victims of Hurricane Katrina. Such claims lasted from 2007-2009 and did not carry into 2010. Therefore, even if Claimant incurred an injury (and it did not), such injury was not due to the Spill.

51. Claim No. XXXX40: Claimant is a Zone D thoracic and cardiovascular medical practice nearly 200 miles from the Gulf of Mexico. The Settlement Program awarded Claimant more than $372,000. Claimant's own financial records show that Claimant did not incur

10

# APPENDIX A

## All claims listed below did not incur an injury due to the Spill and thus are not Class Members

an injury due to the Spill.  Beginning in early 2010, before the Spill, Claimant's revenue declined dramatically and it stopped making most of its purchases and incurring expenses.  Whatever the reason for this extreme contraction of Claimant's business, it pre-dated the Spill.

52. Claim No. XXX26:  Claimant is a Zone D law firm.  In May 2008, a key owner who had generated a significant amount of contingency revenue left.  After the departure, Claimant's revenues decreased by 50% or more from 2008 to 2010 when compared to revenues in 2007.  Despite the fact that Claimant did not incur an injury due to the Spill, the Settlement Program awarded the Claimant a total award of $247,080.94.

53. Claim No. XXX44:  Claimant is a Zone D cancer diagnosis and treatment center located in Alabama.  Claimant is a start-up business.  Claimant did not start paying salaries for physicians until July 2010, recorded no other variable expenses until October 2011, and did not start incurring drug costs until March 2012.  While Claimant's rent expense and lease shows that Claimant could have begun operations in April 2010, its financial data shows that Claimant's revenue was low not because of the Spill but because Claimant simply choose to not yet start true operations.  Despite this, Claimant's total award was $1,666,402.

54. Claim No. XXX17:  Claimant is a Zone C residential building construction company.  Claimant did not incur an injury due to the Spill.  Rather, Claimant's business was in a free fall prior to the Spill.  After earning average annual revenue of $2.7 million from 2007-2009 (virtually all in a single month), Claimant recorded less than $10 in revenue from October 2009 through December 2009 and $0 in 2010 before (and after) the Spill.  Whatever the cause of Claimant's loss, it was not the Spill.  Yet, the Settlement Program awarded Claimant a total award of $433,728.98.

55. Claim No. XXX33:  Claimant, a residential contractor located in Florida and allegedly in the business of  purchasing land and building custom homes, was awarded $274,944.98 in total.  Claimant's loss was not a result of the Spill but appears to be a result of the fact that Claimant was not actually in business.  Claimant's financial records show that it had no payroll, recorded only five months of revenue in the four years used for the Benchmark and Compensation Periods, recorded only one month of variable expenses during 2010, and had no active contractor's license in the state of Florida, despite listing itself as a custom home builder.

56. Claim No. XXX37:  Claimant is a Zone A restaurant located in Florida.  The Settlement Program awarded Claimant more than $1 million, even though Claimant did not incur an injury as the result of the Spill.  During the pre-Spill Benchmark years, Claimant operated three restaurants.  In May 2010, Claimant elected to sell one of the restaurants.  Having decreased the number of restaurants in operation by one-third, Claimant earned less revenue during the Compensation Period than it did in prior years.

# APPENDIX A

## All claims listed below did not incur an injury due to the Spill and thus are not Class Members

57. Claim No. XXX96:  Claimant, a corporate management entity, owns and operates eight restaurants, only two of which are located in the Gulf Coast Areas (three of its restaurants are in Las Vegas casinos and one in a Pennsylvania casino), and provides management services for certain other restaurants.  Prior to 2010, Claimant did not have to pay licensing fees for its famous trademark.  In 2009, however, Claimant entered into a license agreement with another company in the same corporate family, pursuant to which Claimant was required to pay licensing fees for use of the trademark beginning in 2010.  Claimant paid $3 million in licensing fees in 2010—fees that it was not required to pay in 2009—to another wholly-owned entity for use of the trademark.  These fees, and the large fictional loss they created, are entirely unrelated to the Spill.  Claimant also shut down one of its restaurants in May 2010, and made the decision to do so prior to the Spill.  Claimant was awarded nearly $8.2 million.

58. Claim No. XXX40:  Claimant is a boat dealer located in Florida (Zone A).  In 2009, Claimant's lender filed a collection foreclosure action and repossessed 48 of Claimants' boats.  With substantially diminished inventory to sell, Claimant earned less revenue in 2010 than in 2009.  The Settlement Program treated the decline in revenue as an injury due to the Spill, and issued a total award of $1,082,743.90.

59. Claim No. XXX62:  Claimant is a Zone A hotel operator and restaurant located in Florida.  The Settlement Program awarded Claimant $2,414,983, despite the fact that Claimant recorded more revenue and had a higher Variable Profit in 2010 than in pre-Spill 2009.  In the Compensation Period of August to December 2010, Claimant took 32 of its 269 rooms "out of order for renovation" from August to October 2010 and then took an additional 30 rooms "out of order" during September to October 2010 due to "pool area renovations."  Thus, any decline in revenue in the August to October 2010 period was due to Claimant's elective decision to engage in restoration, not the Spill.

60. Claim No. XXXX20:  Claimant is a Zone A rental company.  Claimant sold its short term rental property (the subject of the award) on September 30, 2010.  After Claimant sold the property, it could not earn any further revenue from the property.  Yet, the Settlement Program awarded Claimant more than $63,000 for the Compensation Period October to December 2010, a time period after Claimant had sold the subject property.  Claimant did not incur a loss as the result of the Spill or any other cause.

61. Claim No. XX20:  Claimant is a Zone A cabinet designer/retailer with two locations in Florida.  The Settlement Program awarded Claimant $1,043,042.69.  During Claimant's Benchmark Period, a line of cabinets for which Claimant received substantial commission income was discontinued and thus this income did not recur in 2010.   The absence of revenue in 2010 from the discontinued line of cabinets was in no way, shape, or form an injury due to the Spill.

# APPENDIX A

## All claims listed below did not incur an injury due to the Spill and thus are not Class Members

62. Claim No. XXX44:  Claimant is a television broadcasting studio located in Zone A.  The Settlement Program awarded Claimant more than $4.8 million.  Claimant did not incur an injury due to the Spill.  In 2007 and 2008, Claimant earned increased revenues due to the sale of political ads in connection with local and national elections.  In contrast, 2010 was an election year involving only four races for the House of Representatives, two of which were essentially uncontested.  The decline in relative revenue in 2010 was not due to the Spill, but rather the absence of revenue-generating elections for the studio.

63. Claim No. XXX66:  Claimant is a Zone A retailer which appears to have ceased business operations on March 23, 2010 and opened a new jewelry store under a different name.  Claimant did not provide sales tax returns for April to June 2010, and Claimant's state sales tax returns for July to December 2010 show Claimant received no revenue during these months.  The Settlement Program awarded Claimant more than $900,000, despite the fact that there was no proof Claimant was even operating its business.

64. Claim No. XXX73:  Claimant, a commercial leasing company located in Florida (Zone A), was awarded a total of $339.367.25, notwithstanding the fact that Claimant's loss was not due to the Spill.  This award was driven by the inclusion of commercial rental revenues in the Benchmark Period for a space that ceased generating revenue in September 2009, either because the lease for the property was cancelled or it ended and was not renewed.  This space was not leased again in 2010.

## APPENDIX B

### List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| **Agriculture: Crops** | | | |
| 57 | Agriculture: Crops | 306.9 | $628,918 |
| 33 | Agriculture: Crops | 306.9 | $499,873 |
| 96 | Agriculture: Crops | 306.9 | $49,163 |
| 71 | Agriculture: Crops | 305.5 | $2,172,435 |
| 11 | Agriculture: Crops | 305.5 | $340,982 |
| 00 | Agriculture: Crops | 302.0 | $808,794 |
| 76 | Agriculture: Crops | 302.0 | $574,849 |
| 48 | Agriculture: Crops | 302.0 | $182,903 |
| 63 | Agriculture: Crops | 297.6 | $1,477,872 |
| 15 | Agriculture: Crops | 297.6 | $1,301,965 |
| 23 | Agriculture: Crops | 297.6 | $889,558 |
| 71 | Agriculture: Crops | 297.6 | $843,277 |
| 79 | Agriculture: Crops | 297.6 | $814,397 |
| 22 | Agriculture: Crops | 297.6 | $404,318 |
| 83 | Agriculture: Crops | 297.6 | $308,154 |
| 90 | Agriculture: Crops | 297.6 | $194,344 |
| 02 | Agriculture: Crops | 297.6 | $168,619 |
| 30 | Agriculture: Crops | 289.4 | $585,313 |
| 27 | Agriculture: Crops | 288.0 | $17,693 |
| 07 | Agriculture: Crops | 287.1 | $248,627 |
| 81 | Agriculture: Crops | 285.4 | $61,162 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 01 | Agriculture: Crops | 284.5 | $273,197 |
| 86 | Agriculture: Crops | 283.2 | $703,712 |
| 29 | Agriculture: Crops | 283.2 | $428,968 |
| 93 | Agriculture: Crops | 281.9 | $268,619 |
| 07 | Agriculture: Crops | 280.7 | $1,766,426 |
| 90 | Agriculture: Crops | 280.7 | $792,945 |
| 63 | Agriculture: Crops | 280.7 | $396,485 |
| 20 | Agriculture: Crops | 279.9 | $47,206 |
| 68 | Agriculture: Crops | 275.2 | $1,055,807 |
| 50 | Agriculture: Crops | 275.2 | $913,355 |
| 69 | Agriculture: Crops | 275.2 | $473,752 |
| 68 | Agriculture: Crops | 275.2 | $442,588 |
| 32 | Agriculture: Crops | 275.2 | $183,012 |
| 37 | Agriculture: Crops | 274.3 | $168,605 |
| 71 | Agriculture: Crops | 270.9 | $365,344 |
| 05 | Agriculture: Crops | 268.3 | $1,816,399 |
| 31 | Agriculture: Crops | 268.3 | $1,051,242 |
| 39 | Agriculture: Crops | 268.3 | $672,282 |
| 84 | Agriculture: Crops | 268.3 | $591,638 |
| 82 | Agriculture: Crops | 268.3 | $392,714 |
| 86 | Agriculture: Crops | 268.3 | $333,112 |
| 35 | Agriculture: Crops | 268.3 | $180,801 |

## APPENDIX B

### List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| ██41 | Agriculture: Crops | 268.3 | $129,043 |
| ██58 | Agriculture: Crops | 268.3 | $112,837 |
| ██05 | Agriculture: Crops | 268.3 | $105,866 |
| ██27 | Agriculture: Crops | 268.3 | $93,352 |
| ██88 | Agriculture: Crops | 268.3 | $47,081 |
| ██33 | Agriculture: Crops | 267.0 | $170,039 |
| ██03 | Agriculture: Crops | 266.8 | $561,329 |
| ██74 | Agriculture: Crops | 266.8 | $319,031 |
| ██50 | Agriculture: Crops | 266.8 | $84,200 |
| ██90 | Agriculture: Crops | 264.5 | $396,370 |
| ██90 | Agriculture: Crops | 263.3 | $1,147,024 |
| ██41 | Agriculture: Crops | 263.3 | $647,399 |
| ██07 | Agriculture: Crops | 263.3 | $599,949 |
| ██89 | Agriculture: Crops | 263.3 | $283,984 |
| ██42 | Agriculture: Crops | 263.3 | $155,984 |
| ██06 | Agriculture: Crops | 263.3 | $126,795 |
| ██27 | Agriculture: Crops | 263.3 | $78,329 |
| ██28 | Agriculture: Crops | 259.5 | $891,300 |
| ██09 | Agriculture: Crops | 259.5 | $389,276 |
| ██12 | Agriculture: Crops | 259.5 | $232,153 |
| ██13 | Agriculture: Crops | 259.5 | $211,019 |
| ██82 | Agriculture: Crops | 259.5 | $180,297 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| ██30 | Agriculture: Crops | 259.5 | $26,463 |
| ██41 | Agriculture: Crops | 252.7 | $703,293 |
| ██81 | Agriculture: Crops | 252.7 | $333,171 |
| ██39 | Agriculture: Crops | 252.7 | $267,093 |
| ██75 | Agriculture: Crops | 252.7 | $237,165 |
| ██66 | Agriculture: Crops | 252.7 | $139,630 |
| ██77 | Agriculture: Crops | 252.7 | $53,431 |
| ██67 | Agriculture: Crops | 252.6 | $242,187 |
| ██40 | Agriculture: Crops | 250.3 | $346,251 |
| ██53 | Agriculture: Crops | 250.3 | $290,515 |
| ██02 | Agriculture: Crops | 250.3 | $282,979 |
| ██27 | Agriculture: Crops | 250.3 | $143,464 |
| ██37 | Agriculture: Crops | 250.3 | $141,961 |
| ██80 | Agriculture: Crops | 250.3 | $103,738 |
| ██36 | Agriculture: Crops | 250.3 | $102,159 |
| ██21 | Agriculture: Crops | 250.3 | $84,968 |
| ██59 | Agriculture: Crops | 249.5 | $495,721 |
| ██59 | Agriculture: Crops | 249.5 | $346,137 |
| ██44 | Agriculture: Crops | 249.5 | $117,567 |
| ██15 | Agriculture: Crops | 247.8 | $86,681 |
| ██11 | Agriculture: Crops | 247.3 | $478,572 |
| ██85 | Agriculture: Crops | 247.3 | $392,956 |

# APPENDIX B

## List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| ■01 | Agriculture: Crops | 247.3 | $368,873 |
| ■26 | Agriculture: Crops | 247.3 | $151,484 |
| ■80 | Agriculture: Crops | 243.8 | $131,963 |
| ■21 | Agriculture: Crops | 240.9 | $1,349,589 |
| ■47 | Agriculture: Crops | 239.9 | $291,714 |
| ■28 | Agriculture: Crops | 239.9 | $238,445 |
| ■57 | Agriculture: Crops | 239.9 | $56,775 |
| ■53 | Agriculture: Crops | 237.3 | $77,555 |
| ■05 | Agriculture: Crops | 236.7 | $1,580,093 |
| ■42 | Agriculture: Crops | 236.7 | $885,981 |
| ■32 | Agriculture: Crops | 236.7 | $531,133 |
| ■46 | Agriculture: Crops | 236.7 | $381,583 |
| ■44 | Agriculture: Crops | 236.7 | $350,550 |
| ■18 | Agriculture: Crops | 236.7 | $287,751 |
| ■93 | Agriculture: Crops | 235.7 | $302,805 |
| ■85 | Agriculture: Crops | 235.7 | $132,516 |
| ■62 | Agriculture: Crops | 235.7 | $124,446 |
| ■92 | Agriculture: Crops | 233.5 | $841,633 |
| ■71 | Agriculture: Crops | 233.5 | $796,910 |
| ■40 | Agriculture: Crops | 233.5 | $701,692 |
| ■35 | Agriculture: Crops | 233.5 | $649,160 |
| ■43 | Agriculture: Crops | 233.5 | $637,704 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| ■10 | Agriculture: Crops | 233.5 | $494,529 |
| ■12 | Agriculture: Crops | 233.5 | $408,688 |
| ■95 | Agriculture: Crops | 233.5 | $378,459 |
| ■29 | Agriculture: Crops | 233.5 | $356,058 |
| ■66 | Agriculture: Crops | 233.5 | $308,075 |
| ■57 | Agriculture: Crops | 233.5 | $216,729 |
| ■03 | Agriculture: Crops | 233.5 | $149,077 |
| ■85 | Agriculture: Crops | 233.5 | $92,180 |
| ■50 | Agriculture: Crops | 233.5 | $88,647 |
| ■52 | Agriculture: Crops | 233.5 | $84,091 |
| ■36 | Agriculture: Crops | 233.5 | $74,707 |
| ■62 | Agriculture: Crops | 232.0 | $154,020 |
| ■71 | Agriculture: Crops | 231.2 | $867,174 |
| ■91 | Agriculture: Crops | 231.2 | $827,858 |
| ■41 | Agriculture: Crops | 231.2 | $116,111 |
| ■13 | Agriculture: Crops | 230.1 | $604,179 |
| ■04 | Agriculture: Crops | 230.1 | $518,697 |
| ■29 | Agriculture: Crops | 230.1 | $425,061 |
| ■26 | Agriculture: Crops | 230.1 | $281,093 |
| ■97 | Agriculture: Crops | 230.1 | $92,627 |
| ■82 | Agriculture: Crops | 229.8 | $3,472,163 |
| ■48 | Agriculture: Crops | 229.8 | $514,731 |

3

# APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount | Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|---|---|---|---|
| 62 | Agriculture: Crops | 229.8 | $480,408 | 19 | Agriculture: Crops | 205.8 | $535,833 |
| 67 | Agriculture: Crops | 229.8 | $112,440 | 38 | Agriculture: Crops | 205.8 | $403,362 |
| 78 | Agriculture: Crops | 226.1 | $463,035 | 09 | Agriculture: Crops | 205.8 | $285,609 |
| 21 | Agriculture: Crops | 224.5 | $1,037,365 | 14 | Agriculture: Crops | 202.3 | $982,009 |
| 08 | Agriculture: Crops | 223.8 | $255,180 | 38 | Agriculture: Crops | 199.6 | $241,812 |
| 29 | Agriculture: Crops | 223.8 | $218,518 | 85 | Agriculture: Crops | 195.8 | $827,928 |
| 58 | Agriculture: Crops | 215.8 | $834,572 | 15 | Agriculture: Crops | 195.8 | $700,589 |
| 69 | Agriculture: Crops | 212.5 | $925,056 | 08 | Agriculture: Crops | 195.8 | $211,809 |
| 24 | Agriculture: Crops | 212.5 | $510,523 | 34 | Agriculture: Crops | 195.8 | $198,090 |
| 17 | Agriculture: Crops | 212.5 | $87,432 | 78 | Agriculture: Crops | 195.8 | $153,278 |
| 51 | Agriculture: Crops | 212.5 | $31,905 | 21 | Agriculture: Crops | 193.9 | $1,242,063 |
| 72 | Agriculture: Crops | 212.5 | $538,228 | 49 | Agriculture: Crops | 193.9 | $724,469 |
| 71 | Agriculture: Crops | 212.5 | $452,143 | 16 | Agriculture: Crops | 193.9 | $350,586 |
| 85 | Agriculture: Crops | 212.5 | $332,175 | 58 | Agriculture: Crops | 189.6 | $145,304 |
| 34 | Agriculture: Crops | 212.5 | $210,479 | 77 | Agriculture: Crops | 188.0 | $1,154,739 |
| 97 | Agriculture: Crops | 212.5 | $70,569 | 97 | Agriculture: Crops | 188.0 | $294,227 |
| 04 | Agriculture: Crops | 212.4 | $86,647 | 78 | Agriculture: Crops | 185.8 | $147,901 |
| 15 | Agriculture: Crops | 212.3 | $572,167 | 35 | Agriculture: Crops | 183.5 | $133,100 |
| 48 | Agriculture: Crops | 212.3 | $219,888 | 31 | Agriculture: Crops | 182.1 | $272,168 |
| 70 | Agriculture: Crops | 212.3 | $191,067 | 06 | Agriculture: Crops | 182.1 | $254,231 |
| 45 | Agriculture: Crops | 212.3 | $158,016 | 55 | Agriculture: Crops | 180.2 | $412,381 |
| 21 | Agriculture: Crops | 205.8 | $1,216,308 | 10 | Agriculture: Crops | 179.5 | $308,692 |

4

# APPENDIX B

## List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 84 | Agriculture: Crops | 178.1 | $1,223,466 |
| 41 | Agriculture: Crops | 178.1 | $879,573 |
| 10 | Agriculture: Crops | 178.1 | $266,730 |
| 48 | Agriculture: Crops | 178.1 | $115,032 |
| 16 | Agriculture: Crops | 177.1 | $862,509 |
| 83 | Agriculture: Crops | 177.1 | $860,959 |
| 55 | Agriculture: Crops | 169.9 | $3,139,697 |
| 02 | Agriculture: Crops | 169.9 | $362,834 |
| 67 | Agriculture: Crops | 169.9 | $299,441 |
| 16 | Agriculture: Crops | 169.9 | $275,828 |
| 55 | Agriculture: Crops | 169.9 | $130,090 |
| 70 | Agriculture: Crops | 169.4 | $15,655 |
| 75 | Agriculture: Crops | 166.1 | $709,426 |
| 73 | Agriculture: Crops | 160.9 | $250,519 |
| 62 | Agriculture: Crops | 160.9 | $216,582 |
| 59 | Agriculture: Crops | 158.3 | $239,898 |
| 28 | Agriculture: Crops | 158.3 | $66,401 |
| 38 | Agriculture: Crops | 155.1 | $118,108 |
| 14 | Agriculture: Crops | 153.8 | $72,958 |
| 05 | Agriculture: Crops | 152.2 | $261,565 |
| 37 | Agriculture: Crops | 150.8 | $143,576 |
| 17 | Agriculture: Crops | 131.6 | $367,407 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 55 | Agriculture: Crops | 129.2 | $346,085 |
| 43 | Agriculture: Crops | 110.2 | $227,914 |
| **Total** | **Agriculture: Crops** | | **$90,102,048** |
| | | | |
| | **Agriculture: Other** | | |
| 56 | Agriculture: Other | 306.9 | $195,482 |
| 01 | Agriculture: Other | 297.6 | $1,633,012 |
| 97 | Agriculture: Other | 297.6 | $1,006,314 |
| 46 | Agriculture: Other | 290.9 | $45,607 |
| 46 | Agriculture: Other | 287.1 | $12,219 |
| 31 | Agriculture: Other | 283.2 | $140,665 |
| 37 | Agriculture: Other | 283.2 | $140,581 |
| 23 | Agriculture: Other | 283.2 | $43,832 |
| 19 | Agriculture: Other | 283.2 | $20,772 |
| 50 | Agriculture: Other | 282.0 | $85,737 |
| 94 | Agriculture: Other | 279.9 | $159,827 |
| 06 | Agriculture: Other | 274.2 | $104,739 |
| 69 | Agriculture: Other | 274.2 | $51,698 |
| 78 | Agriculture: Other | 268.3 | $114,784 |
| 83 | Agriculture: Other | 268.3 | $59,949 |
| 82 | Agriculture: Other | 267.0 | $1,687,839 |
| 94 | Agriculture: Other | 263.3 | $910,688 |
| 09 | Agriculture: Other | 263.3 | $73,252 |

5

# APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount | Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|---|---|---|---|
| ██66 | Agriculture: Other | 262.4 | $598,696 | ██22 | Agriculture: Other | 214.4 | $310,575 |
| ██86 | Agriculture: Other | 260.1 | $94,436 | ██57 | Agriculture: Other | 212.5 | $231,483 |
| ██40 | Agriculture: Other | 256.6 | $40,395 | ██92 | Agriculture: Other | 212.5 | $130,220 |
| ██89 | Agriculture: Other | 254.9 | $45,601 | ██23 | Agriculture: Other | 212.3 | $91,118 |
| ██32 | Agriculture: Other | 252.7 | $1,118,017 | ██19 | Agriculture: Other | 202.7 | $42,558 |
| ██56 | Agriculture: Other | 252.4 | $419,918 | ██63 | Agriculture: Other | 195.8 | $90,932 |
| ██33 | Agriculture: Other | 252.4 | $43,448 | ██09 | Agriculture: Other | 195.3 | $294,981 |
| ██91 | Agriculture: Other | 249.5 | $247,842 | ██17 | Agriculture: Other | 193.9 | $587,314 |
| ██68 | Agriculture: Other | 249.5 | $124,640 | ██74 | Agriculture: Other | 193.8 | $952,526 |
| ██46 | Agriculture: Other | 249.5 | $108,262 | ██07 | Agriculture: Other | 193.4 | $260,537 |
| ██78 | Agriculture: Other | 249.1 | $119,383 | ██19 | Agriculture: Other | 189.6 | $205,306 |
| ██26 | Agriculture: Other | 247.8 | $187,953 | ██92 | Agriculture: Other | 188.0 | $32,690 |
| ██48 | Agriculture: Other | 247.3 | $82,186 | ██77 | Agriculture: Other | 187.2 | $34,275 |
| ██13 | Agriculture: Other | 245.4 | $143,704 | ██29 | Agriculture: Other | 175.5 | $47,920 |
| ██27 | Agriculture: Other | 233.5 | $155,455 | ██98 | Agriculture: Other | 172.7 | $349,654 |
| ██13 | Agriculture: Other | 233.5 | $108,767 | ██34 | Agriculture: Other | 170.3 | $1,093,360 |
| ██33 | Agriculture: Other | 233.5 | $49,108 | ██20 | Agriculture: Other | 169.9 | $1,782,107 |
| ██41 | Agriculture: Other | 233.5 | $36,521 | ██09 | Agriculture: Other | 169.4 | $84,401 |
| ██63 | Agriculture: Other | 232.1 | $180,376 | ██29 | Agriculture: Other | 168.3 | $129,411 |
| ██42 | Agriculture: Other | 223.8 | $637,965 | ██51 | Agriculture: Other | 163.5 | $777,723 |
| ██69 | Agriculture: Other | 219.6 | $40,047 | ██16 | Agriculture: Other | 163.5 | $31,768 |
| ██08 | Agriculture: Other | 215.8 | $137,818 | ██40 | Agriculture: Other | 158.3 | $121,465 |
| ██38 | Agriculture: Other | 214.4 | $2,279,139 | ██35 | Agriculture: Other | 155.1 | $439,581 |

6

## APPENDIX B

### List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 55 | Agriculture: Other | 150.8 | $126,759 |
| 57 | Agriculture: Other | 140.5 | $123,270 |
| 33 | Agriculture: Other | 135.0 | $63,390 |
| 95 | Agriculture: Other | 131.6 | $2,128,118 |
| 85 | Agriculture: Other | 129.2 | $563,031 |
| 45 | Agriculture: Other | 128.2 | $185,203 |
| 47 | Agriculture: Other | 124.5 | $209,453 |
| 90 | Agriculture: Other | 122.8 | $233,449 |
| 51 | Agriculture: Other | 121.2 | $37,323 |
| 03 | Agriculture: Other | 117.7 | $392,106 |
| 78 | Agriculture: Other | 107.0 | $951,824 |
| 20 | Agriculture: Other | 102.3 | $216,859 |
| **Total** | **Agriculture: Other** | | **$26,839,365** |
| | **Construction** | | |
| 36 | Construction | 307.2 | $362,777 |
| 03 | Construction | 306.9 | $876,977 |
| 93 | Construction | 306.9 | $10,342 |
| 70 | Construction | 302.0 | $250,648 |
| 92 | Construction | 302.0 | $51,794 |
| 94 | Construction | 292.3 | $54,349 |
| 97 | Construction | 288.0 | $1,016,699 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 26 | Construction | 287.1 | $23,118 |
| 70 | Construction | 287.1 | $12,176 |
| 83 | Construction | 285.7 | $264,971 |
| 30 | Construction | 285.7 | $217,476 |
| 53 | Construction | 283.2 | $94,088 |
| 83 | Construction | 283.2 | $67,181 |
| 84 | Construction | 282.0 | $259,680 |
| 49 | Construction | 281.6 | $2,073,776 |
| 46 | Construction | 281.6 | $1,556,680 |
| 38 | Construction | 281.6 | $571,194 |
| 14 | Construction | 280.7 | $48,836 |
| 99 | Construction | 279.6 | $1,083,621 |
| 24 | Construction | 279.6 | $331,082 |
| 51 | Construction | 279.6 | $240,068 |
| 39 | Construction | 279.6 | $130,430 |
| 26 | Construction | 279.6 | $82,376 |
| 09 | Construction | 279.6 | $10,247 |
| 46 | Construction | 275.9 | $145,102 |
| 36 | Construction | 275.9 | $124,890 |
| 48 | Construction | 275.3 | $159,581 |
| 28 | Construction | 275.3 | $142,913 |
| 04 | Construction | 275.3 | $142,088 |

7

# APPENDIX B

## List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount | | Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|---|---|---|---|---|
| ██09 | Construction | 274.2 | $375,259 | | ██14 | Construction | 235.2 | $799,053 |
| ██50 | Construction | 270.3 | $48,829 | | ██06 | Construction | 233.5 | $619,936 |
| ██60 | Construction | 269.3 | $580,473 | | ██29 | Construction | 233.5 | $221,661 |
| ██09 | Construction | 269.3 | $205,380 | | ██86 | Construction | 233.5 | $149,589 |
| ██53 | Construction | 269.3 | $63,799 | | ██66 | Construction | 233.5 | $33,763 |
| ██18 | Construction | 268.3 | $412,450 | | ██56 | Construction | 232.7 | $123,766 |
| ██93 | Construction | 268.3 | $287,368 | | ██75 | Construction | 232.2 | $22,507 |
| ██95 | Construction | 268.3 | $129,353 | | ██08 | Construction | 230.1 | $86,613 |
| ██69 | Construction | 266.3 | $765,258 | | ██07 | Construction | 227.8 | $49,567 |
| ██81 | Construction | 263.3 | $216,941 | | ██37 | Construction | 223.4 | $2,116,620 |
| ██83 | Construction | 263.3 | $67,282 | | ██75 | Construction | 218.6 | $23,912 |
| ██97 | Construction | 263.3 | $19,205 | | ██14 | Construction | 217.3 | $374,359 |
| ██01 | Construction | 262.4 | $397,544 | | ██40 | Construction | 215.7 | $11,671 |
| ██06 | Construction | 260.4 | $2,031,464 | | ██98 | Construction | 213.9 | $83,349 |
| ██09 | Construction | 260.4 | $62,290 | | ██69 | Construction | 213.7 | $493,194 |
| ██87 | Construction | 257.1 | $35,023 | | ██81 | Construction | 212.5 | $128,423 |
| ██50 | Construction | 250.2 | $5,653,271 | | ██54 | Construction | 212.5 | $22,351 |
| ██53 | Construction | 243.1 | $259,923 | | ██68 | Construction | 211.3 | $1,780,842 |
| ██89 | Construction | 241.6 | $34,823 | | ██13 | Construction | 211.3 | $767,265 |
| ██37 | Construction | 239.9 | $18,792 | | ██17 | Construction | 211.3 | $466,565 |
| ██57 | Construction | 236.7 | $211,159 | | ██27 | Construction | 211.3 | $123,163 |
| ██12 | Construction | 236.7 | $722,119 | | ██08 | Construction | 209.7 | $79,589 |

# APPENDIX B

## List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| ███23 | Construction | 208.9 | $76,017 |
| ███20 | Construction | 208.9 | $27,304 |
| ███58 | Construction | 208.1 | $3,807,297 |
| ███79 | Construction | 206.5 | $2,736,526 |
| ███38 | Construction | 206.1 | $94,854 |
| ███48 | Construction | 205.8 | $624,331 |
| ███11 | Construction | 204.0 | $397,067 |
| ███78 | Construction | 202.8 | $758,564 |
| ███39 | Construction | 202.8 | $557,914 |
| ███06 | Construction | 202.5 | $4,141,232 |
| ███54 | Construction | 202.5 | $1,589,161 |
| ███01 | Construction | 202.5 | $826,800 |
| ███15 | Construction | 202.5 | $630,127 |
| ███46 | Construction | 202.5 | $543,111 |
| ███29 | Construction | 202.5 | $450,101 |
| ███37 | Construction | 201.6 | $2,229,392 |
| ███62 | Construction | 201.6 | $1,200,165 |
| ███93 | Construction | 201.6 | $769,512 |
| ███27 | Construction | 201.6 | $546,457 |
| ███65 | Construction | 201.6 | $169,225 |
| ███66 | Construction | 201.6 | $110,000 |
| ███33 | Construction | 201.6 | $17,904 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| ███31 | Construction | 201.0 | $67,623 |
| ███22 | Construction | 200.8 | $73,985 |
| ███92 | Construction | 200.4 | $1,307,353 |
| ███32 | Construction | 199.3 | $417,434 |
| ███30 | Construction | 199.0 | $13,185,695 |
| ███93 | Construction | 199.0 | $574,297 |
| ███85 | Construction | 197.9 | $158,813 |
| ███43 | Construction | 197.7 | $2,393,982 |
| ███01 | Construction | 197.7 | $885,925 |
| ███46 | Construction | 197.7 | $622,114 |
| ███73 | Construction | 197.7 | $148,800 |
| ███61 | Construction | 197.7 | $5,853 |
| ███37 | Construction | 196.7 | $387,212 |
| ███05 | Construction | 194.9 | $284,898 |
| ███13 | Construction | 194.9 | $267,583 |
| ███03 | Construction | 194.9 | $252,516 |
| ███32 | Construction | 194.9 | $130,056 |
| ███88 | Construction | 194.9 | $129,754 |
| ███82 | Construction | 194.9 | $64,949 |
| ███46 | Construction | 194.9 | $39,030 |
| ███85 | Construction | 193.9 | $1,639,033 |
| ███50 | Construction | 193.9 | $627,647 |

9

## APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount | Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|---|---|---|---|
| ■84 | Construction | 193.9 | $474,566 | ■76 | Construction | 187.7 | $225,317 |
| ■23 | Construction | 193.9 | $213,698 | ■21 | Construction | 187.3 | $110,733 |
| ■61 | Construction | 193.9 | $118,849 | ■77 | Construction | 185.8 | $420,037 |
| ■84 | Construction | 193.9 | $21,519 | ■38 | Construction | 185.8 | $96,332 |
| ■47 | Construction | 193.0 | $118,105 | ■77 | Construction | 185.1 | $341,245 |
| ■19 | Construction | 190.0 | $1,089,958 | ■44 | Construction | 185.1 | $76,000 |
| ■14 | Construction | 190.0 | $935,915 | ■00 | Construction | 185.1 | $43,513 |
| ■50 | Construction | 190.0 | $738,963 | ■12 | Construction | 183.4 | $387,480 |
| ■02 | Construction | 190.0 | $508,471 | ■49 | Construction | 183.4 | $231,504 |
| ■16 | Construction | 190.0 | $447,195 | ■75 | Construction | 181.7 | $794,839 |
| ■60 | Construction | 190.0 | $62,088 | ■59 | Construction | 181.5 | $159,188 |
| ■02 | Construction | 188.6 | $153,396 | ■41 | Construction | 180.3 | $424,807 |
| ■78 | Construction | 188.2 | $1,594,912 | ■78 | Construction | 180.2 | $45,450 |
| ■48 | Construction | 187.7 | $2,206,039 | ■77 | Construction | 180.2 | $592,328 |
| ■54 | Construction | 187.7 | $1,443,717 | ■94 | Construction | 180.2 | $23,202 |
| ■54 | Construction | 187.7 | $943,647 | ■08 | Construction | 179.5 | $822,584 |
| ■60 | Construction | 187.7 | $764,299 | ■40 | Construction | 179.5 | $82,584 |
| ■01 | Construction | 187.7 | $713,306 | ■06 | Construction | 179.5 | $57,508 |
| ■15 | Construction | 187.7 | $516,963 | ■57 | Construction | 175.5 | $42,707 |
| ■69 | Construction | 187.7 | $253,234 | ■62 | Construction | 175.5 | $2,138,544 |
| ■19 | Construction | 187.7 | $2,705 | ■16 | Construction | 174.5 | $260,824 |
| ■91 | Construction | 187.7 | $448,851 | ■11 | Construction | 174.5 | $139,630 |

10

# APPENDIX B

## List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount | Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|---|---|---|---|
| 24 | Construction | 173.0 | $35,448 | 73 | Construction | 155.1 | $99,525 |
| 38 | Construction | 172.9 | $1,378,077 | 30 | Construction | 155.1 | $70,094 |
| 99 | Construction | 169.3 | $1,680,718 | 39 | Construction | 155.1 | $37,895 |
| 18 | Construction | 168.8 | $10,066,646 | 31 | Construction | 155.1 | $21,330 |
| 78 | Construction | 168.8 | $453,686 | 91 | Construction | 153.8 | $1,190,713 |
| 12 | Construction | 168.8 | $355,972 | 49 | Construction | 153.8 | $290,777 |
| 56 | Construction | 168.8 | $51,193 | 45 | Construction | 153.8 | $164,192 |
| 95 | Construction | 168.5 | $1,600,285 | 41 | Construction | 153.8 | $73,374 |
| 68 | Construction | 168.5 | $145,070 | 75 | Construction | 153.6 | $50,421 |
| 23 | Construction | 167.7 | $99,229 | 82 | Construction | 150.8 | $387,088 |
| 50 | Construction | 167.4 | $351,279 | 17 | Construction | 150.5 | $78,887 |
| 33 | Construction | 166.4 | $315,340 | 91 | Construction | 150.5 | $54,016 |
| 82 | Construction | 166.0 | $536,563 | 83 | Construction | 149.7 | $155,358 |
| 99 | Construction | 166.0 | $523,694 | 91 | Construction | 144.0 | $1,713,242 |
| 33 | Construction | 166.0 | $426,183 | 77 | Construction | 144.0 | $1,223,818 |
| 33 | Construction | 166.0 | $164,958 | 31 | Construction | 144.0 | $885,874 |
| 82 | Construction | 166.0 | $105,543 | 73 | Construction | 144.0 | $661,120 |
| 19 | Construction | 166.0 | $49,001 | 28 | Construction | 144.0 | $551,159 |
| 64 | Construction | 163.2 | $374,207 | 55 | Construction | 144.0 | $470,645 |
| 11 | Construction | 162.5 | $494,364 | 81 | Construction | 144.0 | $81,922 |
| 94 | Construction | 155.1 | $3,969,513 | 96 | Construction | 142.8 | $674,247 |
| 91 | Construction | 155.1 | $325,752 | 57 | Construction | 142.8 | $118,533 |

11

## APPENDIX B

### List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| ██20 | Construction | 142.8 | $17,922 |
| ██18 | Construction | 140.1 | $12,916,105 |
| ██28 | Construction | 140.1 | $970,580 |
| ██13 | Construction | 140.1 | $692,586 |
| ██53 | Construction | 140.1 | $139,336 |
| ██93 | Construction | 139.5 | $265,930 |
| ██61 | Construction | 139.5 | $1,010,018 |
| ██41 | Construction | 138.3 | $17,851 |
| ██87 | Construction | 137.9 | $696,292 |
| ██10 | Construction | 137.9 | $40,628 |
| ██98 | Construction | 136.9 | $176,576 |
| ██59 | Construction | 135.7 | $63,166 |
| ██84 | Construction | 134.7 | $5,435,837 |
| ██18 | Construction | 133.8 | $3,489,256 |
| ██99 | Construction | 133.8 | $672,323 |
| ██37 | Construction | 133.0 | $244,845 |
| ██79 | Construction | 133.0 | $75,128 |
| ██02 | Construction | 129.9 | $104,207 |
| ██14 | Construction | 129.9 | $64,270 |
| ██52 | Construction | 129.4 | $690,214 |
| ██87 | Construction | 129.3 | $1,082,582 |
| ██00 | Construction | 129.3 | $963,721 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| ██49 | Construction | 129.3 | $942,434 |
| ██11 | Construction | 129.3 | $576,473 |
| ██62 | Construction | 129.3 | $185,103 |
| ██28 | Construction | 129.3 | $134,716 |
| ██95 | Construction | 129.3 | $80,374 |
| ██32 | Construction | 129.3 | $66,987 |
| ██35 | Construction | 129.3 | $46,252 |
| ██80 | Construction | 129.2 | $2,518,765 |
| ██37 | Construction | 129.2 | $998,811 |
| ██42 | Construction | 129.2 | $269,328 |
| ██02 | Construction | 129.2 | $63,222 |
| ██05 | Construction | 128.5 | $1,556,220 |
| ██77 | Construction | 128.5 | $223,975 |
| ██93 | Construction | 126.6 | $60,018 |
| ██81 | Construction | 126.1 | $405,651 |
| ██93 | Construction | 124.8 | $1,937,354 |
| ██42 | Construction | 124.6 | $1,092,939 |
| ██12 | Construction | 124.6 | $765,668 |
| ██04 | Construction | 124.6 | $106,859 |
| ██58 | Construction | 124.6 | $15,202 |
| ██23 | Construction | 124.5 | $353,604 |
| ██68 | Construction | 124.5 | $137,005 |

12

## APPENDIX B

### List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| ▆81 | Construction | 124.5 | $86,963 |
| ▆29 | Construction | 124.5 | $62,021 |
| ▆85 | Construction | 124.5 | $186,769 |
| ▆14 | Construction | 120.2 | $61,810 |
| ▆03 | Construction | 119.5 | $154,159 |
| ▆57 | Construction | 115.5 | $38,188 |
| ▆51 | Construction | 111.1 | $10,731 |
| ▆42 | Construction | 110.7 | $55,765 |
| ▆45 | Construction | 107.0 | $838,331 |
| ▆11 | Construction | 105.9 | $3,218,951 |
| ▆75 | Construction | 105.9 | $1,193,854 |
| ▆85 | Construction | 105.6 | $298,118 |
| **Total** | **Construction** | | **$179,964,237** |
| | | | |
| | **Health Care** | | |
| ▆49 | Health Care | 297.5 | $24,401 |
| ▆58 | Health Care | 285.7 | $24,210 |
| ▆73 | Health Care | 285.4 | $17,220 |
| ▆22 | Health Care | 280.1 | $216,961 |
| ▆58 | Health Care | 277.0 | $23,983 |
| ▆24 | Health Care | 275.3 | $32,149 |
| ▆21 | Health Care | 269.3 | $68,575 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| ▆67 | Health Care | 268.3 | $297,615 |
| ▆74 | Health Care | 268.3 | $82,550 |
| ▆08 | Health Care | 268.3 | $23,296 |
| ▆83 | Health Care | 263.3 | $150,709 |
| ▆01 | Health Care | 259.2 | $75,986 |
| ▆36 | Health Care | 258.6 | $1,011,167 |
| ▆05 | Health Care | 243.8 | $51,119 |
| ▆43 | Health Care | 233.5 | $421,479 |
| ▆64 | Health Care | 233.5 | $42,580 |
| ▆03 | Health Care | 233.5 | $26,224 |
| ▆97 | Health Care | 217.6 | $32,555 |
| ▆71 | Health Care | 214.6 | $88,390 |
| ▆92 | Health Care | 214.6 | $166,447 |
| ▆05 | Health Care | 204.0 | $53,997 |
| ▆28 | Health Care | 200.8 | $359,611 |
| ▆33 | Health Care | 200.8 | $87,742 |
| ▆48 | Health Care | 199.7 | $349,422 |
| ▆23 | Health Care | 199.7 | $106,816 |
| ▆54 | Health Care | 197.9 | $48,605 |
| ▆38 | Health Care | 197.7 | $309,939 |
| ▆08 | Health Care | 197.7 | $142,933 |
| ▆73 | Health Care | 197.7 | $134,072 |

13

## APPENDIX B

### List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 52 | Health Care | 197.5 | $182,636 |
| 37 | Health Care | 194.9 | $215,023 |
| 88 | Health Care | 193.9 | $91,742 |
| 96 | Health Care | 193.9 | $40,923 |
| 84 | Health Care | 193.2 | $70,171 |
| 89 | Health Care | 185.8 | $213,149 |
| 43 | Health Care | 185.8 | $62,123 |
| 55 | Health Care | 185.1 | $328,009 |
| 89 | Health Care | 184.3 | $17,797 |
| 83 | Health Care | 181.5 | $37,335 |
| 02 | Health Care | 180.2 | $8,304 |
| 14 | Health Care | 174.5 | $246,700 |
| 55 | Health Care | 174.5 | $100,027 |
| 48 | Health Care | 171.6 | $300,000 |
| 24 | Health Care | 171.5 | $344,914 |
| 44 | Health Care | 169.9 | $640,774 |
| 49 | Health Care | 169.2 | $388,059 |
| 97 | Health Care | 169.2 | $268,061 |
| 23 | Health Care | 169.2 | $259,399 |
| 15 | Health Care | 169.2 | $213,291 |
| 40 | Health Care | 168.8 | $372,673 |
| 37 | Health Care | 153.8 | $29,023 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 12 | Health Care | 150.8 | $241,427 |
| 30 | Health Care | 150.8 | $67,507 |
| 16 | Health Care | 150.8 | $28,921 |
| 60 | Health Care | 142.7 | $24,266 |
| 24 | Health Care | 135.3 | $78,916 |
| 59 | Health Care | 135.3 | $41,251 |
| 95 | Health Care | 135.3 | $12,612 |
| 15 | Health Care | 126.1 | $662,587 |
| 49 | Health Care | 126.1 | $425,778 |
| 68 | Health Care | 115.5 | $1,148,665 |
| 12 | Health Care | 111.1 | $67,983 |
| **Total** | **Health Care** | | **$11,700,799** |
| | | | |
| | **Manufacturing** | | |
| 21 | Manufacturing | 292.3 | $39,815 |
| 90 | Manufacturing | 291.0 | $83,757 |
| 99 | Manufacturing | 289.5 | $2,953,101 |
| 02 | Manufacturing | 289.5 | $189,187 |
| 60 | Manufacturing | 286.4 | $7,026 |
| 25 | Manufacturing | 283.2 | $159,604 |
| 26 | Manufacturing | 280.1 | $217,247 |
| 69 | Manufacturing | 275.9 | $921,214 |

14

## APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount | Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|---|---|---|---|
| 33 | Manufacturing | 275.9 | $179,467 | 60 | Manufacturing | 211.0 | $801,507 |
| 02 | Manufacturing | 275.9 | $34,288 | 53 | Manufacturing | 208.0 | $38,221 |
| 75 | Manufacturing | 274.5 | $571,504 | 27 | Manufacturing | 203.8 | $103,917 |
| 13 | Manufacturing | 266.3 | $537,882 | 13 | Manufacturing | 202.9 | $738,922 |
| 76 | Manufacturing | 260.4 | $145,856 | 06 | Manufacturing | 201.6 | $2,012,085 |
| 04 | Manufacturing | 258.6 | $55,870 | 67 | Manufacturing | 201.3 | $655,756 |
| 09 | Manufacturing | 257.1 | $4,264,734 | 51 | Manufacturing | 201.0 | $501,888 |
| 28 | Manufacturing | 243.8 | $1,510,438 | 89 | Manufacturing | 200.7 | $159,690 |
| 82 | Manufacturing | 242.6 | $378,131 | 64 | Manufacturing | 200.4 | $538,364 |
| 31 | Manufacturing | 242.0 | $108,942 | 58 | Manufacturing | 199.7 | $3,683,492 |
| 27 | Manufacturing | 238.6 | $2,113,644 | 13 | Manufacturing | 199.7 | $1,431,395 |
| 26 | Manufacturing | 238.6 | $345,433 | 38 | Manufacturing | 197.9 | $275,412 |
| 79 | Manufacturing | 238.6 | $29,790 | 86 | Manufacturing | 197.7 | $1,084,132 |
| 60 | Manufacturing | 232.2 | $332,832 | 92 | Manufacturing | 197.0 | $460,673 |
| 84 | Manufacturing | 232.1 | $2,914,877 | 60 | Manufacturing | 196.7 | $213,375 |
| 45 | Manufacturing | 232.1 | $95,099 | 40 | Manufacturing | 194.9 | $2,554,179 |
| 31 | Manufacturing | 230.9 | $356,454 | 29 | Manufacturing | 194.9 | $245,737 |
| 55 | Manufacturing | 230.1 | $105,048 | 70 | Manufacturing | 194.9 | $105,034 |
| 11 | Manufacturing | 226.2 | $557,601 | 23 | Manufacturing | 193.2 | $452,423 |
| 87 | Manufacturing | 223.8 | $140,574 | 74 | Manufacturing | 193.2 | $390,741 |
| 52 | Manufacturing | 218.9 | $630,944 | 47 | Manufacturing | 193.2 | $249,593 |
| 75 | Manufacturing | 215.4 | $1,600,687 | 39 | Manufacturing | 191.7 | $151,865 |

15

## APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount | Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|---|---|---|---|
| 81 | Manufacturing | 191.2 | $1,231,159 | 67 | Manufacturing | 156.2 | $3,599,468 |
| 34 | Manufacturing | 190.0 | $48,872 | 54 | Manufacturing | 156.2 | $58,512 |
| 94 | Manufacturing | 187.7 | $980,063 | 22 | Manufacturing | 155.1 | $458,773 |
| 14 | Manufacturing | 187.7 | $646,834 | 73 | Manufacturing | 155.1 | $128,976 |
| 03 | Manufacturing | 187.7 | $158,990 | 94 | Manufacturing | 149.7 | $418,454 |
| 63 | Manufacturing | 187.7 | $91,332 | 03 | Manufacturing | 148.1 | $860,147 |
| 07 | Manufacturing | 187.3 | $490,390 | 40 | Manufacturing | 144.0 | $815,389 |
| 66 | Manufacturing | 186.3 | $582,223 | 15 | Manufacturing | 142.8 | $42,198 |
| 39 | Manufacturing | 185.8 | $2,197,791 | 16 | Manufacturing | 140.1 | $227,625 |
| 08 | Manufacturing | 185.1 | $2,371,290 | 34 | Manufacturing | 135.7 | $397,117 |
| 37 | Manufacturing | 181.7 | $44,758 | 99 | Manufacturing | 135.6 | $183,811 |
| 87 | Manufacturing | 181.7 | $36,698 | 22 | Manufacturing | 134.7 | $339,677 |
| 35 | Manufacturing | 180.2 | $295,356 | 47 | Manufacturing | 133.0 | $82,977 |
| 11 | Manufacturing | 173.0 | $553,906 | 94 | Manufacturing | 129.9 | $22,693 |
| 71 | Manufacturing | 168.8 | $1,229,151 | 04 | Manufacturing | 129.4 | $4,045,272 |
| 70 | Manufacturing | 168.8 | $454,473 | 79 | Manufacturing | 129.4 | $1,784,420 |
| 17 | Manufacturing | 167.7 | $1,447,885 | 53 | Manufacturing | 129.2 | $968,537 |
| 96 | Manufacturing | 166.5 | $391,264 | 02 | Manufacturing | 129.2 | $451,514 |
| 68 | Manufacturing | 166.0 | $27,150 | 32 | Manufacturing | 128.7 | $184,152 |
| 88 | Manufacturing | 163.2 | $640,926 | 17 | Manufacturing | 128.5 | $597,807 |
| 60 | Manufacturing | 159.8 | $3,567,406 | 48 | Manufacturing | 126.1 | $290,375 |
| 06 | Manufacturing | 159.3 | $53,631 | 80 | Manufacturing | 126.1 | $176,722 |

16

# APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 05 | Manufacturing | 124.6 | $522,310 |
| 40 | Manufacturing | 115.5 | $5,592,073 |
| 88 | Manufacturing | 114.3 | $189,795 |
| 58 | Manufacturing | 107.0 | $1,762,005 |
| 44 | Manufacturing | 104.6 | $575,434 |
| **Total** | **Manufacturing** | | **$80,747,234** |
| | **Professional Services: Lawyers** | | |
| 79 | Professional Services: Lawyers | 302.0 | $778,507 |
| 78 | Professional Services: Lawyers | 302.0 | $43,652 |
| 13 | Professional Services: Lawyers | 302.0 | $17,477 |
| 16 | Professional Services: Lawyers | 288.0 | $36,825 |
| 36 | Professional Services: Lawyers | 270.9 | $31,732 |
| 14 | Professional Services: Lawyers | 268.3 | $1,063,851 |
| 26 | Professional Services: Lawyers | 268.3 | $579,822 |
| 48 | Professional Services: Lawyers | 268.3 | $95,657 |
| 63 | Professional Services: Lawyers | 262.4 | $3,391,366 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 15 | Professional Services: Lawyers | 256.2 | $39,614 |
| 03 | Professional Services: Lawyers | 243.8 | $28,403 |
| 60 | Professional Services: Lawyers | 243.1 | $128,972 |
| 98 | Professional Services: Lawyers | 238.6 | $174,501 |
| 43 | Professional Services: Lawyers | 233.5 | $414,144 |
| 47 | Professional Services: Lawyers | 233.5 | $119,148 |
| 40 | Professional Services: Lawyers | 233.5 | $66,893 |
| 68 | Professional Services: Lawyers | 233.5 | $54,441 |
| 21 | Professional Services: Lawyers | 214.6 | $44,544 |
| 06 | Professional Services: Lawyers | 214.6 | $43,554 |
| 10 | Professional Services: Lawyers | 212.5 | $247,625 |
| 26 | Professional Services: Lawyers | 203.6 | $67,545 |
| 78 | Professional Services: Lawyers | 201.0 | $4,095,893 |
| 32 | Professional Services: Lawyers | 201.0 | $3,235,228 |
| 66 | Professional Services: Lawyers | 201.0 | $2,927,563 |

17

## APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount | Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|---|---|---|---|
| ▮66 | Professional Services: Lawyers | 201.0 | $2,129,757 | ▮12 | Professional Services: Lawyers | 194.9 | $170,193 |
| ▮64 | Professional Services: Lawyers | 201.0 | $1,629,915 | ▮21 | Professional Services: Lawyers | 194.9 | $13,537 |
| ▮34 | Professional Services: Lawyers | 201.0 | $601,000 | ▮81 | Professional Services: Lawyers | 191.2 | $28,573 |
| ▮17 | Professional Services: Lawyers | 201.0 | $90,552 | ▮39 | Professional Services: Lawyers | 190.0 | $715,358 |
| ▮02 | Professional Services: Lawyers | 201.0 | $86,432 | ▮41 | Professional Services: Lawyers | 187.7 | $32,131 |
| ▮61 | Professional Services: Lawyers | 201.0 | $46,722 | ▮60 | Professional Services: Lawyers | 185.8 | $172,253 |
| ▮69 | Professional Services: Lawyers | 200.4 | $1,946,572 | ▮89 | Professional Services: Lawyers | 185.1 | $382,271 |
| ▮74 | Professional Services: Lawyers | 199.7 | $664,902 | ▮45 | Professional Services: Lawyers | 185.1 | $158,189 |
| ▮09 | Professional Services: Lawyers | 199.7 | $497,673 | ▮57 | Professional Services: Lawyers | 185.1 | $26,048 |
| ▮89 | Professional Services: Lawyers | 199.7 | $71,496 | ▮95 | Professional Services: Lawyers | 183.4 | $730,995 |
| ▮79 | Professional Services: Lawyers | 197.7 | $1,048,842 | ▮76 | Professional Services: Lawyers | 180.4 | $121,367 |
| ▮36 | Professional Services: Lawyers | 197.7 | $163,444 | ▮48 | Professional Services: Lawyers | 174.5 | $58,047 |
| ▮60 | Professional Services: Lawyers | 196.7 | $415,905 | ▮58 | Professional Services: Lawyers | 172.9 | $320,001 |
| ▮05 | Professional Services: Lawyers | 194.9 | $783,519 | ▮14 | Professional Services: Lawyers | 168.8 | $925,065 |
| ▮49 | Professional Services: Lawyers | 194.9 | $404,531 | ▮77 | Professional Services: Lawyers | 167.7 | $15,552,799 |

18

## APPENDIX B

### List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 73 | Professional Services: Lawyers | 156.2 | $201,391 |
| 61 | Professional Services: Lawyers | 155.1 | $99,467 |
| 75 | Professional Services: Lawyers | 150.8 | $100,956 |
| 90 | Professional Services: Lawyers | 150.5 | $20,455 |
| 86 | Professional Services: Lawyers | 144.0 | $164,002 |
| 13 | Professional Services: Lawyers | 140.1 | $10,844,326 |
| 21 | Professional Services: Lawyers | 137.5 | $856,147 |
| 25 | Professional Services: Lawyers | 137.5 | $143,864 |
| 45 | Professional Services: Lawyers | 134.4 | $89,781 |
| 54 | Professional Services: Lawyers | 132.8 | $309,608 |
| 66 | Professional Services: Lawyers | 129.4 | $433,481 |
| 96 | Professional Services: Lawyers | 129.4 | $293,272 |
| 37 | Professional Services: Lawyers | 129.3 | $266,888 |
| 33 | Professional Services: Lawyers | 129.3 | $7,721 |
| 83 | Professional Services: Lawyers | 129.2 | $64,453 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 14 | Professional Services: Lawyers | 128.5 | $72,511 |
| 96 | Professional Services: Lawyers | 128.1 | $539,144 |
| 05 | Professional Services: Lawyers | 118.7 | $634,986 |
| 05 | Professional Services: Lawyers | 111.5 | $72,018 |
| 92 | Professional Services: Lawyers | 111.1 | $69,448 |
| 57 | Professional Services: Lawyers | 109.4 | $283,281 |
| 18 | Professional Services: Lawyers | 105.6 | $446,245 |
| 50 | Professional Services: Lawyers | 105.6 | $527,198 |
| 57 | Professional Services: Lawyers | 103.3 | $785,718 |
| **Total** | **Professional Services: Lawyers** | | **$65,041,405** |
| | | | |
| | **Professional Services: Other** | | |
| 67 | Professional Services: Other | 311.8 | $31,996 |
| 48 | Professional Services: Other | 302.0 | $225,162 |
| 12 | Professional Services: Other | 302.0 | $24,991 |
| 14 | Professional Services: Other | 302.0 | $13,027 |

19

# APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount | Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|---|---|---|---|
| 68 | Professional Services: Other | 287.1 | $38,895 | 88 | Professional Services: Other | 222.9 | $22,238 |
| 95 | Professional Services: Other | 284.8 | $407,929 | 26 | Professional Services: Other | 220.6 | $843 |
| 14 | Professional Services: Other | 284.8 | $131,455 | 65 | Professional Services: Other | 218.6 | $391,463 |
| 81 | Professional Services: Other | 281.6 | $229,676 | 47 | Professional Services: Other | 215.8 | $627,551 |
| 75 | Professional Services: Other | 279.6 | $167,379 | 89 | Professional Services: Other | 215.8 | $102,748 |
| 15 | Professional Services: Other | 279.6 | $111,467 | 44 | Professional Services: Other | 215.7 | $219,064 |
| 92 | Professional Services: Other | 279.6 | $13,986 | 64 | Professional Services: Other | 212.4 | $36,892 |
| 86 | Professional Services: Other | 275.3 | $127,824 | 97 | Professional Services: Other | 212.3 | $55,792 |
| 71 | Professional Services: Other | 269.3 | $821,098 | 80 | Professional Services: Other | 211.8 | $16,168 |
| 50 | Professional Services: Other | 268.3 | $146,817 | 31 | Professional Services: Other | 211.3 | $269,628 |
| 08 | Professional Services: Other | 263.3 | $118,893 | 17 | Professional Services: Other | 211.3 | $123,105 |
| 73 | Professional Services: Other | 260.4 | $37,918 | 25 | Professional Services: Other | 211.3 | $51,375 |
| 62 | Professional Services: Other | 256.2 | $18,657 | 66 | Professional Services: Other | 211.3 | $23,668 |
| 02 | Professional Services: Other | 244.8 | $3,046,304 | 57 | Professional Services: Other | 211.0 | $49,676 |
| 12 | Professional Services: Other | 244.8 | $60,124 | 01 | Professional Services: Other | 211.0 | $35,699 |
| 73 | Professional Services: Other | 244.3 | $82,664 | 07 | Professional Services: Other | 208.9 | $49,536 |
| 94 | Professional Services: Other | 243.3 | $37,439 | 90 | Professional Services: Other | 208.0 | $31,036 |
| 51 | Professional Services: Other | 233.5 | $175,457 | 63 | Professional Services: Other | 206.5 | $52,093 |
| 17 | Professional Services: Other | 233.5 | $164,574 | 54 | Professional Services: Other | 205.1 | $66,756 |
| 88 | Professional Services: Other | 233.5 | $92,396 | 76 | Professional Services: Other | 204.0 | $133,685 |
| 52 | Professional Services: Other | 233.5 | $72,919 | 51 | Professional Services: Other | 202.5 | $89,519 |
| 91 | Professional Services: Other | 233.5 | $31,919 | 48 | Professional Services: Other | 202.3 | $57,023 |

# APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| ██99 | Professional Services: Other | 201.6 | $426,573 |
| ██78 | Professional Services: Other | 201.6 | $11,313 |
| ██41 | Professional Services: Other | 201.0 | $199,248 |
| ██79 | Professional Services: Other | 201.0 | $78,373 |
| ██28 | Professional Services: Other | 201.0 | $42,056 |
| ██76 | Professional Services: Other | 200.8 | $199,423 |
| ██98 | Professional Services: Other | 200.8 | $24,372 |
| ██09 | Professional Services: Other | 200.4 | $1,172,043 |
| ██70 | Professional Services: Other | 200.4 | $500,150 |
| ██24 | Professional Services: Other | 200.4 | $451,506 |
| ██40 | Professional Services: Other | 200.4 | $227,240 |
| ██22 | Professional Services: Other | 200.4 | $102,418 |
| ██99 | Professional Services: Other | 199.7 | $511,029 |
| ██76 | Professional Services: Other | 199.7 | $273,690 |
| ██20 | Professional Services: Other | 199.7 | $200,986 |
| ██76 | Professional Services: Other | 199.7 | $89,811 |
| ██16 | Professional Services: Other | 199.0 | $453,515 |
| ██51 | Professional Services: Other | 199.0 | $225,519 |
| ██39 | Professional Services: Other | 199.0 | $92,619 |
| ██06 | Professional Services: Other | 198.9 | $85,159 |
| ██18 | Professional Services: Other | 197.7 | $146,745 |
| ██30 | Professional Services: Other | 197.7 | $141,447 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| ██05 | Professional Services: Other | 197.7 | $132,300 |
| ██74 | Professional Services: Other | 197.7 | $121,358 |
| ██61 | Professional Services: Other | 197.7 | $23,700 |
| ██98 | Professional Services: Other | 196.7 | $385,752 |
| ██19 | Professional Services: Other | 196.7 | $337,706 |
| ██97 | Professional Services: Other | 196.7 | $232,288 |
| ██26 | Professional Services: Other | 196.7 | $74,787 |
| ██84 | Professional Services: Other | 196.6 | $74,021 |
| ██31 | Professional Services: Other | 194.9 | $2,191,138 |
| ██41 | Professional Services: Other | 194.9 | $901,170 |
| ██74 | Professional Services: Other | 194.9 | $194,326 |
| ██20 | Professional Services: Other | 194.9 | $69,014 |
| ██35 | Professional Services: Other | 194.9 | $16,166 |
| ██45 | Professional Services: Other | 193.9 | $175,633 |
| ██83 | Professional Services: Other | 193.9 | $152,452 |
| ██81 | Professional Services: Other | 193.9 | $110,592 |
| ██38 | Professional Services: Other | 193.9 | $70,972 |
| ██43 | Professional Services: Other | 193.9 | $36,838 |
| ██51 | Professional Services: Other | 193.0 | $74,214 |
| ██73 | Professional Services: Other | 191.2 | $56,538 |
| ██24 | Professional Services: Other | 190.0 | $1,005,964 |
| ██16 | Professional Services: Other | 190.0 | $388,633 |

21

## APPENDIX B

### List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| █61 | Professional Services: Other | 190.0 | $276,025 |
| █78 | Professional Services: Other | 190.0 | $149,972 |
| █08 | Professional Services: Other | 190.0 | $147,450 |
| █23 | Professional Services: Other | 190.0 | $140,199 |
| █65 | Professional Services: Other | 190.0 | $139,335 |
| █48 | Professional Services: Other | 190.0 | $104,312 |
| █04 | Professional Services: Other | 190.0 | $66,632 |
| █75 | Professional Services: Other | 190.0 | $64,756 |
| █52 | Professional Services: Other | 190.0 | $25,338 |
| █90 | Professional Services: Other | 188.6 | $1,919 |
| █13 | Professional Services: Other | 187.7 | $57,639 |
| █03 | Professional Services: Other | 187.7 | $566,341 |
| █31 | Professional Services: Other | 185.1 | $134,646 |
| █38 | Professional Services: Other | 184.0 | $2,845,657 |
| █66 | Professional Services: Other | 183.4 | $25,569 |
| █39 | Professional Services: Other | 181.5 | $1,007,492 |
| █06 | Professional Services: Other | 181.5 | $75,902 |
| █20 | Professional Services: Other | 180.3 | $26,591 |
| █52 | Professional Services: Other | 177.1 | $39,111 |
| █45 | Professional Services: Other | 174.5 | $177,606 |
| █27 | Professional Services: Other | 174.5 | $158,218 |
| █63 | Professional Services: Other | 173.0 | $3,444 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| █08 | Professional Services: Other | 171.5 | $173,035 |
| █43 | Professional Services: Other | 171.0 | $694,206 |
| █47 | Professional Services: Other | 171.0 | $58,594 |
| █71 | Professional Services: Other | 170.3 | $792,952 |
| █94 | Professional Services: Other | 170.3 | $47,063 |
| █71 | Professional Services: Other | 169.9 | $253,660 |
| █04 | Professional Services: Other | 169.9 | $57,943 |
| █42 | Professional Services: Other | 169.2 | $120,025 |
| █14 | Professional Services: Other | 168.8 | $88,252 |
| █36 | Professional Services: Other | 168.5 | $19,404 |
| █57 | Professional Services: Other | 166.0 | $139,675 |
| █95 | Professional Services: Other | 166.0 | $17,277 |
| █85 | Professional Services: Other | 156.2 | $59,258 |
| █55 | Professional Services: Other | 155.1 | $45,893 |
| █70 | Professional Services: Other | 155.1 | $41,105 |
| █72 | Professional Services: Other | 155.1 | $12,456 |
| █89 | Professional Services: Other | 150.8 | $982,102 |
| █49 | Professional Services: Other | 150.8 | $199,908 |
| █37 | Professional Services: Other | 150.8 | $112,006 |
| █04 | Professional Services: Other | 144.2 | $37,725 |
| █10 | Professional Services: Other | 144.0 | $321,709 |
| █31 | Professional Services: Other | 144.0 | $247,417 |

22

# APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 03 | Professional Services: Other | 144.0 | $107,616 |
| 05 | Professional Services: Other | 144.0 | $34,477 |
| 45 | Professional Services: Other | 140.1 | $51,836 |
| 49 | Professional Services: Other | 140.1 | $33,968 |
| 22 | Professional Services: Other | 136.9 | $1,365,137 |
| 95 | Professional Services: Other | 136.9 | $245,185 |
| 64 | Professional Services: Other | 136.9 | $53,423 |
| 51 | Professional Services: Other | 136.9 | $20,980 |
| 18 | Professional Services: Other | 135.3 | $143,405 |
| 57 | Professional Services: Other | 135.3 | $38,144 |
| 45 | Professional Services: Other | 134.7 | $347,316 |
| 32 | Professional Services: Other | 134.7 | $124,404 |
| 81 | Professional Services: Other | 134.4 | $59,188 |
| 66 | Professional Services: Other | 134.4 | $38,803 |
| 94 | Professional Services: Other | 133.0 | $184,979 |
| 45 | Professional Services: Other | 132.8 | $592,406 |
| 64 | Professional Services: Other | 131.7 | $233,602 |
| 53 | Professional Services: Other | 131.6 | $8,079 |
| 49 | Professional Services: Other | 129.3 | $277,780 |
| 74 | Professional Services: Other | 129.2 | $254,793 |
| 17 | Professional Services: Other | 127.5 | $131,638 |
| 39 | Professional Services: Other | 124.6 | $578,121 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 44 | Professional Services: Other | 124.6 | $522,036 |
| 68 | Professional Services: Other | 124.6 | $420,029 |
| 72 | Professional Services: Other | 124.6 | $131,500 |
| 05 | Professional Services: Other | 124.5 | $67,924 |
| 29 | Professional Services: Other | 124.5 | $22,480 |
| 43 | Professional Services: Other | 120.2 | $65,154 |
| 73 | Professional Services: Other | 117.7 | $1,465,598 |
| 61 | Professional Services: Other | 111.1 | $50,140 |
| 90 | Professional Services: Other | 106.0 | $93,212 |
| 57 | Professional Services: Other | 105.6 | $78,862 |
| **Total** | **Professional Services: Other** | | **$40,015,348** |
| | | | |
| | **Real Estate** | | |
| 12 | Real Estate | 311.4 | $46,818 |
| 93 | Real Estate | 306.9 | $170,960 |
| 90 | Real Estate | 306.9 | $32,960 |
| 83 | Real Estate | 302.0 | $423,055 |
| 43 | Real Estate | 302.0 | $31,054 |
| 87 | Real Estate | 302.0 | $17,804 |
| 38 | Real Estate | 302.0 | $14,074 |
| 86 | Real Estate | 288.0 | $117,669 |

# APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount | Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|---|---|---|---|
| ██18 | Real Estate | 288.0 | $9,449 | ██65 | Real Estate | 243.1 | $42,545 |
| ██31 | Real Estate | 287.1 | $60,039 | ██89 | Real Estate | 243.1 | $28,152 |
| ██56 | Real Estate | 287.1 | $55,649 | ██99 | Real Estate | 242.6 | $143,450 |
| ██00 | Real Estate | 287.1 | $25,971 | ██63 | Real Estate | 242.6 | $41,113 |
| ██72 | Real Estate | 285.7 | $33,158 | ██71 | Real Estate | 241.6 | $54,110 |
| ██20 | Real Estate | 284.8 | $134,706 | ██55 | Real Estate | 240.3 | $7,618 |
| ██54 | Real Estate | 283.2 | $72,478 | ██84 | Real Estate | 235.2 | $78,896 |
| ██05 | Real Estate | 281.2 | $40,570 | ██99 | Real Estate | 235.2 | $20,732 |
| ██23 | Real Estate | 275.9 | $19,536 | ██78 | Real Estate | 233.5 | $34,188 |
| ██76 | Real Estate | 268.3 | $25,106 | ██94 | Real Estate | 233.5 | $33,649 |
| ██30 | Real Estate | 268.3 | $10,762 | ██69 | Real Estate | 233.5 | $22,265 |
| ██54 | Real Estate | 266.3 | $515,054 | ██25 | Real Estate | 232.1 | $76,990 |
| ██38 | Real Estate | 262.4 | $188,160 | ██73 | Real Estate | 232.1 | $5,237 |
| ██38 | Real Estate | 262.4 | $75,324 | ██92 | Real Estate | 226.8 | $15,804 |
| ██60 | Real Estate | 250.2 | $15,877 | ██86 | Real Estate | 212.5 | $47,800 |
| ██92 | Real Estate | 250.0 | $48,517 | ██97 | Real Estate | 209.7 | $31,916 |
| ██21 | Real Estate | 244.8 | $73,412 | ██19 | Real Estate | 208.0 | $29,816 |
| ██87 | Real Estate | 244.8 | $29,436 | ██43 | Real Estate | 204.0 | $43,796 |
| ██67 | Real Estate | 244.8 | $17,224 | ██89 | Real Estate | 201.0 | $167,169 |
| ██68 | Real Estate | 243.8 | $60,757 | ██60 | Real Estate | 200.8 | $224,416 |
| ██59 | Real Estate | 243.1 | $70,868 | ██87 | Real Estate | 200.8 | $170,546 |
| ██50 | Real Estate | 243.1 | $70,848 | ██68 | Real Estate | 200.8 | $42,480 |

24

# APPENDIX B

## List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount | Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|---|---|---|---|
| 66 | Real Estate | 199.7 | $138,377 | 39 | Real Estate | 169.9 | $328,067 |
| 12 | Real Estate | 199.0 | $13,092 | 51 | Real Estate | 169.9 | $228,674 |
| 48 | Real Estate | 198.5 | $279,506 | 11 | Real Estate | 168.8 | $188,675 |
| 19 | Real Estate | 197.7 | $287,591 | 54 | Real Estate | 168.8 | $22,533 |
| 04 | Real Estate | 197.7 | $45,583 | 28 | Real Estate | 156.2 | $32,500 |
| 47 | Real Estate | 196.7 | $70,872 | 24 | Real Estate | 153.8 | $45,234 |
| 20 | Real Estate | 194.9 | $53,236 | 23 | Real Estate | 153.5 | $138,690 |
| 25 | Real Estate | 193.9 | $531,302 | 81 | Real Estate | 150.8 | $225,086 |
| 33 | Real Estate | 193.9 | $334,853 | 91 | Real Estate | 150.8 | $55,841 |
| 81 | Real Estate | 193.9 | $30,403 | 41 | Real Estate | 150.8 | $32,234 |
| 82 | Real Estate | 193.9 | $15,579 | 94 | Real Estate | 150.8 | $21,497 |
| 25 | Real Estate | 190.0 | $163,403 | 78 | Real Estate | 150.8 | $18,413 |
| 98 | Real Estate | 190.0 | $69,607 | 06 | Real Estate | 144.0 | $73,252 |
| 17 | Real Estate | 188.0 | $4,174 | 36 | Real Estate | 144.0 | $66,895 |
| 33 | Real Estate | 187.3 | $141,019 | 36 | Real Estate | 144.0 | $54,741 |
| 49 | Real Estate | 185.8 | $188,741 | 16 | Real Estate | 144.0 | $36,671 |
| 70 | Real Estate | 185.8 | $19,165 | 59 | Real Estate | 144.0 | $11,850 |
| 18 | Real Estate | 183.4 | $59,616 | 91 | Real Estate | 140.1 | $242,802 |
| 59 | Real Estate | 174.5 | $1,178,764 | 88 | Real Estate | 140.1 | $152,381 |
| 41 | Real Estate | 174.5 | $74,270 | 53 | Real Estate | 140.1 | $69,709 |
| 31 | Real Estate | 174.5 | $27,595 | 52 | Real Estate | 140.1 | $32,921 |
| 47 | Real Estate | 170.3 | $42,287 | 90 | Real Estate | 140.1 | $7,816 |

25

## APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 22 | Real Estate | 140.1 | $6,500 |
| 16 | Real Estate | 137.9 | $52,680 |
| 21 | Real Estate | 137.9 | $38,699 |
| 90 | Real Estate | 137.9 | $25,792 |
| 48 | Real Estate | 136.9 | $37,201 |
| 40 | Real Estate | 136.9 | $14,334 |
| 85 | Real Estate | 135.7 | $229,705 |
| 97 | Real Estate | 135.7 | $43,575 |
| 54 | Real Estate | 135.3 | $48,688 |
| 71 | Real Estate | 135.3 | $44,141 |
| 41 | Real Estate | 129.3 | $71,360 |
| 27 | Real Estate | 129.3 | $29,926 |
| 96 | Real Estate | 129.3 | $1,114 |
| 92 | Real Estate | 129.2 | $56,344 |
| 91 | Real Estate | 129.2 | $43,398 |
| 03 | Real Estate | 129.2 | $33,070 |
| 01 | Real Estate | 129.2 | $22,578 |
| 69 | Real Estate | 129.2 | $14,059 |
| 83 | Real Estate | 128.5 | $27,742 |
| 31 | Real Estate | 128.3 | $19,063 |
| 54 | Real Estate | 127.5 | $51,000 |
| 19 | Real Estate | 124.8 | $19,729 |

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| 27 | Real Estate | 117.7 | $7,631 |
| 26 | Real Estate | 117.1 | $27,395 |
| 12 | Real Estate | 112.0 | $85,624 |
| 47 | Real Estate | 110.0 | $68,643 |
| 05 | Real Estate | 105.9 | $29,943 |
| 69 | Real Estate | 105.6 | $812,290 |
| 73 | Real Estate | 105.6 | $90,290 |
| 11 | Real Estate | 104.6 | $21,355 |
| 83 | Real Estate | 104.6 | $15,445 |
| **Total** | **Real Estate** | | **$11,814,809** |
| | | | |
| | **Transportation and Warehousing** | | |
| 69 | Transportation and Warehousing | 302.0 | $47,013 |
| 28 | Transportation and Warehousing | 290.3 | $49,115 |
| 09 | Transportation and Warehousing | 285.4 | $64,244 |
| 12 | Transportation and Warehousing | 282.8 | $521,051 |
| 29 | Transportation and Warehousing | 257.8 | $46,452 |
| 58 | Transportation and Warehousing | 254.1 | $185,172 |
| 65 | Transportation and Warehousing | 236.7 | $184,097 |

26

# APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount | Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|---|---|---|---|
| ■12 | Transportation and Warehousing | 233.5 | $1,152,572 | ■15 | Transportation and Warehousing | 188.2 | $492,036 |
| ■04 | Transportation and Warehousing | 233.5 | $206,270 | ■99 | Transportation and Warehousing | 188.0 | $114,095 |
| ■66 | Transportation and Warehousing | 233.5 | $140,815 | ■29 | Transportation and Warehousing | 187.7 | $122,903 |
| ■30 | Transportation and Warehousing | 233.5 | $83,352 | ■47 | Transportation and Warehousing | 187.7 | $108,334 |
| ■50 | Transportation and Warehousing | 231.9 | $49,113 | ■50 | Transportation and Warehousing | 187.7 | $35,577 |
| ■84 | Transportation and Warehousing | 231.2 | $297,818 | ■43 | Transportation and Warehousing | 172.8 | $89,242 |
| ■89 | Transportation and Warehousing | 221.0 | $25,161 | ■35 | Transportation and Warehousing | 172.7 | $238,619 |
| ■85 | Transportation and Warehousing | 219.4 | $739,739 | ■81 | Transportation and Warehousing | 169.9 | $105,756 |
| ■21 | Transportation and Warehousing | 212.3 | $33,764 | ■42 | Transportation and Warehousing | 166.0 | $104,832 |
| ■34 | Transportation and Warehousing | 212.3 | $20,407 | ■78 | Transportation and Warehousing | 126.1 | $625,323 |
| ■95 | Transportation and Warehousing | 199.0 | $145,931 | ■28 | Transportation and Warehousing | 126.1 | $89,374 |
| ■20 | Transportation and Warehousing | 198.5 | $1,135,728 | ■41 | Transportation and Warehousing | 111.1 | $1,527,092 |
| ■81 | Transportation and Warehousing | 197.0 | $20,994 | ■29 | Transportation and Warehousing | 107.0 | $278,441 |
| ■77 | Transportation and Warehousing | 196.6 | $23,185 | ■74 | Transportation and Warehousing | 106.5 | $739,242 |
| ■65 | Transportation and Warehousing | 191.2 | $232,042 | **Total** | **Transportation and Warehousing** | | **$10,074,901** |

27

# APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount | Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|---|---|---|---|
| | **Wholesale Trade** | | | 55 | Wholesale Trade | 202.8 | $409,882 |
| 65 | Wholesale Trade | 282.8 | $385,720 | 89 | Wholesale Trade | 202.8 | $241,742 |
| 41 | Wholesale Trade | 279.6 | $308,008 | 70 | Wholesale Trade | 202.8 | $57,068 |
| 34 | Wholesale Trade | 275.9 | $421,680 | 57 | Wholesale Trade | 202.8 | $30,837 |
| 13 | Wholesale Trade | 274.5 | $569,463 | 01 | Wholesale Trade | 202.5 | $1,619,498 |
| 40 | Wholesale Trade | 263.3 | $1,170,763 | 03 | Wholesale Trade | 202.5 | $548,462 |
| 87 | Wholesale Trade | 260.4 | $1,127,570 | 26 | Wholesale Trade | 202.5 | $244,700 |
| 56 | Wholesale Trade | 240.6 | $515,311 | 46 | Wholesale Trade | 202.5 | $68,323 |
| 82 | Wholesale Trade | 240.6 | $122,711 | 09 | Wholesale Trade | 202.5 | $36,627 |
| 02 | Wholesale Trade | 238.6 | $189,815 | 05 | Wholesale Trade | 201.6 | $386,943 |
| 34 | Wholesale Trade | 233.5 | $178,008 | 10 | Wholesale Trade | 201.6 | $130,742 |
| 31 | Wholesale Trade | 233.5 | $84,894 | 29 | Wholesale Trade | 201.6 | $77,915 |
| 89 | Wholesale Trade | 232.1 | $102,298 | 75 | Wholesale Trade | 201.3 | $791,562 |
| 45 | Wholesale Trade | 218.9 | $1,998,498 | 59 | Wholesale Trade | 201.3 | $493,951 |
| 31 | Wholesale Trade | 218.9 | $260,817 | 57 | Wholesale Trade | 201.3 | $419,555 |
| 83 | Wholesale Trade | 214.6 | $95,694 | 68 | Wholesale Trade | 201.3 | $73,259 |
| 99 | Wholesale Trade | 213.9 | $230,752 | 62 | Wholesale Trade | 199.7 | $800,763 |
| 24 | Wholesale Trade | 212.4 | $12,871 | 95 | Wholesale Trade | 199.0 | $50,235 |
| 83 | Wholesale Trade | 209.7 | $40,016 | 00 | Wholesale Trade | 198.5 | $620,297 |
| 19 | Wholesale Trade | 209.7 | $31,992 | 44 | Wholesale Trade | 197.9 | $319,641 |
| 41 | Wholesale Trade | 206.5 | $141,918 | 24 | Wholesale Trade | 197.7 | $909,391 |
| | | | | 41 | Wholesale Trade | 197.7 | $559,356 |

## APPENDIX B

**List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries**

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount | Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|---|---|---|---|
| 59 | Wholesale Trade | 197.7 | $36,547 | 41 | Wholesale Trade | 185.8 | $109,104 |
| 32 | Wholesale Trade | 197.7 | $15,240 | 73 | Wholesale Trade | 184.3 | $253,694 |
| 23 | Wholesale Trade | 196.7 | $40,846 | 70 | Wholesale Trade | 184.3 | $8,852 |
| 03 | Wholesale Trade | 196.7 | $4,746 | 07 | Wholesale Trade | 183.4 | $466,974 |
| 94 | Wholesale Trade | 194.9 | $1,835,408 | 73 | Wholesale Trade | 183.4 | $50,519 |
| 29 | Wholesale Trade | 194.9 | $177,544 | 02 | Wholesale Trade | 181.5 | $556,062 |
| 66 | Wholesale Trade | 194.9 | $93,675 | 23 | Wholesale Trade | 180.4 | $102,696 |
| 82 | Wholesale Trade | 193.9 | $194,904 | 11 | Wholesale Trade | 170.5 | $158,544 |
| 96 | Wholesale Trade | 193.9 | $37,569 | 20 | Wholesale Trade | 167.4 | $23,924 |
| 67 | Wholesale Trade | 190.6 | $150,074 | 55 | Wholesale Trade | 153.8 | $147,767 |
| 18 | Wholesale Trade | 190.6 | $70,517 | 18 | Wholesale Trade | 150.6 | $228,523 |
| 38 | Wholesale Trade | 187.7 | $1,089,754 | 90 | Wholesale Trade | 144.2 | $422,444 |
| 44 | Wholesale Trade | 187.7 | $683,414 | 91 | Wholesale Trade | 144.0 | $31,014 |
| 90 | Wholesale Trade | 187.7 | $512,819 | 14 | Wholesale Trade | 140.1 | $1,659,742 |
| 55 | Wholesale Trade | 187.7 | $276,422 | 69 | Wholesale Trade | 140.1 | $182,425 |
| 73 | Wholesale Trade | 187.7 | $158,066 | 70 | Wholesale Trade | 139.5 | $238,547 |
| 34 | Wholesale Trade | 187.7 | $93,450 | 56 | Wholesale Trade | 136.4 | $89,800 |
| 26 | Wholesale Trade | 187.7 | $90,918 | 44 | Wholesale Trade | 132.0 | $50,395 |
| 91 | Wholesale Trade | 187.7 | $84,082 | 45 | Wholesale Trade | 131.7 | $46,015 |
| 76 | Wholesale Trade | 187.7 | $65,093 | 05 | Wholesale Trade | 130.6 | $158,595 |
| 39 | Wholesale Trade | 187.7 | $231,709 | 66 | Wholesale Trade | 129.9 | $629,983 |
| 44 | Wholesale Trade | 187.7 | $75,342 | 70 | Wholesale Trade | 126.1 | $389,110 |

# APPENDIX B

## List of awards to Zone D claimants more than 100 miles from the Gulf in specified industries

| Claim ID | Industry | Approx. Miles to Gulf Waters | Total Award Amount |
|---|---|---|---|
| ██84 | Wholesale Trade | 118.0 | $73,399 |
| ██54 | Wholesale Trade | 102.8 | $1,597,529 |
| **Total** | **Wholesale Trade** | | **$30,573.345** |

# Exhibit R

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| | * * | |
| | * * | HONORABLE CARL J. BARBIER |
| | * | |
| This document relates to Civ. A. No. 12-970. | * * | MAGISTRATE JUDGE SHUSHAN |
| | * | |

### DECLARATION OF HAL SIDER

I, Hal Sider, hereby declare and state as follows:

1.      I am over the age of 21 years and a resident of the State of Illinois.  Unless otherwise stated, I have personal knowledge of the facts set forth herein and, if called to do so, could testify truthfully thereto.

2.      I am an Executive Vice-President of Compass Lexecon, an economic consulting firm with its headquarters in Chicago, IL.  I have been retained by BP and my responsibilities include monitoring the implementation of the Settlement Agreement.  I previously submitted declarations in this matter on February 18, 2013, March 14, 2013, April 21, 2013, July 16, 2013, August 5, 2013, September 20, 2013, October 9, 2013, and October 18, 2013.  My February 18 declaration summarizes my qualifications and includes my curriculum vitae.

3.      I, and others under my supervision, review and evaluate BEL compensation awards made to claimants by the Court Supervised Settlement Program ("CSSP") as reflected in data posted by the Claims Administrator to the CSSP portal as well as claims activity as reported in computer files made available to BP by the CSSP.  I, and others under my supervision, have

1

compiled and evaluated the financial information reported in the profit and loss (P&L) statement data files used by the CSSP in evaluating BEL offers and have reviewed a large number of BEL claims files and offers.  I have also regularly evaluated data on economic activity in Gulf States on an on-going basis since the DWH spill.

## I.      Introduction and Overview of Conclusions

4.      My October 9, 2013 declaration concluded that "patterns of [BEL] awards often bear little relationship to economic reality" and highlighted the large number of BEL offers made to claimants in industries and geographic areas "with little apparent relationship to the DWH spill."[1]   I have been asked by counsel for BP to evaluate such patterns further in order to assess whether a substantial number of BEL claimants likely did not suffer losses due to the DWH spill.

5.      The BEL claim form states that "[t]he Business Economic Loss Claim is for businesses […] that assert economic loss due to the Spill", and claimants must attest to the truthfulness of the submitted information on p. 9 of the form.  I understand that CSSP does not routinely evaluate whether a claimant's losses were due to the spill beyond the criteria identified in Exhibit 4B to the Settlement Agreement.

6.      My analysis evaluates (i) the extent to which BEL claimants previously claimed that they suffered harm due to the spill by participating in the GCCF process or filing a Short Form Joinder in MDL 2179; (ii)  the frequency with which BEL claimants are drawn from industries and geographic areas unlikely to have been affected by the DWH spill; (iii) the extent to which BEL offers are made to such claimants; and (iv) the extent to which BEL offers are made to claimants that did not suffer reductions in revenue or variable profit between 2009 and 2010.

---

1. Sider Declaration, October 9, 2013, (¶¶23-24).  My February 18, 2013 declaration (¶¶14-20) and March 14, 2013 declarations (¶¶22-29) addressed similar issues and drew similar conclusions.

7.      My analysis indicates that a substantial portion of BEL claims and offers are concentrated in geographic areas and industries with little apparent economic connection to the DWH spill (although these results alone do not indicate whether any particular claimant's losses were spill-related – a determination that would require a review of the individual claimant's circumstances).

8.      In evaluating the extent to which the CSSP compensates BEL claimants for losses unrelated to the DWH spill, it is important to understand the extent, if any, to which the DWH spill affected general economic activity in the class geography.  Section II evaluates a variety of economic indicators, all of which suggest that the DWH spill did not have a negative impact on statewide economic activity in the Gulf States.  Section III expands the analysis presented in my February 18, 2013, March 14, 2013, and October 9, 2013 declarations and shows that much BEL activity is concentrated among claimants that did not previously claim spill-related harm by participating in the GCCF or filing an SFJ, and a substantial portion of BEL activity is concentrated in industries and areas that have no direct connection to the DWH spill.

## II.     DWH Spill and General Economic Activity

9.      In interpreting patterns of BEL activity, it is important to understand the extent, if any, to which the DWH spill affected general economic activity in the Gulf region.  Losses suffered by claimants both near and far from the Gulf Coast may have been due to factors other than the spill.  The smaller the DWH spill's impact on overall economic activity, the less likely it is that losses suffered by claimants are spill-related, especially for those located far from the Gulf coast and/or from industries outside the Gulf Coast tourism and seafood sectors (which suffered the most direct impact of the spill).

10.     Evaluation of a variety of economic indicators highlights that the DWH spill did not adversely affect the general level of economic activity throughout each of the Gulf States. [2] This conclusion is based on a comparison of pre-spill and post-spill economic activity as reflected in a variety of standard economic indicators, including sales tax revenue, employment levels and tourism activity.  More specifically, I evaluate the change in the economic indicators between May-December of 2009 and May-December 2010, using as a benchmark the changes in these indicators observed between January-April 2009 and January-April of 2010 that provides a "control" for other changes in economic conditions over this period.[3]  These results, reported below, indicate that the aggregate impact was confined relative to the overall level of economic activity in the state.  However, these results do not necessarily mean that the spill had no effect on a particular business or region.

11.     If the DWH spill had an adverse effect on general economic activity in the Gulf States, indicators of economic activity would be expected to be lower in May-December 2010 compared to May-December 2009 (or at least lower than would be expected based on changes in the indicators observed between January-April 2009 and January-April 2010).  However, for each state and economic indicator analyzed, economic activity was greater than expected in the post-spill period.

12.     One key indicator reflecting spending by residents and tourists in Gulf states is sales tax receipts, since almost all purchases are subject to such state taxes.  To the extent the spill had an adverse effect on statewide economic activity, one would expect to see

---

2.  The section evaluates changes in economic indicators for Louisiana, Mississippi, Alabama, and Florida.  The class geography includes four counties in Texas which I exclude from this analysis.  In addition, the class geography excludes some inland and Atlantic coastal counties in Florida.
3.  This approach is conceptually equivalent to the "Interim methodology" publicized and used by BP in making settlement offers to a variety of government entities following the DWH spill.

corresponding decline in state sales tax receipts.[4]  As shown in Table 1, Louisiana sales tax revenue grew by 5.2% between May-December of 2009 and 2010, while in January-April of 2010 sales tax revenue was 9.8% lower in 2010 relative to 2009.  Together, these data indicate that sales tax revenue was 15.0% higher in May-December than expected based on January-April receipts.  As the table indicates, in each of the Gulf States, sales tax revenue in May-December 2010 was higher than in the same period of 2009, and above the level expected based on January-April trends.  These data thus provide no support for the claim that the DWH spill had an adverse statewide impact on sales tax receipts.

**Table 1**
**Percentage Change in State Sales Tax Collections**
**2009-2010**

|  |  | LA | MS | AL | FL |
|---|---|---|---|---|---|
| Jan. - Apr. 2009-2010 | [1] | -9.8% | -2.4% | 2.3% | 0.4% |
| May - Dec. 2009-2010 | [2] | 5.2% | 1.6% | 3.2% | 3.8% |
| Relative Change | [3] = [2] - [1] | 15.0% | 4.0% | 0.8% | 3.4% |

Source: State Departments of Revenue.
Note: Data reflect month of generation, one month prior to collection month.

13.    Table 2 presents a similar analysis based on employment levels.  The results indicate that employment grew in each state between May-December of 2009 and the same period of 2010 relative to levels expected based on January-April trends.  These data thus provide no support for the view that the DWH spill had an adverse statewide impact on employment levels.

---

4.  Sales taxes, unlike state income taxes, are collected each month.  Our analysis classifies sales tax receipts based on the month in which the taxes were generated, not the month in which the taxes were collected.  Other state taxes, such as income taxes, are collected at least in part on an annual cycle and thus are not amenable to a before/after analysis of this type.

5

**Table 2**
**Percentage Change in Average Employment Levels**
**2009-2010**

|  |  | LA | MS | AL | FL |
|---|---|---|---|---|---|
| Jan. - Apr. 2009-2010 | [1] | -2.2% | -2.1% | -2.5% | -2.7% |
| May - Dec. 2009-2010 | [2] | -0.2% | 0.4% | 0.0% | 0.2% |
| Relative Change | [3] = [2] - [1] | 2.0% | 2.5% | 2.5% | 2.9% |

Source: Bureau of Labor Statistics CES data.
Note: Data are seasonally adjusted.

14.    Table 3 presents a similar analysis for the tourism industry based on revenue per available hotel/motel room (RevPAR) data reported by Smith Travel Research (STR). RevPAR is a standard metric of tourism activity used throughout the industry. The results indicate that RevPAR grew in each state between May-December of 2009 and the same period of 2010. Moreover, in each state, the percentage May-December growth exceeded the level expected based on January-April trends. These data provide no support for the view that the DWH spill had an adverse statewide impact on tourism activity, as reflected in RevPAR.

**Table 3**
**Percentage Change in RevPAR**
**2009-2010**

|  |  | LA | MS | AL | FL |
|---|---|---|---|---|---|
| Jan. - Apr. 2009-2010 | [1] | 1.4% | 1.1% | -2.2% | 0.6% |
| May - Dec. 2009-2010 | [2] | 13.8% | 8.4% | 13.2% | 6.8% |
| Relative Change | [3] = [2] - [1] | 12.4% | 7.3% | 15.4% | 6.3% |

Source: Smith Travel Research.

15.    Recognizing that claimants both near and far from the Gulf Coast can suffer losses that are unrelated to the DWH spill, the absence of evidence of substantial statewide impact of the DWH spill on these economic indicators suggests that losses suffered by many

6

potential claimants were not spill related, especially for those located far from the Gulf coast or from industries not directly affected by the spill.[5]

### III. BEL Activity Among Claimants Unlikely to Have Been Affected by the DWH Spill

16.     The section extends the analysis presented in my prior declarations of the extent of BEL activity from claimants unlikely to have been affected by the DWH spill.  My analysis indicates that the vast majority of BEL claims are from claimants that did not previously indicate that they had suffered spill-related harm by participating in the GCCF or by filing an SFJ.  My analysis also indicates that the bulk of BEL claimants are from geographic areas that are remote from the Gulf Coast and from industries other than the tourism- and seafood-related industries which were most directly affected by the spill.  (As mentioned above, these results alone do not indicate whether any particular claimant in such industries and areas was affected by the spill.  Instead, any such determination would require a more careful review of the individual claimant's circumstances.)

#### 1.     Prior GCCF Activity among BEL Claimants

17.     As discussed in my February 18, 2013, March 14, 2013, and October 9, 2013 declarations, an indication of the likelihood that BEL claimants suffered losses unrelated to the spill is reflected in the share of BEL claimants that did not participate in the GCCF and/or did not file Short Form Joinders indicating their intent to participate in MDL 2179.  One would expect many businesses harmed by the spill to make claims with the GCCF, because GCCF claimants could receive emergency and interim payments without signing a release.

---

5. Data from InfoUSA indicate that Zone D, which covers the bulk of the Class geography, accounts for 74% of all businesses that are potential class members.   InfoUSA is national business directory database.

18.    Figure 1 shows that at the start of the program, fewer than 30% of BEL claims were filed by claimants that did not participate in the GCCF.  However, since the beginning of 2013, this figure exceeds 80%, and the average exceeds 85% over the past 5 months.



**Figure 1**

**Monthly Share of New BEL Claims Filed by Non-GCCF Claimants**

Source: CSSP data as of 10/28/2013.

19.    Table 4 summarizes GCCF participation by BEL claimants by Zone.  The results indicate that fully 85% of Zone D claims are from non-GCCF participants compared to 52.8% of Zone A BEL claimants.  In addition, only 8.6% of BEL claims are from claimants that received any payment from the GCCF.  The great majority of BEL claimants that participated in the GCCF had their claims rejected by the GCCF.

**Table 4**
**Share of BEL Claims by GCCF Status**

| Claim Zone | Submitted Claims | % Not in GCCF | % Paid by GCCF |
|---|---|---|---|
| ZoneA | 16,308 | 52.8% | 20.4% |
| ZoneB | 5,804 | 65.1% | 12.1% |
| ZoneC | 22,733 | 67.1% | 8.2% |
| ZoneD | 36,338 | 85.0% | 3.2% |
| Missing | 1,214 | 81.9% | 1.9% |
| | | | |
| Total | 82,397 | 72.2% | 8.6% |

Source: CSSP data as of 10/28/2013.

20.    Table 5 reports GCCF participation by industry for BEL claimants and indicates that nearly 80% of claimants from the agriculture, professional services, construction, health care, manufacturing, and wholesale industries did not participate in the GCCF.

**Table 5**
**Share of BEL Claims from Non-GCCF Claimants by Industry**

| Industry | Submitted Claims | % Not in GCCF |
|---|---|---|
| Agriculture: Crops | 1,529 | 99.3% |
| Professional Services: Lawyers | 1,991 | 95.3% |
| Agriculture: Other | 1,051 | 93.7% |
| Health Care | 3,748 | 86.1% |
| Professional Services: Other | 4,502 | 82.4% |
| Manufacturing | 2,615 | 82.1% |
| Wholesale Trade | 2,529 | 82.1% |
| Construction | 9,822 | 79.2% |
| Real Estate | 4,425 | 76.9% |
| Retail Trade | 8,774 | 75.7% |
| Services | 6,997 | 69.7% |
| All Other Industries | 2,849 | 67.1% |
| Transportation and Warehousing | 1,765 | 66.3% |
| Missing | 14,471 | 65.2% |
| Property Rental | 7,291 | 63.3% |
| Arts, Entertainment, and Recreation | 2,050 | 56.4% |
| Bars and Restaurants | 4,304 | 52.4% |
| Hotels and Motels | 1,308 | 46.7% |
| Seafood Processing | 376 | 25.8% |
| | | |
| Total | 82,397 | 72.2% |

Source: CSSP data as of 10/28/2013.

21.     Table 6 updates the analysis presented in my October 9, 2013 and prior declarations and shows that only 8.7% of BEL offers are made to claimants that filed an SFJ, and that only 12.1% of claimants that have received offers above $500,000 filed SFJs.  Only 1 of 144 law firms that have received offers of $500,000 or more filed an SFJ.  Similarly, only 3 of 89 manufacturing firms and none of the 66 crop farmers receiving large BEL awards filed an SFJ.

**Table 6**
**BEL Offers to Claimants that Filed Short Form Joinders**

| Industry | Offers Above $500,000 | | | All BEL Offers | | |
|---|---|---|---|---|---|---|
| | Offers | Claimants with SFJ | % of Total | Offers | Claimants with SFJ | % of Total |
| Agriculture: Crops | 66 | 0 | 0.0% | 224 | 0 | 0.0% |
| Professional Services: Lawyers | 144 | 1 | 0.7% | 399 | 13 | 3.3% |
| Transportation and Warehousing | 32 | 1 | 3.1% | 265 | 16 | 6.0% |
| Manufacturing | 89 | 3 | 3.4% | 432 | 28 | 6.5% |
| Agriculture: Other | 27 | 1 | 3.7% | 119 | 1 | 0.8% |
| Construction | 318 | 16 | 5.0% | 1,679 | 101 | 6.0% |
| All Other Industries | 39 | 2 | 5.1% | 821 | 51 | 6.2% |
| Health Care | 64 | 4 | 6.3% | 672 | 27 | 4.0% |
| Professional Services: Other | 74 | 5 | 6.8% | 986 | 49 | 5.0% |
| Wholesale Trade | 80 | 6 | 7.5% | 381 | 25 | 6.6% |
| Real Estate | 27 | 4 | 14.8% | 1,148 | 52 | 4.5% |
| Hotels and Motels | 108 | 20 | 18.5% | 461 | 113 | 24.5% |
| Services | 42 | 8 | 19.0% | 1,171 | 68 | 5.8% |
| Arts, Entertainment, and Recreation | 52 | 11 | 21.2% | 509 | 81 | 15.9% |
| Retail Trade | 151 | 35 | 23.2% | 1,318 | 159 | 12.1% |
| Bars and Restaurants | 87 | 26 | 29.9% | 939 | 176 | 18.7% |
| Property Rental | 37 | 12 | 32.4% | 1,378 | 115 | 8.3% |
| Seafood Processing | 48 | 25 | 52.1% | 156 | 61 | 39.1% |
| Total | 1,485 | 180 | 12.1% | 13,058 | 1,136 | 8.7% |

Sources: CSSP data as of October 27, 2013; MDL 2179 Short Form Joinder data as of March 16, 2012.

**2.      BEL Activity is Concentrated in Zones and Industries Remote from the DWH Spill**

22.     As highlighted in my prior declarations, a large share of BEL claims and offers are made to claimants in geographic areas distant from the Gulf and in industries other than

tourism and seafood, which were most directly affected by the spill indicates that many firms receiving BEL offers did not suffer spill related losses.

### a.    Trends in BEL Claims by Zone

23.    The share of BEL claimants from geographic areas distant from the Gulf has grown dramatically over the course of the BEL program, indicating that recent claimants are less likely to have been affected by the DWH spill than those that filed claims in the program's early months.  Figure 2 shows that the share of claims from Zone D has grown from less than 30% in the initial months of the BEL program to roughly 50% in recent months.  Claims from Zones C and D together now account for more than 80% of new BEL claims.

**Figure 2**



Monthly Share of New BEL Claims in Zones C and D

Source: CSSP data as of 9/30/2013.     —— Zones C/D     - - - Zone D

### b.    BEL Offers by Industry and Zone

24.    Table 7 summarizes the value of BEL offers by industry for Zones A/B and C/D. The table reports percentage of the value of BEL offers for these Zone/industry combinations.

11

- The industries most directly affected by the DWH spill in Zones A/B account for only 21% of the value of BEL offers. (These industries include Zone A/B tourism-related industries broadly defined to include lodging, restaurants, bars, property rental, real estate, entertainment, and retail as well as seafood-related industries.)

- Offers to claimants in Zones C/D together account for 58% of the value of BEL offers. Three of the four industries accounting for the largest dollar amount of BEL offers – construction (21%), law firms (9%), manufacturing (7%) – are not tourism- or seafood-related, and thus do not have a direct connection to the DWH spill.

**Table 7**
**Distribution of BEL Offer Amounts by Industry and Zone**

| Industry Group | Industry | Zone A-B | Zone C-D | Total |
|---|---|---|---|---|
| Tourism or Seafood Related | Arts, Entertainment, and Recreation | 2.6% | 1.0% | 3.5% |
| | Bars and Restaurants | 4.2% | 1.8% | 6.0% |
| | Hotels and Motels | 3.3% | 2.7% | 6.0% |
| | Property Rental | 2.8% | 0.6% | 3.4% |
| | Real Estate | 1.9% | 1.6% | 3.5% |
| | Retail Trade | 4.5% | 5.0% | 9.5% |
| | Seafood Processing | 1.6% | 1.4% | 3.0% |
| | Sub-Total | 21.0% | 14.2% | 35.1% |
| | | | | |
| Other | Agriculture: Crops | 0.1% | 3.0% | 3.1% |
| | Agriculture: Other | 0.7% | 1.3% | 1.9% |
| | Construction | 4.5% | 16.0% | 20.6% |
| | Health Care | 2.0% | 2.6% | 4.6% |
| | Manufacturing | 2.0% | 5.0% | 6.9% |
| | Professional Services: Lawyers | 4.9% | 4.5% | 9.4% |
| | Professional Services: Other | 1.9% | 3.4% | 5.3% |
| | Services | 2.2% | 1.8% | 4.0% |
| | Transportation and Warehousing | 0.3% | 1.4% | 1.7% |
| | Wholesale Trade | 0.8% | 3.3% | 4.1% |
| | All Other Industries | 2.0% | 1.1% | 3.1% |
| | Missing | 0.2% | 0.1% | 0.3% |
| | Sub-Total | 21.5% | 43.3% | 64.9% |
| | | | | |
| Total | | 42.5% | 57.5% | 100.0% |
| Total Amount Offered ($ M) | | | | $3,195.6 |

Source: CSSP data as of 10/28/2013.

      **c.**     **Zone D BEL offers to claimants "closer to" and "farther from" the Gulf**

25.     The zone structure of the Settlement Agreement reflects the view that the likelihood that losses are spill-related is lower for claimants located farther from the Gulf coast. Zone D covers a broad geographic area, with the northern borders of Alabama and Mississippi extending more than 300 miles from the Gulf coast and other Zone D areas located only a few miles from the Gulf.[6]  If compensation is limited to claimants that suffered spill-related losses, it would be expected that Zone D claimants located closer to the Gulf would receive a higher share of BEL offers than Zone D claimants located farther from the Gulf, after controlling for differences in the number of Zone D businesses located "closer to" and "farther from" the coast. The differences across these two groups with respect to average distance from the coast is substantial – the average distance is roughly 32 miles, among the "closer to" BEL claimants that have received offers, while the average distance is 217 miles for claimants from the "farther from" group.

26.     The available data indicate that closer-in Zone D BEL claimants do not receive a disproportionately high share of offers, indicating that BEL offers are often driven by factors other than harm resulting from the spill.  Table 8 reports the dollar share of BEL offers to Zone D claimants located more than and less than 150 miles from the Gulf coast.  The table also reports the share of Zone D business establishments located in each of these "sub-zones".  The table shows that the closer-in areas of Zone D account for 65% of Zone D business establishments but only 59% of the value of Zone D offers; the farther-out areas of Zone D account for 41% of the value of Zone D BEL offers, which is greater than the area's 35% of

---

6.  Measurement of distance to the Gulf is based on the shortest straight-line distance to the Specified Waters of the Gulf as defined in Exhibit 23 of the Settlement Agreement.

Zone D business establishments.  That is, the more distant sub-zone accounts for a disproportionately large share of BEL offers.

**Table 8**

**Zone D BEL Claims by Distance to Gulf Waters**

| Distance Category | Average Distance (Miles) | Offers (% of Total Dollars) | InfoUSA Establishments |
|---|---|---|---|
| 0-150 Miles | 31.6 | 58.6% | 64.7% |
| 150+ Miles | 217.7 | 41.4% | 35.3% |
| **Total** | **91.6** | **100.0%** | **100.0%** |

Note: Analysis includes Zone D portions of LA, MS, AL and FL.
InfoUSA Establishments include all Zone D establishments by zip code centroid distance.

27.     The fact that Zone D claimants located farther from the Gulf, and thus less likely to have suffered spill-related harm, receive a disproportionately large share of Zone D BEL offers suggests that BEL offers frequently compensate claimants for losses that are not spill-related.  These results, of course, do not suggest that losses suffered by claimants located closer to the Gulf necessarily were spill-related.  To the contrary, these results suggest that as a general matter BEL offers are often driven by factors other than spill-related harm.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is a true and correct statement of my analysis and opinions.

Dated:  November 7, 2013

_Hal Sider_

_____

Hal Sider

# Exhibit S

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL No. 2179 |
| This Document Relates to: | SECTION: J |
| No. 12-970 | JUDGE BARBIER |
| | MAGISTRATE SHUSHAN |

<u>OPPOSITION TO BP's MOTION TO AMEND SCHEDULING ORDER
AND MOTION TO AMEND INJUNCTION</u>

(<u>RE</u> <u>CAUSATION</u>)

Eligible Claimants in the Court-Supervised Settlement Program and the Economic & Property Damages Settlement Class respectfully submit the following memorandum in Response to BP's Motion to Amend Scheduling Order and in Opposition to BP's Motion to Amend the Injunction relating to BEL Claims [Doc 11819]:

MAY IT PLEASE THE COURT:

The *Deepwater Horizon* Economic and Property Damages Settlement Agreement forms a contractual agreement between the BP Parties and participating classmembers who submit claims to the Settlement Program.[1]

---

[1] *See, e.g.,* SETTLEMENT AGREEMENT, Section 4.1 (establishment of *Deepwater Horizon* Court Supervised Settlement Program); Section 4.4 (Process for Making Claims); Section 5.12 (establishment of Settlement Trust); Section 21.2 (severability of any provisions found to be invalid, illegal or unenforceable); Section 21.3 (the Claims Administrator will continue to process claims that have been submitted to the Program in the event the class settlement is not fully and finally approved); Section 26.1 (regarding the binding effect of the Agreement on the Parties); Exhibit 26 (Individual Release). *See also, e.g.,* COMPLAINT, *BP v. Deepwater Horizon Court Supervised Settlement Program,* No.13-492 (March 15, 2013) ¶65 ("The Settlement Agreement is a valid contract meeting all required elements: offer, acceptance, and consideration"). *See also,* Ehrheart v. Verizon Wireless, 609 F.3d 590, 592-593 (3d Cir. 2010) ("The requirement that a district court review and approve a class action settlement before it binds all class members does not affect the binding nature of the parties' underlying agreement") (*citing,* In re Syncor ERISA Litig., 516 F.3d 1095, 1100 (9th Cir. 2008)).

The Economic & Property Damages Class Settlement Agreement has separately, and additionally, been approved by the Court under Rule 23(b)(3) and Rule 23(e) as a class settlement, which is binding upon on absent classmembers with respect to economic and property damage rights and claims arising out of the *Deepwater Horizon* Incident.[2]

BP agreed, in the Economic and Property Damages Settlement Agreement, that whether an Entity experienced an actual injury traceable to the *Deepwater Horizon* Incident would be determined by the objective criteria set forth in the Causation Framework contained in Exhibit 4B.

Further, in light of the numerous filings with and representations to the Court, Settlement Program Claimants and absent members of the Economic & Property Damages Settlement Class respectfully submit that BP should be judicially estopped from now taking a contrary position.

For these reasons, for the reasons outlined further below, and for the reasons stated in Class Counsel's *In Camera* Submission of October 9, 2013 [Doc 11728-1], and Class Counsel's Letter Brief to the U.S. Fifth Circuit in Case No. 13-30095 [Doc 11728-6], BP's Motion should be denied.

### The Settlement Agreement Requires and Defines the Criteria by Which a Loss Caused by the Spill is Established

The Economic & Property Damages Settlement Agreement provides an objective way for Settlement Program Claimants and absent classmembers to establish the existence of traceable injury due to or resulting from the *Deepwater Horizon* Incident.

---

[2] *See* ORDER AND JUDGMENT [Doc 8139] (Dec. 21, 2012). In particular, Paragraphs 8-14 of the Order and Judgment provide BP with "the general classwide release ('Economic Class Release') contained in Section 10 of the Settlement Agreement." (*See also,* SETTLEMENT AGREEMENT, Sections 10.1–10.6.)

BP, taking Section 1.3.1.2 of the Class Definition out of context and in isolation, now argues that in order to be an eligible Claimant or Classmember, the business must satisfy a subjective and as-yet-undefined "requirement" that a loss of income, earnings, or profits was suffered "as a result of" the *Deepwater Horizon* Incident.

This, however, ignores that fact that: **(i)** the Economic Damage Category "summary" is prefaced and modified by Sections 1.3 and 1.3.1 of the Class Definition, which make clear that such claims categories are "fully described" in the attached Exhibits;[3] **(ii)** "Economic Damage" is defined to mean loss of profits, income or earnings "<u>allegedly</u>" arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the *Deepwater Horizon* Incident;[4] and **(iii)** the Settlement Agreement itself goes on to set forth the objective methodology by which it is determined that a claiming Entity has, in fact, suffered a loss of income, earnings or profits "as a result of" the *Deepwater Horizon* Incident.

Specifically, Section 5.3.2.3 sets forth the "Causation Requirements For Business Economic Loss Claims" as follows:

> Business Economic Loss Claimants, unless causation is presumed, must establish that their loss was due to or resulting from the Deepwater Horizon Incident. The causation requirements for such Claims are set forth in Exhibit 4B.[5]

---

[3] *See also,* SETTLEMENT AGREEMENT, Section 5.3.1 ("The Economic Damage Claim Process, Economic Damage Claim Frameworks, and other details for determining the Economic Damage Compensation Amounts are set forth in the Exhibits to this Agreement, which are incorporated herein by reference"); Section 5.3.2.1 ("The frameworks setting forth the documentation requirements governing Business Economic Loss Claims, and the standards for evaluating such Claims, are set forth in Exhibits 4A-7 to the Agreement"); Section 5.3.2.3 ("The causation requirements for such Claims are set forth in Exhibit 4B"). *See generally,* Exhibit 4B.

[4] SETTLEMENT AGREEMENT, Section 38.55 (emphasis supplied).

[5] *See also,* SETTLEMENT AGREEMENT, Sections 5.3.1 and 5.3.2.1.

Exhibit 4B, in turn, sets forth the transparent and objective methodologies by which the Parties agreed that BEL Claimants would establish that their loss was due to or resulting from the *Deepwater Horizon* Incident.

<u>The Causation Requirement is a Separate and Distinct Requirement</u>

As observed by Judge Southwick, "Exhibit 4B of the Settlement Agreement allowed causation to be supported by loss calculations under Exhibit 4C rather than by requiring the claimant to prove that the loss had any factual relationship to BP's actions."[6]

It should be noted, at the same time, that for most claims, (and virtually all of the claims that BP is complaining about), the Causation Requirements for Business Economic Loss Claims under Section 5.3.2.3 and Exhibit 4B are separate and distinct from the Compensation Methodology set forth in Section 5.3.2.4 and Exhibit 4C.

Exhibit 4B is a revenue-only test, which requires the claiming Entity to demonstrate not only a Downturn in revenue, but some other indicia that the downturn was caused by the spill – *i.e.* either a Later Upturn in revenue (the V-Shaped Revenue Pattern), or a showing that a certain amount of their customers were either tourists or living in an affected zone (the Modified-V and Decline-Only Revenue Patterns), or a showing of Spill-Related Cancellations.[7]

These Causation Tests are illustrated by two graphs on the next page. [8, 9]

---

[6] SLIP OPINION, pp.38-39 (Southwick, concurring); *see also,* SLIP OPINION, pp.37-38 (Southwick, concurring) ("The Settlement Agreement resolved two separate issues by, in effect, combining them. One concerned loss *causation,* and the other loss *measurement.* If a BEL claimant could prove an economic loss, properly measured, that proof substituted for evidence of causation…. The agreement simplified the claims process by making proof of loss a substitute for proof of factual causation"). The V, Modified-V, and Decline-Only Tests require additional indicia that the claimed losses are Spill-related.

[7] Certainly, there are tens of thousands of businesses within Zones B, C and D which are not eligible for Compensation, as they cannot satisfy one or more of the Causation Tests. *See, e.g.,* Exhibit A to CLAIMS ADMINISTRATOR'S STATUS REPORT (Oct. 11, 2013) [Doc 11646-1], at p.3 (2,840 BEL Causation Denials).

[8] BUSINESS ECONOMIC LOSS CLAIMS: CAUSATION REVENUE TREND TEST (for "Tutorial" with Claims Administrator) (May 7, 2012) (submitted herewith as part of Exhibit "A").

[9] SUMMARY OF REVENUE PATTERN requirements for CAUSATION TESTS (displayed during Preliminary Approval Hearing) (April 25, 2012) [Doc 9087-1, at p.5].

## Business Economic Loss Claims: Causation Revenue Trend Tests

### V-Shaped Revenue Pattern

Revenue decline in 2010 Compensation Period (Zone B & C= 8.5%; Zone D= 15%) compared to the same months in the Benchmark Period year(s) followed by recovery (increase in revenues) in the same months of 2011 (B & C= 5%; D= 10%).



### Modified V-Shaped Revenue Pattern

Revenue decline in 2010 Compensation Period (B & C= 5%; D= 10%) compared to the same months in the Benchmark Period year(s) followed by recovery (increase in revenue) in the same months of 2011 (B & C= 5%; D= 7%) plus additional items.



### Decline Only Revenue Pattern

Revenue decline in 2010 Compensation Period (Zone B & C= 8.5%; Zone D= 15%) compared to the same months in the Benchmark Period year(s) plus additional items including factors outside company's control preventing recovery.



---

## PRELIMINARY APPROVAL HEARING
### Class Counsel Presentation
### April 25, 2012

**Summary of Revenue Pattern Requirements for Causation Tests**

| Test | Zone A | Zone B (Non-Tourism and Non-Seafood) | | Zone C (Non-Seafood) | | Zone D | |
|---|---|---|---|---|---|---|---|
| | Down Up | Down | Up | Down | Up | Down | Up |
| V-Test | N/A | -8.5% | 5% | -8.5% | 5% | -15% | 10% |
| Modified V-Test* | N/A | -5% | 5% | -5% | 5% | -10% | 7% |
| Down Only test* | N/A | 8.50% | N/A | 8.50% | N/A | 15% | N/A |

*= For the Modified V-Test and the Down Only Test, additional requirements apply, as described in Exhibits.

Rec. Doc. 9087-1   (page 5)

It is only after a claiming Entity establishes Causation under Exhibit 4B that the Compensation is determined under the separate and distinct methodology set forth in Exhibit 4C. This Compensation Methodology is a Two-Step Process, which factors in both revenue and expenses, and which can be calculated using different months than were used to establish Causation.[10]

The Allegedly "Fictitious" Claims that BP is Complaining About Are Claims Which Met the Required Proof of Causation

While BP agreed that there would be limited businesses and geographic locations centered around tourism and the seafood industry for which causation would be presumed, these are not the claims that BP is complaining about. Rather, BP is complaining almost exclusively about non-tourism and non-seafood businesses in Zone C and Zone D who *satisfied* the objective Causation Requirements BP agreed to in Exhibit 4B.[11]

**Article III, Rule 23, and the Rules Enabling Act**

As set forth in Class Counsel's Letter Brief to the U.S. Fifth Circuit in Case No. 13-30095, all Article III elements are satisfied.[12]  The Class Representatives clearly have Article III standing.  All Claimants allege that they have a loss caused by the Spill.  The eligible BEL Claimants are required to specifically establish a loss caused by the Spill under the objective

---

[10]  *See, e.g.,* Addendum to Causation Requirements for Business Economic Loss Claims and Compensation Framework for Business Economic Loss Claims [Doc 6276-10, at pp.7-8].

[11]  *See, e.g.,* APPENDIX B to Rumsey Declaration submitted by BP in Support of its Motion ("LIST OF AWARDS TO ZONE D CLAIMANTS MORE THAN 100 MILES FROM THE GULF IN SPECIFIED INDUSTRIES") [Doc 11819-2, at pp.19-48]; *see also,* APPENDIX A [Doc 11819-2, at pp.6-18];  Appendix B to BP'S MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR PRELIMINARY INJUNCTION (March 15, 2013) ("Non-Exhaustive Examples of Claims Affected by Misapplication of Business Economic Loss Frameworks") [Doc 8910-3, at pp.47-71].

[12] *See* Doc. 11728-6, at pp.5-8.

tests and criteria agreed to in Exhibit 4B. And all absent classmembers have, at the very least, a "colorable" claim, under the broad remedial provisions of OPA,[13] the claims that were acknowledged and paid by BP in its GCCF,[14] and as defined within the Gulf Coast Area in the Economic & Property Damage Settlement Agreement.[15]

Moreover, the Article III, Rules Enabling Act and Rule 23 questions could only possibly affect the approval of the Class Settlement (and BP's Classwide Release) under Rule 23(b)(3) and/or Rule 23(e).

Parties retain the right to freely enter into settlement agreements and other enforceable contracts, irrespective of the arguable requirements or limitations of Rule 23.[16]

## **Judicial Estoppel**

Judicial estoppel is an equitable doctrine that "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." In re Paige, 610 F.3d 865, 876 (5th Cir. 2010); Hopkins v. Cornerstone Am., 545 F.3d 338, 347 (5th Cir. 2008); Hall v. GE Plastic Pac. PTE Ltd., 327 F.3d 391, 396 (5th Cir. 2003). As the Fifth Circuit has noted:

> The purpose of the doctrine is to protect the integrity of the judicial process by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest. Importantly, because judicial estoppel is designed to protect the judicial system,

---

[13] *See* LETTER BRIEF TO U.S. FIFTH CIRCUIT (Oct. 18, 2013) [Doc 11728-6] at p.6 fn.16; *citing,* 33 U.S.C. ¶¶ 2702(a), 2702(b)(2)(E), 2705(a), and 2713; In re: Deepwater Horizon, 808 F.Supp.2d 943, 958-962, 965-966 (E.D.La. 2011), David W. Robertson, *The Oil Pollution Act's Provisions on Damages for Economic Loss,* 30 MISS.C.L.REV. 157, 158-160 (2011).

[14] *See, e.g.,* GCCF Maps [Doc 11804-7 thru -11].

[15] *See* SETTLEMENT AGREEMENT, Sections 1.1, 1.2, and 38.78, and Exhibit 22.

[16] *See* Footnote 1, *supra*. Indeed, to nullify or amend the substantive terms of the contractual Settlement Agreement between the BP Parties and participating Claimants based on (alleged) Rule 23 concerns would likely run afoul of the Rules Enabling Act.

not the litigants, detrimental reliance by the party opponent is not required.

In re Paige, 610 F.3d at 876; Superior Crewboats, Inc. v. Primary P&I Underwriters (In re Superior Crewboats, Inc.), 374 F.3d 330, 335 (5th Cir. 2004).

In the Fifth Circuit, judicial estoppel applies where: (1) the party's position is clearly inconsistent with the previous one; (2) the court has accepted the previous position; and (3) the change in position is not inadvertent. In re Paige, 610 F.3d at 876; Superior Crewboats, 374 F.3d at 335.

Typically, judicial estoppel focuses on the positions a party has taken in its pleadings, but may also include counsel's statements in open court. In re Paige, 610 F.3d at 876 n.4; Ergo Science Inc. v. Martin, 73 F.3d 595, 600 (5th Cir. 1996).

BP also has contractual obligations to support and defend the class settlement in the district court and on appeal, from inception to finality.[17]

---

[17] See SETTLEMENT AGREEMENT, Section 16.1 ("The Parties agree to take all actions necessary to obtain final approval of this Agreement and the entry of a Final Order and Judgment, and dismissing all Released Claims against Released Parties with prejudice"); Section 17.1 ("The Parties agree to support the final approval and implementation of this Agreement and defend it against objections, appeal, or collateral attack. Neither the Parties nor their Counsel, directly or indirectly, will encourage any person to object to the Economic and Property Damages Settlement"); see also, Section 9.1 ("Communications by or on behalf of the Parties and their respective Counsel regarding this Agreement with the public and the media shall be made in good faith, shall be consistent with the Parties' agreement to take all actions reasonably necessary for preliminary and final approval of the Settlement"); see also, e.g., F.W.F. Inc. v. Detroit Diesel Corp., 494 F.Supp.2d 1342, 1359 (S.D.Fla. 2007), aff'd, 308 F.App'x 389 (11th Cir. 2009) ("Every maritime contract imposes an obligation of good faith and fair dealing between the parties in its performance and enforcement…. The duty embraces, among other things, an implied obligation that neither party shall do anything to injure or destroy the right of the other party to receive the benefits of the agreement").

**Previous Pleadings, Filings and Statements by the BP Defendants on Causation**

On April 18, 2012, BP filed the *Deepwater Horizon* Economic and Property Damages

Settlement Agreement into the record, which, as noted *supra,* defined Causation for Business

Economic Loss (BEL) Claimants according to the objective criteria set forth in Exhibit 4B.[18]

On April 18, 2012, BP also filed a Joint Memorandum in Support of Preliminary

Approval, which stated that:

> The standards for establishing causation for individuals are flexible
> and provide claimants with multiple options. Causation is presumed for
> those individuals most likely to have been affected by the spill,
> including those on the coast and those employed in certain seafood
> related businesses. Other individual claimants are required to
> demonstrate a loss of earnings attributable to the spill during May
> through December 2010 (or other applicable period in the case of certain
> Seafood Industry claimants) based on financial information….
>
> *       *       *
>
> Businesses in certain geographic zones and industries, such as
> seafood processing, will not be required to provide documentation
> demonstrating causation, while businesses in other zones will be
> required to submit varying degrees of evidence of causation. For
> example, businesses in Fairhope, Alabama fall into Zone B. In order to
> recover, they must submit evidence of causation. One such form of
> evidence is documentation of a V-shaped revenue pattern—an aggregate
> decline of 8.5% or more in total revenues over a period of three
> consecutive months in the eight months following the spill followed by
> an aggregate increase of 5% or more in total revenues over the same
> period in 2011.[19]

On May 8, 2012, BP submitted a powerpoint presentation to the Court-appointed and

Court-supervised Claims Administrator and Trustee, which stated that:

---

[18] *See* SETTLEMENT AGREEMENT (April 18, 2012) [Doc 6276-1], Sections 1.3.1, 5.3.1, 5.3.2.1, and 5.3.2.3; and EXHIBIT 4B [Doc 6276-9].

[19] JOINT MEMO IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL (April 18, 2013) [Doc 6266-1] pp.17, 20. *See also,* EXCERPTS FROM PRELIMINARY APPROVAL HEARING (April 25, 2012) [Doc 8963-59], *and,* PRELIMINARY APPROVAL HEARING PRESENTATION (April 25, 2012) [Doc 9087-1].

Qualifying businesses receive compensation for all losses regardless of actual facts and circumstances."[20]

On August 13, 2012, BP submitted a Memorandum in Support of its Motion for Final Settlement Approval, in which BP stated that:

> Without regard to total payout figures, the parties negotiated claims frameworks, programs, and processes, including details such as (1) what categories of claims would be paid, (2) what types of proof would be required for claimants to receive a settlement payment, (3) whether certain claimants should be permitted to benefit from causation presumptions that BP was willing to accept for settlement purposes (despite its informed legal views as to what OPA or maritime law strictly demanded), and (4) how settlement benefits would be calculated. The negotiations were thus exclusively focused, from the outset, on producing claims frameworks that could be administered fairly, objectively, and consistently.
>
> \* \* \*
>
> …the class definition references geography to reduce or eliminate disputes regarding whether particular claims are included and to focus relief on those in the most affected areas of the Gulf region. *See, e.g.*, Coffee Decl. (Joint Ex. C) ¶ 4 ("Also simplifying this case is the fact that the class definition carefully excludes remote claimants . . . . This deliberately narrow definition of the class . . . ensures that this class action will remain compact and that class members will be similarly situated (and hence more cohesive).")
>
> \* \* \*
>
> …the class definition takes pains to specify a list of exclusions, for two reasons: (1) *to exclude claims that BP does not believe are even colorably compensable under OPA or maritime law*; and (2) to avoid the inclusion of claims that could not be efficiently resolved by a definable and administrable claims framework…. The result is a class that is neither sprawling nor under-inclusive, but instead carefully tailored to what the parties could reasonably agree on against the backdrop of the uniform body of OPA and maritime law that the Court has ruled is applicable….
>
> \* \* \*

---

[20] BUSINESS ECONOMIC GROWTH: BENEFITS (from BP Draft Tutorial Presentation, at p.3) (emphasis in original) (submitted herewith as part of Exhibit "A").

Business economic damage claimants will also be compensated under the settlement for post-spill losses of earnings and profits. As with the individual framework, the goal of the business framework is to fairly compensate businesses for their losses suffered as a result of the spill; it "uses the well-recognized approach of measuring lost earnings or profits by comparison of the post-DWH Spill Compensation Period to a Benchmark Period."

\* \* \*

Many businesses will benefit from causation presumptions…. As Dr. Fishkind explains, the zones and industry definitions governing causation presumptions are economically reasonable, as they benefit the claimants most likely to have been affected by the spill.

\* \* \*

For those claimants required to prove causation, however, the tests are reasonable. *See* Landry Decl. (Ex. 13) ¶ 38 (describing the causation tests as "consistent with . . . economic reality"). Indeed, in many ways the causation principles are remarkably favorable to claimants. *See, e.g.*, Sharp Decl. (Ex. 18) ¶ 17 ("*[O]nce a business meets the causation requirements, for purposes of quantifying compensation, all revenue and variable profit declines during the claimant-selected compensation period are presumed to be caused by the spill, with no analysis required to determine whether the declines might have been due, at least in part, to other causes.*").[21]

On August 13, 2012, BP submitted the Declaration of Holly Sharp, confirming that:

Once a business meets the causation requirements, for purposes of quantifying causation, *all revenue and variable profit declines during the claimant-selected compensation period are presumed to be caused by the spill, with no analysis required to determine whether the declines might have been due, at least in part, to other causes.*[22]

---

[21] BP MEMO IN SUPPORT OF MOTION FOR FINAL SETTLEMENT APPROVAL (Aug. 13, 2012) [Doc 7114-1], at pp.6-7, 11-12, 29-30, 33, (emphasis supplied); *see also,* EXCERPTS FROM BP'S MEMO [Doc 8963-60]. *See also,* EXCERPTS FROM DECLARATIONS SUBMITTED BY BP'S EXPERTS IN SUPPORT OF FINAL APPROVAL [Doc 8963-61].

[22] DECLARATION OF HOLLY SHARP [Doc 7114-18], p.10, ¶17; *quoted in,* BP'S MEMORANDUM IN SUPPORT OF FINAL APPROVAL [Doc 7114-1], at p.33, (emphasis supplied); *see also,* FROM SHARP DECLARATION [Doc 8963-62].

On August 13, 2012, BP also submitted the Declaration of James Henley, who stated that:

> The transparency and objectivity of the frameworks, which rely on expressly stated requirements or mathematical formulas, assures that claimants can understand how their claims can be treated under the frameworks.
>
>         *   *   *
>
> For businesses in Zone A or in certain industries in Zones B and C or Primary Seafood Processors in Zone D, there is a presumption of causation, which will inevitably include businesses that were not economically or financially affected by the DWH Spill.
>
>         *   *   *
>
> …the causation tests reflect reasonable expectations about the economic harm the DWH Spill could have caused to a business, and therefore are appropriate tests for the purpose of establishing causation. The "V tests" require that a business demonstrate a loss after the DWH Spill and a subsequent recovery. Based on my experience analyzing economic loss litigation cases, it is reasonable to expect a recovery at some point after a demonstrated loss where the circumstances claimed to have caused the loss have changed. The tests reflect this reasonable expectation. Moreover, the tests contain exceptions where it is reasonable to expect that other factors may have prevented a recovery, such as entrant of a new competitor or construction preventing customer access.[23]

On August 13, 2012, BP also submitted the Declaration of Henry Fishkind, who stated that:

> …projected earnings during a Claimant-selected post-DWH spill compensation period are compared to actual earnings during that period and *the difference is deemed a compensable loss.*[24]

---

[23] DECLARATION OF JAMES HENLEY [Doc 7114-11], pp.5, 18, 19  ¶¶ 8, 24, 25.  *See also,* EXCERPTS FROM DECLARATIONS SUBMITTED BY BP'S EXPERTS IN SUPPORT OF FINAL APPROVAL [Doc 8963-61].

[24] DECLARATION OF HENRY FISHKIND [Doc 7114-5], p.10, ¶31.  *See also,* EXCERPTS FROM DECLARATIONS SUBMITTED BY BP'S EXPERTS IN SUPPORT OF FINAL APPROVAL [Doc 8963-61].

On September 28, 2012, BP's Counsel, in a letter to the Court-appointed and Court-supervised Claims Administrator and Trustee, (filed into the record by BP on March 20, 2013), reiterated that:

> *One of the cornerstones of the Settlement Agreement is the use of transparent, objective, data-driven methodologies designed to apply clearly-defined standards to a claimant's contemporaneously-maintained financial data submitted in compliance with documentation requirements.* These methodologies and requirements were carefully negotiated by the parties and are set forth in the Settlement Agreement as mandatory requirements. Among other reasons, these methodologies and requirements were negotiated in response to concerns voiced by some that the prior GCCF process was too dependent on accounting judgments that were not transparent.
>
> ….The Settlement Agreement does not allow for the use of professional judgment or discretion as a substitute for expressly articulated standards or requirements….[25]

Around the same time, Mike Juneau, on behalf of the Claims Administrator, had posed the following inquiry to the parties:

> As to BEL claims, once a claimant's financial records satisfy the causation standards set out in Exhibit 4B, does the Settlement Agreement mandate and/or allow the Claims Administrator to separate out losses attributable to the oil spill vs. those that are not? Stated another way, once a claimant passes the causation threshold, is the claimant entitled to recovery of *all* losses as per the formula set out in Exhibit 4C, or is some consideration to be given so as to exclude those losses clearly unrelated to the spill?
>
> I will give a hypothetical situation to try to illustrate the question we are asking:
>
> *Hypo:* A small accounting corporation / firm is located in Zone B. They meet the "V-shaped curve" causation test. The explanation for the drop in revenue is that  one of the three partners went out on medical leave right around the time of the spill. Their work output, and corresponding income, thus went down by about a third. The income went back up 6 months later when the missing partner returned from medical leave.

---

[25] LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU (Sept. 28, 2012) (re: Sept. 25th Policy Announcements), p.1 [Doc 8963-68].

Applying the compensation formula under Exhibit 4C of the Settlement Agreement, the accounting firm can calculate a fairly substantial loss. Is that full loss recoverable?[26]

In response to the question and hypothetical, BP, in a letter to the Court-appointed and Court-supervised Claims Administrator and Trustee, (filed into the record by BP on March 20, 2013), confirmed that:

> If proper application of the methodology with accurate financial data yields a determination that causation is satisfied, *BP agrees with Class Counsel that all losses calculated in accordance with … Exhibits 4C … of the Settlement Agreement are presumed to be attributable to the Oil Spill.*

> \* \* \*

> ….If the accurate financial data establish that the claimant satisfies the BEL causation requirement, then all losses calculated in accord with Exhibit 4C are presumed to be attributable to the Oil Spill.

> *Nothing in the BEL Causation Framework (Ex. 4B) or Compensation Framework (Ex. 4C) provides for an offset where the claimant firm's revenue decline (and recovery, if applicable) satisfies the causation test but extraneous non-fictional data indicate that the decline was attributable to a factor wholly unrelated to the Oil Spill. Such "false positives" are an inevitable concomitant of an objective quantitative, data-based test.*[27]

Based on BP's response, the Claims Administrator issued a formal Policy Statement on October 10, 2012, further confirming that there would be no inquiry into potential "alternative causes" of the claimant's losses.[28]

---

[26] E-MAIL FROM MIKE JUNEAU TO PARTIES (Sept. 25, 2012) [Doc 8963-66] (filed into the record by BP on March 20, 2013).

[27] LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU (Sept. 28, 2012) (re: Issues Raised by Class Counsel or Settlement Program), at pp.1,3 (emphasis supplied) [Doc 8963-67] (filed into the record by BP on march 20, 2013).

[28] ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION (Oct. 10, 2012), No.2. [Doc 8963-71] (filed into the record by BP on March 20, 2013).

On November 8, 2012, BP appeared before the Court at the Fairness Hearing in support of final approval of the Economic & Property Damages Class Settlement. BP Counsel stated, among other things, that:

> We're presuming causation for whole sections of the Settlement Class depending on where you reside and the nature of your business.
>
> *    *    *
>
> It's not only common sense; it's economic reality…. They were a product of arm's length negotiations informed by local experts.[29]

On November 19, 2012, BP submitted Joint Proposed Findings in Support of Final Approval of the Class Settlement, in which the Parties again confirmed that:

> The documentation, causation, and compensation framework for general Business Economic Loss Claims appears as Exhibits 4A-4E of the Settlement Agreement. The framework is fair, reasonable, and adequate….
>
> *    *    *
>
> Causation is presumed (i) for all businesses in Zone A; (ii) for Tourism businesses in both Zones A and B; (iii) for all Primary Seafood Industry claimants; (iv) for Secondary Seafood Industry claimants in Zones A, B, and C; and (v) for Charter Fishing businesses in Zones A, B, and C. Where causation is presumed, the causation presumption applies to all losses established pursuant to the compensation methodology.
>
> *    *    *
>
> The Settlement Agreement fairly and reasonably presumes causation for certain industries more likely to have been affected by the spill; the businesses that benefit from the presumption are the businesses that could most likely prove causation in litigation.
>
> *    *    *
>
> Where causation is not presumed, the causation tests are reasonable and flexible; they use standardized and transparent approaches. The causation tests reflect rational expectations about the economic harm that the spill could have caused businesses. The first option is the V-shaped revenue test, which requires proof of a downturn after the spill

---

[29] *See* Doc 8963-72.

followed by a later upturn. Claimants with a less severe V ("Modified V-Shaped Revenue Pattern") or whose business did not experience an upturn in 2011 ("Decline-Only Revenue Pattern") may still recover provided that they can provide certain reasonable additional information. The causation tests are economically rational and supported by data regarding the economic impact of the oil spill on the Seafood and Tourism industries.

*     *     *

Once the causation tests are satisfied, *all revenue and variable profit declines during the Compensation Period <u>are presumed to be caused entirely</u> <u>by the spill</u>, with no analysis of whether such declines were also traceable to other factors unrelated to the spill.*[30]

On December 12, 2012, the Parties appeared before Judge Barbier in Court. BP Counsel confirmed to the Court that BP agreed with the Claims Administrator's Policy Statement regarding application of the Causation Framework.[31]

On December 21, 2012, the Court issued its Order and Judgment [Doc 8139] as well as its Order and Reasons [Doc 8138]. In approving the Economic & Property Damages Class Settlement, the Court held as follows:

Some business claimants must demonstrate that the spill caused their losses. In many other cases causation is presumed. The Settlement Agreement presumes causation for certain industries more likely to have been affected by the spill; the businesses that benefit from the presumption are the businesses that could most likely prove causation in litigation.

*     *     *

*…the proposed class in this case consists exclusively of individuals and businesses that have already suffered economic loss and property damage,* and the Settlement compensates class members for their past losses through detailed, objective compensation criteria….[32]

---

[30] JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL [Doc 7945], at pp. 33, 36, 37, 38, 39 ¶¶ 108, 117, 122, 124, 126 (emphasis supplied); *see also,* FROM JOINT PROPOSED FINDINGS [Doc 8963-73].

[31] E-MAIL FROM JUDGE BARBIER re "MEETING TODAY re NON-PROFITS AND SIP" (Dec. 12, 2012) [Doc 8963-75] (filed into the record by BP on March 20, 2013).

[32] ORDER AND REASONS (Dec. 21, 2012) [Doc 8138] pp.11, 31 (emphasis supplied).

BP did not timely appeal the Order, Reasons or Judgment, nor has BP moved to modify the judgment under Rule 60.[33]

On March 15, 2013, the BP Parties filed a Complaint in these proceedings against the Court-Supervised Settlement Program and the Claims Administrator, in which BP alleged, agreed, acknowledged and confessed that:

> The Settlement Agreement is a valid contract meeting all required elements: offer, acceptance, and *consideration*.[34]

On July 8, 2013, the Parties appeared before the U.S. Fifth Circuit Court of Appeals in No. 13-30315. BP Counsel stated the following:

| | |
|---|---|
| Judge Clement: | I have a question, sir. In your reply brief, you said the only issue in this appeal is the lost profits calculation and you were talking about how the variable profit is to be calculated…. My problem is I think the real issue in the case is causation and consideration. If you look at 4B where is BP's consideration for agreeing to pay those claims without proving they were caused by the Oil Spill? |
| BP Counsel: | This is a settlement, and with respect to the causation issue, that is not the issue that is before this court…. |

---

[33] A party seeking to modify the substance of a district court's consent decree bears a heavy burden of establishing that revision of the decree is justified. *See* Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367, 383 (1992) ("Although…a district court should exercise flexibility in considering requests for modification of a[]… consent decree, it does not follow that a modification will be warranted in all circumstances. Rule 60(b)(5) provides that a party may obtain relief from a court order when "it is no longer equitable that the judgment should have prospective application," not when it is no longer convenient to live with the terms of a consent decree. Accordingly, a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree"). Further, the Court said that, "[a] party seeking modification of a consent decree may meet its initial burden by showing either a *significant* change either in factual conditions or in law." *Id.* at 384 (emphasis added). "Ordinarily, however, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.* at 385 (citing Twelve John Does v. District of Columbia, 861 F.2d 295, 298-299 (D.C. Cir. 1988), *and* Ruiz v. Lynaugh, 811 F.2d 856, 862-63 (5th Cir. 1987)). But, "[i]f it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Id.*

[34] COMPLAINT, *BP v. Deepwater Horizon Court Supervised Settlement Program,* No.13-492 (March 15, 2013) ¶65, (emphasis supplied).

|                  | The settlement agreement with respect to 4B as to causation provided a mechanism which allowed someone to come through the door to be then entitled to prove the amount of actual lost profits. It was a compromise, which every settlement agreement is, with respect to causation issues…. |
|---|---|
| Judge Clement: | …. Where is the legal connexity between the damage or an injury and the ability to make BP pay? |
| BP Counsel: | It was a part of a compromise. There's going to be tens of thousands – |
| Judge Clement: | Where's the consideration? |
| BP Counsel: | The consideration is the consideration of the settlement class as a whole…. |
| Judge Dennis: | A major consideration is no one can bring suit against you on the oil spill outside of this class action which you have now settled. |
| BP Counsel: | Exactly, your honor. |
| Judge Clement: | They couldn't bring suit against you anyway if it wasn't caused by – |
| BP Counsel: | They could bring suit.  They'd have to prove causation. They could sue, and this is a compromise of tens of thousands of claims. But the important thing, and the issue that were' talking about here, is, assuming causation, assuming that a claimant gets through the door and is now entitled to prove lost profits;  we then come to what everyone agrees in this case. The Appellees say this on page 27 of their brief: This appeal presents a straight forward question of contract interpretation.[35] |

In the decision of October 2, 2013, both Judge Clement and Judge Southwick note that

"alternative causes of losses were irrelevant if the financial figures supported that a loss

---

[35] *See* Unofficial Transcript of Hearing before U.S. Fifth Circuit Court of Appeals in Case No. 13-30315, at pp.10-14, (submitted herewith as Exhibit "B").

occurred." SLIP OPINION, p.21.[36]    Judge Southwick also concluded that: "Because the Rule 23

problem BP raises is confined to the *measurement of loss* and not to *the questions of standing* of

claimants who cannot show their losses were caused by BP's actions, I would not at this time

suggest there is a fundamental Rule 23 defect in the Settlement Agreement."[37]

### Conclusion

For the above and foregoing reasons, for the reasons stated in Class Counsel's *In Camera*

Submission of October 9, 2013 [Doc 11728-1], and for the reasons stated in Class Counsel's

Letter Brief to the U.S. Fifth Circuit in Case No. 13-30095 [Doc 11728-6], the Court should find

that: **(i)** the Economic & Property Damages Settlement Agreement satisfies the requirements of

the General Maritime Law, Article III, the Rules Enabling Act, and Rule 23; **(ii)** the BEL

Causation requirements in Exhibit 4B have been interpreted and applied correctly by the Claims

Administrator; and **(iii)** BP is estopped from taking any position to the contrary.

This 7th day of November, 2013.

Respectfully submitted,

   /s/   Stephen J. Herman                      /s/ James Parkerson Roy
**Stephen J. Herman**, La. Bar No. 23129        **James Parkerson Roy**, La. Bar No.11511
**HERMAN HERMAN & KATZ LLC**                     **DOMENGEAUX WRIGHT ROY EDWARDS LLC**
820 O'Keefe Avenue                              556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                    Lafayette, Louisiana 70501
Telephone: (504) 581-4892                       Telephone: (337) 233-3033
Fax No. (504) 569-6024                          Fax No. (337) 233-2796
E-Mail: sherman@hhklawfirm.com                  E-Mail: jimr@wrightroy.com
*Co-Lead Class Counsel*                         *Co-Lead Class Counsel*

---

[36] *See also,* SLIP OPINION, pp.37-38 (Southwick, concurring) ("the parties agreed that Exhibit 4B's causation framework to ignore alternative explanations for actual losses that occurred to claimants during the proper time period").

[37] SLIP OPINION, p.39 (Southwick, concurring) (emphasis supplied).

## ECONOMIC & PROPERTY DAMAGES CLASS COUNSEL

Brian H. Barr
LEVIN, PAPANTONIO
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office:  (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office:  (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Office:  (415) 956-1000
Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY  10003
Office:  (212) 558-5802
Telefax: (212) 344-5461
E-Mail:  rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office:  (334) 269-2343
Telefax: (334) 954-7555
E-Mail:  rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA  70601
Office:  (337) 439-0707
Telefax: (337) 439-1029
E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office:  (225) 344-3735
Telefax: (225) 344-0522
E-Mail:  mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Opposition will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 7th day of November, 2013.

/s/  Stephen J. Herman and James Parkerson Roy

# Exhibit T

## Baden, John

| | |
|---|---|
| **From:** | Cantor, Daniel A. [Daniel.Cantor@APORTER.COM] |
| **Sent:** | Monday, May 07, 2012 11:47 AM |
| **To:** | Baden, John; JIMR@wrightroy.com; SHERMAN@hhkc.com |
| **Cc:** | Douglas, Charles W; Moskowitz, Keith; Bloom, Wendy L. |
| **Subject:** | Slides for Tuesday Meeting -- For Settlement Purposes Only |
| **Attachments:** | Business Framework Slides_042412.pptx; Coastal Real Property Claims_050412.pptx; Individuals Framework Slides_042412.pptx; Real Property Sales_050412.pptx; Seafood Compensation Program_050412.pptx; Wetland Real Property Claims_050412.pptx |

All,

Attached please find draft slide decks that we plan to use to help facilitate tomorrow's "tutorial" meeting with the claims administration (a few additional ones will follow). We would be pleased to discuss today. If there are materials you plan to present, we would appreciate seeing a draft, and should coordinate in advance how items are presented. Thanks

Dan

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

--------------------------------------------------------------------
For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com



Business Framework

May 8, 2012

Case 13-30095   Document 00512409704   Page 414   Date Filed 11/22/2013
Case 2:10-md-02179-CJB-SS   Document 11826-1   Filed 11/07/13   Page 3 of 16

2

## Business Economic Growth: Benefits

▲ Wide range of options to qualify for benefits:

– Businesses in industries and geographic Zones most impacted by the DWH Spill are not required to present any evidence of causation.

– All other businesses in the class have five different options to recover DWH Spill related losses.

– Separate frameworks created for Start-Up Businesses and Failed Businesses.

– "Business" includes claims for corporations, partnerships and business income reported on 1040 Schedules C, E or F.

▲ Tailored evaluation process to qualify for benefits.

– Businesses in industries and areas most directly effected either automatically qualify or have lower qualification standards.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

## Business Economic Growth: Benefits

▲ Qualifying businesses receive compensation for all losses regardless of actual facts and circumstances.

— All Zone A businesses and others with presumptions.

— All businesses qualifying using overall revenue trends.

— All other businesses can claim specific losses of contracts or reservations.

▲ Compensation calculations are based on lost variable profit with no adjustment or offset for mitigated fixed costs.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

## Business Economic Growth: Benefits

- ▲ All qualifying businesses receive credit for 2% general growth factor regardless of prior experience.

- ▲ No negative growth for any qualifying business even where trends evidence declining revenues.

- ▲ All qualifying businesses receive credit for growth over a minimum of six months even where the effects of the DWH Spill dissipate over a shorter period.

- ▲ Documentation requirements designed to utilize reports and information generally available in the normal course of business.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

Case 1:13-cv-00355 Document 005122400704 Page 417 Date Filed 11/22/2013
Case 2:10-md-02179-CJB-SS Document 11826-1 Filed 11/07/13 Page 6 of 16

5

## Business Economic Growth: Benefits

▲ Claimants have wide optionality to present their best case.

— Five different ways to qualify for damages.

— Eighteen different comparisons against historical benchmarks available to qualify for benefits.

— May qualify using one period of loss and receive compensation based on a different period of loss to maximize benefits.

— Twenty one different options available for calculating the 2010 loss period.

— Multi-facility businesses have the option to submit a consolidated claim for facilities in the Class.

▲ Failed businesses and their owners returned to same economic position held at April 20, 2010.

— Failed businesses receive full buyout of company value as of April 20, 2010.

— Failed start-up businesses receive full equity investment as of April 20, 2010 as well as compensation for invested time and effort ("sweat equity").

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

## Business Economic Loss Claims: Causation

▲ Many businesses receive full presumption that all post-DWH Spill 2010 losses were caused by the Spill regardless of specific circumstances:

- ─ All businesses in Zone A.

- ─ Tourism businesses in Zones A and B.

- ─ All Primary Seafood Industry claimants (landing sites, certain wholesale/retail dealers, primary processors and distributors).

- ─ Secondary Seafood Industry claimants (processors, distributors, retailers) in Zones A, B and C.

- ─ Charter Fishing businesses in Zones A, B and C.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

6

Case 13-30315   Document 00512449704   Page 419   Date Filed 11/22/2013
Case 2:10-md-02179-CJB-SS   Document 11826-1   Filed 11/07/13   Page 8 of 16

7

## Business Economic Loss Claims: Causation

▲ Other businesses have multiple options to qualify for a full causation presumption providing compensation for all post-DWH Spill 2010 losses regardless of specific circumstances:

– Three revenue pattern tests based on changes when compared with historical results. Size of fluctuation depends on where the business is located (Zone B and C have lower thresholds than Zone D).

– Proxy Claimant: Small businesses (less than $75,000 revenue) may qualify by establishing a causal relationship with a nearby business which satisfied causation.

– Businesses unable to qualify based on Revenue Pattern tests may establish causation for specific lost reservations and contracts and be compensated for those losses.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

Case: 13-30315    Document: 00512444944    Page: 420    Date Filed: 11/21/2013
Case 2:10-md-02179-CJB-SS    Document 11826-1    Filed 11/07/13    Page 9 of 16

8

## Business Economic Loss Claims: Causation Revenue

### Trend Tests

▲ Causation of economic loss can be established by showing revenue trends consistent with a temporary business disruption between May 2010 and December 2010. Three different tests are available, and businesses make two different elections for purposes of this analysis:

– **Compensation Period:** The period of time the business claims losses due to the DWH Spill. Claimant selects three or more consecutive months between May 2010 and December 2010.

– **Benchmark Period year(s):** The pre-Spill years chosen by the claimant as the business' historical performance in all compensation and causation calculations. Claimants may select 2009, the average of 2008-2009, or the average of 2007-2009.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

# Business Economic Loss Claims: Causation Revenue

## Trend Tests

### V-Shaped Revenue Pattern

Revenue decline in 2010 Compensation Period (Zone B & C= 8.5%; Zone D= 15%) compared to the same months in the Benchmark Period year(s) followed by recovery (increase in revenues) in the same months of 2011 (B & C= 5%; D= 10%).

### Modified V-Shaped Revenue Pattern

Revenue decline in 2010 Compensation Period (B & C= 5%; D= 10%) compared to the same months in the Benchmark Period year(s) followed by recovery (increase in revenue) in the same months of 2011 (B & C= 5%; D= 7%) plus additional items.

### Decline Only Revenue Pattern

Revenue decline in 2010 Compensation Period (Zone B & C= 8.5%; Zone D= 15%) compared to the same months in the Benchmark Period year(s) plus additional items including factors outside company's control preventing recovery.



| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

Case: 13-30315    Document: 00512449474    Page: 422    Date Filed: 11/21/2013
Case 2:10-md-02179-CJB-SS    Document 11826-1    Filed 11/07/13    Page 11 of 16

10

## Business Economic Loss Claims: Compensation

▲ Compensation is based on the difference between the company's 2010 actual profit post-DWH Spill and expected profit in the absence of the DWH Spill.

▲ For purposes of determining compensation, the Claimant may select a Compensation Period different than used in establishing causation, but the Benchmark Period year(s) must be the same as in causation test:

– **Compensation Period:** The period of time the business claims losses due to the DWH Spill. Claimant selects three or more consecutive months between May 2010 and December 2010.

– **Benchmark Period year(s):** The pre-Spill years chosen by the claimant as the business' historical performance in all compensation and causation calculations. Claimants may select 2009, the average of 2008-2009, or the average of 2007-2009.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

## Business Economic Loss Claims: Compensation

- Compensation is divided into two steps:

  — **Step 1:** Compensates claimant for reduction in 2010 post-DWH Spill profits relative to the same months in the Benchmark Period year(s).

  — **Step 2:** Compensates claimant for lost profit associated with potential post-DWH Spill revenue growth in 2010 across a minimum six month period. Even where the business claims losses over a shorter period of time in Step 1, compensation will be paid for six months worth of lost growth.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

Case: 13-30815    Document: 00512449494    Page: 424    Date Filed: 11/21/2013
Case 2:10-md-02179-CJB-SS    Document 11826-1    Filed 11/07/13    Page 13 of 16

12

## Business Economic Loss Claims: Step 1

## Step 1 Calculation

1. Claimant selects three or more consecutive months between May 2010 and December 2010 as the Compensation Period.

2. Variable profit in the months selected as the Compensation Period is calculated as revenues less variable costs specified in the Settlement Agreement for both:

   – Benchmark Period year(s)

   – 2010

3. Any difference calculated in (2) represents Step 1 compensation (may be positive or negative).

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

## Business Economic Loss Claims: Step 2

## Step 2 Calculation

1. The Company's revenue growth rate is calculated by comparing January-April revenue in 2010 with revenue over the same months in the Benchmark Period year(s) plus a 2% general growth factor.

   – Combined growth rate may not be less than 0% or greater than 12%.

2. Claimant selects six consecutive month period between May and December as the period of lost growth (period may be extended to seven or eight months if also chosen as Compensation Period in Step 1).

3. Revenue during the Benchmark Period year(s) is totaled for the months selected in (2).

4. Total revenue calculated in (3) is multiplied by the revenue growth factor calculated in (1) to determine the amount of lost Incremental Revenue.

5. The lost Incremental Revenue calculated in (4) is multiplied by the company's variable profit margin during May through December of the Benchmark Period year(s) used in (3) to determine Step 2 compensation.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

13

# Business Economic Loss Claims: Total Compensation

▲ Total Compensation to the claimant is equal to the compensation from Step 1 and Step 2 increased by the RTP and then reduced by any prior DWH Spill-related payments:

**Lost Variable Profits =**

(Step 1 Compensation + Step 2 Compensation)

**Total Compensation =**

Lost Variable Profits + (Lost Variable Profits x RTP) - (DWH Spill Related Payments & VoO Offset)

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

15

## Business Economic Loss Claims: Documentation

▲ Documents required are generally available in the normal course of business. In some situations which require additional information, claimants will generally need to provide:

- Completed Claim Form.
- Annual Income Tax Returns.
- Monthly financial statements.
- Business structure and organization information.
- Sales or use tax returns and lodging tax returns (where applicable).
- Customer sales information (where applicable).
- Licensing information (where applicable).
- Other documents as necessary based on claim.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

# Exhibit U

# Transcript of the Testimony of
# **Oral Argument Re: BP Motion for Injunction (Rough Draft)**

## Date taken: July 8, 2013

## Lake Eugenie Land & Development, Inc., et al v. BP Exploration & Production, Inc., et al

All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# **Professional Shorthand Reporters, Inc.**

**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   http://www.psrdocs.com**

Oral Argument Re: BP Motion for Injunction (Rough Draft)
Lake Eugenie Land & Development, Inc., et al v. BP Exploration & Production, Inc., et al

Page 1

                IN THE UNITED STATES COURT OF APPEALS
                     FOR THE FIFTH CIRCUIT
                          No. 30315
                    IN RE: DEEPWATER HORIZON
        --------------------------------------------------
        LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED;
        BON SECOUR FISHERIES, INCORPORATED; FORT MORGAN
        REALTY, INCORPORATED; LFBP 1, L.L.C., doing
        business as GW Fins; PANAMA CITY BEACH DOLPHIN
        TOURS & MORE, L.L.C.; ZEKES CHARTER FLEET, L.L.C.;
        WILLIAM SELLERS; KATHLEEN IRWIN; RONALD LUNDY;
        CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY, on
        behalf of themselves and all others similarly
        situated; HENRY HUTTO; BRAD FRILOUX; JERRY J. KEE,
                    Plaintiffs - Appellees
        v.

        BP EXPLORATION & PRODUCTION, INCORPORATED; BP
        AMERICA PRODUCTION COMPANY; BP PIPE LINE
        COMPANY,

                    Defendants - Appellants
        --------------------------------------------------
        Consolidated with: 13-30329
        IN RE: DEEPWATER HORIZON
        --------------------------------------------------

        LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED;
        BON SECOUR FISHERIES, INCORPORATED; FORT MORGAN
        REALTY, INCORPORATED; LFBP 1, L.L.C., doing
        business as GW Fins; PANAMA CITY BEACH DOLPHIN
        TOURS & MORE, L.L.C.; ZEKES CHARTER FLEET, L.L.C.;
        WILLIAM SELLERS; KATHLEEN IRWIN; RONALD LUNDY;
        CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY, on
        behalf of themselves and all others similarly
        situated; HENRY HUTTO; BRAD FRILOUX; JERRY J. KEE,

                    Plaintiffs - Appellees
        v.
        BP EXPLORATION & PRODUCTION, INCORPORATED; BP
        AMERICA PRODUCTION COMPANY; BP, P.L.C.,

                    Defendants - Appellants
        --------------------------------------------------
                FIFTH CIRCUIT COURT OF APPEAL
          ORAL ARGUMENT RE: BP MOTION FOR INJUNCTION

Oral Argument Re: BP Motion for Injunction (Rough Draft)
Lake Eugenie Land & Development, Inc., et al v. BP Exploration & Production, Inc., et al

Page 2

```
 1   BP EXPLORATION & PRODUCTION, INCORPORATED;
     BP AMERICA PRODUCTION COMPANY
 2
                 Plaintiffs - Appellants
 3   v.
 4   LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED;
     BON SECOUR FISHERIES, INCORPORATED; FORT MORGAN
 5   REALTY, INCORPORATED; LFBP 1, L.L.C., doing
     business as GW Fins; PANAMA CITY BEACH DOLPHIN
 6   TOURS & MORE, L.L.C.; ZEKES CHARTER FLEET, L.L.C.;
     WILLIAM SELLERS; KATHLEEN IRWIN; RONALD LUNDY;
 7   CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY, on
     behalf of themselves and all others similarly
 8   situated; HENRY HUTTO; BRAD FRILOUX; JERRY J. KEE,
 9               Intervenor Defendants - Appellees
10   DEEPWATER HORIZON COURT SUPERVISED SETTLEMENT
     PROGRAM; PATRICK A. JUNEAU, in his official
11   capacity as Claims Administrator of the Deepwater
     Horizon Court Supervised Settlement Program
12   administering the Deepwater Horizon Economic and
     Property Damages Settlement Agreement, and in his
13   official capacity as Trustee of the Deepwater
14               Defendants - Appellees
15   ----------------------------------------------------
16   On appeal from the United States District Court
     for the Eastern District of Louisiana
17
         MDL No. 2179, Civ. A. Nos. 12-970 and 13-492
18
19
                 FIFTH CIRCUIT COURT OF APPEAL
20         ORAL ARGUMENT RE: BP MOTION FOR INJUNCTION
                        July 8, 2013
21
22
     ARGUMENT BY:                              PAGE:
23
     MR. OLSEN:                                   3
24   MR. ISSACHAROFF:                            22
     MR. STANLEY:                                41
25   MR. OLSEN:                                  47
```

Oral Argument Re: BP Motion for Injunction (Rough Draft)
Lake Eugenie Land & Development, Inc., et al v. BP Exploration & Production, Inc., et al

Page 10

1          jurisdiction and the other issues that

2          are involved in this case.  This is

3          otherwise an impossible situation, and

4          injury is going to be done and it is

5          irreparable.  This is exactly what this

6          Court is for.  It is a circumstance that

7          is quite unusual, unquestionably, but

8          it's what this Court's jurisdiction is

9          for.

10         JUDGE 2:

11            I have a question, sir.  In your

12         reply brief you said the only issue in

13         this appeal is the lost profit

14         calculation, and then you were talking

15         about how the variable profit is to be

16         calculated, those issues relevant to

17         applying 4-C's causation framework.

18            My problem is, I think the real

19         issue in the case is causation and

20         consideration.  If you look at 4-B,

21         where is BP's consideration for agreeing

22         to pay those claims without proving they

23         were caused by the oil spill?

24         MR. OLSEN:

25            Well, there is -- this is a

Case 13-30315   Document 00512440745   Page 463   Date Filed 11/22/2013

Oral Argument Re: BP Motion for Injunction (Rough Draft)
Lake Eugenie Land & Development, Inc., et al v. BP Exploration & Production, Inc., et al

Page 11

1          settlement, and with respect to the

2          causation issue, that is not the issue

3          that is before this Court, of course, we

4          haven't briefed that.  That is a

5          separate --

6     JUDGE 2:

7              Well, it will be here sooner or

8          later.

9     MR. OLSEN:

10             It may be, but --

11    JUDGE 2:

12             It may control this entire

13         disposition.

14    MR. OLSEN:

15             It may be.  But that settlement

16         agreement with respect to 4-B as to

17         causation provided a mechanism which

18         allowed someone to come through the

19         door, to be then entitled to prove the

20         amount of actual lost profits.

21             It was a compromise, which every

22         settlement agreement is.  With respect

23         to causation issues, some businesses

24         that are very close to the oil spill,

25         the causation issue is waived entirely.

Oral Argument Re: BP Motion for Injunction (Rough Draft)
Lake Eugenie Land & Development, Inc., et al v. BP Exploration & Production, Inc., et al

Page 12

```
 1            With respect --
 2       JUDGE 2:
 3            Right.  I'm not talking about
 4       those.  I'm talking about the example
 5       that Administrator Juneau sent out for
 6       comments, where if there's an accounting
 7       firm of three members, one is
 8       hospitalized for several months, of
 9       course they lose money.  It's totally
10       unrelated to the oil spill, but yet the
11       BP lawyers, two of them, in fact, said
12       that that would be recoverable, that
13       that would be presumed.  How can that
14       logically be correct?  Where is the
15       legal connexity between a damage or an
16       injury and the ability to make BP pay
17       for it?
18       MR. OLSEN:
19            It was a part of a compromise,
20       which there's going to be thousands --
21       tens of thousands --
22       JUDGE 2:
23            But where's the consideration?
24       MR. OLSEN:
25            The consideration is a
```

Oral Argument Re: BP Motion for Injunction (Rough Draft)
Lake Eugenie Land & Development, Inc., et al v. BP Exploration & Production, Inc., et al

Page 13

```
 1              consideration of a settlement class as a

 2              whole.  But the causation issue is going

 3              to be different with respect to each

 4              particular claimant.  Judgments were

 5              made with respect to compromises on a

 6              proof of causation in order, but only in

 7              order, to get to the point of proving

 8              the actual lost profits.  And that's

 9              what is the fundamental issue that was

10              decided below, and it's what is being --

11         JUDGE 1:

12              Well, your major consideration is

13         no one can bring suit against you on the

14         oil spill outside of this class action,

15         which you have announced you have

16         settled.

17         MR. OLSEN:

18              Exactly, Your Honor.

19         JUDGE 2:

20              But they couldn't bring suit

21         against you anyway if it wasn't caused

22         by --

23         MR. OLSEN:

24              They could bring suit.  They'd have

25         to prove causation.  They could bring --
```

Oral Argument Re: BP Motion for Injunction (Rough Draft)
Lake Eugenie Land & Development, Inc., et al v. BP Exploration & Production, Inc., et al

Page 14

1          they could.  And this is a compromise of

2          tens of thousands of claims.

3                  But the important thing and the

4          issue that we're talking about here is,

5          assuming causation, assuming that a

6          claimant gets through the door and is

7          now entitled to prove lost profits, we

8          then come to what everyone agrees in

9          this case -- the appellees say this on

10         page 27 of their brief -- this appeal

11         presents a straightforward question of

12         contract interpretation.

13                 The judge, when he reviewed the

14         reasonableness of the settlement,

15         specifically said, to paraphrase him,

16         that this is -- the process was intended

17         to calculate actual lost profits

18         according to generally accepted and

19         widely understood accounting terms and

20         common and regularly applied

21         methodologies.

22                 Now our point with respect to this

23         is that the formula provides for a

24         calculation of revenue and expenses.

25         Those terms are commonly understood and

Page 15

```
 1              widely accepted in the accounting and

 2              economic profession with respect to

 3              calculation of lost profits.  Those are

 4              the --

 5         JUDGE 1:

 6              Aren't you just taking individual

 7              words out of the settlement and

 8              constructing a purpose and a scheme that

 9              you would like based on that?  This is

10              not -- this case has not been tried.

11              This is an agreement between the

12              parties, and the parties have opposing

13              interests.  And the parties have given

14              up things in order to gain things.

15         MR. OLSEN:

16              Yes, but --

17         JUDGE 1:

18              And it seems to me that something

19              that you gave up was -- the agreement

20              defines what is a lost profit in a

21              particular way, and you had a chance to

22              not agree to that, several chances.  So

23              why -- how can we go beyond the four

24              corners of the agreement?

25         MR. OLSEN:
```

# Exhibit V

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL NO. 2179 |
| | SECTION J |
| This document relates to: All Cases and No. 12-970 | Honorable CARL J. BARBIER |
| | Magistrate Judge SHUSHAN |

**REPLY MEMORANDUM IN SUPPORT OF
MOTION TO AMEND SCHEDULING ORDER RE BEL REMAND AND
PRELIMINARY INJUNCTION RELATING TO BEL CLAIMS**

Class Counsel's Opposition rests on a fundamental mischaracterization of the Settlement Agreement, because it confuses the threshold requirement of class membership with the separate, subsequent requirements imposed by Exhibit 4B. In the simplest terms, the Opposition puts the cart before the horse. A claimant must satisfy the class definition first. Only if the claimant is a member of the class does he pass "Go" to reach Exhibit 4B. Indeed, Exhibit 4B says just that, for the caption to the Exhibit is footnoted, and the footnote explains that "[t]h[ese] Causation Requirements for Business Economic Claims do[] ***not*** apply to . . . Entities, Individuals or Claims ***not included with the Economic Class definition*** . . . ."[1] That is, one should not read beyond the caption of Exhibit 4B unless the claimant meets the class definition. The Opposition fails to consider, much less explain, this footnote, which makes clear that Exhibit 4B is subject to the class definition, not vice versa.

It is no answer for Class Counsel to invoke "judicial estoppel." The class definition's requirement that members have suffered injury "as a result of" the Oil Spill is a requirement that arises from Article III and Rule 23. Unless class membership involves injury with a causal

---

[1]   Settlement Agreement Ex. 4B n.1, May 3, 2012, Doc. No. 6430-9 (emphasis added).

nexus to the Spill, the class would lack standing and could not be certified in the first instance (or continue as certified). Because standing is a constitutional and Rule 23 requirement, it cannot be waived. The doctrine of judicial estoppel is just a variant of the doctrine of wavier, and is also inapplicable. In any event, BP has said repeatedly that class membership is the threshold test in the claims process, as has Class Counsel. The BP statements cited in the Opposition relate to Exhibit 4B, not the class definition and class membership. It is plaintiffs who should be estopped from now disputing, contrary to their statements in the preliminary approval hearing, that determining a claimant's membership in the class is Step One in the claims process.

## I.    CLASS COUNSEL'S INTERPRETATION OF THE AGREEMENT DEFIES COMMON SENSE AND IMPERILS THE SETTLEMENT

Class Counsel's construction of the Agreement cannot be reconciled with the plain terms of the class definition, nor can it be squared with any reasonable understanding of the Settlement's purpose. It is unsupportable and, ultimately, jeopardizes the entire Settlement.

The Opposition asserts that BP takes "the Class Definition out of context and in isolation." Opp. 3, Nov. 7, 2013, Doc. No. 11826 . On the contrary, BP showed that reference to the class definition's causal nexus requirement is pervasive—from the text of the Agreement to the class notice to the settlement website to the claims form to the release. BP Br. 5-6, Nov. 7, 2013, Doc. No. 11819-1. To state the obvious, this settlement—the "*Deepwater Horizon Economic and Property Damages Settlement*"—was about resolving claims resulting from the *Deepwater Horizon* Oil Spill. Do plaintiffs really mean to dispute that the goal of this Settlement was, as the class definition (and all these provisions) say, to compensate for losses suffered "as a result of" the Spill?[2]

---

[2]    Settlement Agreement ¶ 1.3.1.2, May 3, 2012, Doc. No. 6430-1.

2

Even though the Settlement Agreement as a whole repeats again and again the class definition's causal nexus requirement, it would not matter if the class definition did stand alone, because for certain purposes (such as standing and the ascertainability of who is and is not a member) Rule 23 focuses solely on the definition. It is the class definition that "identifies the persons who are entitled to relief." *Singer v. AT&T Corp.*, 185 F.R.D. 681, 685 (S.D. Fla. 1998); *see also, e.g.*, *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004) ("A precise class definition is necessary to identify properly those entitled to relief, those bound by the judgment, and those entitled to notice." (internal quotation marks omitted)).

Thus, the class definition cannot be disregarded here or in any case. And there can be no mistaking the bounds of the definition here. One is not a member of the class because one lived or operated a business in the Gulf region at the time of the Spill, or visited the region then. And one is not a member because one happened to suffer economic losses in the aftermath. One is only a member of the class if the residency and other requirements are met ***and*** such losses occurred "as a result of" the Spill. Meeting the definition for class membership is the ticket of admission to the claims process.

The Opposition contends that any loss must only be "allegedly" due to the Oil Spill, as if the question at hand were whether the complaint states a claim. Opp. 3. The question, however, is whether the Administrator as a matter of policy or practice has excised the causal-nexus requirement from the class definition. BP provided $76 million of examples for which there is objective evidence that the Spill had nothing to do with the losses.[3] Tellingly, the Opposition does not attempt to articulate a colorable allegation of causation for even one of the 64 examples. And the Opposition has nothing to say about the Claims Administrator's frank assessment that he

---

[3] *See* Decl. of Allison B. Rumsey App. A, Nov. 7, 2013, Doc. No. 11819-2; BP Br. 12-13 & nn. 25-28.

has paid claims "for losses that a reasonable observer might conclude *were not in any way related to* the Oil Spill."[4]  In short, there is no dispute that many claimants now swept within the definition under the Administrator's interpretation are "without colorable legal claims."[5]

In any event, demonstrating Article III standing in the class context requires more than "alleg[ing] . . . a loss caused by the Spill."  Opp. 6.  If all that a court were obligated to do was locate an assertion of causation in the class action complaint, class representatives could propose any class definition—no matter how many persons with wholly unrelated losses were then included in the class.  As the cases cited by BP explain, BP Br. 11—cases that go unaddressed in the Opposition—the class definition must set bounds that ensure the requirements of standing are met.  If "the definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad."  *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009).  Here the class definition properly limited the class to those with losses incurred "as a result of" the Oil Spill.  The Claims Administrator cannot as a matter of policy or practice rewrite that definition to jettison the causal-nexus requirement and award claimants with no standing.

In the end, adopting Class Counsel's position imperils the Settlement.  If claimants who have not suffered losses resulting from the Oil Spill are systematically allowed to recover as if

---

[4]   Brief of Appellees Deepwater Horizon Court Supervised Settlement Program at 16, *In re Deepwater Horizon*, Nos. 13-30315 & 13-30329 (5th Cir. May 24, 2013) (emphasis added).

[5]   *In re Deepwater Horizon*, No. 13-30315, slip op. at 33 (Clement, J.) ("BEL Opinion"); *see also id.* at 25-28 ("[I]f a claimant has suffered a loss, but it has no colorable claim that the loss was caused by the spill, it lacks standing and cannot state a claim. . . .  Allowing recovery from the settlement fund by those who have no case and cannot state a claim, the court acts *ultra vires*.") (Clement, J.).

they were members of the class, the Agreement cannot stand under Rule 23 or Article III.[6]  It is difficult to understand why the validity of the Court-approved class settlement should be put in jeopardy to allow claimants with no damages from the Spill to receive windfall recoveries.  Why is the PSC risking the recovery of proper class members to protect those without legitimate claims who are outside the class?  Enforcing the plain meaning of the class definition not only eliminates that risk, but stops baseless and inexplicable awards like the $76 million of examples described in BP's Brief and the Rumsey Declaration.

## II.     EXHIBIT 4B IS *SUBJECT TO* THE CLASS DEFINITION

The Opposition argues, in effect, that the class definition is subject to Exhibit 4B—in other words, that a claimant satisfies the class definition if he "satisfie[s] the objective Causation Requirements BP agreed to in Exhibit 4B."  Opp. 6.  This construction reads the class definition out of the Settlement Agreement, however, telling the Administrator that he has no reason or occasion to refer to or apply the class definition, but to go to straight to Exhibits 4A, 4B, and 4C.

Rule 23 is clear that class membership is its own, threshold requirement.  In the words of Class Counsel, at the preliminary approval hearing:  "I think sort of ***the general principles of the settlement is that one needs to determine if they've got class membership.  Then*** they need to look at each of the damage categories . . . to determine if they have a claim in one or more of those categories."[7]  And the Settlement Agreement itself is clear that class membership is the gateway through which any prospective claimant must pass ***before*** Exhibits 4B and 4C come into

---

[6]     Class Counsel apparently recognize this risk, posturing that this class-wide deal could be transformed into a private "contractual agreement" between the BP and "participating class members."  Opp. 1.  But the classwide release is a material term of the agreement, and the agreement therefore would fail without it.

[7]     Tr. of Hr'g on the Mots. for Conditional Certification of Rule 23(b)(3) Classes for Settlement Purposes at 20, Apr. 25, 2012, Doc. No. 6395 (emphasis added) ("Preliminary Approval Tr.").

play at all. Exhibit 4B itself states that class membership is a prerequisite to the 4B calculation. Footnote 1, which is appended to the Exhibit's caption, specifies: "Th[ese] Causation Requirements for Business Economic Claims do[] ***not*** apply to . . . Entities, Individuals or Claims ***not included with the Economic Class definition*** . . . ."[8] The Opposition fails to take any account of footnote 1. It points to Section 5.3.2.3, which provides that "causation requirements" for "Business Economic Loss Claimants" are "set forth in Exhibit 4B." Opp. 3. Indeed so, but Exhibit 4B by its terms requires that the claimant first satisfy the class definition. Thus, one literally does not read beyond the heading of Exhibit 4B unless class membership is established. That a stranger to the class can mathematically satisfy Exhibit 4B criteria does not make him a member of the class.

Any other interpretation would effectively write footnote 1 out of the Agreement. The rules of contractual construction, however, forbid reducing contractual language to surplusage. *See Transco Exploration Co. v. Pac. Emp'rs Ins. Co.*, 869 F.2d 862, 864 n.3 (5th Cir. 1989) (court must, "where possible, construe the words so as to harmonize all while rendering none superfluous")

## III.   BP DID NOT AND COULD NOT WAIVE THE REQUIREMENT OF CLASS MEMBERSHIP

BP did not waive the requirement that claimants must be a member of the class of individuals whose losses occurred as a result of the Oil Spill. Class Counsel's selective quotation of prior BP statements again conflates class membership with causation under Exhibit 4B. Regardless, even if Class Counsel's claims were correct, it would be immaterial because BP cannot waive the requirements of Article III standing or compliance with Rule 23.

---

[8]   Settlement Agreement Ex. 4B n.1, May 3, 2012, Doc. No. 6430-9 (emphasis added).

6

Based on what BP has said in the past—statements which the Opposition claims are inconsistent with what BP says now—the Opposition argues that BP is judicially estopped from taking the position that the Administrator has redefined class membership. As we explain below, BP has not been inconsistent. In any event, what BP said or did not say before is irrelevant, because the causal-nexus issue goes to the Court's Article III jurisdiction and the Settlement's compliance with Rule 23. Even if the high bar of judicial estoppel was met, BP is not subject to estoppel, because Article III standing cannot be waived by a party. *See, e.g.*, *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 n.6 (5th Cir. 2002) ("[B]ecause 'standing is a jurisdictional requirement, [it] may always be addressed for the first time on appeal.'") (quoting *Public Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2001)); *see also Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("principles of estoppel do not apply" to questions of federal court subject-matter jurisdiction (citation omitted)). Similarly, the Court has an independent duty to evaluate compliance with Rule 23; those requirements, too, cannot be waived. *See, e.g.*, *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998); *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003).

BP has not been inconsistent, however. It has never conceded that a claimant may bypass the requirements of class membership to obtain compensation. Indeed, it has appealed awards under the Settlement on the ground that they lacked any apparent causal nexus to the Spill and that the claimants therefore were not class members. The Opposition points to BP's prior statements concerning Exhibit 4B but has not identified any contradictory BP statements about the threshold determination of class membership. About class membership, Class Counsel too has said that establishing a claimant's membership in the class is a threshold requirement:

- In arguing for preliminary approval, Class Counsel affirmed that "***the general principle[] of the settlement is that one needs to determine if they've got class***

*membership.  Then* they need to look at each of the damage categories . . . to determine if they have a claim in one or more of those categories."[9]

This statement means that, if estoppel applies at all, it is ***Class Counsel*** that should be estopped to deny the centrality and independent nature of the test for class membership.  BP's statements were entirely consistent with Class Counsel's own understanding:

- During the Final Fairness Hearing, BP again said—without contradiction—that the Settlement Agreement did not extend to individuals with no injury from the spill, but rather is "designed to fairly and generously compensate the ***legitimate claims of those who were injured as a result of the oil spill***."[10]

- On December 7, 2012, before this Court issued its Order Granting Final Approval of the Settlement Agreement, BP objected to proposed advertising, which solicited claimants with no nexus to the Oil Spill.  BP stated that the proposed ads were "contrary to Rule 23[] and at odds with the terms of the Settlement Agreement" because they invited individuals with no connection to the Oil Spill to make claims.[11] BP distinguished statements in prior advertising, which "reference a causal connection to the spill" from the new spots which impermissibly "omit any reference to the Class itself and fail to mention that the Settlement Agreement requires a connection to the spill."[12]

- Before Final Approval of the Settlement Agreement, BP began to challenge claims that did not have a causal link to the Oil Spill through the CSSP appeals process.[13]

Thus, Class Counsel fails to show that BP has taken an inconsistent position, let alone met the high bar of judicial estoppel, which requires *inter alia* that there have been "clearly inconsistent positions."  *In re Texas Wyoming Drilling, Inc.*, 647 F.3d 547, 552 (5th Cir. 2011).

---

[9]   Preliminary Approval Tr. at 20 (emphasis added).

[10]   Tr. of Final Fairness Hr'g at 50, Nov. 8, 2012, Doc. No. 7892 (emphasis added).

[11]   Letter from R. Godfrey to Hon. S. Shushan at 1, Dec. 7, 2012 (attached as Exhibit  A).

[12]   *Id.* at 3-4.

[13]   *See, e.g.*, BP's Initial Proposal for Claim No. XXX38 at 1 (Dec. 3, 2012) ("BP reluctantly files this appeal because it appears that the Settlement Program erred by including in its assessment of causation and damages millions of dollars of earnings from two business lines that Claimant had dropped years before the spill.") (attached as Exhibit B, Decl. of Allison B. Rumsey, Attachment 1 (under seal)).

At worst, if the failure to distinguish between class membership and Exhibit 4B were found to be an "inconsistent" position, it is not a situation where BP allegedly took one position before final approval of the Settlement Agreement and a different position afterward; rather, the allegedly inconsistent position is one that **both** parties expressed **before** approval of the Settlement.  And the Court was not misled, as it expressly found in granting final approval to the settlement that "persons with marginal or potentially worthless claims . . . were excluded from the proposed class."[14]

## CONCLUSION

For these reasons and those stated in BP's opening memorandum, the Motion to Amend should be granted.  The Court should adopt what is not only the most reasonable interpretation of the Agreement, but also the only interpretation that avoids needlessly imperiling this Settlement.

November 12, 2013                              Respectfully submitted,

James J. Neath                                  _/s/ Kevin M. Downey_
Mark Holstein                                   Kevin M. Downey
BP AMERICA INC.                                 F. Lane Heard, III
501 Westlake Park Boulevard                     WILLIAMS & CONNOLLY LLP
Houston, TX  77079                              725 Twelfth Street, N.W.
Telephone:  (281) 366-2000                      Washington, D.C. 20005
Telefax:  (312) 862-2200                        Telephone:  (202) 434-5000
                                                Telefax:  (202) 434-5029

---

[14]   Order and Reasons Granting Final Approval of the Economic and Property Damages
       Settlement Agreement at 33, Dec. 21, 2012, Doc. No. 8138.

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

**OF COUNSEL**

    */s/ Don K. Haycraft*
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger
Wendy L. Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 12th day of November, 2013.

/s/ Don K. Haycraft
Don K. Haycraft

# Exhibit W

# Exhibit A

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois 60654

Richard C. Godfrey, P.C.
To Call Writer Directly:
(312) 862-2391
richard.godfrey@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

December 7, 2012

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA  70130

Re:    BP's Response to Class Counsel's Proposed Supplemental Information
Program

Dear Judge Shushan:

BP submits this letter to bring to the Court's attention certain concerns about the Class Counsel's proposed Supplemental Information Program ("SIP"). BP cannot consent and the proposed program cannot be approved because in certain respects it is confusing and misleading, contrary to Rule 23, and at odds with the terms of the Settlement Agreement as amended ("Settlement Agreement"). It is, therefore, not "consistent with the goals of the Economic Class Action Settlement Notice Program," as required by Section 4.4.15 of the Settlement Agreement.[1] *See In re Katrina Canal Breaches Litigation*, 628 F.3d 185, 198-99 (5th Cir. 2010)(reversing district court's order certifying class and approving class settlement because, among other things, the class notice was "misleading" and "unfaithful to the settlement agreement"). Until and unless these substantive flaws are remedied, BP does not consent and the Court should decline to approve the SIP.

## 1.    Content Of Proposed Supplemental Information Program

---

[1] Section 4.4.15 provides BP with the opportunity to review in advance and comment on any proposed Supplemental Information Program. We note in this regard that only four television/radio scripts were presented for review with the current proposal, notwithstanding that the proposed Supplemental Information Program also contemplates print ads in publications, a website, internet and social media postings, and telephone communication. Given the importance of these issues to the success and public perception of the Settlement, and the serious flaws in even the limited materials BP has been given for review, BP requests the Court to ensure that BP's right under the Settlement Agreement that no materials, including website content, are issued as part of a BP-funded, Court-approved informational program without BP's review and input. *See* Settlement Agreement at § 4.4.15.

Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai      Washington, D.C.

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
December 7, 2012
Page 2

The proposed advertising spots in the SIP omit the critical, fundamental requirement that only economic losses that a claimant alleges in good faith were caused by the Deepwater Horizon Incident are compensable under the Settlement Program. The SIP thus creates a substantial risk of leaving a misimpression and creating unrealistic expectations.

The requirement that a loss for which a claim is made have been allegedly caused by the Deepwater Horizon Incident is unambiguously and expressly set forth in the Settlement Agreement. Section 38.42 of the Settlement Agreement defines the Deepwater Horizon Settlement Litigation which is the subject of the Settlement as:

> [A]ll Claims brought by Plaintiffs or any Economic Class Member
> for damage covered by the Seafood Compensation Program,
> Coastal Real Property Damage, Economic Damage, Real Property
> Sales Damage, Subsistence Damage, VoO Charter Payment,
> Vessel Physical Damage or Wetlands Real Property Damages
> ***allegedly arising out of, due to, resulting from, or relating in any***
> ***way to, directly or indirectly, the Deepwater Horizon Incident***, in
> the multidistrict litigation titled *In re Oil Spill by the Oil Rig*
> *"Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*
> (MDL No. 2179).

(emphasis supplied). Consistent with the scope of that litigation, the Settlement Agreement defines "Economic Damage" for which a Claim for compensation can be made under the Settlement Agreement to mean:

> [L]oss of profits, income and/or earnings arising in the Gulf Coast
> Areas or Specified Gulf Waters ***allegedly arising out of, due to,***
> ***resulting from, or relating in any way to, directly or indirectly,***
> ***the Deepwater Horizon Incident*** . . . .

(Settlement Agreement §38.57, emphasis supplied). Other provisions of the Settlement Agreement reiterate this bedrock causation requirement. *See* Settlement Agreement §§ 1.3.1.2, 1.3.1.3, 1.3.1.5, 1.3.1.10, 38.15, 38.57, 38.63, 38.84, 38.155. The Release is of claims "***arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident*** . . . ." *Id.* § 10.2 (emphasis supplied).

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
December 7, 2012
Page 3

The Court-approved Notices, which are posted on the Settlement Program's website, accurately reflected this requirement of the Settlement Agreement.  For example, the Short-Form Notice stated:

> If you have economic loss or property damage **because of the Deepwater Horizon oil spill,** you could get money from a class action settlement with BP Exploration & Production Inc. and BP America Production Company ("BP"). . . .
>
> "The Economic and Property Damages ("E&PD") Settlement Class includes people, businesses, other entities, and properties in the states of Louisiana, Alabama and Mississippi, and certain counties in Texas and Florida, **that were harmed by the oil spill**. The website has detailed descriptions and maps to help you determine whether a geographic location may be included in the E&PD Settlement. Additionally, you can call 1-866-992-6174 or e-mail questions@DeepwaterHorizonEconomicSettlement.com to find out if a geographic location is included.

(emphasis supplied).  *See also* Long Form Notice ("[Y]ou may receive money if you have been damaged by the Deepwater Horizon oil spill"; "Class Representatives are suing to obtain payments for a class of individuals and businesses with specific types of claims for economic loss and property damage arising from the Deepwater Horizon Incident"; "Claims for economic damage can be made by Individuals and Entities in certain industries or geographic zones that lost profits or earnings as a result of the Deepwater Horizon Incident").

Likewise, the Court-approved advertisement scripts used for Class Notice Plan reference a causal connection to the spill.  *See* Exhibit 1 attached hereto (Rec. Doc. 6266-2 at 142 television spot "If you or your business were harmed by the Deepwater Horizon Oil Spill, you may be able to get payments and other benefits from two separate legal settlements." and at 147 radio script "If you or your business were harmed by the Deepwater Horizon Oil Spill, you may be able to get payments and other benefits from two separate legal actions.").

In contrast to these accurate, Court-approved notices, Class Counsel's proposed SIP ads, which are slated to run primarily in regions that fall within Zone D, an area remote from the spill, suggest that almost any business in areas where the spots might run may be eligible, so long as it lost revenue for three months between May and December 2010.  Because the spots omit any reference to the Class itself and fail to mention that the Settlement Agreement requires a

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
December 7, 2012
Page 4

connection to the spill, they will likely create unrealistic expectations among potential Class members. No reference at all is made to the Deepwater Horizon Litigation in three of the scripts, rather only to "BP Money."

## 2.      Proposed Creation Of Additional New Website

These risks of confusing and misleading potential Class members, in contravention of Rule 23 and the Settlement Agreement's provisions are compounded by Class Counsel's proposal, as it currently stands, to have SIP ads direct potential Class members to a new website (www.BPRecoveryNow.com), and not to the Court-authorized Settlement website maintained by the Court-appointed Claims Administrator (www.DeepwaterHorizonSettlements.com). While Class Counsel has not disclosed any of the content for the proposed new website, it has suggested the new website will include "informational pieces about the claims payable in the Settlement," profile "success stories" of particular Settlement Class members, and offer "direction to" the Settlement website. Class Counsel's proposal is silent as to what input or control BP or the Court will have over the content of this new website once it is up and running. *See supra* n.1.

The introduction of this new website is unnecessary and further risks confusing and potentially misleading Class members, particularly if its content is flawed in the same manner as the proposed spots. There is no legitimate reason why a new website should be introduced into official Court-approved, Claims Administrator-led communications when the official website is being maintained appropriately and is operating effectively. Accordingly, BP respectfully requests that all broadcast, media, and other communications comprising the Supplemental Information Program only reference the Court-authorized Settlement website (www.DeepwaterHorizonSettlements.com).

## 3.      Participation Of The Claims Administrator In The Supplemental Program

In light of these flaws, Class Counsel's proposal that the Court-appointed Claims Administrator personally appear in SIP spots also is a matter of concern. Moreover, in these circumstances, it might potentially lead to confusion regarding the roles of the Court and the Claims Administrator in connection with the Settlement.

## 4.      Timing

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
December 7, 2012
Page 5

Both as a general matter of Rule 23 procedure, and particularly in light of the substantive flaws in the content of the SIP, BP has concerns about the Court approving such a program to promote a Settlement that the Court has not finally approved. Class Counsel proposes launching its program on December 10th, prior to the deadline for class members who have excluded themselves from the Settlement to revoke their opt outs without BP's approval. The proposed program is being submitted prematurely, in BP's view, and could invite due process challenges that could endanger the Settlement itself. Accordingly, BP respectfully asks that no SIP be approved by the Court until after the Court determines whether to approve the Settlement.

For these reasons, BP respectfully asks the Court to require that certain critical changes be made to Class Counsel's proposed Supplemental Information Program before it is approved, namely that:

1. The content of all ad pieces be revised to reflect accurately the terms of the Settlement in accordance with the concerns raised herein, including the important causal link to the Deepwater Horizon incident;

2. The content of any SIP be consistent with the Court approved Notice Program;

3. The SIP be postponed until after the Court has determined whether to grant final approval of the Settlement and approved the content of the SIP or December 15, 2012, whichever is later; and

4. All components of the SIP direct interested persons to the Court-authorized Settlement website maintained by the Claims Administrator (www.DeepwaterHorizonSettlements.com), and not reference a new website.

Respectfully Submitted,

Richard C. Godfrey, P.C.

Cc:    James Roy
       Steve Herman
       Pat Juneau
       David Odom
       Christine Reitano
       Ben Allums

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
December 7, 2012
Page 6

RCG/cpl

# EXHIBIT 1

**Deepwater Horizon Court-Supervised Settlement Program**
*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in Gulf of Mexico on April 20, 2010*, MDL 2179
**30 Second Television Spot**





OFF-CAMERA NARRATOR: If you or your business

1.  Wide shot of beach and clouds.



were harmed by the Deepwater Horizon Oil Spill,

2.  Men in marshy area.



you may be able to get payments and other benefits

3.  Small beach house.



from two separate legal settlements.

4.  Fisherman in front of boat.



One settlement provides payments

5.  Man at desk in marina.



for economic and property damage.

6.  Hotel housekeeper making bed.

*Final images may vary depending on photo licensing details, but will be content equivalent.*

Deepwater Horizon Court-Supervised Settlement Program
*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in Gulf of Mexico on April 20, 2010,* MDL 2179
**30 Second Television Spot**





*Final images may vary depending on photo licensing details, but will be content equivalent.

Front Cover Text

**Deepwater Horizon Oil Spill Litigation - Class Action Notice**

Court-approved PSAs about two separate settlements related to the Deepwater Horizon Oil Spill - one settlement addressing economic and property damage claims, and a separate settlement addressing medical claims.  People and businesses across the Gulf Coast region may be eligible for payments and other benefits from one or both of the two settlements.

Please air these important announcements alerting those affected about their rights, including their right to be excluded from the case, by **Month DD, 20YY.**

Back Cover Text

**Deepwater Horizon Oil Spill Litigation - Class Action Notice**

Dear Public Service Director:

Two separate settlements have been reached related to the Deepwater Horizon Oil Spill - one settlement addressing economic and property damage claims, and a separate settlement addressing medical claims.  People and/or businesses across the Gulf Coast region may be eligible for payments and other benefits from one or both of the two settlements.

This message is important because the people and/or businesses affected have various rights, including the right to file claims, request exclusion from or object to either or both settlements.  The PSAs inform people and businesses of their legal rights and how to obtain additional information.

Please air these spots as soon as possible, and continue to do so until **Month DD, 20YY.**  Thank you for taking the time to consider sharing these PSAs with your audience.

Sincerely,
Notice Administrator

Inside Text
30 second TV PSA:

People and/or businesses across the Gulf Coast region may be eligible for payments and other benefits from two separate class action settlements related to the Deepwater Horizon Oil Spill.

One settlement provides payments for some types of economic and property damage claims.  The other settlement provides payments and other benefits for certain medical claims.

To get claim forms and notices, go to **www.[_____].com**  or call **8XX-XXX-XXXX**.

:30 Radio Script

If you or your business were harmed by the Deepwater
Horizon Oil Spill, you may be able to get payments and other
benefits from two separate legal settlements.

One settlement provides payments for economic and property
damage.  The other provides payments and benefits for
medical claims.

To get detailed information and claim forms go to
**www.[＿＿＿].com** or call **8XX-XXX-XXXX**.

# Exhibit X

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**In re: Oil Spill by the Oil Rig**
**"Deepwater Horizon" in the Gulf**
**of Mexico, on April 20, 2010**

**This Document Relates to:**

**No. 12-970**

**MDL No. 2179**

**SECTION: J**

**JUDGE BARBIER**

**MAGISTRATE SHUSHAN**

<u>**SUR-REPLY IN OPPOSITION TO BP's MOTION TO AMEND**</u>
<u>**SCHEDULING ORDER AND INJUNCTION**</u>

(<u>RE</u> <u>CAUSATION</u>)

Eligible Claimants in the Court-Supervised Settlement Program and the Economic & Property Damages Settlement Class respectfully submit the following Sur-Reply in Opposition to BP's Motion to Amend Scheduling Order and Injunction relating to BEL Claims:

MAY IT PLEASE THE COURT:

BP continues to ignore not only the plain and express terms of the agreement it negotiated, executed and supported, but numerous filings, statements and representations by experts and counsel confirming that the Settlement Agreement was intended to be interpreted and applied in a way that is contrary to the as-yet-to-be-defined interpretation that BP's new counsel suggest today.  BP continues to distort and misquote the Class Definition.  BP does not in any way refute the fact that the 64 "examples" of incomplete, unverified, self-serving characterizations by BP's Counsel *satisfied* the objective Causation Test that BP agreed would be used to determine whether a business had suffered a loss "as a result of" the Spill.  In addition to the numerous filings, statements and representations outlined in Plaintiffs' original Opposition, BP's newfound argument that there is some additional unknown, uncertain,

subjective causation element to the Class Definition contradicts additional BP pleadings, statements and representations regarding the ascertainability of the Class. Finally, BP submits its own evidence which (i) further confirms that BP knowingly continued to support formal approval of the Settlement as originally and consistently interpreted, and (ii) when read in context, further demonstrates that BP formally confessed and conceded this issue in December of 2012, if not before. For these reasons, and for the reasons stated in Plaintiffs' original Opposition, BP's Motion should be denied.

### BP Continues to Misquote and Distort the Class Definition

Plaintiffs' Opposition did ***not*** assert that "BP takes 'the Class Definition out of context and in isolation.'"[1]

BP, rather, takes *one sentence* out of the Class Definition in isolation, ignoring the rest of the Class Definition.

The relevant portion of the Class Definition provides that:

> 1.3.1.   The following are *summaries* of the Damage Categories, which are *fully described* in the attached *Exhibits 1A-15*:
>
> > 1.3.1.2.   Economic Damage Category. Loss of income, earnings or profits Suffered by Natural Persons or Entities as a result of the *Deepwater Horizon* Incident.

BP asks the Court to look only at the "summary" contained within Section 1.3.1.2, and to completely disregard the incorporation of Exhibit 4B as the "full description" of *Class Members*, as stated in Section 1.3.1.

---

[1] *See* BP REPLY BRIEF [Doc 11838-2], at p.2.

BP's proffered interpretation also asks the Court to disregard the definition of "Economic Damage" in Section 38.55, as well as the further incorporation of Exhibit 4B in Sections 5.3.1, 5.3.2.1, and 5.3.2.3.

## BP's Current Position is Inconsistent with its Previous Position regarding Class Ascertainability

In addition to the numerous filings, statements and representations outlined in Plaintiffs' original Opposition,[2] BP also made numerous statements in pleadings and other filings regarding the ascertainability of the Class. For example, BP's expert on class certification and settlement approval told the Court in August of 2012 that the Class Definition "clearly and *objectively* defines the class in terms of time period, geographic region, and *type* of claim."[3] BP also submitted the testimony of Professor Coffee, who told the Court in August of 2012 that the net result of the Class Definition is "a list of easily identifiable categories of individuals and entities *who are permitted to show objective losses from that disaster.*"[4] In the Joint Proposed Findings in Support of Final Approval of the Class Settlement submitted by BP on November 19, 2012, the Class Definition "is *objective,* precise, and detailed, and *does not turn on the merits.*"[5] Further:

> **Nothing in the class definition requires a determination on the merits or delves into any person's subjective mental state.** The definition is based on ***objective criteria*** such as where a person resided, worked, received an offer to work, or owned property; or

---

[2] *See* DOC 11826, at pp.9-18.

[3] MILLER DECLARATION [Doc 7114-16], p.6, ¶13, (emphasis supplied).

[4] COFFEE DECLARATION [Doc 7110-3], p.13, ¶19, (emphasis supplied).

[5] JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL [Doc 7945], at p.87, ¶321, (emphasis supplied).

**where an entity owned, operated, or leased a physical facility, or employed full time workers.**[6]

Now, by contrast, BP argues that an Entity's class membership should be determined based on a subjective characterization by BP Counsel.

## BP Has Not Established that Any Entity Did Not Suffer A Loss Caused by the Spill

Congress, in passing OPA;[7] BP, in establishing and administering the GCCF;[8] and BP, in agreeing to the Class Definition and BEL Framework contained within the Settlement Agreement,[9] all recognized that *indirect* damages would be suffered in the wake of the many ripple effects from widespread losses throughout a region's economy.

BP has not "proven" that any Entity did not suffer a loss that did not, at least in part, indirectly, arise from the Spill.

All BP has presented are inadmissible, non-evidentiary, self-serving and incomplete characterizations of claims by a BP attorney.

## BP Does Not Refute the Fact that All of Its "Examples" Demonstrated Indicia of Causation by Satisfying the Objective Causation Test that BP Agreed Would Demonstrate Injury "As a Result of" the Spill

As set forth in Plaintiffs' original Opposition, the Settlement Agreement imposes a separate and distinct requirement on Entities seeking compensation to prove that they suffered a

---

[6] JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL [Doc 7945], at p.87, ¶322, (emphasis supplied).

[7] *See, e.g.,* LETTER BRIEF TO U.S. FIFTH CIRCUIT (Oct. 18, 2013) [Doc 11728-6] at p.6 fn.16; *citing,* 33 U.S.C. ¶¶ 2702(a), 2702(b)(2)(E), 2705(a), and  2713; In re: Deepwater Horizon, 808 F.Supp.2d 943, 958-962, 965-966 (E.D.La. 2011), David W. Robertson, *The Oil Pollution Act's Provisions on Damages for Economic Loss,* 30 MISS.C.L.REV. 157, 158-160 (2011).

[8] *See, e.g.,* GCCF Maps [Doc 11804-7 thru -11], which show significant payments by the GCCF for economic losses to businesses throughout the class geography north of I-10.

[9] *See* SETTLEMENT AGREEMENT, Sections 1.1, 1.2, and 38.78, and Exhibit 22.

loss "as a result of" the Spill.[10]  These objective financial and other tests require indicia of causation.  In all 64 "examples" described by BP Counsel, the Entity _satisfied_ these objective requirements that BP negotiated, agreed and represented to the Court would – in addition to satisfying Class Membership – determine causation.

## Article III Standing, Rule 23 and the Rules Enabling Act are Irrelevant to Contractual Interpretation

BP expressly agreed that the Settlement Agreement and Trust would not be conditioned upon formal and final certification and approval under Rule 23.[11]

Nevertheless, and in any event, neither Rule 23, the Rules Enabling Act, nor Article III can be used to re-write the terms of a contractual agreement.

If, as BP suggests, the Settlement Agreement which BP entered into has some defect under Rule 23 or Article III, (which is denied [12]),  then the effect would be that the settlement would not be approved as a class settlement, and BP would not get a class-wide release.

Contrary to BP's suggestion, the Rules Enabling Act, invoked by BP, would actually prevent Rule 23 from altering the substantive rights of the Parties.

---

[10] _See_ DOC 11826, at pp.4-6; _see also,_ pp.9, 11, 15-16.

[11] _See_ HERMAN DECLARATION (Nov. 11, 2013) [Doc 11833-1], ¶¶ 5-7; _citing,_ SETTLEMENT AGREEMENT, Section 4 (establishing the _Deepwater Horizon_ Court Supervised Settlement Program, a Transition Program, and a Process for Making Claims); Section 5.12 (establishment of a Settlement Trust); Section 21.2 (severability clause); Section 21.3 (in the event that final approval is rejected, the Program and Trust will continue to process and pay submitted claims); Section 26.1 (regarding the binding effect of the Agreement on the Parties); and Exhibit 26 (Individual Release).  _See also,_ COMPLAINT, _BP v. Deepwater Horizon Court Supervised Settlement Program,_ No.13-492 (March 15, 2013) ¶65 ("The Settlement Agreement is a valid contract meeting all required elements: offer, acceptance, and consideration").

[12] _See_ LETTER TO THE U.S. FIFTH CIRCUIT IN NO.13-30095 (Oct. 18, 2013) [Doc 11728-6], pp.5-8; _see also,_ OPPOSITION [Doc 11826], at pp.6-7. (_See also, generally,_ APPELLEE BRIEF ON THE MERITS, U.S. Fifth Cir. No. 13-30095 [5th Cir. Doc 00512361333] (Sept. 3, 2013).)

**BP's Evidence Further Establishes that BP Supported Final Approval of the Class Settlement, as Correctly Interpreted and Applied**

BP submits with its Reply Brief a Letter to Judge Shushan regarding the Supplemental Information Program ("SIP") dated December 7, 2012.[13]   In this letter, BP contended – for the first time, and contrary to all of the previous filings, statements and representations outlined in Plaintiffs' original Opposition[14] – that there was some additional, subjective, non-specific causation requirement imposed by the Class Settlement Agreement.

This letter was shocking to Class Counsel, the Claims Administrator, and apparently to the Court, in light of BP's numerous previous statements, filings and representations to the contrary.

Therefore, when the Parties appeared before the Court on an unrelated matter five days later, the Court asked BP to clarify its position.

BP Counsel, at that point, abandoned the suggestions in its December 7th Letter, and re-confirmed to Class Counsel, to the Claims Administrator, and to the Court, that BP *agrees* "with the Claims Administrator's objective analysis of causation with respect to his evaluation of economic damage claims, as previously set forth by Mr. Juneau in paragraph 2 of his October 10, 2012 policy announcement,"[15] which stated as follows:

> **The Settlement Agreement represents the Parties' negotiated agreement on the criteria to be used in establishing causation. The Settlement Agreement sets out specific criteria that must be satisfied in order for a claimant to establish causation.** Once causation is established, the Settlement Agreement further provides specific formulae by which compensation is to be measured. All such matters are negotiated terms that are an integral part of the Settlement Agreement. **The**

---

[13] *See* DOC 11838-3.
[14] *See* DOC 11826, at pp.9-18.

[15] E-MAIL FROM JUDGE BARBIER RE "MEETING TODAY RE NON-PROFITS AND SIP" (Dec. 12, 2012) [Doc 8963-75] (filed into the record by BP on March 20, 2013).

> **Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in the Settlement Agreement. Both Class Counsel and BP have in response to the Claims Administrator's inquiry confirmed that this is in fact a correct statement of their intent and of the terms of the Settlement Agreement.** The Claims Administrator will thus compensate eligible Business Economic Loss and Individual Economic Loss claimants for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, **without regard to whether such losses resulted or may have resulted from a cause other than the Deepwater Horizon oil spill provided such claimants have satisfied the specific causation requirements set out in the Settlement Agreement.**[16]

Not only does the December 7, 2012 letter, when considered together with BP's representations to the Court on December 12, 2012, conclusively establish that BP formally waived, admitted, confessed and conceded the issue, but it also shows that BP was aware of the definitive interpretation and application of the Agreement when it continued to support the approval of said Class Settlement through the date of the Court's Order and Judgment on December 21, 2012.[17]

---

[16] *See* DOC 8963-71 (filed into the record by BP on March 20, 2013), (emphasis supplied).

[17] *See* ORDER AND JUDGMENT [Doc 8139] (Dec. 21, 2012).

## Conclusion

For the above and foregoing reasons, for the reasons stated in Class Counsel's *In Camera* Submission of October 9, 2013 [Doc 11728-1], for the reasons stated in Class Counsel's Letter Brief to the U.S. Fifth Circuit in Case No. 13-30095 [Doc 11728-6], and for the reasons stated in Plaintiffs' original Opposition [Doc 11826], the Court should find that: **(i)** the Economic & Property Damages Settlement Agreement satisfies the requirements of the General Maritime Law, Article III, the Rules Enabling Act, and Rule 23; **(ii)** the BEL Causation requirements in Exhibit 4B have been interpreted and applied correctly by the Claims Administrator; and **(iii)** BP is estopped from taking any position to the contrary.

This <u>14th</u> day of <u>November</u>, <u>2013</u>.


Respectfully submitted,

<table>
<tr>
<td>

   /s/  Stephen J. Herman    <br>
**Stephen J. Herman**, La. Bar No. 23129<br>
**HERMAN HERMAN & KATZ LLC**<br>
820 O'Keefe Avenue<br>
New Orleans, Louisiana 70113<br>
Telephone: (504) 581-4892<br>
Fax No. (504) 569-6024<br>
E-Mail: sherman@hhklawfirm.com<br>
*Co-Lead Class Counsel*

</td>
<td>

    /s/ James Parkerson Roy    <br>
**James Parkerson Roy**, La. Bar No.11511<br>
**DOMENGEAUX WRIGHT ROY EDWARDS LLC**<br>
556 Jefferson Street, Suite 500<br>
Lafayette, Louisiana 70501<br>
Telephone: (337) 233-3033<br>
Fax No. (337) 233-2796<br>
E-Mail: jimr@wrightroy.com<br>
*Co-Lead Class Counsel*

</td>
</tr>
</table>

### ECONOMIC & PROPERTY DAMAGES CLASS COUNSEL

<table>
<tr>
<td>

Brian H. Barr<br>
LEVIN, PAPANTONIO<br>
316 South Baylen St., Suite 600<br>
Pensacola, FL 32502-5996<br>
Office: (850) 435-7045<br>
Telefax: (850) 436-6187<br>
E-Mail: bbarr@levinlaw.com

</td>
<td>

Robin L. Greenwald<br>
WEITZ & LUXENBERG, PC<br>
700 Broadway<br>
New York, NY 10003<br>
Office: (212) 558-5802<br>
Telefax: (212) 344-5461<br>
E-Mail: rgreenwald@weitzlux.com

</td>
</tr>
</table>

Jeffrey A. Breit
BREIT, DRESCHER & IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT

Rhon E. Jones
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP

519 Florida Avenue, SW
Denham Springs, LA  70726
Office:  (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Sur-Reply will be served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of November, 2013.

/s/  Stephen J. Herman and James Parkerson Roy

# Exhibit Y

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION "J" |
| | * | |
| This Document Applies To: | * | JUDGE BARBIER |
| | * | |
| *12-970* | * | MAG. JUDGE SHUSHAN |

## ORDER

Before the Court are BP's Motion to Amend Scheduling Order re BEL Remand and Preliminary Injunction Relating to BEL Claims (Rec. Doc. 11819) and related filings (Rec. Docs. 11826, 11838, 11840, 11848).

As a preliminary matter, IT IS ORDERED that BP's Motion for Leave to File Reply Memorandum (Rec. Doc. 11838), BP's Motion to File Under Seal Attachment 1 to the Declaration of Allison B. Rumsey (Exhibit B) in Support of BP's Reply Memorandum (Rec. Doc. 11840), and Class Counsel's Motion for Leave to File Sur-Reply (Rec. Doc. 11848) are hereby GRANTED.

IT IS FURTHER ORDERED that BP's Motion to Amend Scheduling Order re BEL Remand and Preliminary Injunction Relating to BEL Claims (Rec. Doc. 11819) is DENIED for the reasons previously stated in the Court's Preliminary Injunction Order of October 18, 2013 (Rec. Doc. 11697) and further for the reasons stated by Class Counsel.

New Orleans, Louisiana, this 15th day of November, 2013.

_United States District Judge_

# Exhibit Z

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by | * | **MDL NO. 2179** |
| the Oil Rig "Deepwater Horizon" | * | |
| in the Gulf of Mexico, on April 20, 2010 | * | **SECTION J** |
| | * | |
| **This document relates to:** | * | |
| **All Cases and No. 12-970** | * | **Honorable CARL J. BARBIER** |
| | * | |
| | * | **Magistrate Judge SHUSHAN** |
| | * | |
| | * | |

---

## DECLARATION OF RICHARD C. GODFREY

I, Richard C. Godfrey, do hereby declare that the following statements made by me under oath are true and accurate to the best of my knowledge, information and belief:

1.     My background and qualifications are set out in my declaration of November 7, 2013.  *See* Rec. Doc. 11818-2.  I make this Declaration based upon my own personal knowledge.

2.     The *Deepwater Horizon* Economic & Property Damages Settlement Agreement (the "Settlement Agreement") provides that BP will fund a Supplemental Information Program ("SIP") that is "consistent with the goals of the Economic Class Action Settlement Notice Program," "approved by the Court," and "submitted in advance for review and comment by BP." Settlement Agreement (Rec. Doc. 6430-1) ¶ 4.4.15.

3.     Class Counsel (Mr. Herman) submitted a proposed SIP to the Court on November 30, 2012.  *See* Ex. A (Nov. 30, 2012 Herman E-Mail) (attachments omitted).  On December 7, 2012, I sent a letter to Magistrate Judge Shushan raising concerns and objections on BP's behalf to the proposed SIP.  *See* Rec. Doc. 11838-3.  My letter stated that "BP cannot consent and the proposed program cannot be approved because in certain respects it is confusing and misleading,

contrary to Rule 23, and at odds with the terms of the Settlement Agreement as amended." *Id.* at

1. Among other things, I pointed out that:

- "The requirement that a loss for which a claim is made have been allegedly caused by the Deepwater Horizon Incident is unambiguously and expressly set forth in the Settlement Agreement." *Id.* at 2.

- "The Court-approved Notices, which are posted on the Settlement Program's website, accurately reflected this requirement of the Settlement Agreement." *Id.* at 3.

- "Because the spots omit any reference to the Class itself and fail to mention that the Settlement Agreement requires a connection to the spill, they will likely create unrealistic expectations among potential Class members." *Id.* at 3-4.

- In several cases "[n]o reference at all is made to the Deepwater Horizon Litigation . . . rather only to 'BP Money.'" *Id.* at 4.

4.      I sent a follow-up letter to Magistrate Judge Shushan on December 11, 2012.  *See*

Ex. B (Dec. 11, 2012 Godfrey Letter).  Among other things, my letter observed that:

- The proposed SIP "is not consistent with the original official Court-approved Notice Program, which specifies that the Settlement Program is designed to compensate for economic losses arising from the *Deepwater Horizon* spill." *Id.* at 1.  "That inconsistency raises substantial risks of confusing and misleading both non-class members and potential class members, in violation of Rule 23 . . . ." *Id.*

- "[T]he proposed SIP is inconsistent with the provisions of the Settlement Agreement which expressly state that it provides compensation only for economic losses that were caused by the *Deepwater Horizon* incident." *Id.*

- "[T]he proposed SIP advertisements are misleading and confusing because they omit to mention that a claimant is only entitled to make a claim for damages caused by the DWH spill.  That requirement is expressly provided for both in the Settlement Agreement and in the Court-approved Notice describing it, and by the sworn Claim Forms developed by the Settlement Program with the input and consent of the Parties." *Id.* at 2 (citation omitted).

- "The vice in the proposed SIP spots is that by omitting the requirement that the spill caused the loss, the spots would encourage viewers to submit claims for losses that have nothing to do with the oil spill and are not covered by the Settlement." *Id.* at 3.

5.      On December 12, 2012, I attended an *in camera* status conference before Judge

Barbier that had been scheduled to address BP's appeal of the Panel decision regarding the

handling of Business Economic Loss claims by nonprofit organizations.  I was present for BP, as

was Andrew T. Karron. Mark Holstein and Jeffrey Lennard appeared for BP by telephone. Jim Roy, Steve Herman, Calvin Fayard, and Joe Rice attended for the PSC. Also present were Magistrate Judge Shushan, Patrick Juneau, Mike Juneau, Orran Brown, and Judge Barbier's law clerk. No court reporter was present, and as far as I am aware no transcription was made.

6.     The majority of the status conference focused on the nonprofits issue. After the Court expressed its views on that issue, there was a brief discussion of the proposed SIP. Judge Barbier indicated that he thought it was clear that, with respect to how causation is determined under the Settlement, everyone agreed that the Exhibit 4B tests were objective. I agreed on behalf of BP that the causation tests of Exhibit 4B are objective. The discussion, however, did not address the threshold question of class membership. For this reason, I believe it to be inaccurate for Class Counsel to argue in their surreply (as they do without evidentiary support) that at the December 12, 2012 closed-door hearing "BP Counsel, at that point, abandoned the suggestions in its December 7th Letter... ." Rec. Doc. 11848-1 at 6. Post-hearing correspondence and discussions between the parties confirm that Class Counsel's assertion is inaccurate.

7.     Following the hearing, the Court sent an e-mail to the parties regarding the conference. Among other things, that e-mail explained: "There was further discussion regarding the proposed Supplemental Information Program. The Court advised the parties that it agreed with BP that there was no need for a new website, and that the Court would not approve the commencement of this supplemental program until it issues an order of final approval for the settlement. The Court further instructed the parties to meet and confer to attempt to resolve any remaining issues with respect to the SIP." Rec. Doc. 8963-75.

3

8. Later that week, the parties met and conferred by phone regarding the SIP. BP's view remained unchanged — only persons whose losses were caused by the spill were class members potentially eligible for compensation. Thus, on December 14, 2012, I sent an e-mail to Class Counsel suggesting that the SIP advertisement featuring Mr. Juneau must include a disclaimer indicating either (1) "If you had a loss as a result of the Spill, you may qualify under the Settlement" or (2) "If you were damaged as a result of the Spill, you may qualify under the Settlement." Ex. C (Dec. 14, 2012 Godfrey E-Mail). That same day, Class Counsel (Mr. Roy) responded with the following counterproposal: **"Damages must be as a result of the Deepwater Horizon Incident as provided in Deepwater Horizon Economic and Property Damages Settlement Agreement."** Ex. D (Dec. 14, 2012 Roy E-Mail). Mr. Roy explained that "This should capture your concern about 1.3.1.2,[1] yet not do violence to our belief that the BEL right to collect under the settlement is subject to causation test in the Settlement Agreement that are mechanical, objective, formulaic — not subject to alternate cause analysis, not subjective— state of mind or otherwise." *Id.*

9. On December 15, 2012, I responded that the proposed language[2] was "acceptable to us as a means of avoiding the burden and expense of requiring Mr. Juneau to retape the spot… ." Ex. E (Dec. 15, 2012 Godfrey E-Mail).

---

[1]    Paragraph 1.3.1.2, importantly, is the paragraph of the Class Definition upon which BP's objections were in part based. *See* Settlement Agreement (Rec. Doc. 6430-1) ¶ 1.3.1.2 ("Economic Damage Category. Loss of income, earnings or profits suffered by Natural Persons or Entities as a result of the **DEEPWATER HORIZON INCIDENT**, subject to certain Exclusions.").

[2]    The proposed language to which I was referring was as follows: **"Damages must be as a result of the Deepwater Horizon Incident as provided in Deepwater Horizon Economic and Property Damages Settlement Agreement."** This was the language contained in Mr. Roy's e-mail of December 14, 2012. *See* Ex. D (Dec. 14, 2012 Roy E-Mail).

10. On December 17, 2012, Class Counsel (Mr. Roy) wrote to Magistrate Judge Shushan to report the parties' agreement with respect to the disclaimer. Ex. F (Dec. 17, 2012 Roy E-Mail). Setting aside the Juneau disclaimer language, however, the parties did not resolve their differences regarding the timing and content of the proposed SIP as a whole.

11. On January 9, 2013, Class Counsel (Mr. Roy) sent the Court a proposed order approving a television advertisement featuring Mr. Juneau and containing the parties' agreed-upon disclaimer language. *See* Ex. G (Jan. 9, 2013 Roy E-Mail) (attachment omitted). That language was: **"Damages must be as a result of the Deepwater Horizon Incident as provided in Deepwater Horizon Economic and Property Damages Settlement Agreement."** Ex. D (Dec. 14, 2012 Roy E-Mail). The Court did not rule or enter the order approving the advertisement.

12. On January 30, 2013, Class Counsel (Mr. Barr) sent the Court its most recent revised proposed plan for the SIP. *See* Ex. H (Jan. 30 Barr E-mail) (attachments omitted). On February 15, 2013, I wrote to Judge Shushan concerning this draft and objecting on BP's behalf to the proposed SIP once again. Ex. I (Feb. 15, 2013 Godfrey Letter) at 1. As I explained, the SIP suffered from several fundamental problems:

- "*First*, the SIP deviates materially from the contents of the Class Notice. The SIP divorces, almost entirely, claimed damages from any causal nexus with the Deepwater Horizon Oil Spill. That is inappropriate, confusing and misleading — and also contrary to the express terms of the parties' Settlement Agreement." *Id.* at 1.

- "*Second*, the SIP targets individuals and businesses in certain specific areas — areas where there is low likelihood of any damages at all, much less causal damages arising from the oil spill." *Id.* at 2.

- "*Last*, the SIP improperly suggests that all listeners and recipients of SIP communications are members of the defined Class, regardless of the class definition and, in many instances, contrary to the class definition." *Id.*

- "Moreover, the invasive outreach proposed by Class Counsel is misguided, as it would inevitably create unrealistic expectations among those who are contacted and encouraged to file a claim. Claims only should be filed by those who believe and attest that they have suffered a loss caused by the oil spill. That is what the Registration Form and Claim Form provide. Encouraging people and businesses to file claims to see whether they can get money under inaccurate pretenses is not appropriate." *Id.* at 4.

- "One of the proposed print advertisements encourages viewers, 'When in doubt, file a claim.' This phrase improperly suggests, without basis, that the viewer most likely is eligible for compensation under the Settlement. It also ignores the requirement that any request for compensation under the Settlement must be causally related to the Deepwater Horizon incident. And, it improperly suggests that a claimant can sign the Registration Form and Claim Form without having a belief and making a sworn attestation that the claim is for losses caused by the Deepwater Horizon Oil Spill. Accordingly, this phrase should not be a part of the SIP." *Id.* at 8 (citation omitted).

13. Class Counsel responded by disagreeing with my February 15 letter on February 19. *See* Ex. J (Feb. 19, 2013 Class Counsel Letter). BP considered the matter already fully submitted and did not respond further.

14. Because the matter had been fully briefed, Class Counsel (Mr. Barr) wrote to the Court on March 6, 2013, to advise the Court that "the issue is ready for determination." Ex. K (Mar. 6, 2013 Barr E-Mail). To date, the Court has not approved the SIP.

Richard C. Godfrey

Dated: November 20, 2013

# Exhibit A

**Godfrey, Richard C.**

| | |
|---|---|
| From: | Steve Herman [SHERMAN@hhklawfirm.com] |
| Sent: | Friday, November 30, 2012 3:21 PM |
| To: | 'Sally_Shushan@laed.uscourts.gov'; Ben Allums |
| Cc: | James Roy; pjuneau@dheclaims.com; Nick Gagliano; Godfrey, Richard C.; Bloom, Wendy L. |
| Subject: | BP Oil - Supplemental Notice Program |

Dear Judge Shushan and Ben,

As required by Section 4.4.15, Class Counsel would like to submit for Court approval this updated Supplemental Notice/Information Program. To that end, we are attaching to this email a package of materials detailing the proposed Program. The materials are as follows: Media Buy, Budget, and Creative, including Scripts and Spots. As you may remember, this is a "Call to Action" program and was always envisioned to supplement the massive, but static, traditional Class Notice program. Upon mutual consent of the parties, it was decided that this program would be more effective if launched after the Fairness Hearing, and thus we are presenting to you now, as a revision of what had been previously submitted. Please note, in this regard, that a change to this updated program is that Mr. Juneau, in his capacity as Administrator, has agreed to become the "face" of this informational (and motivational) campaign. His office has been consulted regularly since the Fairness Hearing, and Mr. Juneau was personally involved in the development and approval of the attached materials and scripts/ads.

Our goal is to have the TV spots produced and running by **December 10.** In order to meet that timeframe, we would respectfully request that BP provide its comments as soon as possible so that the Court can consider same.

The following outlines the general parameters of the Program:

Media Buy & Budget:

Ø  **$4,536,664.41** in gross media (broadcast, cable, radio, print, internet). This is accomplished though a deep discount on media commission – saving $425,000, and a smart buy strategy. (Attached is the proposed media buy) Add in direct phone marketing, website, and a social media team the gross direct communications budget is **97%**

Ø  The biggest challenge is covering the necessary geographic territory, which includes a total of 28 media markets, on our limited budget. To maximize the effectiveness of this campaign, we targeted cost efficient markets with television for our heaviest resource allocation. We will still reach out

through social media, radio, print and phones to the non-TV markets. We also allocated resources for programming research, like Neilson data. This ensures we are targeting programming with maximum viewership.

Ø  You will note a few instances where the media buy is located outside our specified coverage zone. For example, Atlanta, GA. While in this case the television station is located in Atlanta, their selling zone includes our markets in Alabama – ads will only run in Alabama. The Memphis broadcast market will hit Memphis but is the most effective way to reach northern Mississippi.

Ø  The attached media buy plan does not include production. Unused production money will be reinvested in direct advertising.

Ø  The current plan calls for a dip in advertising during the Christmas Holiday. During this lull, we will put the priority on using earned media, social media and other communication mediums.

Ø  We will conduct effectiveness testing for social media, phones as well as print communication. We have allocated resources for focus group testing of the television and radio spots. These measures will help us maximize every dollar.

Creative:

While there are many different directions for creative in this campaign, we feel this recommendation will deliver a clean, concise and easy to understand message that produces results.

Ø  Phase 1: Initial rollout will be to inform residents of the region of their potential claim eligibility featuring Claims Administrator Pat Juneau. Mr. Juneau approved the attached script. We shot the commercial on November 29th to accommodate his schedule.

Ø  Phase 2: The spots "Freeze Frame" and "Answers" both poll tested very high and will be used to re-enforce Mr. Juneau's opening ad.

Ø  Once the creative concept is approved, we will develop the micro-targeting plan that includes localized radio, social media advertising, a phone program and art work for print advertising.

2

Subject to approval, we will go live with the campaign on December 10, 2012.

In addition to the material above, Class Counsel anticipates that a website will be created at the www.BPRecoveryProject.com website.

The content of the site will contain informational pieces about the claims payable in the settlement and direction to the www.deepwaterhorizonsettlements.com website. Further, we anticipate that spots will be created for radio and print media will be on the site. However, before we go to the additional expense of building the site and actually producing TV/radio/print content, we believe it is more efficient to obtain Court approval for the overall "themes" of the Supplemental Information Program. If the Court approves the content of the scripts, all of the other content would be coordinated.

Of course, we would submit to the Court for approval prior to going live with any content.

In conclusion, Class Counsel believes that the material attached meets the requirements of the Settlement Agreement in that it is consistent with the goals of the Economic Class Notice. The TV scripts provide additional notice to members of the Economic Class stressing the broad range of business types that have potential claims under the Settlement and that claims are not limited to just those businesses close to the Coast or just those businesses that are Seafood/Coastal Tourism driven. In fact, the Settlement contemplates payments to qualifying businesses regardless of the facts and circumstances surrounding their loss.

As stated above, our goal is to have the TV spots produced and running by December 10. In order to meet that timeframe, we need to receive BP's comments on the as soon as possible. Thus, we respectfully suggest that BP provide its comments by December 5, 2012 so that the Court can consider same.

We thank you for your consideration.

Jim & Steve

CONFIDENTIAL ATTORNEY WORK PRODUCT
This e-mail message contains confidential, privileged information intended
solely for the addressee.  Please do not read, copy, or disseminate it unless
you are the addressee.  If you have received it in error, please call us
(collect) immediately at (504) 581-4892 and ask to speak with the message
sender.  Also, we would appreciate your forwarding the message back to us and
deleting it from your system.  Thank you.

Attachments:
    Draft PSC Campaign Budget 11.26.12.xlsx (40301 Bytes)
    Legal Settlement Announcement Media Plan v23.xlsx (120772 Bytes)
    Final Juneau Script .docx (14832 Bytes)
    Freezeframe & Answers TV Scripts.docx (64205 Bytes)

# Exhibit B

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois 60654

Richard C. Godfrey, P.C.
To Call Writer Directly:
(312) 862-2391
richard.godfrey@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

December 11, 2012

**VIA ELECTRONIC MAIL**
The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Re:     BP's Supplemental Response To Class Counsel's Proposed Supplemental
        Information Program

Dear Judge Shushan:

Last Friday I wrote on behalf of BP to express its concerns regarding certain aspects of Class Counsel's proposed Supplemental Information Program ("SIP"). Both Mr. Michael Juneau and Class Counsel have now communicated to Your Honor to address issues beyond the scope of the point BP made in my Friday letter. BP submits this brief supplemental response to restate and if necessary, to clarify, its specific objections to Class Counsel's proposed Supplemental Information Program.

BP has four simple objections to the substance of the proposed SIP:

*First*, BP objects to the proposed SIP because it is not consistent with the original official Court-approved Notice Program, which specifies that the Settlement Program is designed to compensate for economic losses arising from the *Deepwater Horizon* spill. That inconsistency raises substantial risks of confusing and misleading both non-class members and potential class members, in violation of Rule 23, and Section 4.4.15 of the Amended Settlement Agreement ("Settlement Agreement"), which requires that any supplemental information program be "consistent with the goals of the Economic Class Action Settlement Notice Program."

*Second*, the proposed SIP is inconsistent with the provisions of the Settlement Agreement which expressly state that it provides compensation only for economic losses that were caused by the *Deepwater Horizon* Incident. *See* Settlement Agreement §§ 1.3.1.2, 1.3.1.3, 1.3.1.5, 1.3.1.10, 38.15, 38.42, 38.57, 38.63, 38.84, 38.155. *See also* Long-Form Notice at 1 ("If you had

Hong Kong      London      Los Angeles      Munich      New York      Palo Alto      San Francisco      Shanghai      Washington, D.C.

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
December 11, 2012
Page 2

economic loss or property damage because of the Deepwater Horizon oil spill, you could get money from a class action settlement"), 12.

*Third,* the proposed additional web-site, in addition to the official web-site of the Court-Supervised Settlement Program, is both unnecessary and confusing.

*Fourth*, the proposed SIP advertisements are misleading and confusing because they omit to mention that a claimant is only entitled to make a claim for damages caused by the DWH spill. That requirement is expressly provided for both in the Settlement Agreement and in the Court-approved Notice describing it, *see supra*, and by the sworn Claim Forms developed by the Settlement Program with the input and consent of the Parties. *See, e.g.,* Registration Form at 1, item 1 ("***To make a claim under the*** Deepwater Horizon Economic and Property Damages Settlement Agreement (the ***"Settlement") for damages arising from the Deepwater Horizon Incident*** on April 20, 2010 (the "Spill"), you must complete and submit this Registration Form and all documentation required by the Settlement . . .") (emphasis added); Business Economic Loss Claim Form at 1 ("***To make a Business Economic Loss Claim under the*** Deepwater Horizon Economic and Property Damages Settlement Agreement (the ***"Settlement") for damages arising from the Deepwater Horizon Incident*** on April 20, 2010 (the "Spill"), you must complete and submit this Claim Form and all documentation . . .") (emphasis added); Business Economic Loss Claim Form Instructions at 1.

In addition to its four objections to the SIP, BP also has a procedural concern relating to the proposed role of the Claims Administrator in making television advertisements. Class Counsel has not cited, and we are not familiar with, any precedent for having a Court-appointed Special Master or Claims Administrator making such television advertisements regarding a claims facility and settlement. Given the special role of the Claims Administrator under the Court's supervision, this proposed novel role and its implications raises questions and concerns that, at the very least, warrant further discussion among the parties, as well as some legal research, so that the parties, the Administrator and the Court may consider the issue with the benefit of a fully developed record. BP believes such a thorough, careful vetting of the issues and possible implications is in the best interests not only of the Class, the PSC, and BP, but also of the Court and the Claims Administrator.

Finally, I should note what BP is not asking for. In this regard, and contrary to Class Counsel's suggestion, BP is *not* asking Mr. Juneau to engage in a subjective analysis or examination of whether a claimant's loss was or was not caused by the spill. BP clearly stated that position in its letter dated September 28, 2012. What BP *is* saying, however, is that the Settlement Agreement itself as well as the sworn claim forms require, as a prerequisite to making

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
December 11, 2012
Page 3


a claim, that the injury for which the claim is submitted "aris[e] from" or be "caused by" the spill.   It is for that reason that, as noted in BP's September 28 letter, cases in which the quantitative tests of the Settlement Agreement are satisfied but there was no actual causation attributable to the DWH spill should be relatively rare.   The vice in the proposed SIP spots is that by omitting the requirement that the spill caused the loss, the spots would encourage viewers to submit claims for losses that have nothing to do with the oil spill and are not covered by the Settlement.

If Your Honor has any questions about BP's position, please let me know.   We intend, however, to reach out to Class Counsel to see whether we can — as we have done with many other issues in this case — work through our objections and concern so as to be able either to present an agreed-upon SIP to the Court or, alternatively, to narrow the issues in dispute.

Respectfully submitted,

*Richard C. Godfrey, P.C./cc*

Richard C. Godfrey, P.C.


Cc:     James Roy
          Steve Herman
          Pat Juneau
          Michael Juneau
          David Odom
          Christine Reitano
          Ben Allums



RCG/cpl

# Exhibit C

**Godfrey, Richard C.**

| | |
|---|---|
| **From:** | Godfrey, Richard C. |
| **Sent:** | Friday, December 14, 2012 3:44 PM |
| **To:** | James Roy; 'Calvin Fayard'; <cfayard@gmail.com> |
| **Cc:** | Brian Barr; SHERMAN@hhklawfirm.com; Andrew_Karron@aporter.com; Bloom, Wendy L.; jeffrey.lennard@snrdenton.com |
| **Subject:** | RE: BP-- SUPP NOTICE TV ADS PAT SHOT |

Friends:  what about one of these two alternatives?  Rick

If you had a loss as a result of the Spill, you may qualify under the Settlement.

       If you were damaged as a result of the Spill, you may qualify under the Settlement

Richard C. Godfrey, P. C.
Kirkland & Ellis LLP
300 North La Salle
Chicago, IL  60654
312-862-2391 DIRECT __| 312-862-2200 FAX
rgodfrey@kirkland.com

**From:** James Roy [mailto:JIMR@wrightroy.com]
**Sent:** Friday, December 14, 2012 1:48 PM
**To:** 'Calvin Fayard'; <cfayard@gmail.com>
**Cc:** Brian Barr; SHERMAN@hhklawfirm.com; Godfrey, Richard C.; Andrew_Karron@aporter.com; Bloom, Wendy L.; jeffrey.lennard@snrdenton.com
**Subject:** RE: BP-- SUPP NOTICE TV ADS PAT SHOT

thanks

**From:** Calvin Fayard [mailto:Calvin@fayardlaw.com]
**Sent:** Friday, December 14, 2012 7:44 AM
**To:** <cfayard@gmail.com>
**Cc:** Brian Barr; James Roy; SHERMAN@hhklawfirm.com; richard.godfrey@kirkland.com; Andrew_Karron@aporter.com; wendy.bloom@kirkland.com; jeffrey.lennard@snrdenton.com
**Subject:** Re: BP-- SUPP NOTICE TV ADS PAT SHOT

Thank you for sorting this out.

Confidential

Calvin C. Fayard, Jr.

Attorney

(225) 664-4193


On Dec 13, 2012, at 3:40 PM, "cfayard@gmail.com" <cfayard@gmail.com> wrote:

> Hopefully everyone now has the rough cut of Mr. Juneau's ad plus the transcript of what he says, and then also the draft tv scripts (nothing filmed) entitled "Freeze Frame" and "Answers." To answer Wendy and Rick's questions on length, all of the TV spots were timed to run 30 seconds. Per our experts this usually means no more than 28.5 seconds of audio. However the Juneau ad is fully timed at 30 seconds of audio.
>
> A draft radio script was attached to the end of the "Freeze frame/Answers" script submitted to the Court, and this ad is segmented by region. It is slotted at 60 seconds/58.5 seconds of voiceover sound. To date the only ad that has been filmed is the one with Mr. Juneau, and that was done on an expedited basis in order to accommodate Mr. Juneau's schedule.
>
> Please let me know if anyone needs anything else.
>
> Thanks,
> Caroline
>
>
> -
> Confidential
> Caroline Fayard
> Attorney at Law
> 504 810 1130

---

**From:** "Brian Barr" <BBarr@levinlaw.com>

**Date:** Thu, 13 Dec 2012 14:20:52 -0600

**To:** Jim Roy<jimr@wrightroy.com>; <SHERMAN@hhklawfirm.com>; <cfayard@gmail.com>; <Calvin@fayardlaw.com>; <

# Exhibit D

## Godfrey, Richard C.

| | |
|---|---|
| **From:** | James Roy [JIMR@wrightroy.com] |
| **Sent:** | Friday, December 14, 2012 4:15 PM |
| **To:** | Godfrey, Richard C.; 'Calvin Fayard'; <cfayard@gmail.com> |
| **Cc:** | Brian Barr; SHERMAN@hhklawfirm.com; Andrew_Karron@aporter.com; Bloom, Wendy L.; jeffrey.lennard@snrdenton.com |
| **Subject:** | RE: BP-- SUPP NOTICE TV ADS PAT SHOT |

Rick:

In response to your note below, assuming the supplemental notice TV ad Pat Juneau wrote & shot stays as is except 1) to correct web site to be www.DeepwaterHorizonSettlements.com and

2) the proposed wording we are discussing is contemplated to be in the nature of a static "disclaimer" print message at bottom of TV screen for part of the time of the ad, we'd prefer to see such a printed/disclaimer/notice to read::

> **"Damages must be as a result of Deepwater Horizon Incident as provided in Deepwater Horizon Economic and Property Damages Settlement Agreement. "**

This should capture your concern about 1.3.1.2, yet not do violence to our belief that the BEL right to collect under the settlement is subject to causation test in the Settlement Agreement that are mechanical, objective, formulaic — not subject to alternate cause analysis, not subjective—state of mind or otherwise.

Look forward to hearing from you. Let us know if call is needed.

Jim

**From:** Godfrey, Richard C. [mailto:rgodfrey@kirkland.com]
**Sent:** Friday, December 14, 2012 3:44 PM
**To:** James Roy; 'Calvin Fayard'; <cfayard@gmail.com>
**Cc:** Brian Barr; SHERMAN@hhklawfirm.com; Andrew_Karron@aporter.com; Bloom, Wendy L.;
jeffrey.lennard@snrdenton.com
**Subject:** RE: BP-- SUPP NOTICE TV ADS PAT SHOT


Friends:  what about one of these two alternatives?  Rick


If you had a loss as a result of the Spill, you may qualify under the Settlement.

        If you were damaged as a result of the Spill, you may qualify under the Settlement




Richard C. Godfrey, P. C.
Kirkland & Ellis LLP
300 North La Salle
Chicago, IL  60654
312-862-2391 DIRECT __| 312-862-2200 FAX
rgodfrey@kirkland.com


**From:** James Roy [mailto:JIMR@wrightroy.com]
**Sent:** Friday, December 14, 2012 1:48 PM
**To:** 'Calvin Fayard'; <cfayard@gmail.com>
**Cc:** Brian Barr; SHERMAN@hhklawfirm.com; Godfrey, Richard C.; Andrew_Karron@aporter.com;
Bloom, Wendy L.; jeffrey.lennard@snrdenton.com
**Subject:** RE: BP-- SUPP NOTICE TV ADS PAT SHOT


thanks


**From:** Calvin Fayard [mailto:Calvin@fayardlaw.com]
**Sent:** Friday, December 14, 2012 7:44 AM
**To:** <cfayard@gmail.com>
**Cc:** Brian Barr; James Roy; SHERMAN@hhklawfirm.com; richard.godfrey@kirkland.com;

Andrew_Karron@aporter.com; wendy.bloom@kirkland.com; jeffrey.lennard@snrdenton.com
**Subject:** Re: BP-- SUPP NOTICE TV ADS PAT SHOT

Thank you for sorting this out.

Confidential

Calvin C. Fayard, Jr.

Attorney

(225) 664-4193

On Dec 13, 2012, at 3:40 PM, "cfayard@gmail.com" <cfayard@gmail.com> wrote:

Hopefully everyone now has the rough cut of Mr. Juneau's ad plus the transcript of what he says, and then also the draft tv scripts (nothing filmed) entitled "Freeze Frame" and "Answers." To answer Wendy and Rick's questions on length, all of the TV spots were timed to run 30 seconds. Per our experts this usually means no more than 28.5 seconds of audio. However the Juneau ad is fully timed at 30 seconds of audio.

A draft radio script was attached to the end of the "Freeze frame/Answers" script submitted to the Court, and this ad is segmented by region. It is slotted at 60 seconds/58.5 seconds of voiceover sound. To date the only ad that has been filmed is the one with Mr. Juneau, and that was done on an expedited basis in order to accommodate Mr. Juneau's schedule.

Please let me know if anyone needs anything else.

Thanks,
Caroline

-
Confidential
Caroline Fayard
Attorney at Law
504 810 1130

---

**From:** "Brian Barr" <BBarr@levinlaw.com>

**Date:** Thu, 13 Dec 2012 14:20:52 -0600

**To:** Jim Roy<jimr@wrightroy.com>; <SHERMAN@hhklawfirm.com>; <cfayard@gmail.com>; <Calvin@fayardlaw.com>; <richard.godfrey@kirkland.com>; <Andrew_Karron@aporter.com>; <wendy.bloom@kirkland.com>; <jeffrey.lennard@snrdenton.com>

**Subject:** FW: FW: BP-- SUPP NOTICE TV ADS PAT SHOT

To make things easier for everyone, here is the script as shot.


*********************************************************
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related

# Exhibit E

## Godfrey, Richard C.

| | |
|---|---|
| **From:** | Godfrey, Richard C. |
| **Sent:** | Saturday, December 15, 2012 10:44 AM |
| **To:** | Steve Herman |
| **Cc:** | James Roy; Calvin Fayard; <cfayard@gmail.com>; Brian Barr; Andrew_Karron@aporter.com; Bloom, Wendy L.; jeffrey.lennard@snrdenton.com |
| **Subject:** | RE: BP-- SUPP NOTICE TV ADS PAT SHOT |

Jim and Steve:


After conferring with my colleagues, I wish to express our appreciation for your willingness to work with us on this TV ad issue.  Your proposal items (1) and (2) including the static language are acceptable to us as a means of avoiding the burden and expense of requiring Mr. Juneau to retape the spot, with the understanding that we will have an opportunity to view the static language to confirm that it is properly placed so that it will be readily visible to the viewer.   Thus, please send what you propose to be the final version of the TV spot, so that we can review it and finalize what I think we collectively have now agreed to.



Thanks again.  Rick




Richard C. Godfrey, P. C.
Kirkland & Ellis LLP
300 North La Salle
Chicago, IL  60654
312-862-2391 DIRECT __| 312-862-2200 FAX
rgodfrey@kirkland.com



**From:** Steve Herman [mailto:SHERMAN@hhklawfirm.com]
**Sent:** Friday, December 14, 2012 6:29 PM
**To:** Godfrey, Richard C.
**Cc:** James Roy; Calvin Fayard; <cfayard@gmail.com>; Brian Barr; Steve Herman; Andrew_Karron@aporter.com; Bloom, Wendy L.; jeffrey.lennard@snrdenton.com
**Subject:** Re: BP-- SUPP NOTICE TV ADS PAT SHOT



Thanks

Steve Herman

1

On Dec 14, 2012, at 6:13 PM, "Godfrey, Richard C." <rgodfrey@kirkland.com> wrote:

Jim: thanks very much. Let me get together with Jeff, Tres (Andy Karron) and Wendy--but I think we are very close or may be there on the specific language--depending of course on how the proposed language would actually appear in the TV spot itself. But, we have made very good progress, and are close. Thus, I will get back with you hopefully yet this evening.

Rick

Richard C. Godfrey, P. C.
Kirkland & Ellis LLP
300 North La Salle
Chicago, IL 60654
312-862-2391 DIRECT __| 312-862-2200 FAX
rgodfrey@kirkland.com

**From:** James Roy [mailto:JIMR@wrightroy.com]
**Sent:** Friday, December 14, 2012 4:15 PM
**To:** Godfrey, Richard C.; 'Calvin Fayard'; <cfayard@gmail.com>
**Cc:** Brian Barr; SHERMAN@hhklawfirm.com; Andrew_Karron@aporter.com; Bloom, Wendy L.; jeffrey.lennard@snrdenton.com
**Subject:** RE: BP-- SUPP NOTICE TV ADS PAT SHOT

Rick:

In response to your note below, assuming the supplemental notice TV ad Pat Juneau wrote & shot stays as is except 1) to correct web site to be www.DeepwaterHorizonSettlements.com and

2) the proposed wording we are discussing is contemplated to be in the nature of a static "disclaimer' print message at bottom of TV screen for part of the time of the ad, we'd prefer to see such a printed/disclaimer/notice to read::

**"Damages must be as a result of Deepwater Horizon Incident as provided in Deepwater Horizon Economic and Property Damages Settlement Agreement. "**

This should capture your concern about 1.3.1.2, yet not do violence to our belief that the BEL right to collect under the settlement is subject to causation test in the Settlement Agreement that are mechanical, objective, formulaic — not subject to alternate cause analysis, not subjective—state of mind or otherwise.

Look forward to hearing from you. Let us know if call is needed.

Jim

**From:** Godfrey, Richard C. [mailto:rgodfrey@kirkland.com]
**Sent:** Friday, December 14, 2012 3:44 PM
**To:** James Roy; 'Calvin Fayard'; <cfayard@gmail.com>
**Cc:** Brian Barr; SHERMAN@hhklawfirm.com; Andrew_Karron@aporter.com; Bloom, Wendy L.; jeffrey.lennard@snrdenton.com
**Subject:** RE: BP-- SUPP NOTICE TV ADS PAT SHOT

Friends: what about one of these two alternatives? Rick

If you had a loss as a result of the Spill, you may qualify under the Settlement.

 If you were damaged as a result of the Spill, you may qualify under the Settlement

Richard C. Godfrey, P. C.
Kirkland & Ellis LLP

3

300 North La Salle
Chicago, IL  60654
312-862-2391 DIRECT __| 312-862-2200 FAX
rgodfrey@kirkland.com


**From:** James Roy [mailto:JIMR@wrightroy.com]
**Sent:** Friday, December 14, 2012 1:48 PM
**To:** 'Calvin Fayard'; <cfayard@gmail.com>
**Cc:** Brian Barr; SHERMAN@hhklawfirm.com; Godfrey, Richard C.; Andrew_Karron@aporter.com; Bloom, Wendy L.; jeffrey.lennard@snrdenton.com
**Subject:** RE: BP-- SUPP NOTICE TV ADS PAT SHOT


thanks


**From:** Calvin Fayard [mailto:Calvin@fayardlaw.com]
**Sent:** Friday, December 14, 2012 7:44 AM
**To:** <cfayard@gmail.com>
**Cc:** Brian Barr; James Roy; SHERMAN@hhklawfirm.com; richard.godfrey@kirkland.com; Andrew_Karron@aporter.com; wendy.bloom@kirkland.com; jeffrey.lennard@snrdenton.com
**Subject:** Re: BP-- SUPP NOTICE TV ADS PAT SHOT


Thank you for sorting this out.

Confidential

Calvin C. Fayard, Jr.

Attorney

(225) 664-4193


On Dec 13, 2012, at 3:40 PM, "cfayard@gmail.com" <cfayard@gmail.com> wrote:

Hopefully everyone now has the rough cut of Mr. Juneau's ad plus the transcript of what he says, and then also the draft tv scripts (nothing filmed) entitled "Freeze Frame" and "Answers." To answer Wendy and Rick's questions on length, all of the TV spots were timed to run 30 seconds. Per our experts this usually means no more than 28.5 seconds of audio. However the Juneau ad is fully timed at 30 seconds of audio.

A draft radio script was attached to the end of the "Freeze frame/Answers" script submitted to the Court, and this ad is segmented by region. It is slotted at 60 seconds/58.5 seconds of voiceover sound. To date the only ad that has been filmed is the one with Mr. Juneau, and that

was done on an expedited basis in order to accommodate Mr. Juneau's schedule.

Please let me know if anyone needs anything else.

Thanks,
Caroline

-
Confidential
Caroline Fayard
Attorney at Law
504 810 1130

---

**From:** "Brian Barr" <BBarr@levinlaw.com>

**Date:** Thu, 13 Dec 2012 14:20:52 -0600

**To:** Jim Roy<jimr@wrightroy.com>; <SHERMAN@hhklawfirm.com>; <cfayard@gmail.com>; <Calvin@fayardlaw.com>; <richard.godfrey@kirkland.com>; <Andrew_Karron@aporter.com>; <wendy.bloom@kirkland.com>; <jeffrey.lennard@snrdenton.com>

**Subject:** FW: FW: BP-- SUPP NOTICE TV ADS PAT SHOT

To make things easier for everyone, here is the script as shot.

*************************************************************
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
*************************************************************

*************************************************************

IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenu

Exhibit F

## Godfrey, Richard C.

| | |
|---|---|
| **From:** | James Roy [JIMR@wrightroy.com] |
| **Sent:** | Monday, December 17, 2012 5:45 PM |
| **To:** | Pat Juneau (pjuneau@dhcclaims.com); Magistrate Shushan |
| **Cc:** | Calvin Fayard; <cfayard@gmail.com>; Brian Barr; Andrew_Karron@aporter.com; Bloom, Wendy L.; Godfrey, Richard C.; jeffrey.lennard@snrdenton.com; Steve Herman; Mike Juneau (MJJ@juneaudavid.com); Christine Reitano; Nick Gagliano (nick@gaglianogroup.com) |
| **Subject:** | BP-- SUPP NOTICE TV ADS PAT SHOT |

Judge Shushan and Pat:

Subject to approval of Pat Juneau and the Court, BP and Class Counsel have conferred since the conference with the Court last week and compromised on the Supplemental Notice TV ad that Pat recently shot. The compromise agreement is as follows:

**The supplemental notice TV ad Pat Juneau wrote & shot stays as is except:**

**1) to correct web site to be www.DeepwaterHorizonSettlements.com and**

**2) the proposed wording we are discussing adding is contemplated to be in the nature of a static "disclaimer/notice"' print message at bottom of TV screen for part of the time of the ad, to read::**

**"Damages must be as a result of Deepwater Horizon Incident as provided in**

**Deepwater Horizon Economic and Property Damages Settlement Agreement. "**

This attempts to capture BP's concern about 1.3.1.2, yet not do violence to Class Counsel belief that the BEL right to collect under the settlement is subject to causation tests in the Settlement Agreement that are mechanical, objective, formulaic — not subject to alternate cause analysis, not subjective—state of mind or otherwise. (I've retained the entire string below so the context of comments by BP and Class Counsel are preserved).

Assuming Mr. Juneau **and** the Court are in agreement, then the ad production people of Pat (Nick Gagliano) and our tech people can substitute the website info and insert the "disclaimer to show during the second sentence of the script and the "finished" product can be distributed to BP, Class

Counsel, The Court and Pat for final, final review and hopefully, final approval of the Court to run. Hopefully this remedial post-production can take place quickly.


Regards,


Jim


**From:** Godfrey, Richard C. [mailto:rgodfrey@kirkland.com]
**Sent:** Saturday, December 15, 2012 10:44 AM
**To:** Steve Herman
**Cc:** James Roy; Calvin Fayard; <cfayard@gmail.com>; Brian Barr; Andrew_Karron@aporter.com; Bloom, Wendy L.; jeffrey.lennard@snrdenton.com
**Subject:** RE: BP-- SUPP NOTICE TV ADS PAT SHOT


Jim and Steve:


After conferring with my colleagues, I wish to express our appreciation for your willingness to work with us on this TV ad issue. Your proposal items (1) and (2) including the static language are acceptable to us as a means of avoiding the burden and expense of requiring Mr. Juneau to retape the spot, with the understanding that we will have an opportunity to view the static language to confirm that it is properly placed so that it will be readily visible to the viewer. Thus, please send what you propose to be the final version of the TV spot, so that we can review it and finalize what I think we collectively have now agreed to.


Thanks again.  Rick


Richard C. Godfrey, P. C.
Kirkland & Ellis LLP
300 North La Salle
Chicago, IL  60654
312-862-2391 DIRECT __| 312-862-2200 FAX
rgodfrey@kirkland.com

**From:** Steve Herman [mailto:SHERMAN@hhklawfirm.com]
**Sent:** Friday, December 14, 2012 6:29 PM
**To:** Godfrey, Richard C.
**Cc:** James Roy; Calvin Fayard; <cfayard@gmail.com>; Brian Barr; Steve Herman;
Andrew_Karron@aporter.com; Bloom, Wendy L.; jeffrey.lennard@snrdenton.com
**Subject:** Re: BP-- SUPP NOTICE TV ADS PAT SHOT


Thanks

Steve Herman


On Dec 14, 2012, at 6:13 PM, "Godfrey, Richard C." <rgodfrey@kirkland.com> wrote:

Jim:  thanks very much.  Let me get together with Jeff, Tres (Andy Karron) and Wendy--but I think we are very close or may be there on the specific language--depending of course on how the proposed language would actually appear in the TV spot itself.  But, we have made very good progress, and are close.  Thus, I will get back with you hopefully yet this evening.


Rick



Richard C. Godfrey, P. C.
Kirkland & Ellis LLP
300 North La Salle
Chicago, IL  60654
312-862-2391 DIRECT __| 312-862-2200 FAX
rgodfrey@kirkland.com


**From:** James Roy [mailto:JIMR@wrightroy.com]
**Sent:** Friday, December 14, 2012 4:15 PM
**To:** Godfrey, Richard C.; 'Calvin Fayard'; <cfayard@gmail.com>
**Cc:** Brian Barr; SHERMAN@hhklawfirm.com; Andrew_Karron@aporter.com; Bloom, Wendy L.;
jeffrey.lennard@snrdenton.com
**Subject:** RE: BP-- SUPP NOTICE TV ADS PAT SHOT


Rick:

In response to your note below, assuming the supplemental notice TV ad Pat Juneau wrote & shot stays as is except 1) to correct web site to be www.DeepwaterHorizonSettlements.com and

2) the proposed wording we are discussing is contemplated to be in the nature of a static "disclaimer' print message at bottom of TV screen for part of the time of the ad, we'd prefer to see such a printed/disclaimer/notice to read::


**"Damages must be as a result of Deepwater Horizon Incident as provided in Deepwater Horizon Economic and Property Damages Settlement Agreement. "**


This should capture your concern about 1.3.1.2, yet not do violence to our belief that the BEL right to collect under the settlement is subject to causation test in the Settlement Agreement that are mechanical, objective, formulaic — not subject to alternate cause analysis, not subjective—state of mind or otherwise.


Look forward to hearing from you. Let us know if call is needed.


Jim


**From:** Godfrey, Richard C. [mailto:rgodfrey@kirkland.com]
**Sent:** Friday, December 14, 2012 3:44 PM
**To:** James Roy; 'Calvin Fayard'; <cfayard@gmail.com>
**Cc:** Brian Barr; SHERMAN@hhklawfirm.com; Andrew_Karron@aporter.com; Bloom, Wendy L.; jeffrey.lennard@snrdenton.com
**Subject:** RE: BP-- SUPP NOTICE TV ADS PAT SHOT


Friends:  what about one of these two alternatives?  Rick

4

If you had a loss as a result of the Spill, you may qualify under the Settlement.

If you were damaged as a result of the Spill, you may qualify under the Settlement

Richard C. Godfrey, P. C.
Kirkland & Ellis LLP
300 North La Salle
Chicago, IL  60654
312-862-2391 DIRECT __| 312-862-2200 FAX
rgodfrey@kirkland.com

**From:** James Roy [mailto:JIMR@wrightroy.com]
**Sent:** Friday, December 14, 2012 1:48 PM
**To:** 'Calvin Fayard'; <cfayard@gmail.com>
**Cc:** Brian Barr; SHERMAN@hhklawfirm.com; Godfrey, Richard C.; Andrew_Karron@aporter.com;
Bloom, Wendy L.; jeffrey.lennard@snrdenton.com
**Subject:** RE: BP-- SUPP NOTICE TV ADS PAT SHOT

thanks

**From:** Calvin Fayard [mailto:Calvin@fayardlaw.com]
**Sent:** Friday, December 14, 2012 7:44 AM
**To:** <cfayard@gmail.com>
**Cc:** Brian Barr; James Roy; SHERMAN@hhklawfirm.com; richard.godfrey@kirkland.com;
Andrew_Karron@aporter.com; wendy.bloom@kirkland.com; jeffrey.lennard@snrdenton.com
**Subject:** Re: BP-- SUPP NOTICE TV ADS PAT SHOT

Thank you for sorting this out.

Confidential

Calvin C. Fayard, Jr.

Attorney

(225) 664-4193

On Dec 13, 2012, at 3:40 PM, "cfayard@gmail.com" <cfayard@gmail.com> wrote:

Hopefully everyone now has the rough cut of Mr. Juneau's ad plus the transcript of what he says, and then also the draft tv scripts (nothing filmed) entitled "Freeze Frame" and "Answers." To answer Wendy and Rick's questions on length, all of the TV spots were timed to run 30 seconds. Per our experts this usually means no more than 28.5 seconds of audio. However the Juneau ad is fully timed at 30 seconds of audio.

A draft radio script was attached to the end of the "Freeze frame/Answers" script submitted to the Court, and this ad is segmented by region. It is slotted at 60 seconds/58.5 seconds of voiceover sound. To date the only ad that has been filmed is the one with Mr. Juneau, and that was done on an expedited basis in order to accommodate Mr. Juneau's schedule.

Please let me know if anyone needs anything else.

Thanks,
Caroline

-
Confidential
Caroline Fayard
Attorney at Law
504 810 1130

---

**From:** "Brian Barr" <BBarr@levinlaw.com>

**Date:** Thu, 13 Dec 2012 14:20:52 -0600

**To:** Jim Roy<jimr@wrightroy.com>; <SHERMAN@hhklawfirm.com>; <cfayard@gmail.com>; <Calvin@fayardlaw.com>; <richard.godfrey@kirkland.com>; <Andrew_Karron@aporter.com>; <wendy.bloom@kirkland.com>; <jeffrey.lennard@snrdenton.com>

**Subject:** FW: FW: BP-- SUPP NOTICE TV ADS PAT SHOT

To make things easier for everyone, here is the script as shot.

************************************************************

IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform

you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer fo

# Exhibit G

**Godfrey, Richard C.**

| | |
|---|---|
| **From:** | James Roy [JIMR@wrightroy.com] |
| **Sent:** | Wednesday, January 09, 2013 10:51 AM |
| **To:** | Ben_Allums@laed.uscourts.gov; Magistrate Shushan |
| **Cc:** | Godfrey, Richard C.; *sherman@hhkc.com; Nick Gagliano (nick@gaglianogroup.com); Pat Juneau (pjuneau@dheclaims.com); Christine Reitano; Brian Barr |
| **Subject:** | BP--- DWH ECON SETTLEMENT SUPPLEMENTAL NOTICE PROGRAM----------- PROPOSED ORDER APPROVING JUNEAU TV AD |

Judge Shushan and Ben:


Attached is a Proposed Order Steve and I as Lead Class Counsel are  submitting in connection with the DWH Economic Settlement Supplemental Notice Program to approve the "ad" Pat Juneau recently produced.

This matter was raised in Court last month and BP  requested two changes which  the parties agreed to.

The proposed (revised) ad is attached. The stock photos will lose their watermark in final production once they are purchased.


The attached ad and proposed order have both been approved by Rick Godfrey on behalf of BP.

Pat Juneau has approved the ad.


We would ask that the Court consider the attached proposed order and enter it at its earliest opportunity.


Of course if a formal motion is needed or if the Court has any questions, we will respond accordingly to accommodate the Court's wishes.


Once an order is signed approving the ad, it will be run.


If you have any questions I can be reached at 337-278-7892 (CEL).


Regards,  Jim

Attachments:
    Proposed Order - Juneau Spot 1-8-2013.docx (16644 Bytes)
    Juneau_501_Ver_C-Viewer.mov (3150154 Bytes)

## UNITED STATES DISTRICT OF COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL BY THE OIL | § | MDL No. 2179 |
| RIG "DEEPWATER HORIZON" | § | |
| IN THE GULF OF MEXICO, | § | SECTION: J |
| ON APRIL 20, 2010 | § | |
| | § | |
| *Relates to:* No. 12-970 | § | JUDGE BARBIER |
| | § | |
| | § | MAG. JUDGE SHUSHAN |

### ORDER

Pursuant to Section 4.4.15 of the Economic and Property Damages Settlement Agreement, Class Counsel developed a televised advisory with the participation and approval of the Claims Administrator.

In light of comments made by BP, the Parties agreed to a modification which has been approved by the Claims Administrator.

The revised advisory has been provided to BP, who has raised no objection.

Now, therefore:

**IT IS ORDERED** that, in accordance with Section 4.4.15 of the Economic and Property Damages Settlement Agreement, the televised advisory submitted by Class Counsel be and is hereby approved by the Court.

Signed at New Orleans, Louisiana, this _____ day of January, 2013.

_____

**Hon. Carl J. Barbier**

# Exhibit H

**Godfrey, Richard C.**

| | |
|---|---|
| **From:** | Brian Barr [BBarr@levinlaw.com] |
| **Sent:** | Wednesday, January 30, 2013 1:22 PM |
| **To:** | Godfrey, Richard C.; Bloom, Wendy L. |
| **Cc:** | Jim Roy; SHERMAN@hhklawfirm.com; Calvin@fayardlaw.com; caroline@fayardlegal.com; Sally_Shushan@laed.uscourts.gov |
| **Subject:** | Supplemental Information Plan |

Rick/Wendy/Judge Shushan:

Attached to this email are the components of the entire supplemental information plan. I have included a memorandum that explains each piece of the plan as well as scripts and, where applicable, audio and video files for the TV and radio spots. In accordance with the settlement agreement, we are providing these materials to BP for review and comment and to the Court for approval. We would like to implement the plan as soon as possible so we would appreciate your attention to this matter and a quick turnaround on any comments you intend to offer. Class Counsel believes the Plan should be approved as designed as it is consistent with the Economic Settlement Notice Program and accurately describes the settlement agreement.

I have binders prepared so that each of you can review the complete content in that format if preferred. The binders also contain CDs that have the relevant files.

Judge Shushan – I can have your binder delivered.

Rick/Wendy – please let me know if you would like a binder delivered somewhere in New Orleans or if you want it sent directly to you.

Brian Barr
Attorney at Law
Levin, Papantonio, Thomas, Mitchell, Echsner, Rafferty & Proctor, P.A.
316 S. Baylen Street
Pensacola, FL  32501
850-435-7044 V
850-436-6044 F

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, DO NOT READ IT. PLEASE IMMEDIATELY REPLY TO THE SENDER THAT YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR.  THEN DELETE IT. THANK YOU.

Attachments:
    Supplemental Information Plan Memorandum.pdf (66921 Bytes)
    draft psc campaign budget 1.29.13.xlsx (10385 Bytes)
    legal settlement announcement media plan v26.xlsx (121964 Bytes)
    bp psc freezeframe tv 1.29.13.docx (61621 Bytes)
    bp psc tv answers script 1.29.13.docx (60869 Bytes)
    bp_answers_ver-j.mov (5474672 Bytes)
    bp_freezeframe_ver-j.mov (5891496 Bytes)
    final juneau script .docx (14832 Bytes)
    juneau_501_ver_c-viewer.mov (3148626 Bytes)
    claim al la ms radio 60 1-25-13.mp3 (910049 Bytes)
    claim fl radio 60 1-25-13(2).mp3 (919223 Bytes)
    psc radio 1.2.13 for florida-2.docx (77535 Bytes)
    psc radio 1.2.13 for lamsal-2.docx (75621 Bytes)
    bp ads_v1 r1 8.5x10.pdf (905287 Bytes)
    bp google adwords -2.xls (36928 Bytes)
    bp tweets-2.docx (89418 Bytes)
    fb-bp-ad4-100x72.jpg (5095 Bytes)
    fb-bp-ad5-100x72-1.jpg (4900 Bytes)
    draft phone script for the bp deepwater horizon economic settlement 01 03 13.docx (14958 Bytes)

# Exhibit I

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle Street
Chicago, Illinois 60654

Richard C. Godfrey, P.C.
To Call Writer Directly:
(312) 862-2391
richard.godfrey@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

February 15, 2013

The Honorable Sally Shushan
United States District Court
Eastern District of Louisiana
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

> Re:    BP's Response to Class Counsel's Revised Proposed Supplemental
> Information Program, as submitted on January 30, 2013

Dear Judge Shushan:

By this letter, BP provides the Court and Class Counsel with its comments, concerns and objections to Class Counsel's most recent revised proposed plan for the Supplemental Information Program ("SIP"), submitted to the Court and BP on January 30, 2013. Although the current proposal is somewhat improved as compared to previous submissions, the SIP cannot and should not "be approved as designed," as Class Counsel request. The proposed revised SIP fails to incorporate changes discussed by the parties when the SIP was last considered in December. Most significantly, the current proposal includes broadcast, print, and social media spots that omit any reference to the Settlement, fail to communicate the Settlement's purpose of providing compensation for losses resulting from the Deepwater Horizon incident, and are otherwise factually inaccurate and misleading. In addition to these and other substantive flaws requiring rejection, approval and implementation of the SIP would be inappropriate at this time in light of the significant ongoing dispute among the parties, pending before the Court, regarding the Court-Supervised Settlement Program's implementation of the Economic and Property Damage Settlement's Business Economic Loss ('BEL') Compensation Framework.

In overview, there are three fundamental problems with the SIP as proposed. *First*, the SIP deviates materially from the contents of the Class Notice. The SIP divorces, almost entirely, claimed damages from any causal nexus with the Deepwater Horizon Oil Spill. That is inappropriate, confusing and misleading — and also contrary to the express terms of the parties' Settlement Agreement.

Hong Kong     London     Los Angeles     Munich     New York     Palo Alto     San Francisco     Shanghai     Washington, D.C.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 15, 2013
Page 2

*Second*, the SIP targets individuals and businesses in certain specific areas — areas where there is low likelihood of any damages at all, much less causal damages arising from the oil spill. Examples include farmers, construction firms and law firms. Setting aside the increased risk of claims for fictitious, non-existent losses and/or fraud, it is misleading at best to target and solicit participants in certain sectors of the economy where there is low likelihood that there was a negative economic impact caused by the spill.

*Last*, the SIP improperly suggests that all listeners and recipients of SIP communications are members of the defined Class, regardless of the class definition and, in many instances, contrary to the class definition.

### Deferral of the SIP Until BEL Compensation Framework Issues Are Resolved

Before even reaching the substantive content of the proposed SIP, BP submits that no action should be taken with respect to the SIP until the dispute regarding the BEL Compensation Framework is finally resolved. As the Court is aware, the parties are attempting to resolve, with the Court's assistance and through mediation, certain claims administration questions involving the Settlement Program's implementation of the BEL Compensation Framework (Settlement Agreement at Ex. 4C). Among the types of claims where these errors have produced particularly absurd and illogical results are claims by businesses in the farming, construction, and professional services industries. Yet despite this ongoing dispute, the SIP focuses on BEL claims in these very industries. For example, the television spots entitled "Freeze Frame" and "Answers" (SIP Tab C), as well as the proposed radio spots (SIP Tab D), all reference lumberyard owners, and the proposed print ads (SIP Tab E) feature professional services workers and livestock farmers.

Moreover, it is clear that the SIP, as designed, expressly and specifically is premised on a view of the Settlement Agreement that dispenses with the carefully-negotiated causation requirement: "In fact, the Settlement contemplates payments to qualifying businesses regardless of the actual facts and circumstances." (Supplemental Information Plan Approval Memorandum ("SIP Memo") at 5.) That statement is simply inaccurate and untrue, and is contrary to the Registration Form as well as the Claim Form; it is also contrary, we submit, to the attestation signed by claimants. The statement will give rise to numerous unmeritorious claims.

Until the BEL issue has been finally resolved, the proposed SIP should not move forward, as it focuses on such disputed claims, disseminates confusing and/or inaccurate information about BEL claims, and encourages additional claims based on such information. Deferral is appropriate both to preserve the Court's ability to address the issue fully and, equally

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 15, 2013
Page 3

importantly, to avoid potentially misinforming and confusing class members and the public. Accordingly, consideration of any SIP should be deferred pending resolution of the BEL issue.

### BP's Substantive Objections to Selected Aspects of Class Counsel's Proposed SIP

As Your Honor may recall, Class Counsel last presented a proposal for the SIP in December, at which time the parties, with the guidance of the Court, conferred regarding the specific content of certain proposed informational pieces. Most notably, the parties negotiated about a proposed television spot that had already been filmed (prior to BP's review of the script) featuring Claims Administrator Patrick Juneau. As a concession to avoid the inconvenience of re-filming a revised spot, BP consented to the Court approving the proposed "Juneau" television spot (notwithstanding certain outstanding objections), provided that certain post-production changes were made. Specifically, the spot was to direct viewers solely to the official Claims Administrator's Settlement website (www.DeepwaterHorizonSettlements.com), and mutually-agreed text was to be superimposed to convey the causation requirement for economic loss claims ("Damages must be as a result of the Deepwater Horizon incident as provided in the Deepwater Horizon Economic and Property Damages Settlement Agreement"). But BP in no way waived its objections to certain misleading or otherwise inappropriate content in other proposed informational pieces. To the contrary, discussion of those other informational pieces was put off until a later time, at which point Class Counsel would submit modified versions for consideration.

While some of the points discussed then by the parties are reflected in Class Counsel's revised SIP, they are not applied consistently throughout the various ads and media communications. Several of the proposed informational spots continue to use inaccurate and/or misleading language regarding the Settlement. Moreover, the current SIP introduces new concepts that are objectionable on their face and/or require further explanation. BP's specific objections to components of the SIP are discussed further as follows, and are reflected in the mark-ups of the proposed SIP scripts and ads attached hereto as **Exhibit A**.

### A.    Proposed Direct Call Program

Class Counsel's proposed Direct Call Program, described with specificity for the first time in the January 30, 2013 SIP submission, is inappropriate as currently designed and should not be approved. First, Class Counsel offer no detail whatsoever as to what businesses would be "targeted" for the Direct Call Program, nor do they describe how they would identify businesses that are "in the class" in the first instance. (SIP Memo at 1.) Those in the Class are defined; but

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 15, 2013
Page 4

the Direct Call Program is divorced from the class definition. Thus, the scope of the potential calling campaign is unclear.

Second, to the extent details about the Direct Call Program are provided, they raise serious substantive and professional concerns about the appropriateness of the proposed campaign. BP objects to operators calling persons and entities, with no basis to know whether they are even in the Class, and identifying themselves as "calling on behalf of the court-approved BP Deepwater Horizon Economic Settlement" (SIP Tab G) — particularly where the operators have not been trained by the Court-Supervised Settlement Program and do not work with the Court-Supervised Settlement Program. Moreover, even if operators were appropriately trained (and there is no indication from Class Counsel's proposal as to what training, if any, that Direct Call Program operators would receive), representatives of the Court-Supervised Settlement Program should *not* be affirmatively contacting businesses: (a) with assumption that those businesses have any actual losses at all, much less losses caused by the spill; (b) with the assumption that they should file claims under the Settlement, and (c) asking those businesses if they have actually filed claims. It is not appropriate for the Claims Administrator or Court-Supervised Settlement Program personnel, who are serving a neutral adjudicative function, to be soliciting potential class members and encouraging them to participate or suggesting any view on the merits of their potential unsubmitted claims. *See* Settlement Agreement at §§ 4.1, 4.3.1, 4.4.7, 6. In fact, the Court-Supervised Settlement Program already has established processes in place for communicating with potential class members who have filed claims. To the extent such contacts are initiated by independent third-party media personnel, or media personnel engaged by Class Counsel, any representation that they are calling on behalf of the Court-Supervised Settlement Program would be inaccurate and misleading.

Moreover, the invasive outreach proposed by Class Counsel is misguided, as it would inevitably create unrealistic expectations among those who are contacted and encouraged to file a claim. Claims only should be filed by those who believe and attest that they have suffered a loss caused by the oil spill. That is what the Registration Form and Claim Form provide. Encouraging people and businesses to file claims to see whether they can get money under inaccurate pretenses is not appropriate.

In addition, the SIP, as described in the Settlement Agreement, contemplates another Class Notice approach; it does not anticipate or assume cold calls to businesses and individuals for whom there is no basis to believe that they have claims for losses caused by the oil spill. Such an approach is not contemplated by the Settlement Agreement and is likely to result in unnecessary and inappropriate, if not fraudulent, claims being made. Such an approach, which

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 15, 2013
Page 5

inevitably will lead to these adverse results, should not be approved or encouraged. In sum, the very concept of the Direct Call Program proposed by Class Counsel is flawed and should not be approved.

Finally, the proposed script for the Direct Call Program (SIP Tab G) contains inaccurate and misleading statements — beyond the misidentification of the source of the call — that should not be sanctioned by the Court or the Court-Supervised Settlement Program. Problematic language in the proposed script includes the following, among others (as set forth in the attached **Exhibit A(g)**):

- "BP has agreed that businesses and organizations are eligible for payment." This statement is false, omits the causation requirement, and should be qualified to state, "BP has agreed that if you or your business were harmed by the Deepwater Horizon Oil Spill, you may be eligible for payment." This language tracks the Class Notice and should not deviate from it.

- "Tens of thousands of businesses and organizations qualify for billions in BP settlement funds...." There is no empirical data supporting the quantification of businesses and organizations that actually qualify for compensation under the Settlement. In addition, the statement as written does not cite the causation requirement and inaccurately suggests that there is a dedicated pool of Settlement money to be distributed, when in fact there is no fixed fund. The statement should be amended to track the language of the Claim Form, Registration Form or Class Notice.

- "A farmer in north Louisiana qualified." This example is inappropriate and should not be used because the eligibility of the farmer in north Louisiana is the subject of a pending appeal, and also is subject to the parties' current dispute regarding implementation of the BEL Compensation Framework.

- "If you have any doubt about your eligibility…" This language suggests in the context of the call, without basis, that call recipients most likely are eligible for compensation under the Settlement and, further, incorrectly implies that recipients should presume they are eligible for compensation even if they know or doubt that they experienced any harm caused by the spill.[1]  This biased language should be deleted and replaced with more

---

[1]  Because a variation of this phrase ("As I've said before, if in doubt, file a claim") is included in the Court-approved "Juneau" television spot (SIP Tab C), Class Counsel may have mistakenly assumed that BP waived its

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 15, 2013
Page 6

> neutral language such as, "If you have any questions about eligibility or need further information…."

Class Counsel's representation that they have "communicated with ethics counsel" regarding the proposed direct call program (SIP Memo at 5) does not render their proposed program appropriate. To the contrary, both the content and the structure of the proposed Direct Call Program — as well as the entire SIP — quickly raised concern among the ethics experts BP consulted. Even as roughly sketched out by Class Counsel, the Direct Call Program, like other aspects of the SIP, raises issues of solicitation, advertising, misleading information, and the creation of improper expectations.

### B. Specific Proposed Content of SIP Spots and Communications

The scripts and materials submitted with the proposed SIP contain phrases and statements that are inaccurate and likely to confuse and misinform class members, as well as create unrealistic expectations about the Settlement. The following examples are particularly troubling and require appropriate revision before approval and implementation of Class Counsel's proposed SIP.

> ➢ *The written script for the previously-approved "Juneau" television spot must be updated to reflect previously-agreed revisions.* While the filmed television spot featuring Mr. Juneau correctly incorporates the changes agreed by the parties, the written "Juneau" script (SIP Tab C) does not reflect all of the changes and should be amended, as set forth in **Exhibit A(c)**, to reflect the edits and additions that were fundamental to the parties' discussion and to avoid any risk of confusion or error:

---

objection to this phrase. However, as previously noted, BP consented to use of that phrase in the "Juneau" spot solely as an accommodation so that the spot would not need to be re-filmed. To mitigate some of the effect of the phrase, moreover, the parties agreed that the "Juneau" television spot would include a written disclosure, superimposed on the screen, to make clear that claimants' losses must be a result of the Deepwater Horizon incident. There is no such disclaimer in the Direct Call scripts. Thus, BP has not in any way waived its right to challenge that statement in other SIP materials.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 15, 2013
Page 7

- A written statement to reflect that compensable losses must have been caused by the Deepwater Horizon incident ("Causation Statement") appears on the screen from approximately :07 through :12 of the filmed "Juneau" spot: "*Damages must be as a result of the Deepwater Horizon incident as provided in the Deepwater Horizon Economic and Property Damages Settlement Agreement.*" This important language, negotiated and agreed by the parties, should be inserted into the written "Juneau" script itself.

- Likewise, the text of the "newspaper headline" that appears on the screen from approximately :13 through :20 of the filmed and approved "Juneau" spot should be reflected in the written "Juneau" script (as well as the written scripts for the "Answers" and "Freeze Frame" spots, where the "newspaper headline" also appears), as noted in **Exhibit A(c)**.

- The parties previously agreed, and the Court echoed, that the "Juneau" spot (and indeed all SIP materials) should direct potential class members to the official Settlement website maintained by the Claims Administrator (www.DeepwaterHorizonSettlements.com), and not to any new site previously proposed by Class Counsel (such as www.BPRecoveryProject.com). The written "Juneau" script should be updated to reflect only the authorized website.

➤ *The proposed television, radio, and print spots and scripts omit the critical and previously-agreed Causation Statement that only economic losses caused by the Deepwater Horizon incident are compensable.* The written Causation Statement that was critical to approval of the "Juneau" television spot does not appear in the written scripts or actual television spots entitled "Answers" and "Freeze Frame" (SIP Tab C). As previously negotiated and agreed by the parties, the inclusion of this Causation Statement — "*Damages must be as a result of the Deepwater Horizon incident as provided in the Deepwater Horizon Economic and Property Damages Settlement Agreement*" — is essential to communicate the important causation requirement. The Causation Statement should be added to the written scripts for the "Answers" and "Freeze Frame," as set forth in attached **Exhibit A(c)**, and inserted as superimposed text in the corresponding spots. Likewise, this important Causation Statement must be added to the two radio spots (SIP Tab D) as set forth in attached **Exhibit A(d)**, and to the four print advertisements (SIP Tab E) as set forth in attached **Exhibit A(e)**, in order to avoid misleading and creating unrealistic expectations among potential class

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 15, 2013
Page 8

> members, particularly given that the spots and ads target regions within Zone D, where there is no causation presumption.

> ➤ *Several proposed spots make unsupportable and misleading assertions presented as fact.* The television script entitled "Freeze Frame" (SIP Tab C) begins with the statement, "Tens of thousands of businesses and organizations may qualify for BP Deepwater Horizon Economic Settlement Funds even though they aren't directly on the Gulf." However, there is no empirical data suggesting that tens of thousands of potential class members are actually eligible for Settlement funds even if they are remotely located from the Gulf itself, and this statement omits the causation requirement. The statement should track the Class Notice and be amended to, "Businesses and organizations that were harmed by the Deepwater Horizon Oil Spill may qualify for BP Deepwater Horizon Economic Settlement Funds even though they aren't directly on the Gulf," as set forth in attached **Exhibit A(c)**. Similarly, all four of the proposed print advertisements (SIP Tab E) feature misleading language that falsely suggests that all businesses and organizations are eligible for Settlement payments and inaccurately implies that there is a fixed fund of Settlement money to be distributed: "BP has agreed that businesses and organizations are eligible for payment from the billions in the Deepwater Horizon Economic Settlement fund." The text for all four print ads should be revised to track the Class Notice and state, "BP has agreed that businesses and organizations that were harmed by the Deepwater Horizon Oil Spill may be eligible for payment from the Deepwater Horizon Economic Settlement," as set forth in attached **Exhibit A(e)**.

> ➤ *The recommendation that Class Members should file claims as a default ignores the causation requirement.* One of the proposed print advertisements (SIP Tab E) encourages viewers, "When in doubt, file a claim." This phrase improperly suggests, without basis, that the viewer most likely is eligible for compensation under the Settlement. It also ignores the requirement that any request for compensation under the Settlement must be causally related to the Deepwater Horizon incident. And, it improperly suggests that a claimant can sign the Registration Form and Claim Form without having a belief and making a sworn attestation that the claim is for losses caused by the Deepwater Horizon Oil Spill. Accordingly, this phrase should not be a part of the SIP. Likewise, several of the proposed internet banner ads include language that encourages viewers to "File a claim" in order to "Find out if you qualify" (SIP Tab F), without reference to causation. These ads should be amended,

KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 15, 2013
Page 9

> as set forth in attached **Exhibit A(f)**, to eliminate any suggestion that people and
> entities should file claims as a default, without regard to causation.

➢ *The proposed use of Twitter "Tweets" is unclear, and some proposed language is
  misleading.* In general, Class Counsel has provided inadequate detail regarding the
  proposed use of Twitter. For example, from the limited information presented
  regarding the proposed Twitter effort (SIP Tab F), it is unclear what Tweet recipients
  would be clicking through "to see who qualifies" (proposed Tweet #2) or "to see if
  there is money waiting for you?" (proposed Tweets #4 and 8). The indicated link
  (Http:/bit.ly/TUuRup) should be changed to reflect the address of the official
  Settlement website (www.DeepwaterHorizonSettlements.com).    Indeed, it is
  inconceivable that a Tweet could possibly, in 140 characters, communicate the
  causation requirement and convey sufficiently accurate and not confusing or
  misleading information for a recipient to determine their eligibility for Settlement
  funds. In short, greater clarity and explanation is needed about the proposed Twitter
  feeds to allow BP to provide reasoned reaction and comment. In addition, BP objects
  to specific language in several of the proposed Tweets (SIP Tab F), as reflected below
  and in attached **Exhibit A(f)**:

  - The phrase, "qualify for BP money" (proposed Tweets #2, 3, 4, 5, 6, and 7) is
    objectionable because it includes no reference to the Settlement itself. It
    should be changed to "qualify for compensation under the BP Settlement."

  - The phrase "many businesses and organizations qualify for settlement funds"
    (proposed Tweet #1) should be amended to "many businesses and
    organizations harmed by the Deepwater Horizon spill may qualify for
    compensation under the BP Settlement."

  - The statement, "Businesses and organizations that aren't directly on the Gulf
    qualify for BP money" (proposed Tweet #3) should be amended to reflect the
    causation requirement: "Businesses and organizations harmed by the
    Deepwater Horizon spill that aren't directly on the Gulf may qualify for
    compensation from the BP Settlement."

# KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 15, 2013
Page 10

- The example that a "farmer in northern Louisiana qualified for BP money" (proposed Tweet #4) should be eliminated entirely because the eligibility of that claim is the subject of a pending appeal and is also subject to the parties' current dispute regarding implementation of the BEL Compensation Framework.

- The proposed Tweet stating, "When in doubt, file a claim" (proposed Tweet #9) should be eliminated entirely because it improperly suggests, without basis, that the Tweet recipient most likely is eligible for compensation under the Settlement. It also ignores the requirement that any request for compensation under the Settlement be causally related to the Deepwater Horizon incident.

- The phrase, "see if there's money waiting for you" (proposed Tweets #4 and 8) incorrectly suggests that there is a fixed fund of Settlement money to be distributed. It should be changed to "see if you might be eligible."

➢ *Internet Banner Ads Contain Inaccurate and Misleading Statements.* Several of the proposed internet banner ads (SIP Tab F) include the text, "qualify for a settlement from BP." This text is factually misleading. The Settlement has already occurred and been approved, and the only question is whether someone qualifies for a payment under the terms of the Settlement. This text should be more appropriately changed to, "qualify for compensation under the BP Settlement." There are several other instances of misleading and/or confusing text in the banner ads that are noted, with proposed amended text, in the attached **Exhibit A(f)**.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 15, 2013
Page 11

### C. Details Not Sufficiently Set Forth in SIP Proposal

The proposed SIP plan does not offer sufficient detail regarding all of the proposed communication efforts to allow BP a meaningful opportunity for review and comment. Section 4.4.15 of the Settlement Agreement provides BP the opportunity to review in advance and comment on any proposed SIP. Given the importance of accurate communications to the success and public perception of the Settlement, and the defects in the limited materials that Class Counsel has provided to BP, it is important that BP be permitted to review and provide input on *all SIP content* before approval and dissemination to potential class members. *See* Settlement Agreement at § 4.4.15. BP's input is a critical part of the SIP process and should not be treated as a mere formality. Rather, BP's substantive feedback should be carefully considered as a safeguard to ensure that each of the SIP's components is factually accurate, not misleading, and entirely consistent with the Class Action Settlement Notice Program, as required by the Settlement Agreement.

Here, significant substantive details regarding the proposed SIP are simply omitted. For example, in the memorandum describing the SIP, Class Counsel refers to the attached radio scripts (SIP Tab D) as "exemplars of the audio that would run" (SIP Memo at 4), apparently meaning that Class Counsel intends to change the content, including highlighted business types, of the radio scripts at some point in the future. Similarly, when discussing the proposed use of social media (SIP Tab F), Class Counsel refers to providing internet users with a "customized web experience" (SIP Memo at 4), again suggesting that Class Counsel intends to make post-approval alterations to SIP content with regard to social media and without notice or the opportunity to comment by BP or by the Court. BP objects to allowing Class Counsel this proposed carte blanche to alter the specific content of SIP communications without prior Court review and approval, contrary to Section 4.4.15 of the Settlement Agreement. BP — as well as the Court itself — must be permitted to review and comment upon *any* alterations to SIP content, including radio scripts and website content, before it is disseminated to potential class members as part of a BP-funded,[2] Court-approved SIP. *See* Settlement Agreement at § 4.4.15.

---

[2]    The Settlement Agreement requires BP to fund the SIP in an amount up to $5 million in total. *See* Settlement Agreement at § 4.4.15. To the extent that Class Counsel's estimated proposed budget actually exceeds the $4,520,174 currently allocated (SIP Tab B), BP will only furnish $5 million.

## KIRKLAND & ELLIS LLP

The Honorable Sally Shushan
February 15, 2013
Page 12

Accordingly, for these reasons, among others, BP requests that the Court defer consideration and approval of the proposed SIP plan until after the parties' dispute regarding the BEL Compensation Framework is finally resolved. In addition, BP asks that when the proposed SIP plan is ultimately considered, the Court require that certain changes be made, as outlined above, before the SIP is approved. Finally, if instead of the unprecedented SIP proposed, Class Counsel wish — as they should — to propose another version of the already-approved Class Notice, then BP would have no objection to using the pre-approved Class Notice language, or some version thereof, immediately. That language is accurate; was already approved by the Court; and according to experts on both sides, was clear and not confusing. It also will avoid any further disagreement or disputes between Class Counsel and BP regarding the language of the SIP. And, such a Class-Notice-based SIP could be implemented now, without risk.

Respectfully submitted,

Richard C. Godfrey, P.C.

Cc:    James Roy
       Steve Herman
       Brian Barr

RCG/cpl

# EXHIBIT A

# EXHIBIT A(c)

Mr. Pat Juneau – TV Script
Title: Deepwater
30 Second

Juneau to camera:

I'm Patrick Juneau, the court appointed claims administrator for the
BP Deepwater Horizon Economic Settlement.

BP has agreed that businesses and organizations are eligible for payment.

(Written disclaimer appears on screen:  "Damages must be as a result of the
Deepwater Horizon incident as provided in the Deepwater Horizon Economic
and Property Damages Settlement Agreement.")

And not just those directly on the Gulf.

A farmer in north Louisiana qualified. A bike shop in Florida.  A restaurant in north
Alabama…and a car dealership in Mississippi.

> **Comment [s1]:** BP agreed to use of this farmer in north Louisiana example for the "Juneau" spot only.

(Image of newspaper headline appears on screen, "BP Reaches Estimated $7.8
Billion Deal - Bloomberg.com 3/3/12.")Super: (on screen)

In general, businesses and organizations that had a decline in revenue for any
consecutive 3-month period between May and December 2010 as compared to
previous years may qualify. Go to
*DeepWaterHorizonSettlements.com*BPRecoveryProject.com for full information.

site change alt: *DeepWaterHorizonSettlements.com for more information.*

Juneau to camera:

There's a formula in place and if you fit, you qualify. As I've said before, if in
doubt, file a claim.

> **Comment [s2]:** BP agreed to the "if in doubt" language for this spot only.

Super: (on screen)
BPRecoveryProject.com (site change alt: *DeepWaterHorizonSettlements.com)*
1-886-992-6174
The Court Supervised Settlement Program

## TV Script

**"Answers"**
**30 Second TV Spot**

**Announcer VO:**

When it comes to qualifying for BP Deepwater Horizon Settlement Funds, people still have a lot of questions.

Do I have to be a fisherman?

The answer is no.

**(Written disclaimer appears on screen:  "Damages must be as a result of the Deepwater Horizon incident as provided in the Deepwater Horizon Economic and Property Damages Settlement Agreement.")**

Do I have to live on the Gulf Coast?

Again, the answer is no.

**(Image ~~on screen:~~ of newspaper headline ~~of newspaper~~ appears on screen: "BP Reaches Estimated $7.8 Billion Deal – Bloomberg.com 3/3/12." (~~ads that is the same as Juneau spot~~).**

Whether you own a restaurant,

A car dealership,

Or even a lumberyard.

…you may qualify.

Find out now if you qualify at DeepWaterHorizonSettlements.com.

Don't wait to get the answers you need.

**Comment [s1]:** Object because construction businesses fall squarely within the current BEL Compensation Framework dispute.

**TV Scripts**

**"Freeze Frame"**
**30 Second TV Spot**

**Announcer VO:**

~~Tens of thousands of b~~Businesses and organizations that were harmed by the Deepwater Horizon Oil Spill may qualify for BP Deepwater Horizon Economic Settlement Funds even though they aren't directly on the Gulf.

**(Written disclaimer appears on screen: "Damages must be as a result of the Deepwater Horizon incident as provided in the Deepwater Horizon Economic and Property Damages Settlement Agreement.")**

Truth is, whether you own a lumberyard,

**(Image ~~on screen:~~ of newspaper headline ~~of newspaper~~ appears on screen: "BP Reaches Estimated $7.8 Billion Deal - Bloomberg.com 3/3/12.")**~~that is the same as Juneau spot.~~

A car dealership,

Or even a restaurant, you may qualify.

Go to DeepWaterHorizonSettlements.com to learn if you do.

Everyday more hard working people are finding out they qualify and moving forward. Now is your chance to do the same.

> **Comment [s1]:** Object because construction businesses fall squarely within the current BEL Compensation Framework dispute.

# EXHIBIT A(d)

"Claim - LAMSAL"
Radio: 60 second
Voice Over

BP has agreed that businesses and organizations may be eligible for
payment from the BP Deepwater Horizon Economic Settlement Fund.

But when it comes to qualifying people still have a lot of questions.

Do I have to be a fisherman?

The answer is no.

Do I have to live on the Gulf Coast?

Again, the answer is no.  Businesses in all parts of Louisiana, Alabama and
Mississippi may qualify so long as damages were the result of the
Deepwater Horizon incident as provided in the Deepwater Horizon
Economic and Property Damages Settlement Agreement.

Visit deepwaterhorizonsettlements.com or call 1-866-992-6174 for more
information on this court approved settlement.

Whether you own a restaurant,

A car dealership,

Or even a lumberyard.

…you may qualify.

Visit DeepWaterHorizonSettlements.com or call 1-866-992-6174 to
learn more today.

There's a formula in place and if you fit, you qualify.

**Comment [s1]:** Object because construction
businesses fall squarely within the current BEL
Compensation Framework dispute.

"Claim FL"
Radio: 60 second
Voice Over

BP has agreed that businesses and organizations may be eligible for payment from the BP Deepwater Horizon Economic Settlement Fund.

But when it comes to qualifying people still have a lot of questions.

Do I have to be a fisherman?

The answer is no.

Do I have to live on the Gulf Coast?

Again, the answer is no. Businesses in all parts of the Florida panhandle and the Gulf Coast of Florida down to the Keys may qualify so long as damages were the result of the Deepwater Horizon incident as provided in the Deepwater Horizon Economic and Property Damages Settlement Agreement.

Visit deepwaterhorizonsettlements.com or call 1-866-992-6174 for more information on this court approved settlement.

Whether you own a restaurant,

A car dealership,

Or even a lumberyard.

…you may qualify.

Visit DeepWaterHorizonSettlements.com or call 1-866-992-6174 to learn more today.

There's a formula in place and if you fit, you qualify.

**Comment [s1]:** Object because construction businesses fall squarely within the current BEL Compensation Framework dispute.

# EXHIBIT A(e)



YOU DON'T HAVE TO BE
A FISHERMAN TO QUALIFY.

STOCK PHOTO

BP has agreed that businesses and organizations ~~are~~ eligible for payment from ~~the billions~~ that were harmed by the Deepwater Horizon Oil Spill may be
~~of~~ the Deepwater Horizon Economic Settlement ~~Fund.~~ Even ones that aren't directly on the Gulf.
FIND OUT IF YOU QUALIFY AT DEEPWATERHORIZONSETTLEMENTS.COM

DeepwaterHorizonSettlements.com
1-866-992-6174

The Court Supervised Settlement Program





(Object to professional services worker, as this fails squarely within pending BEL compensation framework dispute.)



YOU DON'T HAVE TO BE A FISHERMAN TO QUALIFY.

(Object to farmer, as this falls squarely within pending BEL Compensation Framework dispute.)

STOCK PHOTO

BP has agreed that businesses and organizations ~~are~~ eligible for payment from ~~the billions~~ *that were harmed by the Deepwater Horizon Oil Spill may be* ~~~the Deepwater Horizon Economic Settlement.~~~ Even ones that aren't directly on the Gulf.
FIND OUT IF YOU QUALIFY AT DEEPWATERHORIZONSETTLEMENTS.COM

DeepwaterHorizonSettlements.com
1-866-992-6174

The Court Supervised Settlement Program

# EXHIBIT A(f)

| Keyword | Global Monthly Searches | Local Monthly Searches |
|---|---|---|
| BP Settlement | 18,100 | 14,600 |
| Deepwater Horizon Settlement | 6,600 | 5,400 |
| BP Oil Spill Claim | 2,400 | 2,400 |
| BP Oil Spill Settlement | 2,400 | 2,400 |

| Headline | Text line 1 | Text line 2 | Link |
|---|---|---|---|
| Qualify for compensation under the BP settlement ~~money~~? | Find out if you qualify today. | Many people already have. | www.DeepWaterHorizonSettlements.com |
| Qualify for compensation under the BP settlement ~~money~~? | You may qualify for compensation ~~BP a settlement~~. | File a claim today. If you were harmed by the oil spill. | www.DeepWaterHorizonSettlements.com |
| Qualify for compensation under the BP settlement ~~money~~? | Find out if you qualify for a | compensation under the settlement ~~from BP. File a claim.~~ | www.DeepWaterHorizonSettlements.com |
| BP Settlement | Not directly on the Gulf? | You may still qualify if you were harmed by the oil spill. | www.DeepWaterHorizonSettlements.com |
| BP Settlement | Find out if you qualify for a | settlement compensation from the BP settlement. ~~File a claim.~~ | www.DeepWaterHorizonSettlements.com |
| BP Settlement | You may qualify for compensation ~~BP a settlement~~. | File a claim today. If you were harmed by the oil spill. | www.DeepWaterHorizonSettlements.com |
| BP Settlement Money | Find out if you qualify for a | settlement compensation from the BP settlement. ~~File a claim.~~ | www.DeepWaterHorizonSettlements.com |
| BP Oil Spill Claim | You may qualify for compensation ~~BP a settlement~~. | File a claim today. If you were harmed by the oil spill. | www.DeepWaterHorizonSettlements.com |
| BP Oil Spill Claim | Find out if you qualify for a | compensation under the settlement ~~claim today. File online.~~ | |
| BP Oil Spill Claim | Harmed by BP oil spill? | You may qualify for compensation under the a settlement. | www.DeepWaterHorizonSettlements.com |
| DeepWater Horizon Settlement | Find out if you qualify today. | ~~File a claim.~~ | www.DeepWaterHorizonSettlements.com |
| DeepWater Horizon Settlement | Looking for settlement information? | You may qualify for compensation under the BP settlement ~~money~~. | www.DeepWaterHorizonSettlements.com |
| DeepWater Horizon Settlement | Looking for information on the DeepWater | Horizon Settlement? Learn more. | www.DeepWaterHorizonSettlements.com |
| DeepWater Horizon Settlement | You or your business harmed by | Deepwater Horizon? File a claim. | www.DeepWaterHorizonSettlements.com |
| BP Oil Spill Settlement | Not directly on the Gulf? | You may still qualify if you were harmed by the oil spill. | www.DeepWaterHorizonSettlements.com |
| BP Oil Spill Settlement | Find out if you qualify for a | settlement compensation from the BP settlement. ~~File a claim.~~ | www.DeepWaterHorizonSettlements.com |
| BP Oil Spill Settlement | You may qualify for compensation under the ~~BP a~~ settlement. | ~~File a claim today.~~ If you were harmed by the oil spill. | www.DeepWaterHorizonSettlements.com |
| BP Oil Spill Settlement | Find out if you qualify for a | compensation under the settlement ~~claim today. File online.~~ | www.DeepWaterHorizonSettlements.com |

## BP Tweets

1. Many businesses and organizations harmed by the Deepwater Horizon spill may qualify for compensation under the for BP settlement funds from BP. See if you may qualify here: Http://bit.ly/TUuRupwww.DeepwaterHorizonSettlements.com

2. You don't have to be a fisherman to qualify for compensation under the BP settlementBP money. Click through to see who qualifies: Http://bit.ly/TUuRupwww.DeepwaterHorizonSettlements.com

3. Businesses and organizations harmed by the Deepwater Horizon spill that aren't directly on the Gulf may qualify for compensation from the BP settlementBP money. Qualify today Http://bit.ly/TUuRupwww.DeepwaterHorizonSettlements.com

4. A farmer in North Louisiana qualified for compensation under the BP settlementBP money. Click through to see if you might be eligible there's money waiting for you: Http://bit.ly/TUuRupwww.DeepwaterHorizonSettlements.com

   > **Comment [s1]:** Object to this example because the claim of a farmer in North Louisiana is the subject of a pending appeal and falls squarely within the current BEL Compensation Framework dispute.

5. A bike shop in Florida qualified for compensation under the BP settlementBP money. Visit Http:// bit.ly/TUuRupwww.DeepwaterHorizonSettlements.com to see if you do too

6. A restaurant in North #Alabama qualified for compensation under the BP settlementBP money. Visit Http://bit.ly/TUuRupwww.DeepwaterHorizonSettlements.com to see if you do too

7. A car dealership in #Mississippi qualified for compensation under the BP settlementBP money. Visit Http://bit.ly/TUuRupwww.DeepwaterHorizonSettlements.com to see if you do too

8. There's a formula in place to see if you qualify for money from ~~the~~ BP settlement. Visit
   Http://~~bit.ly/TUuRup~~www.DeepwaterHorizonSettlements.com to see if you might be eligible~~there's money waiting for you~~.

9. ~~When in doubt, file a claim for BP settlement funds. Visit~~
   ~~Http://bit.ly/TUuRup~~
   ~~today~~www.DeepwaterHorizonSettlements.com

> **Comment [s2]:** Object because this statement ignores the causation requirement and suggests, without basis, that the recipient most likely is eligible for compensation under the Settlement.

# EXHIBIT A(g)

*Draft phone script for the court approved BP Deepwater Horizon Economic Settlement.  This script is written based on contacting targeted businesses.*

> **Comment [s1]:** Not clear what the "targeted businesses are"

[Once the business owner and/or decision maker of the business is on the phone]: Hi, this is _____ and I am calling ~~on behalf ofabout~~ the Court Approved BP Deepwater Horizon Economic Settlement.  BP has agreed that if you or your business were harmed by the Deepwater Horizon Oil Spill, ~~businesses and organizations areyou may be~~ eligible for payment.  ~~Tens of thousands of bBusinesses~~ and organizations that were harmed by the Deepwater Horizon Oil Spill may qualify for ~~billions in~~ BP settlement funds and not just those located directly in the Gulf.  The purpose of my call today is to see if you have already filed a claim or if you are in the process of filing a claim.

> **Comment [s2]:** Objection to calling on behalf of CA

[Record status]
A)   Have already filed a claim

B)   In the process of filing a claim

C)   Unsure if we are eligible to file a claim

**[IF A - Already filed a claim]:** That's great.  We just wanted to touch base and make sure you have the information that you need and direct you to the website if you have any questions.  (If needed, the website is ***DeepWaterHorizonSettlements.com***).  The Claims Administrator ~~We also have~~ has a call center of trained representatives that can assist you with any questions that you may have.

**[IF B or C – In the process of filing or unsure if eligible]:**

OK. For example: ~~A farmer in north Louisiana qualified.~~ A bike shop in Florida qualified.  A restaurant in north Alabama…and a car dealership in Mississippi. If you have any questions~~doubt~~ about ~~your~~ eligibility or need ~~any~~ further information, the website is *DeepWaterHorizonSettlements.com*.  Or if you prefer, we can connect you to the Claims Administrator's ~~our~~ call center where trained representatives will explore your eligibility and/or help you file your claim. [Call Associate will transfer calls to the call center as deemed appropriate.]

Thank you for your time today, hopefully we've been able to provide some helpful information.

> **Comment [s3]:** Object to this example because the claim of a farmer in North Louisiana is the subject of a pending appeal and fall squarely within the current BEL Compensation Framework dispute.

# Exhibit J

TO:              **Honorable Sally Shushan**

FROM:            **Class Counsel**

Matter:          ***In re:  Deepwater Horizon*, MDL No. 2179**

Subject:         **Supplemental Information Program**

Date:            **February 19, 2013**
_____

   Through this memorandum, Class Counsel provides its responses to BP's comments, concerns and objections to Class Counsel's proposed plan for the Supplemental Information Program.  Keeping in mind that BP does not have the right to approve the Program and is only allowed to review and comment, Class Counsel continues to believe that the proposed Supplemental Information Program is "consistent with the goals of the Economic Class Action Settlement Notice Program" and should be approved.

   BP's comments and objections completely ignore the fact that:

- The entire purpose and intent of the Supplemental Information Program was and is to motivate potentially eligible people and businesses to submit claims;
- There is nothing "misleading" about encouraging a business that may be eligible for payment to submit a claim;
- There is nothing "fraudulent" about a business who meets the objective criteria set forth in the Business Economic Loss Causation and Compensation Framework submitting a claim;
- The only reason Class Counsel agreed to the "disclaimer" on the television advisory which had been scripted by and recorded by Mr. Juneau was to expedite approval and to avoid having to potentially re-shoot the spot; Class Counsel never agreed with BP that the "disclaimer" was in any way necessary.

**A.     Supplemental Information Program Should Not Be Deferred**

  1.  <u>BP's Comment</u>:  The Supplemental Information Program Should be Deferred until such Time as the BEL Framework Dispute is Resolved

  2.  <u>Class Counsel's Response</u>:  The Supplemental Information Program and the BEL Framework Dispute are Not Related and the Supplemental Information Program Should Not be Deferred

The dispute surrounding the implementation of Exhibit 4C (which also impacts 4A and 4B) has no bearing on the Supplemental Information Program. While Class Counsel believes that BP is attempting to re-write the settlement agreement through its proposals, the dispute itself is not about the types of businesses eligible to file claims for compensation in the Settlement Program. That dispute pertains primarily to the methodology for making calculations under the settlement agreement. In contrast, each of the business types highlighted in the Supplemental Information Program is unquestionably eligible to file a claim. These are not excluded businesses. Whether these businesses meet the objective causation test and qualify for compensation will depend on the respective financial statements for that business and the manner of calculation; however, there is no question they are eligible to file and have that determination made by the Program. This is the exact message of the Supplemental Information Program: If in doubt, file a claim.

**B.  BP Overstates the Agreement with Class Counsel on the Script from Mr. Juneau**

1. <u>BP Comment</u>: The Disclaimer Agreed to for the Juneau Spot Should be Included in All Supplemental Information Program Spots

2. <u>Class Counsel Response</u>: Class Counsel Did Not Agree to Include the Disclaimer in All Supplemental Information Program Spots and Only Agreed to Include the Disclaimer in the Juneau Spot for specific and particularized reasons. Further, the disclaimer, as requested by BP, could mislead class members into believing they are not eligible to file claims.

BP overstates the agreement with Class Counsel pertaining to the advertisement recorded by Mr. Juneau. Class Counsel agreed that the ad would refer solely to the deepwaterhorizonsettlement.com website. As Class Counsel understands, the Court determined that the Supplemental Information Program should only reference the Program website, and Class Counsel has made that change in the advertisement. However, the agreement as to the superimposed text ("Damages must be a result of the Deepwater Horizon incident as provided in the Deepwater Horizon Economic and Property Damages Settlement Agreement") was only for the advertisement produced with Mr. Juneau. Class Counsel made such a concession given Mr. Juneau's role in the implementation of the settlement agreement pursuant to Court Order and to expedite approval of the Juneau advertisement without having to inconvenience Mr. Juneau any further. Class Counsel did not and does not agree that the language is necessary or that it "convey[s] the causation requirement for economic loss claims" as suggested by BP.

The causation requirement for economic loss claims is set out in Exhibit 4B and does not require a subjective view of the cause of any class member's loss. The causation requirement is intentionally objective. If a class member meets the objective financial test, that class member suffered damages as a result of the

incident.  Requiring this language in all other supplemental informational pieces could potentially cause eligible class members to believe they do not have claims as part of this settlement.  Given the Class Notice, Final Approval and that BP has gotten a class-wide release from all such businesses, such an impression should be avoided.

**C.     Tbe Proposed Content of Supplemental Information Program Spots and Communications are Accurate and Consistent with the purpose of the Class Notice Plan**

   1.  <u>BP's Comment</u>:  The Content of the Proposed Spots are Misleading and Could Cause Class Members Who Will Not Ultimately Qualify to File Claims

   2.  <u>Class Counsel Response</u>:  The Communications Proposed Are Accurate and Consistent with the Class Notice Program.  Further, All Class Members Should Be Informed that they are Eligible to File Claims.  Each Class Member has a Right to Have Its Claim Viewed in the Best Light by the Claims Administrator Based Upon its Financial Information.  Whether the Class Member Ultimately Qualifies for Payment is Not Relevant to the Supplemental Information Program

The proposed Supplemental Information Program is accurate and will not lead to confusion or create unrealistic expectations.  Each piece of the program sets out the basic premise of the settlement; eligibility for all class members is determined by an objective formula (or is presumed).  The Program does not allude to or state any compensation figures to even suggest the level of compensation to which each class member may be entitled.  Instead, the plan simply reinforces the Class Notice in that it informs each and every class member, including those in the furthest points of Zone D, a formula is in place that will determine their eligibility for compensation.  These statements are true and cannot be disputed.  While BP may prefer that these claimants not file claims, its argument that Class Counsel's proposal is inaccurate or confusing is misplaced.

*Written Script for the "Juneau" television spot*

An updated script as requested by BP is attached as Exhibit A.  However, Class Counsel would point out that BP and the Court were provided the actual video of the advertisement.  The requested changes were made in the video, and the video is the means of communication to class members – not the written script.  Still, to cure this harmless error, Class Counsel has attached the revised and updated script.

*The proposed television, radio, and print spots and scripts are accurate as written and do not require a "disclaimer"*

Again, Class Counsel did not agree to include the negotiated language for the Juneau spot into all other advertisements in the Supplemental Information Program. BP's argument to include such language is, in fact, counter to the purpose of the Supplemental Plan. Class Counsel's goal is to reinforce the Class Notice and further stress that causation is an objective requirement established by the standards and formulas of Exhibit 4B. BP now desires to insert a subjective causation requirement as to whether a class member believes their losses were subjectively caused by the incident. BP's suggestion is not consistent with the negotiated settlement and serves only to attempt to minimize the number of class members that file claims. This attempt is untenable in this objective class action settlement – particularly given the class-wide release.

In light of the above, Class Counsel does not believe BP's language should be added to any of the other advertisements. Further, it is not possible to add this language to the radio spots as each of these spots is timed to fit within a specific timeframe.

*All of the statements in the advertisements are accurate and consistent with the known facts and terms of the settlement agreement*

BP's comment as to the "tens of thousands of businesses and organizations may qualify" is without merit. Class Counsel is not required to submit empirical data proving tens of thousands of business may qualify. There is no question that tens of thousands (and more likely hundreds of thousands) of businesses are eligible to file and may qualify. In fact, as of February 11, 2013, over 125,000 claim forms on behalf of businesses and organizations have been submitted.[1] The fact that these claims have been submitted prior to any Supplemental Information Program implies that indeed, "tens of thousands of businesses and organizations may qualify." Thus, the statement at issue is true. Importantly, the statement does not guarantee that any of these businesses will actually qualify. That is not the point of the advertisement. The point is to further reinforce the Class Notice so that these businesses perform, or submit the claim to the Settlement Program so it can perform, the objective causation analysis prescribed in Exhibit 4B. Class Counsel's proposed language should be approved.

BP has also commented that the statement that "BP has agreed that businesses and organizations are eligible for payment from the billions in the Deepwater Horizon Economic Settlement fund" implies that the fund may be limited. Class Counsel proposes the following language to cure this concern as Class Counsel does not intend to imply a limited fund: "BP has agreed that businesses and organizations may be eligible for payment from the Deepwater Horizon Economic

---

[1] See Claims Administrator's Status Report #6, (Feb. 11, 2013).

Settlement Fund. Even ones not directly on the Gulf. Find out if you qualify for this uncapped settlement estimated to be worth billions at deepwaterhorizonsettlements.com" Further, Class Counsel is happy to refer to BP's own public estimates of the settlement value should BP wish.

*Class Members should be encouraged to file claims as a default as all class members, even those who do not qualify for payment, have provided BP with a class-wide release.*

BP has focused on the language "when in doubt, file a claim" to argue that class members should not, as a default, file claims with the Program and that such language ignores the causation requirement. Again, the causation requirement is an objective standard (in a presumed zone with a presumed zone business) or formula. There is not a subjective, mental impression requirement. Representing that such a requirement exists misrepresents to class members their rights under the settlement agreement. BP is attempting to hide the ball. BP has a class-wide release but does not want class members to file a claim. Further, the settlement agreement was negotiated and implemented for the exact purpose of allowing class members to file claims as a default.

One of the principal settlement benefits to class members was the requirement that the Program ensure that the maximum amount of recovery is provided to each class member. A class member is not required to have a detailed knowledge of the intricacies of the causation requirement. While it was intended that the causation requirement be a simple formula for a class member to understand and determine if he or she is eligible for payment, it is not required that they do so. Instead, the Settlement Program will calculate the claim *de novo* and ensure that the best case is presented for a class member to be found eligible and to maximize compensation. In fact, the Claim Form even allows a class member to choose "Claims Administrator Selected" as an option for the Benchmark and Compensation Period. Thus, the idea that businesses should not default to filing a claim is simply wrong. Rather, the opposite is true: if a business is unsure of whether it meets the eligibility requirements, it should be encouraged, as a default, to file a claim.

*BP misunderstands the proposed use of Twitter "Tweets" and the proposed language is accurate and consistent with the purpose of the Class Notice*

BP's first comments as to the use of Twitter reflect a misunderstanding of how Twitter operates. For that, Class Counsel accepts responsibility. A Tweet is limited to 140 characters. The website link referenced in a tweet counts against the 140 character limit. Thus, displaying www.deepwaterhorizonsettlement.com would require a substantial portion of the 140 character limit. To overcome this limit, software presently available on the internet, like that provided on tinyurl.com, can take a long website name like the name above and condense it to a much shorter name, like http:/bit.ly/TUuRup. This allows a Tweet to focus more information on the content of the tweet rather than the website. However, by clicking on the

website, a user will be directed to the Settlement Program site, www.deepwaterhorizonsettlement.com.  In short, the Settlement Program website is the site linked; however, the appearance on the link has been condensed to fit within the 140 character limit.

Given the 140 character limits, it is not possible to implement BP's suggestions.  Further, BP's suggestions are not necessary as the statements are consistent with the Class Notice and the Settlement Agreement.  Further, the website to which recipients are directed is the Settlement Program website.  It is inconceivable that a simple tweet that directs class members to the Settlement Program site could be misleading or confusing.

*Internet Banner Ads Are Accurate and Not Misleading*

Most of BP's comments and suggestions are repeats of its comments and objections on other portions of the Supplemental Information Program and are addressed above.  However, BP has pointed out that the Google banner ads state "qualify for a settlement from BP" and complains that this is factually misleading.  The intent with this language was to use plain English that all class members clearly comprehend.  While most class members may understand the term "compensation," the term "settlement" is certainly better understood and also implies the legal nature of this proceeding.  To satisfy BP's comment, Class Counsel could edit the "qualify for a settlement from BP" language to "qualify for payment from BP" or possibly "qualify for payment under the BP Settlement."  Nearly all of the other BP comments have been addressed in detail above or are not possible within the limited space of an internet banner ad.  Again, the ad clicks straight through to the Settlement Program website and is designed to capture attention in keeping with the primary purpose of the Supplemental Information Program.  Class Counsel's proposal satisfies that purpose and is consistent with the Class Notice program.

*Proposed Direct Call Program*

Most of BP's comments as to the proposed direct call program are, again, without merit.  For instance, BP questions how Class Counsel would identify which businesses are in the class.  Class Counsel has the ability, as BP is fully aware given the Class Notice and requirements of a class action, to determine which businesses are in the class.  Perhaps, BP intended something else but such a statement seems particularly odd in the present context of a finally approved settlement of an identifiable class.

Further, as set out above, the inaccuracies BP states regarding the script are meritless.  Still, Class Counsel understands BP's concerns and comments regarding the Direct Call Program and would like to attempt to resolve these issues with BP.  In that light, Class Counsel proposes that it be allowed to further work with BP to refine the Direct Call Program.  Notably, the entirety of the other components of the Supplemental Information Program can stand on their own and should be approved.

If BP and Class Counsel are able to reach agreement on the Direct Call Program, Class Counsel will submit such agreement to the Court for approval.

**D.      Class Counsel has Provided Sufficient Detail to BP to Meaningfully Comment on the Supplemental Information Program**

  1. <u>BP's Comment</u>:  Class Counsel Has Not Provided Enough Detail to Meaningfully Comment on the Details of the Proposed Settlement Program

  2. <u>Class Counsel Response</u>:  Class Counsel has Provided Sufficient Detail to Allow BP to Exercise its Rights Under the Settlement Agreement to Comment on the Proposed Supplemental Information Program.

  BP has misunderstood some of the statements in Class Counsel's memo describing the Supplemental Information Plan.  As a further explanation, Class Counsel's comment on the radio scripts – particularly the language that sets out the scripts are "exemplars of the audio that would run" is not an indication that Class Counsel intends to change the scripts outside of the manner described in the settlement agreement.  The statement simply conveys that Class Counsel intends to have radio spots that highlight different businesses that may qualify.  The only edit would be to the business type.  No other language would change.  As the business types that are eligible to file a claim are readily ascertainable and not objectionable, BP's concern is baseless.  To be clear, there would be no wholesale re-write of the radio script without allowing BP to comment and submitting to the Court for approval.  Class Counsel fully understands its obligations under the settlement agreement.

  As to social media, BP misunderstands Class Counsel's comment on a "customized web experience."  The banner ads, tweets and other social media set out in the plan would not change.  The "customized web experience" was simply a description of the everyday use of the internet.  Any user of the internet has a somewhat customized experience.  The banner ads seen on pages visited are different for different internet users based upon searches performed and websites visited as determined by cookies and other information.  This information is stored on each internet user's computer and internet banner ads that should interest the specific internet user based upon information on their computer will appear on pages visited.  This is all that was meant by the customized web experience.

  Class Counsel is unsure of any other additional detail it can provide BP.  BP has been provided, for some time now, the scripts, actual spots, banner ads, print ads, budgets, buys, proposed tweets and all other components of the supplemental program.  BP's statement that it has not received enough information to allow a

meaningful review is without merit.[2]  Many of BP's suggestions are factually inaccurate and serve as an attempt to depress the number of claims filed.  Class Counsel's purpose is simple.  To reinforce the idea that all businesses and individuals, other than excluded businesses and individuals, may qualify for payment in all areas of the Class.  The Supplemental Information Plan proposed by Class Counsel meets that goal in a manner that accurately depicts the settlement agreement and is consistent with Class Notice.

The proposed Supplemental Information Program is accurate and consistent with the purpose of the Class Notice Program.  As such, it should be approved as proposed by Class Counsel with the exception of the Direct Call Program – which Class Counsel is willing to discuss further with BP.

---

[2] For instance, in its memo BP parenthetically refers to the Juneau ad being shot prior to BP's review of the script.  See BP Memo at 3.  Any implication that Class Counsel somehow orchestrated anything underhanded in the production of this ad is incorrect.  As explained repeatedly by Class Counsel, the timing of the shoot was done at Mr. Juneau's request, out of courtesy to his schedule and availability, and the ad that was cut was entirely based upon a script Mr. Juneau personally helped write and approve.

# Exhibit K

**Godfrey, Richard C.**

| | |
|---|---|
| **From:** | Brian Barr [BBarr@levinlaw.com] |
| **Sent:** | Wednesday, March 06, 2013 4:34 PM |
| **To:** | Sally_Shushan@laed.uscourts.gov; 'Ben_Allums@laed.uscourts.gov |
| **Cc:** | SHERMAN@hhklawfirm.com; Jim Roy; Godfrey, Richard C.; Bloom, Wendy L.; *mark.Holstein@bp.com |
| **Subject:** | RE: Class Counsel's Response to BP's Comments to the Proposed Supplemental Information Program |

Judge Shushan/Ben:

Now that Judge Barbier has issued his Order on the Matching of Revenue and Expenses, Class Counsel would like to get the Supplemental Notice Plan implemented. I believe both sides have provided their comments and the issue is ready for determination. Thanks for your consideration!

**From:** Brian Barr
**Sent:** Tuesday, February 19, 2013 6:44 PM
**To:** Sally Shushan (Sally_Shushan@laed.uscourts.gov); "Ben_Allums@laed.uscourts.gov'
**Cc:** Steve Herman (SHERMAN@hhklawfirm.com); Jim Roy; Godfrey, Richard C. (rgodfrey@kirkland.com); Bloom, Wendy L. (wbloom@kirkland.com); mark.Holstein@bp.com
**Subject:** Class Counsel's Response to BP's Comments to the Proposed Supplemental Information Program

Judge Shushan/Ben:

Attached is Class Counsel's memorandum in response to BP's comments on the Supplemental Information Program. Thanks for your attention to this matter.

Brian Barr
Attorney at Law
Levin, Papantonio, Thomas, Mitchell, Echsner, Rafferty & Proctor, P.A.
316 S. Baylen Street
Pensacola, FL 32501
850-435-7044 V
850-436-6044 F

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION

IN ERROR, DO NOT READ IT. PLEASE IMMEDIATELY REPLY TO THE SENDER THAT YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR.  THEN DELETE IT. THANK YOU.

# Exhibit AA

No. 13-30315
(consolidated with No. 13-30329)

———————————————————

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————————————

## IN RE:  DEEPWATER HORIZON

———————————————————

On Appeal from the United States District Court
for the Eastern District of Louisiana
MDL No. 2179, Civ. A. No. 12-970

———————————————————

**DECLARATION OF DANIEL A. CANTOR**

1.   I am a partner in the law firm of Arnold & Porter LLP, resident in the firm's Washington, D.C. office.  I am counsel for BP Exploration & Production Inc., BP America Production Company, and BP p.l.c. (collectively, "BP") in the above-captioned case.  I am over the age of 18 and, if called, competent to testify to the facts set forth herein.

2.   In connection with my representation of BP, I have reviewed and become familiar with the Economic and Property Damages Settlement, as amended, in the above-captioned case. I have reviewed numerous claims awards made by the Court-Supervised Settlement Program (CSSP) pursuant to that Settlement, the briefing of appeals of claims awards by BP or Claimants, and related claims files available through the Settlement Program portal.  I also have received, on behalf of BP, communications from the Settlement Program regarding its processing of claims pursuant to the District Court's preliminary injunction.

3. After the Fifth Circuit issued its October 2, 2013 decision in the BEL appeal, the District Court temporarily enjoined payments by the Settlement Program with respect to BEL claims for which the proper matching of revenues and expenses was at issue. The Settlement Program responded by effectively suspending payment of BEL claims pending further guidance from the District Court. On October 18, 2013, the District Court entered its preliminary injunction barring payment of all BEL claims where matching is at issue but directing the Claims Administrator to process and pay all BEL claims supported by properly matched accrual-type records.

4. The Settlement Program's Appeals Coordinator and its legal counsel have recently informed the parties that, pursuant to the District Court's preliminary injunction, the Settlement Program is proceeding with the processing and payment of awards under the BEL framework that (i) pre-date the United States Court of Appeals for the Fifth Circuit's October 2, 2013 decision and (ii) were not appealed on the basis of failure to match revenues and expenses. According to the Settlement Program's Appeals Coordinator, the Settlement Program is proceeding with such awards at a rate of approximately 25 per day going forward, subject to notice and an opportunity for the parties to object that the award was in fact appealed on the basis of failure to match revenue and expenses.

5. To date, the Settlement Program has given the parties notice that it intends to proceed with, and, subject to the completion of the Settlement Agreement's internal appeals process, pay multiple awards that lack any colorable nexus to the Deepwater Horizon spill. One such example is as follows:

2

- Claim No. xxx15:  The Settlement Program awarded Claimant approximately $660,000.  Claimant is a family medical practice located approximately 150 miles from the Gulf of Mexico.  Claimant did not incur a loss as a result of the Deepwater Horizon spill.    From February-August 2010, the physician who had previously generated the most revenue for Claimant was unable to practice medicine and therefore generate revenue because his medical license had been suspended by the State of Alabama.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 21st day of November, 2013 in Washington DC.



/s/ Daniel A. Cantor
Daniel A. Cantor