# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-30315
IN RE: DEEPWATER HORIZON

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED; BON SECOUR FISHERIES, INCORPORATED; FORT MORGAN REALTY, INCORPORATED; LFBP 1, L.L.C., doing business as GW Fins; PANAMA CITY BEACH DOLPHIN TOURS & MORE, L.L.C.; ZEKES CHARTER FLEET, L.L.C.; WILLIAM SELLERS; KATHLEEN IRWIN; RONALD LUNDY; CORLISS GALLO; JOHN TESVICH; MICHAEL GUIDRY, on behalf of themselves and all others similarly situated; HENRY HUTTO; BRAD FRILOUX; JERRY J. KEE,
*Plaintiffs - Appellees*
v.
BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA PRODUCTION COMPANY; BP PIPE LINE COMPANY,
*Defendants - Appellants*

On Appeal from the United States District Court
for the Eastern District of Louisiana
MDL No. 2179, Civ. A. No. 12-970

## APPELLEES' OPPOSITION TO EMERGENCY MOTION FOR INJUNCTION

Stephen J. Herman
Herman, Herman & Katz LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: sherman@hhklawfirm.com
*Co-Lead Class Counsel*

James Parkerson Roy
Domengeaux, Wright, Roy, &
   Edwards LLC
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com
*Co-Lead Class Counsel*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record for Appellees certify that the Certificate of Interested Persons as set forth by Appellants in their Motion is complete. Undersigned are not aware of any other interested persons under *Fed. R. App. Proc.* 28.2.1.

<u>/s/ Stephen J. Herman and James Parkerson Roy</u>
*Co-Lead Class Counsel*

# **TABLE OF CONTENTS**

Certificate of Interested Persons.     .     .     .     .     .     .     2

Table of Contents .     .     .     .     .     .     .     .     3

Table of Authorities     .     .     .     .     .     .     .     .     4

Jurisdiction in this Honorable Court is Lacking     .     .     .     .     5

The Parties Agreed that Eligible Claimants and/or Class Members
Would Have to Establish a Traceable Loss "As A Result Of" the Spill
Under the Objective Causation Tests Set Forth in the Settlement Agreement . 7

      Causation Is a Separate, Distinct and Integral Requirement of the
      Settlement Agreement     .     .     .     .     .     .     10

      BP Has Not Established That Any Claim Did Not Suffer a Loss
      As a Result of the Spill     .     .     .     .     .     .     13

BP Made Numerous Representations to the Court in Support of the Objective
Causation Requirements for BEL Claims, and Is Judicially Estopped from
Raising These Contrary Arguments Following Approval  .     .     .     14

The Settlement Agreement is a Valid and Enforceable Contract .     .     28

      Article III Standing is Satisfied for Rule 23 Purposes

      Rule 23, the Rules Enabling Act, and Article III Are Irrelevant to the
      Contractual Interpretation Issues, and Cannot Alter or
      Invalidate the Substantive Rights of the Parties     .     .     .     32

Conclusion  .     .     .     .     .     .     .     .     .     34

Certificate Regarding Page and Type Requirements.     .     .     .     37

Certificate of Electronic Compliance  .     .     .     .     .     38

Certificate of Service     .     .     .     .     .     .     .     39

Exhibits

      Ex. A – BP Proposed Tutorial re Settlement (May 7, 2012)

      Ex. B – GCCF Payment Maps (Summer 2011)

## TABLE OF AUTHORITIES

In re AIG Securities Litigation, 689 F.3d 229 (2d Cir. 2012)    .    .    31

Amchem Products v. Windsor, 521 U.S. 591 (1997)    .    .    .    29-30

Butler v. Sears Roebuck & Co., 727 F.3d 796 (7th Cir. 2013)    .    .    31

Comcast Corp. v. Behrend, 133 S.Ct. 1426 (2013) .    .    .    .    29

In re: Deepwater Horizon, 808 F.Supp.2d 943 (E.D.La. 2011)    .    .    13, 30, 32

In re: Deepwater Horizon, 732 F.3d 326 (5th Cir. 2013)    .    .    10, 27-28, 30

Ehrheart v. Verizon Wireless, 609 F.3d 590 (3d Cir. 2010)    .    .    28, 31, 33

Mims v. Stewart Title Guar. Co., 590 F.3d 298 (5th Cir. 2009)    .    .    30

In re Paige, 610 F.3d 865 (5th Cir. 2010)    .    .    .    .    .    28

Richardson v. United States, 468 U.S. 317 (1984)    .    .    .    .    30

In re Syncor ERISA Litig., 516 F.3d 1095 (9th Cir. 2008).    .    .    33

OIL POLLUTION ACT OF 1990 ("OPA"), 33 U.S.C. ¶¶ 2701, et seq.    .    13

David W. Robertson, The Oil Pollution Act's Provisions on
    Damages for Economic Loss, 30 MISS.C.L.REV. 157 (2011)    .    13, 30

## JURISDICTION IN THIS COURT IS LACKING

The BP Parties filed a new Notice of Appeal yesterday in the District Court.[1] The Orders from which that appeal is sought are not final and appealable judgments under Rule 54.

Hence, the BP Parties captioned their Emergency Motion to be filed in No. 13-30315. However, as expressly acknowledged by BP in Appellants' Reply Brief,[2] and by BP's Counsel during the July 8, 2013 Oral Argument,[3] the issues regarding causation that are the subject of BP's Emergency Motion were not, and are not, before this Honorable Court.

Moreover, the Settlement Agreement, approved by Court Order,[4] provides that the Claims Administrator shall implement and administer the Settlement, "consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court."[5] Any disputes over the interpretation and application of the Settlement Agreement shall be addressed by a Claims Administration Panel, and, in the absence of unanimous agreement, "referred to the Court for resolution."[6] The Court is defined as "the United States District Court for the Eastern District of Louisiana, Judge Carl Barbier, presiding."[7]

---

[1] Doc. 11879.

[2] *See* APPELLANTS' REPLY BRIEF, No. 13-30315 (May 31, 2013), p.19 [Fifth Cir. Doc. 00512259592, at 28].

[3] *See* Unofficial Transcript of Hearing before U.S. Fifth Circuit Court of Appeals in Case No. 13-30315 (July 8, 2013), at pp.10-14 [Doc. 11826-2].

[4] *See* ORDER AND JUDGMENT [Doc. 8139], which is the subject of a separate appeal in this Honorable Court, No.13-30095.

[5] SETTLEMENT AGREEMENT, Section 4.3.1.

[6] SETTLEMENT AGREEMENT, Section 4.3.4.

[7] SETTLEMENT AGREEMENT, Section 38.40.

With respect to this particular issue, the Claims Administrator issued a Policy Statement that BP agreed to on October 10, 2012.[8]  BP confirmed its agreement with that Policy Statement in Court on December 12, 2012.[9]  As set forth more fully herein, BP is judicially estopped from raising the arguments set forth in its Motion.  However, to the extent BP seeks to repudiate its well-established position and agreement on the subject from the time the Settlement Agreement was filed in April 2012 through final approval in December of 2012, there is no jurisdiction in this Honorable Court, as such issues have been fully and finally resolved by the District Court.

While Judge Clement noted that Class Counsel did not explicitly make this argument in response to the original appeal of the Compensation Framework interpretation in No. 13-30315,[10] Class Counsel did specifically raise this issue in

---

[8] ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION (Oct. 10, 2012), No.2. [Doc. 8963-71] ("The Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in the Settlement Agreement. Both Class Counsel and BP have in response to the Claims Administrator's inquiry confirmed that this is in fact a correct statement of their intent and of the terms of the Settlement Agreement. The Claims Administrator will thus compensate eligible Business Economic Loss and Individual Economic Loss claimants for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, without regard to whether such losses resulted or may have resulted from a cause other than the Deepwater Horizon oil spill provided such claimants have satisfied the specific causation requirements set out in the Settlement Agreement.  Further, the Claims Administrator will not evaluate potential alternative causes of the claimant's economic injury").

[9] E-MAIL FROM JUDGE BARBIER re "MEETING TODAY re NON-PROFITS AND SIP" (Dec. 12, 2012) [Doc. 8963-75] ("Counsel for BP and the PSC agree with the Claims Administrator's objective analysis of causation with respect to his evaluation of economic damage claims, as previously set forth by Mr. Juneau in paragraph 2 of his October 10, 2012 policy announcement").

[10] In re: Deepwater Horizon, 732 F.3d 326, 332 n.3 (5th Cir. 2013).

the District Court,[11] and strongly suggested that this Honorable Court had no jurisdiction to hear that appeal.[12]

Frankly, most of the arguments in BP's Motion appear directed, not to this Panel, but to the Panel presiding over the issue of Rule 23 approval, in No. 13-30095. It seems curious that BP is returning to this Panel with what is largely a re-styled regurgitation of what was just argued and submitted to that Panel on November 4, 2013.

In any event, jurisdiction over BP's Motion is lacking.

## The Parties Agreed that Eligible Claimants and/or Class Members Would Have to Establish a Traceable Loss "As A Result Of" the Spill Under the Objective Causation Tests Set Forth in the Settlement Agreement

The *Deepwater Horizon* Economic and Property Damages Settlement Agreement forms a contractual agreement between the BP Parties and participating classmembers who submit claims to the Settlement Program.[13]

---

[11] *See* OPPOSITION TO MOT FOR INJUNCTION [Doc. 9087], at p.4; TRANSCRIPT OF HEARING ON MOT FOR INJUNCTION (April 5, 2013), at p.40.

[12] *See* APPELLEES' BRIEF, No. 13-30315 (May 24, 2013), pp.5-8 [Fifth Cir. Doc. 00512253711, at 16-19].

[13] *See, e.g.,* SETTLEMENT AGREEMENT, Section 4.1 (establishment of *Deepwater Horizon* Court Supervised Settlement Program); Section 4.4 (Process for Making Claims); Section 5.12 (establishment of Settlement Trust); Section 21.2 (severability of any provisions found to be invalid, illegal or unenforceable); Section 21.3 (the Claims Administrator will continue to process claims that have been submitted to the Program in the event the class settlement is not fully and finally approved); Section 26.1 (regarding the binding effect of the Agreement on the Parties); Exhibit 26 (Individual Release). *See also, e.g.,* COMPLAINT, *BP v. Deepwater Horizon Court Supervised Settlement Program,* No.13-492 (March 15, 2013) ¶65 ("The Settlement Agreement is a valid contract meeting all required elements: offer, acceptance, and consideration"). (*See also, e.g.,* HERMAN DECLARATION (Nov. 11, 2013) [Doc 11833-1], ¶¶ 5-7.)

The Economic & Property Damages Class Settlement Agreement has separately, and additionally, been approved by the District Court under Rule 23(b)(3) and Rule 23(e) as a class settlement, which is binding upon on absent classmembers.[14] (This approval is the subject of a separate appeal, No. 13-30095.)

BP agreed, in the Economic and Property Damages Class Settlement Agreement, that the question of whether an Entity experienced an actual injury traceable to the *Deepwater Horizon* Incident would be determined by the objective criteria set forth in the Causation Framework contained in Exhibit 4B.

Specifically, the relevant portion of the Class Definition provides that:

> 1.3.1. The following are *summaries* of the Damage Categories, which are *fully described* in the attached *Exhibits 1A-15*:
>
> 1.3.1.2.    Economic Damage Category. Loss of income, earnings or profits Suffered by Natural Persons or Entities as a result of the *Deepwater Horizon* Incident.

BP, taking a sentence out of context and in isolation, asks the Court to look only at the "summary" contained within Section 1.3.1.2, and to completely disregard the incorporation of Exhibit 4B as the "full description" of Class Members, as stated in Section 1.3.1.

---

[14] *See* ORDER AND JUDGMENT [Doc 8139] (Dec. 21, 2012).  In particular, Paragraphs 8-14 of the Order and Judgment provide BP with "the general classwide release ('Economic Class Release') contained in Section 10 of the Settlement Agreement." (*See also,* SETTLEMENT AGREEMENT, Sections 10.1–10.6.)

BP's proffered interpretation also asks the Court to disregard the definition of "Economic Damage" in Section 38.55,[15] as well as the express incorporation of Exhibit 4B within the Business Economic Loss Sections 5.3.1, 5.3.2.1, and 5.3.2.3.

Section 5.3.2.3, in particular, sets forth the "Causation Requirements For Business Economic Loss Claims" as follows:

> Business Economic Loss Claimants, unless causation is presumed, *must establish that their loss was due to or resulting from* the Deepwater Horizon Incident. The causation requirements for such Claims *are set forth in Exhibit 4B.*[16]

Exhibit 4B, in turn, sets forth the transparent and objective methodologies by which the Parties agreed that BEL Claimants would establish that their loss was due to or resulting from the *Deepwater Horizon* Incident.

As acknowledged by Mr. Godfrey in his most recent declaration, BP expressly reconfirmed, on December 15, 2012, that, as to the Section 1.3.1.2 Class Definition question, "Damages must be as a result of the *Deepwater Horizon* Incident *as provided in* the Deepwater Horizon Economic and Property Damages

---

[15] "Economic Damage" is defined as loss of profits, income or earnings "*allegedly*" arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the *Deepwater Horizon* Incident.

[16] *See also* SETTLEMENT AGREEMENT, Section 5.3.1 ("The Economic Damage Claim Process, Economic Damage Claim Frameworks, and other details for determining the Economic Damage Compensation Amounts *are set forth in the Exhibits to this Agreement, which are incorporated herein by reference*") (emphasis supplied); Section 5.3.2.1 ("The frameworks setting forth the documentation requirements governing Business Economic Loss Claims, and the standards for evaluating such Claims, *are set forth in Exhibits 4A-7 to the Agreement*") (emphasis supplied).

Agreement."[17]   Stated another way, BP expressly reconfirmed on December 15, 2012, that damages must be caused by the Spill, *as provided in* the objective terms and provisions of Exhibit 4B.

<u>Causation Is a Separate, Distinct and Integral Requirement of the Settlement Agreement</u>

As observed by Judge Southwick, "Exhibit 4B of the Settlement Agreement allowed causation to be supported by loss calculations under Exhibit 4C rather than by requiring the claimant to prove that the loss had any factual relationship to BP's actions."[18]

It should be noted, at the same time, that for most claims, (and virtually all of the claims that BP is complaining about), the Causation Requirements for Business Economic Loss Claims under Section 5.3.2.3 and Exhibit 4B are separate and distinct from the Compensation Methodology set forth in Section 5.3.2.4 and Exhibit 4C.

Exhibit 4B is a revenue-only test, which requires the claiming Entity to demonstrate not only a downturn in revenue, but some other indicia that the

---

[17] GODFREY DECLARATION (Nov. 20, 2013) [Doc. 11876-1], ¶¶ 8-9.

[18] In re: Deepwater Horizon, 732 F.3d 326, 347 (5th Cir. 2013) (Southwick, J., concurring); *see also,* 732 F.3d at 346 (Southwick, J., concurring) ("The Settlement Agreement resolved two separate issues by, in effect, combining them.  One concerned loss *causation,* and the other loss *measurement.*  If a BEL claimant could prove an economic loss, properly measured, that proof substituted for evidence of causation….  The agreement simplified the claims process by making proof of loss a substitute for proof of factual causation").  The V, Modified-V, and Decline-Only Tests require additional indicia that the claimed losses are Spill-related.

downturn was caused by the Spill – *i.e.* either a later upturn in revenue (the V-Shaped Revenue Pattern), or a showing that a certain amount of their customers were either tourists or living in an affected zone (the Modified-V and Decline-Only Revenue Patterns), or a showing of Spill-related cancellations.[19]

These Causation Tests are illustrated by the following two graphs: [20, 21]



---

[19] **Certainly, there are tens of thousands of businesses within Zones B, C and D which are not eligible for Compensation, as they cannot satisfy one or more of the Causation Tests.** *See, e.g.,* Exhibit A to CLAIMS ADMINISTRATOR'S STATUS REPORT (Oct. 11, 2013) [Doc. 11646-1], at p.3 (2,840 BEL Causation Denials).

[20] BUSINESS ECONOMIC LOSS CLAIMS: CAUSATION REVENUE TREND TEST (for "Tutorial" with Claims Administrator) (May 7, 2012) [Doc. 11826-1, at 10], (attached as EXHIBIT "A").

[21] SUMMARY OF REVENUE PATTERN requirements for CAUSATION TESTS (displayed during Preliminary Approval Hearing) (April 25, 2012) [Doc. 9087-1, at p.5].

### PRELIMINARY APPROVAL HEARING
#### Class Counsel Presentation
#### April 25, 2012

| Summary of Revenue Pattern Requirements for Causation Tests | | | | | | | |
|---|---|---|---|---|---|---|---|
| Test | Zone A | Zone B (Non-Tourism and Non-Seafood) | | Zone C (Non-Seafood) | | Zone D | |
| | Down Up | Down | Up | Down | Up | Down | Up |
| V-Test | N/A | -8.5% | 5% | -8.5% | 5% | -15% | 10% |
| Modified V-Test* | N/A | -5% | 5% | -5% | 5% | -10% | 7% |
| Down Only test* | N/A | 8.50% | N/A | 8.50% | N/A | 15% | N/A |

*= For the Modified V-Test and the Down Only Test, additional requirements apply, as described in Exhibits.

Rec. Doc. 9087-1   (page 5)

It is only after a claiming Entity establishes Causation under Exhibit 4B that the Compensation is determined under the separate and distinct methodology set forth in Exhibit 4C. This Compensation Methodology is a separate two-step process, which factors in both revenue and expenses, and which can be calculated using different months than were used to establish Causation.[22]

---

[22] *See, e.g.,* Addendum to Causation Requirements for Business Economic Loss Claims and Compensation Framework for Business Economic Loss Claims [Doc. 6276-10, at pp.7-8].

<u>BP Has Not Established That Any Claim Did Not Suffer a Loss as a Result of the Spill</u>

Congress, in passing the Oil Pollution Action of 1990 ("OPA");[23]  BP, in establishing and administering the Gulf Coast Claims Facility ("GCCF");[24] and the BP Parties, in agreeing to the Class Definition and BEL Framework contained within the Settlement Agreement itself;[25] all recognized that *indirect* damages would be suffered in the wake of the many ripple effects from widespread post-spill losses throughout a region's economy.

While BP agreed that there would be limited businesses and geographic locations centered around tourism and the seafood industry for which causation would be presumed, these are <u>*not*</u> the claims that BP is complaining about.

Rather, BP is complaining almost exclusively about non-tourism and non-seafood businesses in Zone C and Zone D who <u>*satisfied*</u> the objective Causation Requirements that BP agreed to in Exhibit 4B.[26]

---

[23] *See, e.g.,* <u>In re: Deepwater Horizon</u>, 808 F.Supp.2d 943, 958-962 (E.D.La. 2011) ("One significant part of OPA broadened the scope of private persons who are allowed to recover for economic losses resulting from an oil spill. OPA allows recovery for economic losses 'resulting from' or 'due to' the oil spill, regardless of whether the claimant sustained physical damage to a proprietary interest"); *see generally,* 33 U.S.C. ¶¶ 2702(a), 2702(b)(2)(E), 2705(a), and 2713; DAVID W. ROBERTSON, <u>The Oil Pollution Act's Provisions on Damages for Economic Loss</u>, 30 MISS.C.L.REV. 157, 158-160 (2011); <u>Deepwater Horizon</u>, <u>supra</u>, 808 F.Supp. at 958-966.

[24] *See, e.g.,* GCCF MAPS [Doc. 11804-7 thru -11], which show significant payments by the GCCF for economic losses to businesses throughout the Class Geography, North of I-10. (*See, e.g.,* the Louisiana and Alabama Maps, attached as EXHIBIT "B")

[25] *See* SETTLEMENT AGREEMENT, Sections 1.1, 1.2, and 38.78, and Exhibit 22.

[26] *See, e.g.,* APPENDIX B to Rumsey Declaration submitted by BP in Support of its Motion [Doc. 11819-2, at pp.19-48]; *see also,* APPENDIX A [Doc. 11819-2, at pp.6-18]; Appendix B to

All BP has presented are inadmissible, non-evidentiary, self-serving and incomplete characterizations of claims by a BP attorney.

**BP Made Numerous Representations to the Court in Support of the Objective Causation Requirements for BEL Claims, and Is Judicially Estopped from Raising These Contrary Arguments Following Approval**

On April 18, 2012, BP filed the *Deepwater Horizon* Economic and Property Damages Settlement Agreement into the record, which, as noted *supra,* defined Causation for Business Economic Loss (BEL) Claimants according to the objective criteria set forth in Exhibit 4B.[27]

On April 18, 2012, BP also filed a Joint Memorandum in Support of Preliminary Approval, which stated that:

> The standards for establishing causation for individuals are flexible and provide claimants with multiple options. Causation is presumed for those individuals most likely to have been affected by the spill, including those on the coast and those employed in certain seafood related businesses. Other individual claimants are required to demonstrate a loss of earnings attributable to the spill during May through December 2010 (or other applicable period in the case of certain Seafood Industry claimants) based on financial information….
>
> *    *    *
>
> Businesses in certain geographic zones and industries, such as seafood processing, will not be required to provide documentation demonstrating causation, while businesses in

---

BP's MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR PRELIMINARY INJUNCTION (March 15, 2013) [Doc. 8910-3, at pp.47-71].

[27] *See* SETTLEMENT AGREEMENT (April 18, 2012) [Doc. 6276-1], Sections 1.3.1, 5.3.1, 5.3.2.1, and 5.3.2.3; and EXHIBIT 4B [Doc. 6276-9].

other zones will be required to submit varying degrees of evidence of causation. For example, businesses in Fairhope, Alabama fall into Zone B. In order to recover, they must submit evidence of causation. One such form of evidence is documentation of a V-shaped revenue pattern—an aggregate decline of 8.5% or more in total revenues over a period of three consecutive months in the eight months following the spill followed by an aggregate increase of 5% or more in total revenues over the same period in 2011.[28]

On May 8, 2012, BP submitted a powerpoint presentation to the Court-appointed and Court-supervised Claims Administrator and Trustee, which stated that:

Qualifying businesses receive compensation for **all losses** *regardless of actual facts and circumstances.*[29]

On August 13, 2012, BP submitted a Memorandum in Support of its Motion for Final Settlement Approval, in which BP stated that:

Without regard to total payout figures, the parties negotiated claims frameworks, programs, and processes, including details such as (1) what categories of claims would be paid, (2) what types of proof would be required for claimants to receive a settlement payment, (3) whether certain claimants should be permitted to benefit from causation presumptions that BP was willing to accept for settlement purposes (despite its informed legal views as to what OPA or maritime law strictly demanded), and (4) how settlement benefits would be calculated. The negotiations were thus

---

[28] JOINT MEMO IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL (April 18, 2013) [Doc. 6266-1] pp.17, 20. *See also,* EXCERPTS FROM PRELIMINARY APPROVAL HEARING (April 25, 2012) [Doc. 8963-59], *and,* PRELIMINARY APPROVAL HEARING PRESENTATION (April 25, 2012) [Doc. 9087-1].

[29] BUSINESS ECONOMIC GROWTH: BENEFITS (from BP Draft Tutorial Presentation, at p.3) (some emphasis in original; some emphasis supplied) [Doc. 11826-1, at 4], (attached as EXHIBIT "A").

exclusively focused, from the outset, on producing claims frameworks that could be administered fairly, objectively, and consistently.

\* \* \*

…the class definition references geography to reduce or eliminate disputes regarding whether particular claims are included and to focus relief on those in the most affected areas of the Gulf region. *See, e.g.*, Coffee Decl. (Joint Ex. C) ¶ 4 ("Also simplifying this case is the fact that the class definition carefully excludes remote claimants . . . . This deliberately narrow definition of the class . . . ensures that this class action will remain compact and that class members will be similarly situated (and hence more cohesive).")

\* \* \*

…the class definition takes pains to specify a list of exclusions … *to exclude claims that BP does not believe are even <u>colorably</u> compensable under OPA or maritime law* …. The result is a class that is neither sprawling nor under-inclusive, but instead carefully tailored to what the parties could reasonably agree on against the backdrop of the uniform body of OPA and maritime law that the Court has ruled is applicable….

\* \* \*

Business economic damage claimants will also be compensated under the settlement for post-spill losses of earnings and profits. As with the individual framework, the goal of the business framework is to fairly compensate businesses for their losses suffered as a result of the spill; it "uses the well-recognized approach of measuring lost earnings or profits by comparison of the post-DWH Spill Compensation Period to a Benchmark Period."

\* \* \*

Many businesses will benefit from causation presumptions…. As Dr. Fishkind explains, the zones and industry definitions governing causation presumptions are economically reasonable, as they benefit the claimants most likely to have been affected by the spill.

* * *

For those claimants required to prove causation, however, the tests are reasonable. *See* Landry Decl. (Ex. 13) ¶ 38 (describing the causation tests as "consistent with . . . economic reality"). Indeed, in many ways the causation principles are remarkably favorable to claimants. *See, e.g.,* Sharp Decl. (Ex. 18) ¶ 17 ("*[O]nce a business meets the causation requirements, for purposes of quantifying compensation, all revenue and variable profit declines during the claimant-selected compensation period are presumed to be caused by the spill, with no analysis required to determine whether the declines might have been due, at least in part, to other causes.*").[30]

On August 13, 2012, BP submitted the Declaration of Holly Sharp, confirming that:

*Once a business meets the causation requirements,* for purposes of quantifying causation, *all revenue and variable profit declines during the claimant-selected compensation period are presumed to be caused by the spill, with no analysis required to determine whether the declines might have been due, at least in part, to other causes.*[31]

On August 13, 2012, BP also submitted the Declaration of James Henley, who stated that:

The transparency and objectivity of the frameworks, which rely on expressly stated requirements or mathematical

---

[30] BP MEMO IN SUPPORT OF MOTION FOR FINAL SETTLEMENT APPROVAL (Aug. 13, 2012) [Doc. 7114-1], at pp.6-7, 11-12, 29-30, 33, (emphasis supplied); *see also,* EXCERPTS FROM BP'S MEMO [Doc. 8963-60]. *See also,* EXCERPTS FROM DECLARATIONS SUBMITTED BY BP'S EXPERTS IN SUPPORT OF FINAL APPROVAL [Doc. 8963-61].

[31] DECLARATION OF HOLLY SHARP [Doc. 7114-18], p.10, ¶17; *quoted in,* BP'S MEMORANDUM IN SUPPORT OF FINAL APPROVAL [Doc. 7114-1], at p.33, (emphasis supplied); *see also,* FROM SHARP DECLARATION [Doc. 8963-62].

formulas, assures that claimants can understand how their claims can be treated under the frameworks.

\* \* \*

For businesses in Zone A or in certain industries in Zones B and C or Primary Seafood Processors in Zone D, there is a presumption of causation, which will inevitably include businesses that were not economically or financially affected by the DWH Spill.

\* \* \*

…the causation tests reflect reasonable expectations about the economic harm the DWH Spill could have caused to a business, and therefore are appropriate tests for the purpose of establishing causation. The "V tests" require that a business demonstrate a loss after the DWH Spill and a subsequent recovery. Based on my experience analyzing economic loss litigation cases, it is reasonable to expect a recovery at some point after a demonstrated loss where the circumstances claimed to have caused the loss have changed. The tests reflect this reasonable expectation. Moreover, the tests contain exceptions where it is reasonable to expect that other factors may have prevented a recovery, such as entrant of a new competitor or construction preventing customer access.[32]

On August 13, 2012, BP also submitted the Declaration of Henry Fishkind, who stated that:

…projected earnings during a Claimant-selected post-DWH spill compensation period are compared to actual earnings during that period and *the difference is deemed a compensable loss.*[33]

---

[32] DECLARATION OF JAMES HENLEY [Doc. 7114-11], pp.5, 18, 19 ¶¶ 8, 24, 25. *See also,* EXCERPTS FROM DECLARATIONS SUBMITTED BY BP'S EXPERTS IN SUPPORT OF FINAL APPROVAL [Doc. 8963-61].

[33] DECLARATION OF HENRY FISHKIND [Doc. 7114-5], p.10, ¶31. *See also,* EXCERPTS FROM DECLARATIONS SUBMITTED BY BP'S EXPERTS IN SUPPORT OF FINAL APPROVAL [Doc. 8963-61].

On the Class Definition issue, BP's expert on class certification and settlement approval told the Court that the Class Definition "clearly and *objectively* defines the class in terms of time period, geographic region, and *type* of claim."[34]

BP also jointly submitted the testimony of Professor Coffee, who told the Court in August of 2012 that the net result of the Class Definition is "a list of easily identifiable categories of individuals and entities *who are permitted to show objective losses from that disaster.*"[35]

On September 28, 2012, BP's Counsel, in a letter to the Court-appointed and Court-supervised Claims Administrator and Trustee, (filed into the record by BP on March 20, 2013), reiterated that:

> *One of the cornerstones of the Settlement Agreement is the use of transparent, objective, data-driven methodologies designed to apply clearly-defined standards to a claimant's contemporaneously-maintained financial data submitted in compliance with documentation requirements.* These methodologies and requirements were carefully negotiated by the parties and are set forth in the Settlement Agreement as mandatory requirements. Among other reasons, these methodologies and requirements were negotiated in response to concerns voiced by some that the prior GCCF process was too dependent on accounting judgments that were not transparent.
>
> ….The Settlement Agreement does not allow for the use of professional judgment or discretion as a substitute for expressly articulated standards or requirements….[36]

---

[34] MILLER DECLARATION [Doc. 7114-16], p.6, ¶13, (emphasis supplied).
[35] COFFEE DECLARATION [Doc. 7110-3], p.13, ¶19, (emphasis supplied).
[36] LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU (Sept. 28, 2012) (re: Sept. 25th Policy Announcements), p.1 [Doc. 8963-68].

Around the same time, Mike Juneau, on behalf of the Claims Administrator, had posed the following inquiry to the parties:

> As to BEL claims, once a claimant's financial records satisfy the causation standards set out in Exhibit 4B, does the Settlement Agreement mandate and/or allow the Claims Administrator to separate out losses attributable to the oil spill vs. those that are not? Stated another way, once a claimant passes the causation threshold, is the claimant entitled to recovery of *all* losses as per the formula set out in Exhibit 4C, or is some consideration to be given so as to exclude those losses clearly unrelated to the spill?
>
> I will give a hypothetical situation to try to illustrate the question we are asking:
>
> *Hypo:* A small accounting corporation / firm is located in Zone B. They meet the "V-shaped curve" causation test. The explanation for the drop in revenue is that  one of the three partners went out on medical leave right around the time of the spill. Their work output, and corresponding income, thus went down by about a third. The income went back up 6 months later when the missing partner returned from medical leave. Applying the compensation formula under Exhibit 4C of the Settlement Agreement, the accounting firm can calculate a fairly substantial loss. Is that full loss recoverable?[37]

In response to the question and hypothetical, BP, in a letter to the Court-appointed and Court-supervised Claims Administrator and Trustee, (filed into the record by BP on March 20, 2013), confirmed that:

> If proper application of the methodology with accurate financial data yields a determination that causation is

---

[37] E-MAIL FROM MIKE JUNEAU TO PARTIES (Sept. 25, 2012) [Doc. 8963-66] (filed into the record by BP on March 20, 2013).

satisfied, *BP agrees with Class Counsel that all losses calculated in accordance with ... Exhibits 4C ... of the Settlement Agreement are presumed to be attributable to the Oil Spill.*

\*   \*   \*

….If the accurate financial data establish that the claimant satisfies the BEL causation requirement, then all losses calculated in accord with Exhibit 4C are presumed to be attributable to the Oil Spill.

*Nothing in the BEL Causation Framework (Ex. 4B) or Compensation Framework (Ex. 4C) provides for an offset where the claimant firm's revenue decline (and recovery, if applicable) satisfies the causation test but extraneous non-fictional data indicate that the decline was attributable to a factor wholly unrelated to the Oil Spill. Such "false positives" are an inevitable concomitant of an objective quantitative, data-based test.*[38]

Based on BP's response, the Claims Administrator issued a formal Policy Statement on October 10, 2012, further confirming that Exhibit 4B would be applied objectively, without a subjective inquiry into potential alternative causes of the claimant's losses.[39]   (BP has not ever formally objected to or appealed this Policy.)

---

[38] LETTER FROM MARK HOLSTEIN TO PATRICK JUNEAU (Sept. 28, 2012) (re: Issues Raised by Class Counsel or Settlement Program), at pp.1,3 (emphasis supplied) [Doc. 8963-67] (filed into the record by BP on march 20, 2013).

[39] ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION (Oct. 10, 2012), No.2. [Doc. 8963-71] (filed into the record by BP on March 20, 2013) (quoted fully *infra*).

On November 8, 2012, BP appeared before the Court at the Fairness Hearing in support of final approval of the Economic & Property Damages Class Settlement. BP Counsel stated, among other things, that:

> We're presuming causation for whole sections of the Settlement Class depending on where you reside and the nature of your business.
>
> *   *   *
>
> It's not only common sense; it's economic reality…. They were a product of arm's length negotiations informed by local experts.[40]

On November 19, 2012, BP submitted Joint Proposed Findings in Support of Final Approval of the Class Settlement, in which the Parties again confirmed that:

> The documentation, causation, and compensation framework for general Business Economic Loss Claims appears as Exhibits 4A-4E of the Settlement Agreement. The framework is fair, reasonable, and adequate….
>
> *   *   *
>
> Causation is presumed (i) for all businesses in Zone A; (ii) for Tourism businesses in both Zones A and B; (iii) for all Primary Seafood Industry claimants; (iv) for Secondary Seafood Industry claimants in Zones A, B, and C; and (v) for Charter Fishing businesses in Zones A, B, and C. Where causation is presumed, the causation presumption applies to all losses established pursuant to the compensation methodology.
>
> *   *   *
>
> The Settlement Agreement fairly and reasonably presumes causation for certain industries more likely to have been affected by the spill; the businesses that benefit from the

---

[40] *See* Doc. 8963-72.

presumption are the businesses that could most likely prove causation in litigation.

*   *   *

Where causation is not presumed, the causation tests are reasonable and flexible; they use standardized and transparent approaches. The causation tests reflect rational expectations about the economic harm that the spill could have caused businesses. The first option is the V-shaped revenue test, which requires proof of a downturn after the spill followed by a later upturn. Claimants with a less severe V ("Modified V-Shaped Revenue Pattern") or whose business did not experience an upturn in 2011 ("Decline-Only Revenue Pattern") may still recover provided that they can provide certain reasonable additional information. The causation tests are economically rational and supported by data regarding the economic impact of the oil spill on the Seafood and Tourism industries.

*   *   *

*Once the causation tests are satisfied, all revenue and variable profit declines during the Compensation Period <u>are presumed to be caused</u> **<u>entirely</u>** <u>by the spill</u>, with no analysis of whether such declines were also traceable to other factors unrelated to the spill.*[41]

With respect to the Class Definition, BP represented in the Joint Proposed Findings that the definition "is *objective,* precise, and detailed, and *does not turn on the merits.*"[42]  Further:

*Nothing in the class definition requires a determination on the merits or delves into any person's subjective mental state.* The definition is based on **objective criteria** such as where a person

---

[41] JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL [Doc. 7945], at pp. 33, 36, 37, 38, 39  ¶¶ 108, 117, 122, 124, 126 (emphasis supplied); *see also,* FROM JOINT PROPOSED FINDINGS [Doc. 8963-73].

[42] JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL APPROVAL [Doc. 7945], at p.87, ¶321, (emphasis supplied).

resided, worked, received an offer to work, or owned property; or *where an entity owned, operated, or leased a physical facility, or employed full time workers.*[43]

On December 12, 2012, the Parties appeared before Judge Barbier in Court. BP Counsel confirmed to the Court that BP agrees "with the Claims Administrator's objective analysis of causation with respect to his evaluation of economic damage claims, as previously set forth by Mr. Juneau in paragraph 2 of his October 10, 2012 policy announcement,"[44] which stated as follows:

> ***The Settlement Agreement represents the Parties' negotiated agreement on the criteria to be used in establishing causation. The Settlement Agreement sets out specific criteria that must be satisfied in order for a claimant to establish causation.*** Once causation is established, the Settlement Agreement further provides specific formulae by which compensation is to be measured. All such matters are negotiated terms that are an integral part of the Settlement Agreement. ***The Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in the Settlement Agreement. Both Class Counsel and BP have in response to the Claims Administrator's inquiry confirmed that this is in fact a correct statement of their intent and of the terms of the Settlement Agreement.*** The Claims Administrator will thus compensate eligible Business Economic Loss and Individual Economic Loss claimants for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, ***without regard to whether such losses resulted or may have resulted from a cause other than the Deepwater Horizon oil***

---

[43] Joint Proposed Findings of Fact and Conclusions of Law in Support of Final Approval [Doc. 7945], at p.87, ¶322, (emphasis supplied).

[44] E-Mail from Judge Barbier re "Meeting Today re Non-Profits and SIP" (Dec. 12, 2012) [Doc. 8963-75] (filed into the record by BP on March 20, 2013).

> *spill provided such claimants have satisfied the specific causation requirements set out in the Settlement Agreement. Further, the Claims Administrator will not evaluate potential alternative causes of the claimant's economic injury,* other than the analysis required by Exhibit 8A of whether an Individual Economic Loss claimant was terminated from a Claiming Job for cause.[45]

On December 21, 2012, the Court issued its Order and Judgment, as well as its Order and Reasons approving the class settlement under Rule 23.[46]    In approving the Economic & Property Damages Class Settlement, the Court held:

> Some business claimants must demonstrate that the spill caused their losses. In many other cases causation is presumed. The Settlement Agreement presumes causation for certain industries more likely to have been affected by the spill; the businesses that benefit from the presumption are the businesses that could most likely prove causation in litigation.
>
> *   *   *
>
> *…the proposed class in this case consists exclusively of individuals and businesses that have already suffered economic loss and property damage,* and the Settlement compensates class members for their past losses through detailed, objective compensation criteria….[47]

BP did not timely appeal the Order, Reasons or Judgment, nor has BP moved to modify the judgment under Rule 60.

---

[45] ANNOUNCEMENT OF POLICY DECISIONS REGARDING CLAIMS ADMINISTRATION (Oct. 10, 2012), No.2. [Doc. 8963-71] (filed into the record by BP on March 20, 2013), (emphasis supplied).

[46] *See* Docs. 8138 and 8139.

[47] ORDER AND REASONS (Dec. 21, 2012) [Doc. 8138] pp.11, 31 (emphasis supplied).

On March 15, 2013, the BP Parties filed a Complaint in these proceedings against the Court-Supervised Settlement Program and the Claims Administrator, in which BP alleged, agreed, acknowledged and confessed that:

> The Settlement Agreement is a valid contract meeting all required elements: offer, acceptance, *and underline consideration.*[48]

On July 8, 2013, the Parties appeared before this Panel in No. 13-30315. BP Counsel again confirmed the following:

| | |
|---|---|
| Judge Clement: | I have a question, sir. In your reply brief, you said the only issue in this appeal is the lost profits calculation and you were talking about how the variable profit is to be calculated…. My problem is I think the real issue in the case is causation and consideration. If you look at 4B where is BP's consideration for agreeing to pay those claims without proving they were caused by the Oil Spill? |
| BP Counsel: | This is a settlement, and with respect to the causation issue, that is not the issue that is before this court…. |
| | The settlement agreement with respect to 4B as to causation provided a mechanism which allowed someone to come through the door to be then entitled to prove the amount of actual lost profits. It was a compromise, which every settlement agreement is, with respect to causation issues…. |
| Judge Clement: | …. Where is the legal connexity between the damage or an injury and the ability to make BP pay? |
| BP Counsel: | It was a part of a compromise. There's going to be tens of thousands – |

---

[48] COMPLAINT, *BP v. Deepwater Horizon Court Supervised Settlement Program,* No.13-492 (March 15, 2013) ¶65, (emphasis supplied).

| | |
|---|---|
| Judge Clement: | Where's the consideration? |
| BP Counsel: | The consideration is the consideration of the settlement class as a whole…. |
| Judge Dennis: | A major consideration is no one can bring suit against you on the oil spill outside of this class action which you have now settled. |
| BP Counsel: | Exactly, your honor. |
| Judge Clement: | They couldn't bring suit against you anyway if it wasn't caused by – |
| BP Counsel: | They could bring suit.  They'd have to prove causation.  They could sue, and this is a compromise of tens of thousands of claims. But the important thing, and the issue that were' talking about here, is, assuming causation, assuming that a claimant gets through the door and is now entitled to prove lost profits;  we then come to what everyone agrees in this case. The Appellees say this on page 27 of their brief: This appeal presents a straight forward question of contract interpretation.[49] |

In the decision of October 2, 2013, both Judge Clement and Judge Southwick note that "alternative causes of losses were irrelevant if the financial figures supported that a loss occurred." Deepwater Horizon, 732 F.3d at 338.[50]

Judge Southwick also concluded that:  "Because the Rule 23 problem BP raises is confined to the *measurement of loss* and *not* to *the questions of standing* of

---

[49] *See* Unofficial Transcript of Hearing before U.S. Fifth Circuit Court of Appeals in Case No. 13-30315, at pp.10-14 [Doc. 11826-2].

[50] *See also,* Deepwater Horizon, 732 F.3d at 346 (Southwick, J., concurring) ("the parties agreed that Exhibit 4B's causation framework to ignore alternative explanations for actual losses that occurred to claimants during the proper time period").

claimants who cannot show their losses were caused by BP's actions, I would not at this time suggest there is a fundamental Rule 23 defect in the Settlement Agreement." <u>Deepwater Horizon</u>, 732 F.3d at 347, (Southwick, J., concurring) (emphasis supplied).

On November 15, 2013, the District Court agreed with Class Counsel that that the Parties had agreed that the question of whether an Entity suffered a traceable injury "as a result of" the Spill would be determined, for both Class Definition and Business Economic Loss Claim purposes, based solely and exclusively on the objective tests set forth in the BEL Causation Framework, Exhibit 4B, and that BP is judicially estopped from taking a position to the contrary, based on the numerous pleadings, statements and other representations BP made from the time the Settlement Agreement was filed on April 18, 2012 thru the date of Final Approval by the Court on December 21, 2012.[51] *See, e.g.,* <u>In re Paige</u>, 610 F.3d 865, 876 (5th Cir. 2010).

## The Settlement Agreement is a Valid and Enforceable Contract

The Third Circuit, in *Ehrheart v. Verizon,* discusses the "strong judicial policy in favor of class action settlement" which "ties into the strong policy favoring the finality of judgments and the termination of litigation."[52] In this case,

---

[51] ORDER (Nov. 15, 2013) [Doc. 11857] (denying BP's Motion to Amend "for the reasons stated by Class Counsel" (*citing,* Rec. Docs. 11826 and 11848)).

[52] <u>Ehrheart v. Verizon Wireless</u>, 609 F.3d 590, 595 (3d Cir. 2010).

the Settlement Agreement itself provides a categorical, consistent and transparent means (in BP's words, "an objective quantitative data-based test") to establish the existence and extent of traceable injury by objectively defining the loss that was "due to or resulting from the *Deepwater Horizon* Incident." In other words, the settlement provides an objective measure of which claimants have colorable causes of action. In BP's words, it reflects "economic reality". No settlement can ever guarantee that each claimant would have prevailed were its individual claim to be tried to judgment – a process that would vitiate the long-established judicial policy of furtherance of settlement in favor of an endless series of individual trials.

If the Court's concern is that a Due Process or Rules Enabling Act issue might arise if a defendant were cast in judgment to classmembers who arguably have no injury by operation of the class action device, how does that concern arise within the context of a settlement class, wherein the defendant is choosing the exact parameters of whom and how much it will pay?

In *Comcast,* for example, the Court reversed the certification of a litigation class where the class-wide proof of antitrust harm could not possibly establish liability with respect to a large part of the class. *See* Comcast Corp. v. Behrend, 133 S.Ct. 1426 (2013). As a result, there was no way to establish whether a large part of the class had been harmed, a consideration that was held dispositive for purposes of proving liability on a class-wide basis. A settlement, on the other hand, does not require a trial on liability, as recognized by the Supreme Court in *Amchem,* in which the Court indicated that a district court reviewing a proposed settlement class did not have to concern itself with the manageability of a trial.

Amchem Products v. Windsor, 521 U.S. 591, 620 (1997). By agreeing to the substantive terms of the settlement and the definition of the class, BP accepted the fact that those included class members would have a substantial basis to prevail at trial, and chose to settle with them on the negotiated terms. As BP told the District Court, it settled the "colorable claims."

In this particular context, moreover, (as noted *supra*), the Oil Pollution Act was specifically intended by Congress to be applied broadly and expansively, to afford compensation to businesses and individuals that were injured indirectly, as well as directly, in the wake of an oil spill.[53]

Yet, even assuming *arguendo* that Article III might enter into the Rule 23 class certification analysis, the standard is, at most, that a litigant merely have a "colorable" claim. *See* Deepwater Horizon, 732 F.3d at 340; *citing,* Richardson v. United States, 468 U.S. 317, 326 n.6 (1984). As this Circuit has recognized, standing is satisfied by the allegation of (i) injury-in-fact, (ii) causation, and (iii) redressability. Mims v. Stewart Title Guar. Co., 590 F.3d 298, 302 (5th Cir. 2009). The Plaintiffs clearly alleged these elements in the underlying *Bon Secour* Complaint.[54] As defined in the Settlement Agreement, moreover, "Economic Damage" means "loss of profits, income and/or earnings arising in the Gulf Coast Area or Specified Gulf Waters *allegedly* arising out of, due to, resulting from, or relating in any way, directly or indirectly, the Deepwater Horizon Incident."[55] And

---

[53] *See* Deepwater Horizon, supra, 808 F.Supp.2d at 958-962, 965-966; ROBERTSON, supra, 30 MISS.C.L.REV. at 158-160.
[54] *See* AMENDED CLASS ACTION COMPLAINT [Doc. 6412], ¶¶ 13, 306, 339-349, 371-375.
[55] SETTLEMENT AGREEMENT, Section 38.55 (emphasis supplied).

as BP itself recognized, "*the class definition takes pains to ... exclude claims that BP does not believe are even <u>colorably</u> compensable under OPA or maritime law.*"[56]

There may be cases in which it is arguably unclear whether the plaintiff could establish an injury fairly traceable to the defendant's conduct. Yet BP was free, within the context of Rule 23 or otherwise, to develop and apply a common and uniform set of criteria to resolve the question of whether the spill caused an economic injury. *See, e.g.,* <u>In re AIG Securities Litigation</u>, 689 F.3d 229, 243 (2d Cir. 2012) (that some claims might be viewed as "meritless" does not bar their inclusion in a class settlement, whose purpose is to relieve both sides of the risks of contested adjudication).[57]

Indeed, BP's own class certification and settlement approval expert confirmed that "the parties' ability to compromise disputed claims does not cease with respect to claims to which the defendant believes it has a strong defense."[58]

---

[56] *See, e.g.,* BP MEMO IN SUPPORT OF MOTION FOR FINAL SETTLEMENT APPROVAL (Aug. 13, 2012) [Doc. 7114-1], at p.11 (emphasis supplied).

[57] *See, e.g.,* <u>Ehrheart v. Verizon</u>, <u>supra</u> (class settlement did not become "moot" when legislation eliminated the statutory cause of action that formed the basis of the settlement); *see also, e.g.,* <u>Butler v. Sears Roebuck & Co.</u>, 727 F.3d 796, 801 (7th Cir. 2013) (reaffirming certification following remand in light of *Comcast*) ("If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined … in settlement negotiations … the fact that damages are not identical across all class members should not preclude class certification").

[58] SUPP. DECLARATION OF GEOFFREY MILLER [Rec. Doc. 7731-6] at ¶9; *citing,* <u>Sullivan v. DB Investments</u>, 667 F.3d 273, 305 (3d Cir. 2011) (en banc), *cert. denied,* 132 S.Ct. 1876 (2012), *rehearing denied,* 132 S.Ct. 2451 (2012); *see also,* SUPP. MILLER DECLARATION, at ¶15; *citing,* <u>Sullivan</u>, 667 F.3d at 305, *and,* <u>Kohen v. Pacific Investment Management Co.</u>, 571 F.3d 672, 677 (7th Cir. 2009) ("[A] class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable….").

The categories of claims and damages that BP chose to include in the Settlement Class and the BEL Causation and Compensation Frameworks pre-dated the settlement: These were largely the groups and claims identified and asserted in the "B1 Bundle" Master Complaint filed shortly after the litigation was centralized in the District Court, which were then challenged by motions to dismiss, and which survived that process, as colorable claims, and hence of rational concern to BP.[59]

## Rule 23, the Rules Enabling Act, and Article III Are Irrelevant to the Contractual Interpretation Issues, and Cannot Alter the Substantive Rights of the Parties

Neither Rule 23, the Rules Enabling Act, nor Article III can be used to re-write the terms of a contractual agreement.

As noted *supra,* BP expressly agreed that the Settlement Agreement and Trust would not be conditioned upon formal and final certification and approval under Rule 23.[60]

While the Class believes that both Rule 23(b)(3) and Rule 23(e) are fully satisfied for all of the reasons stated by Plaintiffs-Appellees in Appeal No. 13-

---

[59] *See* <u>Deepwater Horizon</u>, <u>supra</u>, 808 F.Supp.2d 943 (E.D.La. 2011).

[60] *See* HERMAN DECLARATION (Nov. 11, 2013) [Doc 11833-1], ¶¶ 5-7; *citing,* SETTLEMENT AGREEMENT, Section 4.1 (establishment of *Deepwater Horizon* Court Supervised Settlement Program); Section 4.4 (Process for Making Claims); Section 5.12 (establishment of Settlement Trust); Section 21.2 (severability of any provisions found to be invalid, illegal or unenforceable); Section 21.3 (the Claims Administrator will continue to process claims that have been submitted to the Program in the event the class settlement is not fully and finally approved); Section 26.1 (regarding the binding effect of the Agreement on the Parties); Exhibit 26 (Individual Release). *See also, e.g.,* COMPLAINT, *BP v. Deepwater Horizon Court Supervised Settlement Program,* No.13-492 (March 15, 2013) ¶65 ("The Settlement Agreement is a valid contract meeting all required elements: offer, acceptance, and consideration").

30095, if that Panel were to conclude that the Settlement Agreement, as correctly interpreted and applied (with BP's express concurrence at the time) by the Claims Administrator, does not satisfy one or more Rule 23 requirements, then the effect – and the *only* effect – would be that the settlement would lose its approval as a class settlement with respect to absent classmembers, and BP would not get a class-wide release.

Contrary to BP's suggestion, there is no Rule 23 limitation, nor even an Article III limitation, on the freedom of contract. Certainly a party is free to settle claims brought by plaintiffs who might not be able to establish a traceable injury if the case were to proceed to judgment at trial. The only limitation that Rule 23 imposes is the ability of a defendant to bind absent classmembers. *See, e.g.,* Ehrheart v. Verizon, supra, 609 F.3d at 593 (Rule 23 requires district courts "to act as fiduciaries for the absent class members, but that does not vest them with broad powers to intrude upon the parties' bargain…. The requirement that a district court review and approve a class action settlement before it binds all class members does not affect the binding nature of the parties' underlying agreement") (*citing,* In re Syncor ERISA Litig., 516 F.3d 1095, 1100 (9th Cir. 2008)).

BP, after realizing that the settlement was going to cost a lot more money than it had originally predicted, now invokes to the Rules Enabling Act to suggest that the substantive terms of its contract should be retroactively altered or

invalidated by Rule 23.  In fact, the Rules Enabling Act stands for just the opposite proposition: The Rules of Civil Procedures cannot alter or invalidate the substantive rights of the Parties.

## Conclusion

For the above and foregoing reasons, the Emergency Motion filed by BP should be denied, and BP should be further estopped from taking these untimely, ill-founded, and inconsistent positions.

This 22nd day of November, 2013.

Respectfully submitted,

Stephen J. Herman
HERMAN, HERMAN & KATZ LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Fax No. (504) 569-6024
E-Mail: sherman@hhklawfirm.com
*Co-Lead Class Counsel*

James Parkerson Roy
DOMENGEAUX, WRIGHT, ROY, &
EDWARDS LLC
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033
Fax No. (337) 233-2796
E-Mail: jimr@wrightroy.com
*Co-Lead Class Counsel*

Samuel Issacharoff
40 Washington Square South, 411J
New York, NY 10012
Telephone: (212) 998-6580
E-Mail: si13@nyu.edu
*Appeal Counsel*

## ECONOMIC & PROPERTY DAMAGE CLASS COUNSEL

Brian H. Barr
LEVIN, PAPANTONIO
316 South Baylen St., Suite 600
Pensacola, FL 32502-5996
Office: (850) 435-7045
Telefax: (850) 436-6187
E-Mail: bbarr@levinlaw.com

Jeffrey A. Breit
BREIT, DRESCHER &
IMPREVENTO
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Office: (757) 670-3888
Telefax: (757) 670-3895
E-Mail: jbreit@bdbmail.com

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008
E-Mail: ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110
E-Mail: pcossich@cossichlaw.com

Robin L. Greenwald
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
Office: (212) 558-5802
Telefax: (212) 344-5461
E-Mail: rgreenwald@weitzlux.com

Rhon E. Jones
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P. C.
218 Commerce St., P.O. Box 4160
Montgomery, AL 36104
Office: (334) 269-2343
Telefax: (334) 954-7555
E-Mail: rhon.jones@beasleyallen.com

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU &
SOUTH, LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029
E-Mail: mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031
E-Mail: rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail: mike@mikespy.com

Calvin C. Fayard, Jr. FAYARD &
HONEYCUTT
519 Florida Avenue, SW Denham
Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail: calvinfayard@fayardlaw.

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail: ervin@colson.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514
E-Mail: sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172
E-Mail: ssummy@baronbudd.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

## CERTIFICATION REGARDING PAGE LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Plaintiffs-Appellees have sought leave to exceed the ordinary 20 page limitation set by Federal Rule of Appellate Procedure 27(d)(2).

Undersigned Counsel certify that the Opposition contains 30 pages and 7,857 words as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Fifth Circuit Rule 32.2.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/ Stephen J. Herman and James Parkerson Roy
*Co-Lead Class Counsel*

## CERTIFICATE OF ELECTRONIC COMPLIANCE

I hereby certify that that, on November 22, 2013, Appellee's Opposition will be transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit through the Court's CM/ECF document filing system, https://ecf.ca5.uscourts.gov.  I further certify that required privacy redactions have been made pursuant to this Court's Rule 25.2.13.

/s/ Stephen J. Herman and James Parkerson Roy
*Co-Lead Class Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on <u>November 22, 2013</u>, an electronic copy of the foregoing Opposition will be filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system.

I further certify that service will be accomplished by the appellate CM/ECF system, and *via* e-mail, on the following counsel:

Theodore B. Olson
Miguel A. Estrada
Thomas G. Hungar
Scott P. Martin
GIBSON, DUNN & CRUTCHER
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

George H. Brown
GIBSON, DUNN & CRUTCHER
1881 Page Mill Road
Palo Alto, CA 94304
(650) 849-5339

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
R. Chris Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

S. Gene Fendler
Don K. Haycraft
R. Keith Jarrett
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, LA 70139
(504) 581-7979

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 662-5985

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
(202) 942-5000

Jeffrey Lennard
Keith Moskowitz
DENTONS
233 South Wacker Drive
Suite 7800
Chicago, IL 60606
(312) 876-8000

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX 77079
(281) 366-2000

*Attorneys for BP Exploration & Production Inc., BP America Production
Company, and BP p.l.c.*

Richard C. Stanley
Jennifer L. Thornton
Gina M. Palermo
Patrick H. Fourroux
STANLEY, REUTER, ROSS,
THORNTON & ALFORD, L.L.C.
909 Poydras Street, Suite 2500
New Orleans, LA 70112
(504) 523-1580

Patrick A. Juneau
Claims Administrator of the
*Deepwater Horizon* Court-Supervised
Settlement Program

*Additional Interested Parties*

/s/ Stephen J. Herman and James Parkerson Roy
*Co-Lead Class Counsel*

## Baden, John

| | |
|---|---|
| **From:** | Cantor, Daniel A. [Daniel.Cantor@APORTER.COM] |
| **Sent:** | Monday, May 07, 2012 11:47 AM |
| **To:** | Baden, John; JIMR@wrightroy.com; SHERMAN@hhkc.com |
| **Cc:** | Douglas, Charles W; Moskowitz, Keith; Bloom, Wendy L. |
| **Subject:** | Slides for Tuesday Meeting -- For Settlement Purposes Only |
| **Attachments:** | Business Framework Slides_042412.pptx; Coastal Real Property Claims_050412.pptx; Individuals Framework Slides_042412.pptx; Real Property Sales_050412.pptx; Seafood Compensation Program_050412.pptx; Wetland Real Property Claims_050412.pptx |

All,

Attached please find draft slide decks that we plan to use to help facilitate tomorrow's "tutorial" meeting with the claims administration (a few additional ones will follow).  We would be pleased to discuss today.  If there are materials you plan to present, we would appreciate seeing a draft, and should coordinate in advance how items are presented. Thanks

Dan

---

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

---

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

--------------------------------------------------------------------
For more information about Arnold & Porter LLP, click here :
http://www.arnoldporter.com

1



Business Framework

May 8, 2012

Case: 13-30815   Document: 00512450442   Page: 43   Date Filed: 11/22/2013
Case 2:10-md-02179-CJB-SS   Document 11826-1   Filed 11/07/13   Page 3 of 16

2

## Business Economic Growth: Benefits

▲ Wide range of options to qualify for benefits:

– Businesses in industries and geographic Zones most impacted by the DWH Spill are not required to present any evidence of causation.

– All other businesses in the class have five different options to recover DWH Spill related losses.

– Separate frameworks created for Start-Up Businesses and Failed Businesses.

– "Business" includes claims for corporations, partnerships and business income reported on 1040 Schedules C, E or F.

▲ Tailored evaluation process to qualify for benefits.

– Businesses in industries and areas most directly effected either automatically qualify or have lower qualification standards.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

Case 2:13-30315 Document 00512450442 Page 44 Date Filed: 11/22/2013
Case 2:10-md-02179-CJB-SS Document 11826-1 Filed 11/07/13 Page 4 of 16

3

# Business Economic Growth: Benefits

▲ Qualifying businesses receive compensation for all losses regardless of actual facts and circumstances.

— All Zone A businesses and others with presumptions.

— All businesses qualifying using overall revenue trends.

— All other businesses can claim specific losses of contracts or reservations.

▲ Compensation calculations are based on lost variable profit with no adjustment or offset for mitigated fixed costs.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

4

## Business Economic Growth: Benefits

▲ All qualifying businesses receive credit for 2% general growth factor regardless of prior experience.

▲ No negative growth for any qualifying business even where trends evidence declining revenues.

▲ All qualifying businesses receive credit for growth over a minimum of six months even where the effects of the DWH Spill dissipate over a shorter period.

▲ Documentation requirements designed to utilize reports and information generally available in the normal course of business.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

Case: 13-30315    Document: 00512456044    Page: 46    Date Filed: 11/22/2013
Case 2:10-md-02179-CJB-SS    Document 11826-1    Filed 11/07/13    Page 6 of 16

5

## Business Economic Growth: Benefits

▲ Claimants have wide optionality to present their best case.

– Five different ways to qualify for damages.

– Eighteen different comparisons against historical benchmarks available to qualify for benefits.

– May qualify using one period of loss and receive compensation based on a different period of loss to maximize benefits.

– Twenty one different options available for calculating the 2010 loss period.

– Multi-facility businesses have the option to submit a consolidated claim for facilities in the Class.

▲ Failed businesses and their owners returned to same economic position held at April 20, 2010.

– Failed businesses receive full buyout of company value as of April 20, 2010.

– Failed start-up businesses receive full equity investment as of April 20, 2010 as well as compensation for invested time and effort ("sweat equity").

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

Case: 13-30315    Document: 00512445044    Page: 47    Date Filed: 11/22/2013
Case 2:10-md-02179-CJB-SS    Document 11826-1    Filed 11/07/13    Page 7 of 16

6



## Business Economic Loss Claims: Causation

▲ Many businesses receive full presumption that all post-DWH Spill 2010 losses were caused by the Spill regardless of specific circumstances:

– All businesses in Zone A.

– Tourism businesses in Zones A and B.

– All Primary Seafood Industry claimants (landing sites, certain wholesale/retail dealers, primary processors and distributors).

– Secondary Seafood Industry claimants (processors, distributors, retailers) in Zones A, B and C.

– Charter Fishing businesses in Zones A, B and C.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

Case: 13-30315    Document: 00512456044    Page: 48    Date Filed: 11/22/2013
Case 2:10-md-02179-CJB-SS   Document 11826-1   Filed 11/07/13   Page 8 of 16

7

## Business Economic Loss Claims: Causation

▲ Other businesses have multiple options to qualify for a full causation presumption providing compensation for all post-DWH Spill 2010 losses regardless of specific circumstances:

– Three revenue pattern tests based on changes when compared with historical results. Size of fluctuation depends on where the business is located (Zone B and C have lower thresholds than Zone D).

– Proxy Claimant: Small businesses (less than $75,000 revenue) may qualify by establishing a causal relationship with a nearby business which satisfied causation.

– Businesses unable to qualify based on Revenue Pattern tests may establish causation for specific lost reservations and contracts and be compensated for those losses.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

Case: 13-30315   Document: 00512456044   Page: 49   Date Filed: 11/22/2013
Case 2:10-md-02179-CJB-SS   Document 11826-1   Filed 11/07/13   Page 9 of 16

8

## Business Economic Loss Claims: Causation Revenue

### Trend Tests

▲ Causation of economic loss can be established by showing revenue trends consistent with a temporary business disruption between May 2010 and December 2010. Three different tests are available, and businesses make two different elections for purposes of this analysis:

‒ **Compensation Period:** The period of time the business claims losses due to the DWH Spill. Claimant selects three or more consecutive months between May 2010 and December 2010.

‒ **Benchmark Period year(s):** The pre-Spill years chosen by the claimant as the business' historical performance in all compensation and causation calculations. Claimants may select 2009, the average of 2008-2009, or the average of 2007-2009.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

# Business Economic Loss Claims: Causation Revenue

## Trend Tests

### V-Shaped Revenue Pattern

Revenue decline in 2010 Compensation Period (Zone B & C= 8.5%; Zone D= 15%) compared to the same months in the Benchmark Period year(s) followed by recovery (increase in revenues) in the same months of 2011 (B & C= 5%; D= 10%).

### Modified V-Shaped Revenue Pattern

Revenue decline in 2010 Compensation Period (B & C= 5%; D= 10%) compared to the same months in the Benchmark Period year(s) followed by recovery (increase in revenue) in the same months of 2011 (B & C= 5%; D= 7%) plus additional items.

### Decline Only Revenue Pattern

Revenue decline in 2010 Compensation Period (Zone B & C= 8.5%; Zone D= 15%) compared to the same months in the Benchmark Period year(s) plus additional items including factors outside company's control preventing recovery.





| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

## Business Economic Loss Claims: Compensation

▲ Compensation is based on the difference between the company's 2010 actual profit post-DWH Spill and expected profit in the absence of the DWH Spill.

▲ For purposes of determining compensation, the Claimant may select a Compensation Period different than used in establishing causation, but the Benchmark Period year(s) must be the same as in causation test:

   – **Compensation Period:** The period of time the business claims losses due to the DWH Spill. Claimant selects three or more consecutive months between May 2010 and December 2010.

   – **Benchmark Period year(s):** The pre-Spill years chosen by the claimant as the business' historical performance in all compensation and causation calculations. Claimants may select 2009, the average of 2008-2009, or the average of 2007-2009.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

## Business Economic Loss Claims: Compensation

▲ Compensation is divided into two steps:

- **Step 1:** Compensates claimant for reduction in 2010 post-DWH Spill profits relative to the same months in the Benchmark Period year(s).

- **Step 2:** Compensates claimant for lost profit associated with potential post-DWH Spill revenue growth in 2010 across a minimum six month period.  Even where the business claims losses over a shorter period of time in Step 1, compensation will be paid for six months worth of lost growth.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

## Business Economic Loss Claims: Step 1

### Step 1 Calculation

1. Claimant selects three or more consecutive months between May 2010 and December 2010 as the Compensation Period.

2. Variable profit in the months selected as the Compensation Period is calculated as revenues less variable costs specified in the Settlement Agreement for both:

   – Benchmark Period year(s)

   – 2010

3. Any difference calculated in (2) represents Step 1 compensation (may be positive or negative).

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

## Business Economic Loss Claims: Step 2

## Step 2 Calculation

1. The Company's revenue growth rate is calculated by comparing January-April revenue in 2010 with revenue over the same months in the Benchmark Period year(s) plus a 2% general growth factor.

   – Combined growth rate may not be less than 0% or greater than 12%.

2. Claimant selects six consecutive month period between May and December as the period of lost growth (period may be extended to seven or eight months if also chosen as Compensation Period in Step 1).

3. Revenue during the Benchmark Period year(s) is totaled for the months selected in (2).

4. Total revenue calculated in (3) is multiplied by the revenue growth factor calculated in (1) to determine the amount of lost Incremental Revenue.

5. The lost Incremental Revenue calculated in (4) is multiplied by the company's variable profit margin during May through December of the Benchmark Period year(s) used in (3) to determine Step 2 compensation.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

## Business Economic Loss Claims: Total Compensation

▲ Total Compensation to the claimant is equal to the compensation from Step 1 and Step 2 increased by the RTP and then reduced by any prior DWH Spill-related payments:

**Lost Variable Profits =**

(Step 1 Compensation + Step 2 Compensation)

**Total Compensation =**

Lost Variable Profits + (Lost Variable Profits x RTP)
- (DWH Spill Related Payments & VoO Offset)

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

## Business Economic Loss Claims: Documentation

△ Documents required are generally available in the normal course of business. In some situations which require additional information, claimants will generally need to provide:

– Completed Claim Form.

– Annual Income Tax Returns.

– Monthly financial statements.

– Business structure and organization information.

– Sales or use tax returns and lodging tax returns (where applicable).

– Customer sales information (where applicable).

– Licensing information (where applicable).

– Other documents as necessary based on claim.

| PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT |

# Louisiana
# GCCF Program Statistics - By county
(as of July 5, 2011)



# Alabama
## GCCF Program Statistics - By county
### (as of July 7, 2011)



**Amounts Paid**

- More Than $100 Million
- $25.1 Million - $100 Million
- $1.1 Million - $25 Million
- $100,000 - $1 Million
- Less Than $100,000