No. 13-30315
(consolidated with Nos. 13-30329, 13-31220)

———————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

———————————

IN RE:  DEEPWATER HORIZON

———————————

On Appeal from the United States District Court
for the Easter District of Louisiana
MDL No. 2179, Civ. A. No. 12-970

———————————

**OPPOSITION OF PLAINTIFFS-APPELLEES TO BP'S
RENEWED MOTION FOR AN INJUNCTION**

———————————

Stephen J. Herman
Herman, Herman & Katz LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892

James Parkerson Roy
Domengeaux, Wright, Roy, & Edwards LLC
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233-3033

Samuel Issacharoff
40 Washington Square South, 411J
New York, NY 10012
Telephone: (212) 998-6580

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

<u>PAGE</u>

I.    INTRODUCTION AND PROCEDURAL BACKGROUND …………..1

II.   ARGUMENT........................................................................... ..7

  A. BP's Motion Is Procedurally Improper, Irregular, And Unnecessary .... 7

  B. The Class Definition, The Settlement, And Causation .......................... 9

     1.    Causation Is a Separate, Distinct, and Integral Requirement of the Settlement Agreement for Class Membership……………..…….11

     2.    No Analysis of Alternative Causes of Economic Losses……..….15

     3.    The Settlement Agreement Properly Defines Class Membership Objectively……………………………………………..…..17

     4.    The Class Definition Includes a Contextually-Specific Causation Requirement……………………………………………...……21

     5.    BP Still Has Not Defined the Punitive "Causal Nexus"…………27

  C. The Economic Class Presents "Colorable" Claims............................... 27

  D. The Settlement Class And Its Claims Satisfy Article III Standing Requirements........................................................................................ 31

  E. The District Court Properly Applied Principles of Judicial Estoppel To The    Facts Stipulated By The Parties As These Appear In The Factual Record Of The Settlement And Its Approval Process…………..……40

  F. A Certified Class Action May Properly Include Persons Who Will Not Ultimately Recover …………..………………………………………44

III.  CONCLUSION........................................................................ 48

- i -

# TABLE OF AUTHORITIES

**<u>PAGE</u>**

## CASES

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200, 211 (1995) ...................................................................43

*Allen v. Int'l Truck & Engine Corp.*,
    358 F.3d 469 (7th Cir. 2004) ...........................................................38

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997) .........................................................................36

*Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds*,
    133 S. Ct. 1184, 1191 (2013) .........................................................37

*Bell Atlantic Corp. v. AT&T Corp.*
    339 F.3d 294, 307 (5th Cir. 2003)...................................................38

*Califano v. Yamasaki*,
    442 U.S. 682, 701 (1979) .................................................................42

*Carnegie v. Household Intern., Inc.*, 376 F.3d 656 (7th Cir. 2004) .........................6

*Cleveland v. Policy Mgmt. Sys. Corp.*,
    526 U.S. 795, 821 (1999) .................................................................46

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) .....................................................................37

*DeBrekmaeker v. Short*,
    433 F.2d 733, 734 (5th Cir. 1970)...................................................18

*Dothard v. Rawlinson*,
    433 U.S. 321 (1977) .........................................................................41

*Erica P. John Fund, Inc. v. Halliburton*,
    131 S.Ct. 2179 (2011) ......................................................................37

*General Telephone Co. of Southwest v. Falcon*,
   457 U.S. 147 [159 n.15] (1982)..............................................................42

*Gratz v. Bollinger*,
   539 U.S. 244, 267 (2003) .......................................................................42

*Grutter v. Bollinger*,
   539 U.S. 306 (2003) ...............................................................................41

*In re Foodservice Inc. Pricing Litigation*, 729 F.3d 108, 123 n.8 (2d Cir. 2013)...37

*In re VISA/Master Money Antitrust Litigation*,
   280 F.3d 124, 141 (2nd Cir. 2001) ........................................................38

*John v. National Sec. Fire & Cas. Co.*,
   501 F.3d 443, 445 (5th Cir. 2007).........................................................18

*Kohen v. Pac. Inc. Mgmt. Co.*,
   571 F.3d 672, 677 (7th Cir. 2009).........................................................39

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555, 560 (1992) .......................................................................30

*Mims v. Stewart Title Guar. Co.*,
   590 F.3d 298 (5th Cir. 2009)..................................................................30

*Monsanto Co. v. Geerston Seed Farms*,
   561 U.S. 139, (2010) ..............................................................................37

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ...............................................................................46

*Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville, Fla.*,
   508 U.S. 656, 665 (1993) .......................................................................43

*Parents Involved in Community Schools v. Seattle School Dist. No. 1*,
   551 U.S. 701, 713 (2007) .......................................................................43

*Pegram v. Herdrich*,
   530 U.S. 211, 227 n.8 (2000) ...................................................................6

*Reed v. General Motors Corp.*,
   703 F.2d 170, 172 (5th Cir. 1983) ......................................................... vi

*Regents of Univ. of Cal. v. Bakke*,
   438 U.S. 265, 280-81 n.14 (1978) ...........................................................43

*Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 168 (2nd Cir. 2001) ......38

*Rodriguez v. Countrywide Home Loans, Inc.*, 695 F.3d 360, 364 (5th Cir. 2012).. vi

*Sullivan v. DB Investments, Inc.*,
   667 F.3d 273, 308 (3d Cir. 2010) (en banc) ..........................................31

## STATUTES

Fed. R. Civ. P. 23(c)(3) .............................................................................26

Fed. R. Civ. P. 23(e) .................................................................................26

## OTHER AUTHORITIES

MANUAL FOR COMPLEX LITIGATION, FOURTH (Federal Judicial Center 2004) .......18

MOORE'S FEDERAL PRACTICE ..................................................................18

## APPENDIX

DECLARATION OF JOHN S. CREEVY  ....................................…APPENDIX A

## REQUEST FOR ORAL ARGUMENT

Plaintiffs-Appellees respectfully request oral argument.  Oral argument will assist the Court in better understanding the extensive legal and factual issues in this appeal.    Although oral argument has already been conducted, the issues of causation and class membership were expressly disavowed as non-issues by BP-Appellants at that time, thereby depriving Plaintiffs of the opportunity to fully discuss with this Panel.  These issues were the focus of the Class Certification Panel of this Court, No. 13-30095, and Plaintiffs request the same opportunity before this Panel.  Finally, this is the first opportunity both Plaintiffs-Appellees and BP-Appellants have had to brief these issues before this Panel.

## STANDARD OF REVIEW

The standard of review in this matter is abuse of discretion for both the issue of causation (referred to as "class membership" or "causal nexus" by BP) and the application of judicial estoppel. In deciding the issue of causation, the District Court invoked the extensive factual record created as part of the Class Settlement, representations made by BP outside the settlement, and numerous statements made in court and otherwise on the record during the course of the implementation of the Settlement Program. Like the review of class certification, given the essentially factual basis of the inquiry on remand, the District Court's findings related to the interpretation of a class settlement should be reviewed for abuse of discretion. *See Rodriguez v. Countrywide Home Loans, Inc.*, 695 F.3d 360, 364 (5th Cir. 2012); *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983). This Court specifically remanded to the District Court to consider parol evidence outside of the four corners of the Settlement Agreement itself. *In re Deepwater Horizon*, No. 13-30315, at 18 (10/3/13) [Doc. 512394834].

BP concedes that the District Court's findings concerning judicial estoppel are reviewed under the abuse of discretion standard. *BP Renewed Motion for Injunction*, at 10.

## I.  INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiffs-Appellees respectfully submit this response to an unspecified request for an injunction against practices that are already stayed before the District Court.[1] The Claims Administrator's October 10, 2012 Policy Interpretation regarding causation was never appealed by BP to the District Court, much less to this Honorable Court.  Indeed, BP Counsel expressly acknowledged that causation was not part of the present appeal during the July 8, 2013 Oral Argument.  Nevertheless, and in light of the questions raised by this Court in conjunction with the "matching" question, the District Court has, out of an abundance of caution, enjoined the determination and payment of *all* Business Economic Loss (BEL) Claims until the Panel in No. 13-30095 has had a chance to fully consider the class settlement approval issues and/or this Honorable Panel has had a chance to fully review the interpretive issues (should any remain).  BP's "renewed motion" to this Honorable Court curiously seeks the appellate review of an injunction that is already in place.

From a substantive standpoint, BP's Motion completely ignores the fact that its Settlement Agreement includes a specific definition and test for injuries allegedly traceable to the Spill in Exhibit 4B.  Not only does the Agreement as a whole satisfy all of the requirements of a valid and enforceable contract under

---

[1] Plaintiffs respectfully suggest that this Honorable Court has no jurisdiction over the "renewed motion", any Class Definition or Exhibit 4B interpretive issues, or questions of certification or approval under Rule 23, for all of the reasons previously stated and based on the facts, evidentiary record, and procedural history outlined herein.

General Maritime Law, but the test for traceable loss contained within Exhibit 4B is fully consistent with any and all requirements of both Rule 23 and Article III. The Claims Administrator's interpretation and application of Exhibit 4B (for both Class Definition and BEL Causation purposes) is, in fact, what BP agreed to. And while BP has never, to this day, suggested an alternative definition or test for establishing a loss traceable to the Spill other than what it agreed to in Exhibit 4B, any such attempt to contradict BP's clear and well-established position should be estopped by the Court.

On December 2, 2013, this Court directed the District Court, in connection with the remand of the "matching" issues, to explore the record regarding the role of causation in the Settlement and to make factual findings regarding the intent of the parties and operation of the Settlement. The District Court has done so, mustering factual evidence and argument from the parties in issuing its detailed December 24, 2013 *Order & Reasons* [Rec. Doc. 12055], setting forth its findings on the remanded matters, including the definition of "variable profit" for BEL claims; causation under the economic settlement; and, with the caveat that it may lack jurisdiction to do so (given the prior submission of these matters to another Panel) the cluster of "Article III issues" that BP addresses in its instant "renewed motion" as well.

The District Court found in favor of BP with respect to the interpretation of Variable Profit under the Settlement's Exhibit 4C, and instructed the Claims Administrator to adopt and implement an appropriate protocol for handling BEL claims in which the claimant's financial records do not match revenue with corresponding variable expenses.

The District Court conducted the inquiry requested by this Court on the issue of causation. The court found that the settling parties agreed to define and determine whether an alleged loss was traceable to the Spill according to the objective standards required by the Settlement as set forth in Exhibit 4B. Based on the repeated representations to the District Court during the Settlement approval process, as well as the negotiating history of the Settlement, the District Court found that class members who satisfy the evidentiary requirements of Exhibit 4B demonstrate that their claimed economic losses are traceable to the *Deepwater Horizon* oil spill. Whether their economic losses are compensable depends on the independent valuation under Exhibit 4C.

The District Court relied on two independent analytic frameworks for these findings. In the first instance, the District Court reviewed the factual record of the case regarding Exhibit 4B and its causation findings, much of which had unfolded before the Court in real time. Second, the District Court relied on the repeated representations of fact made by BP in securing judicial approval for the binding

class settlement, and accordingly framed its analysis under the principle of judicial estoppel.[2]

Although the District Court stated it "does not believe it has jurisdiction to consider the issues concerning Article III, Rule 23, and the Rules Enabling Act", the District Court found "that the Settlement is not defective under Article III, Rule 23, or the Rules Enabling Act, nor was certification of the class improper." [3]

Finally, and importantly, the District Court expressly maintained the preliminary injunction against BEL claims payments, as amended on December 5, 2013 [Rec. Doc. 11928], pending further action "by the Certification Panel or the BEL Panel of the Fifth Circuit."[4]  To the extent that BP is seeking a standstill injunction pending its full merits appeal of the December 24 ruling, that is already in place.  To the extent that BP seeks to have this Court order a different test to be applied by the Claims Administrator, it did not specify what that test was in any moving papers to the court below, nor has it asked this Court for any specific form

---

[2] Specifically, the District Court held "With respect to how causation is determined under the Settlement, the Court finds that BP is judicially estopped from arguing (1) that Exhibit 4B is not the exclusive means of determining whether a business economic loss is "as a result of" the Deepwater Horizon Incident for purposes of the Settlement, including the Class Definition; (2) or that the Settlement contains, implicitly or explicitly, a causation requirement other than Exhibit 4B; (3) or that satisfying Exhibit 4B does not establish under the Settlement an irrebuttable presumption that a business' economic loss was "as a result of" the Deepwater Horizon Incident; (4) or making similar arguments.  As a corollary to this ruling, the Court finds that whether a business economic loss is "as a result of" the Deepwater Horizon Incident for purposes of the Settlement is determined exclusively by Exhibit 4B."  [Rec. Doc. 12055-37]
[3] 12-24-13 *Order & Reasons*, at 36 [Rec. Doc. 12055].
[4] 12/24/13 *Order & Reasons*, at 37-38 [Rec. Doc. 12055].

of order.

Thus, BP's "renewed motion for an injunction" is without procedural foundation, factual support or legal necessity, and is an effort to disrupt the orderly determination of different issues before different Panels of this Court.  On that basis alone, it is due to be denied.  There is no imminent or irreparable harm to BP and no claims will be paid until matters that relate specifically to BEL claim determination are resolved.  BP's new request, for an additional, presumably subjective and as yet to be defined  "causal nexus" test, which it never sought during settlement negotiations, from the Claims Administrator, or from the District Court, and which it specifically disavowed at oral argument in this Court,[5] is simply not ripe for adjudication by any court.

The District Court's December 24, 2013 *Order & Reasons* is a record-based interpretation of the operation of the Settlement, derived from a comprehensive analysis of the many filings, statements, acknowledgements, stipulations, representations, and arguments made by the parties, and is definitive for three reasons.  *First*, the District Court interprets the express language of the Settlement documentation itself correctly, inclusively, and non-selectively:  The Exhibit 4 provisions that provide the mechanism of BEL payments are express, clear and unambiguous.  *Second*, to the extent that the exhaustively negotiated settlement

---

[5] *Order and Reasons*, at 42 [Rec. Doc. 12055]; *Unofficial Transcript of Oral Argument*, at 10-14 [Rec. Doc. 11826-2].

instruments are arguably ambiguous, the Court has reviewed all of the parol evidence submitted by the parties as an aid to interpretation. Thus, the Court's interpretation of the causation mechanisms of the Settlement stands apart from and independent to its *third* determination, the application of judicial estoppel to reject BP's one hundred eighty degree change of position.

The District Court's estoppel ruling follows from its review of the factual record. The core of the judicial estoppel ruling is not the legal arguments advanced by BP and its phalanx of experts as to why the Settlement satisfied all the Rule 23 criteria for a binding class judgment, although many courts have estopped such switches in legal positions.[6] Rather, the estoppel rests on the factual record that BP put before the court. Having submitted evidence, including unimpeached and unchallenged expert testimony, BP was bound by the factual record that it created before the District Court. This is an unremarkable use of judicial estoppel so as to "prevent[] a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich,* 530 U.S. 211, 227 n.8 (2000).

For reasons of its own fashioning, BP now wishes to turn on the Settlement it negotiated. Its chosen vehicle is to confuse the requirement that the class members allege economic loss resulting from the Spill -- which they expressly do,

---

[6] *See e.g.*, *Carnegie v. Household Intern., Inc*., 376 F.3d 656 (7th Cir. 2004) (Posner, J.).

in the operative class action complaint [7] -- with a requirement, contrary to controlling law, that individual class members prove such causation (by an as yet unidentified, unspecified, and unexplained mechanism) before the Claims Administrator can commence the determination of their losses under Exhibits 4B and 4C.

The simplest reason this fails is that it is contrary to every element of the Settlement. As BP repeatedly acknowledged to the District Court in the Settlement approval process (and as its legal and economic experts opined), objective mechanisms establish class membership, the economic losses traceable to the Spill, and qualify class members for BEL payments. As the District Court found, this is fully supported by the negotiating history, the clear and unambiguous terms of the Settlement, and by the factual record below.

## II.   ARGUMENT

### A.   BP's Motion Is Procedurally Improper, Irregular, And Unnecessary

On remand from this Court, [8] the District Court on December 5, 2013 enjoined further BEL payments. *Order Amending Preliminary Injunction Related to BEL Claims* [Rec. Doc. 11928]. As the District Court explained in this Order,

> On October 18, 2013, following remand in Fifth Circuit case no. 13-30315 (the BEL appeal), this Court issued a preliminary injunction staying the payment of those BEL claims where the matching of

---

[7] *See* AMENDED CLASS ACTION COMPLAINT, ¶¶ 13, 306, 339-349, 371-375 [Rec. Doc. 6412] .
[8] *In Re Deepwater Horizon*, 732 F. 3d 326 (5th Cir. 2013).

expenses and revenues is an issue, but otherwise allowing the processing and payment of other BEL claims that are supported by properly matched accrual-basis accounting records. [Rec. Doc. 11697] On November 5, 2013, this Court amended and clarified the injunction with respect to the settlement program's appeal process. [Rec. Doc. 11790]

On December 2, 2013, the panel of the Fifth Circuit found that this Court "erred by not considering [BP's] arguments on causation." The panel remanded the issue of causation and ordered this Court to "craft[] '[a] stay tailored so that those who experienced actual injury traceable to loss from the Deepwater Horizon accident continue to receive recovery but those who did not do not receive their payments until this case is fully heard and decided through the judicial process,' including by any other panel of this court that resolves these issues." [Rec. Doc. 11928-1]

The District Court accordingly amended its earlier injunctions, Rec. Doc. 11697 and 11790, to provide as follows:

The Claims Administrator may continue to accept BEL claims and process said claims, but shall temporarily suspend the issuance of final determination notices and payments of BEL claims, pending resolution of the BEL issues that are the subject of the pending remand. This suspension shall also apply to claims currently in the claims appeal process.

Except as provided in this Order, the provisions of the Preliminary Injunction issued on October 18, 2013, and amended on November 5, 2013, remain in full force and effect unless and until modified by this Court." [Rec. Doc. 11928-2]

A comprehensive injunction suspending the issuance of final determination notices and payments of all BEL claims is thus in effect. BP is in no peril that any such claims will proceed pending further action by this Court. No "extra" injunction is required. BP is somewhat curiously asking this Court to command

the District Court to do what it has already done:  suspend payments pending an

ultimate determination by the Panel in No. 13-30095 regarding Rule 23 approval

and/or by this Panel regarding the "variable profit" contractual interpretation issue.

The District Court has considered both issues in its December 24, 2013 *Order &*

*Reasons*, but has not modified its injunction as to BEL claims, as its *Order &*

*Reasons* itself expressly specifies [Rec. Doc. 12055-37-38].

With an injunction in place, BP's instant motion appears to be simply, and

improperly, an attempt to push through an appeal without proper briefing and an

orderly presentation of the appellate record. As an injunction, there is no showing

of any risk of irreparable injury nor even a likelihood of prevailing on an as yet

unspecified request for a permanent injunction.  Nor is it at all clear that the

District Court could even entertain the issues BP now raises.  These matters were

fully briefed, argued and under submission to another Panel, and the District Court

does not currently hold the mandate.[9]  BP thus now requests what due process

precludes, what the substantive law does not require, and what the facts foreclose.

### B.    The Class Definition, The Settlement, And Causation

BP agreed, in the Economic and Property Damages Class Settlement

Agreement, that the question of whether an Entity experienced an actual injury

---

[9] As the District Court addressed them, so do we, under the same jurisdictional caveat, and respectfully submit that this Panel should affirm the District Court's December 24, 2013 *Order & Reasons* in all respects to enable a determination of BEL claims to move forward.

traceable to the *Deepwater Horizon* Incident would be determined by the objective criteria set forth in the Causation Framework contained in Exhibit 4B.

Specifically, the relevant portion of the Class Definition provides that:

> 1.3.1. The following are ***summaries*** of the Damage Categories, which are fully described in the attached Exhibits 1A-15:
>
> > 1.3.1.2.    Economic Damage Category. Loss of income, earnings or profits Suffered by Natural Persons or Entities as a result of the *Deepwater Horizon* Incident.

BP, taking a sentence out of context and in isolation, asks the Court to look only at the "**summary**" contained within Section 1.3.1.2, and to completely disregard the incorporation of Exhibit 4B as the "**full description**" of Class Members, as stated in Section 1.3.1.

BP's proffered interpretation also asks the Court to disregard the definition of "Economic Damage" in Section 38.55,[10] as well as the express incorporation of Exhibit 4B within the Business Economic Loss Sections 5.3.1, 5.3.2.1, and 5.3.2.3. In short, BP asks the Court to disregard the Settlement's actual causation requirements for Business Economic Loss Claims.

---

[10] "Economic Damage" is defined as loss of profits, income or earnings "*allegedly*" arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the *Deepwater Horizon* Incident.

Section 5.3.2.3 of the Settlement is key.  It sets forth the "Causation Requirements For Business Economic Loss Claims" as follows:

> Business Economic Loss Claimants, unless causation is presumed, ***must establish that their loss was due to or resulting from*** the Deepwater Horizon Incident.  The ***causation requirements*** for such Claims ***are set forth in Exhibit 4B***.[11]

Exhibit 4B, in turn, sets forth the transparent and objective methodologies by which the Parties agreed that BEL Claimants would establish that their loss was due to or resulting from the *Deepwater Horizon* Incident.

### 1.     Causation Is a Separate, Distinct, and Integral Requirement of the Settlement Agreement for Class Membership.

As observed by Judge Southwick, "Exhibit 4B of the Settlement Agreement allowed causation to be supported by loss calculations under Exhibit 4C rather than by requiring the claimant to prove that the loss had any factual relationship to BP's actions."[12]  Exhibit 4B sets out the proof of what losses are attributable to the Spill for settlement purposes, but does not establish the compensation due any

---

[11] *See also* SETTLEMENT AGREEMENT, § 5.3.1 ("The Economic Damage Claim Process, Economic Damage Claim Frameworks, and other details for determining the Economic Damage Compensation Amounts *are set forth in the Exhibits to this Agreement, which are incorporated herein by reference*") (emphasis supplied); § 5.3.2.1 ("The frameworks setting forth the documentation requirements governing Business Economic Loss Claims, and the standards for evaluating such Claims, *are set forth in Exhibits 4A-7 to the Agreement*") (emphasis supplied).

[12] *In re: Deepwater Horizon*, 732 F.3d 326, 347 (5th Cir. 2013) (Southwick, J., concurring); *see also,* 732 F.3d at 346 (Southwick, J., concurring) ("The Settlement Agreement resolved two separate issues by, in effect, combining them.  One concerned loss *causation,* and the other loss *measurement.*  If a BEL claimant could prove an economic loss, properly measured, that proof substituted for evidence of causation…. The agreement simplified the claims process by making proof of loss a substitute for proof of factual causation").  It is also true that the Settlement tests do implicate spill causation by objective, calculable means.  The V, Modified-V, and Decline-Only Tests require additional indicia that the claimed losses are Spill-related.

claimant.  Compensation is established under Exhibit 4C.  Thus, for most claims, (and virtually all of the claims that BP is now complaining about), the Causation Requirements for Business Economic Loss Claims under Section 5.3.2.3 and Exhibit 4B are separate and distinct from the Compensation Methodology set forth in Section 5.3.2.4 and Exhibit 4C.

Exhibit 4B requires the claiming Entity to demonstrate not only a downturn in revenue, but some other indicia that the downturn was caused by the Spill.  The parties agreed that the indicia of relatedness to the spill could come in to two general forms.  First, if a claimant could show that after the decline in revenue there was a later upturn in revenue within the required timeframe (the V-Shaped Revenue Pattern), then the parties agreed that the decline was "due to" and/or "caused by" the spill:  causation is accomplished.  In those instances in which a claimant business did not experience a later upturn in revenue, that claimant would need to open its books even further to show that a certain amount of its customers were either tourists or living in an affected zone.[13]

---

[13] There are tens of thousands of businesses within Zones B, C, and D which are not eligible for Compensation because they cannot satisfy one or more of the Causation Tests for reasons ranging from the obvious (they did not lose income) to the mathematical (their losses do not meet the necessary percentage increase during the specified time frame).  As of October 2013, the Claims Administrator denied 2,840 BEL claims for failing to meet these very causation tests. *See, e.g.,* Exhibit A to CLAIMS ADMINISTRATOR'S STATUS REPORT (Oct. 11, 2013) [Rec. Doc. 11646-1], at 3.

These Causation Tests are illustrated by the following two graphs: [14, 15]



---

[14] BUSINESS ECONOMIC LOSS CLAIMS: CAUSATION REVENUE TREND TEST (for "Tutorial" with Claims Administrator) (May 7, 2012) [Doc. 11826-1, Exhibit "A", at 10].
[15] SUMMARY OF REVENUE PATTERN REQUIREMENTS FOR CAUSATION TESTS (displayed during Preliminary Approval Hearing) (April 25, 2012) [Doc. 9087-1, at 5].

It is only after a claiming Entity establishes Causation under Exhibit 4B that its Compensation is determined under the separate and distinct methodology set forth in Exhibit 4C.  This Compensation Methodology, in turn, is a separate two-step process, which factors in both revenue and expenses, and which can be calculated using different months than were used to establish Causation.[16]

BP's current argument ignores what the settlement documentation actually shows, and what the District Court found:  The Settlement Agreement does incorporate express and specific causation requirements and tests, employing objective criteria, that connect class members' claimed economic losses to the Spill. The Agreement is replete with causation criteria, tests, and requests, all of which were made a part of the Claims Administrator's determination process.

As a matter of historical fact, the Claims Administrator sought and received guidance and clarity on this point from the parties before final approval, in order to assure identification and implementation of all of the Settlement Agreement's actual and express causation requirements.

In its December 24, 2013 *Order & Reasons* [Rec. Doc. 12055], the District Court noted:

> Accordingly, on October 10, 2012, after receiving input from BP and Class Counsel, the Claims Administrator issued the following policy announcement:

---

[16] *See, e.g.,* Addendum to Causation Requirements for Business Economic Loss Claims and Compensation Framework for Business Economic Loss Claims [Doc. 6276-10, at pp.7-8].

**2. No Analysis of Alternative Causes of Economic Losses.**

The Settlement Agreement represents the Parties' negotiated agreement on the criteria to be used in establishing causation. The Settlement Agreement sets out specific criteria that must be satisfied in order for a claimant to establish causation. Once causation is established, the Settlement Agreement further provides specific formulae by which compensation is to be measured. All such matters are negotiated terms that are an integral part of the Settlement Agreement. *The Settlement Agreement does not contemplate that the Claims Administrator will undertake additional analysis of causation issues beyond those criteria that are specifically set out in the Settlement Agreement. Both Class Counsel and BP have in response to the Claims Administrator's inquiry confirmed that this is in fact a correct statement of their intent and of the terms of the Settlement Agreement.* The Claims Administrator will thus compensate eligible Business Economic Loss and Individual Economic Loss claimants for all losses payable under the terms of the Economic Loss frameworks in the Settlement Agreement, **without regard to whether such losses resulted or may have resulted from a cause other than the Deepwater Horizon oil spill provided such claimants have satisfied the specific causation requirements set out in the Settlement Agreement.** Further, the Claims Administrator *will not evaluate potential alternative causes* of the claimant's economic injury, other than the analysis required by Exhibit 8A of whether an Individual Economic Loss claimant was terminated from a Claiming Job for cause.

[Rec. Doc. 8963-71 (emphasis added)].  In other words, with respect to business economic loss claims, so long as a claim satisfied one of the tests set forth in Exhibit 4B to the Settlement (and assuming the claimant met the geographic requirements and the claimant or claim was not excluded under Section 2 or Section 3), the Settlement mandated that the Claims Administrator deem the claim

eligible for payment.  No further inquiry into whether or not the loss was factually caused by the oil spill was necessary because the Settlement's causation criteria were satisfied.[17]

Nor is there any further causal inquiry to determine class membership. While BP now claims that the Class Definition inquiry is somehow separate and distinct from the Exhibit 4B inquiry, BP did ***not*** – either in responding to the Claims Administrator's inquiry in September 2012, in response to the Claims Administrator's Policy announced in October of 2012, or when the Parties appeared before the Court in December of 2012 – ever suggest that there was some *additional* undefined and presumably subjective "causal nexus" requirement for Class Definition purpose.  Indeed, as acknowledged by Mr. Godfrey in his declaration submitted on this remand, BP expressly reconfirmed, on December 15, 2012, that, as to the Section 1.3.1.2 Class Definition question, "Damages must be as a result of the *Deepwater Horizon* Incident *as provided in* the Deepwater Horizon Economic and Property Damages Agreement."[18]

### 3. The Settlement Agreement Properly Defines Class Membership Objectively.

The attempt to root an ill-defined causation requirement in the class definition is also unsupported by the record.  At each stage below, BP and its

---

[17] 12/24/13 *Order & Reasons*, at 32 [Rec. Doc. 12055].
[18] GODFREY DECLARATION, ¶¶ 8-9 (11/20/13) [Doc. 11876-1].

experts represented to the District Court that a chief virtue of the Settlement Agreement was the existence of an objectively ascertainable class. *See, e.g., BP Defendants and Plaintiffs Proposed Findings of Fact and Conclusions of Law in Support of Final Approval* [Rec. Doc 7945], at 87, ¶321 (the Class Definition "is objective, precise, and detailed, and does not turn on the merits …. Nothing in the class definition requires a determination on the merits or delves into any person's subjective mental state. The definition is based on objective criteria such as where … an entity owned, operated, or leased a physical facility, or employed full time workers"); MILLER DECLARATION [Doc 7114-16], p.6, ¶13 (the Class Definition "clearly and objectively defines the class in terms of time period, geographic region, and type of claim"); COFFEE DECLARATION [Doc 7110-3], p.13, ¶19 (the Class Definition leads to "a list of easily identifiable categories of … entities who are permitted to show objective losses from that disaster"); BP MEMO IN SUPPORT OF MOTION FOR FINAL SETTLEMENT APPROVAL (Aug. 13, 2012) [Doc 7114-1], at pp.6-7, 11-12, 29-30, 33; BUSINESS ECONOMIC GROWTH: BENEFITS (from BP Draft Tutorial Presentation, at pp.2-3) [Doc 11826-1, at 3-4].[19]

---

[19] *See, e.g., John v. National Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23.") (*citing DeBrekmaeker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970), *and* 5 MOORE'S FEDERAL PRACTICE §23.21[1], at 23-47 (Matthew Bender 3d ed. 1997) ("the class must be susceptible of precise definition. There can be no class action if the proposed class is 'amorphous' or 'imprecise'")). Deferring membership pending proof of causation, or other merits elements, would create an imprecise, amorphous class. *See also* MANUAL FOR COMPLEX LITIGATION, FOURTH (Federal

From a procedural standpoint, moreover:

> BP never appealed from or otherwise sought this Court's review of
> the October 10, 2012 policy announcement. This is in contrast to the
> Claims Administrator's January 15, 2013 policy announcement
> regarding the calculation of variable profit for BEL claims under
> Exhibit 4C, which, as detailed in the previous discussion, BP
> promptly appealed to this Court and then to the Fifth Circuit BEL
> panel. Indeed, as reflected in the policy announcement and as
> discussed below and in the Appendix, BP advanced the very position
> adopted by the Claims Administrator in the October 12, 2012 policy
> announcement.[20]

BP now apparently regrets that it chose not to insist upon an alternative

causation defense to individual BEL claims payments.  Were this a genuine

mistake, or inadvertence on the part of a less sophisticated litigant, there might be

room, as a matter of discretion, for it to be accommodated.  But the record is so

clear that BP repeatedly chose, and promoted its choice in support of settlement

approval, to dispense with an alternative causation defense, but this would result,

after the fact, in a completely new Settlement.   This essential point is made by the

District Court at pages 30-32 of its *Order & Reasons*, and bears consideration:  the

Settlement's existing causation mechanisms were a choice, not a mistake; they

were an intended choice, not an inadvertent one; and they were a choice that BP

---

Judicial Center 2004) §21.222 ("The definition must be precise, objective and presently
ascertainable.").  The definition should *not* build in causation, proof on the merits, or damages.
*Id.*  These are determined after common, liability-related questions are adjudicated or settled.
*See* MANUAL, §§ 21.322; 21.5; 21.66, *see also* 12/21/12 *Order and Reasons* ("Granting Final
Approval of the Economic and Property Damages Settlement Agreement") [Rec. Doc. 8138-25],
for a functional summary of the Settlement class definition.
[20] 12/24/13 *Order & Reasons*, at 10-11 [Rec. Doc. 12055].

affirmatively represented to the court and to the members of the class as a positive benefit of the Settlement and a reason for class members to participate as claimants.

BP argues that what it presented as a benefit now represents a conflict: "good" class members would get more than the settlement if "bad" class members were kept out under a new "causal – nexus requirement."[21]  As the District Court noted, *supra*, this argument makes no sense, assuming the settlement is, as BP had consistently represented, an uncapped one as to BEL.   Indeed, both sides repeatedly represented to the court that settlement negotiations involved no trade-off among groups or programs: as to BEL, there are neither caps nor trades.[22]  If BP is taking this new "conflict" argument seriously, it is repudiating its position, in public and on the record, that these claims are uncapped.   If it is attacking the settlement now because there was an internal cap, omitted from the record, such omission itself warrants judicial estoppel on this basis alone.   *See*, *e.g.*, *In re Superior Crewboats, Inc.*, 374 F.3d 330 (5th Cir. 2004).

---

[21] In the District Court, Plaintiffs challenged BP's conclusory allegations that 64 claims were not in any way causally related to the Oil Spill.   *Motion to Strike Unsubstantiated Exhibits & Contest Misstatements Concerning Specific Claims* [Rec. Doc. 11989].   Even a simple cursory review of BP's list of 64 examples included numerous claims in which the Claimant explained how they sustained losses from the Spill and that at least four of these claims were previously paid by BP through the GCCF.   *See Declaration of John Creevy*, at 2-4 [Rec. Doc. 11989-2], attached as Appendix "A" to this filing.   The District Court has yet to rule on the Motion to Strike.

[22] *See, e.g.,* Rec. Doc. 8138-7; 8138-32, 33.

Although BP correctly notes the connection between the settlement definition contained in the Settlement Agreement, and that set forth in the *Bon Secour* settlement class action complaint, filed contemporaneously, that history is incomplete.[23] Omitted is the fact that this Settlement was based the previously-filed B1 Master Complaint, which had served, pursuant to the District Court's case management orders, as the operative class pleading throughout the pretrial stage of the litigation.[24]

It was this Master Complaint that defined the scope of discovery and other pretrial activity, and it was this Master Complaint that was the subject of motions to dismiss by various defendants, including BP. The Settlement class definition was comprised of the claims that had survived prior legal challenge via motions to dismiss directed to the B1 Master Complaint. The District Court's September 30, 2011 *Order and Reasons* [As to Motions to Dismiss the B1 Master Complaint] [Rec. Doc. 4159] described the contours of the class and claims that survived these motions. These contours are carried forward in the definition of the settlement class. These claims are hence not merely "colorable;" they have been battle-tested, and survived, having met the plausibility requirements of *Twombly* and *Iqbal*, as

---

[23] No. 12-970, *Bon Secour Fisheries, Inc., et al. v. BP* [Rec. Doc. 6276, filed 4/16/2012]. The Settlement was filed on 4/18/2012 [Rec. Doc. 6276]. The *Bon Secour* complaint was amended on 5/2/2012 [Rec. Doc. 6412]. BP answered it on 5/7/2012 [Rec. Doc. 6453].
[24] Pretrial Order 11, at 3 [Rec. Doc. 569]. *Master Complaint: All Cases in B1 Bundle* [Rec. Doc. 879]. The First Amended B1 Complaint was filed on 2/9/2011 [Rec. Doc. 1128]. After motions were decided [Rec. Doc. 3830], BP answered the amended Complaint on 9/27/2011 [Rec. Doc. 4130].

set forth in the District Court's decision, as to the maritime and federal statutory claims of the class asserting economic loss in the wake of the spill. The settlement negotiations commenced only after this decision established the parameters of colorable claims.

The Agreement resolves these claims, albeit for a somewhat *narrower* class than that in the Master Complaint.[25] Settlement classes are not infrequently broader than those certified, or which could have been certified, for litigation purposes; here, the economic loss settlement class is *not* broader than the litigation class that survived motions to dismiss, and, if anything, is narrower.

### 4. The Class Definition Includes a Contextually-Specific Causation Requirement.

There are actually three steps to class membership: (1) one must reside in the geographical boundary; (2) one must have one of the claim types identified in the Settlement; and (3) the claim type must *not* be specifically excluded (*e.g.*, belong to the banking, insurance, core oil and gas, defense, real estate developing, or gaming industries).[26] It is step 2 that BP appears to take issue with. "Causation" is different for each of the different claims programs. For example, to

---

[25] The Class Definition excludes certain categories of claimants that the operative economic and property damages litigation class complaint, the "B1 Master Complaint," asserted, such as those in the insurance, core oil and gas, banking, real estate developing, defense contracting, and gaming industries. SETTLEMENT AGREEMENT, § 2.2. Other types of claims are also excluded by the Settlement but reserved to those who may have claims within the settlement, such as bodily injury claims, moratoria losses, or separate punitive damage claims against Halliburton and Transocean defendants. *Id.* at § 2.3.

[26] *See, e.g.,* Rec. Doc. 8138-67.

be included in the class for VoO claim, one would need to show that she signed a

MCVA, was placed on hire, and completed training.[27]  That completes causation.

BP does not contest this.  For the Seafood Program, one simply needs to show

captaincy or ownership of a vessel with a commercial fishing license, and submit

tax returns or trip tickets for 2007-2009.  A Seafood Claimant does not need to

make any showing whatsoever of lost income as a result of the spill.[28]  There is no

requirement to provide any financial information for after the spill in 2010 or

beyond.  BP does not contest this.  For Vessel Damage, by contrast, one needs to

show proof of repairs, and explain -- in a letter -- how they were related to the

spill.[29]  For IEL claims, post-spill financials are required, but there is no

requirement for the claimant to make a declaration that these losses result from the

Spill.[30]  In fact, IEL claimants can piggy-back onto eligibility determination of the

business who employs them.[31]  BP does not contest any of these.

The BEL program has a mathematical formula for causation applied to

everyone equally who satisfies the three steps above, and only those who show a

---

[27] SETTLEMENT AGREEMENT, § 5.5.

[28] *See BP Expert Fishkind Decl.* (Ex. 4), at ¶ 122 ("Eligible Claimants do not have to prove that their economic losses were due to the DWH Spill; rather, losses are presumed to have been due to the DWH spill.").

[29] SETTLEMENT AGREEMENT, Exhibit 14, at 3-4.

[30] SETTLEMENT AGREEMENT, § 5.3.6 and Exhibit 8A-8E.

[31] *BP Defendants and Plaintiffs Joint Proposed Findings of Fact and Conclusions of Law in Support of the Fairness Hearing*, at ¶ 160 (11/19/12) [Rec. Doc. 7945].  *See also id.* at ¶ 158 ("Causation is presumed if an individual (i) worked in Zone A; (ii) worked in the Primary Seafood Industry; (iii) worked in the Secondary Seafood Industry in Zones B or C; (iv) worked in Tourism in Zone B; or (v) worked in Charter Fishing in Zones A, B, or C.").

loss are paid. As BP summarized for the District Court in joint *Proposed Findings of Fact and Conclusions of Law*[32] in support of the Class Settlement:

> Where causation is not presumed, the causation tests are reasonable and flexible; they use standardized and transparent approaches. The causation tests *reflect rational expectations about the economic harm that the spill could have caused businesses*. The first option is the V-shaped revenue test, which requires proof of a downturn after the spill followed by a later upturn. Claimants with a less severe V ("Modified V-Shaped Revenue Pattern") or whose business did not experience an upturn in 2011 ("Decline-Only Revenue Pattern") may still recover provided that they can provide certain reasonable additional information. *The causation tests are economically rational and supported by data regarding the economic impact of the oil spill on the Seafood and Tourism industries.*[33]

Thus, no matter how many times BP quotes "as a result of," "due to," or "caused by," it is a semantic argument. The Settlement Agreement (depending on the claim) has different causations for different claims. The oil spill's effect on businesses, the parties agreed, could vary depending on industry and location. The

---

[32] The importance of the *BP Defendants and Plaintiffs' Joint Proposed Findings of Fact and Conclusions of Law* can not be overstated. [Rec. Doc. 7945] This 213 page pleading contains 732 paragraphs of background, procedural history, evidentiary support, and interpretative analysis of the Settlement Agreement submitted to the District Court and signed by *both parties*. It is the central document (other than the Settlement Agreement itself) that explicitly discusses "the intent of the parties" through negotiation and lays bear how BEL causation and class membership are intertwined. Rarely in a dispute concerning the interpretation of a Settlement Agreement does such a joint filing memorializing the parties' intent and understanding ever exist.

[33] *Id.* at ¶ 124 (emphasis supplied) [Rec. Doc. 7945]. *See also id.* at ¶ 126 ("Once the causation tests are satisfied, *all revenue and variable profit declines during the Compensation Period are presumed to be caused entirely by the spill, with no analysis of whether such declines were also traceable to other factors unrelated to the spill. This presumption would not be available in litigation*.") (emphasis supplied).

parties remedied the industry question by excluding a host of very prominent ones (*e.g.,* core oil and gas, insurance, banking, real estate development, defense contracting, and gaming).  The parties recognized the location issue by creating a sliding scale of compensation based on location and identified them pursuant to four zones --   Zones A, B, C, and D.  Zone A has no causation component (and, notably, BP does not even complain of that).[34]  Zones B and C are located in the Gulf Coast in those areas where the parties readily agreed there would likely be an impact from the spill.[35]  Zone D is typically located farther from the gulf and is by far the largest of the geographic zones.[36]

The term "causation" is used at least 250 times across the Settlement Agreement.  It means different things to different claims; and it means different things to different businesses depending on where they are located.  The test changes by percentage points to recognize this.  The Zone D test requires a greater

---

[34] *Id.* at ¶ 117 ("Causation is presumed (i) for all businesses in Zone A; (ii) for Tourism businesses in both Zones A and B; (iii) for all Primary Seafood Industry claimants; (iv) for Secondary Seafood Industry claimants in Zones A, B, and C; and (v) for Charter Fishing businesses in Zones A, B, and C.  Where causation is presumed, the causation presumption applies to *all losses established pursuant to the compensation methodology*.") (emphasis supplied).

[35] *Id.* at ¶ 119 ("Zone B consists of supplemental tourism areas that rely heavily on Gulf Coast–related tourism but whose economic activity also serves permanent residents."); *id.* at ¶ 120 ("Zone C consists of broader areas proximate to the Gulf Coast that include businesses that rely on both Gulf-related tourism and permanent residents.").

[36] *Id.* at ¶ 121 ("Zone D consists of the other areas outside of Zone A, B, and C — the remaining areas of the entirety of Louisiana, Mississippi, and Alabama, as well as certain counties in Florida and Texas.").

bounce back after the spill than Zone B.[37]  This results in far fewer businesses

qualifying under the test.  There is no causation test for Zone A and BP has not

complained about a single Zone A determination.

The economic class definition contained in both the Settlement, and the

operative complaint it resolves, reflects best practices for class definition in

compliance with Rule 23.[38]  As summarized in the Federal Judicial Center's

*Manual for Complex Litigation* (Fourth edition, 2004), Section 21.22 *Definition of*

*Class*,

> The definition must be precise, objective and presently ascertainable.
> For example, the class may consist of those persons and companies
> that purchased specified products or securities from the defendants
> during the specified period, or it may consist of all persons who
> sought employment or who were employed by the defendant during a
> fixed periods . . . an identifiable class exists if its members can be
> ascertained by reference to objective criteria.  The order defining the

---

[37] *Id.* at ¶ 123 ("Similarly, the zones included in the Economic Loss Zone Map reasonably reflect
the likelihood of a potential economic effect of the spill; it is generally reasonable to posit that as
distance increases away from the coast, the likelihood of damage is reduced.").  *See also
Affidavit of Economist Tim Ryan*, at 19 [Rec. Doc.12008-2] ("It is clear from the theoretical
economic analysis and the results of the simulation model employed in this report, the 2010 BP
oil spill touched almost every business in the area of direct damage and in other areas of the
Louisiana economy."); *Declaration of Economist Professor Sean Michael Smith*, at ¶ 11 (opining
that the economic impact from the BP Oil Spill reverberated throughout the entire Gulf Region
and throughout a spectrum of industries) [Rec. Doc. 12008-3].

[38] *See BP Counsel Rick Godfrey, Transcript of the Fairness Hearing*, at 52 (11/08/12) ("But in
this settlement agreement, in reaching it, we did one thing also that was unusual, that is, the PSC
and BP.  We not only had the oversight and wise guidance of Magistrate Judge Shushan; we not
only had the court-appointed neutral, Mr. Perry; we also went out and retained the nation's
leading legal experts, Professors Coffee, Miller, Klonoff and Issacharoff.  They have provided
the Court with their own declarations on both the structure, the propriety, the analysis under class
action law, and the fairness, reasonable and adequacy of this settlement. Those declarations are
well worth considering because these are our nation's leading experts in this field.") [Rec. Doc.
7892].

class should avoid subjective standards (e.g., a plaintiff's state of mind) or terms that depend on resolution of the merits (e.g., persons who were discriminated against).

BP's after-the-fact attempt to superimpose a subjective, merits-based "causal-nexus requirement" upon this class definition, so as to admit only those in the presently objectively-defined class who (in BP's view) should "win" on their claims, up-ends this rule.    The prevailing objective approach recognizes the distinctions between admission to class membership, proof on the merits on an individual claim, and recovery under a judgment or settlement.    The requirements for each of these are distinct, and should not merge.    Whether defined for purposes of a judgment under Fed. R. Civ. P. 23(c)(3) (litigation class), or a settlement agreement under Fed. R. Civ. P. 23(e) (settlement class), the class definition is broader than those who will make claims, which is again broader than those who will be paid claims.[39]    Many class members make no claims, and some who make claims fail the requirements for compensation, yet all are bound, preclusively, by the classwide judgment.    *Id.*    This system is objective, fair, practical, predictable, and final.    The system (if it can even be called such) which BP now requests, without specifying its mechanism, would have none of these attributes.

---

[39] *See BP Counsel Rick Godfrey, Transcript of the Fairness Hearing*, at 61 ("So the class size is the citizens and communities here that fall within the class definition. We estimate it, you know, could be a *couple million*, but it doesn't really matter. We think that the total objectors and opt-outs, no matter how you measure them, are less than one percent.").    To date, only approximately 250,000 claims have been filed, far less than the millions that BP Counsel estimated.

**5.     BP Still Has Not Defined the Putative "Causal Nexus"**

Despite BP's after-the-fact attempt to superimpose an additional "causal-nexus requirement" that the Claims Administrator is to somehow apply to determine class membership before commencing the determination of a BEL claim, neither that requirement, nor any such pre-test, has been identified by BP, or is found in the class definition, or elsewhere in the Settlement documents, or in any documents or statements made in or to the District Court, or to this Honorable Court, prior to its remand.

**C.     The Economic Class Presents "Colorable" Claims**

The District Court properly read this Court's BEL Panel opinion, *In re Deepwater Horizon*, 732 F.3d 326, 340-44 (5th Cir. 2013), to not require an inquiry into the "colorable" nature of the claims in the class settlement. That portion of Judge Clement's lead opinion did not muster the vote of Judge Southwick and therefore was not the holding of the Court. The time has come, however, to address this issue head on. BP has taken this discussion to mean that its failure to agree or insist on what it now calls an additional "causal-nexus requirement" is irrelevant, because such a requirement must inhere in the settlement for its approval to stand.

The simple fact is that claims that assert legally cognizable causes of action and that have survived motions to dismiss are "colorable" and satisfy all aspects of

Article III.  The District Court thoroughly addressed the Article III and Rule 23 issues in its December 24, 2013 *Order & Reasons*, at pages 19-37.  The District Court also observed, correctly we respectfully submit, that this cluster of Article III, Rule 23, and Rules Enabling Act issues is already and properly before the Certification Panel, subsequent to full briefing and oral argument by BP and Class Counsel, and that jurisdiction to determine these questions reposes there.

As for "colorability," the simple answer is that under this Court's articulation of the legal standard for determining whether a claim is colorable, the Economic Class described by the class definition in the operative pleading—the *Bon Secour* amended settlement class action complaint—asserts colorable claims on behalf of all Economic Class members.[40]  The Settlement defines the class identically, and adds a detailed system of causation tests to determine which of these colorable claims will actually be paid.

The BEL Panel opinion defines a "colorable" claim as a claim with "some possible validity," operationally, it is a claim where the plaintiff "can *allege* standing and the elements necessary to state a claim on which relief can be granted."  *In re Deepwater Horizon*, 732 F.3d at 340, 342 (emphasis in original). This Court took pains to show that for class members to have colorable claims, they need not prove that they would ultimately prevail on the merits, but only that

---

[40] As the District Court noted, the analysis and declarations of BP's economic experts, further support colorability.  *See, e.g., Order and Reasons,* at 32-35.

they can assert legally tenable claims: "There is a distinction here between whether a claim is colorable and whether it is meritorious. A plaintiff's claim is colorable if he can *allege* standing and the elements necessary to state a claim on which relief can be granted—whether or not his claim is ultimately meritorious—whether he can *prove* his case." *Id.* (emphasis in original).

There are two key requirements here. First, the determination of whether a claim is colorable is one of pleading based on the *allegation* of standing and the necessary elements to state a claim. This is basically the standard for asserting constitutional standing and for surviving a motion to dismiss and is consistent with the law of this Circuit that the standing of class members was a matter of pleading, not further evidentiary proof.

Thus, in *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298 (5th Cir. 2009), this Court addressed the Article III standing requirement in the context of a class action.[41] In rejecting defendants' "no standing" argument, the *Mims* court determined essentially that defendants there made the same error BP is advancing here. "Although [defendant] references Article III standing and cites the appropriate factors from *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992),

---

[41] *Mims* determined that the class had standing to assert its claims, reversed class certification on the federal statutory RESPA claim [12 U.S.C. § 2607(b)], and remanded to the district court for further proceedings on class certification of the related state law claims, stating "Although we see no legal impediment to the certification of a class on the state law claims, given our reversal of the federal class certification, we remand to allow the district court to consider whether to exercise its discretion to retain pendant jurisdiction over those claims." *Mims*, 590 F.3d at 301.

the substance of its argument is that the plaintiff failed to state a claim under RESPA on the merits." *Id.* at 302. The *Mims* decision recognizes that standing is a matter of pleading claims, not of proving them on the merits. Accordingly, it focused on the class allegations. "There is no serious question that the plaintiffs have standing to bring this claim. They have *alleged* an injury-in-fact (overpayment of premiums for title insurance issued upon refinancing their mortgage), causation (the defendants overbilled for the premiums) and redressability (if plaintiffs are successful, they will be refunded the overpayment)." *Id.* (emphasis added). Standing, and hence "colorability," are matters of pleading, not of proof. No case imposes victory at trial as the predicate of standing, or of determining the colorability of a claim.

Second, this Court's discussion of the colorability standard points to a critical difference between the legal adequacy of claims asserted and their ultimate proof on the facts of the case. It is helpful to return to the dispute that divided the en banc Third Circuit, and which informed much of the discussion in this Court and in the court below. *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 308 (3d Cir. 2010) (en banc).

### D.  *Sullivan* Supports the Present Class Settlement

At issue in *Sullivan* was whether a nationwide class settlement could be certified for a variety of classes asserting antitrust and related claims against the

DeBeers diamond cartel. Judge Jordan dissented because he found that, if the classes were construed to assert only antitrust claims, indirect purchasers in states that were not covered by *Illinois Brick* repealers could not legally assert a claim. Under such circumstances, Judge Jordan maintained that the class settlement could not expand the scope of liability to include in the settlement claimants whose claims were barred *as a matter of law*. *Id.* at 340 ("The problem with the enormous, nationwide class most particularly at issue in this case is not that it may include people with marginal or dubious claims. The class of indirect purchasers of De Beers diamonds actually presents a far more troubling problem than that. It includes people who have no legal claim whatsoever.").

The Third Circuit majority rejected this view for two reasons. First, it found that the underlying cases asserted a variety of claims that were not precluded as a matter of law. *Id.* at 308. Second, the majority found that even a determination of the legal merits of all class claims would run afoul of the purposes of Rule 23's expansive view of class action settlement authority:

> Were we to require district courts to ensure that . . . each class member has a "colorable legal claim," district courts would be obligated at the class certification stage to, *sua sponte*, conduct a thorough Rule 12(b)(6) analysis of every statutory and common-law claim to ensure that each plaintiff—including absent class members— possesses a valid cause of action or a "colorable claim" under the applicable federal or state substantive law. Such an inquiry into the merits goes beyond the requirements of Rule 23, for Rule 23 does not require a district court to determine whether class members

individually have a colorable claim—one that [in the words of the dissent] "appear[s] to be true, valid, or right."

*Id.*

This case does not pose the issue that divided the Third Circuit in *Sullivan*. Here, the District Court did conduct a rule 12(b)(6) analysis of the claims comprising the Settlement, and no appeals were taken from these determinations. Thus, there is no argument that the class claims are legally impossible; even under BP's repeated invocations of the need for proof of a "causal nexus," the demand boils down instead to a question of the sufficiency of the factual proof on the merits, something that is outside the colorability analysis. The entire class alleges economic injury in fact as a result of the Gulf Spill, causation, and redressibility – the factors identified by *Mims* as necessary for standing as a class member.

As the District Court noted in its Order & Reasons, the Class claims are federal statutory claims (OPA claims) that are broader in scope than traditional maritime claims. This broad remedial scheme extends the reach of maritime law well beyond *Robins Dry Dock* and any requirement of physical proximity to the oil slick as a basis of recovery. Liability under OPA makes all these claims "colorable" and whether a given Class member has sustained OPA economic damages is inherently a fact based question: the very question that the Settlement resolves, rather than adjudicates, by providing for a systematic claims determination mechanism.

Plaintiffs-Appellees submit that the *Sullivan* majority has the better of the argument on the scope of class action settlement authority.  As the District Court noted, implementation of the *Sullivan* minority view "apparently would require either this Court or the Claims Administrator to assess the viability of ***each*** claim—imposing a new, undefined, and subjective requirement as to whether each claim is "colorable."  As the *Sullivan* majority recognized, "Even were a district court to properly ascertain the applicable law after conducting the choice-of-law inquiry, it would likely encounter unsettled legal questions, further undermining its ability to assess the viability of some class members' claims and increasing the costs of administration."  *Sullivan*, 667 F.3d at 309.  But the battle between the *Sullivan* majority and minority is avoided by the Deepwater Economic Settlement: it satisfies both views.

Unlike in *Sullivan,* all the Class claims here have undergone, and survived, the Rule 12 challenge that provides assurance—were such required—of colorability.  In short, the *Sullivan* minority concern was not that a given class member might be unable to prove individual loss as a result of overcharging by De Beers:  that was the issue that was proper for classwide settlement.  Rather, the concern was one, entirely absent here, that a given class member might be without a cognizable claim on which to proceed.  That question has been answered in this case.

Moreover, the record reveals extensive *factual* support for the colorability of the claims that BP now attacks. Even were this Court to embrace fully the standard that claims must be proven colorable before being settled, the district court relied on a sufficient evidentiary basis for that conclusion. At the settlement approval stage, the District Court heard evidence propounded by Halliburton, including the extensive econometric analysis, challenging the injury standard for claims in the case, including some of the same BEL claims at issue in the present motion for injunctive relief.

In response, BP propounded expert testimony from Professors Miller and Coffee, as well as econometric experts, to claim that the class was properly defined as comprised of persons and businesses who had live claims against BP. As BP told the district court: "the class definition takes pains … to exclude claims that BP does not believe ***are even colorably compensable*** under OPA or maritime law; See Miller Decl. (Ex. 15) ¶ 21 ("The exclusions reduce the risk that such claims would distort the orderly and rational allocation of settlement benefits to persons and entities who were most affected by the Incident."). The result is a class that is … carefully tailored to what the parties could reasonably agree on against the backdrop of the uniform body of OPA and maritime law that the Court has ruled is applicable (but while preserving any BP objections to this Court's prior rulings." *BP Memorandum in Support of Final Approval of Economic Settlement,* at 11-14

(8/13/12) [Rec. Doc. 7114-1].

Any such "colorability" pre-test was met long ago, when the class claims survived motions to dismiss, and additional "causal-nexus" sorting took place throughout the negotiation process; as the District Court has noted, there are exclusions from the settlement class; BP's experts and counsel explained multiple times in BP's Settlement approval filings, the Settlement class contours that emerged were designed to include colorable, and exclude non-colorable claims.[42] The claims of the economic class, as asserted in the economic settlement class action complaint have passed any applicable "colorability" test as a matter of historic factual record.

The District Court's *Order & Reasons* also cogently addresses the contention that colorability, like standing, must somehow be proven backwards, that is, that whether a claim is "colorable" proceeds from a showing of causation. Even under such a regime, where parties must prove their claims before they settle them, the District Court demonstrates, from BP's experts' economic analysis, that the Settlements "V-Shaped Revenue Pattern" test for causation is also a functional

---

[42] *BP Defendants and Plaintiffs' Joint Proposed Findings of Fact and Conclusions of Law*, ¶ 8 ("The Court issued an order granting in part and denying in part various motions to dismiss the Amended B1 Complaint on August 26, 2011. *See* Rec. Doc. 3830. This ruling, along with others issued by the Court, helped to apprise both plaintiffs and defendants of various dimensions of legal risk inherent in their positions, claims, and defenses. Most significantly, this Order concluded that while the Oil Pollution Act did not fully displace federal maritime law, federal maritime law entirely preempted state law.") [Rec. Doc. 7945].

colorability test.  [Rec. Doc. 12055 at 32-35, quoting from Fishkind Declaration, Rec. Doc. 7114-5, 20-22]

But a standard that required proof that each claim was legally viable prior to settlement would stand Supreme Court authority on its head.  The Supreme Court in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) recognized that even future claims, by definition claims that are not yet colorable, may be settled in a class action assuming adequacy of representation.  The *Amchem* rule was not that no future claims may be settled because they are not legally colorable at the time, but that such claims could be resolved in a class settlement, if it were restructured to adequately protect their interests.[43]  Further, the Supreme Court has twice recently rejected the proposition that a litigation class must establish the impact of the challenged conduct on class members as a condition precedent to class certification.  As the Court held, insistence on a finding that the defendant is probably liable prior to ruling on class certification, a proposition this Court rejected last term because it "would have us put the cart before the horse." *Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1191 (2013). The burden at class certification is not to establish that the class members "will win the fray…; rather, it is to select the 'metho[d]' best suited to adjudication

---

[43] *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139 (2010) affirming similarly broad standing to seek redress from potential future wrongs, including those implicating other causes, in a litigation context.

of the controversy 'fairly and efficiently.'" *Id.*   As *Amgen* holds, "Rule 23 grants Courts no license to engage in fee-ranging inquiries at the class certification stage." *Id* at 1194-95.[44]  *See also Erica P. John Fund, Inc. v. Halliburton*, 131 S.Ct. 2179 (2011).

As Judge Posner noted in *Carnegie*, "often … there is a big difference from the standpoint of manageability between the liability and remedial phases of a class action.   The number of class members need have no bearing on the burdensomeness of litigating a violation of RICO.  Whether particular members of the class are defrauded and if so what their damages were are another matter, and it may be that if and when defendants are determined to have violated the law separate proceedings of some character will be required to determine the entitlement of the individual class member to relief." *Id.*   Many other courts, including this one, have agreed.  *See*, *e.g.*, *Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469 (7th Cir. 2004), *Bell Atlantic Corp. v. AT&T Corp.* 339 F.3d 294, 307 (5th Cir. 2003), *In re VISA/Master Money Antitrust Litigation*, 280 F.3d 124, 141 (2nd Cir. 2001), *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 168 (2nd

---

[44] BP omits *Amgen* in favor of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) but both buttress the propriety of the District Court's certification and settlement-related findings. *Comcast* involved classwide "impact" damage models specific to antitrust litigation classes, requiring that the proffered economic methodology be linked to the theory of liability. *Comcast* requires the existence of this match or link between liability and damage theories, not a pre-determination of the merits. *Id.* at 143 33; *In re Foodservice Inc. Pricing Litigation*, 729 F.3d 108, 123 n.8 (2d Cir. 2013).  To the extent such a linkage applies beyond the realm of antitrust to an OPA settlement class, the Settlement methodologies, as acknowledged in damages/causation declarations of BP's economic experts provide it. *Order and Reasons*, at 14-15 & 32-36.

Cir. 2001).

In none of these cases is it intimated that such proof of damages elements be proven by class members as a predicate to class membership, if it were, that procedural rarity, reverse bifurcation (causation/damages trials first; liability trial second) would be the litigation norm. To the contrary, the common, class-wide liability questions are decided (or settled) before class members' individual causation and damage questions are addressed. For these logical, practical, and due-process reasons, classes as defined, for either trial or settlement, may and do contain many who will ultimately be unable to prove entitlement to relief. They are in the class until (and when) they fail; rather than awaiting admission until they succeed.

This rule was stated trenchantly in *Kohen v. Pac. Inc. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) (affirming class certification). "What is true is that a class will often include persons who have not been injured by the defendants' conduct; indeed this is almost inevitable because … many of the members of the class may be unknown … or … the facts hearing on these claims may be unknown. Such a possibility or, indeed, inevitability does not preclude class certification." *Id*.

Nor does it defeat these class members' Article III standing. Judge Posner in *Kohen* drew the comparison between class members and individual plaintiffs "if an individual's case goes to trial, he may lose, because he cannot prove injury.

Upon such failure of proof, the court does not lose jurisdiction. "Jurisdiction established at the pleading stage by a claim of injury that is not successfully challenged at that stage is not lost when at trial the plaintiff fails to substantiate the allegation of injury. Instead the suit is dismissed on the merits." The same is true in class suits. *Kohen*, 571 F.3d at 677. The District Court was not required to determine that every member of the class had suffered damages as a prerequisite to class certification. *Mims*, 590 F.3d at 308. And the same is true in settled class suits; class members who fail to establish entitlement to settlement proceeds under the claims mechanisms of the settlement are not paid, but they remain in the class, under the court's jurisdiction, and bound by its judgment.

The Supreme Court's recent decision in *Amgen*, affirming class certification, also illustrates this point. There, the court decided that while securities classes must prove common question of materiality to prevail on the merits, it need not do so as a predicate to class certification. Materiality is a common question, decided on an objective basis by the trier of fact, and as to this question, the class is entirely cohesive, it will prevail or fail in unison. In no event will the individual circumstances of particular class members bear on the inquiry." *Amgen*, 133 S. Ct. 1184, 1191. Likewise, of course, no inquiry is tried on the individual circumstances of the class member (*e.g.*, whether they suffered economic loss, and what caused it) until such common questions are adjudicated or compromised. The

formation of the class and admission to its membership precedes, rather than awaits, those events.

### E.    A Certified Class Action May Properly Include Persons Who Will Not Ultimately Recover

As an alternative to arguing what the Settlement actually provides, BP asserts that the combination of Rule 23, Article III and the Rules Enabling Act mandate a causation test beyond what is to be found in the actual settlement instrument and the settlement history. Such a position runs contrary to decades of well-settled law about the propriety of class actions based on the common conduct of the defendant, not the common injury of the class members -- even in the litigation setting.

There is nothing novel in courts entertaining classes that satisfy the requirements of Rule 23 and that are comprised of persons similarly exposed to challenged conduct, regardless whether each class member would ultimately obtain a benefit. In all disparate impact employment discrimination claims, for example, the class is defined by exposure to unlawful conduct, notwithstanding the fact that not all class members would be entitled to a remedy. *See, e.g., Dothard v. Rawlinson*, 433 U.S. 321 (1977) (invalidating height and weight requirements for prison guards as discriminatory against women, without any showing of who, if anyone, would gain employment).

In *Grutter v. Bollinger*, 539 U.S. 306 (2003), the Supreme Court reviewed a challenge to law school admissions practices brought by a class comprised of disappointed applicants for admission to the University of Michigan Law School, claiming that they had been disadvantaged by racial preferences, without any proof that specific individuals would have benefitted from a remedy. The trial court had ordered "bifurcation of the trial into liability and damages phases," *id.* at 317, meaning that this Court reviewed claims before there had been any determination of which, if any, class members stood to gain from the remedy.

This is hardly a novel proposition: "the class-action device save[s] the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion." *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979). *Califano* granted classwide relief to all persons subject to challenged social security regulations, regardless whether a harm had been visited upon them:

> [C]lass relief for claims such as those presented by respondents in this case is peculiarly appropriate. The issues involved are common to the class as a whole. They turn on questions of law applicable in the same manner to each member of the class. The ultimate question is whether a pre-recoupment hearing is to be held, and each individual claim has little monetary value. It is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue. And the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every social security beneficiary to be litigated in an economical fashion under Rule 23.

*Id.* at 701.  As the Court subsequently explained in striking down the University of Michigan undergraduate affirmative action program: "Particularly instructive here is our statement in *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 [159 n.15] (1982), that "[i]f [defendant-employer] used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the ... requirements of Rule 23(a)."  *Gratz v. Bollinger*, 539 U.S. 244, 267 (2003).

BP's attempt to recast their opposition as a matter of constitutional standing or - even more fancifully - due process is equally unavailing.  In the non-class context, the Supreme Court has entertained challenges to unlawful conduct by those who have been exposed to the conduct, regardless whether each individual has proven a realized harm.  *See, e.g., Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 713 (2007) (allowing challenge to school assignment by Parents Involved based on behalf of  individuals "who have been or may be denied assignment to their chosen high school in the district because of their race") (emphasis added).

The same standard obtains even in claims brought by individuals.  Thus, "even if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he lacked standing."

*Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville, Fla.*, 508 U.S. 656, 665 (1993) (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280-81 n.14 (1978) (emphasis added). *See also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (same). As the Court added, "'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Northeastern Florida Chapter*, 508 U.S. at 666.

F. **The District Court Properly Applied Principles Of Judicial Estoppel To The Facts Stipulated By The Parties As These Appear In The Factual Record Of The Settlement And Its Approval Process**

On remand, the District Court conducted a thorough review of an extensive factual record, including Exhibits 4B and 4C of the Settlement, the entirety of the Settlement itself (including its Exhibits), the submissions made by the parties to the Claims Administrator regarding settlement interpretation and implementation, and the voluminous submissions made contemporaneously throughout the settlement approval process itself by the parties. Under the unusual posture of this Appeal, however, the key elements of that record have not been made available to this Court. Accordingly, Plaintiffs-Appellants will summarize some of the salient features of the record below without reference to an appellate record. Plaintiff-Appellants will also supplement this discussion with a letter brief, as instructed by the Court.

To begin with, the District Court had before it a complete record of everything the parties had said, written, and done pertinent to the manner in which the Settlement addresses and determines causation for BEL claims. The parties had a full opportunity to create a complete record, through their corresponding submissions. The District Court was charged with determining what the parties had done, and it did so. What the District Court found is unremarkable: consistent with the principles of class settlements, the parties have negotiated, drafted, finalized, and submitted for preliminary and final approval a compensation system calibrated, first, to geographic proximity to the Spill, and second to objectively quantifiable evidence of economic loss subsequent to the Spill. This detailed public and objective system was intended by the parties to replace the previous GCCF system, controlled by BP, with one supervised by the court; replacing a system that was subjective and individualized, with one that was objective and consistent; and replacing a system in which BP could unilaterally refuse to pay claims with one in which both claimants and BP had appellate recourse within the settlement system for review and reconsideration of the Claims Administrator's payment determinations. All of these transformations were expected under processes and procedures described, in great detail, in the intensively negotiated and ultimately agreed provisions of the Settlement itself.[45]

---

[45] *BP Defendants and Plaintiffs Joint Proposed Findings of Fact and Conclusions of Law*, at ¶¶

As the District Court found, "BP not only took the position that causation under the Settlement was determined exclusively through Exhibit 4B, it promoted Exhibit 4B as providing a benefit to claimants in that it was 'more than reasonable,' 'more than fair,' 'objective,' 'transparent,' 'standardized,' 'economically appropriate,' 'consistent with . . . economic reality,' and an 'efficient' method of establishing causation. Such attributes, BP claimed, were part of the reason the Settlement deserved Court approval under Rule 23." Slip. Op. at 18.

The District Court has now twice found this to be the facts of record – once at class certification, and then again on remand from this Court. BP provides no basis at all in the 50-page memorandum that we have seen to challenge these factual determinations under any appropriate standard of appellate review. Nor should BP be allowed to. Fact-finding is the very heart of the trial court enterprise and the doctrine of judicial estoppel applies strictly when parties seek strategic gain by repudiating their factual representations to a trial court that relied upon those representations in awarding them relief.

The Supreme Court's opinion in *New Hampshire v. Maine*, 532 U.S. 742 (2001), is highly instructive. In a boundary dispute between two States, the Court held the State of New Hampshire to earlier factual assertions over how the "middle" of a river should be measured, and denied the State an attempt to seek an

40-43 [Rec. Doc. 7945].

inconsistent but preferable interpretation subsequently. *Id.* at 755. *See also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 821 (1999) (describing a purely factual representation, in the context of judicial estoppel, as "the light was red/green," or "I can/cannot raise my arm above my head"); *In re Superior Crewboats, Inc.*, 374 F.3d 330, 334-35 (5th Cir. 2004) (omission of personal injury claim from bankruptcy proceeding barred party from later filing suit on personal injury claim).[46]

The District Court properly invoked this Court's judicial estoppel cases to protect the integrity of the factual representations made to that Court:[47] "[J]udicial estoppel is an equitable doctrine that prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *In Re Paige*, 610 F. 3d 865, 876 (5th Cir. 2010).[48] Moreover, judicial estoppel runs to the representations to the District

---

[46] There are many reported cases in which litigants are bound by the evidentiary record that they put before the court. This seems to most commonly occur in the bankruptcy context. In the typical case, a party purports to declare all his or her assets, fails to declare a potential tort or civil rights claim, then later files suit seeking benefits for this claim. Thus, in *In re Superior Crew Boats, Inc.*, 374 F.3d 330 (5th Cir. 2004), Judge Edith Jones found that judicial estoppel prohibited a debtor from raising a personal injury claim where he had previously failed to disclose that claim to the bankruptcy court. *Id.* at 333 (describing the estopped party as attempting to "have their cake and eat it too").

[47] The District Court made specific findings on each of the three requirements for judicial estoppel: (1) that BP's new position is clearly inconsistent with its oft-repeated previous one on how the Settlement determines causation; (2) that the District Court accepted this previous position in making a number of its orders, including its final settlement approval determination; and (3) that BP's change in position was not inadvertent. [Rec. Doc. 12055 at 17-18]

[48] As the District Court noted, the Fifth Circuit recognizes three requirements for judicial estoppel: (1) the current position is clearly inconsistent with the previous one; (2) the court must

- 46 -

Court of the facts underlying the propriety of Rule 23 class certification. Judicial estoppel has been invoked to preclude a party from altering its previous positions on a question pertinent to class certification.

## CONCLUSION

Based upon the foregoing, BP's "Renewed Motion For An Injunction" is without procedural, factual or legal basis and should be denied.

Dated: January 8, 2014                    Respectfully submitted,

Stephen J. Herman                         James Parkerson Roy
Herman, Herman & Katz LLC                 Domengeaux, Wright, Roy, & Edwards LLC
820 O'Keefe Avenue                        556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113              Lafayette, Louisiana 70501
Telephone: (504) 581-4892                 Telephone: (337) 233-3033

                                          Samuel Issacharoff
                                          40 Washington Square South, 411J
                                          New York, NY 10012
                                          Telephone: (212) 998-6580

*Counsel for Plaintiffs-Appellees*

---

have accepted the previous position; and (3) the change in position must not have been inadvertent. *In re Paige, supra. See also Reed v City of Arlington*, 650 F. 3d 571, 574 (5th Circ. 2011) (en banc). "Because judicial estoppel is an equitable doctrine, and the decision whether to invoke it within the Court's discretion, we review for abuse of discretion." *Browning Mfg. v Mims (In re Coastal Plains, Inc.)* 179 F. 3d 197, 204-05 (5th Circ. 1999); *In re Flugence*, 2013 WL 6244758 (5th Cir. 11/22/13).

## CERTIFICATE OF SERVICE

I certify that on January 8, 2014, an electronic copy of the foregoing "Opposition of Plaintiffs-Appellees to BP's Renewed Motion for an Injunction," in Appeal No. 13-30315, consolidated with Nos. 13-30329, 13-31220, was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. I further certify that service will be accomplished by the appellate CM/ECF system:

Respectfully submitted,
/s/ Stephen J. Herman and James Parkerson Roy
*Counsel for Plaintiffs-Appellees*

# EXHIBIT A

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | MDL NO. 2179 |
| | | SECTION J |
| | * * * | HONORABLE CARL J. BARBIER |
| | * * * | MAGISTRATE JUDGE SHUSHAN |
| | * | |

### DECLARATION OF JOHN S. CREEVY

I, John S. Creevy, respectfully declare, under penalty of perjury, that I have personal knowledge as to the following:

1. I am licensed to practice law in the State of Louisiana, the United States District Court for the Eastern District of Louisiana and the United States Fifth Circuit Court of Appeals. I am over the age of 18 and, if called, competent to testify to the facts set forth herein.

2. I am an attorney at the law firm of Herman, Herman & Katz, LLC, working on behalf of Class Counsel for the Economic & Property Damages Settlement Class. In connection with my work with Class Counsel, I have reviewed and become familiar with the Economic & Property Damages Settlement, as amended, in the above captioned case. I have reviewed numerous claims awards made by the Court-Supervised Settlement Program (CSSP) pursuant to that Settlement, the briefing of appeals of claims awards by BP and Claimants, and related claims files available through the Settlement Program portal.

3. The document attached to this Declaration as Appendix 1 was created by me following review of the November 7, 2013, Declaration of Allison B. Rumsey [Doc 11819-2] and the Exhibit A attached to that declaration identifying certain business economic loss claims filed with the CSSP.[1] I have reviewed the documents submitted to the CSSP in connection with the 64 claims identified by Ms. Rumsey in her declaration. In particular, I have reviewed the memoranda and documents submitted by BP and by claimants in support of positions on appeal and any appeal decisions with the stated reasoning provided by the Appeal Panel.

4. I have identified at least 17 claims (listed on Appendix 1) for which the Claimant has provided evidence or argument contradicting the statements contained in Ms. Rumsey's Declaration that the 64 listed claimants did not suffer a loss related to the *Deepwater Horizon* oil spill. To the extent that Appendix 1 contains any quotations, I have personally confirmed that these quotations are as found in the claims file.

5. I have identified another 32 claims listed in Ms. Rumsey's Declaration for which the claimant argued for and/or relied upon the causation presumptions and/or objective financial causation tests found in the Settlement Agreement (generally Exhibit 4B) in opposition to BP's appeal of the claim award. An additional 6 claims have not yet proceeded to the point of filing of memoranda.

6. Of the 41 claims listed in Ms. Rumsey's Declaration which have resulted in an Appeal Panel decision in favor the Claimant, I have identified in the record only 14 claims for which BP sought discretionary review of the appeal decision by the Court.

---

[1] See RUMSEY DECLARATION (Nov. 7, 2013) [Doc 11819-2], pp.6-18.

7. Although the Claimants' identifying information do not appear on the Appendix to this declaration, in order to preserve the confidentiality pursuant to outstanding orders of the Court, I can provide the identifying information if requested to do so by the Court.

8. Of the 64 claims listed by Ms. Rumsey in her declaration, I have identified from the Settlement Program records four claimants who appear to have been paid in aggregate over $1,500,000 for oil-spill-related business economic losses by the Gulf Coast Claims Facility (Claim Nos. XXX23, XXX51, XX20 and XXX62).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th Day of December, 2013 in New Orleans, Louisiana.

John S. Creevy

**APPENDIX 1**

## 17 SAMPLES FROM BP's LIST OF 64 ALLEGED "NO CAUSATION" CLAIMS

| | What BP Represented To The Court: | What BP Failed To Disclose To The Court: |
|---|---|---|
| 1. | Claim No. XXX08:  . . . *Claimant had no injury due to the Spill*. Claimant's decline in revenue in late 2010 was caused by this water damage that forced its office to close. . . . | Claimant further addresses BP's alternative causation argument by explaining that it actually had 2 locations and that following the closure of one office, all patients were routed to the other office (6.8 miles away).  Thus, *Claimant contends it was not completely shut down* and continued to generate revenue during the late 2010 months.   Doc. Id. XXXX148   **Appeal Panel:** On 6/3/13, found for Claimant and noted that, *"The Claimant's business was not totally shut down* for unrelated causes. . . ."  Doc. ID XXXX5778 |
| 2. | Claim No. XXXX20:  . . . In November 2010, Claimant's tugboat—its only source of revenue—was not operating because the tugboat was undergoing major repairs unrelated to the Spill. . . . *Claimant did not incur any injury due to the Spill* or for any other reason. . . . | On 6/27/13, the Appeal Panel found in favor of Claimant and noted that ". . . *BP's argument concerning vessel repairs finds no support in the record* or the Settlement Agreement."  Doc. ID XXXX1876 |
| 3. | Claim No. XXX65: Claimant is a Zone D nursing home facility in Central Louisiana. . . . Almost a full year before the Spill, Claimant shut down its facility and transferred its license to operate the business. Yet, the Settlement Program engaged in the fiction that the absence of revenue in 2010, after Claimant had closed and transferred its license, was an injury due to the Spill. | Claimant's Final Proposal admits that at the facility in question, it transferred its operating license on May 31, 2009.  Nonetheless, Claimant argues that although it shut down its "larger line of service", *it continued to operate another line of service at that same location, i.e., it still earned revenues at said location*. (with sufficient revenue in 2011 to pass the V-shaped Pattern Revenue Test) Doc. ID XXXX3226 |

| | **What BP Represented To The Court:** | **What BP Failed To Disclose To The Court:** |
|---|---|---|
| 4. | Claim No. XXX51: Claimant is a hotel in Mississippi. . . . Claimant experienced a fire in mid-September 2010 that caused the hotel to remain closed from October 2010 until the Spring of 2011. Claimant recorded no revenue during those months. Claimant's Compensation Period included October 2010. The Settlement Program created the fiction that the absence of revenue in October 2010 was a loss resulting from the Spill, when in fact it was due to the fact that the fire caused the business to shut down. | Claimant countered that it received insurance proceeds that "replaced" the otherwise lost proceeds during the periods the hotel was closed. Doc. ID XXXX763 <br><br> On 6/27/13, the Appeal Panel found in favor of Claimant, noting that Claimant fully accounted for its business interruption insurance income in its financial statements and that "...*Claimant voluntarily recalculated its monthly profit and loss statements in its final proposal to apply the insurance proceeds when they were earned rather than when they were received which reduced the claim by $52,877.57 in BP's favor. Nonetheless, BP still contends that Claimant is entitled to an award of $0*. . ." Doc. ID XXXX5745 |
| 5. | Claim No. XXX08: . . . Claimant's decrease of profit in 2010 was directly attributable to a reduction, which took effect prior to the Spill, in rates paid by third-party payors (e.g. government programs and private insurers). | Claimant contends that "*BP fails to consider that all health care businesses' financial performance tracks the general economy and harm to the economy results in harm to all health care business*. Rates are lowered either because of loss of tax revenue to governmental payors, *patients and their families delay treatment, and private insurers drop rates because they lose enrolled members*." Doc. ID XXXX119. <br><br> On 6/28/13, a unanimous three member Appeal Panel found in favor of claimant stating "BP's argument that the claimant may have had some decreased reimbursement rates does not provide justification for not implementing the financial process set forth in the Settlement Agreement and confirmed by the District Court." Doc. ID XXXX4014 |
| 6. | Claim No. XXX00: Claimant is a non-profit in Florida that provides counseling for at risk youth and their families. Claimant's economic performance in 2010 changed *not as a result of an injury due to the Spill*—or indeed any injury at all—but rather due to an elective change in the matter in which Claimant receives funding. . . . | Claimant responded that, "While _____ did change the structure of its contract to receive State Funding, this change actually saved _____ more in expenses than it cost in revenue. *If _____ had not done this change, the losses in 2010 would have been even greater than they were for 2010*." Doc. ID XXXX366 |

| | What BP Represented To The Court: | What BP Failed To Disclose To The Court: |
|---|---|---|
| 7. | Claim No. XXXX41: . . . Claimant's financial documentation demonstrates that it did not engage in farming operations in either 2009 or 2010. . . . *Claimant could not have experienced an injury due to the Spill*—or indeed any injury regardless of cause—as Claimant opted not to plant crops in either 2009 or 2010. | Claimant responds that *despite BP's assertion that it ceased farming activities in 2009 and 2010, Claimant planted wheat in the fall of 2010. Claimant also earned revenue from the rental of his farm equipment in 2009* because the land he leased was not available to Claimant that year. Doc. ID XXXX7639 |
| 8. | Claim No. XXX27: Claimant operates a car dealership in Louisiana . . . . General Motors eliminated the Pontiac brand of automobiles, which Claimant sold, prior to Claimant's Compensation Period. Accordingly, Claimant's losses related to the elimination of the Pontiac brand were *entirely unrelated to the Spill*. . . . | GM announced the elimination of the Pontiac brand on April 27, 2009. For the period of June-Dec 09 the *Claimant sold its remaining inventory of Pontiac vehicles.* The claimant received a wind down letter from GM on June 1, 2009 stating that it would have to close by October 31, 2010. On May 27, 2010 the *Claimant signed a reinstatement agreement with GM. From the June 1, 2009 through the date of the reinstatement the claimant was a Buick/GMC dealer selling and servicing new and used cars. The claimant was a Buick/GMC dealer throughout the entire process without any change in business model.* Doc. XXXX6836 |
| 9. | Claim No. XXX60: Claimant is a Zone C real estate rental company which, prior to the Spill, earned revenue from leasing two properties to Saturn car dealerships. . . . . Claimant's only major sources of income, the Saturn dealership leases, dried up prior to the Spill because those dealerships went out of business in 2009. In 2010, the year of the Spill, Claimant did not earn any revenue because it had, prior to the Spill, lost its tenants. *Claimant did not incur an injury due to the Spill.* | Claimant's response: ". . . It is correct that the tenants stopped paying rent the end of 2009. However, *but for the spill and the devastating economic effects of the spill, the properties may well have been leased during 2010.* To suggest that the only way the Claimant could have suffered a loss is from not being paid anticipated rents from the same tenant in past years imposes an unsupportable condition on making a successful claim that does not exist in the Agreement, and which defies logic. *Claimant certainly expected to earn profits in 2010, and may have been successful in doing so but for the spill.*" Doc. ID XXXX972 |

| | **What BP Represented To The Court:** | **What BP Failed To Disclose To The Court:** |
|---|---|---|
| 10. | Claim No. XXX58: Claimant is a Zone B catering service and restaurant located in Louisiana. . . . Among other services, Claimant provides catering to emergency response clean-up personnel, particularly after hurricanes. Claimant's revenue spiked in December 2007 as well as September/October 2008 due to Hurricanes Katrina and Gustav. . . . | Claimant counters that it handles mass catering events for all of the restaurant group's special occasions, and not merely just hurricanes. Such mass catering includes fundraisers, weddings, receptions, and festivals. Though Claimant benefitted from two large catering jobs related to hurricanes, this does not evidence Claimant's "line of business" as BP suggests. Doc. ID XXXX7056 |
| 11. | Claim No. XXX48: Claimant, a Zone B emergency room physician's group operating in Louisiana, entered into a contractual relationship with a hospital pursuant to which it received certain subsidies until its patient volume or billings increased. . . . The lower subsidy in 2010 was not the result of an injury due to the Spill, but, to the contrary, the elimination of an agreed-to subsidy when Claimant's business expanded. . . . | *Claimant argues that the subsidy in question is hopelessly intertwined with all other revenue.* "If you see a decrease in this account, you can bet the farm that there will be a corresponding increase in revenues elsewhere in the P&Ls. Which account will go up in that case would take a much more complicated and lengthy explanation, but it will happen by necessity. There is no substantive difference between this account and the contractual adjustments on hospital P&Ls. The Subsidy revenue line is for reporting just one of several different types of revenue earned under the same contract, and it is directly and integrally related to those other revenue accounts." Doc. ID XXXX4748 |
| 12. | Claim No. XXXX25: Claimant is a Zone C dentist office located in Florida. . . . *Claimant did not incur an injury due to the Spill.* Rather, Claimant's revenue declined because of the departure of one of Claimant's dentists prior to the Spill. | Claimant points out that: "BP is correct that _____ left the practice during 2009 and that Claimant removed him from the Annual Report as a 'managing member/manager.' However, *the attached Buyout Agreement and Promissory Note proves that _____ left effective the 2nd day of February, 2009. Any income attributed to _____ would not have been recorded in the applicable 2009 'Only Benchmark Months' of June through October*. Therefore, the variable profits being compared from the relevant 2009 'Only Benchmark Period' would be comparable to the 2010 variable profits in the same months." Doc. ID XXXX1590 |

| | What BP Represented To The Court: | What BP Failed To Disclose To The Court: |
|---|---|---|
| 13. | Claim No. XXX40: Claimant is a Zone C cancer diagnosis and treatment center located in Alabama. . . . Claimant experienced a one-time lag in processing its insurance reimbursements causing spikes in revenue during the Benchmark Period—an event that had nothing to do with the Spill and yet inflated Claimant's award. . . . | Claimant argues that *"after the oil spill and the ensuing lost jobs and lost insurance benefits the numbers of patients unable to pay increased dramatically, although the incidence of cancer occurring in the general population remained consistent."* Doc. ID XXXX6111 |
| 14. | Claim No. XXX17: Claimant is a Zone C residential building construction company. *Claimant did not incur an injury due to the Spill.* Rather, Claimant's business was in a free fall prior to the Spill. . . . | *Claimant addressed the timing of revenues and ongoing expenses of the claimant to show that claimant remained in operation during the class period.* Doc. ID  XXXX5129 <br>**Appeal Panel:** Panel ruled for Claimant on 7/29/13. "The record supports the Claim Administrator's award which is affirmed." Doc ID XXXX4012 |
| 15. | Claim No. XXX33: . . . *Claimant's loss was not a result of the Spill but appears to be a result of the fact that Claimant was not actually in business.* . . . | **Appeal Panel:** *". . . The claimant addressed the issue raised by BP regarding whether this company was a valid business entity entitled to compensation under the settlement agreement. It provided a copy of a valid business license. It presented copies of it's corporate tax returns and P and Ls. It provided a legitimate explanation of some of the nuances with it's financial statements. . . . Additionally, the financial calculations were appropriate and consistent. There is no improper anomaly as asserted by BP. . . . "* Doc. ID XXXX1355 |
| 16. | Claim No. XXX44: Claimant is a television broadcasting studio located in Zone A. . . . *Claimant did not incur an injury due to the Spill.* . . . The decline in relative revenue in 2010 was not due to the Spill, but rather the absence of revenue-generating elections for the studio. | Claimant argues that the political advertising in 2010 actually exceeded that in 2009. Political advertising is only one of over 29 separate revenue line items and that political ads occur throughout the benchmark and compensation periods. Doc. ID XXXX680 |

| | What BP Represented To The Court: | What BP Failed To Disclose To The Court: |
|---|---|---|
| 17. | Claim No. XXX73: Claimant, a commercial leasing company located in Florida (Zone A), . . . *Claimant's loss was not due to the Spill*. This award was driven by the inclusion of commercial rental revenues in the Benchmark Period for a space that ceased generating revenue in September 2009, either because the lease for the property was cancelled or it ended and was not renewed. This space was not leased again in 2010. | Claimant argues that, **"Claimant specifically denies BP's assertion and actually did expect to earn a profit on Space 107 in 2010, but could not because of the Spill."** Doc. ID XXXX852 |